**RECORD NO. 22-7113**

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

𝕴𝖓 𝕿𝖍𝖊

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

𝕱𝖔𝖗 𝕿𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## STACY SCOTT-MCKINNEY, M.D.,

*Plaintiff - Appellant,*

**v.**

## CHILDREN'S NATIONAL MEDICAL CENTER, also known as CHILDREN'S NATIONAL HEALTH SYSTEM,

*Defendant - Appellee.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————

### JOINT APPENDIX

————————

Eric L. Siegel
KALBIAN HAGERTY LLP
888 17th Street, NW, Suite 1200
Washington, DC  20006
(202) 223-5600

Kraig Long
Jeffrey T. Johnson
NELSON MULLINS RILEY
  & SCARBOROUGH LLP
100 South Charles Street, Suite 1600
Baltimore, Maryland  21201
(443) 392-9460

*Counsel for Appellant*

*Counsel for Appellee*

**THE LEX GROUP**DC ♦ 1050 Connecticut Avenue, N.W. ♦ Suite 500, #5190 ♦ Washington, D.C.  20036
(202) 955-0001 ♦ (800) 856-4419 ♦ www.thelexgroup.com

# <u>TABLE OF CONTENTS</u>

<u>Appendix Page</u>

Docket Entries................................................................................... 1

Plaintiff's Post-Trial Brief on Equitable Relief
    filed March 29, 2022........................................................... 36

Defendant's Post-Trial Brief on Economic Damages and
Opposition to Plaintiff's Motion for Injunctive Relief
    filed April 12, 2022............................................................. 62

Plaintiff's Post-Trial Reply Brief Seeking Injunctive Relief,
With Exhibit,
    filed April 19, 2022............................................................. 84

    <u>Exhibit</u>:

    1.    Declaration of Plaintiff Stacy Scott-McKinney, M.D.
            dated April 19, 2022................................................ 95

Transcript of Economic Damages Hearing before
The Honorable Trevor N. McFadden
    on May 2, 2022 ................................................................... 102

    <u>Testimony of Stacy Scott-McKinney, M.D.</u>:

    Direct Examination by Mr. Siegel ............................................ 126
    Cross Examination by Mr. Johnson........................................... 164
    Redirect Examination by Mr. Siegel.......................................... 215

Transcript of Economic Damages Hearing before
The Honorable Trevor N. McFadden
    on May 2, 2022, continued:

<u>Testimony of Mark Janowiak</u>:

Direct Examination by Mr. Johnson............................................228
Examination by the Court ..........................................................231
Examination by the Court ..........................................................251
Direct Examination by Mr. Johnson............................................253
Cross Examination by Mr. Siegel ...............................................259

<u>Testimony of Stacy Scott-McKinney, M.D.</u>:

Direct Examination by Mr. Siegel ...............................................272
Cross Examination by Mr. Johnson..............................................274

<u>Plaintiff's Exhibits</u>:

1.    Amended & Restated Physician Employment Agreement,
      With Exhibits,
          dated January 1, 2010 ................................................293

      <u>Exhibits</u>:

      A.    Job Description for Physician ...................................309

      B.    Description of Benefits.............................................311

      C.    Physician Compensation Program ...........................312

13.   Journal of Hours at Laurel Office 2017
          undated.......................................................................322

97.   Children's Pediatricians and Associates, LLC's
      Revenue Sheets 2017-2020
          undated.......................................................................359

<u>Plaintiff's Exhibits</u>, continued:

107. Fiscal Year 2019 Annual Physician Compensation
Reconciliation Report, College Park - Laurel Practice
dated August 12, 2019 .............................................. 363

110. Fiscal Year 2018 Annual Physician Compensation
Reconciliation Report, College Park - Laurel Practice
dated August 16, 2018 .............................................. 364

119. Fiscal Year 2020 Annual Physician Compensation
Reconciliation Report, College Park - Laurel Practice
dated October 21, 2020 .............................................. 365

162. Orthopedic Patient Notes
dated June 13, 2017 .............................................. 366

163. Orthopedic Patient Notes
dated September 4, 2018 .............................................. 367

164. Orthopedic Patient Notes
dated March 5, 2019 .............................................. 369

166. Note from David Levin, M.D.
Re: Limiting Computer Work Hours
dated August 20, 2019 .............................................. 371

168. Note from David Levin, M.D.
Re: Limiting Computer Work Hours
dated November 19, 2019 .............................................. 372

169. Orthopedic Patient Notes
dated March 31, 2020 .............................................. 373

170. Orthopedic Patient Notes
dated May 12, 2020 .............................................. 375

<u>Plaintiff's Exhibits</u>, continued:

175.  Orthopedic Patient Notes
        dated November 24, 2020 ..........................................377

192.  Fiscal Year 2021 Annual Physician Compensation
      Reconciliation Report, College Park - Laurel Practice
        dated September 14, 2021..........................................379

193.  Children's National Pediatricians and Associates, LLC
      CP Laurel, Fiscal Year 2021 Actuals
        dated July 7, 2021......................................................380

194.  Fiscal Year 2020 Annual Physician Compensation
      Reconciliation Report, College Park - Laurel Practice
        undated......................................................................381

195.  Fiscal Year 2021 Annual Physician Compensation
      Reconciliation Report, College Park - Laurel Practice
        undated......................................................................382

196.  Backpay and Assumptions by Plaintiff
        undated......................................................................383

197.  The Orthopaedic Center, P.A.'s Doctors' Notes
      Re:  Carpel Tunnel
        various dates .............................................................391

198.  Social Security Administration's Retirement and
      Benefits Planner
        undated......................................................................401

199.  Declaration of Stacey-Scott McKinney, M.D.
        dated April 19, 2022..................................................403

200.  The Orthopaedic Center, P.A.'s Medical Notes
      Re:  Return Office Visit
        dated March 27, 2019................................................410

Defendant's Exhibits:

173. The Orthopaedic Center, P.A.'s Doctors' Notes
        dated August 11, 2020 ............................................... 413

174. Effective Accommodation Opinion Supplemental Report for
     Stacy Scott-McKinney by Jody Malcolm and Dana Blair
        dated January 25, 2022 ............................................. 415

175. Email from Eric L. Siegel to Kraig Long and Jeffrey Johnson
     Re: Scott-McKinney v. CNMC
        dated April 25, 2022 ................................................. 427

192A. Fiscal Year 2021 Annual Physician Compensation
      Reconciliation Report, College Park - Laurel Practice
        dated September 14, 2021 ......................................... 428

195A. Fiscal Year 2021 Annual Physician Compensation
      Reconciliation Report, College Park - Laurel Practice
        undated ...................................................................... 429

Plaintiff's Closing Brief for May 2, 2022 Evidentiary Hearing,
With Exhibits,
        filed May 16, 2022 ....................................................... 430

Exhibits:

B. Transcript Excerpt of Deposition of David Levin, M.D.
        on January 20, 2022 .................................................. 463

C. Declaration of Eric L. Siegel
        dated September 7, 2021 ............................................ 476

D. Email from Eric L. Siegel to Jeffrey Johnson and Kraig Long
   Re: Supplemental Production
        dated September 9, 2021 ............................................ 498

Defendant's Closing Brief on Front and Back Pay Damages,
With Exhibit,
    filed May 16, 2022 ........................................................................ 501

    <u>Exhibit</u>:

    B.    Transcript Excerpt of Deposition of David Levin, M.D.
        on January 20, 2022 ................................................. 525

Memorandum Opinion of
The Honorable Trevor N. McFadden
Re:  Granting in Part and Denying in Part Plaintiff's Motion for
Injunctive Relief
    filed July 5, 2022 ........................................................................ 530

Order of
The Honorable Trevor N. McFadden
Re:  Granting in Part and Denying in Part Plaintiff's Motion for
Injunctive Relief
    filed July 5, 2022 ........................................................................ 545

APPEAL,CLOSED,JURY,MEDIATION,TYPE−H

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:19−cv−02980−TNM</u>

| | |
|---|---|
| SCOTT−MCKINNEY, M.D. v. CHILDREN'S NATIONAL MEDICAL CENTER | Date Filed: 10/03/2019 |
| | Date Terminated: 07/05/2022 |
| Assigned to: Judge Trevor N. McFadden | Jury Demand: Plaintiff |
| Demand: $300,000 | Nature of Suit: 442 Civil Rights: Jobs |
| Cause: 28:451 Employment Discrimination | Jurisdiction: Diversity |

**<u>Plaintiff</u>**

**STACY SCOTT−MCKINNEY, M.D.**          represented by  **Spencer D. O'Dwyer**
KALBIAN HAGERTY LLP
888 17th St, NW
Washington, DC 20006
202−223−5600
Fax: 202−223−6625
*TERMINATED: 08/20/2020*

**Eric Lee Siegel**
KALBIAN HAGERTY LLP
888 17th Street, N.W.
Suite 1200
Washington, DC 20006
202−223−5600
Email: <u>esiegel@kalbianhagerty.com</u>
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**CHILDREN'S NATIONAL MEDICAL CENTER**          represented by  **Jeffrey Thomas Johnson**
*also known as*
CHILDREN'S NATIONAL HEALTH SYSTEM
NELSON MULLINS RILEY & SCARBOROUGH LLP
100 S. Charles Street
Suite 1600
Baltimore, MD 21201
443−392−9430
Fax: 443−392−9499
Email: <u>Jeffrey.Johnson@nelsonmullins.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kraig B. Long**
NELSON MULLINS RILEY & SCARBOROUGH LLP
100 South Charles Street

Suite 1600
Baltimore, MD 21201
443−392−9460
Email: kraig.Long@nelsonmullins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/03/2019 | 1 | | COMPLAINT against CHILDREN'S NATIONAL MEDICAL CENTER with Jury Demand ( Filing fee $ 400 receipt number 0090−6415956) filed by Stacy Scott−McKinney. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Siegel, Eric) (Attachment 1 replaced on 10/8/2019) (zeg). (Entered: 10/03/2019) |
| 10/08/2019 | 2 | | NOTICE of Appearance by Spencer D. O'Dwyer on behalf of Stacy Scott−McKinney (O'Dwyer, Spencer) (Entered: 10/08/2019) |
| 10/08/2019 | | | Case Assigned to Judge Trevor N. McFadden. (zeg) (Entered: 10/08/2019) |
| 10/08/2019 | 3 | | SUMMONS (1) Issued Electronically as to CHILDREN'S NATIONAL MEDICAL CENTER. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 10/08/2019) |
| 10/08/2019 | 4 | | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 10/8/2019. (lctnm3) (Entered: 10/08/2019) |
| 10/17/2019 | 5 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHILDREN'S NATIONAL MEDICAL CENTER served on 10/8/2019, answer due 10/29/2019 (O'Dwyer, Spencer) (Entered: 10/17/2019) |
| 10/29/2019 | 6 | | MOTION to Dismiss , or in the Alternative, Motion to Stay by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Text of Proposed Order)(Long, Kraig) (Attachment 2 replaced on 10/30/2019) (rj). Added MOTION to Stay on 11/1/2019 (ztth). (Entered: 10/29/2019) |
| 10/29/2019 | 7 | | ENTERED IN ERROR.....MOTION to Dismiss *or in the Alternative, Motion to Stay* by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Text of Proposed Order)(Long, Kraig); Modified on 10/30/2019 (ztth). (Entered: 10/29/2019) |
| 10/30/2019 | | | NOTICE OF CORRECTED DOCKET ENTRY: re 7 MOTION to Dismiss *or in the Alternative, Motion to Stay* was entered in error at the request of counsel. Said pleading is a duplicate of docket entry 6 . (ztth) (Entered: 10/30/2019) |
| 11/08/2019 | 8 | | AMENDED COMPLAINT against CHILDREN'S NATIONAL MEDICAL CENTER with Jury Demand filed by STACY SCOTT−MCKINNEY, M.D..(O'Dwyer, Spencer) (Entered: 11/08/2019) |
| 11/08/2019 | 9 | | Memorandum in opposition to re 6 MOTION to Dismiss , *or in the Alternative, Motion to Stay* MOTION to Stay filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(O'Dwyer, Spencer) (Entered: 11/08/2019) |

| | | |
|---|---|---|
| 11/13/2019 | | MINUTE ORDER. Upon consideration of the Defendant's 6 Motion to Dismiss, the Plaintiff's 8 Amended Complaint, and the Plaintiff's 9 Opposition, it is hereby ORDERED that the Defendant's 6 Motion to Dismiss is denied as moot. Plaintiff was entitled to amend her Complaint within 21 days after Defendant filed its 6 Motion to Dismiss. See Fed. R. Civ. P. 15(a)(1)(B). Accordingly, the Motion to Dismiss is now rendered moot. SO ORDERED. Signed by Judge Trevor N. McFadden on 11/13/2019. (lctnm3) (Entered: 11/13/2019) |
| 11/22/2019 | 10 | ANSWER to 8 Amended Complaint by CHILDREN'S NATIONAL MEDICAL CENTER.(Long, Kraig) (Entered: 11/22/2019) |
| 11/22/2019 | 11 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CHILDREN'S NATIONAL MEDICAL CENTER (Long, Kraig) (Entered: 11/22/2019) |
| 11/22/2019 | 12 | ORDER setting an Initial Scheduling Conference for December 19, 2019 at 10 a.m. in Courtroom 2, before Judge Trevor N. McFadden. See attached Order for additional details. Signed by Judge Trevor N. McFadden on 11/22/2019. (lctnm3) (Entered: 11/22/2019) |
| 11/25/2019 | | Set/Reset Hearings: Initial Scheduling Conference set for 12/19/2019 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (hmc) (Entered: 11/25/2019) |
| 12/09/2019 | 13 | MEET AND CONFER STATEMENT. (O'Dwyer, Spencer) (Entered: 12/09/2019) |
| 12/16/2019 | 14 | Consent MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeffrey T. Johnson, Filing fee $ 100, receipt number ADCDC−6648575. Fee Status: Fee Paid. by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Long, Kraig) (Entered: 12/16/2019) |
| 12/16/2019 | | ENTERED IN ERROR.....MINUTE ORDER granting 14 Motion for Leave to Appear Pro Hac Vice as to Jeffrey T. Johnson. **Counsel shall register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/16/2019. (lctnm3) Modified on 12/17/2019; refiled with correct link in entry. (ztnr) (Entered: 12/16/2019) |
| 12/16/2019 | | MINUTE ORDER granting 14 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Trevor N. McFadden on 12/16/2019. (ztnr) (Entered: 12/17/2019) |
| 12/17/2019 | 15 | NOTICE of Appearance by Jeffrey Thomas Johnson on behalf of CHILDREN'S NATIONAL MEDICAL CENTER (Johnson, Jeffrey) (Entered: 12/17/2019) |
| 12/19/2019 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Initial Scheduling Conference held on 12/19/2019. Discovery shall begin on 12/20/2019 and shall close on 6/1/2020. Amended Pleadings due by 2/1/2020. Plaintiff's designation of expert witnesses pursuant to Rule 26(a)(2) due by 2/14/2020. Defendant's designation of expert witnesses pursuant to Rule |

| | | |
|---|---|---|
| | | 26(a)(2) due by 3/13/2020. Rebuttal expert witnesses pursuant to Rule 26(a)(2) due by 3/27/2020. Each party may hold up to 5 depositions. Post−Discovery Status Conference set for 6/10/2020 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (Court Reporter Crystal Pilgrim.) (hmc) (Entered: 12/19/2019) |
| 02/13/2020 | 16 | Consent MOTION for Extension of Time to *Submit Plaintiff's Expert Witness Disclosure* by STACY SCOTT−MCKINNEY, M.D. (Attachments: # 1 Text of Proposed Order)(O'Dwyer, Spencer) (Entered: 02/13/2020) |
| 02/13/2020 | | MINUTE ORDER granting Plaintiff's 16 Consent Motion for Extension. The discovery schedule adopted at the Initial Scheduling Conference shall be modified as follows: Plaintiff's Expert Witness Disclosure shall be due February 28, 2020; Defendant's Expert Witness Disclosure shall be due March 30, 2020; and Rebuttal Expert Witness Disclosures shall be due April 13, 2020. These changes shall have no effect on the remainder of the schedule. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/13/2020. (lctnm3) (Entered: 02/13/2020) |
| 02/14/2020 | | Set/Reset Deadlines: Plaintiff's Expert Witness Disclosure due by 2/28/2020. Defendant's Expert Witness Disclosure due by 3/30/2020. Rebuttal Expert Witness Disclosures due by 4/13/2020. (hmc) (Entered: 02/14/2020) |
| 03/17/2020 | 17 | Consent MOTION for Extension of Time to File *Designation of Expert* by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Text of Proposed Order)(Long, Kraig) (Entered: 03/17/2020) |
| 03/17/2020 | | MINUTE ORDER granting Defendant's 17 Consent Motion for Extension. Defendant's expert designations shall be due April 13, 2020, and Plaintiff's rebuttal expert designations shall be due April 27, 2020. This Order shall have no effect on the remainder of the discovery schedule. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/17/2020. (lctnm3) (Entered: 03/17/2020) |
| 03/17/2020 | | Set/Reset Deadlines: Defendant's expert designations due by 4/13/2020. Plaintiff's rebuttal expert designations due by 4/27/2020. (hmc) (Entered: 03/17/2020) |
| 05/07/2020 | 18 | Joint MOTION for Extension of Time to Complete Discovery by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Text of Proposed Order)(Long, Kraig) (Entered: 05/07/2020) |
| 05/08/2020 | | MINUTE ORDER granting the parties' 18 Joint Motion for Extension. Discovery shall close on July 31, 2020 and the post−discovery status conference shall be held on August 10, 2020 at 10 a.m. in Courtroom 2 before Judge Trevor N. McFadden. Should quarantining requirements continue to complicate in−person depositions, the Court expects the parties to pursue alternative options, including remote depositions. Further extension requests will be disfavored. SO ORDERED. Signed by Judge Trevor N. McFadden on 5/8/2020. (lctnm3) (Entered: 05/08/2020) |
| 05/08/2020 | | Set/Reset Deadlines/Hearings: Discovery due by 7/31/2020. Post−Discovery Status Conference rescheduled to 8/10/2020 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (hmc) (Entered: 05/08/2020) |
| 07/29/2020 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER setting a teleconference for July 30, 2020, at 3:00 p.m., before Judge McFadden. Dial−in information will be emailed to counsel. SO ORDERED. Signed by Trevor N. McFadden on 7/29/2020. (lctnm3) (Entered: 07/29/2020) |
| 07/30/2020 | | Set/Reset Hearings: Telephone Conference set for 7/30/2020 at 3:00 PM before Judge Trevor N. McFadden. (hmc) (Entered: 07/30/2020) |
| 07/30/2020 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephone Conference held on 7/30/2020. Plaintiff's request to extend discovery, GRANTED. Discovery due by 8/7/2020. (Court Reporter: Crystal Pilgrim.) (hmc) (Entered: 07/30/2020) |
| 08/07/2020 | | MINUTE ORDER. The Post−Discovery Status Conference scheduled for August 10, 2020, at 10:00 a.m. will be conducted with counsel by telephone. Dial−in information has been emailed to counsel. SO ORDERED. Signed by Judge Trevor N. McFadden on 8/7/2020. (lctnm3) (Entered: 08/07/2020) |
| 08/10/2020 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephonic Status Conference held on 8/10/2020. Joint Status Report due by 12/1/2020. Case will be referred for mediation. Order forthcoming in the next few weeks. (Court Reporter: Crystal Pilgrim.) (hmc) (Entered: 08/10/2020) |
| 08/13/2020 | | MINUTE ORDER referring this matter to a Magistrate Judge for mediation pursuant to the joint request of the parties. The parties shall file a Joint Status Report on or before December 1, 2020, that addresses: (a) the status of the mediation and settlement discussions; (b) whether the parties believe they would benefit from additional time for mediation and/or settlement discussions; and (c) any other information of which the parties believe the Court should be aware. If the parties reach a settlement before December 1, 2020, then they shall promptly inform the Court. SO ORDERED. Signed by Judge Trevor N. McFadden on 8/13/2020. (lctnm3) (Entered: 08/13/2020) |
| 08/13/2020 | | CASE RANDOMLY REFERRED to Magistrate Judge Robin M. Meriweather for mediation. (zsb) (Entered: 08/14/2020) |
| 08/20/2020 | <u>19</u> | NOTICE OF WITHDRAWAL OF APPEARANCE as to STACY SCOTT−MCKINNEY, M.D.. Attorney Spencer D. O'Dwyer terminated. (O'Dwyer, Spencer) (Entered: 08/20/2020) |
| 10/06/2020 | | MINUTE ORDER REFERRING CASE to Mediation. In light of unforeseen circumstances, and in order to resolve this case as expeditiously as possible, the parties are hereby REFERRED to the Circuit Mediator's District Court Mediation Program for settlement purposes. The parties are directed to contact the Circuit Mediator to schedule mediation at their convenience. Signed by Magistrate Judge Robin M. Meriweather on 10/06/20. (lcaw) Modified on 10/7/2020 (kk). (Entered: 10/06/2020) |
| 11/25/2020 | <u>20</u> | Joint STATUS REPORT by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 11/25/2020) |
| 11/30/2020 | | MINUTE ORDER. Upon consideration of the parties' <u>20</u> Joint Status Report, it is hereby ORDERED that the parties shall submit another Joint Status Report on or before December 10, 2020. If the parties reach a settlement before that date, they shall promptly inform the Court. SO ORDERED. Signed by Judge |

| | | |
|---|---|---|
| | | Trevor N. McFadden on 11/30/2020. (lctnm3) (Entered: 11/30/2020) |
| 11/30/2020 | | Set/Reset Deadlines: Joint Status Report due by 12/10/2020. (hmc) (Entered: 11/30/2020) |
| 12/10/2020 | 21 | Joint STATUS REPORT by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 12/10/2020) |
| 12/11/2020 | | MINUTE ORDER. Upon consideration of the parties' 21 Joint Status Report, the parties shall adhere to the following briefing schedule. Defendant shall file its motion for summary judgment on or before January 15, 2021. Plaintiff shall file her combined opposition and cross−motion for summary judgment on or before February 19, 2021. Defendant shall file its combined reply and opposition on or before March 12, 2021. Plaintiff shall file her reply, if any, on or before March 26, 2021. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/11/2020. (lctnm3) (Entered: 12/11/2020) |
| 12/11/2020 | | Set/Reset Deadlines: Defendant's motion for summary judgment due by 1/15/2021. Plaintiff's opposition and cross−motion due by 2/19/2021. Defendant's reply and opposition due by 3/12/2021. Plaintiff's reply due by 3/26/2021. (hmc) (Entered: 12/11/2020) |
| 01/15/2021 | 22 | MOTION for Summary Judgment by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 List of Exhibits, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Text of Proposed Order)(Long, Kraig) (Entered: 01/15/2021) |
| 01/15/2021 | 23 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CHILDREN'S NATIONAL MEDICAL CENTER (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Memorandum in Support, # 2 Proposed Sealed Exhibits, # 3 Text of Proposed Order)(Long, Kraig) (Entered: 01/15/2021) |
| 01/18/2021 | | MINUTE ORDER granting Plaintiff's 23 Sealed Motion for Leave to File Document under Seal. The Clerk of the Court is directed to docket ECF No. 23−2 under seal. SO ORDERED. Signed by Judge Trevor N. McFadden on 1/18/2021. (lctnm3) (Entered: 01/18/2021) |
| 01/18/2021 | 24 | SEALED DOCUMENT filed by CHILDREN'S NATIONAL MEDICAL CENTER. re 22 MOTION for Summary Judgment filed by CHILDREN'S NATIONAL MEDICAL CENTER. (This document is SEALED and only available to authorized persons.)(zeg) (Entered: 01/19/2021) |
| 02/18/2021 | 25 | Memorandum in opposition to re 22 MOTION for Summary Judgment *and Cross−Motion for Summary Judgment* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts, # 3 Exhibit Index List, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, |

| | | | |
|---|---|---|---|
| | | | # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30)(Siegel, Eric) (Entered: 02/18/2021) |
| 02/18/2021 | 26 | | Cross MOTION for Summary Judgment by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts, # 3 Exhibit Index List, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30)(Siegel, Eric) (Entered: 02/18/2021) |
| 03/02/2021 | 27 | | NOTICE of Change of Address by Eric Lee Siegel (Siegel, Eric) (Entered: 03/02/2021) |
| 03/12/2021 | 28 | | Memorandum in opposition to re 26 Cross MOTION for Summary Judgment filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 List of Exhibits, # 4 Exhibit P, # 5 Exhibit Q, # 6 Exhibit R, # 7 Exhibit S, # 8 Exhibit T, # 9 Exhibit U, # 10 Exhibit V, # 11 Exhibit W, # 12 Exhibit X, # 13 Exhibit Y, # 14 Exhibit Z, # 15 Exhibit AA, # 16 Exhibit BB, # 17 Text of Proposed Order)(Long, Kraig) Modified docket event/text on 3/18/2021 (eg). (Entered: 03/12/2021) |
| 03/12/2021 | 29 | | REPLY to opposition to motion re 22 MOTION for Summary Judgment filed by CHILDREN'S NATIONAL MEDICAL CENTER. (See Docket Entry 28 to view document). (eg) (Entered: 03/18/2021) |
| 03/22/2021 | 30 | | REPLY to opposition to motion re 26 Cross MOTION for Summary Judgment *Plaintiff's Reply Memorandum in Support of her Cross−Motion for Summary Judgment* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit Updated and Revised Exhibit Index List, # 2 Exhibit 19, # 3 Exhibit 31, # 4 Exhibit 32, # 5 Exhibit 33)(Siegel, Eric) (Entered: 03/22/2021) |
| 05/11/2021 | | | MINUTE ORDER. Under the local rules, "[t]he first filing by or on behalf of a party shall have in the caption the name and full residence address of the party." LCvR 5.1(c)(1). Plaintiff's complaint and amended complaint list only a Post Office Box address for Plaintiff. But a "Post Office Box address does not constitute a full and correct residence address for purposes of the Local Rules." *Betz v. First Credit Servs., Inc.*, 139 F. Supp. 3d 451, 454 (D.D.C. 2015). It is hereby ORDERED that Plaintiff file a notice including her full residence address as required under the local rules by May 18, 2021. SO ORDERED. Signed by Judge Trevor N. McFadden on 5/11/2021. (lctnm3) (Entered: 05/11/2021) |
| 05/11/2021 | | | MINUTE ORDER. It is hereby ORDERED that the parties shall appear for a Motion Hearing re Defendant's 22 Motion for Summary Judgment and Plaintiff's 26 Cross−Motion for Summary Judgment on June 4, 2021, at 11 a.m. in Courtroom 2, before Judge Trevor N. McFadden. SO ORDERED. Signed by Judge Trevor N. McFadden on 5/11/2021. (lctnm3) (Entered: 05/11/2021) |
| 05/12/2021 | 31 | | NOTICE *of Plaintiff's Address pursuant to LCvR 5.1(c)(1)* by STACY SCOTT−MCKINNEY, M.D. (Siegel, Eric) (Entered: 05/12/2021) |

| | | |
|---|---|---|
| 05/12/2021 | | Set/Reset Hearings: Motion Hearing set for 6/4/2021 at 11:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (hmc) (Entered: 05/12/2021) |
| 06/04/2021 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Motion Hearing held on 6/4/2021 re 22 MOTION for Summary Judgment filed by CHILDREN'S NATIONAL MEDICAL CENTER, 26 Cross MOTION for Summary Judgment filed by STACY SCOTT−MCKINNEY, M.D. Held in abeyance. (Court Reporter: Crystal Pilgrim.) (hmc) (Entered: 06/04/2021) |
| 06/07/2021 | 32 | MEMORANDUM ORDER denying Defendant's 22 Motion for Summary Judgment and denying Plaintiff's 26 Cross−Motion for Summary Judgment. See attached Order for details. Signed by Judge Trevor N. McFadden on 6/7/2021. (lctnm3) (Entered: 06/07/2021) |
| 06/08/2021 | | Set/Reset Hearings: Telephone Status Conference scheduled for 6/29/2021 at 10:00 AM before Judge Trevor N. McFadden. (ztg) (Entered: 06/08/2021) |
| 06/29/2021 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephonic Status Conference held on 6/29/2021. Motions in Limine due by 1/5/2022, Oppositions due by 1/26/2022, Replies due by 2/9/2022. Joint Proposed Final Jury Instructions and Joint Proposed Voir Dire due by 2/18/2022. Joint Proposed Statement of the case, witness lists and exhibit lists due by 2/18/2022. Pretrial Conference set for 2/25/2022 at 10:00 AM in Courtroom 2 (In Person) before Judge Trevor N. McFadden. Jury Selection/Jury Trial set for 3/7/2022 at 9:00 AM in Courtroom 2 (In Person) before Judge Trevor N. McFadden. (Court Reporter: Crystal Pilgrim.) (hmc) (Entered: 06/29/2021) |
| 09/02/2021 | | MINUTE ORDER granting a limited reopening of discovery for the purposes of deposing Dr. Mills and Dr. Scott−McKinney, in response to the informal joint request of both parties. The depositions should be limited to investigating new facts post−dating the close of discovery. The Court declines now to set a cut−off date for facts that will be admissible at trial, but the proponent of any new evidence must be able to fully justify its late disclosure and show lack of prejudice to the opposing party. SO ORDERED. Signed by Judge Trevor N. McFadden on 9/2/2021. (lctnm3) (Entered: 09/02/2021) |
| 11/04/2021 | 33 | Consent MOTION for Discovery *to be Reopened for Two Additional Depositions* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Text of Proposed Order)(Long, Kraig) (Entered: 11/04/2021) |
| 11/05/2021 | | MINUTE ORDER granting Defendant's 33 Consent Motion for Discovery to be Reopened for Two Additional Depositions. The Court will grant a limited reopening of discovery for the purposes of deposing Alicia Charles and will reopen the deposition of Dr. David Levin to explore records produced since his prior deposition on July 7, 2020. SO ORDERED. Signed by Judge Trevor N. McFadden on 11/5/2021. (lctnm3) (Entered: 11/05/2021) |
| 01/05/2022 | 34 | MOTION in Limine *re Advice of Counsel Defense* by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Siegel, Eric) (Entered: 01/05/2022) |
| 01/05/2022 | 35 | MOTION for Leave to File *Amended Answer* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Johnson, Jeffrey) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/05/2022) |
| 01/05/2022 | 36 | | MOTION in Limine *re Excluding Expert Testimony re Damage Calculations and Legal Conclusions* by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Siegel, Eric) (Entered: 01/05/2022) |
| 01/05/2022 | 37 | | MOTION in Limine *re Excluding Evidence Contrary to Admission Against Interest on Disability element of proof* by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Siegel, Eric) (Entered: 01/05/2022) |
| 01/05/2022 | 38 | | MOTION in Limine *to Bar Plaintiff from Arguing that Defendants Provision of a Scribe has Any Relevance to Whether Defendant was Required to provide Plaintiff a Scribe as a Reasonable Accommodation* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 01/05/2022) |
| 01/05/2022 | 39 | | MOTION in Limine *to preclude Plaintiff from introducing evidence of, or seeking recovery for, punitive damages at trial* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 01/05/2022) |
| 01/05/2022 | 40 | | MOTION in Limine *to preclude Plaintiff from introducing evidence of, or seeking recovery for, physical injury or worsening of her medical conditions at trial* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 01/05/2022) |
| 01/05/2022 | 41 | | MOTION in Limine *to Exclude Expert Testimony of Jody Malcolm at Trial* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 01/05/2022) |
| 01/05/2022 | 42 | | MOTION in Limine *Bar Plaintiff from Introducing Evidence of the Use of Medical Scribes in Defendants Hospitals Emergency Department* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 01/05/2022) |
| 01/14/2022 | 43 | | Memorandum in opposition to re 35 MOTION for Leave to File *Amended Answer* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Siegel, Eric) (Entered: 01/14/2022) |
| 01/21/2022 | 44 | | REPLY to opposition to motion re 35 MOTION for Leave to File *Amended Answer* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A)(Long, Kraig) (Entered: 01/21/2022) |
| 01/25/2022 | 45 | | Joint STIPULATIONs by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) Modified docket event/text on 1/27/2022 (zeg). (Entered: 01/25/2022) |
| 01/26/2022 | 46 | | Memorandum in opposition to re 34 MOTION in Limine *re Advice of Counsel Defense* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Long, Kraig) (Entered: 01/26/2022) |

| 01/26/2022 | 47 | | Memorandum in opposition to re 36 MOTION in Limine *re Excluding Expert Testimony re Damage Calculations and Legal Conclusions* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Text of Proposed Order)(Long, Kraig) (Entered: 01/26/2022) |
| 01/26/2022 | 48 | | Memorandum in opposition to re 37 MOTION in Limine *re Excluding Evidence Contrary to Admission Against Interest on Disability element of proof* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Long, Kraig) (Entered: 01/26/2022) |
| 01/26/2022 | 49 | | Memorandum in opposition to re 38 MOTION in Limine *to Bar Plaintiff from Arguing that Defendants Provision of a Scribe has Any Relevance to Whether Defendant was Required to provide Plaintiff a Scribe as a Reasonable Accommodation* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 01/26/2022) |
| 01/26/2022 | 50 | | Memorandum in opposition to re 39 MOTION in Limine *to preclude Plaintiff from introducing evidence of, or seeking recovery for, punitive damages at trial* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 01/26/2022) |
| 01/26/2022 | 51 | | Memorandum in opposition to re 40 MOTION in Limine *to preclude Plaintiff from introducing evidence of, or seeking recovery for, physical injury or worsening of her medical conditions at trial* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 01/26/2022) |
| 01/26/2022 | 52 | | Memorandum in opposition to re 41 MOTION in Limine *to Exclude Expert Testimony of Jody Malcolm at Trial* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Siegel, Eric) (Entered: 01/26/2022) |
| 01/26/2022 | 53 | | Memorandum in opposition to re 42 MOTION in Limine *Bar Plaintiff from Introducing Evidence of the Use of Medical Scribes in Defendants Hospitals Emergency Department* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Siegel, Eric) (Entered: 01/26/2022) |
| 01/27/2022 | 54 | | ORDER granting the 35 Motion for Leave to File. The Clerk of Court is requested to docket ECF No. 35−2. See attached Order for details. Signed by Judge Trevor N. McFadden on 1/27/2022. (lctnm1) (Entered: 01/27/2022) |
| 01/27/2022 | 55 | | Amended ANSWER to Complaint with Jury Demand by CHILDREN'S NATIONAL MEDICAL CENTER.(zeg) (Entered: 01/28/2022) |
| 02/02/2022 | | | MINUTE ORDER. The joint proposed final jury instructions, joint proposed voir dire, joint proposed statement of the case, witness lists, and exhibit lists previously due on 2/18/2022, are now due by 2/16/2022. The Pretrial Conference previously set for 2/25/2022 is rescheduled to 2/18/2022 at 3:30 PM in Courtroom 2− In Person before Judge Trevor N. McFadden by Judge Trevor N. McFadden on 2/2/2022. (hmc) (Entered: 02/02/2022) |
| 02/07/2022 | 56 | | MOTION to Strike 53 Memorandum in Opposition, 52 Memorandum in Opposition *and Plaintiff's Amended Interrogatory Answers* by CHILDREN'S |

| | | |
|---|---|---|
| | | NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Text of Proposed Order)(Long, Kraig) (Entered: 02/07/2022) |
| 02/09/2022 | 57 | REPLY to opposition to motion re 34 MOTION in Limine *re Advice of Counsel Defense* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/09/2022) |
| 02/09/2022 | 58 | REPLY to opposition to motion re 36 MOTION in Limine *re Excluding Expert Testimony re Damage Calculations and Legal Conclusions* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/09/2022) |
| 02/09/2022 | 59 | REPLY to opposition to motion re 37 MOTION in Limine *re Excluding Evidence Contrary to Admission Against Interest on Disability element of proof* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/09/2022) |
| 02/09/2022 | 60 | Memorandum in opposition to re 56 MOTION to Strike 53 Memorandum in Opposition, 52 Memorandum in Opposition *and Plaintiff's Amended Interrogatory Answers* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Siegel, Eric) Modified docket event/text on 2/14/2022 (zeg). (Entered: 02/09/2022) |
| 02/09/2022 | 61 | REPLY to opposition to motion re 40 MOTION in Limine *to preclude Plaintiff from introducing evidence of, or seeking recovery for, physical injury or worsening of her medical conditions at trial* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 02/09/2022) |
| 02/09/2022 | 62 | REPLY to opposition to motion re 38 MOTION in Limine *to Bar Plaintiff from Arguing that Defendants Provision of a Scribe has Any Relevance to Whether Defendant was Required to provide Plaintiff a Scribe as a Reasonable Accommodation* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 02/09/2022) |
| 02/09/2022 | 63 | REPLY to opposition to motion re 39 MOTION in Limine *to preclude Plaintiff from introducing evidence of, or seeking recovery for, punitive damages at trial* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 02/09/2022) |
| 02/09/2022 | 64 | REPLY to opposition to motion re 41 MOTION in Limine *to Exclude Expert Testimony of Jody Malcolm at Trial* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 02/09/2022) |
| 02/09/2022 | 65 | REPLY to opposition to motion re 42 MOTION in Limine *Bar Plaintiff from Introducing Evidence of the Use of Medical Scribes in Defendants Hospitals Emergency Department* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Long, Kraig) (Entered: 02/09/2022) |
| 02/15/2022 | | MINUTE ORDER: Plaintiff previously filed a 34 Motion in Limine seeking to exclude from trial any argument or evidence related to an advice of counsel defense. The Defendant has since represented it will not assert any such defense. See ECF No. 46. Accordingly, the Plaintiffs motion is hereby DENIED as moot with regard to argument or evidence relating to the advice of |

| | | |
|---|---|---|
| | | counsel defense. The motion is HELD IN ABEYANCE insofar as it seeks to exclude specific witness testimony. Plaintiff may re−raise this portion of the motion during trial if necessary. And the motion is GRANTED insofar as it seeks to exclude evidence not previously disclosed in discovery. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/15/2022. (lctnm1) (Entered: 02/15/2022) |
| 02/16/2022 | 66 | PRETRIAL STATEMENT by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 2)(Siegel, Eric) (Entered: 02/16/2022) |
| 02/16/2022 | 67 | Proposed Jury Instructions by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/16/2022) |
| 02/16/2022 | 68 | Proposed Voir Dire by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/16/2022) |
| 02/18/2022 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Pretrial Conference held on 2/18/2022. Plaintiff's 36 Motion in Limine re Excluding Expert Testimony re Damage Calculations and Legal Conclusions, found as moot; Plaintiff's 37 Motion in Limine re Excluding Evidence Contrary to Admission Against Interest on Disability element of proof, granted in part and denied in part; Defendant's 38 Motion in Limine to Bar Plaintiff from Arguing that Defendants Provision of a Scribe has Any Relevance to Whether Defendant was Required to provide Plaintiff a Scribe as a Reasonable Accommodation, granted; Defendant's 39 Motion in Limine to preclude Plaintiff from introducing evidence of, or seeking recovery for, punitive damages at trial, denied; Defendant's 40 Motion in Limine to preclude Plaintiff from introducing evidence of, or seeking recovery for, physical injury or worsening of her medical conditions at trial, granted in part and denied in part; Defendant's 41 Motion in Limine to Exclude Expert Testimony of Jody Malcolm at Trial, granted; Defendant's 42 Motion in Limine to Bar Plaintiff from Introducing Evidence of the Use of Medical Scribes in Defendants Hospitals Emergency Department, denied; Defendant's 56 Motion to Strike, granted in part and denied in part. (Court Reporter: Lorraine Herman.) (hmc) (Entered: 02/22/2022) |
| 02/23/2022 | 69 | Joint STATUS REPORT *Re deposition of Expert Jody Malcolm* by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/23/2022) |
| 02/28/2022 | 70 | MOTION to Set Aside *Pretrial Rulings by Objections under LCvR 16.5(3)* by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 02/28/2022) |
| 02/28/2022 | | MINUTE ORDER: Upon consideration of the 69 Status Report, the parties are hereby granted leave to take the supplemental deposition of Witness Malcolm after trial of Plaintiff's claims. If necessary, an evidentiary hearing on the issue of damages will be set at a later date. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/28/2022. (lctnm1) (Entered: 02/28/2022) |
| 03/02/2022 | 71 | MOTION Take Judicial Notice of Code of Federal Regulation by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Text of Proposed Order)(Siegel, Eric) (Entered: 03/02/2022) |
| 03/03/2022 | | MINUTE ORDER denying the 70 Motion to Set Aside Pretrial Rulings. For the reasons stated at the motion hearing on February 18, 2022, the Court will |

adhere to its prior ruling. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/3/2022. (lctnm1) (Entered: 03/03/2022)

| 03/04/2022 | 72 | | Memorandum in opposition to re 71 MOTION Take Judicial Notice of Code of Federal Regulation filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) Modified docket event/text on 3/4/2022 (zeg). (Entered: 03/04/2022) |
| --- | --- | --- | --- |
| 03/04/2022 | 73 | | REPLY to opposition to motion re 71 MOTION Take Judicial Notice of Code of Federal Regulation filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 03/04/2022) |
| 03/07/2022 | | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Jury Selection/Jury Trial held on 3/7/2022. Plaintiff's 71 Motion for Court to Take Judicial Notice of Code of Federal Regulation, DENIED. Jury Selection began and concluded. Seven jurors selected and sworn. Jury Trial began and continued to 3/8/2022 at 9:30 AM in Courtroom 2− In Person before Judge Trevor N. McFadden. Plaintiff's Witness: Stacy Scott−McKinney, M.D. (testimony began and continued). (Court Reporter: Cathryn Jones.) (hmc) Modified on 3/14/2022 to include oral ruling of ECF 71(hmc). (Entered: 03/07/2022) |
| 03/08/2022 | | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Jury Trial resumed and held on 3/8/2022. Same jury of 7. Jury Trial continued to 3/9/2022 at 9:15 AM in Courtroom 2− In Person before Judge Trevor N. McFadden. Plaintiff's Witnesses: Stacy Scott−McKinney, M.D. (testimony resumed and concluded), Chaimika Mills, Ph.D., David Levin, M.D. (video testimony), Asiah Cauley. (Court Reporter: Lisa Bankins.) (hmc) (Entered: 03/08/2022) |
| 03/09/2022 | | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Jury Trial resumed and held on 3/9/2022. Same jury of 7. Jury Trial continued to 3/10/2022 at 9:00 AM in Courtroom 2− In Person before Judge Trevor N. McFadden. Defendant's oral motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, DENIED as to reasonable accommodation and GRANTED as to punitive damages. Plaintiff's Witnesses: Nasima Hossain, Philip Shin, deposition of Alexandra Freemire read by Sherri Langford, Curtis Robert, Alexandra Freemire, Alicia Charles, deposition of Rosemary Carr read by Sherri Langford, Cheryl Scott. Defendant's Witnesses: Dan Glaser, Mark Janowiak. (Court Reporter: Lisa Griffith.) (hmc) (Entered: 03/09/2022) |
| 03/09/2022 | 75 | | NOTICE OF FILING REDACTED DOCUMENT *De Bene Esse Deposition of David Levin, M.D. shown at trial* by STACY SCOTT−MCKINNEY, M.D. (Attachments: # 1 Exhibit Deposition Transcript)(Siegel, Eric) (Entered: 03/09/2022) |
| 03/10/2022 | 76 | | Proposed Jury Instructions by CHILDREN'S NATIONAL MEDICAL CENTER. (Johnson, Jeffrey) (Entered: 03/10/2022) |
| 03/10/2022 | | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Jury Trial resumed and concluded on 3/10/2022. Same jury of 7. Jury Deliberation began and continued to 3/14/2022 at 9:00 AM in Courtroom 2− In Person before Judge Trevor N. McFadden. Jury Note (1). (Court Reporter: Liz Saint−Loth.) (hmc) Modified on 3/10/2022 (hmc). (Entered: 03/10/2022) |

| 03/10/2022 | 77 | | Final Jury Instructions. (hmc) (Entered: 03/10/2022) |
| 03/10/2022 | 78 | | Jury Note. (hmc) (Entered: 03/10/2022) |
| 03/10/2022 | 79 | | **Signature Page of Foreperson** in Jury Note. (Access to the PDF Document is restricted pursuant to the E−Government Act. Access is limited to Counsel of Record and the Court.). (hmc) (Entered: 03/10/2022) |
| 03/14/2022 | 80 | | Exhibit List by STACY SCOTT−MCKINNEY, M.D.(hmc) (Entered: 03/14/2022) |
| 03/14/2022 | 81 | | Exhibit List by CHILDREN'S NATIONAL MEDICAL CENTER. (hmc) (Entered: 03/14/2022) |
| 03/14/2022 | 82 | | ATTORNEYS' ACKNOWLEDGMENT OF TRIAL EXHIBITS. (hmc) (Entered: 03/14/2022) |
| 03/14/2022 | | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Jury Deliberation held on 3/14/2022. Same jury of 7. Jury Deliberation resumed and concluded on 3/14/2022. Jury verdict for the Plaintiff. Jury panel of 7 discharged. Jury Note (1). (Court Reporter: Tim Miller.) (hmc) Modified on 3/14/2022 (hmc). (Entered: 03/14/2022) |
| 03/14/2022 | 83 | | Jury Note. (hmc) (Entered: 03/14/2022) |
| 03/14/2022 | 84 | | **Signature Page of Foreperson** in Jury Note. (Access to the PDF Document is restricted pursuant to the E−Government Act. Access is limited to Counsel of Record and the Court.). (zhmc) (Entered: 03/14/2022) |
| 03/14/2022 | 85 | | Verdict Form. (hmc) (Entered: 03/14/2022) |
| 03/14/2022 | 86 | | **Signature Page of Foreperson** in Jury Verdict. (Access to the PDF Document is restricted pursuant to the E−Government Act. Access is limited to Counsel of Record and the Court.). (zhmc) (Entered: 03/14/2022) |
| 03/14/2022 | 87 | | CLERK'S JUDGMENT in favor of Plaintiff. Signed by Deputy Clerk Michelle Chaclan on 3/14/2022. (hmc) (Entered: 03/14/2022) |
| 03/17/2022 | 88 | | Joint STATUS REPORT *per Court Order* by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 03/17/2022) |
| 03/25/2022 | 89 | | ORDER: Upon consideration of the 88 Joint Status Report, the parties shall appear for a one−day hearing on economic damages on May 2, 2022 at 10 A.M., in−person before Judge Trevor N. McFadden in Courtroom 2. See attached Order for briefing schedule. Signed by Judge Trevor N. McFadden on 3/25/2022. (lctnm1) (Entered: 03/25/2022) |
| 03/25/2022 | | | Set/Reset Deadlines/Hearings: Pre−hearing brief and motion for injunctive relief due by 3/29/2022. Opposition due by 4/12/2022. Reply due by 4/19/2022. Closing briefs due by 5/16/2022. Motion Hearing set for 5/2/2022 at 10:00 AM in Courtroom 2− In Person before Judge Trevor N. McFadden. |

| | | (hmc) (Entered: 03/25/2022) |
|---|---|---|
| 03/28/2022 | 90 | Consent MOTION for Extension of Time to *file Fee Petition per Scheduling Order ECF#89* by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Text of Proposed Order)(Siegel, Eric) (Entered: 03/28/2022) |
| 03/28/2022 | | MINUTE ORDER granting the 90 Consent Motion for Extension of Time. The Plaintiff's Fee and Cost Petition shall be due on or before May 23, 2022. All other dates set forth in the Court's 89 Scheduling Order remain in place. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/28/2022. (lctnm1) (Entered: 03/28/2022) |
| 03/29/2022 | | Set/Reset Deadlines: Plaintiff's Fee and Cost Petition due by 5/23/2022. (ztg) (Entered: 03/29/2022) |
| 03/29/2022 | 91 | Post−TRIAL BRIEF by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) Modified docket event/text on 4/1/2022 (zeg). (Entered: 03/29/2022) |
| 04/01/2022 | 92 | BILL OF COSTS by STACY SCOTT−MCKINNEY, M.D.. Objection to Bill of Costs due by 4/18/2022. (Siegel, Eric) (Entered: 04/01/2022) |
| 04/12/2022 | 93 | REPLY re 91 Memorandum *Defendant's Post−Trial Brief on Economic Damages and Opposition to Plaintiff's Motion for Injunctive Relief* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 04/12/2022) |
| 04/14/2022 | 94 | MOTION in Limine *To Exclude Expert Testimony by Jody Malcolm at the Evidentiary Hearing on Damages* by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 04/14/2022) |
| 04/16/2022 | 95 | Memorandum in opposition to re 94 MOTION in Limine *To Exclude Expert Testimony by Jody Malcolm at the Evidentiary Hearing on Damages* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Siegel, Eric) (Entered: 04/16/2022) |
| 04/19/2022 | 96 | REPLY to opposition to motion re 91 Memorandum *Seeking Permanent Injunctive Relief* filed by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit Declaration of Plaintiff)(Siegel, Eric) (Entered: 04/19/2022) |
| 04/21/2022 | 97 | SUPPLEMENTAL MEMORANDUM to re 94 MOTION in Limine *To Exclude Expert Testimony by Jody Malcolm at the Evidentiary Hearing on Damages Praecipe withdrawing Malcolm as witness* filed by STACY SCOTT−MCKINNEY, M.D.. (Siegel, Eric) (Entered: 04/21/2022) |
| 04/26/2022 | | MINUTE ORDER: Upon consideration of the 97 Supplemental Memorandum, Defendant's 94 Motion in Limine is denied as moot. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/26/2022. (lctnm1) (Entered: 04/26/2022) |
| 04/26/2022 | 98 | ENTERED IN ERROR.....NOTICE *of Plaintiff's Recent Disclosure of New Opinions Concerning Lost Wages that Plaintiff Seeks to Introduce at the Evidentiary Hearing on May 2, 2022* by CHILDREN'S NATIONAL MEDICAL CENTER (Attachments: # 1 Exhibit A, # 2 Exhibit A194, # 3 Exhibit A195, # 4 Exhibit A196)(Johnson, Jeffrey) Modified on 4/28/2022 (zeg). (Entered: 04/26/2022) |

| | | |
|---|---|---|
| 04/26/2022 | 99 | ENTERED IN ERROR.....NOTICE *Response to Defendant's Notice (ECF #98)* by STACY SCOTT−MCKINNEY, M.D. (Attachments: # 1 Exhibit A)(Siegel, Eric) Modified on 4/28/2022 (zeg). (Entered: 04/26/2022) |
| 04/28/2022 | | NOTICE OF ERROR regarding 99 Notice (Other), 98 Notice (Other),. The following error(s) need correction: Incorrect format (Letter)− correspondence is not permitted (LCvR 5.1(a)). Please refile. (zeg) (Entered: 04/28/2022) |
| 05/02/2022 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Economic Damages Hearing held on 5/2/2022. Defendant's motion to strike Plaintiff's exhibits 194, 195, 196, denied. Plaintiff's Fee and Cost Petition due by 5/31/2022. Award of front and back pay, held under advisement. Plaintiff's Witness: Stacy Scott−McKinney, M.D. Defendant's Witness: Mark Janowiak. (Court Reporter: Lorraine Herman.) (hmc) (Entered: 05/03/2022) |
| 05/02/2022 | 100 | Exhibit List by STACY SCOTT−MCKINNEY, M.D. (hmc) (Entered: 05/03/2022) |
| 05/02/2022 | 101 | Exhibit List by CHILDREN'S NATIONAL MEDICAL CENTER. (hmc) (Entered: 05/03/2022) |
| 05/03/2022 | 102 | TRANSCRIPT OF PROCEEDINGS before Judge Trevor N. McFadden held on 3−9−2022; Page Numbers: 1−323. Date of Issuance:5−3−2022. Court Reporter/Transcriber Lisa Griffith, Telephone number (202) 354−3247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced abo ve. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/24/2022. Redacted Transcript Deadline set for 6/3/2022. Release of Transcript Restriction set for 8/1/2022.(Griffith, Lisa) (Entered: 05/03/2022) |
| 05/16/2022 | 103 | MEMORANDUM by STACY SCOTT−MCKINNEY, M.D.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Siegel, Eric) (Entered: 05/16/2022) |
| 05/16/2022 | 104 | MEMORANDUM by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A, # 2 Errata B, # 3 Text of Proposed Order)(Johnson, Jeffrey) (Entered: 05/16/2022) |
| 05/24/2022 | 105 | Joint MOTION for Attorney Fees *To Set Aside Briefing Schedule on Plaintiff's Petition* by CHILDREN'S NATIONAL MEDICAL CENTER. (Long, Kraig) (Entered: 05/24/2022) |

| 05/24/2022 | | | MINUTE ORDER granting 105 Joint Motion to Set Aside Briefing Schedule on Plaintiff's Petition for Attorney's Fees and Costs. The briefing schedule on plaintiff's petition for attorney's fees and costs is vacated. SO ORDERED. Signed by Judge Trevor N. McFadden on 5/24/2022. (hmc) (Entered: 05/24/2022) |
|---|---|---|---|
| 06/12/2022 | 106 | | MOTION *for Injunctive Relief* by STACY SCOTT−MCKINNEY, M.D. re 96 Reply to opposition to Motion (Attachments: # 1 Exhibit)(Siegel, Eric) Modified docket event/text on 6/14/2022 (zeg). (Entered: 06/12/2022) |
| 06/15/2022 | 107 | | RESPONSE re 106 MOTION *To Plaintiff's Praecipe In Support* filed by CHILDREN'S NATIONAL MEDICAL CENTER. (Attachments: # 1 Exhibit A)(Johnson, Jeffrey) (Entered: 06/15/2022) |
| 06/15/2022 | | | NOTICE OF ERROR re 107 Response to Document; emailed to Jeffrey.Johnson@nelsonmullins.com, cc'd 11 associated attorneys — The PDF file you docketed contained errors: 1. **Please note the following for future filings; do not refile document**, 2. FYI: DO NOT REFILE. Attorney signature must match login/password in future fillings. (zeg, ) (Entered: 06/15/2022) |
| 07/05/2022 | 108 | | MEMORANDUM OPINION re: Plaintiff's 106 Motion for Injunctive Relief. Signed by Judge Trevor N. McFadden on 7/5/2022. (lctnm1) (Entered: 07/05/2022) |
| 07/05/2022 | 109 | | ORDER. For the reasons stated in the 108 Memorandum Opinion, the Plaintiff's 106 Motion for Injunctive Relief is GRANTED in part and DENIED in part. See attached ORDER for details. Signed by Judge Trevor N. McFadden on 7/5/2022. (lctnm1) (Entered: 07/05/2022) |
| 08/03/2022 | 110 | | NOTICE OF APPEAL TO DC CIRCUIT COURT by STACY SCOTT−MCKINNEY, M.D.. Filing fee $ 505, receipt number ADCDC−9416052. Fee Status: Fee Paid. Parties have been notified. (Siegel, Eric) (Entered: 08/03/2022) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STACY SCOTT-MCKINNEY, M.D.,

           *Plaintiff*,

v.                                                                   Case No. 1:19-cv-02980

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

           *Defendant*.

## **NOTICE OF APPEAL**

Plaintiff Stacy Scott-McKinney, by and through counsel, respectfully gives Notice that

Plaintiff appeals to the United States Court of Appeals for the District of Columbia Circuit the

final judgment of the United States District Court for the District of Columbia entered in this action

on July 5, 2022 (ECF #109 and Memorandum at ECF #108), in favor of Defendant Children's

National Medical Center and against Plaintiff ("Judgment") and from any and all adverse rulings,

decisions and/or opinions incorporated in, merged into, antecedent to, or ancillary to the Judgment.

Date:  August 3, 2022                              Respectfully submitted,

                                   **KALBIAN HAGERTY, LLP**

                                   By *Eric L. Siegel*
                                   Eric L. Siegel
                                   888 17th Street, N.W., Suite 1200
                                   Washington, D.C. 20006
                                   Tel: (202) 419-3296
                                   Fax: (202) 223-6625
                                   esiegel@kalbianhagerty.com

1

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed through the ECF system, and will be served to the registered participants identified on the Notice of Electronic Filing on the 3rd day of August, 2022.

*/s/ Eric L. Siegel*
Eric L. Siegel

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STACY SCOTT-MCKINNEY, M.D.**, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-02980 (TNM) |
| **CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM**, | |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

Dr. Stacy Scott-McKinney sued Children's National Medical Center (Children's National, or the Hospital) under the D.C. Human Rights Act. She alleged the Hospital discriminated against her because of her disability when it denied her a scribe to assist in her work as a physician. A jury agreed and awarded $200,000 in non-economic damages. Scott-McKinney now seeks more remedies—injunctive relief, back pay, and front pay—and the Hospital objects. The Court held an evidentiary hearing and received post-hearing briefing on remedies. Considering the evidence adduced at trial and the post-trial damages hearing, as well as the parties' briefing, the Court finds Scott-McKinney is entitled to some prospective injunctive relief but has not proven economic damages.

**I. FACTUAL BACKGROUND AND LEGAL PRINCIPLES**

As early as 2017, Scott-McKinney had pain and other symptoms in her neck, shoulder, and hand. Both parties agree Scott-McKinney's physical ailments make her "disabled" under federal and D.C. law. Her work as a physician in the Hospital's Laurel, Maryland, practice—in

particular, typing and clicking during medical notetaking—exacerbated that disability. The Hospital provided Scott-McKinney a scribe to assist in those notetaking responsibilities to ameliorate her pain. Then, from July 2019 to November 2020, the Hospital removed the scribe.

Scott-McKinney sued. She argued the Hospital's failure to provide a scribe violated the District's anti-discrimination law (the D.C. Human Rights Act or DCHRA). A jury agreed, awarding $200,000 in non-economic damages. The only remaining question is whether the Court should also award back pay, front pay, and/or injunctive relief.

The DCHRA allows a plaintiff to recover "damages and such other remedies as may be appropriate." D.C. Code § 2-1403.16(a). Those remedies may include an "order . . . requiring such respondent to cease and desist from such unlawful discriminatory practice" as well as "compensatory damages to the person aggrieved by such practice." *Id.* § 2-1403.13(a)(1), (a)(1)(D); *see also id.* § 2-1403.16(b). A court may make factual findings to determine what relief is appropriate, but those findings and the relief it awards must be "consistent with the jury verdict." *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005). Ultimately, the plaintiff bears the burden of "proving damages with reasonable certainty." *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 109 (D.D.C. 2018) (cleaned up); *see also* D.C. Mun. Regs. tit. 4 § 200.3 (noting an intent to "award damages of any nature whatever which can be fairly proved to have resulted from acts of discrimination").

Ultimately, Scott-McKinney does not show she suffered—or will suffer—economic damages because of Children's National failing to provide a scribe. She *has* shown a reasonable likelihood Children's National may discriminate against her again by removing her scribe, entitling her to an injunction prohibiting the Hospital from doing so. There is no evidence, however, showing a need for broader, company-wide relief.

The Court explains its conclusion for each form of relief below, but certain credibility findings are relevant to all forms of relief and thus warrant preliminary discussion. At the evidentiary hearing, Scott-McKinney testified about her symptoms, their effect on her work, and her alleged lost wages due to losing her scribe. She also proffered several demonstrative exhibits, videotaped deposition testimony from Dr. David Levin (one of her treating physicians) introduced at trial, and doctor's notes documenting her disability diagnosis and prognosis. Children's National relied mostly on Levin's videotaped deposition testimony, live testimony at the evidentiary hearing from its Director of Business Operations, Mark Janowiak, and cross-examination of Plaintiff's witnesses. Reviewing this evidence, the Court makes the following initial findings of fact:

- Scott-McKinney is a generally credible witness. Her demeanor throughout the evidentiary hearing was calm and precise, suggesting honesty. Substantively, Scott-McKinney gave compelling testimony showing that her disability has limited her ability to manage a typical patient load.

- Janowiak is a highly credible witness with background knowledge that makes him uniquely qualified to testify about physician compensation at Children's National. Because Janowiak calculates physician pay at the Laurel Practice, he is well-positioned to opine on whether (and how much) Scott-McKinney lost out on compensation during the time she worked without a scribe. He came across as very intelligent and competent in his field.

- When Scott-McKinney and Janowiak's back/front pay calculations conflict, the Court finds Janowiak's testimony more credible. Although the Court found Scott-McKinney to be generally credible, her testimony on this point is self-serving—she has every incentive to inflate her past and potential lost wages to increase her pay—and well outside her area of expertise. More, her lost-pay calculations appear to be adopted from a now-abandoned expert report, and cross-examination during the evidentiary hearing showed those calculations do not reflect how the Hospital compensates physicians. By contrast, Janowiak's testimony was well-supported by actuarial explanation.

- Doctor's notes recording Plaintiff's diagnosis and treatment are probative but ultimately entitled to little weight. The Court found adequate foundation authenticating those notes, but they do not (on their face) establish causation between Scott-McKinney's disability and the Hospital removing her scribe. Without supporting testimony to provide that causal link, they are of little probative value.

3

With these general findings of fact in mind, the Court turns to its more particularized findings for each form of relief.

## II. BACK PAY

Scott-McKinney is not entitled to back pay because the evidence shows the Hospital's discrimination did not impact her pay in Fiscal Year 2020 or Fiscal Year 2021.

To understand why requires some understanding of how Children's National compensates physicians. The Hospital's physician pay consists of base compensation and incentive compensation. *See, e.g.*, Pl.'s Ex. 119 (FY 2020 Annual Physician Compensation Reconciliation Report). Janowiak, explained how those two forms of pay break down. Children's National calculates what it calls "actual earned compensation" by multiplying a physician's net medical revenue by an inverse expense ratio (total expenses/total charges). *See* May 2, 2022, Remedies Hearing Tr. (RH Tr.) 133:15–134:11 (Testimony of M. Janowiak). A physician's base compensation is 85% of the rolling three-year average of that actual earned compensation figure. *See id.* at 134:10–11. If a physician's annual actual earned compensation exceeds her base compensation, she can receive that excess as incentive pay. *See id.* at 132:16–17. But, if a practice runs a budget deficit, actual earned compensation is reduced on a *pro rata* basis so that all physicians bear their share of the shortfall. *See id.* at 135:8–14.[1]

---

[1] "Senior" physicians may also earn a "junior doctor credit"—essentially a percentage of revenue generated by less-experienced doctors in the practice. *See, e.g.*, Pl.'s Ex. 192 (FY 2021 Annual Physician Comp. Reconciliation Rep't).

4

Applying this compensation formula, Scott-McKinney did not lose any pay in FY 2020 due to the Hospital's discrimination.[2]  The Laurel Practice ran a significant budget margin deficit—$54,381—because of business shutdowns occasioned by COVID-19, which in turn meant none of the practice's physicians were eligible for incentive pay in Q3 or Q4.  *See* Pl.'s Ex. 194; Pl.'s Ex. 119; RH Tr. 140:16–17 ("When it first hit, they essentially stopped visits. All visits stopped."); *id.* at 143:4–11.  Scott-McKinney concedes the Hospital's failure to provide a scribe did not cause her any back-pay losses in FY2020.  *See* RH Tr. 47:4–5.

The real dispute concerns whether Plaintiff lost incentive pay in FY 2021.  She testified that working without a scribe made her documentation responsibilities significantly more onerous.  *See, e.g.*, RH Tr. 28:17–19 ("I had a very difficult time managing really long hours. I brought work home routinely, worked into the middle of the night routinely.").  And her symptoms apparently worsened and took on new dimensions during that time.  *See, e.g.*, *id.* at 28:22–24 ("I had worsening neck and shoulder pain, and I also had quite significant hand symptoms, cold, achy, numb, blue hand.").

But Scott-McKinney has not shown her loss of efficiency caused her to lose out on incentive pay.  To the contrary, the evidence shows that even with a scribe Plaintiff likely would have been paid the same.  This was evident in Janowiak's testimony.  He presented a hypothetical compensation calculation for FY 2021, replacing the two FY 2021 quarters Scott-McKinney operated *without* a scribe with figures representing her best financial quarter *with* a

---

[2]  There was some confusion at the evidentiary hearing about whether Scott-McKinney claims losses in base salary, losses in incentive payout, or some combination of both.  *See* RH Tr. 108:19–112:3.  But Plaintiff ultimately acknowledged "loss in base salary[ ] is not calculated" in her back-pay loss calculations.  *Id.* at 112:11–13.  And, if there were any doubt, her own exhibits calculate back-pay losses as a "Year-End Incentive Payout."  *See, e.g.*, Pl.'s Ex. 195 (line 36).

5

**-24-**

virtual scribe.[3]  *See* Def.'s Ex. 192A (Hypothetical FY 2021 Annual Physician Comp.

Reconciliation Rep't); RH Tr. 148:13–16.  Even with that Plaintiff-friendly calculation, Scott-

McKinney's actual earned compensation (after budget margin) would not exceed her base

compensation.  *See id.* at 150:2; *see also* Def.'s Ex. 192A (actual earned compensation:

$233,270; base compensation: $236,820; incentive payout: $0).  This is because of FY 2021's

particularly high budget margin deficit.  *Compare* Pl.'s Ex. 110 (FY 2018 Annual Physician

Comp. Reconciliation Rep't) (showing a budget margin deficit of $30,039), *with* Pl.'s Ex. 195

(FY 2021 Reconciliation Rep't) (showing a budget margin deficit of $154,028).[4]  So there is a

straightforward, nondiscriminatory explanation for Plaintiff not receiving incentive pay.

 Seeking to avoid this conclusion, Scott-McKinney offers an alternative calculation.  In

her post-evidentiary hearing briefing, she summarizes her methodology as follows:

- She reviewed the "Summary by Provider" documents (Pl.'s Exs. 97 & 193) to determine
  her annual patient visits and annual revenues that she generated for fiscal years 2018
  through 2021.

- She then took all her patient visits by fiscal year for FY 2018 and 2019 and compared
  those numbers to those of FY 2020 and 2021 to determine the average lost patient visits
  of 763. See Pl. Ex. 196 at 2. This corroborated her assumption of losing about 15 patient
  visits per week, or 735 patient visits per year (15 patient visits x 49 weeks, which reflects
  vacations) based on a reduced direct patient care schedule of six hours versus eight.

---

[3]  Although these figures are hypothetical, the Court has already explained that Janowiak is "a
witness who is well-positioned to make the assumption[s]" underlying them.  RH Tr. 148:6–7.
Scott-McKinney says the hypotheticals are faulty because they rely on her performance under a
6-hour work-restriction with a virtual scribe post-November 2020, rather than her performance in
the 13 years before losing her scribe.  *See* Pl.'s Br. on Remedies 13 n.12.  Plaintiff did not
meaningfully impeach Janowiak on this point at the evidentiary hearing.  And in any case, it
makes little sense to rely on Scott-McKinney's performance in the years before her disability
deteriorated.  The question is how much revenue she could have generated in FY 2021 while
coping with limiting symptoms, not how much revenue she could generate before her symptoms
became apparent.

[4]  Plaintiff acknowledged the uniquely high budget margin deficit in FY 2021.  *See* Pl.'s Br. on
Remedies 14 ("FY 2021 was plagued by COVID-related expenses . . . .").

6

- She then determined that her average revenue per patient visit for FY 2020 was $192.50 by dividing her total revenue for that fiscal year by her total patient visits for the year.

- She performed the same calculation for FY 2021 to arrive at an average revenue per patient visit of $220.00.

- She then used Defendant's Annual Physician Compensation Reconciliation Reports for fiscal years 2020 and 2021 (Pl. Exs. 119 and 192), applied the formulas contained there, which came directly from her Employment Agreement's Physician Compensation Plan (Pl. Ex. 1, App'x C), and performed the calculations to determine her back pay loss.

Pl.'s Br. on Remedies 12, ECF No. 103.

The Court finds this methodology is unreliable. Scott-McKinney's calculations largely rely on multiplying purported lost revenue (due to working less without a scribe) by a "conservative" baseline of how much of the practice's revenue Plaintiff generates (32%). *See* Pl.'s Ex. 196. But there's at least two problems with that approach.

*First*, as Scott-McKinney admits, Children's National does not determine her compensation that way. *See* RH Tr. 112:21 –113:3 ("Q: Does your employment agreement provide that you will be paid a percentage of your patient revenue as wages? . . . A: I don't think so but I would have to read it again."); *see also* Pl.'s Ex. 1 (Employment Agreement). *Second*, and more fundamentally, her "lost revenue" calculation appears to attribute 100% of the reduction in patient visits to the Hospital's discrimination—it does not reflect other reasons she may have seen a reduced patient load in FY 2021 compared with FY 2019. For example, nowhere does the "reduced patient visits" calculation account for Plaintiff's 3-week vacation or her 8-week sabbatical for COVID-19.[5] *See* RH Tr. 46:14–19. Nor does it consider that the practice shut down its second location. *See id.* at 130:18–24 ("They are now in one location,

---

[5] This omission is particularly strange because Scott-McKinney *does* account for her vacation and sabbatical in calculating the total number of weeks she worked.

7

**-26-**

with six exam rooms [as opposed to 16], and the same number of providers. So it's physically impossible to see that same volume of patients that they were seeing in '18 and/or '19 with only one location."). And it does not acknowledge that one of Scott-McKinney's baseline years—FY 2019—was "an abnormally good year." *Id.* at 131:9–10.

Given all this, the Court has serious doubts about the reliability of Plaintiff's back-pay calculations. She selected a methodology that differs significantly from how Children's National calculates her compensation. In doing so, she ignored contributing factors that might reduce her overall back pay recovery while relying on baselines that are uniquely favorable to her. By contrast, Janowiak gave detailed, well-supported testimony explaining (1) how physicians at Children's National are compensated, (2) why physicians in the Laurel practice saw reduced patient loads in FY 2021, and (3) why even Plaintiff's best quarter with a virtual scribe would not have earned her any more compensation in FY 2021 due to an unusually high budget margin deficit. And Scott-McKinney never successfully impeached Janowiak on the accuracy of these points.

Given all this, the Court finds Plaintiff has not proved back-pay damages to a "reasonable certainty." *Robinson*, 341 F. Supp. 3d at 109 (cleaned up).[6]

### III. PAY AFTER NOVEMBER 2020/FRONT PAY

The next question is whether Plaintiff is entitled to compensation for *ongoing* harm caused by the Hospital's failure to provide a scribe for 16 months. The Court finds Scott-

---

[6] By extension, Scott-McKinney has no right to lost employer contributions on her purported back-pay losses. The Court therefore denies that requested relief as well.

McKinney has not shown the Hospital's discrimination caused lasting harm that will undermine her ability to earn compensation when working with a scribe.

Plaintiff's argument in favor of front pay is straightforward, relying on two premises. First, she says "excessive typing" without a scribe from July 2019 to November 2020 caused her repetitive strain injuries. Pl.'s Br. on Remedies 5. Second, those repetitive strain injuries form "the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care." *Id.* 6–7. As a result, she argues, she is entitled to front pay to compensate her for the added revenue she would have generated but-for the Hospital's discrimination. *Id.* 18; *see also* Pl.'s Ex. 196 at 2 (Front Pay Calculation).

Scott-McKinney offers a variety of evidence to establish premise one—that working without a scribe caused her repetitive strain injuries.

At the evidentiary hearing on damages, Plaintiff testified that during the 16 months without a scribe she "had a very difficult time managing really long hours" and that she "had quite significant hand symptoms, cold, achy, numb, blue hand." RH Tr. 28:11–19; *id.* 28:20–24. Scott-McKinney eventually sought care from Dr. Leo Rozmaryn, *see* Pl.'s Ex. 197 (Treatment Notes from Dr. Rozmaryn), who diagnosed her with repetitive strain syndrome secondary to carpal tunnel syndrome, *id.* (February 4, 2021 note). She says Rozmaryn concluded "the hand injury is related to the work" and that "the physical stressors of her job are a significant contributing factor." *See id.* She also relies on videotaped deposition testimony—introduced at trial—from Levin, the physician who treated her cervical-spine disability. He explained that Plaintiff "suffers from a hand disorder that is different and independent from the radiculopathy associated with her neck and shoulder disorders." Pl.'s Br. on Remedies 8 (citing Levin Dep. 15:6–16:17, ECF No. 103-2).

9

But these diagnoses do not facially support a causal link between the Hospital removing Scott-McKinney's scribe and her developing carpal tunnel syndrome.  Rozmaryn's references to "the work" and "the physical stressors of her job" suggest Plaintiff's work *in general* causes her symptoms, not that the specific 16-month period at issue is responsible.  The evidence confirms as much.

The record shows Scott-McKinney's non-radiculopathic symptoms predate the Hospital's discrimination by more than a year.  Rozmaryn's initial patient visit notes reveal Plaintiff "*for the past 3 years* has had steady increasing pain mostly numbness and tingling and color changes in her fingers." Def.'s Ex. 173 (Dr. Rozmaryn 8/11/2020 Patient Notes) (emphasis added); *see also* Pl.'s 197 (Dr. Rozmaryn 2/2/2021 Patient Notes) (showing Plaintiff's pain "has been present for 4 years").  And Dr. Sunjay Berdia—another treating physician—noted that Plaintiff's "discoloration and color changes and numbness" had "been going on for about one year" in *March 2019*.  *See* Pl.'s Ex. 200.  That these symptoms arose well before the Hospital removed her scribe undermines any causal connection between the two.

To overcome this problematic timeline, Scott-McKinney says Berdia "ruled out carpel [sic] tunnel syndrome as a diagnosis for the hand symptoms that [she] was experiencing" during her March 2019 exam.  Pl.'s Br. on Remedies 5.  True, Berdia offered a preliminary opinion that her non-radiculopathic symptoms were "more vascular in nature, . . . not coming from her cervical or carpal tunnel."  Pl.'s Ex. 200; *see id.* (noting an impression of "[r]ight hand Reynaud's phenomenon").  But Rozmaryn later noted that diagnosis was incomplete after more testing.  *See* Def.'s Ex. 173 (Dr. Rozmaryn 8/11/2020 Patient Notes) ("She has . . . had vascular studies which were really not that conclusive except she was told that she has some Reynaud's disease with color changes when she put her finders in cold water. With the vascular flow study

10

she has had arteriograms with Doppler. And essentially was told that this was mostly normal."). In any case, this argument proves too much—Rozmaryn himself ruled out carpal tunnel syndrome in August 2020, more than a year after the Hospital removed Plaintiff's scribe. *See id.* ("She has no history of any night pain, which rules out carpal tunnel syndrome.").

To be sure, Scott-McKinney's symptoms worsened over time. But that deterioration, again, does not establish a causal link between the Hospital removing her scribe and her non-radiculopathic symptoms. Rozmaryn's own notes explain that "[i]n most people, [carpal tunnel] symptoms worsen over time." *See* Pl.'s Ex. 197 (Dr. Rozmaryn 2/2/2021 Patient Notes). And "many factors [ ] contribute to [that] development"—"heredity, being overweight, overuse of the hand (i.e., extensive typing), hormone changes during pregnancy, and age." *Id.* So, without more, Plaintiff has shown only a temporal *correlation* between losing her scribe and a deterioration in her condition; she has not shown *causation*.

Part of the issue here is that Scott-McKinney relies almost entirely upon enigmatic doctor's notes to prove causation. Although the Court admitted these notes over the Hospital's objections, they ultimately do not provide the proof that she needs. Indeed, as explained above, the timeline they imply defeats her case. The only actual testimony from an expert, Dr. Levin, was at best irrelevant and at worst undermined her argument.[7] This leaves her with her own

---

[7] Levin acknowledged Plaintiff is "not able to tolerate the amount of time that she was working prior" to losing her scribe, but he could not say with "medical certainty that her conditions worsened as a result of not having that scribe." Levin Dep. 72:19–73:9. Scott-McKinney says that testimony was limited to her cervical-spine issues. Perhaps. But reading Levin's testimony as limited in scope still leaves Plaintiff with a dearth of causation evidence related to her non-radiculopathic symptoms.

testimony. It was sincere, but she is neither an expert in this area nor did her explanations alone fill the holes in the other evidence.

In sum, the evidence shows Scott-McKinney's repetitive strain injury predates the Hospital's decision to remove her scribe and arises out of her work. While her condition appears to have worsened during the 16 months at issue, there is no medical evidence establishing a causal link between that deterioration and her working without a scribe. So there is little basis to link the Hospital's decision to remove the scribe with her diminished earning capacity. That means there is no basis to award front pay.[8]

### IV. INJUNCTIVE RELIEF

The last question is whether Plaintiff is entitled to injunctive relief. She asks for two types of injunctions: (1) an order requiring the Hospital "to provide a scribe" until a valid substitute can be found, and (2) an order requiring the Hospital "to train its managers annually" on the DCHRA's requirements and "to post statutorily required notices of such laws." Pl.'s Br. on Remedies 26–27.

"Given the substantial similarity" between Title VII and the DCHRA, courts in this circuit rely on interpretations of Title VII when reviewing claims under the DCHRA. *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999); *cf. Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008). In the mine run of Title VII cases, "enjoining a defendant from further acts of discrimination is a typical remedy." *Johnson*

---

[8] Given this, the Court need not reach Plaintiff's second premise—that her repetitive strain injury is "the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care." Pl.'s Br. on Remedies 6–7. And the Court likewise need not address any claim for lost employer contributions to front pay.

*v. Brock*, 810 F.2d 219, 225 (D.C. Cir. 1987). This is true even where the defendant ceases the

illegal conduct. And a "request for injunctive relief will be moot only where there is no

reasonable expectation that the conduct will recur." *Bundy v. Jackson*, 641 F.2d 934, 946 n.13

(D.C. Cir. 1981).[9] But any such injunctive relief "should be narrowly tailored and should

generally apply only to the plaintiff where a class has not been certified." *Jean-Baptiste v.*

*District of Columbia*, 958 F. Supp. 2d 37, 50 (D.D.C. 2013).

      The Hospital has not shown that "there is no reasonable expectation that the conduct will

recur." *Bundy*, 641 F.2d at 946 n.13. To dispel the prospect of future discrimination, it offers

Janowiak's testimony that it has "budgeted [Scott-McKinney's scribe] for the next fiscal year."

RH Tr. 158:6–7. But that is not enough—although it appears the Hospital intends to employ a

scribe for FY 2023, the Court can only speculate about its plans afterward. And as Plaintiff

notes, it appears the Hospital intends to implement a new electronic medical records (EMR)

technology in late-2022, potentially paired with a pre-existing voice dictation software (VDS).

*See* Decl. of Dr. Scott-McKinney ¶¶ 3, 9 ECF No. 96-1. Children's National had implemented

VDS as an "alternative" during the 16 months it removed her scribe, *see id.* ¶ 5, so Plaintiff's

concern that this technological changeover may lead to further discrimination is not

unreasonable.[10]

---

[9] As other courts have recognized, a different four-factor test applies to most requests for permanent injunction. *See Jean Baptiste v. District of Columbia*, 958 F. Supp. 2d 37, 49 n.15 (D.D.C. 2013) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). But it appears "the general practice in our Circuit [is] granting Title VII injunctions without an explicit invocation of this test." *Id.* Neither party has suggested otherwise. The Court thus follows suit.

[10] In a late filing, Plaintiff offered invoices showing the Hospital was late in paying for her scribe at least once. *See* Pl.'s Ex. to Praecipe, ECF No. 106-1; Def.'s Response to Praecipe, ECF No. 107. The Court acknowledges this additional evidence but finds it does little to establish a prospect of future discrimination.

The Hospital says issuing an injunction requiring it to provide a scribe would be a windfall because "under the DCHRA, no employee enjoys the unfettered right to a single accommodation through their anticipated retirement." Def.'s Post-Trial Br. 14, ECF No. 93. It says there are an "endless number of ways in which Plaintiff's computing responsibilities, physical limitations, and potential accommodations could change." *Id.* 15. Sure, those things might change. But Defendant has offered nothing to show they *will* change, much less any concrete details about how those changes would affect the reasonableness of using a scribe as an accommodation.

The jury reviewed ample evidence of Scott-McKinney's limitations, her work responsibilities, and the Hospital's "alternatives" to a scribe. It concluded a scribe was a reasonable accommodation and that the Hospital's failure to provide one was unlawful. The Court will not contradict that finding. *See Porter*, 414 F.3d at 21 (noting that a court's remedy must be "consistent with the jury verdict"). A scribe is a reasonable accommodation, and the Court will order that Defendant provides one for Scott-McKinney as long as she works at Children's National.

The Court will not, however, order broad company-wide injunctive relief. Scott-McKinney requests an order requiring the Hospital to "train its managers annually on disability discrimination law requirements, reasonable accommodation, and the interactive process," as well as "to post statutorily required notices of such laws." Pl.'s Br. on Remedies 26–27. But Plaintiff did not seek to certify a class and there was no evidence establishing systemic unlawful behavior toward individuals with disabilities. She offers only bare *ipsi dixit. See id.* at 27 ("To date, Defendant has not done so."). Without more, the Court will not order such sweeping relief.

## V. CONCLUSION

In sum, Scott-McKinney has not established the Hospital's discrimination caused her to lose out on incentive pay in fiscal years 2020 and 2021. She has also not shown the Hospital's discrimination reduced her earning capacity going forward. That means she is not entitled to back or front pay. But Plaintiff has established a reasonable probability of discrimination going forward, and the Hospital has offered almost no evidence to dispel the specter of future discrimination. For that reason Scott-McKinney is entitled to an injunction requiring the Hospital to provide her a scribe.

A separate order will issue.

2022.07.05
11:04:59 -04'00'

Dated: July 5, 2022                                    TREVOR N. McFADDEN, U.S.D.J.

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACY SCOTT-MCKINNEY, M.D.**, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-02980 (TNM) |
| **CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM**, | |
| Defendant. | |

## **ORDER**

Upon consideration of the evidence, the relevant law, and the parties' briefing—and for the reasons stated in the accompanying Memorandum Opinion—the Court will grant in part and deny in part the Plaintiff's [106] Motion for Injunctive Relief.

Plaintiff Stacy Scott-McKinney's requests for economic damages in the form of front- and back-pay are hereby DENIED.

The request for injunctive relief is hereby GRANTED in part. Defendant Children's National Medical Center shall provide Plaintiff a scribe so long as she works at the Hospital performing substantially the same duties. The Court denies any broader, company-wide relief.

SO ORDERED.

The Clerk of Court is requested to close this case.

2022.07.05
11:07:18 -04'00'

Dated: July 5, 2022                     TREVOR N. McFADDEN, U.S.D.J.

-35-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STACY SCOTT-MCKINNEY,

      **Plaintiff,**

v.                                                                          **Case No: 1:19-CV-2980-TNM**

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

      **Defendant.**

**<u>PLAINTIFF'S POST-TRIAL BRIEF ON EQUITABLE RELIEF</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS………………………………………………………………..i

TABLE OF AUTHORITIES………………………………………………...ii

The DCHRA Provides For Equitable Relief……………………………………………1

The Court Has Broad Equitable Powers………………………………………………..3

Legal Standards For Back Pay……………………….....................................................5

Back Pay Relief Includes Interest……………………………………………………6

Legal Standards For Awarding Front Pay……………………………………………...6

Plaintiff Is Entitled To Injunctive Relief To Make Her Whole And To Prevent Future Disability Discrimination…………………………………………………………………14

CONCLUSION………………………………………………..............18

## **TABLE OF AUTHORITIES**

**CASES**                                                                                      **PAGE**

*Abdul-Azim v. Howard Univ. Hosp.*,
213 A.3d 99 (D.C. 2019)........................................................................................1

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)..............................................................................4, 5, 9, 14

*Atlantic Richfield, Co. v. District of Columbia Comm'n on Human Rights*,
515 A.2d 1095 (D.C. 1986)....................................................................................5

*Barbour v. Merrill*,
48 F.3d 1270 (D.C. Cir. 1995)................................................................6, 7, 8, 9, 10

*Berger v. Iron Workers Reinforced Rodmen*,
170 F.3d 1111 (D.C. Cir. 1999)..........................................................4, 6, 17

*Biondo v. City of Chicago, Illinois*,
382 F.3d 680 (7th Cir. 2004).................................................................................7

*Blackman v. Visiting Nurses Ass'n*,
694 A.2d 865 (D.C. 1997).....................................................................................5

*Brown v. Marsh*,
713 F. Supp. 20 (D.D.C. 1989)............................................................................17

*Bruso v. United Airlines, Inc.*,
239 F.3d 848 (7th Cir. 2001)...............................................................................15

*Coulibaly v. Pompeo*, Civil Action No. 14-712 (RC),
2020 U.S. Dist. LEXIS 58622 (D.D.C. Mar. 31, 2020)...................................8, 9

*Craig v. Mnuchin*,
2018 U.S. Dist. LEXIS 198148 (D.D.C., Nov. 21, 2018).................................17

*Cruz-Foster v. Foster*,
597 A.2d 927 (D.C. 1991).....................................................................................17

*Curri v. Sec'y of HHS*,
No. 17-0432V, 2018 U.S. Claims LEXIS 1594,
2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018)....................................13

ii

*Daka v. Breiner*,
711 A.2d 86 (D.C. 1998) .................................................................................... 5

*Danielson v. Sec'y of HHS*,
No. 18-1878V, 2020 U.S. Claims LEXIS 2743 (Fed. Cl. Dec. 29, 2020) ......... 13

*Davis v. Combustion Engineering, Inc.*,
742 F.2d 916 (6th Cir. 1984) ............................................................................ 12

*Davoll v. Webb*,
194 F.3d 1116 (10th Cir. 1999) ......................................................................... 11

*D.C. Hous. Auth. v. D.C. Office of Human Rights*,
881 A.2d 600 (D.C. 2005) ............................................................................... 4, 5

*D.C. Office of Human Rights v. D.C. Dep't of Corr.*,
40 A.3d 917 (D.C. 2012) .................................................................................... 6

*Dillenbeck v. Sec'y of HHS*,
No. 17-428V, 2019 U.S. Claims LEXIS 1069 (Fed. Cl. July 29, 2019) ........... 13

*Duke v. Uniroyal, Inc.*,
928 F.2d 1413 (4th Cir.), 502 U.S. 963 (1991) ................................................ 11

*Durham Life Ins. Co. v. Evans*,
166 F.3d 139 (3d Cir. 1999) ................................................................................ 8

*EEOC v. General Lines, Inc.*,
865 F.2d 1555 (10th Cir. 1989) ......................................................................... 11

*EEOC v. Goodyear Aerospace Corp.*,
813 F.2d 1539 (9th Cir. 1987) ...................................................................... 15, 16

*EEOC v. Ilona of Hungary, Inc.*,
108 F.3d 1569 (7th Cir. 1997) ........................................................................... 15

*Equal Rights Ctr. v. Props. Int'l*,
110 A.3d 599 (D.C. 2015) ................................................................................. 16

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
749 A.2d 724 (D.C. 2000) ............................................................................... 1, 2

*Fogg v. Ashcroft*,
254 F.3d 103 (D.C. Cir. 2001) ............................................................................ 5

*Forman v. Korean Air Lines Co.*,
84 F.3d 446 (D.C. Cir. 1996) ........................................................................ 6

*Furline v. Morrison*,
953 A.2d 344 (D.C. 2008) ............................................................................ 1

*Gamboa v. Henderson*,
240 F.3d 1074 (5th Cir. 2000) ..................................................................... 9

*Goldman v. Sec'y of HHS*,
No. 16-1523V, 2020 U.S. Claims LEXIS 2397 (Fed. Cl. Nov. 2, 2020) .......... 13

*Gotthardt v. National RR Passenger Corp.*,
191 F.3d 1148 (9th Cir. 1999) ..................................................................... 12

*Hayes v. SkyWest Airlines, Inc.*,
Civil Action No. 15-cv-02015-REB-NYW,
2018 U.S. Dist. LEXIS 163023 (D. Colo. Sep. 24, 2018) .............................. 12

*Hull by Hull v. United States*,
971 F.2d 1499 (10th Cir. 1992), 507 U.S. 1030 (1993) ................................ 12

*In re Body Transit, Inc.*,
619 B.R. 816 (Bankr. E.D. Pa. 2020) .......................................................... 13

*In re Engle Cases*,
283 F. Supp. 3d 1174 (M.D. Fla. 2017) ....................................................... 13

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) .................................................................................... 17

*Johnson v. Brock*,
810 F.2d 219 (D.C. Cir. 1987) ..................................................................... 15

*Johnson v. Spencer Press of Maine, Inc.*,
364 F.3d 368 (1st Cir. 2004) ................................................................... 8, 9

*Jones & Laughlin Steel Corp. v. Pfeifer*,
462 U.S. 523, 103 S.Ct. 2541 (1983) .......................................................... 12

*Kimmel v Gallaudet Univ.*,
639 F.Supp.2d 34 (D.D.C. 2009) ................................................................. 1

*Kolstad v. American Dental Ass'n*,
108 F.3d 1431, 139 F.3d 958 (D.C. Cir. 1998), 119 S. Ct. 2118 (1999) ....... 5

*Lathem v. Dep't of Children & Youth Servs.,*
172 F.3d 786 (11th Cir. 1999) ................................................................. 8

*Lively v. Flexible Packing Ass'n,*
830 A.2d 874 (D.C. 2003) ................................................................... 1, 5

*Loeffler v. Frank,*
486 U.S. 549 (1988) ....................................................................... 4, 5, 6

*Luna v. Coombs (In re Coombs),*
Nos. 7-10-11712 SA, 10-1099 S,
2012 Bankr. LEXIS 1994 (Bankr. D.N.M. May 4, 2012) ...................... 13

*Mbakpuo v. Ekeanyanwu,*
738 A.3d 776 (D.C. 1999) ..................................................................... 16

*McKnight v. General Motors Corp.,*
908 F.2d 104 (7th Cir. 1990), 499 U.S. 919 (1991) ........................ 7, 10

*Morgan v. Psychiatric Institute of Washington,*
692 A.2d 417 (D.C. 1997) ..................................................................... 10

*Morris v. BNSF Ry. Co.,*
No. 15 C 2923, 2019 U.S. Dist. LEXIS 36566 (N.D. Ill. Mar. 7, 2019) ...... 13

*Newhouse v. McCormick & Co., Inc.,*
110 F.3d 635 (8th Cir. 1997) ................................................................ 11

*Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights,*
917 A.2d 1094 (D.C. 2007) ..................................................................... 7

*Peyton v. DiMario,*
287 F.3d 1121 (2002) ............................................................................ 12

*Pollard v. E. I. du Pont de Nemours & Co.,*
532 U.S. 843 (2001) .................................................................... 5, 6, 7, 8

*Porter v. Natsios,*
414 F.3d 13 (D.C. Cir. 2005) ................................................................... 4

*Regal v. Wells Fargo Bank, N.A.,*
205 F. Supp. 3d 195 (D. Mass. 2016) ................................................... 13

*Reneau v. Wayne Griffin & Sons, Inc.,*
945 F.2d 869 (5th Cir. 1991) ................................................................ 11

*Robinson v. District of Columbia*,
341 F. Supp. 3d 97 (D.D.C. 2018).................................................6, 15

*Roe v. Cheyenne Mountain Conference Resort, Inc.*,
124 F.3d 1221 (10th Cir. 1997)................................................15

*Shelton v. Babbitt*,
921 F.Supp. 787 (D.D.C. 1994)................................................15

*Shirley v. Chrysler First, Inc.*,
970 F.2d 39 (5th Cir. 1992).....................................................11

*Thompson v. Sawyer*,
678 F.2d 257 (D.C. Cir. 1982)...............................................7, 14

*Timus v. District of Columbia Dep't of Human Rights*,
633 A.2d 751 (D.C. App. 1993)................................................18

*UMW v. Moore*,
717 A.2d 332 (D.C. 1998)....................................................4, 10

*United States v. W.T. Grant Co.*,
345 U.S. 629, 97 L. Ed. 1303, 73 S. Ct. 894 (1953)......................16

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
715 A.2d 873 (D.C. 1998)....................................................1, 2

*Wash. Convention Ctr. Auth. v. Johnson*,
953 A.2d 1064 (D.C. 2008).....................................................7

*Welsh v. McNeil*,
162 A.3d 135 (D.C. 2017)........................................................2

*White v. D.C. Water & Sewer Auth.*,
 962 A.2d 258 (D.C. 2008)...............................................3, 4, 14

*Williams v. General Foods Corp.*,
492 F.2d 399 (7th Cir. 1974)..................................................15

*Williamson v. Handy Button Mach. Co.*,
817 F.2d 1290 (7th Cir.1987).....................................................6

*Williams v. Pharmacia, Inc.*,
137 F.3d 944 (7th Cir. 1998).....................................................7

## **STATUTES**

Civil Rights Act of 1964 § 706(g) .......................................................................5

42 U.S.C. § 2000e-5(g) .......................................................................................14

42 U.S.C. § 2000e-5(g)(1) ................................................................................4, 5

D.C. Code § 2-1401.01 .........................................................................................1

D.C. Code § 2-1401.51 .......................................................................................18

D.C. Code §  2-1403.07 ........................................................................................2

D.C. Code § 2-1402.11(a)(1) ................................................................................1

D.C. Code §2-1403.13(a) .................................................................................2, 14

D.C. Code § 2-1403.13 (a)(1) ............................................................................14

D.C. Code § 2-1403.13 (a)(1)(A) .........................................................................4

D.C. Code § 2-1403.16 .....................................................................................2, 14

D.C. Mun. Reg. § 214.5 ........................................................................................3

D.C. Mun. Reg. §§ 4-206, 4-207 .........................................................................3

LEX K. LARSON, 4 LABOR AND EMPLOYMENT LAW § 109.02 (2008) .......................3, 4

## **RULES**

Fed. R. Civ. Proc. 54(c) ........................................................................................1

Pursuant to this Court's Scheduling Order dated March 25, 2022 (ECF #89), Plaintiff, Stacy Scott-McKinney, by and through her counsel, hereby provides a brief regarding the legal standards governing equitable relief, including but not limited to back pay, front pay, interest on back pay, and injunctive relief under the D.C. Human Rights Act ("DCHRA"). She also demonstrates why injunctive relief is appropriate in this case, as she requested in her Complaint.

On March 14, 2022, this Court entered Judgment on the jury verdict in Plaintiff's favor. ECF #87. Specifically, the jury found that Defendant discriminated against Plaintiff in violation of the DCHRA by failing to provide her with a reasonable accommodation for her disability. ECF #85. As a result of that verdict in Plaintiff's favor, the "… final judgment should grant the relief to which [Dr. Scott-McKinney] is entitled, even if [she] has not demanded that relief in [her] pleadings." Fed.R.Civ.Proc. 54(c).

## The DCHRA Provides For Equitable Relief

As the Court is well aware, the DCHRA's stated goal is to eliminate "discrimination for any reason other than that of individual merit," D.C. Code § 2-1401.01, and evinces an intent to "'strike at the entire spectrum of disparate treatment' of individuals with disabilities." *Kimmel v Gallaudet Univ.*, 639 F.Supp.2d 34, 41 (D.D.C. 2009). The DCHRA prohibits an employer from discriminating against an employee wholly *or partially* on the basis of a disability. *Abdul-Azim v. Howard Univ. Hosp.*, 213 A.3d 99, 102 (D.C. 2019) (citing D.C. Code § 2-1402.11(a)(1)) (emphasis added); *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008)). "The DCHRA 'is a remedial civil rights statute that *must be generously construed*.' *Lively v. Flexible Packing Ass'n*, 830 A.2d 874, 887 (D.C. 2003) quoting *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 731 (D.C. 2000) (citing *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 889 (D.C. 1998) (emphasis added).

1

**-44-**

In terms of remedies for discrimination, the DCHRA provides in pertinent part:

**(a)**   Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction ***for damages and such other remedies as may be appropriate*** ….

**(b)**   The court may grant ***any relief*** it deems appropriate, including, the relief provided in §§ 2-1403.07 and 2-1403.13(a).

D.C. Code § 2-1403.16 (emphasis added).  D.C. Code § 2-1403.13(a) provides in relevant part:

**(a)**

**(1)**   Except as provided in paragraph (3) of this subsection, if, at the conclusion of the hearing, the Commission determines that a respondent has engaged in an unlawful discriminatory practice or has otherwise violated the provisions of this chapter, the Commission shall issue, and cause to be served upon such respondent, a decision and order, accompanied by findings of fact and conclusions of law, ***requiring such respondent to cease and desist from such unlawful discriminatory practice, and to take such affirmative action***, ***including but not limited to***:

* * *

**(C)**   The extension of full, equal and unsegregated accommodations, advantages, facilities and privileges to all persons;

**(D)**   The payment of compensatory damages to the person aggrieved by such practice;

**(E)**   The payment of reasonable attorney fees;

* * *

**(F)**   The payment of hearing costs, as, in the judgment of the Commission, will effectuate the purposes of this chapter, and ***including a requirement for a report as to the manner of compliance*** with such decision and order.

(Emphasis added).  Accordingly, the DCHRA provides for damages and equitable relief in private civil actions.  *Welsh v. McNeil*, 162 A.3d 135, 154 n.56 (D.C. 2017), citing D.C. Code § 2-1403.16.

In this case, the jury has already awarded $200,000.00 in compensatory damages to Dr. Scott-McKinney.  *See* ECF #85. Pursuant to Local Civil Rule 54.1(a), Plaintiff shall file her Bill of Costs by no later than April 4, 2022, the 21-day deadline set by the Rule.  In addition, interest

on expenses shall be paid at eight percent (8%) from the date incurred to the date of payment.  D.C. Mun. Reg. § 214.5.

Furthermore, Plaintiff shall file her petition for attorneys' fees and remaining costs not covered by the Bill of Costs, if not resolved by agreement with Defendant, by the deadline set by the Court in its amended Scheduling Order, or May 23, 2022.  *See* ECF #89 and Minute Order dated March 28, 2022.  The categories of expenses covered by the fee petition shall be consistent with those permitted by the D.C. Commission on Human Rights under the DCHRA.  D.C. Mun. Reg. §§ 4-206, 4-207.

Accordingly, this memorandum shall focus on other equitable remedies, including but not limited to back pay, interest on back pay, front pay, and injunctive relief to require Defendant to provide Dr. Scott-McKinney with a medical scribe as a reasonable accommodation for her physical disabilities so long as she remains employed by Defendant, as well as other requests for injunctive relief set forth in her Complaint in this matter.

### The Court Has Broad Equitable Powers

As an initial matter, in addressing employment discrimination cases under the DCHRA, the D.C. Court of Appeals has stated that "trial courts have the discretion to fashion remedies to make the plaintiff whole, to recreate the employment conditions and relationships that would have existed in the absence of intentional discrimination." *White v. D.C. Water & Sewer Auth.*, 962 A.2d 258, 260 (D.C. 2008), quoting LEX K. LARSON, 4 LABOR AND EMPLOYMENT LAW § 109.02 (2008).  For example, citing to D.C. Code § 2-1403.13 (a)(1)(A), the D.C. Court of Appeals has stated that reinstatement is an available remedy under the DCHRA when there has been a finding that a defendant has engaged in an unlawful discriminatory practice.  *Id*.  "Similarly, Congress has given the federal courts '***broad equitable powers***' to 'ensure that victims of

3

**-46-**

employment discrimination would be provided complete relief.'" *White*, 962 A.3d at 260, quoting *Loeffler v. Frank*, 486 U.S. 549, 558 n.6 (1988); *see also UMW v. Moore*, 717 A.2d 332, 339 (D.C. 1998) (trial court has broad discretion to determine appropriate relief under the DCHRA).

The overarching principle in awarding equitable relief to a plaintiff who has been adjudged to be the victim of discrimination is to make her whole.  The U.S. Supreme Court stated long ago: "[T]he court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as ***bar like discrimination in the future***." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (emphasis added).  Put another way, "a court must, as nearly as possible, recreate the conditions and relationships that would have been, had there been no unlawful discrimination."  *Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111, 1119 (D.C. Cir. 1999) (citation and internal quotation marks omitted).

In furtherance of this objective, "[d]uring the remedial stage of the proceedings, the district court may make factual findings to determine appropriate 'make whole' relief under § 2000e-5(g)(1), as long as the findings are consistent with the jury verdict." *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005) (internal citation omitted).

While the D.C. Court of Appeals has addressed remedies in employment discrimination cases, it looks to federal cases interpreting Title VII and its implementing regulations for guidance in its decisions under the DCHRA and construing the Act.  *D.C. Hous. Auth. v. D.C. Office of Human Rights*, 881 A.2d 600, 612 (D.C. 2005), citing *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 869 (D.C. 1997); *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887 (D.C. 2003); *Daka v. Breiner*, 711 A.2d 86, 92 n.14 (D.C. 1998) (quoting *Atlantic Richfield, Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1103 n.6 (D.C. 1986) (citations omitted)).

4

**-47-**

Like the DCHRA, "[u]nder § 706(g) of the Civil Rights Act of 1964 as originally drafted [("Title VII")], when a court found that an employer had intentionally engaged in an unlawful employment practice, the court was authorized to 'enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate….'" *Pollard v. E. I. du Pont de Nemours & Co*., 532 U.S. 843, 848 (2001).

Moreover, in cases involving allegations of discrimination, "…the district court must … follow the jury's factual findings with respect to a plaintiff's legal claims when later ruling on claims for equitable relief." *Fogg v. Ashcroft*, 254 F.3d 103, 110 (D.C. Cir. 2001), quoting *Kolstad v. American Dental Ass'n*, 108 F.3d 1431, 1440, rev'd in part on other grounds, 139 F.3d 958 (D.C. Cir. 1998), vacated and remanded, 119 S. Ct. 2118 (1999).

### Legal Standards for Back Pay

Plaintiffs who allege employment discrimination under Title VII traditionally have been entitled to such remedies including back pay and lost benefits under § 706(g) of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-5(g)(1); *Pollard*, 532 U.S. at 847-48.  Title VII allows for back pay as a remedy. *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (recognizing Title VII's provision for back pay as "a manifestation of Congress' intent to make 'persons whole for injuries suffered through past discrimination'") (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421-22 (1975)) (holding that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination").

"[T]he Title VII plaintiff bears the burden of proving damages with reasonable certainty . . . but back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach

5

**-48-**

of contract case." *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 109 (D.D.C. 2018) (internal citations omitted).

### Back Pay Relief Includes Interest

The D.C. Court of Appeals requires that a defendant found to have violated the DCHRA by unlawfully discriminating against an employee shall pay interest on the award of back pay. *D.C. Office of Human Rights v. D.C. Dep't of Corr.*, 40 A.3d 917, 929 (D.C. 2012). "The back pay provision of Title VII 'is a manifestation of Congress' intent to make persons whole for injuries suffered through past discrimination,' and '[p]rejudgment interest, of course, is an element of complete compensation.'" *Berger*, 170 F.3d at 1139, quoting *Loeffler v. Frank*, 486 U.S. at 558. Accordingly, "prejudgment interest 'must be an ordinary part of any award of back pay.'" *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (quoting *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1297 (7th Cir.1987)). The decision of how to compute prejudgment interest is within this Court's discretion. *Berger*, 170 F.3d at 1139 (citing *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996)).

### Legal Standards for Awarding Front Pay

In the Title VII context, back pay occurring after the date of judgment is known as "front pay." *Pollard*, 532 U.S. at 849. Front pay is defined as "a lump sum … representing the discounted present value of the difference between the earnings [an employee] would have received in his old employment and earnings he can be expected to receive in his present and future, and by hypothesis, inferior employment." *McKnight v. General Motors Corp.*, 908 F.2d 104, 116 (7th Cir. 1990), cert. denied, 499 U.S. 919 (1991). The front pay award is designed to approximate the benefit Dr. Scott-McKinney would have received had she been able to return to her regular eight

hours of direct patient care both before and when she had a medical scribe through July 2019.  *See*

*Williams v. Pharmacia, Inc*., 137 F.3d 944, 953 (7th Cir. 1998).

The goal of front pay is to put the victim of discrimination in the financial position she should have enjoyed (i.e., to make the plaintiff whole) as a result of the losses caused by a defendant's discriminatory actions. *Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights*, 917 A.2d 1094, 1105 n.22 (D.C. 2007) (DCHRA case); *see Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1080-81 (D.C. 2008) (DCHRA case); *Thompson v. Sawyer*, 678 F.2d 257, 292 (D.C. Cir. 1982) (Title VII case); *Barbour v. Merrill*, 48 F.3d 1270, 1279-80 (D.C. Cir. 1995) (same).

"[F]ront pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination." *Id*. quoting *Biondo v. City of Chicago, Illinois*, 382 F.3d 680, 691 (7th Cir. 2004) (citing *Pollard*, 532 U.S. at 846 (other citations omitted). Awards of front pay are to be judged by the standards applied to all Title VII relief: whether they will further the goals of ending illegal discrimination and rectifying the harm it causes. *Thompson*, 678 F.2d at 292.  "Front pay is one of the tools available to the Court in awarding equitable relief, and it may be used, where warranted, to compensate a victim of discrimination for the continuing future effects of discrimination until the victim is made whole." *Barbour v. Medlantic Mgmt. Corp.*, 952 F.Supp. 857, 863 (D.D.C. 1997), citing *Thompson*, 678 F.3d at 293 (and other cases). "Front pay is intended to serve as restitution for the victim, not to punish an employer." *Barbour*, 952 F.Supp. at 863.

The U.S. Supreme Court in *Pollard* held that "[i]n cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of **psychological injuries** suffered by the plaintiff as a result of the discrimination, courts

7

have ordered front pay as a substitute for reinstatement." *Pollard*, 532 U.S. at 846 (emphasis added).

In this case, Plaintiff claims that she is permanently unable to return to eight hours of direct patient care because of ***physical injuries and pain she now has***, including her recently diagnosed carpel tunnel syndrome, which she now suffers as a result of disability discrimination, namely Defendant's failure to provide a medical scribe for 16 months. She is only able to provide six hours of direct patient care going forward. That reduction in patient care has resulted in seeing approximately 15 patients less per week, which has a negative financial impact on her incentive compensation going forward, justifying an award of front pay.

Like for back pay, "[i]f the employer caused the disability through its discriminatory conduct, front pay is available. *Coulibaly v. Pompeo*, Civil Action No. 14-712 (RC), 2020 U.S. Dist. LEXIS 58622, at *23-24 (D.D.C. Mar. 31, 2020), citing, e.g., *Johnson v. Spencer Press of Maine, Inc*., 364 F.3d 368, 384 (1st Cir. 2004) ("[A]n employee who cannot mitigate damages because of the unlawful actions of the employer can still receive back pay."); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir. 1999) ("Because [the employer's] conduct affirmatively impaired [the employee's] ability to mitigate her damages, it would be inequitable to reduce her back pay award in this case."); *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999) ("[A] Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability."). "This rule is merely a logical corollary of the principle that the victims of discrimination should be restored, 'so far as possible . . . to a position where they would have been were it not for the unlawful discrimination." *Johnson v. Spencer Press of Me., Inc*., 364 F.3d 368, 383-84 (1st Cir. 2004), quoting *Albemarle*, 422 U.S. at 421. "If the

employer's unlawful conduct caused the employee's inability to mitigate damages, then the

employer should be liable for the resulting consequences." *Id*.

> The U.S. District Court for the District of Columbia has noted:
>
> There does not appear to be significant case law on the burden of proof in such a setting. However, the Fifth Circuit has reasoned that
>
> [w]hile we have recognized that the burden of proving a failure to mitigate damages by finding substantially equivalent work rests on the defendant, we have never held that when a plaintiff seeks front and back pay on the theory that she is disabled as a result of the defendant's conduct, the plaintiff is not obliged to prove up this theory by establishing that the defendant's violation of Title VII caused her disability. The better rule, we think, is to place the burden on the plaintiff to prove such a claim.

*Coulibaly*, 2020 U.S. Dist. LEXIS 58622, at *24-25, quoting *Gamboa v. Henderson*, 240 F.3d

1074 (5th Cir. 2000) (citation omitted).  Plaintiff Scott-McKinney is not fully disabled.  Rather,

she continues to work the same number of office hours as before.  However, as a result of the 16

months without a scribe, which was caused by Defendant's failure to accommodate, her pain levels

and deteriorated physical condition has worsened to the point that she cannot tolerate more than 6

hours of direct patient care and a total of 10-11 hours in the office.  Her pain and physical

impairments post deprivation of a scribe include her diagnosis of carpel tunnel syndrome, which

was made during that 16-month period when she was typing long hours into the night in an attempt

to keep up with patient record documentation.

"Determining the amount and duration of front pay requires some speculation because

assumptions about the future are necessary." *Barbour*, 952 F.Supp. at 863 (internal citations

omitted).  However, "a party is not required to prove damages to a degree of mathematical

certainty, . . . but must instead offer some evidence which allows the trier of fact to make a reasoned

judgment." *UMW v. Moore*, 717 A.2d 332, 339-40 (D.C. 1998), quoting *Morgan v. Psychiatric

Institute of Washington*, 692 A.2d 417, 426 (D.C. 1997) (citations omitted); *Barbour v. Merrill*,

9

48 F.3d 1270, 1280 (D.C. Cir. 1995) (citations omitted) ("court should not refuse to award front pay merely because some speculation about future earnings is necessary, or because parties have introduced conflicting evidence"). "Indeed, in other contexts, such as when valuing lost earning capacity in a personal injury case, courts (or juries) routinely engage in some speculation, based on the factual record the parties have established…. Courts are equally capable of resolving similar uncertainties when awarding front pay to victims of employment discrimination." *Barbour*, 48 F.3d at 1280 (internal citations omitted).

"The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award,' including 'the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate.'" *Barbour*, 48 F.3d at 1279, quoting *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992), cert. denied, 122 L. Ed. 2d 665, 113 S. Ct. 1270 (1993). "The defendant remains free to challenge the award's amount, length, or interest rate, or to establish as an affirmative defense that the plaintiff failed to mitigate damages." *Id*.

The D.C. Circuit Court of Appeals in *Barbour* found the evidence sufficient to support a front pay award. There, the plaintiff presented the proposed salary base for the award and a definite duration for the award. The appellate court reasoned:

> Although Medlantic and Merrill then argued that Barbour had failed to mitigate, and challenged both Barbour's proposed salary base and his claim that he would have remained at Medlantic until retirement, the district court should not have rejected Barbour's front-pay request merely because these issues were contested and required resolution. The court had already weighed the evidence to establish a salary base when it calculated the back-pay award.

*Id*. at 1280. All that remained for the trial court, according to the D.C. Circuit, was for it to determine the appropriate duration of the front-pay award, to incorporate proper salary increases, "and then to determine the award's present value, using an appropriate discount rate." *Id*.

The Court may consider all evidence presented at trial in formulating the proper award. *See EEOC v. General Lines, Inc*., 865 F.2d 1555, 1562 (10th Cir. 1989).  A front pay award should reflect the individualized circumstances of the plaintiff and the employer.  *Davoll v. Webb*, 194 F.3d 1116, 1144 (10th Cir. 1999).  "Calculations of front pay cannot be totally accurate because they are prospective and necessarily speculative in nature. The courts must employ intelligent guesswork to arrive at the best answer."  *Reneau v. Wayne Griffin & Sons, Inc*., 945 F.2d 869, 868 (5th Cir. 1991). (citations omitted); *Shirley v. Chrysler First, Inc*., 970 F.2d 39, 43 (5th Cir. 1992).

The D.C. Circuit in *Barbour* listed a number of non-exhaustive factors that district courts should consider in determining a front pay award, including the plaintiff's age, the length of time employees in similar positions stay at the defendant employer and other factors.  48 F.3d at 1280. Other courts offer more factors to consider, which may be useful in this present case, including "the length of prior employment, the permanency of the position held, the nature of work, [and] the age and physical condition of the employee …." *Reneau*, 945 F.2d at 871. "If a plaintiff is close to retirement, front pay may be the only practical approach." *See Newhouse v. McCormick & Co., Inc*., 110 F.3d 635, 641-42 (8th Cir. 1997) citing *Duke v. Uniroyal, Inc*., 928 F.2d 1413, 1424 (4th Cir.), cert. denied, 502 U.S. 963 (1991).

Like Dr. Scott-McKinney in this case, who is 58 years old, the D.C. Circuit Court of Appeals has found permissible front pay awards through retirement based in part on the plaintiff's age. *Peyton v. DiMario*, 287 F.3d 1121, 1129-30 (2002).  In *Peyton*, the Court of Appeals cited to *Gotthardt v. National RR Passenger Corp*., 191 F.3d 1148 (9th Cir. 1999), and observed:

> That case involved a 59 year-old employee approaching retirement who had been truly incapacitated by the employer's wrongful conduct and could not enter another career. *See* 191 F.3d at 1156. Given those circumstances, the Ninth Circuit upheld a front pay award that compensated future lost earnings through the mandatory retirement age of 70: "Although an eleven-year front pay award seems generous, the district court explicitly found that Gotthardt would be unable to work in the

future, taking into account her age (59), her educational and vocational background, and, especially, her health." 191 F.3d at 1157.

*Peyton*, 287 F.3d at 1129-30, also citing to *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984)( upholding award of front pay to 59 year-old plaintiff).

As with any award of future damages, a front pay award must be discounted to present value. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537, 103 S.Ct. 2541, 2550 (1983). "The discount rate should be based on the rate of interest that would be earned on the best and safest investments." *Jones & Laughlin Steel Corp*., 103 S.Ct. at 2550 (citation and internal quotation marks omitted). "Some courts have sought to avoid the complexity of such computations by assuming that investment interest and inflation rates will normally have a fairly fixed relationship to each other so that a net discount rate may be used that merely reflects the rate by which ***investment interest*** normally will exceed inflation." *Hull by Hull v. United States*, 971 F.2d 1499, 1511 (10th Cir. 1992), cert. denied, 507 U.S. 1030 (1993) (emphasis added). "Regardless what method is chosen, determination of an award of future damages 'should not be converted into a graduate seminar on economic forecasting.'" *Hayes v. SkyWest Airlines, Inc*., Civil Action No. 15-cv-02015-REB-NYW, 2018 U.S. Dist. LEXIS 163023, at *18-21 (D. Colo. Sep. 24, 2018) (court uses present value calculator to arrive at front pay award), quoting *Jones & Laughlin Steel Corp*., 103 S.Ct. at 2556 (citation and internal quotation marks omitted). In this case, a conservative investment interest rate would be the 10-year U.S. Treasury Interest Rate, which is currently at approximately 2.5%.

Determining the present value of a front pay calculation has become easy for courts given the ubiquity of net present value ("NPV") calculators on the internet; many courts simply apply an applicable discount interest rate to the principal sums awarded per year for the duration of the front pay award to discount to present value. *See*, *e.g. Morris v. BNSF Ry. Co*., No. 15 C 2923, 2019

12

U.S. Dist. LEXIS 36566, at *4 n.1 (N.D. Ill. Mar. 7, 2019) (court applies NPV calculator to determine front pay amount); *Curri v. Sec'y of HHS*, No. 17-0432V, 2018 U.S. Claims LEXIS 1594, 2018 WL 6273562, at *7 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (court applies 1% discount rate for 15 years and 2% thereafter to account for low treasury interest rates of the present day) (citing cases); *Danielson v. Sec'y of HHS*, No. 18-1878V, 2020 U.S. Claims LEXIS 2743, at *12 n.10 (Fed. Cl. Dec. 29, 2020); *Dillenbeck v. Sec'y of HHS*, No. 17-428V, 2019 U.S. Claims LEXIS 1069, at *44-45 (Fed. Cl. July 29, 2019) (calculating figure using the online NPV calculator available at https://financial-calculators.com/present-value-calculator (compounding annually)); *Regal v. Wells Fargo Bank, N.A.*, 205 F. Supp. 3d 195, 204 (D. Mass. 2016) (using NPV calculator to determine sum under Home Affordable Modification Program at HHS); *In re Body Transit, Inc.*, 619 B.R. 816, 830 n.21 (Bankr. E.D. Pa. 2020) (bankruptcy court uses NPV calculator to determine business valuation); *Goldman v. Sec'y of HHS*, No. 16-1523V, 2020 U.S. Claims LEXIS 2397, at *38 (Fed. Cl. Nov. 2, 2020) (using online NPV calculator); *In re Engle Cases*, 283 F. Supp. 3d 1174, 1254 n.71 (M.D. Fla. 2017) (taking judicial notice of the Bureau of Labor Statistics' inflation-adjustment calculator, a widely-accepted instrument for measuring the present-value of a dollar figure); *Luna v. Coombs (In re Coombs)*, Nos. 7-10-11712 SA, 10-1099 S, 2012 Bankr. LEXIS 1994, at *10-11 n.4 (Bankr. D.N.M. May 4, 2012) (using NPV calculator).

### Plaintiff Is Entitled To Injunctive Relief To Make Her Whole And To Prevent Future Disability Discrimination

In the Joint Report filed with this Court, Defendant has stated that it opposes Dr. Scott-McKinney's request that the Court issue a permanent injunction to affirmatively require Defendant to provide her with the reasonable accommodation of a medical scribe for the duration of her employment with Defendant until she plans to retire in 2030: a work life expectancy of nine years. That opposition alone should persuade the Court that Defendant will stop at nothing to take Dr.

13

Scott-McKinney's scribe away again.  As generously construed by the Courts, the DCHRA is clear under § 2-1403.13(a)(1) (as applied by D.C. Code § 2-1403.16) that the Court may issue injunctive relief "***requiring such respondent to cease and desist from such unlawful discriminatory practice, and to take such affirmative action***…" (Emphasis added).

Likewise, Title VII (which D.C. courts rely on in construing the DCHRA) grants the court wide discretion in formulating injunctive relief, which may include "affirmative action" and "any other equitable relief as the court deems appropriate."  *Thompson*, 678 F.2d at 293, quoting 42 U.S.C. § 2000e-5(g) (1976).  As stated earlier in this brief, the U.S. Supreme Court stated long ago: "[T]he court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as ***bar like discrimination in the future***."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (emphasis added).  The D.C. Court of Appeals under the DCHRA has likewise determined that "trial courts have the discretion to fashion remedies to make the plaintiff whole, to recreate the employment conditions and relationships that would have existed in the absence of intentional discrimination." *White v. D.C. Water & Sewer Auth.*, 962 A.2d 258, 260 (D.C. 2008).

In this case, injunctive relief is required to ensure that Plaintiff Scott-McKinney will not lose her medical scribe again.  This is the reasonable accommodation, which the jury in this case found she was entitled to be provided *but for* Defendant's disability discrimination.

Title VII provides that when the Court finds in favor of the plaintiff, the plaintiff is entitled to injunctive relief and other equitable relief that the Court deems appropriate. *Shelton v. Babbitt*, 921 F.Supp. 787, 792-93 (D.D.C. 1994), citing 42 U.S.C. § 2000e-5(g). The D.C. Circuit has held that injunctive relief is a "typical remedy in Title VII cases, where a plaintiff prevails. *Johnson v. Brock*, 810 F.2d 219, 225 (D.C. Cir. 1987). That said, "[a]lthough enjoining a defendant from

14

further acts of discrimination is a typical remedy in Title VII cases, [the D.C. Circuit] has never held that it is a mandatory remedy…." *Johnson*, 810 F.2d at 225.

"Where 'the proscribed discriminatory practice has been terminated and there is little likelihood of recurrence,' a court need not enjoin the defendant from further acts of discrimination." *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 108 (D.D.C. 2018), quoting *Williams v. General Foods Corp.*, 492 F.2d 399, 407 (7th Cir. 1974); *see also EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) ("Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination unless the employer proves it is unlikely to repeat the practice"); *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001) (holding that the "relevant inquiry" in determining whether to enjoin discrimination "is whether the employer's discriminatory conduct could possibly persist in the future"); *EEOC v. Ilona of Hungary, Inc*., 108 F.3d 1569, 1579 (7th Cir. 1997) (granting permanent injunction when primary decision makers offered no evidence to suggest they would cease discriminating); *Roe v. Cheyenne Mountain Conference Resort, Inc*., 124 F.3d 1221, 1231 (10th Cir. 1997) (employer's defiant hostility to amending Americans with Disabilities Act violative policy indicated danger of recurrence, requiring injunction).

Similarly, the D.C. Court of Appeals takes a similar approach in issuing injunctions where there is a likelihood of recurrence of discrimination. *See, e.g., Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015) ("a plaintiff seeking forward-looking relief, such as an injunction, must allege facts showing that the injunction is necessary to prevent injury otherwise likely to happen in the future"). Given Defendant's objection in the Joint Report to injunctive relief; its arbitrariness in refusing to replace the scribe in July 2019, harkening back to its "slippery slope" argument in June 2018 by its workers' compensation counsel (and its repeated refrain during

15

closing argument at trial of this case); its requirement that Dr. Scott-McKinney use a clearly ineffective voice dictation software (as corroborated by the MModal representative himself and Philip Shin, CP&A's IT manager at trial), the Court should not simply take Defendant's word for it through witness testimony that it will not attempt to remove her scribe again.  It is Defendant's burden to prove that it is unlikely to repeat its action of discriminatorily taking away Dr. Scott-McKinney's medical scribe.  *Goodyear Aerospace Corp.*, 813 F.2d at 1544.

The D.C. Court of Appeals in *Mbakpuo v. Ekeanyanwu*, 738 A.3d 776, 782 (D.C. 1999), set forth the standard for the merits of issuing an injunction as follows:

> The standard governing the issuance of an injunction was set forth by the Supreme Court in *United States v. W.T. Grant Co.*, 345 U.S. 629, 97 L. Ed. 1303, 73 S. Ct. 894 (1953):
>
> The purpose of an injunction is to prevent future violations. . . and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists *some cognizable danger of recurrent violation*, something more than mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.
>
> *Id.* at 633 (citation omitted); accord, *e.g.*, *Cruz-Foster v. Foster*, 597 A.2d 927, 930 (D.C. 1991).

(Emphasis added).  Dr. Scott-McKinney proved at trial that there is certainly "some cognizable danger of recurrent violation" and more than a "mere possibility."  Left to its own devices, Defendant will do what it did before: remove the scribe for no legitimate reason.  The Court should prevent that outcome by issuing a permanent injunction.

"[A] district court which endeavors to fashion a remedy for discrimination cannot confine itself to narrow or technical measures which, while perhaps bearing a logical connection to the plaintiff's complaint, fail to reflect the whole of the plaintiff's injury." *See Craig v. Mnuchin*, 2018

16

U.S. Dist. LEXIS 198148, *18 (D.D.C., Nov. 21, 2018), quoting *Brown v. Marsh*, 713 F. Supp. 20, 22 (D.D.C. 1989). In attempting to "recreate the conditions and relationships that would have been" in the absence of Defendant's disability discrimination against Dr. Scott-McKinney, as determined by the jury, *Berger*, 170 F.3d at 1119 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 372 (1977), the Court may look beyond the jury's verdict to place Dr. Scott-McKinney in the position she would have been in had Defendant not removed her scribe in 2019. *Craig*, 2018 U.S. Dist. LEXIS 198148, at *18. Again, the evidence presented at the trial clearly supports that a permanent injunction is required to prevent Defendant from taking away Dr. Scott-McKinney's scribe to experiment again with other "accommodations" that it has never tested or determined would work prior to requiring that she use it. Her physical and mental health is at stake and should not be endangered by Defendant's whims of the day.

Lastly, Plaintiff requested in her Complaint, as amended, that the Court issue an injunction requiring that (1) Defendant conduct annual training for all managers of the disability discrimination laws and requirements, including reasonable accommodations and the interactive process; (2) Defendant properly post notices that set forth the requirements of the District of Columbia discrimination laws in conformity with D.C. Code § 2-1401.51; (3) Defendant's Reasonable Accommodation Policy be distributed to all employees on a regular basis and/or when an employee makes a written or oral request for reasonable accommodation; and (4) management adhere to proper protocol to implement reasonable accommodation requests by expeditiously engaging in the interactive process. Just like under Title VII of the Civil Rights, the DCHRA deputizes private citizens to be "private attorney generals" to enforce the civil rights of District citizens. *Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 775 n.13 (D.C. App. 1993). To that end, Dr. Scott-McKinney wishes to ensure that no other disabled employees

experience what she has experienced.  Injunctive relief is required to ensure that result.  Defendant

should be held to account for its violation of the District's civil rights laws.

**CONCLUSION**

For the foregoing reasons, the Court should follow the legal standards set forth above for

the equitable remedies requested and should issue a permanent injunction requiring Defendant to

provide Dr. Scott-McKinney with a medical scribe for the duration of her employment at its

expense.

Date:  March 29, 2022                              Respectfully submitted,

                                                  */s/ Eric L. Siegel*
                                                  Eric L. Siegel  (D.C. Bar No. 427350)
                                                  KALBIAN HAGERTY, LLP
                                                  888 17th Street, N.W., Suite 1200
                                                  Washington, D.C. 20006
                                                  (202) 419-3296
                                                  esiegel@kalbianhagerty.com
                                                  *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 29th day of March 2022, a copy of the foregoing was

served via the Court's ECF system to:

         Kraig B. Long, Bar#467858
         Jeffrey T. Johnson, Bar#1724768
         Nelson Mullins Riley & Scarborough, LLP
         100 S. Charles Street, Suite 1600
         Baltimore, MD 21201
         Tel: 443-392-9460
         Fax: 443-392-9499
         Kraig.Long@nelsonmullins.com
         Jeffrey.Johnson@nelsonmullins.com
         *Counsel for Defendants*

                                                  */s/ Eric L. Siegel*
                                                  Eric L. Siegel

18

**-61-**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STACY SCOTT-MCKINNEY,

     Plaintiff,

v.                                                              Case No: 1:19-CV-2980-TNM

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

     Defendant.

## DEFENDANT'S POST-TRIAL BRIEF ON ECONOMIC DAMAGES AND OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

     Pursuant to this Court's Scheduling Order dated March 25, 2022 (ECF # 89), Defendant, Children's National Medical Center ("Children's National" or "Defendant"), by and through its undersigned counsel, hereby submits this Post-Trial Brief on Plaintiff's Economic Damages and Opposition to Plaintiff's Motion for Injunctive Relief.

     Respectfully submitted,

     */s/ Kraig B. Long*
     Kraig B. Long, Bar#467858
     Jeffrey T. Johnson, Bar#1724768
     Nelson Mullins Riley & Scarborough, LLP
     100 S. Charles Street, Suite 1600
     Baltimore, MD 21201
     Tel: 443-392-9460
     Fax: 443-392-949
     Kraig.Long@nelsonmullins.com
     Jeffrey.Johnson@nelsonmullins.com
     ***Counsel for Defendant***

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .......................................................................................................... 1

LEGAL STANDARDS AND ARGUMENT ................................................................. 2

I.      Equitable Relief Available Under the DCHRA ................................................ 2

II.     Plaintiff Cannot Prove Back Pay Damages with Reasonable Certainty ........... 3

III.    Plaintiff is not Entitled to Front or Back Pay Since Receipt of a Virtual Scribe in
        November of 2020 ............................................................................................ 5

        A.      Plaintiff receiving both a scribe and front pay would amount to windfall. ........... 6

        B.      Front pay is barred by this Court's prior ruling that Plaintiff cannot recover for
                personal injuries or worsening of her medical condition. ....................................... 7

        C.      Plaintiff can only speculate that any future loss of earning capacity is attributable
                to the 16-month period she worked without a scribe. ............................................ 8

III.    Injunctive Relief is Inappropriate Given that Plaintiff Already has a Scribe. .................. 10

        A.      Plaintiff has not demonstrated any likelihood of future harm to support the
                requested injunctive relief. .................................................................................. 11

        B.      The injunction requested by Plaintiff would grant rights which she would not
                otherwise enjoy but for Defendant's failure to accommodate. ........................... 14

        C.      Plaintiff's request for company-wide injunctive relief is overbroad. ................... 16

CONCLUSION ............................................................................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albemarle Paper Co. v. Moody,*
    422 U.S. 405 (1975)................................................................................3

*Barbour v. Merrill,*
    48 F.3d 1270 (D.C. Cir. 1995)...................................................2, 3, 5, 6, 8, 10

*Berger v. Iron Workers Reinforced Rodmen, Local 201,*
    170 F.3d 1111 (D.C. Cir. 1999)...............................................................3

*Crump v. United States Dept. of Navy,*
    205 F.Supp.3d 730 (E.D. Va. 2016) ........................................................4

*Doherty v. Corizon Health,*
    No. 3:19CV420-HEH, 2022 WL 782777 (E.D. Va. Mar. 14, 2022) .......................9

*Dollar v. Smithway Motor Xpress, Inc.,*
    710 F.3d 798 (8th Cir. 2013) .................................................................8

*Duke v. Uniroyal Inc.,*
    928 F.2d 1413 (4th Cir. 1991) ...............................................................6

*EEOC v. Goodyear Aerospace Corp.,*
    813 F.2d 1539 (9th Cir. 1987) ..............................................................11

*Equal Rights Center v. Properties Intern.,*
    110 A.3d 599 (D.C. 2015) ...................................................................12

*Ford Motor Co. v. EEOC,*
    458 U.S. 219 (1982).............................................................................3

*Green v. American University,*
    647 F.Supp.2d 21 (D.D.C. 2009) ..............................................................2

*Hayes v. Shalala,*
    933 F. Supp. 21 (D.D.C. 1996) ..............................................................13

*Jean-Baptiste v. District of Columbia,*
    958 F.Supp.2d 37 (D.D.C. 2013) .......................................................3, 6, 16

*Jefferson v. Milvets Sys. Tech., Inc.,*
    986 F.Supp. 6 (D.D.C. 1997) ..............................................................4, 8, 9

*Johnson v. Brock*,
    810 F.2d 219 (D.C. Cir. 1987) ............................................................................... 11, 13

*Mazor v. State Dep't of Correction*,
    279 Md. 355 (1977) ....................................................................................................... 7

*McKnight v. General Motors Corp.*,
    973 F.2d 1366 (7th Cir. 1992) ..................................................................................... 5

*Musgrove v. Government of Dist. of Columbia*,
    775 F.Supp.2d 158 (D. D.C. 2011) ........................................................................... 12

*Ogden v. Wax Works, Inc.*,
    29 F.Supp.2d 1003 (N.D. Iowa 1998) ....................................................................... 5

*Peyton v. DiMario*,
    287 F.3d 1121 (D.C. Cir. 2002) ................................................................................. 8

*Porter v. Jackson*,
    668 F. Supp. 2d 222 (D.D.C. 2009), *aff'd*, 410 F. App'x 348 (D.C. Cir. 2010) ...... 15

*Porter v. Natsios*,
    414 F.3d 13 (D.C. Cir. 2005) ..................................................................................... 3

*Queen v. Queen*,
    308 Md. 574 (1987) ..................................................................................................... 7

*Robinson v. D.C.*,
    No. CV 15-444 (RC), 2019 WL 2028397 (D. D.C. May 8, 2019) .......................... 14

*Robinson v. District of Columbia*,
    341 F.Supp.3d 97 (D.D.C. 2018) ...................................................................... 3, 11, 14

*See Whitbeck v. Vital Signs, Inc.*,
    116 F.3d 588 (D.C. Cir. 1997) ................................................................................... 2

*Siddique v. Macy's*,
    923 F.Supp.2d 97 (D.D.C. 2013) ............................................................................... 2

*Sourgoutsis v. United States Capitol Police*,
    No. 16-CV-1096 (KBJ), 2020 WL 6887782 (D.D.C. Nov. 24, 2020) .......... 11, 12, 16

*Sturgill v. United Parcel Serv., Inc.*,
    512 F.3d 1024 (8th Cir. 2008) ................................................................................... 15

*Tobin v. Liberty Mut. Ins. Co.*,
    553 F.3d 121 (1st Cir. 2009) ..................................................................................... 15

*United Mine Workers of America, Intern. Union v. Moore*,
   717 A.2d 332 (D.C. 1998) ...................................................................................................3

*Welch v. United Parcel Serv., Inc.*,
   871 F. Supp. 2d 164 (E.D.N.Y. 2012) ...............................................................................12

*White v. District of Columbia Water and Sewer Authority*,
   962 A.2d 258 (D.C. 2008) ...................................................................................................3

**Statutes**

42 U.S.C. § 2000e ...................................................................................................................2

Civil Rights Act of 1964 Title VII.................................................................................2, 8, 13

D.C. Code § 2-1403.13(a) .......................................................................................................2

D.C. Code § 2-1403.13(a)(1) .............................................................................................2, 11

**Other Authorities**

29 C.F.R. § 1630.2(n) ............................................................................................................14

29 C.F.R. § 1630.2(o) ............................................................................................................14

iv

## INTRODUCTION

Following a trial on the merits, this Court scheduled a post-trial evidentiary hearing on economic damages for May 2, 2022, and requested that the parties brief Plaintiff's request for a permanent injunction enjoining Children's National from making any changes to the current accommodation that it has provided Plaintiff since November 19, 2020. In her Post-Trial Brief on Equitable Relief ("Plaintiff's Post-Trial Brief"), Plaintiff seeks an order requiring Children's National to provide her with a scribe through her anticipated retirement in 2030. Plaintiff also has proposed a standard for the award of back pay and front pay, including the period after November 19, 2020 when she was provided with a scribe by Children's National as a reasonable accommodation.

As set forth in further detail below, Plaintiff's request for back pay, front pay and injunctive relief should be denied. First, Plaintiff lacks sufficient evidence to establish that she is entitled to back pay damages with reasonable certainty for the period of time when she worked without a scribe from July 29, 2019 to November 19, 2020. Further, Plaintiff is not entitled to back or front pay damages after November 19, 2020 – when she received a virtual scribe – because the award of such damages 1) would constitute a windfall for Plaintiff, 2) would contravene this Court's prior Order that Plaintiff cannot recover damages for personal injuries, and 3) is unsupported by any evidence that Children's National caused any of Plaintiff's ongoing limitations. Lastly, a permanent injunction cannot be granted because Plaintiff cannot meet her burden of proving a likelihood of future harm. Moreover, Plaintiff has cited no legal authority to support her extraordinary request that her employer provide her with a specific accommodation (a scribe) for the remainder of her employment. Accordingly, Defendant respectfully requests that this Court 1) deny Plaintiff's request for back pay damages between July 29, 2019 and November 19, 2020, 2)

deny Plaintiff's request for back pay or front pay damages after November 19, 2020, and 3) deny

Plaintiff's request for a permanent injunction.

<u>**LEGAL STANDARDS AND ARGUMENT**</u>

**I.     Equitable Relief Available Under the DCHRA**

The DCHRA provides that, in a private cause of action, the court "may grant any relief it

deems appropriate," including the relief provided in D.C. Code § 2-1403.13(a). Section 2-

1403.13(a) of the D.C. Code provides for, *inter alia*, "[t]he hiring, reinstatement or upgrading of

employees, with or without backpay;" and "[t]he payment of compensatory damages to the person

aggrieved by such practice[.]"   The DCHRA also permits the court to order that the defendant

"cease and desist from such unlawful discriminatory practice, and to take such affirmative action."

D.C. Code § 2-1403.13(a)(1)

When interpreting the provisions and remedies of the DCHRA, D.C. courts look to other

employment discrimination statutes. *See Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588, 591 (D.C.

Cir. 1997) ("District of Columbia Courts interpreting the DCHRA have generally looked for

guidance to cases from the federal courts arising under federal civil rights statutes" (internal

citations omitted)); *Siddique v. Macy's*, 923 F.Supp.2d 97, 103 (D.D.C. 2013) ("The DCHRA is

interpreted consistently with similar terms in Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.*"); *Green v. American University*, 647 F.Supp.2d 21, fn 3 (D.D.C. 2009) ("Guidance

for analyzing DCHRA claims may be found in case law that has construed the [Americans with

Disabilities Act]").

Ultimately, the purpose of any remedy awarded under the DCHRA is to provide "complete

make-whole relief[.]"   *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995).   That is, "to

recreate the employment conditions and relationships that would have existed in the absence of

intentional discrimination." *White v. District of Columbia Water and Sewer Authority*, 962 A.2d 258, 260 (D.C. 2008); *see also United Mine Workers of America, Intern. Union v. Moore*, 717 A.2d 332, 339 (D.C. 1998) ("noting that "the trial court has 'broad discretion' to determine appropriate relief under the DCHRA" (internal citation omitted)). To this end, the trial court may make factual findings to determine the appropriate "make-whole" relief, as long as the findings are consistent with the jury verdict. *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005).

## II.    Plaintiff Cannot Prove Back Pay Damages with Reasonable Certainty

"[I]n devising a back pay award, the Court must, 'as nearly as possible, recreate the conditions and relationships that would have been, had there been no unlawful discrimination.'" *Robinson v. District of Columbia*, 341 F.Supp.3d 97, 109 (D.D.C. 2018) (quoting *Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111, 1119 (D.C. Cir. 1999)). The award of back pay "is not an automatic or mandatory remedy" but rather "is one which the courts may invoke in the exercise of their sound discretion [which] is equitable in nature." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 226 (1982); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415 (1975) ("It is true that backpay is not an automatic or mandatory remedy; like all other remedies under the [Civil Rights Act], it is one which the courts *may* invoke." (emphasis added)); *Jean-Baptiste v. District of Columbia*, 958 F.Supp.2d 37, 43 (D.D.C. 2013).

"Back pay is 'the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination[.]'" *Robinson*, 341 F.Supp.3d at 109 (citations omitted). The plaintiff bears the burden of "establishing the value of the lost salary and benefits." *Barbour*, 48 F.3d at 1278. Further, the plaintiff is required to prove back pay with "reasonable certainty." *Robinson*, 341 F.Supp.3d at 109. Even in cases where the plaintiff has suffered "compensable, emotional distress at the hands of the defendant[,]" the plaintiff cannot

support an award of back pay based only on conjecture and speculation.  *See Jefferson v. Milvets Sys. Tech., Inc.*, 986 F.Supp. 6, 8-9 (D.D.C. 1997) (rejecting the plaintiff's claim for back pay as "utterly speculative" when the plaintiff failed to provide "any supporting evidence" that he was unable to offset the damages attributable to his retaliatory discharge with other employment). Assuming that a plaintiff in a failure to accommodate case is entitled to back pay, "courts generally begin the back pay calculation at the point when a plaintiff begins to suffer financial loss after, and as a result of, the defendant employer's failure to accommodate." *Crump v. United States Dept. of Navy*, 205 F.Supp.3d 730, 743 (E.D. Va. 2016) (citations omitted).

Here, Plaintiff cannot prove that she is entitled to back pay with any reasonable certainty. The evidence will rather demonstrate that Plaintiff received her full base salary at all times while working without a scribe from July 29, 2019 to November 19, 2020, and that Plaintiff remained the highest paid doctor at the medical practice where she works (referred to as "Laurel CP&A"). Even assuming, *arguendo*, that Plaintiff could prove that she would have been able to see slightly more patients and generate more revenue for Laurel CP&A if she had a scribe from July 29, 2019 to November 19, 2020, she would not have received any more incentive compensation.  This is because, under Plaintiff's compensation arrangement, incentive compensation is largely dependent on the revenue generated by other doctors at Laurel CP&A, as well as the expenses of Laurel CP&A, both of which were adversely affected by the COVID-19 pandemic.  Indeed, Mark Janowiak, Director of Business Operations, will testify that, even if Plaintiff saw 15 or more additional patients per week during the period she worked without a scribe, her annual compensation would not have changed.

### III.    Plaintiff is not Entitled to Front or Back Pay Since Receipt of a Virtual Scribe in November of 2020

Like back pay, the purpose of front pay is "to make a victim of discrimination 'whole' and to restore him or her to the economic position he or she would have occupied but for the unlawful conduct of his or her employer." *Barbour*, 48 F.3d at 1279.  "The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award, including 'the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate.'"[1]  *Barbour*, 48 F.3d at 1279 (quoting *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992).

In the case at bar, Plaintiff claims that she is entitled to front pay for the expected duration of her employment with Children's National through 2030, notwithstanding that she has received her preferred accommodation of a virtual scribe at all times since November 19, 2020.  Plaintiff justifies this as follows:

> In this case, Plaintiff claims that she is permanently unable to return to eight hours of direct patient care because of physical injuries and pain she now has, including her recently diagnosed carpel tunnel syndrome, which she now suffers as a result of disability discrimination, namely Defendant's failure to provide a medical scribe for 16 months. She is only able to provide six hours of direct patient care going forward. That reduction in patient care has resulted in seeing approximately 15 patients less per week, which has a negative financial impact on her incentive compensation going forward, justifying an award of front pay.

---

[1] In determining front pay (if any), the Court may consider (1) the plaintiff's age, (2) the length of time the plaintiff was employed by the defendant employer, (3) the likelihood the employment would have continued absent the discrimination, (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment, (5) the plaintiff's work and life expectancy, (6) the plaintiff's status as an at-will employee, (7) the length of time other employees typically held the position lost, (8) the plaintiff's ability to work, (9) the plaintiff's ability to work for the defendant-employer, (10) the employee's efforts to mitigate damages, and (11) the amount of any liquidated or punitive damage award made to the plaintiff. *Ogden v. Wax Works, Inc.*, 29 F.Supp.2d 1003, 1015 (N.D. Iowa 1998).

5

Plaintiff's Post-Trial Brief at p. 8. Plaintiff's is mistaken for three separate reasons. First, awarding Plaintiff front pay when she already has a scribe would amount to a windfall. Second, this Court has already ruled that Plaintiff is not entitled to damages for physical injuries. Finally, Plaintiff has provided no evidence that she has sustained ongoing physical injuries as the result of working without a medical scribe for 16 months.

### A. Plaintiff receiving both a scribe and front pay would amount to windfall.

The D.C. Circuit observed in *Barbour* that "[t]he presumption that back pay will extend through the date of judgment derives from the related presumption that the employer will then rectify the discrimination by hiring or reinstating the employee." 48 F.3d at 1279. The Court further noted that only "[w]hen that preferred remedy [of reinstatement] is unavailable, front pay is appropriate." *Id.* Thus, in *Jean-Baptiste*, the Court declined to award front pay where the plaintiff was reinstated to their former or comparable position. 958 F.Supp.2d at 43; *see also Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) ("While reinstatement, which is clearly an equitable remedy, is the most preferred remedy, front pay may serve as a substitute or a complement. Because of the potential for windfall, however, its use must be tempered.").

Here, awarding Plaintiff front or back pay during any period of time when she was appropriately accommodated (after November 19, 2020) would be akin to awarding a plaintiff who was terminated both front pay and reinstatement. Simply put, the wrong that Plaintiff sought to redress by her claim for failure to accommodate was cured as of November 19, 2020. Thus, under the reasoning of both *Jean-Baptiste* and *Barbour*, there can be no front or back pay after this time. Indeed, Plaintiff does not cite to any failure to accommodate case in any jurisdiction where a plaintiff received both their preferred accommodation <u>and</u> front pay through the reminder of their

anticipated tenure with the employer.  This is because any such an award would amount to a windfall or double recovery for the plaintiff.

**B.  Front pay is barred by this Court's prior ruling that Plaintiff cannot recover for personal injuries or worsening of her medical condition.**

On January 5, 2022, Defendant filed a Motion *in Limine* to Preclude Plaintiff from Introducing Evidence of, or Seeking Damages for, Physical Injury or Worsening of her Medical Condition (ECF No. 40) ("Defendant's Motion *in Limine*").  Defendant's Motion *in Limine* argued that Plaintiff's award for permanent partial disability benefits from the Maryland Workers' Compensation Commission amounted to a binding election of remedies, precluding double recovery for the same damages caused by working without a scribe.  Defendant's request that Plaintiff be barred from seeking recovery for personal injury or worsening of her medical condition was granted by the Court during the Pretrial Conference on February 18, 2022.

Plaintiff's request that she be compensated for "physical injuries and pain" that allegedly reduced her future earning capacity directly contravenes this Court's prior ruling that Plaintiff is barred from recovering for personal injury.  *See* Plaintiff's Post-Trial Brief at p. 8.  The permanent partial disability award by the Maryland Worker's Compensation Commission already compensated Plaintiff for this alleged injury.  *See Queen v. Queen*, 308 Md. 574, 586 (1987) (a "lump sum permanent partial disability award … represents an amount based on the loss of future earning capacity[.]") (emphasis added); *Mazor v. State Dep't of Correction*, 279 Md. 355, 363 (1977) ("workmen's compensation is one facet of an overall system of wage-loss protection[.]").  As such, allowing Plaintiff to seek recovery for economic losses stemming from her alleged personal injury is inconsistent with this Court's previous ruling that Plaintiff's is barred from seeking damages for personal injury or worsening of her medical condition.

7

**-73-**

### C. Plaintiff can only speculate that any future loss of earning capacity is attributable to the 16-month period she worked without a scribe.

"While some speculation is necessary to determine front pay," such damages cannot be overly speculative, and must be supported by competent evidence allowing the court to project the plaintiff's losses into the future. *Peyton v. DiMario*, 287 F.3d 1121, 1129 (D.C. Cir. 2002); *see also Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798 (8th Cir. 2013) (vacating award of front pay where the damages were overly speculative). Moreover, implicit in the award of front pay is a causal connection between the defendant's violation and the plaintiff's future lost earnings. *Barbour*, 48 F.3d at 1279. This Court's decision in *Jefferson v. Milvets Sys. Tech., Inc.* is instructive. 986 F.Supp. 6 (D. D.C. 1997). In that case, the plaintiff succeeded at trial in proving that he was terminated from his employment in retaliation for protected activity under Title VII. *Id.* at 8. The evidence revealed that the plaintiff, after termination by the defendant, began working in a comparable role at a different company, but worked about half as many hours as he had worked for the defendant. *Id.* According to the plaintiff, he could not return to full-time work due to emotional distress caused by his retaliatory termination and would be unable to do so for another five years. *Id.* Plaintiff therefore sought a year-and-a-half in back pay and five years of front pay. *Id.* The Court in *Jefferson*, while opining that plaintiff's claims for back and front pay were "utterly speculative," stated:

> [w]hile there was sufficient evidence for a reasonable jury to find that the plaintiff had suffered some compensable, emotional distress at the hands of the defendant, the plaintiff has pointed to no probative evidence (such as expert testimony from a psychologist or a physician) that this emotional distress has precluded him from working full-time and will continue to do so for another five years.

*Id.* In rendering its opinion, the Court was clear that speculative evidence would not support an award of back or front pay. *Id.* at 7.

8

Here, Plaintiff's evidence of ongoing pain and limitations attributable to the 16-month period when she worked without a scribe is even more tenuous than the plaintiff's evidence in *Jefferson*. Not only is there a lack of any evidence on causation, but Plaintiff's own treating physician, Dr. David Levin, testified at trial that there is no causal connection between the 16-month period that Plaintiff worked without a scribe and any ongoing limitations. Dr. Levin rather testified at trial that Plaintiff's condition is "degenerative," meaning that it progresses over time. *See* Excerpts of Dr. David Levin Trial Testimony, attached hereto as Exhibit A, at p. 44:2-9. Dr. Levin further testified that computer work did not cause the discs in Plaintiff's neck to degenerate, and that the structural changes to Plaintiff's discs were not made worse as the result of the 16 months when Plaintiff worked without a scribe. Exhibit A at pp. 44:10-18, 72:8-14. Dr. Levin plainly testified that he does "not think [Plaintiff] is necessarily worse off now than had she had the scribe all along." Exhibit A at pp. 74:18-75:18.

Despite that Plaintiff's own doctor has rejected the notion that she suffers any ongoing limitation as the result of working without a scribe for roughly 16 months, Plaintiff claims in her Post-Trial Brief that she developed an entirely new condition, carpel tunnel syndrome, as the result of working without a scribe. Yet, just like the plaintiff in *Jefferson*, there has been no evidence from an expert or otherwise that Plaintiff is currently limited in her ability to see patients (and will be so limited in the future) because of carpel tunnel syndrome. Notably, there is no reference to Plaintiff having carpel tunnel syndrome in her Complaint, and Plaintiff presented no evidence of the cause of carpel tunnel syndrome during discovery or trial. Indeed, there is no evidence – outside of Plaintiff's speculation as a lay witness – that working without a scribe caused Plaintiff's carpel tunnel syndrome at all. *But see Doherty v. Corizon Health*, No. 3:19CV420-HEH, 2022 WL 782777, at *10 (E.D. Va. Mar. 14, 2022) ("Doherty, a lay person, is incompetent to testify as

to the cause of any medical condition.") (citations omitted).  The speculative nature of Plaintiff's attempt to recover lost wages after November 19, 2020 is further compounded by the fact that Plaintiff cannot show lost wages during the period of time when she did not have a scribe, as set forth in Part II, *supra*.  Because Plaintiff did not lose any wages as the result of working a reduced patient load between July 29, 2019 and November 19, 2020, there is no basis to project any loss into the future.

Plaintiff is also unable to satisfy her burden of providing evidence of the discount rate/methodology to be used in reducing an award of front pay to present value. *See Barbour*, 48 F.3d at 1279 (noting that Plaintiff has "the initial burden of providing the district court "with the essential data necessary to calculate a reasonably certain front pay award," including "the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate.") (citations omitted).  Rather than citing to any evidence of an appropriate discount rate or methodology in light of the current economic conditions, Plaintiff cites to numerous decisions from outside of this jurisdiction that have reached varying conclusions about an appropriate discount rate.  *See* Plaintiff's Post-Trial Brief at pp. 12-13.  Of course, this is not evidence, but rather legal argument by Plaintiff's counsel.  Plaintiff then incredibly asks the Court to defer to an online calculator for reducing any award of front pay to present value.  This surely does not satisfy Plaintiff's burden of providing a non-speculative, underlying <u>evidentiary basis</u> for calculating front pay damages.

### III.    Injunctive Relief is Inappropriate Given that Plaintiff Already has a Scribe.

In support for her request for a permanent injunction, Plaintiff speculates that, because Children's National did not provide her with a scribe from July 2019 to November 2020 and now opposes her request for injunctive relief, "Defendant will stop at nothing to take [Plaintiff's] scribe

away again." Pl. Motion at pg. 13-14. Plaintiff's contention that Defendant intends to take away the accommodation it provided to her for almost a year-and-a-half is entirely unsubstantiated. Moreover, injunctive relief cannot be based on Defendant's legal position that it was not required to provide a scribe. Otherwise, injunctive relief would necessarily be an automatic remedy under the DCHRA, irrespective of any evidence that future harm is likely or that the injunction is necessary to place the plaintiff in the same position that she would have been in but for the defendant's conduct.

### A. Plaintiff has not demonstrated any likelihood of future harm to support the requested injunctive relief.

The DCHRA only provides that the Court may issue injunctive relief requiring a defendant "to cease and desist from such unlawful discriminatory practice, and to take such affirmative action, including but not limited to: (A) the hiring, reinstatement or upgrading of employees, with or without back pay." D.C. Code § 2-1403.13(a)(1) (emphasis added). Further, injunctive relief is not a "mandatory remedy" and is inappropriate where "the proscribed discriminatory practice has been terminated and there is little likelihood of recurrence." *See Robinson v. District of Columbia*, 341 F.Supp.3d 97, 109 (D.D.C. 2018); *Johnson v. Brock*, 810 F.2d 219, 225 (D.C. Cir. 1987).

In her Post-Trial Brief, Plaintiff relies on a decision of the Ninth Circuit in *EEOC v. Goodyear Aerospace Corp.*, for the proposition that "[i]t is Defendant's burden to prove that it is unlikely to repeat its action of discriminatorily taking away Dr. Scott-McKinney's medical scribe." Plaintiff's Post-Trial Brief at p. 15 (citing 813 F.2d 1539, 1544 (9th Cir. 1987)). However, that approach has never been adopted by the D.C. Court of Appeals or the D.C. Circuit. Instead, this Court has placed the burden on the plaintiff to prove a "reasonable likelihood" of discriminatory behavior in the future with "record evidence[,]" as opposed to speculation. *Robinson*, 341 F. Supp. 3d at 109 (denying the plaintiff's request for injunctive relief where "Mr. Robinson has failed to

demonstrate that Ms. Sutter is reasonably likely to ever again discriminate against Mr. Robinson

or be placed in a position to do so."); *Sourgoutsis v. United States Capitol Police*, No. 16-CV-1096

(KBJ), 2020 WL 6887782, at *3 (D.D.C. Nov. 24, 2020) (denying the plaintiff's request for

injunctive relief where "the record evidence does not give rise to a reasonable expectation that

USCP will discriminate against Sourgoutsis in the future.").   Furthermore, the D.C. Court of

Appeals, in interpreting the DCHRA, has ruled that "a plaintiff seeking forward-looking relief,

such as an injunction, must allege facts showing that the injunction is necessary to prevent injury

otherwise likely to happen in the future."[2]  *Equal Rights Center v. Properties Intern*., 110 A.3d

599, 603 (D.C. 2015).  This Court has further observed that injunctive relief should be limited to

those cases where the defendant has exhibited a "callous disregard" for the plaintiff's rights.

*Sourgoutsis*, 2020 WL 6887782, at *4.

      Here, there is no evidence to support Plaintiff's contentions of a likelihood of future harm.

Defendant has provided Plaintiff her preferred accommodation of a scribe at all times since

November 19, 2020—well before any jury verdict in this matter.  Thus, there is no discriminatory

activity or other wrongful conduct to cure with injunctive relief, and Plaintiff's speculation that

Defendant may fail to accommodate her at some point in the future cannot suffice to show a

likelihood of future harm.  *See Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 199

(E.D.N.Y. 2012) (holding that the plaintiff in a failure to accommodate case acknowledged that

his current position "does accommodate his disability[,]" and the "speculative assertion" that this

accommodation may be taken away "is insufficient to warrant the strict remedy of permanent

injunctive relief.").

---

[2] *Musgrove v. Government of Dist. of Columbia*, 775 F.Supp.2d 158, 171 (D. D.C. 2011) ("When
construing provisions of the D.C. Code – including the DCHRA – this Circuit defers to the District
of Columbia Court of Appeals on questions of statutory interpretation.").

The fact that Defendant voluntarily provided Plaintiff a scribe as a reasonable accommodation since November 19, 2020, and continues to do so, demonstrates that Defendant has no intention of violating any of Plaintiff's rights. Notwithstanding its earlier legal position that Plaintiff was not entitled to the services of a scribe, Defendant still provided this accommodation on November 19, 2020, "pending a decision in the present litigation on whether a scribe is a required accommodation[.]" *See* Declaration of Mark Janowiak ECF No. 22-18, at ¶ 5. The jury has now made a finding, and Defendant fully intends to conduct itself in compliance with the rights determined by the jury. Thus, the jury verdict in this matter is more than sufficient to protect Plaintiff from any speculative risk of future harm. *See Hayes v. Shalala*, 933 F. Supp. 21, 27 (D.D.C. 1996) ("An injunction prohibiting discrimination and retaliation in this case is both unnecessary and inappropriate. The jury verdict is sufficient in and of itself to protect plaintiff against future acts of discrimination and retaliation. The Court will not presume that the [defendant and its] employees will not follow the law and plaintiff has not demonstrated that future violations are likely.").

The evidence at trial further showed that Defendant's actions were not the product of a "callous disregard" for Plaintiff's rights, such that injunctive relief is necessary to protect Plaintiff going forward. *See Johnson v. Brock*, 810 F.2d 219, 226 (D.C. Cir. 1987) (denying the plaintiff's request for injunctive relief where the defendant's "past practices do not suggest the callous disregard for the goals of Title VII which necessitate injunctive relief."). The evidence at trial rather showed that Defendant provided Plaintiff numerous alternative accommodations other than a scribe which helped to alleviate her pain and allowed her to perform the essential functions of her job. These included a standing desk, a new ergonomic chair, a laptop cart to bring into patient examination rooms, a new mouse, a gel pad to wrest her wrist on while using the mouse, a new

keyboard, an adjustable footrest for her desk, a Bluetooth headset, a touchscreen tablet, a modified work schedule on the recommendation of Dr. Levin, voice dictation software, and a duplicate ergonomic office set up for Plaintiff's home.  Surely, an employer with "callous disregard" for a disabled employee's rights would not provide all of these accommodations and later provide a scribe even through it maintained that it had no legal duty to do so.  This evidence can only demonstrate that Defendant made a good faith effort to accommodate Plaintiff, notwithstanding its legal position that a scribe was not a required accommodation under the law.  In fact, this evidence caused the Court to grant Defendant's Motion for Judgment as a Matter of Law on the issue of punitive damages at the close of Plaintiff's case.

### B. The injunction requested by Plaintiff would grant rights which she would not otherwise enjoy but for Defendant's failure to accommodate.

Just as any other relief, an injunction is intended to "restore [plaintiff], as nearly as possible, to the circumstances [s]he 'would have occupied if the wrong had not been committed.'" *Robinson v. D.C.*, No. CV 15-444 (RC), 2019 WL 2028397, at *7 (D.  D.C. May 8, 2019).  For example, in *Robinson*, the jury found that the plaintiff was denied access to overtime hours for discriminatory reasons, and the Court issued an injunction "that he not be discriminatorily denied access" to overtime in the future.  *Id.*  In that case, the defendant was enjoined from violating a right that the plaintiff should enjoy but for the wrongful conduct of his employer.

Contrary to *Robinson* and the other cases where this Court has granted injunctive relief – none of which concerned a failure to accommodate – Plaintiff asks for an injunction to provide more rights than she would otherwise enjoy under the law.  In particular, under the DCHRA, no employee enjoys the unfettered right to a single accommodation through their anticipated retirement.  Disabled employees are rather only entitled to a reasonable accommodation that allows them to perform the essential functions of their job and/or enjoy equal benefits and privileges of

employment. *See* 29 C.F.R. §1630.2(o) and (n) (defining reasonable accommodation and essential functions). Moreover, if there is more than one accommodation that allows an employee to perform the essential functions of the job and/or enjoy equal benefits and privileges, then the employer has the ultimate discretion to choose between those accommodations. *See Porter v. Jackson*, 668 F. Supp. 2d 222, 235 (D.D.C. 2009), *aff'd*, 410 F. App'x 348 (D.C. Cir. 2010).

Given the endless number of ways in which Plaintiff's computing responsibilities, physical limitations, and potential accommodations could change over the course of the ensuing years, the Court cannot reasonably rule that a scribe is a required reasonable accommodation through Plaintiff's anticipated retirement in 2030. *Cf. Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035 (8th Cir. 2008) (reversing the lower court's grant of an injunction requiring UPS "to accommodate plaintiff's religious observation of the Sabbath in the future" on the grounds that "it is not at all clear what accommodations will be reasonable in the future."). Given the fluidity of an ongoing employment relationship and the individualized and job-specific considerations required in the accommodation process, there is simply no basis for the Court to rule that what is now a required reasonable accommodation will continue to be so in the future. *See Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 133 (1st Cir. 2009) (recognizing a "possibility of changes in either the employee's condition or the workplace environment that could warrant a different response from the employer to renewed requests for accommodation."). Indeed, there is no support for such an order, and Plaintiff does not cite to a single failure to accommodate case where such relief has been granted. Thus, there is no basis in the DCHRA for ordering that an employer provide an employee a particular accommodation for the remainder of their employment.

**C. Plaintiff's request for company-wide injunctive relief is overbroad.**

Lastly, Plaintiff's request for company-wide injunctive relief, including the posting of notices, annual training, and distribution of policies, far exceeds the scope of the individualized claims made by Plaintiff in this matter. *See* Plaintiff's Post-Trial Brief at p. 17. This Court has previously ruled that injunctions – if granted at all – must be "narrowly tailored and should generally apply only to the plaintiff where a class has not been certified." *Jean-Baptiste v. D.C.*, 958 F. Supp. 2d 37, 50 (D.D.C. 2013); *see also Sourgoutsis v. United States Capitol Police*, No. 16-CV-1096 (KBJ), 2020 WL 6887782, at *3 (D.D.C. Nov. 24, 2020) (denying the plaintiff's request for widespread injunctive relief where plaintiff had not "alleged widespread, institutionalized discrimination against female employees[.]"). Here, Plaintiff has not made any allegations that anyone other than her has been denied a reasonable accommodation, and there is no evidence of any systemic or institutionalized discrimination to justify company-wide injunctive relief. Thus, any company-wide injunctive relief would be patently overbroad.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant Children's National respectfully requests that this Court 1) deny Plaintiff's request for back pay damages between July 29, 2019 and November 19, 2020, 2) deny Plaintiff's request for back pay and front pay damages after November 19, 2020, and 3) deny Plaintiff's request for a permanent injunction.

Date:  April 12, 2022                         Respectfully submitted,

                                             */s/ Kraig B. Long*
                                             Kraig B. Long, Bar#467858
                                             Jeffrey T. Johnson, Bar#1724768
                                             Nelson Mullins Riley & Scarborough, LLP
                                             100 S. Charles Street, Suite 1600
                                             Baltimore, MD 21201
                                             Tel: 443-392-9460
                                             Fax: 443-392-949
                                             Kraig.Long@nelsonmullins.com
                                             Jeffrey.Johnson@nelsonmullins.com
                                             **Counsel for Defendant**


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of April 2022 the foregoing Post-Trial Brief

on Economic Damages and Opposition to Plaintiff's Motion for Injunctive Relief was served via

the Court's ECF system on:

                         Eric L. Siegel
                         KALBIAN HAGERTY, LLP
                         888 17th Street, N.W., Suite 1000
                         Washington, D.C. 20006
                         (202) 419-3296
                         esiegel@kalbianhagerty.com

                         **Counsel for Plaintiff**

                         Kraig B. Long

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACY SCOTT-MCKINNEY,** | |
| **Plaintiff,** | |
| **v.** | **Case No: 1:19-CV-2980-TNM** |
| **CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM,** | |
| **Defendant.** | |

## PLAINTIFF'S POST-TRIAL REPLY BRIEF SEEKING INJUNCTIVE RELIEF

Plaintiff, Stacy Scott-McKinney, by and through her counsel, hereby provides this reply brief in support of her request for permanent injunctive relief under the D.C. Human Rights Act ("DCHRA"). She seeks an injunction requiring Defendant to provide her with a medical scribe as a reasonable accommodation for so long as she remains employed by Defendant, with the exception of a new future technology, product or service which is equally effective as her scribe in managing her pain and productivity after being fully tested and proven **before** a substitution is made. She also seeks company-wide injunctive relief set forth in her Complaint and her Post-Trial Brief. That injunctive relief is part of the make-whole relief as a result of the jury finding of disability discrimination.

Before addressing the merits of Defendant's arguments and assertions in its opposition brief starting at page 10, Plaintiff states that she will not spend the time in this reply brief responding to Defendant's arguments and factual assertions regarding back pay and front pay relief. Defendant apparently has ignored the Court's instructions in its March 25 Order to provide

a post-trial brief *on legal standards* and instead has sought to use its brief to argue the merits. Defendant's effort is premature given the Court's deadline of May 16, 2022 to file closing briefs after the evidence is presented at the evidentiary hearing scheduled for May 2. Plaintiff will not take the bait because the evidence presented will debunk Defendant's assertions.

One other initial matter that needs correction. Defendant continues to state that it voluntarily provided Dr. Scott-McKinney a "reasonable accommodation" as of November 19, 2020 by providing a scribe. Defendant's Opposition to Injunctive Relief ("Def's Opp.") at 16, 17, 18. Defendant did no such thing. The only evidence presented at trial was that Defendant provided Dr. Scott-McKinney a scribe on that date after she continued to fall further and further behind in completing her patient medical records such that she could not bill for those services. Defendant provided a scribe solely to protect its economic self-interest. There was no benevolence here.

The Court may recall that Defendant filed a motion in limine prior to trial seeking to exclude any evidence or argument by Plaintiff that merely because Defendant provided a scribe in November 2020 should not be the basis to argue that it failed to provide a reasonable accommodation prior to that date. Defendant cannot advance such an argument as a shield prior to trial to prevent introduction of such evidence only to reverse course now that it lost at trial and advance the same assertion as a sword that it generously provided an "accommodation" to Dr. Scott-McKinney, and, as a result, the Court should decline to issue permanent injunctive relief. The Court should reject this disingenuous maneuver.

Regarding the merits of Plaintiff's request for injunctive relief, the DCHRA expressly provides that the Court may take "affirmative action" to prevent Defendant from unlawfully discriminating against Dr. Scott-McKinney. D.C. Code § 2-1403.13(a)(1) (as applied by D.C. Code § 2-1403.16). As stated in Plaintiff's initial post-trial brief, "Where 'the proscribed

2

discriminatory practice has been terminated and there is little likelihood of recurrence,' a court need not enjoin the defendant from further acts of discrimination." *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 108 (D.D.C. 2018), quoting *Williams v. General Foods Corp.*, 492 F.2d 399, 407 (7th Cir. 1974).

This law places the burden on Defendant, not Dr. Scott-McKinney, to present evidence that there is "little likelihood of recurrence" of discrimination. *See EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) ("Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination unless the employer proves it is unlikely to repeat the practice"); *EEOC v. Ilona of Hungary, Inc*., 108 F.3d 1569, 1579 (7th Cir. 1997) (granting permanent injunction when primary decision makers offered no evidence to suggest they would cease discriminating). Defendant argues that the *Goodyear Aerospace Corp.* standard requiring the employer to provide little likelihood of recurrence has never been adopted by the D.C. Circuit. Def's Opp. at 16. That argument is odd since the court in *Robinson*, 341 F.Supp. 3d at 109, expressly cited to *Goodyear Aerospace Corp.* for the rule of law cited by Plaintiff here.

Defendant presented no evidence either at trial or attached to its opposition brief that suggests that it will not take away Dr. Scott-McKinney's scribe again and use her as a Guinea pig to try other methods of documenting patient care to her detriment. In contrast, Dr. Scott-McKinney has presented trial evidence that Defendant, in fact, used her as a Guinea pig in August 2019 after refusing to replace her exiting scribe. Specifically, Defendant refused to provide a replacement scribe but instead ordered her to use untried and unproven "MModal" voice dictation software ("VDS") with Children's Pediatrician & Associates' ("CP&A") archaic electronic medical record ("EMR") system. The Court and jury heard testimony from Defendant's IT manger Philip Shin

that he was not familiar with the MModal software and took the word of the vendor that it worked.

Mr. Shin testified that he did not test whether it would actually navigate through the boxes and

dropdown menus of CP&A's EMR software.  Perhaps most damning is Plaintiff Exhibit 125,

which is Plaintiff's journal of her efforts to use the MModal VDS.  She wrote contemporaneously

on July 31, 2019, when she was having orientation with the MModal representative:

> July 31-MModal representative, Patrick, gave me an "overview training" on
> software. Trainer states someone in CP&A will do the training for the
> "implementation phase". **Patrick states our EHR is "click heavy" and this
> software "will not help with that".** This software captures narrative only. Patrick
> states this software would help certain specialties more than others. All
> documentation in records done by me.

(Emphasis added).  Thus, contrary to Defendant's suggestion (Def's Opp. at 18), this evidence

clearly demonstrates that Defendant callously disregarded Dr. Scott-McKinney's civil rights – a

factor militating in favor of granting a permanent injunction (*Sourgoutsis v. United States Capitol

Police*, No. 16-cv-1096 (KBJ), 2020 WL 6887782, at *4 (D.D.C. Nov. 24, 2020) – by requiring

her to use VDS software that clearly would not help with box clicks and dropdown menus.

Defendant's ongoing callous disregard for Dr. Scott-McKinney's civil rights is further

evidenced by her non-selection to serve as Team Lead for her practice at the end of 2021, when

her former Team Lead, Dr. Dan Glaser, retired.  The Team Lead is a supervisory position and will

carry with it financial benefits.  Exhibit 1 at ¶ 18.  Specifically, upon Dr. Glaser's announcement

of his retirement and given that she is the most senior physician in her Laurel, Maryland practice,

Dr. Scott-McKinney volunteered to assume the Team Lead position for her practice after

consulting with and receiving agreement from her physician colleagues.  *Id*. at ¶ 19.  She sent an

email to CP&A's Medical Director, Marc DiFazio, M.D., Director of CP&A Business Operations,

Mark Janowiak, and Director of CP&A Clinical Operations, Kathy Prestidge, stating her

willingness and interest to volunteer for the Team Lead position.  Dr. DiFazio responded that there

4

-87-

would be a formal interview and application process for the Team Lead position. *Id*. at ¶ 20.
During her over 15-year tenure with Defendant, such an application and interview process for the
Team Lead position is unprecedented. It is typical that the most senior physician in a CP&A
practice group assumes the Team Lead position when the incumbent retires. *Id*. at ¶ 21.

    Contrary to Dr. DiFazio's statement about a formal process, neither Dr. Scott-McKinney
nor her practice physician colleagues ever received any notification of an application or interviews.
*Id*. at ¶ 22. Instead, Defendant CNMC/CP&A unilaterally selected a physician who is junior to
Dr. Scott-McKinney and is outside of her Laurel practice group to assume the Team Lead position
for *her* practice. That physician is not only junior to her but also works in CP&A's Bowie,
Maryland office. *Id*. at ¶ 23. She is unaware of any time during her tenure with Defendant that a
physician from one practice group has ever assumed the Team Lead position for another practice
group. This too is unprecedented. *Id*. at ¶ 24. The only logical inference to be drawn is that Dr.
Scott-McKinney was refused this Team Lead supervisory position because she "rocked the boat"
and asserted her civil rights. There is no other logical explanation. This evidence of alleged
retaliation for pursuing this lawsuit (within weeks of the trial) further supports the vindictiveness
and callousness that Defendant has demonstrated in dealing with Dr. Scott-McKinney, which
further supports the issuance of a permanent injunction. The decision to deny her the Team Lead
position also rested on the decisions of Dr. DiFazio and Mark Janowiak, among others, who still
remain part of leadership at CP&A going forward.

    Furthermore, as stated in her original brief filed March 29, 2022, given Defendant's
objection in the Joint Report to injunctive relief; its arbitrariness in refusing to replace the scribe
in July 2019, harkening back to its "slippery slope" argument in June 2018 by its workers'
compensation counsel (and its repeated refrain during closing argument at trial of this case); its

requirement that Dr. Scott-McKinney use a clearly ineffective voice dictation software (as corroborated by the MModal representative himself and Philip Shin, CP&A's IT manager at trial), the Court should not simply take Defendant's word for it through assertion alone that it will not attempt to remove her scribe again.

Defendant argues that, in this failure to accommodate case, granting an injunction will give Dr. Scott-McKinney more rights which she would not otherwise enjoy because "… no employee enjoys the unfettered right to a single accommodation through their anticipated retirement." Def's Opp. at 19. To the contrary, Plaintiff does not seek a permanent injunction simply because she won at trial. She seeks an injunction because a medical scribe is the ***only*** accommodation for her disability that allows her to perform the essential functions of her job and still maintain manageable pain levels, ***and*** there is a strong likelihood that Defendant will take away her scribe based on its past behavior ***and*** near-term events.

In particular, Defendant CNMC/CP&A[1] is apparently implementing a new EMR software at CP&A in the fall of 2022 manufactured by Cerner Corporation. *See* Exhibit 1 (Declaration of Plaintiff Scott-McKinney) at ¶ 3. That software will replace the current EMR software used by CP&A practice groups, such as Dr. Scott-McKinney's practice. Dr. Scott-McKinney was one of a handful of physicians who has already piloted the new Cerner EMR software prior to all employees being trained on it before its implementation. *Id*. at ¶ 6. From her firsthand experience, she already knows that there are many boxes and dropdown menus in this EMR software, just like in her current EMR software. *Id*. at ¶ 7. As a result, the new EMR software being implemented at CP&A could not possibly have VDS capabilities that would be effective for her medical condition

---

[1]    Recall that the parties stipulated that CNMC and its subsidiary CP&A are a single employer. *See* ECF# 45.

as Defendant has offered no VDS that can check boxes and navigate dropdown menus effectively. *Id*. at ¶ 8.

In fact, Defendant currently uses "Dragon" VDS at its hospital with the Cerner EMR software. Exhibit 1 at ¶ 9.  Dragon software is not a Cerner product.  Not only does Dr. Scott-McKinney know this fact firsthand, but also Cerner, through a representative, has confirmed that fact.  She testified at trial that she previously piloted Dragon software in 2018 prior to her scribe, Asiah Cauley, starting. *Id*. That VDS, like MModal, was and is only useful for narrative style documenting and not dropdown menus or box clicks.  Cerner representatives have also confirmed her prior experience with Dragon software that the software will dictate where the cursor is placed. It is up to Dr. Scott-McKinney to place the cursor, which means she must move the mouse to do so. *Id*. It is a vicious cycle that gets Dr. Scott-McKinney back to where her problems began and why she needed the accommodation of a scribe in the first place, which the jury has found is "reasonable."

Based on Dr. Scott-McKinney's long tenure at CP&A, she states that it is highly unlikely that EMR software will be changed again prior to her retirement in 2030 given the exorbitant expense involved with such a transition.  *Id*. at ¶ 11.  Consequently, it is unlikely that any VDS software, including Dragon, will effectively work with the Cerner EMR software to extinguish the need for Dr. Scott-McKinney to use a scribe.  Of course, as stated earlier, if the future brings a new VDS technology which can overcome these problems, Dr. Scott-McKinney is more than willing to try it, and, if successful, use it in lieu of a scribe.  That day is a long time away, if at all.

Based on these facts above, Defendant's assertion that "there is no evidence to support Plaintiff's contentions of a likelihood of future harm" (Def's Opp. at 17) is without merit. Defendant's continued characterization that Dr. Scott-McKinney's scribe is her "preferred

7

accommodation" (*id.*) is likewise baseless. In fact, as the jury has found, it is the ***only*** reasonable accommodation to allow her to perform the essential functions of her pediatrician job.  Exhibit 1 at ¶ 10.

Defendant's claim that Plaintiff speculates that "Defendant may fail to accommodate her at some point in the future" is belied by the evidence at trial and with this reply brief, namely the fact that Defendant will be implementing new EMR software in 2022 which has many boxes to check and dropdown menus to navigate.  Defendant should not be permitted to force Dr. Scott-McKinney to try untested and unproven VDS after removing her scribe.  **To be clear, until Defendant can demonstrate, in good faith, that it has an equally effective alternative to a scribe, Defendant should be required to provide Dr. Scott-McKinney with that scribe.**  In light of these recent EMR developments, that is why an injunction should issue.

As the D.C. Court of Appeals in *Mbakpuo v. Ekeanyanwu*, 738 A.3d 776, 782 (D.C. 1999), stated: "The necessary determination is that there exists ***some cognizable danger of recurrent violation***…." *Id.* citing  *United States v. W.T. Grant Co*., 345 U.S. 629, 97 L. Ed. 1303, 73 S. Ct. 894 (1953).  The evidence presented by Plaintiff, not Defendant, clearly demonstrates some cognizable danger of recurrent violation, justifying the issuance of an injunction in this case.

Defendant complains that an injunction will not permit it to consider the "endless number of ways in which Plaintiff's computing responsibilities, physical limitations, and potential accommodations could change over the course of the ensuing years."  Def's Opp. at 20.   That is not true.  To repeat, Dr. Scott-McKinney is open to trying new methods of documenting as an adjunct to a scribe to ensure that those products or services are effective before giving up her scribe.  *See* Exhibit 1 at ¶ 14.  However, without an injunction, she should not be required to give up her scribe to be a Guinea pig for untried and unproven technologies, as Defendant required her

8

**-91-**

to do in the past. So long as technologies are tested and validated as being as effective as her scribe, she is not opposed to trying other options in the future. She only seeks from CNMC sensitivity to her debilitated physical condition such that CNMC should be required to demonstrate that other accommodations will be equally effective as her scribe in managing her pain levels and maximizing her productivity over the passage of time. Forcing her to reduce her hours of direct patient care, as Defendant did by its failure to provide the scribe for 16 months, is not an effective accommodation. She has and will continue to suffer ongoing financial impacts because of that 6-hour work limitation, which she is now required to follow because of the damage done as a result of not having a scribe for 16 months. That is the subject of the evidentiary hearing on damages.

Defendant states that the "fluidity of the ongoing employment relationship" between Defendant and Dr. Scott-McKinney also militates against the issuance of an injunction. Def's Opp. at 20. Given that Dr. Scott-McKinney is and has been the highest producer in her practice group for years (as she testified at trial), has made Defendant a great deal of money over the years (as the evidence at trial demonstrated), and has expressed no desire to leave her employment with Defendant, one wonders what Defendant has in mind with such references to the "fluidity" of her employment. In sum, she has been a loyal and trusted physician of Defendant for years and looks forward to working with Defendant until her retirement from the practice of medicine. Such arguments by Defendant should be dismissed as unpersuasive and as a distraction from the facts, which support the issuance of a permanent injunction.

Lastly, Defendant opposes Plaintiff's request for company-wide injunctive relief, including the posting of notices, annual manager training, and distribution of policies as "far exceed[ing] the scope of the individualized claims made by Plaintiff in this matter." Def's Opp. at 21. To the contrary, Defendant ignores the facts and the law that she is a "private attorney general" under the

DCHRA enforcing not only her rights but also the rights of District citizens.  *Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 775 n.13 (D.C. App. 1993).  First, the posting of notices that sets forth the requirements of the District of Columbia discrimination laws is **mandatory** under D.C. Code § 2-1401.51.  Dr. Scott-McKinney was not made aware of her rights under the DCHRA until she met with a lawyer.  An injunction should be issued given Defendant's failure to adhere to this notice posting requirement.

Next, as Dr. Scott-McKinney testified, she was forced to pursue her accommodation requests through Defendant's workers compensation coordinator rather than through its Reasonable Accommodation Committee, where it should have been properly vetted.  She also testified that Defendant failed to engage in the interactive process in July-August 2019 when she lost her scribe.  Rather, Defendant summarily ordered her to use the untested MModal VDS. Based on Dr. Scott-McKinney's direct negative experience seeking an accommodation and the lack of an interactive process, she seeks an injunction to require Defendant to conduct annual training for all managers of the disability discrimination laws and requirements, including reasonable accommodations, Defendant's specific policies and processes for pursuing accommodations and the interactive process.   Under the circumstances, requiring Defendant's Reasonable Accommodation Policy to be distributed to all employees on its training portal (which Plaintiff is informed Defendant already does) **and to provide a copy directly to an employee** when he or she makes a written or oral request for reasonable accommodation is not unreasonable or overly broad requested relief.  It simply ensures that Defendant will follow the law and proper disability accommodation processes, which a jury has found it violated in the case of Dr. Scott-McKinney. Dr. Scott-McKinney wishes to ensure that no other disabled employees experience what she has experienced.  As a "private attorney general" enforcing civil rights, she is permitted to pursue and

ask for such relief, which she requested in her Complaint at the start of this case.  Defendant should

not be surprised and should be held to account for its violation of the District's civil rights laws.

## CONCLUSION

For the foregoing reasons, the Court should issue an injunction requiring Defendant to

provide Dr. Scott-McKinney with a medical scribe for the duration of her employment at its

expense, until such time as Defendant has provided to her a tested and validated substitute for

documenting patient care in order to justify Dr. Scott-McKinney relinquishing her scribe.   As a

"private attorney general," Plaintiff also seeks the other injunctive relief as set forth above based

on the evidence presented in this case.

Date:  April 19, 2022                    Respectfully submitted,

                                         */s/ Eric L. Siegel*
                                         Eric L. Siegel  (D.C. Bar No. 427350)
                                         KALBIAN HAGERTY, LLP
                                         888 17th Street, N.W., Suite 1200
                                         Washington, D.C. 20006
                                         (202) 419-3296
                                         esiegel@kalbianhagerty.com
                                         *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 19th day of April 2022, a copy of the foregoing was

served via the Court's ECF system to:

Kraig B. Long, Bar#467858  (Kraig.Long@nelsonmullins.com)
Jeffrey T. Johnson, Bar#1724768 (Jeffrey.Johnson@nelsonmullins.com)
Nelson Mullins Riley & Scarborough, LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
Tel: 443-392-9460
*Counsel for Defendants*

                                         */s/ Eric L. Siegel*
                                         Eric L. Siegel

11

**-94-**

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STACY SCOTT-MCKINNEY, M.D.,

        *Plaintiff,*

v.

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

        *Defendant.*

Case No. 1:19-cv-02980

I, Stacy Scott-McKinney, M.D., declare under penalty of perjury that the foregoing are true statements based on my personal knowledge:

1.    I am the Plaintiff in the above-captioned lawsuit.

2.    I submit this Declaration in support of my request for permanent injunctive relief as a result of Defendant's discrimination against me for failing to provide a scribe for 16 months and the resulting lasting negative impact of that unlawful decision.

3.    I was informed by Defendant representatives that, later this fall 2022, Defendant CNMC's subsidiary, Children's Pediatricians and Associates ("CP&A"), will be transitioning to new electronic medical records ("EMR") software from Cerner Corporation. This is the first time CNMC/CP&A has changed its EMR software in 15 years.

4.    The main hospital at CNMC has had Cerner EMR software for some time, so now CP&A will as well.

5.    I could envision Defendant trying to have me attempt voice dictation software ("VDS") again like it did in August 2019 with the "MModal" software.

1

6.    However, I was one of a handful of physicians who has already piloted the new Cerner EMR software prior to all employees being trained on it before its implementation.

7.    From my firsthand experience, I already know that there are many boxes and dropdown menus in this EMR software, just like my current EMR software.

8.    As a result, the new EMR software being implemented at CP&A later this year could not possibly have VDS that would be effective for my medical condition as there is no VDS that can check boxes and navigate dropdown menus.

9.    Defendant uses "Dragon" VDS at its hospital with the Cerner EMR software. Cerner, through a representative, has confirmed that fact. I previously piloted Dragon software in 2018 prior to my scribe, Asiah Cauley, starting. That VDS, like MModal, was and is only useful for narrative style documenting and not dropdown menus or box clicks. Cerner representatives have also confirmed my prior experience with Dragon software that the software will dictate where the cursor is placed. It is up to me to place the cursor, which means I have to move the mouse to do so. Dragon software is not a Cerner product.

10.   A medical scribe is the only effective accommodation to allow me to continue patient record documentation duties.

11.   Additionally, based on my longstanding tenure with Defendant, I find it highly unlikely that Defendant CNMC/CP&A will change EMR systems again prior to 2030 given the exorbitant price tag involved with such a transition.

12.   In the unlikely event that CNMC/CP&A does replace the EMR software prior to 2030 (when I retire), I would still need a scribe unless the replacement EMR alternative is proven to be comparable *and* effective with VDS or other means to navigate that software so that my medical condition is not exacerbated further.

13. My medical condition/disorders include cervical radiculopathy, shoulder tendinitis, carpel tunnel syndrome and finger tendinitis.

14. The reasonableness of any accommodation to replace my scribe has to prioritize *effectiveness* not just whether it is "reasonable" in concept or compatible with the EMR software.

15. I do not mind trying new products or services that could help me, but Defendant should not be the arbiter of whether such products or services are a suitable alternative to the scribe without proper testing and validation.

16. My experience in 2019 with being ordered to use MModal VDS software when the MModal representative told me on July 31, 2019 that it does not work with box clicking validates that Defendant forced me to use VDS that was never tested in practice and did not work, which placed me in danger of further injury.

### Further Evidence of Retaliation for Protected Activity

17. During the pendency of this lawsuit and in the fall of 2021, my Team Lead physician, Dr. Dan Glaser, announced that he was going to retire at the end of the year.

18. The Team Lead is a supervisory position and will carry with it financial benefits.

19. Upon Dr. Glaser's announcement of his retirement and given that I am the most senior physician in my Laurel, Maryland practice, I volunteered to assume the Team Lead position for my practice after consulting with and receiving agreement from my physician colleagues.

20. I sent an email to CP&A's Vice President of Ambulatory Services, Marc DiFazio, M.D., Director of CP&A Business Operations, Mark Janowiak, and Kathy Prestidge, Director of CP&A Clinical Operations, stating my willingness and interest to volunteer for the Team

3

Lead position. He responded that there would be a formal interview and application process for the Team Lead position. See the email exchange attached to this Declaration.

21. During my over 15-year tenure with Defendant, such an application and interview process for the Team Lead position is unprecedented. It is typical that the most senior physician in a CP&A practice group assumes the Team Lead position when the incumbent retires.

22. Contrary to Dr. DiFazio's statement about a formal process, neither I nor my practice physician colleagues ever received any notification of an application, interviews or how to apply.

23. Instead, Defendant CNMC/CP&A unilaterally selected a physician who is junior to me and is outside of my Laurel practice group to assume the Team Lead position for my practice. That physician is not only junior to me but works in CP&A's Bowie, Maryland office.

24. To my knowledge during my tenure with Defendant, no physician from one practice group has ever assumed the Team Lead position for another practice group. This too is unprecedented.

I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 that the foregoing facts are true and made on my personal knowledge.

___April 19, 2022___
Date

Stacy Scott-McKinney, M.D.

4

-99-

**RE: Team Lead-Laurel**

DiFazio, Marc <MDiFazio@childrensnational.org>

Mon 11/29/2021 5:56 PM

To: Scott-Mckinney, Stacy <STscott@childrensnational.org>;Janowiak, Mark <MJanowia@childrensnational.org>;Prestidge, Kathy <kprestidge@childrensnational.org>;Kim, Holly <HoKim@childrensnational.org>

Hi Stacy – thanks for your interest.  The new CNPA leadership team is addressing the transition, and we have a recruitment and interview process that will be followed – This may require an interim leader, and I have alerted Dan.     We encourage you to send us a CV, a letter confirming your interest in the formal job description once reviewed (Holly will send out) and we will proceed with interviews for all who express interest!


md

**From:** Scott-Mckinney, Stacy <STscott@childrensnational.org>
**Sent:** Monday, November 29, 2021 12:43 PM
**To:** DiFazio, Marc <MDiFazio@childrensnational.org>; Janowiak, Mark <MJanowia@childrensnational.org>; Prestidge, Kathy <kprestidge@childrensnational.org>
**Subject:** RE: Team Lead-Laurel

Hi All
Checking back...see message from 11/19 below...
Thx
Stacy

**From:** Scott-Mckinney, Stacy
**Sent:** Friday, November 19, 2021 5:08 PM
**To:** Glaser, Dan <DGlaser@childrensnational.org>; DiFazio, Marc <MDiFazio@childrensnational.org>; Janowiak, Mark <MJanowia@childrensnational.org>; Prestidge, Kathy <kprestidge@childrensnational.org>
**Subject:** RE: Team Lead-Laurel

Howdy All and Happy Friday
I am following back up to see where things stand with the Team Lead position for Laurel. As you know, I am willing and able, over 30yrs experience, seniority and have the support of all providers.
If there are concerns perhaps we can meet to discuss them.
Let me know.
Thx and have a nice weekend.
Stacy


**From:** Glaser, Dan <DGlaser@childrensnational.org>
**Sent:** Thursday, November 4, 2021 11:00 AM
**To:** Scott-Mckinney, Stacy <STscott@childrensnational.org>
**Cc:** Janowiak, Mark <MJanowia@childrensnational.org>; Prestidge, Kathy <kprestidge@childrensnational.org>; DiFazio, Marc <MDiFazio@childrensnational.org>
**Subject:** RE: Team Lead

Just letting you know that the decision of who will be the Physician Lead is not a done deal, and that Management, including Kathy, Mark, and the Director Marc DiFazio are  involved in the decision.  Thank you for your patience.  Dan

**From:** Scott-Mckinney, Stacy <STscott@childrensnational.org>
**Sent:** Wednesday, November 3, 2021 1:15 PM
**To:** Glaser, Dan <DGlaser@childrensnational.org>
**Cc:** Demmeke, Tsega <TDemmeke@childrensnational.org>; Lowe, Vanessa <vlowe@childrensnational.org>; Pyle, Jessica <Jessica.Pyles@childrensnational.org>; Pampati, Sneha <spampati@childrensnational.org>
**Subject:** Team Lead

Hey Dan
I wanted to let you know everyone is supportive of me assuming Team Lead after you retire in December.
Thanks
Stacy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STACY SCOTT-MCKINNEY, M.D.,

          Plaintiff,

      vs.

CHILDREN'S NATIONAL MEDICAL
CENTER,

          Defendant.

CV Action
No. 1:19-2980

Washington, DC
May 2, 2022

10:06 a.m.

TRANSCRIPT OF IN-PERSON ECONOMIC DAMAGES HEARING
**BEFORE THE HONORABLE TREVOR N. McFADDEN**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**    **ERIC LEE SIEGEL**
                        **KRISTIN KIM**
                        KALBIAN HAGERTY LLP
                        888 17th Street, N.W., Suite 1200
                        Washington, DC 20006
                        202-223-5600

**For the Defendant:**    **JEFFREY THOMAS JOHNSON**
                        **KRAIG B. LONG**
                        NELSON MULLINS RILEY & SCARBOROUGH
                        100 S. Charles Street, Suite 1600
                        Baltimore, MD 21201
                        443-392-9430

**Reported By:**    **LORRAINE T. HERMAN, RPR, CRC**
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
                        Room 6720
                        Washington, DC 20001
                        202-354-3196

*** Proceedings recorded by stenotype shorthand and this
    transcript was produced by computer-aided
    transcription.

<u>**I N D E X**</u>

| <u>**WITNESS**</u> | <u>**PAGE**</u> |
|---|---|
| STACY SCOTT-McKINNEY, M.D. | |
| Direct Examination by Mr. Siegel | 25 |
| Cross-Examination by Mr. Johnson | 63 |
| Redirect Examination by Mr. Siegel | 114 |
| | |
| MARK JANOWIAK | |
| Direct Examination by Mr. Johnson | 127 |
| | |
| MARK JANOWIAK | |
| Examination by the Court | 130 |
| | |
| MARK JANOWIAK | |
| Examination by the Court | 150 |
| | |
| MARK JANOWIAK | |
| Direct Examination by Mr. Johnson | 152 |
| Cross-Examination by Mr. Siegel | 158 |
| | |
| STACY SCOTT-McKINNEY, M.D. | |
| Direct Examination by Mr. Siegel | 171 |
| Cross-Examination by Mr. Johnson | 173 |

<u>**E X H I B I T S**</u>

| <u>**EXHIBIT**</u> | <u>**PAGE**</u> |
|---|---|
| Plaintiff's No. 199 Admitted into Evidence | 28 |
| Plaintiff's No. 13  Admitted into Evidence | 29 |
| Plaintiff's No. 197 Admitted into Evidence | 34 |
| Plaintiff's No. 13  Admitted into Evidence | 36 |
| Plaintiff's No. 193 Admitted into Evidence | 41 |
| Plaintiff's No. 194 Admitted into Evidence | 48 |
| Plaintiff's No. 195 Admitted into Evidence | 50 |
| Plaintiff's No. 196 Admitted into Evidence | 60 |
| Plaintiff's No. 192 Admitted into Evidence | 60 |
| Plaintiff's No. 198 Admitted into Evidence | 62 |
| Plaintiff's No. 195A Admitted into Evidence | 85 |
| Plaintiff's No. 173 Admitted into Evidence | 102 |
| Defendant's No. 174 Admitted into Evidence | 102 |
| Defendant's No. 175 Admitted into Evidence | 102 |
| Plaintiff's No. 200 Admitted into Evidence | 120 |
| Defendant's No. 192A Admitted into Evidence | 148 |

1           **P R O C E E D I N G S**

2           **DEPUTY CLERK:**  Your Honor, this is civil action

3    19-2980, Stacy Scott-McKinney, M.D. versus Children's

4    National Medical Center.

5           Counsel, please come forward to identify

6    yourselves for the record, starting with the plaintiff.

7           **MR. SIEGEL:**  Good morning.  Eric Siegel and

8    Kristen Kim on behalf of Dr. Scott-McKinney, the plaintiff.

9           **THE COURT:**  Good morning, folks.

10          **MR. JOHNSON:**  Good morning, Your Honor.  Kraig

11   Long and Jeff Johnson on behalf of the defendant, Children's

12   National.

13          **THE COURT:**  Good morning, gentlemen.

14          Mr. Long, I know you had some email correspondence

15   over the past week.  Do you want to put anything on the

16   record at this point?

17          **MR. LONG:**  Yes, I will have my co-counsel,

18   Mr. Johnson, put it on.

19          **MR. JOHNSON:**  Thank you, Your Honor.

20          There was a request which was filed as ECF No. 98,

21   which we emailed to Mr. Ferguson, and it was to bar

22   plaintiff from introducing evidence of or providing

23   testimony about Plaintiff's Exhibits 194, 195 and 196.

24          The basis for the request is that, you know, it's

25   part of a pattern by the plaintiff whereby every time the

4

1    defendant obtains discovery under calculation of lost wages,

2    they change.

3         You know, plaintiff had originally designated Jody

4    Malcolm to provide testimony on lost wages in this case.

5    The defendant deposed her.  And she provided a new report in

6    response to our Motion in Limine.  We moved to strike that

7    report, and Your Honor gave us an opportunity to depose her

8    again after trial on liability.

9         We do that -- you know, we depose her at the

10   deposition.  She says she is going to provide the testimony

11   in her expert report at today's hearing.  And then plaintiff

12   withdraws her again, you know, less than a week before

13   today's hearing.

14        After that, we get what is referred to as a

15   compilation by plaintiff and her lawyer, which copy and

16   pastes substantially from the Jody Malcolm's expert reports.

17   Have the same charts and many of the statements verbatim.

18        So we are in yet another situation where the

19   plaintiff's calculation of lost wages have changed for a

20   third time.  Every time the defendant obtains discovery on

21   it and files a motion and tends to oppose it, it's a moving

22   target.

23        The issue as well is that, you know, plaintiff is

24   taking expert testimony, which was clearly unreliable under

25   *Daubert*, in Rule 702.  And now, you know, performing sort of

1  an endaround by getting that testimony in through an expert

2  report that was drafted by her and her lawyer.  If it wasn't

3  reliable for Ms. Malcolm to say it, because there was no

4  factual basis for it, and she conceded that it wasn't based

5  in plaintiff's compensation formula.  The plaintiff and her

6  lawyer shouldn't be able to get that testimony in by

7  disguising a compilation, which is really, you know, nothing

8  more than an expert report by her and her lawyer; so that's

9  the basis for the motion, Your Honor.

10     **THE COURT:**  Mr. Johnson, do you know how much you

11  spent in relation to the most recent deposition?

12     **MR. JOHNSON:**  I don't know, Your Honor, but we

13  would be happy to provide documentation of those fees, if

14  the Court is inclined to consider it.

15     **THE COURT:**  Okay.  All right.  So to be clear,

16  what are you requesting?

17     **MR. JOHNSON:**  So, I guess, we are requesting, one,

18  that plaintiff be barred from introducing Plaintiff's

19  Exhibits 194, 945 and 196 or providing testimony about those

20  documents.  And then also that defendant be awarded its fees

21  for opposing Ms. Malcolm's testimony, taking her deposition,

22  filing Motions in Limine for an expert that plaintiff had no

23  intent to use at today's hearing.

24     **THE COURT:**  Okay.  Mr. Siegel?

25     **MR. SIEGEL:**  Your Honor, Mr. Johnson has indicated

6

1    quite a bit of hyperbole about the worth of expert Jody

2    Malcolm's testimony and the type -- the exhibits themselves

3    194, 195 and 196.

4            Jody Malcolm didn't concede anything during her

5    deposition with respect to whether or not she is relying

6    upon the employment agreement of the plaintiff.  She

7    testified consistent with the way she testified the first

8    time that she testified in 2020.  Her reports have never

9    been different.  It's a simple methodology and arithmetic

10   calculation that she did.

11           We determined after the deposition, not because

12   she testified well or because she had problems in her

13   testimony.  In fact, she provided a methodology that my

14   client has used for purposes of and will be presenting today

15   in testimony.  The methodology is simply how she arrived at

16   revenue per patient visit in order to calculate her back-pay

17   loss.

18           There's never been a moving target here.  The

19   numbers are exactly the same as they were.  The only

20   difference is, and as Your Honor may recall from the trial

21   in this case, that the annual physician compensation

22   reconciliation reports that were presented in evidence,

23   Plaintiff Exhibits 107 and 119, set forth reconciliation.

24   She merely used those exact same numbers, added in her

25   revenue per patient visit and ran the formula to determine

1    whether or not back pay existed for FY 2020 and 2021 and

2    then going forward through 2022 and on.

3         So there's been no shifting in terms of economic

4    damages, and there is no surprise here.  All she did was

5    simply add one line to the existing reconciliation reports,

6    as she will testify to today.

7         **THE COURT:**  Who is the "she"?

8         **MR. SIEGEL:**  Dr. Scott-McKinney.

9         **THE COURT:**  I thought she has been your expert

10    witness, though, that we are talking about.

11         **MR. SIEGEL:**  No.  The expert witness was not

12    needed because at the end of the day -- she provided a

13    methodology and framework, but at the end of the day there

14    were arithmetic calculations my client can clearly do as a

15    plaintiff.  It's simple addition and multiplication.  So we

16    felt that for expediency, and candidly for the expense, not

17    to call her as a witness but she would be a non-testifying

18    expert who has assisted my client in preparing her testimony

19    for today's trial.

20         The exhibits themselves are admissible.  And I'm

21    happy -- I prepared a bench brief, which I'm happy to give

22    to counsel, if you would like the case law.  Federal Rule of

23    Evidence 1006 for compilations for summary of voluminous

24    records would support as one aspect of it.  The other end of

25    the continuum are demonstrative aids, which would come in

8

1       simply as a demonstrative aid and not as an exhibit

2       themselves.

3              And then there is a third hybrid of the two, where

4       you don't have voluminous compilation of records, that a

5       summary comes into evidence themselves so long as the

6       underlying source documents come into evidence, the

7       demonstrative aid the plaintiff used to calculate her

8       damage, would come into evidence.

9              The case law I'd support for that is the D.C.

10      Circuit's case which I cited in earlier briefs before this

11      Court -- I'm happy to hand this up -- the D.C. Circuit in

12      the U.S. versus *Hemphill*, which is a 514 F.3d 1315.  They

13      rely upon a Fifth Circuit case.  And other sister courts of

14      this court have relied upon a Fifth Circuit case, *U.S.*

15      *versus Bray*, which sets forth the three types of evidence

16      where you deal with quasi demonstrative aids.

17             So whether it's a summary under Federal Rule of

18      Evidence 1006, which would come into evidence in and of

19      itself in lieu of the underlying voluminous records or where

20      you have a situation such as this case where you have

21      Plaintiff Exhibit [sic] 107, 119, which are one-page

22      reconciliation reports, she is merely just adding an

23      additional line item for additional revenue that she lost as

24      a result of the work restriction, and then running the

25      numbers.  So it would come in under that authority.

9

1        I'm certainly happy, for the record, to hand up

2   the bench brief so you have the analysis.

3        **THE COURT:**  Sure.

4        So, Mr. Siegel, what about Mr. Johnson's concern

5   that there is kind of a bait-and-switch here.  They went to

6   the expense and time of deposing Ms. Malcolm.  They have

7   their great cross-examination all ready.  They are going to

8   be able to show how she doesn't know what she is talking

9   about.  She doesn't come.  Instead, you are having your

10  client testify, who they may not have deposed.

11       **MR. SIEGEL:**  Your Honor, we don't perceive it to

12  be a bait-and-switch for the following reason -- I mean,

13  it's not like I sat and waited until the eve of the hearing

14  to withdraw her as a witness.  Within a day or two of

15  actually deposing her I determined that given what we were

16  going to be having her testify about, Dr. Scott-McKinney can

17  do the same thing and I wouldn't be having the expense of

18  having her come here.

19       The most important thing about her testimony,

20  which she clearly laid out, is a methodology of how she

21  arrived at revenue per patient visit and equated that with

22  lost revenues associated with a work restriction.

23       So for her to assist my client to testify wasn't

24  that big of a stretch.  And to have her come in to testify

25  duplicatively on these types of analyses, it just didn't

1  make a lot of sense.

2  So after considering it, I decided to withdraw

3  her.  Not because she didn't testify well or because of any

4  of the arguments they are making.  For Mr. Johnson to argue

5  that she's unreliable under *Daubert*, there's never been a

6  *Daubert* challenge.  So that's really not an issue here.

7  They can make the assertion, but there's never been a

8  *Daubert* challenge.  There's never been voir dire of Jody

9  Malcolm to even assess whether or not she is capable of

10  providing testimony.

11  What she did was provide a methodology.  It's a

12  simple methodology that my client has used to calculate her

13  damages, which she can do as a plaintiff.  The law would

14  clearly support her to do it, as long as she is providing a

15  reasonable estimate without providing exactitude, as the law

16  requires.

17  **THE COURT:**  Okay.  Thank you.

18  **MR. SIEGEL:**  May I hand this up, Your Honor?

19  **THE COURT:**  Yes.

20  Mr. Johnson, I will give you the last word.

21  **MR. JOHNSON:**  Your Honor, I'd like to first

22  respond to the point that the calculations are simple

23  methodology and simple arithmetic.  If that was the case,

24  there was no need for plaintiff to designate an expert under

25  Rule 702 to provide expert testimony on a scientific or

1    technical matter.  So plaintiff shouldn't be able to now

2    characterize what was once an expert opinion as simple, just

3    so the plaintiff can provide that opinion.

4          Now, the idea that Plaintiff's Exhibits 194, 195

5    and 196 are demonstrative aids or summaries, they are not

6    that at all.  And if that's the case, there is no

7    distinction between and expert report and a demonstrative or

8    a summary.  The plaintiff is taking evidence that was in

9    this case and providing an opinion that she has experienced

10   lost wages during various fiscal years.  She provides the

11   opinion that during fiscal year 2020, in Exhibit 194, that

12   she had no back-pay loss.  She provides the testimony in

13   Plaintiff's Exhibit 195, that she had about $30,000 in

14   back-pay loss.

15         And if you refer to Plaintiff's Exhibit 196, she

16   is engaging in net present value calculations.  She's coming

17   up with new revenue numbers that were not in Ms. Malcolm's

18   report to calculate her lost wages.  So if that's the case,

19   if this is just simple arithmetic, then why was Jody Malcolm

20   ever in this case for the two-plus years that she was?

21         On the point about the numbers not changing or the

22   numbers being the same, that's not the case at all.  Jody

23   Malcolm's first expert report calculated lost wages as

24   simply the revenue that the plaintiff would have generated

25   via patient visits; that was report number one.

1     Report number two took that revenue number and

2     reduced it by a compensation figure, but didn't account for

3     budget margin deficit or any of the other factors that are

4     in the reconciliation reports, which is expert opinion

5     number 3, but which is now drafted by the plaintiff and her

6     lawyer, takes it another step further and tries to account

7     for those budget margin deficit numbers by doing additional

8     calculations.

9          So the Court can simply compare the three reports

10     next to each other and see the numbers are not the same at

11     all.  They are very different.

12          The timing of the report is different too.  If the

13     plaintiff simply made a strategic decision not to call

14     Ms. Malcolm, then why did we dispose Ms. Malcolm on March 29

15     and the plaintiff waited until April 21 to withdraw her,

16     only after there was a Motion in Limine filed moving to

17     exclude her testimony.

18          You know, if the plaintiff wanted to proceed to

19     today's hearing using only the plaintiff's testimony, that's

20     fine.  But there is absolutely no reason why she led the

21     defendants to believe that she was going to call

22     Ms. Malcolm, and we went through the trouble to depose her,

23     and we only figure out it is the plaintiff and her lawyer

24     presenting the testimony, with only a little more than a

25     week before the evidentiary hearing today, and we can't take

1    any discovery on it.

2            **THE COURT:**  Okay.

3            **MR. JOHNSON:**  Your Honor, also, our corporate

4    representative, Mr. Mark Janowiak, entered the courtroom

5    while I was at the podium last time.  So I just wanted to

6    introduce him.

7            **THE COURT:**  Okay.  Good morning, Mr. Janowiak.

8            All right.  I think what I want to do is go ahead

9    and start the hearing and, essentially, take the defense

10   motion under advisement.

11           I'll tell you, my inclination is this all probably

12   goes more to weight than admissibility.  I haven't looked at

13   194, 195 and 196, but I think I'll certainly consider the

14   defense -- any objection they have and any cross-examination

15   they have on those documents at this point.  But we no

16   longer have a jury.  I think it makes sense to just get

17   started and see what the plaintiff has.  And, I think, the

18   defense has, you know, plenty fodder here to call into

19   question the validity of these documents and the

20   calculations without an expert.  But I don't think an expert

21   is necessarily automatically required.

22           So I want to see what the plaintiff has.  I

23   specifically want to consider the concern about attorneys'

24   fees for what does feel like a bit of an unnecessary

25   deposition of Ms. Malcolm in late March but I'll decide that

1    later.

2            So, Mr. Siegel, why don't you go ahead and begin.

3    If you want to make a brief opening statement, you are

4    welcome to but, otherwise, let's start with your evidence.

5            **MR. SIEGEL:**  Your Honor, before I begin, I have

6    one quasi housekeeping matter, I guess.

7            **THE COURT:**  Okay.

8            **MR. SIEGEL:**  I conferred with counsel.  We are

9    both in agreement, but it is up to Your Honor as to how you

10    want to approach it.  Both of us have excerpts from

11    Dr. Levin's testimony -- the de bene esse testimony -- that

12    we were going to --

13            **THE COURT:**  He was your client's treating

14    physician; is that right?

15            **MR. SIEGEL:**  Correct.  Yeah, one of the medical

16    experts.  We've conferred and we think for expediency, if

17    Your Honor is welcoming it, since we are submitting a

18    closing brief, we can just attach those excerpts to the

19    brief and spare the Court having us read them today.

20            **THE COURT:**  That would be great.

21            **MR. SIEGEL:**  Okay.

22            **THE COURT:**  Thank you.

23            **MR. SIEGEL:**  The last housekeeping matter has to

24    do with the issue of the deadline to prepare and file the

25    motion or petition for attorneys' fees.  I've conferred with

1    counsel.  My concern is -- and you have graciously given us

2    time to meet and confer on the issue to try to resolve it.

3    We can't really start that until May 16th, when the closing

4    brief is done, which means I only have seven days to confer

5    meaningfully and then prepare a very -- a petition package.

6         Petitions are very, very detailed and very complex

7    in terms of how they are supposed to be put together.  So I

8    am asking the Court for an additional two weeks, until June

9    6th, to submit the petition, if we don't reach agreement.

10   But I want to have an opportunity for us to talk about it.

11   And it's going to take more than a day.  I'm going to need

12   time for us to work through it.

13        So right now I'm asking the Court if you would

14   agree to grant a motion to extend the deadline from May

15   23rd, which was the original deadline, to June 6th, which

16   gives us time to discuss the matter and also in light of the

17   Memorial Day weekend holiday.

18        **THE COURT:**  All right.  I think that was the date

19   you proposed.

20        **MR. SIEGEL:**  May 23rd was the date you set after

21   your scheduling order.

22        **THE COURT:**  But based on your consent motion.

23   Right?

24        **MR. SIEGEL:**  Correct.  Initially it was but then I

25   thought about it in reflection.  And what is required for a

1    fee petition -- I'm trying to keep the fees down.  And it's

2    going to take many hours to prepare a fee petition with

3    declarations and various other things.  I thought in order

4    for us to have a meaningful conversation to try to resolve

5    the fees issue, I would wait until after we have that

6    conversation before preparing it.  So that's why I'm asking

7    for another extension, you know, before I even start that

8    exercise.  And it's not opposed.  It's a consent motion.

9         **THE COURT:**  Okay.  I think they have an objection

10   due by April 18th.  Right?

11        **MR. SIEGEL:**  I'm sorry?

12        **THE COURT:**  Well, do we have -- wouldn't they have

13   an opportunity to object to your petition?

14        **MR. SIEGEL:**  Yes.  As I understand it, petitions

15   are treated the same as motions.  So they would have 14 days

16   to prepare an opposition, and I would have 7 days for a

17   reply brief.

18        **THE COURT:**  Okay.

19        **MR. SIEGEL:**  So it would flow in that ordinary

20   course.  So I'm asking for the 6th, and they would have

21   until the 20th.  And I would have until 27th to submit a

22   reply brief -- of June.

23        **THE COURT:**  I will give you an extra week.  So

24   your petition will be due on May 31st, since the 30th is a

25   holiday, and then their response would be due the normal

1    course thereafter.

2         **MR. SIEGEL:**  I appreciate that, Your Honor, but I

3    am going to be out of town for an entire week, right around

4    Memorial Day weekend.  All right.  I will figure it out.

5    Thank you, Your Honor.  Two weeks after that is their

6    opposition and then -- okay.

7         **THE COURT:**  And then one week for any reply from

8    you.

9         **MR. SIEGEL:**  Thank you, Your Honor.

10        I'll make the opening very brief.

11        **THE COURT:**  Okay.

12        **MR. SIEGEL:**  You are going to be hearing testimony

13   today from Dr. Scott-McKinney and her assessment of her

14   back- and front-pay losses in this case.

15        We have submitted briefing on the issue of

16   injunctive relief.  The only testimony you are going to hear

17   today in support of that is simply to move into evidence the

18   ECF 96-1, which is the declaration she submitted in support

19   of that brief, just because I wasn't sure of the Court's

20   desire of making sure there is a record at trial, as opposed

21   to just submitting it in an ECF filing.

22        With respect to the back- and front-pay losses,

23   Dr. Scott-McKinney will testify that as a result of the 16

24   months without a scribe, not only has her pain continued to

25   increase, but more importantly she was recently -- she was

1    subsequently diagnosed with repetitive strain disorder or

2    symptom or syndrome rather and carpal tunnel syndrome, which

3    is not party of her original ailments and disorders.

4            **THE COURT:**  Remind me exactly what you are

5    seeking.

6            **MR. SIEGEL:**  What we are seeking in back pay is

7    approximately -- and, again, I don't have the exact numbers

8    in front of me.

9            **THE COURT:**  Why don't you get it.

10           **MR. SIEGEL:**  Okay.  Your Honor, plaintiff is

11   seeking in back pay $79,271.76.

12           **THE COURT:**  Okay.

13           **MR. SIEGEL:**  And front pay she is seeking

14   $323,402.23.

15           **THE COURT:**  Say that one more time, sir?

16           **MR. SIEGEL:**  Sure.  $323,402.23 for front pay.

17           **THE COURT:**  Okay.  And each of those numbers

18   reflect lost wages, as well as the 5 percent employer

19   contribution to the health insurance -- to her retirement

20   plan, excuse me, that she's had for the entire 15 years of

21   her tenure, and then you are also seeking declaratory

22   relief.

23           **MR. SIEGEL:**  Declaratory and injunctive relief,

24   yes, Your Honor.

25           **THE COURT:**  All right.  And that is?  Say that

**-119-**

1    again.

2         **MR. SIEGEL:** Sure. The motion has sought that she

3    be provided a scribe for the duration of her employment with

4    Children's National Medical Center with the narrow exception

5    that to the extent there are other methodologies that the

6    hospital wishes to employ, that they be introduced to the

7    plaintiff as an adjunct to her using a scribe, until such

8    time as is determined it is effective as the scribe before

9    replacing it.

10        **THE COURT:** And who would determine that?

11        **MR. SIEGEL:** Well, Dr. Scott-McKinney will give

12   feedback, as she has done in the past as part of the

13   interactive process. But in terms of allowing her to be as

14   productive as she is now with the scribe, if for example, as

15   I indicated in the motion papers and her declaration,

16   Dr. Scott-McKinney -- rather, the hospital is going to be,

17   this fall, introducing a new electronic medical record

18   system for CP&A, Children's Pediatricians and Associates.

19        That new EMR system, Dr. Scott-McKinney was one of

20   a handful of doctors to pilot that software system. And it

21   just has -- not as many, but it has a lot of box clicks and

22   dropdown menus. And it relies upon a voice dictation

23   software called Dragon, that she testified at trial she had

24   tried, to failure, in 2018.

25        So if -- she's not foreclosing in the future that,

1    you know, if there's some technology comes out where voice

2    dictation works seamlessly, and is less expensive, she's not

3    saying to the Court, Don't replace the scribe.  There is a

4    narrow exception here.  She is willing to try it.  But until

5    such time that they can show in good faith that there is an

6    effective substitute, we are asking for injunctive relief to

7    order the defendant to provide the scribe and to continue to

8    pay for that scribe for her.

9            **THE COURT:**  But it sounds like you are saying

10   unless she agrees that something equally as effective; is

11   that correct?

12           **MR. SIEGEL:**  Well, not just her agreeing it [sic].

13   I think her and the hospital jointly, through the

14   interactive process, come to a conclusion that is as

15   effective, and it doesn't cause the exacerbation of pain and

16   other symptoms that it has in the past.

17           The only foreseeable technology, candidly, would

18   be voice dictation software, if the technology were to

19   improve to the point it can handle the type of box clicks

20   and dropdown menus that she has now and that she will have

21   in the new electronic medical system, and she is willing to

22   try it to see whether or not it is as effective, to allow

23   her to see as many patients she has been seeing, without

24   having to reduce her schedule even further.  So that's the

25   exception, kind of a good-faith exception we are carving out

1  from the injunctive relief.

2      **THE COURT:**  Okay.

3      **MR. SIEGEL:**  The other aspect of injunctive relief

4  we are asking for, Your Honor, is that the defendant be

5  ordered to post notices of the D.C.'s anti-discrimination

6  laws, which is required under the statute.

7      Secondly that it trains managers on an annual

8  basis on its reasonable accommodation policies and the

9  interactive process; and that it provide the policy to its

10  employees when they request accommodation.  They already

11  post it on their portal for employees to see, but when

12  employees request it, we are asking the employer to provide

13  that information to the employee.

14      And that's necessitated, as I indicated in the

15  reply brief, in support of the Motion for Injunctive Relief

16  by the fact that Dr. Scott-McKinney was steered into the

17  Workers' Compensation direction and not addressing the ADA

18  Accommodations Committee, her request for accommodation,

19  which created a lot of problems for her.

20      **THE COURT:**  Um, I think the defense argues that,

21  you know, declaratory relief runs to the plaintiff, but it

22  would be pretty unusual for declaratory relief to run to

23  parties not in front of the Court.  Aren't they right about

24  that?

25      **MR. SIEGEL:**  No, Your Honor.  Not only under

1    federal law, but under the D.C. Human Rights Act --

2    unfortunately, I don't think I can cite it off the top of my

3    head.  I think it's Tinnus, T-i-n-n-u-s, versus D.C. --

4    every plaintiff that comes into this Court is a private

5    attorneys general, just like under Title VII, to enforce the

6    civil rights of this country.  She is enforcing the civil

7    rights for herself, as well as citizens for the district.

8         She has a right to come in and not only seek

9    relief for herself, that benefits herself, but also benefits

10   those that would come after her, that would be potentially

11   subjected to the same form of discrimination.  She is not

12   asking for a lot.  She is only asking for them to do what

13   they are required to do under the law, which is to post the

14   notices of D.C. law's anti-discrimination laws.  The statute

15   requires it.  They just haven't done it.

16        Secondly, she is asking for them to train

17   managers, because -- the reason why she got into this mess

18   in the first place is because her managers didn't

19   appropriately deal with it, didn't have interactive process.

20   The just instructed her or ordered her to use voice

21   dictation software, without going through an interactive

22   process.  So it's really just to enforce the problems that

23   she raised through trial in her testimony as a private

24   attorneys general.

25        **THE COURT:**  Okay.  So you are saying that DCHRA

**-123-**

1      creates an exception to the general rule that defense cites?

2              **MR. SIEGEL:**  I'm saying that the defense's

3      argument, they didn't cite any case law that would trump the

4      private attorney general aspect of civil rights cases, both

5      either under D.C. Human Rights Act or under Title VII, I

6      mean, if you are going to apply that here as well.

7              The U.S. Supreme Court has longstandingly said

8      that each citizen of the United States is a private attorney

9      general.  So I understand that generally speaking this is

10     not a class case, so she is not seeking classwide relief in

11     that regard.  But in this narrow way, she is entitled, as a

12     private attorney general, to ensure that this defendant

13     follows the rules and ensures that others receive same

14     treatment so they are not discriminated against.

15             **THE COURT:**  Okay.

16             **MR. SIEGEL:**  Would Your Honor prefer to have

17     defense present their opening before I start my first

18     witness?

19             **THE COURT:**  No, why don't you go ahead.

20             **MR. SIEGEL:**  I'd like to call Dr. Scott-McKinney

21     to the stand.

22             **MR. JOHNSON:**  Your Honor, we would like to present

23     an opening.

24             **THE COURT:**  Are you going to be presenting any

25     evidence?

1          **MR. JOHNSON:**  Yes, we are.

2          **THE COURT:**  Why don't we do it when it comes time

3    for you.

4          **MR. JOHNSON:**  Thank you, Your Honor.

5          **THE COURT:**  All right.

6          **MR. SIEGEL:**  Your Honor, while the witness is

7    taking the stand, I have one question.  Since COVID rules

8    are now dropped, do you want me to hand up exhibits hard

9    copy or do you want me to use the monitor or both?  I will

10   give you an exhibit package of whatever we admit.

11         **THE COURT:**  Okay.  Yes. I would like to see

12   something.  The useful thing about using the monitor, I

13   tried to do that pre-COVID, just so we can all see it.  So

14   that's my preference.  But, I mean, this is less formal, if

15   you need to give her something; that's fine.

16         **MR. SIEGEL:**  I have it electronically as well.  I

17   can show it to her, show it to you and show it to counsel.

18         **THE COURT:**  That would be my preference.

19         **MR. SIEGEL:**  Sure.  And I can hand up for your

20   records once you admit it.

21         **THE COURT:**  Thanks.

22         **DEPUTY CLERK:**  Would you please raise your right

23   hand?  Do you solemnly swear or affirm that any information

24   or testimony you shall present to the Court will be the

25   truth, the whole truth and nothing but the truth?

1          **THE WITNESS:**  Yes, I do.

2          **THE COURT:**  Good morning, ma'am.

3      **DIRECT EXAMINATION OF STACY SCOTT-McKINNEY, M.D.**

4  **BY MR. SIEGEL:**

5      **Q.**   Dr. Scott-McKinney, how old are you?

6      **A.**   Fifty-eight.

7      **Q.**   And how long have you been working for Children's

8  National Medical Center?

9      **A.**   Over 15 years.

10     **Q.**   Do you know how long, approximately, Dr. Dan

11  Glaser, who testified in this case, worked for the defendant

12  prior to his retirement?

13     **A.**   I believe over 25 years.

14         **THE COURT:**  Feel free to adjust the mike.

15         **THE WITNESS:**  Thank you.

16         **THE COURT:**  It needs to be comfortable for you.

17         **THE WITNESS:**  Okay.

18  **BY MR. SIEGEL:**

19     **Q.**   When do you intend to retire from the practice of

20  medicine?

21     **A.**   2030.

22     **Q.**   And why is that?

23     **A.**   I will be 67 and my full retirement benefits

24  should kick in then.

25     **Q.**   Do you recall submitting a declaration in this

26

1    case in support of injunctive relief?

2        **A.**   Yes.

3        **Q.**   I want to show you what's been marked as Plaintiff

4    Exhibit 199, which has also been filed in this case as ECF

5    96-1.  Do you recognize the document?

6        **A.**   Could you scroll down?

7        (Brief pause.)

8        Yes, I recognize this document.

9        **Q.**   Turning to the last page of this document, last

10   page of your declaration.

11       **MR. SIEGEL:**  Go back up one page.  Stop.

12   **BY MR. SIEGEL:**

13       **Q.**   Do you recognize the signature on that page?

14       **A.**   Yes.

15       **MR. JOHNSON:**  Your Honor, I don't mean to

16   interrupt but I can't see the exhibit.

17       **THE COURT:**  Yeah.  I can't either, Ms. Chaclan.

18       **MR. SIEGEL:**  Your Honor, I have hard copies, if

19   you would prefer it.

20       **THE COURT:**  Yeah, we may need to fall back to

21   that.  Do you have a binder or something for me, Mr. Siegel?

22       **MR. SIEGEL:**  Regrettably, we don't have a binder.

23   There's not many of them.  I would be happy to hole punch

24   them later to put them into the binder that you have.

25       **THE COURT:**  Why don't you just go ahead and pass

27

1    them up for now.  Is that your only copy?

2         **MR. SIEGEL:**  What do you mean?

3         **THE COURT:**  Do you need to use those?

4         **MR. SIEGEL:**  No, no.  I have three copies of each

5    exhibit.

6         **THE COURT:**  Okay.

7         **MR. SIEGEL:**  Do you want the entire packet?

8         **THE COURT:**  Sure.  Why don't you just give me the

9    whole packet.

10         **MR. SIEGEL:**  [Complied]

11         **THE COURT:**  Thank you.

12         **MR. SIEGEL:**  May we still use the electronic?

13         **THE COURT:**  Yes.

14         **MR. SIEGEL:**  Okay.

15         **MR. JOHNSON:**  Your Honor, we don't have a copy of

16    exhibit either.  I don't know if Mr. Siegel has an extra

17    one.

18         **MR. SIEGEL:**  Sure.

19    **BY MR. SIEGEL:**

20         **Q.**   Dr. Scott-McKinney, I'd like to ask if you

21    recognize the signature on this page?

22         **A.**   Yes, I do.

23         **Q.**   And are the facts presented on this declaration to

24    your personal knowledge?

25         **A.**   Yes.

1    **MR. SIEGEL:**  Your Honor, I'd like to move into

2  evidence, Plaintiff Exhibit 199.

3    **MR. JOHNSON:**  Objection, your Honor.  It's the

4  plaintiff's own out-of-court statement.  She can't use it

5  here for testimony today.

6    **THE COURT:**  All right.  I think she's adopting it.

7  This is a bench proceeding.  I am going to overrule the

8  objection.

9    (Plaintiff's Exhibit 199 was admitted.)

10  **BY MR. SIEGEL:**

11    **Q.**  Dr. Scott-McKinney, you testified at trial that

12  about 16 months went by without a scribe from July of 2019

13  to November 2020.  Do you recall that testimony?

14    **A.**  Yes.

15    **Q.**  During that time, can you describe how you managed

16  your documentation responsibilities as a physician?

17    **A.**  I had a very difficult time managing really long

18  hours.  I brought work home routinely, worked into the

19  middle of the night routinely.

20    **Q.**  What, if any, symptoms did you suffer during this

21  time period without a scribe?

22    **A.**  I had worsening neck and shoulder pain, and I also

23  had quite significant hand symptoms, cold, achy, numb, blue

24  hand.

25    **Q.**  How frequently were these hand symptoms?

1      **A.**   Every day.

2      **Q.**   I want to show you what's been previously marked

3   as Plaintiff Exhibit 13.

4          **MR. SIEGEL:**  I believe, Your Honor, this was

5   previously admitted into evidence.

6   **BY MR. SIEGEL:**

7      **Q.**   Dr. Scott-McKinney, what is this exhibit?

8      **A.**   That is the journal of my hours for the past five

9   years.

10         **MR. SIEGEL:**  Your Honor, for the sake of --

11  **BY MR. SIEGEL:**

12     **Q.**   Who prepared this journal?

13         **MR. SIEGEL:**  For sake of completeness, Your Honor,

14  I would ask to move this into evidence, just in case I

15  didn't do it before.

16         **MR. JOHNSON:**  No objection, Your Honor.  It's

17  already in evidence.

18         **THE COURT:**  All right.  Without objection -- and

19  what is this exhibit number again?

20         **MR. SIEGEL:**  Plaintiff Exhibit 13.

21         **THE COURT:**  All right.  Without objection,

22  Plaintiff's Exhibit 13 is admitted.

23      (Plaintiff's Exhibit 13 was admitted.)

24  **BY MR. SIEGEL:**

25     **Q.**   Can you go through Plaintiff Exhibit 13, and share

1    with the judge examples of your hand symptoms, during the

2    time you worked without a scribe?

3        **A.**    Yes, what is highlighted.  Here are some dates,

4    for example, in January of 2020, where I write about my hand

5    being dusky and cold.  January 8th, January 9th, my right

6    hand cold all day and dusky.  January 13th, cold, numb most

7    of the day and so forth.  If you could scroll down a little

8    more.

9        **Q.**    Before we continue, Dr. Scott-McKinney, why were

10   you documenting your hand symptoms at this time?

11       **A.**    Because they were very problematic and significant

12   for me.

13       **Q.**    Without reading these into the record, to what

14   extent did -- what were you seeking to do by documenting

15   this information?

16       **A.**    I was just noting what was significant about my

17   day.  As I had testified previously, the journal initially

18   was kept because I was working very long hours, 12-, 13-,

19   14-hour days.  And then over time, anything that was

20   significant, it was just incorporated into my journal.

21       **Q.**    To what extent did your hand symptoms persist

22   after you obtained the virtual scribe in November of 2020?

23       **A.**    Persistent, not well-controlled.

24       **Q.**    So what did you do to address that, if anything?

25       **A.**    I went to see a hand specialist, a doctor.

1          **Q.**   Who was that?

2          **A.**   Dr. Rozmaryn.

3          **Q.**   And what symptoms did you describe with

4     Dr. Rozmaryn?

5          **A.**   Achy, numb, cold, blue, tingly right hand.

6          **Q.**   I want to show you Plaintiff Exhibit 197 for

7     identification.  Do you recognize the first page of this

8     document?

9          **A.**   Yes.

10          **MR. SIEGEL:**  Could you please flip through the

11     pages.  Keep going.

12          **THE WITNESS:**  Yes.

13     **BY MR. SIEGEL:**

14          **Q.**   Dr. Scott-McKinney, what is this document or these

15     documents?

16          **A.**   These are some of my medical records from

17     Dr. Rozmaryn.

18          **Q.**   How did you come to receive them?

19          **A.**   He gave them to me after my visits.

20          **Q.**   You heard testimony in this case from Dr. David

21     Levin.  Correct?

22          **A.**   Yes.

23          **Q.**   What relationship, if any, is Dr. Rozmaryn and

24     Dr. Levin?

25          **A.**   They are partners.  They work in the same

32

1   practice.

2          **MR. SIEGEL:**  Your Honor, at this time I would like

3   to move into evidence Plaintiff Exhibit 197.

4          **MR. JOHNSON:**  Objection, Your Honor.  It's not

5   hearsay and not authenticated.

6          **MR. SIEGEL:**  May I be heard?  Dr. Levin testified

7   in this case, and I am happy to proffer it and provide it in

8   the closing brief, to a list of probably a dozen questions

9   to establish these are business records; and that these

10  medical records are kept in the regular course of business

11  in the medical practice; and that they are all part of

12  medical records system in this particular medical practice

13  of which Dr. Rozmaryn is one.

14         **THE COURT:**  I'm sorry.  Dr. Levin testified to

15  this?

16         **MR. SIEGEL:**  Dr. Levin, at the beginning of his

17  videotaped testimony.

18         **THE COURT:**  Did I see it?

19         **MR. SIEGEL:**  Yeah.  I can hand it up, Your Honor,

20  if you would like to see it, as a proffer.

21         **MR. JOHNSON:**  Your Honor --

22         **THE COURT:**  I honestly don't remember that but,

23  yeah.

24         **MR. JOHNSON:**  That's just false.  Dr. Levin never

25  testified about Dr. Rozmaryn's records.  He testified about

33

1    his own records.  Dr. Rozmaryn's records have never been

2    admitted into evidence at any -- a deposition of Dr. Levin

3    or at the trial in this case.  They simply weren't exhibits.

4        **MR. SIEGEL:**  Your Honor, Counsel is correct that

5    Dr. Levin testified about the medical records that he keeps

6    as part of the practice.  Dr. Rozmaryn is part of his

7    practice.  Dr. Rozmaryn cites Dr. Levin throughout these

8    documents.  They are all kept as one EMR in the practice.

9    I'm happy to hand up, as a proffer, the testimony from

10   Dr. Levin, establishing they are business records.

11       **THE COURT:**  Okay.  Let me take a look at his

12   testimony.

13       **MR. SIEGEL:**  Your Honor, for the record, we are

14   going to be starting on Page 9, Line 4 through Page 10, Line

15   18.  I'm going to need this back.

16       (Brief pause.)

17       **THE COURT:**  Okay.  And you said this was presented

18   in the trial, this testimony?

19       **MR. SIEGEL:**  Correct, Your Honor.

20       **THE COURT:**  All right.  Do you disagree with that,

21   Mr. Johnson?

22       **MR. JOHNSON:**  Your Honor, I agree that that

23   testimony was provided at trial.  If you read the

24   transcript, it's clear that Dr. Levin is talking about his

25   own patients.  He is asking about "your patients' notes."

1          The fact that Dr. Levin authenticated his own

2     patient notes doesn't allow plaintiff to come in with any

3     and all medical records from his practice from any doctor.

4     He testified about his own notes, and those were the ones

5     that were admitted into evidence via this very same

6     transcript.  He's never said anything about Dr. Rozmaryn's

7     notes.

8          **THE COURT:**  Okay.  So I'm looking at the

9     transcript here.  I think it's a little ambiguous.  But I

10    think the better interpretation is that he is talking about

11    what the medical practice does.  If only we spoke French, we

12    would know whether you were asking the singular you or

13    plural you.  But I think when you talk about, "your medical

14    practice," "Do you document patient visits and care?"

15    there's a number of questions.  He says, "Yes, I do," and I

16    see that, to Mr. Johnson's point.  But I think the better

17    understanding of the questions is that it was being asked

18    about what the practice does.  And so I'll admit this 197 as

19    a business record over objection.

20         (Plaintiff's Exhibit 197 was admitted.)

21    **BY MR. SIEGEL:**

22    **Q.**   Dr. Scott-McKinney, I'd like to show you what has

23    been previously marked as 166.

24         **MR. SIEGEL:**  Your indulgence, Your Honor.

25

**-135-**

1  **BY MR. SIEGEL:**

2      **Q.**   Dr. Scott-McKinney, do you recognize this

3  document?

4      **A.**   Yes, I do.

5      **Q.**   What is it?

6      **A.**   This is the Maryland Workers' Compensation

7  Commission award of compensation.

8      **Q.**   When was this issued?

9      **A.**   The hearing was in December of 2021, and this was

10  issued January 4th of 2022.

11      **Q.**   As a result of your meeting with Dr. Rozmaryn,

12  referring back to his medical notes, did you receive any

13  diagnoses for your hand symptoms?

14      **A.**   Yes, I did.

15      **Q.**   What were you diagnosed as having?

16      **MR. JOHNSON:**  Objection.  Hearsay.

17      **THE COURT:**  Overruled.

18      **THE WITNESS:**  I was diagnosed with repetitive

19  strain syndrome and carpal tunnel syndrome.

20  **BY MR. SIEGEL:**

21      **Q.**   From your perspective what is that?

22      **A.**   Repetitive strain symptom is --

23      **MR. JOHNSON:**  Your Honor, it calls for a lay

24  opinion.  She is not a lay witness.

25      **THE COURT:**  Overruled.

1        **THE WITNESS:**  Repetitive strain syndrome is a

2    syndrome -- it's an overuse syndrome, a repetitive motion

3    that causes inflammation of the affected body part.  And

4    carpal tunnel syndrome is -- basically your carpal tunnel is

5    a narrow passageway in your hand that is surrounded by bones

6    and ligaments, and your median nerve travels through that

7    passageway.  So carpal tunnel syndrome has symptoms related

8    to the compression of your median nerve.

9        **Q.**   To what extent, if any, did the Workers'

10   Compensation Commission include in its finding of permanent

11   partial disability anything associated with your hand?

12            **MR. JOHNSON:**  Objection.  Hearsay.

13            **THE COURT:**  Overruled.

14            **THE WITNESS:**  There was no -- this compensation

15   award was for my neck and my shoulder only.

16            **MR. SIEGEL:**  Your Honor, I would like to move into

17   evidence Defendant's Exhibit 166.

18            **MR. JOHNSON:**  No objection.

19            **THE COURT:**  Without objection, 166 is admitted.

20       (Plaintiff's Exhibit 166 was admitted.)

21   **BY MR. SIEGEL:**

22       **Q.**   Dr. Scott-McKinney, do you recall testifying about

23   the impact of losing your scribe on the number of patient

24   visits that you see?

25       **A.**   Yes.

1      **Q.**    How many hours of direct patient care did you have

2    when you had a scribe in 2018/2019?

3      **A.**    Up to eight hours.

4      **Q.**    And if you are working eight hours of direct

5    patient care, how many hours are you working in the office

6    on the computer?

7      **A.**    An eight-hour, direct-patient day typically

8    equates to anywhere from 10 to 14 hours in the office.

9      **Q.**    And how many hours of direct patient care do you

10    have since losing your scribe in July of 2019?

11      **A.**    Up to six hours.

12      **Q.**    And how many hours does six hours of

13    direct-patient care equate to the number of hours you spend

14    in the office on the computer?

15      **A.**    Nine to 11 hours, approximately.

16      **Q.**    After receiving your virtual scribe in November of

17    2020, did you go back to eight hours of direct-patient care?

18      **A.**    No.

19      **Q.**    Why not?

20      **A.**    First, I have a permanent 6-hour -- up-to-6-hour

21    work restriction from Dr. Levin, and also I was diagnosed

22    with the repetitive strain syndrome and carpal tunnel

23    syndrome and --

24          **MR. JOHNSON:**  Objection.  She's talking about what

25    Dr. Rozmaryn diagnosed her with.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  So I am trying to prevent

3     progression of my disorders, and I'm trying to strike a

4     balance between managing pain, managing hand symptoms,

5     trying to be productive and having some type of quality of

6     life, because a 6-hour -- up-to-6-hour workday is still 9 to

7     11 hours in the office and an 8-hour workday is 10 to 14

8     hours.  And that was three years ago.  Now I'm less

9     efficient because of my hand than I was three years ago.

10    **BY MR. SIEGEL:**

11         **Q.**   How many patient visits do you estimate that

12    you've lost per week as a result of your 6-hour work

13    restriction?

14         **A.**   Approximately 15.

15         **Q.**   And approximately how many weeks per year do you

16    see patients in a typical year?

17         **A.**   Forty-nine.

18         **Q.**   And why is that?

19         **A.**   I usually have three weeks of leave that I take

20    every year.

21         **Q.**   Approximately how many patient visits do you claim

22    you've lost by going to a permanent, 6-hour work

23    restriction?

24         **A.**   Approximately 735.

25         **Q.**   And how do you reach that conclusion?

1          **A.**   Fifteen patients a week, multiplied by 49 weeks a

2     year.

3          **Q.**   I'd like to show you what's been marked as --

4     previously marked as Plaintiff Exhibit 97.

5          (Brief pause.)

6          Dr. Scott-McKinney, what is this document?

7          **A.**   This is financials for the practice.  It's a

8     summary by provider of all charges, visits, receipts,

9     revenue.

10          **MR. SIEGEL:**  Your Honor, for the record, Plaintiff

11     Exhibit 97 has already been moved into evidence at trial.

12          **THE COURT:**  Okay.

13     **BY MR. SIEGEL:**

14          **Q.**   I'd like to show you Plaintiff Exhibit 193.

15     Dr. Scott-McKinney, what is this document?

16          **A.**   This is also a summary by provider.  Basically the

17     year's financials.  It's the same document as the previous

18     exhibit, just for FY '21, though.

19          **Q.**   And how, if at all, did these summaries help you

20     validate your 15-patient-per-week approximation?

21          **A.**   Well, I actually pulled the data from my visit by

22     provider summary.  So if you scroll down for FY '21, it says

23     I saw 3,223 patients in FY '21.  And then on the previous

24     exhibit I pulled -- I wrote down the number of visits by

25     provider for fiscal year '20, fiscal year '19 and fiscal

1    year '18.

2        **Q.**    And what result did you obtain by comparing those

3    years for FY 2018, '19, '20 and '21?

4            **THE COURT:**    Sorry.    Which two exhibits are we

5    looking at?

6            **MR. SIEGEL:**    Plaintiff Exhibit 97, Your Honor.

7            **THE COURT:**    I don't believe I have that.    Right?

8            **MR. SIEGEL:**    You don't?    Oh, it was previously

9    admitted.

10            I'm sorry.    Can you please put back on the screen

11    Plaintiff Exhibit 97?

12            **THE COURT:**    All right.    So you are comparing 197

13    -- or you are comparing 97 with 193?

14            **MR. SIEGEL:**    Yes, Your Honor.

15    **BY MR. SIEGEL:**

16        **Q.**    So, Dr. Scott-McKinney, for the record, Page 1 of

17    Plaintiff Exhibit 97, covers what fiscal year?

18        **A.**    Page 1 is fiscal year 2020.

19        **Q.**    Turning to Page 2, what fiscal year is that?

20        **A.**    This is fiscal year 2019.

21        **Q.**    And Page 3?

22        **A.**    Fiscal year 2018.

23        **Q.**    So I'd like to direct your attention now to

24    Plaintiff Exhibit 196.

25            **MR. SIEGEL:**    Go to Page 2, please.

1          Your Honor, before I ask the witness about

2     Plaintiff Exhibit 196, I would like to move into evidence

3     Plaintiff Exhibit 193.

4          **MR. JOHNSON:**  No objection, Your Honor.

5          **THE COURT:**  Without objection, 193 is admitted.

6          (Plaintiff's Exhibit 193 was admitted.)

7     **BY MR. SIEGEL:**

8          **Q.**   Plaintiff Exhibit 196, what is this document?

9          **A.**   Um, this is where I took the actual patient visit

10     numbers from the financials for each year.  And then 2018

11     and 2019 was when I worked up to 8 hours, and I added up all

12     the patients, divided by 2.  And then '20 and '21 are the

13     years so far where I worked up to 6 hours.  I added up those

14     patients and divided that by 2.  So, basically, I took the

15     average of those two years for each and came to 763 lost

16     patient visits.

17          **Q.**   Returning back to Page 1 of Plaintiff Exhibit 196,

18     can you describe for the Court what this document is?

19          **A.**   Oh, it's a back-pay calculation.

20          **Q.**   And who prepared this document?

21          **A.**   I did.

22          **Q.**   Returning to Plaintiff Exhibit 97, on Page 1, to

23     what extent did you use this document to help you determine

24     your personal revenue per patient visit to calculate

25     economic damages in this case?

42

1      **A.**  Oh, yes.  I used this visit -- I mean, I used this

2      exhibit.  I added up the k- or I divided, actually, my total

3      receipts.  So if you look at receipts, it says that I

4      brought in $689,502 in FY '20.  And then if you scroll down,

5      it tells you how many patients I saw in FY '20.  I saw 3,582

6      patients.  You just divide the two numbers, and that will

7      tell you what your per patient -- revenue is per patient for

8      that fiscal year.

9      **Q.**  I'd like to return you back to now Plaintiff

10     Exhibit 193.  Can you please go through the same exercise

11     for the Court to explain how you arrive at your personal

12     revenue per patient visit for fiscal year 2021?

13     **A.**  I did the same thing.

14     **MR. JOHNSON:**  Your Honor, it's a lay opinion

15     testimony again.

16     **THE COURT:**  I am going to overrule the objection.

17     **THE WITNESS:**  I just added -- I divided, rather,

18     my total receipts, which is 705,000 and some change, divided

19     by the number of patients I saw that year; and that gives me

20     my per patient revenue visit.

21     **BY MR. SIEGEL:**

22     **Q.**  I'd like to direct your attention back to

23     Plaintiff Exhibit 196 now.  If we focus on Page 1, what does

24     this -- focusing on the first paragraph, what did you

25     determine to be your average revenue per patient visit for

43

1    FY 2020?

2            **MR. JOHNSON:**  Objection.

3            **THE COURT:**  On what basis?

4            **MR. JOHNSON:**  Again, lay opinion testimony about

5    her own compensation.  We are getting now into the substance

6    of the report.  It's an expert report drafted by the

7    plaintiff.

8            **THE COURT:**  Okay.  Are you saying 193 -- which is

9    the expert report?

10           **MR. JOHNSON:**  196, 194 and 195.  194 and 195 we

11   haven't gotten to yet.

12           **THE COURT:**  So 196 she testified she has put

13   together.

14           **MR. JOHNSON:**  Right.

15           **THE COURT:**  I think that would go to the weight,

16   not the admissibility.  And it's not clear to me that this

17   is something that only an expert can testify on.  So I'm

18   overruling the objection.

19           **MR. JOHNSON:**  Thank you, Your Honor.

20   **BY MR. SIEGEL:**

21       **Q.**   Dr. Scott-McKinney, for FY 2021, what did you

22   determine your average revenue per patient visit?

23       **A.**   FY 2021, when you do the math, it's $220 per

24   patient.

25       **Q.**   And that equates with how much money per week at 6

**-144-**

1    hours of direct-patient care?

2        **A.**    So it's $220 per patient and 15 patients a week.

3        **Q.**    Going to the third paragraph, for FY 2022 going

4    forward, were you able to determine what your personal

5    revenue per patient visit is for FY 2022?

6        **A.**    Yes.

7        **Q.**    How were you able to do that?

8        **A.**    Well, I used the FY 2021 practice revenue.  So

9    instead of looking at my personal one, I actually used the

10    practice as a whole, so it included my partners, and I took

11    the per-patient revenue for the entire practice.

12        **Q.**    Why did you do that?

13        **A.**    I thought it would be more conservative because it

14    included junior doctors, and I am the most senior doctor

15    there.

16        **Q.**    So what did you do in order to determine an

17    average revenue per patient visit for the practice of

18    $186.56?

19        **A.**    I just added up from their document the total

20    practice revenue for every doctor, and then the total number

21    of patients that all the doctors saw and divided it and that

22    was $186.56.  It's lower than mine but it includes the other

23    -- you know, my partners.

24        **Q.**    I'd like to show you what's been previously marked

25    and admitted into evidence as Plaintiff Exhibit 119.  What

1    is this document?

2         **A.**    This is the physician -- annual physician

3    compensation reconciliation report, which is basically the

4    end of the year when practice expenses are factored into

5    revenue.  It's a reconciliation.

6         **Q.**    To what extent do the formulas, in this particular

7    reconciliation report -- strike that.  Where do the formulas

8    for this reconciliation report come from?

9         **A.**    It comes from my employment agreement.

10         **MR. SIEGEL:**  If you could scroll down the page.

11         So how much in compensation did you receive in

12    FY 2022, according to Plaintiff Exhibit 119?

13         **THE COURT:**  FY 2020?

14         **MR. SIEGEL:**  Yes, for FY 2020.

15         **THE WITNESS:**  What I actually earned when I was

16    paid was $253,743.

17    **BY MR. SIEGEL:**

18         **Q.**    Now I'd like to direct your attention to Plaintiff

19    Exhibit 194.  Dr. Scott-McKinney, who prepared this

20    document?

21         **A.**    I did.

22         **Q.**    And can you describe for the Court, looking at

23    Columns C and E, what you used to create this document?

24         **A.**    I used all of Plaintiff Exhibit 119, as well as

25    the employment agreement appendix.

46

1    **Q.**   So where did you get the formulas, if you scroll

2   down the page, you will see there is a number of formulas

3   here.  Where did you get those formulas from?

4    **A.**   They come from Exhibit 119 and from my employment

5   agreement, Appendix C.

6    **Q.**   Going to Row 19, what does this reflect?

7    **A.**   So this just reflects one line item where I took

8   the lost -- what I perceived as lost income from working up

9   to a 6-hour day, and I multiplied it by the per patient

10   revenue for that fiscal year and then multiplied that by the

11   number -- multiplied that by 41 weeks.

12    **Q.**   Why did you use 41 weeks?

13    **A.**   Because that was fiscal year 2020, which was

14   COVID.  So I took off three weeks of vacation, and I took

15   off eight weeks for COVID.  When I say "took off" -- well,

16   the three weeks of vacation obviously I don't see patients.

17   And then the eight weeks for COVID, I did see patients, but

18   it was much less than usual.  So I just used 11 -- took off

19   11 weeks, when I did that calculation.

20    **Q.**   What was the budget margin deficit for the

21   practice for FY 2020?

22    **A.**   It was $54,381.

23    **Q.**   When you added in your additional lost revenue of

24   118,388, what did you determine, if any, to be your back-pay

25   loss?

1          **MR. JOHNSON:**  Objection.

2          **THE COURT:**  Overruled.

3          **MR. SIEGEL:**  Can you scroll down, please?

4          **THE WITNESS:**  Well, when I did the math, there was

5    no back-pay loss for 2020.

6    **BY MR. SIEGEL:**

7       **Q.**   And why is that?

8       **A.**   Partly because there was an incentive payout

9    forgiveness or amendment forgiveness, and adjust the numbers

10   when there was no loss.  I didn't have any loss.

11      **Q.**   So I'd like to show you now Plaintiff Exhibit 192

12   and ask if you recognize this document?

13      **A.**   Yes, this is the same document but for fiscal year

14   2021.  The end of the year reconciliation where all expenses

15   are accounted for.

16      **Q.**   Who produces this document?

17      **A.**   Children's.

18      **Q.**   The defendant in this case?

19      **A.**   Yes.

20      **Q.**   So this reflects the 2021 Annual Physician

21   Compensation Reconciliation Report?

22      **A.**   Yes.

23      **Q.**   I'd like to direct your attention to Plaintiff

24   Exhibit 195.

25          **MR. SIEGEL:**  Your Honor, before I discuss this

1  exhibit with the witness, I'd like to move into evidence

2  Plaintiff Exhibit 194.

3        **MR. JOHNSON:**  Objection, Your Honor, for the same

4  basis.  It's based on unreliable -- (inaudible)

5        **THE COURT:**  Okay.  Dr. Scott-McKinney has said she

6  put this together.  I'm going to admit it.

7        (Plaintiff's Exhibit 194 was admitted.)

8  **BY MR. SIEGEL:**

9      **Q.**  Dr. Scott-McKinney, Plaintiff Exhibit 195, can you

10  explain to the Court what columns C and E reflect?

11      **A.**  It comes from that annual reconciliation report,

12  which is Exhibit 192, and just the formulas from my

13  employment agreement, Appendix C.

14      **Q.**  I want to direct your attention to row 19 again

15  and ask what you did here?

16      **A.**  I did the same exact math.  I just added in one

17  line for if I had seen those additional patients, that

18  fiscal year, what the revenue would have been.  Instead of

19  using 41 weeks, I used 49.

20      **Q.**  And what was the revenue per patient visit you

21  used for FY 2021?

22      **A.**  According to their document, it was $220 per

23  patient.

24      **Q.**  So if we scroll down the page, after running the

25  formulas and numbers and the numbers in that calculation,

1   what if any back-pay loss did you determine?

2       **A.**    For this fiscal year there was a back-pay loss of

3   $31,618.

4       **Q.**    I want to direct your attention to row 25.  What

5   is "Junior Doc NMR Credit?"

6       **A.**    That's when Children's distributes extra revenue

7   that the junior doctors in the practice generated.  And that

8   revenue gets distributed to the senior physicians by

9   percentages.

10      **Q.**    Do you see in that line, if you go over to row D,

11  where it says $28,451?

12      **A.**    Yes.

13      **Q.**    Where did you get that number from?

14      **A.**    That came from the Children's Annual

15  Reconciliation Report.

16      **Q.**    What Plaintiff Exhibit Number is that?

17      **A.**    192.

18      **Q.**    So after arriving at your allocation of that

19  junior doctor NMR credit, to what extent did you then

20  address the budget margin deficit?

21      **A.**    Well, I also had to -- budget margin deficit is

22  distributed to all the providers.  It's also based on a

23  percentage though.  So the doctors who earn more have to,

24  obviously, bear more of the brunt of the budget margin

25  deficit.  So I had a certain percentage and that's the

1    percentage.  So it worked out to I was responsible to assume

2    $43,000 of that budget margin deficit.

3         **MR. SIEGEL:**  Your Honor, I'd like to move into

4    evidence Plaintiff Exhibit 195.

5         **MR. JOHNSON:**  Objection.

6         **THE COURT:**  Over objection, I will admit 195.

7         (Plaintiff's Exhibit 195 was admitted.)

8    **BY MR. SIEGEL:**

9    **Q.**  Dr. Scott-McKinney I'd like to return back to

10   Plaintiff Exhibit 196.  You contend you suffered back-pay

11   loss for fiscal year 2022?

12   **A.**  Yes.

13   **Q.**  For the record, when does the fiscal year start

14   and end?

15   **A.**  The fiscal year begins July 1 and it ends on June

16   30th of the following year.

17   **Q.**  So for fiscal year 2022, what would be the last

18   day of that fiscal year?

19   **A.**  June 30th.

20   **Q.**  And what is the back-pay loss that you claim for

21   fiscal year 2022?

22   **A.**  $43,878.91.

23   **Q.**  And how did you arrive at that number?

24   **A.**  Well, I used the practice's per patient visit

25   revenue, not my own.  So that was the 186 instead of 220.

1    And then I just multiplied that by the number of weeks that

2    I work, and that came to the 137,121.  And then I took a

3    percentage of off that and that came to 42,878.

4        **Q.**    What does that reflect?

5        **A.**    Well, typically, it looks at -- it reflects the --

6    how the practice did with expenses and revenue, and

7    Children's determines what percentage.  Customarily the goal

8    -- and it is usually 35 percent.  With COVID it was down to

9    30 percent.  And last year it was 34.14 percent.

10       **Q.**    So why did you use 32 percent in applying the

11   compensation percentage to your calculation for back pay for

12   2022?

13       **A.**    It was just a more conservative number.

14       **Q.**    Does this particular number take into account a

15   budget margin deficit?

16       **A.**    Yes, it does.

17       **Q.**    How so?

18       **A.**    So typically for -- I mean, the past 15 years that

19   I've worked, the majority of them have been at the 35

20   percent, but the past two were not.  The last two, as I

21   said, COVID was 30 percent and last year was back up to

22   43.14 percent.  So I did take that into account.

23       **Q.**    Does the number you've arrived at take into

24   account the junior doctor NMR credit?

25       **A.**    Yes.

52

1    **Q.**   How so?

2    **A.**   Well, I assume no credit, actually.  Since I can't

3    really forecast the future, I just didn't give a credit for

4    junior doctors at all.

5    **Q.**   How, if at all, would a credit affect your

6    compensation?

7    **A.**   Oh, I'd receive more if I had a credit.

8    **Q.**   Your back-pay loss that you've calculated on

9    Plaintiff Exhibit 196 for fiscal year 2022 goes through June

10   30th of 2022; is that right?

11   **A.**   Yes.

12   **Q.**   Why is that?

13   **A.**   Well, the fiscal year ends in less than two

14   months, and my understanding is that this proceeding is

15   followed by other proceedings and probably -- I assume that

16   by the time everything is resolved it would be probably the

17   end of the fiscal year.

18   **Q.**   Moving to the bottom of Page 1, what does the

19   $75,496.91 reflect?

20   **A.**   Oh, that's the total back-pay loss from FY '21 and

21   FY '22.

22   **Q.**   And if you go down one more paragraph, what does

23   the $3,774.85 reflect?

24   **A.**   That's for my retirement.  I have always,

25   throughout my 15 years, contributed enough to my 401 so that

53

1    I would earn the maximum 5 percent match from my employer.

2    So that just represents the 5 percent match.

3        **Q.**    And how did you calculate that number?

4        **A.**    I just did the math.  Five percent of the 75,000.

5        **Q.**    So what is the total amount of the back-pay loss

6    that you are claiming in this case?

7        **A.**    $79,271.76.

8        **Q.**    Do you claim lost front pay in this case?

9        **A.**    Yes.

10       **Q.**    Turning to Page 3 of Plaintiff Exhibit 196, can

11   you describe for the Court what this document -- what this

12   page reflects?

13       **A.**    So this is the calculation I ran for my work life

14   expectancy.  Since I'm going to retire when I'm 67, I just

15   did each year and I still kept, you know, the 32 percent.  I

16   just allotted out each year.

17       **Q.**    I want to show you what has been marked as

18   Plaintiff Exhibit 198.  What is this document?

19       **A.**    Oh, that's the work life expectancy from Social

20   Security Administration.

21       **Q.**    Where did you get this document?

22       **A.**    SSA.gov.

23       **Q.**    How, if at all, did you use this as part of your

24   front pay analysis?

25       **A.**    Well, I used it -- it just helped to confirm that

1    2030, when I'm 67, that's when, according to Social Security

2    Administration, I would reach full retirement age, 67, for

3    my year of birth.

4         **MR. SIEGEL:**  Let's return back to Plaintiff

5    Exhibit 196, Page 3.  Scrolling down.  There you go.

6    **BY MR. SIEGEL:**

7        **Q.**  You see a number there with $351,031.28?

8        **A.**  Yes.

9        **Q.**  What does that number reflect?

10        **A.**  That reflects the lost wages over the next eight

11    years.

12        **Q.**  Do you know what a present-value calculator is?

13        **A.**  Yes.

14        **Q.**  What is it?

15        **A.**  It's a calculation that you do to determine what

16    the present-day value is of a number that's in the future.

17        **Q.**  And as part of your analysis in this case, can you

18    describe to the Court what you did in terms of obtaining or

19    using a present value calculator?

20        **MR. JOHNSON:**  Objection, Your Honor.  She's well

21    outside of the scope of her expertise.  She's not an

22    accountant.

23        **MR. SIEGEL:**  May I respond?

24        Your Honor, net present value calculators are

25    ubiquitous.  They are for car loans, house loans.  Anyone

1    can grab them off the internet and put the numbers in.  The

2    remaining pages of her exhibit she will explain what she

3    did.  She grabbed off the internet a reputable net present

4    value calculator, plugged in a discount rate, which she will

5    explain, plugged in each of these yearly front pay loss

6    numbers and pressed a button to calculate.  It's ubiquitous.

7    Courts use them.

8         You may recall from my briefing that I put

9    together to the Court of the legal standards, courts use

10   them all the time.  You don't need an expert to do a net

11   present value calculation.  In fact, if the Court were not

12   inclined to have the plaintiff do it, the Court can do it.

13   And courts have done it to arrive at a front-pay loss

14   calculation; that's why I attached those cases.

15        For the Court's convenience, I've prepared a bench

16   brief that I can hand up to the Court with those cases,

17   again, so you have them in front of you.  But the plaintiff

18   is well-versed and capable of explaining what she did to

19   calculate the discounted present value of the $351,000 that

20   she added up.

21        **MR. JOHNSON:**  Your Honor, their own former expert

22   testified that she would have an economist do that.  Simply

23   because the plaintiff went online and found a calculator,

24   doesn't make it reliable for admissible evidence.

25        **THE COURT:**  All right.  I'm going to admit it.  It

1    strikes me as the type of thing that a layperson can testify

2    to.  Dr. Scott-McKinney is very intelligent person.  Again,

3    I think a lot of this goes to the weight not whether she can

4    present it.  So I'm overruling the objection.

5    **BY MR. SIEGEL:**

6        **Q.**   Dr. Scott-McKinney, is the $351,031.28 your total

7    front-pay loss?

8        **A.**   No.

9        **Q.**   Why not?

10       **A.**   Because you have to apply the net present value

11   calculator to see what that actually equates to in today's

12   dollars.

13       **Q.**   What is a discount rate?

14       **A.**   That's the interest rate that you use to do the

15   net present value calculator.

16       **Q.**   And what interest rate did you use?

17       **A.**   I used three percent.

18       **Q.**   Why did you use a three percent discount rate?

19           **MR. JOHNSON:**  Objection.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  It's a conservative number.  It's

22   based on a 10-year treasury bill.  Usually bonds are very

23   conservative investments.  So I know it's been in the low

24   twos -- well, mid-twos.  And Friday it was 2.88.  So it's

25   just a conservative number.

1   **BY MR. SIEGEL:**

2      **Q.**   Turning to Page 4 of Plaintiff Exhibit 196, what

3   does this page reflect?

4      **A.**   Oh, that's just the calculator.  So I used one

5   dollar.  I put in a discount rate of three percent.  And I

6   just plugged in each year, it was the same for each year,

7   and you just push calculate.  It does the math for you.

8      **Q.**   So what is your total front-pay wage loss that you

9   are claiming in this case?

10     **A.**   Well, when you apply the net present value

11   calculator with three percent, it takes it down from 351

12   down to 308.

13         **THE COURT:**  Sorry.  I'm having a hard time

14   understanding this page.  So does this say you put in one

15   dollar and one year it's worth almost 44,000?

16         **THE WITNESS:**  No, it's not that it's worth that.

17   Each year I'm putting in the amount from the other exhibit

18   for the 43,000.  You just fill in the years, and then it

19   calculates for you what that would be.  So the start --

20   initial development starts one dollar, but each line you put

21   in what each year the cash flow would be.

22         **THE COURT:**  I see.  So what's the number that you

23   put in?

24         **THE WITNESS:**  Under year one, 43,878.91.  And then

25   the same for each year.  So that corresponds to --

58

1          **THE COURT:**  I see.  You put in --

2          **THE WITNESS:**  Oh, yeah.

3          **THE COURT:**  And remind me.  Where is the 43,000?

4          **THE WITNESS:**  Oh, so if you scroll --

5          **MR. SIEGEL:**  Can you go back to Page 3, please?

6          **THE WITNESS:**  It's these numbers to the right, the

7    43,078; that's the total and you put that in for each year,

8    for the eight years, with the three percent discount rate.

9    And the calculator just calculates what 351,000 is worth or

10   the value of that in today's dollars.

11         **THE COURT:**  I understand.  Thank you.

12         **THE WITNESS:**  You're welcome.

13   **BY MR. SIEGEL:**

14     **Q.**   Dr. Scott-McKinney, do you claim lost retirement

15   contributions associated with respect to your front-pay

16   loss?

17     **A.**   Yes.

18         **MR. SIEGEL:**  Can you turn to Page 6 of Plaintiff

19   Exhibit 196?

20   **BY MR. SIEGEL:**

21     **Q.**   What does this page reflect?

22     **A.**   That page reflects -- again, for my entire

23   duration I've always put in enough in my 401 to earn

24   Children's 5 percent match.  So that just reflects the 5

25   percent for each year.

59

1    **Q.**   So what does the 17,551.60 reflect?

2    **A.**   When you add up the eight years, that's the total

3    for eight years.

4    **Q.**   Is that your total front pay loss for purpose of

5    lost retirement benefit?

6    **A.**   No, because you have to do the same calculation

7    with the net present value calculator, because that's a

8    number in the future and you have to discount it.

9        **MR. SIEGEL:**  Turn to Page 7, please.

10   **BY MR. SIEGEL:**

11   **Q.**   What does this page, Page 7, what does this page

12   reflect?

13   **A.**   So I did the same thing, put a dollar, three

14   percent discount rate, eight years and I put in the five

15   percent employer match for the eight years.  When you hit

16   calculate, it takes the 17,000 down to 15,000 and some

17   change.

18       **MR. SIEGEL:**  Your Honor, I'd like to move into

19   evidence Plaintiff Exhibit 196.

20       **MR. JOHNSON:**  Objection, Your Honor.  The

21   plaintiff isn't qualified to create this document.  It was

22   given to us less than a week before today's hearing.  We

23   haven't had any discovery on it.  It's what the plaintiff's

24   prior expert witness would have said but couldn't say.  So

25   now the plaintiff is giving it as a lay opinion.

60

1          **THE COURT:**  All right.  Over objection I will

2     admit 196.

3          (Plaintiff's Exhibit 196 was admitted.)

4          **MR. SIEGEL:**  Your Honor, I have no further

5     questions.

6          **THE COURT:**  Okay.  Why don't we take five minutes.

7          (Recess.)

8          **MR. SIEGEL:**  Your Honor, I forgot to admit in two

9     pieces of evidence that have been shown to the witness.

10          **THE COURT:**  Okay.

11          **MR. SIEGEL:**  Plaintiff Exhibit 192, I would like

12     to move into evidence.

13          **MR. JOHNSON:**  Your Honor, because the exhibit

14     isn't up, I don't see 192 in front of me.

15          **THE COURT:**  Yeah, I don't remember which one that

16     is either, sir.  Oh, I think this was one of your charts.

17          **MR. JOHNSON:**  Oh, we have no objection.

18          **THE COURT:**  All right, 192 is in.

19          (Plaintiff's Exhibit 192 was admitted.)

20          **MR. JOHNSON:**  No objection.

21          **MR. SIEGEL:**  I'd also like to move into evidence,

22     Your Honor, Plaintiff Exhibit 198, which is the Social

23     Security Administration retirement document.

24          **MR. JOHNSON:**  Your Honor, we do object to that as

25     unauthenticated hearsay.  If she wants to testify --

61

1    (inaudible) -- she can certainly do that.

2              **MR. SIEGEL:**  Your Honor --

3              **THE COURT:**  Yes.

4              **MR. SIEGEL:**  -- that comes in under Federal Rule

5    of Evidence 803.17.  It's a compilation that's generally

6    relied upon by the public.  I've prepared a bench brief

7    citing case law that allows statistical information from the

8    Bureau of Labor and Statistics, Department of Labor and

9    other federal agencies to -- as being non-hearsay.

10             **MR. JOHNSON:**  Your Honor, 803.17 refers to market

11   reports and other similar publications.  I don't see how the

12   exhibit falls under the exception here.  The predicates for

13   admission under 803.17 were not established.  I don't see

14   how it applies to a printout from the Social Security

15   Administration's website.

16             **MR. SIEGEL:**  For the record, Your Honor, may I

17   hand this up?

18             **THE COURT:**  Yeah.  Yes, if you could hand that up.

19   Thank you.

20             **MR. SIEGEL:**  I would refer Your Honor to Page 2,

21   last paragraph.

22             **THE COURT:**  All right.  So is this something I can

23   find pretty easily online?

24             **MR. SIEGEL:**  Oh, yeah.  Go to Social Security,

25   SSA.gov.  I'll give you the exact page, Your Honor.

62

1        **THE COURT:**  Okay.

2        **MR. SIEGEL:**  I'm sorry.  It's loading, Your Honor.

3    Sss.gov/benefits/retirement/planner/agereduction.html.

4        **THE COURT:**  I see it right here, Mr. Johnson.  I

5    think probably the better thing for me to do is just to take

6    judicial notice of this.  I will hear you, if you don't

7    think I should be.

8        **MR. JOHNSON:**  Your Honor, we do object.  We

9    haven't had a chance to review plaintiff's case law, but we

10   do not think this falls into the definition of a market

11   report.  We also don't think it is appropriate for the

12   plaintiff to be providing lay testimony, based on market

13   reports, which again is akin to what an expert would do,

14   which she withdrew.

15       **THE COURT:**  Okay.  I'm going to admit 198, I

16   think, whether it, in fact, is appropriately one of the

17   exceptions to hearsay that Mr. Siegel points out or whether

18   I just can take judicial notice of this webpage.  Either way

19   I think it comes in.

20           Are you done, Mr. Siegel?

21       **MR. SIEGEL:**  Your Honor, I'm done with this

22   witness.  Thank you.

23       **THE COURT:**  Okay.

24   (Plaintiff's Exhibit 198 was admitted.)

25       **THE COURT:**  Cross, Mr. Johnson?  And,

63

1    Dr. Scott-McKinney, I remind you you are still under oath.

2         **MR. JOHNSON:**  Your Honor, I assume the defendant

3    will be permitted to make its opening before we present

4    Mr. Janowiak.

5         **THE COURT:**  Yes.

6         **MR. JOHNSON:**  We also have exhibit binders for the

7    Court to follow along.  If I can just hand them up to

8    Mr. Ferguson.

9         <u>**CROSS-EXAMINATION OF STACY SCOTT-McKINNEY, M.D.**</u>

10   **BY MR. JOHNSON:**

11   **Q.**    Good afternoon, Dr. Scott-McKinney.

12   **A.**    Good afternoon.

13   **Q.**    Dr. Scott-McKinney, you've been employed by

14   Children's National as a CP&A pediatrician since 2007; isn't

15   that right?

16   **A.**    Yes.

17   **Q.**    And you have an employment agreement with CP&A,

18   don't you?

19   **A.**    Yes.

20   **Q.**    Dr. Scott-McKinney, I'd like to show you what has

21   been marked as Plaintiff's Exhibit 1, which was previously

22   introduced into evidence at the trial in this matter.  Let

23   me know when you see that up on your screen, please.

24        **DEPUTY CLERK:**  From the ELMO?

25        **MR. JOHNSON:**  No, the computer.  We are only going

64

1    to use the ELMO for one exhibit.

2         **THE WITNESS:**  Yes, I see it.

3    **BY MR. JOHNSON:**

4         **Q.**   And, Doctor, I'd like to draw your attention to

5    Page 21 of this agreement.  Doctor, at Page 21 of this

6    agreement, there is a reference to the physician

7    compensation program.  Do you see that on your screen?

8         **A.**   Yes.

9         **Q.**   Okay.  And, Doctor, that program describes how you

10   were compensated by CP&A, doesn't it?

11        **A.**   Yes.

12        **Q.**   And this exhibit doesn't provide anywhere that you

13   will be paid a percentage of all revenue you generate as

14   wages, does it?

15        **A.**   I don't think so.

16        **Q.**   Now, Doctor, I'd like to refer you to Page 1 of

17   this Exhibit.  On Page 1 it indicates that the agreement is

18   effective January 1, 2010.  Correct?

19        **A.**   Yes.

20        **Q.**   And if we refer to Page 7 of the agreement,

21   Paragraph 11 indicates that the agreement renews in

22   five-year terms.  Right?

23        **A.**   Yes.

24        **Q.**   So your current contract is only effective through

25   2025.  Right?

65

1       **A.**   Well, yes.  Unless it doesn't auto renew.  Yes.

2       **Q.**   Right.  So unless either party agrees to cancel

3  the agreement in advance of 2025, there's a chance that you

4  could no longer be employed by Children's as of that date.

5  Right?

6       **A.**   Correct.

7       **Q.**   Yet you and your attorney have calculated lost

8  wages in this case through 2030.

9       **A.**   Correct.

10      **Q.**   Now, Doctor, I'd like to draw your attention to

11  fiscal year '20.  You worked without a scribe for about 16

12  months.  Correct?

13      **A.**   Yes.

14      **Q.**   And that was from July 29, 2019 to November 19,

15  2020.  Correct?

16      **A.**   Yes.

17      **Q.**   And CP&A's fiscal year ran from July 1, 2019 to

18  June 30, 2020, the 2020 fiscal year.  Correct?

19      **A.**   Yes.

20      **Q.**   And for all but one month of that fiscal year you

21  did not have a scribe.

22      **A.**   For 2020?

23      **Q.**   Yes.

24      **A.**   A month and some change, yes.

25      **Q.**   Okay.  So for just about all of fiscal year 2020

1    you had no scribe.  Correct, Doctor?

2        **A.**    Almost, yes.

3        **Q.**    And it was Dr. Levin who recommended you work a

4    reduced patient load during that period of time.  Right?

5        **A.**    Yes.

6        **Q.**    And it was also Dr. Levin who recommended that you

7    receive a scribe?

8        **A.**    Correct.

9        **Q.**    Now, Dr. Levin treated you prior to July of 2019

10    when your live scribe had resigned, didn't he?

11        **A.**    Yes.

12        **Q.**    And he also treated you during the period of time

13    that you worked without a scribe.  Right?

14        **A.**    Yes.

15        **Q.**    And he continued to treat you after you got a

16    virtual scribe.  Right?

17        **A.**    Yes.

18        **Q.**    So you would agree then that Dr. Levin is

19    knowledgeable of your medical condition, wouldn't you?

20        **A.**    With respect to the issues that I brought to him,

21    yes.

22        **Q.**    Right.  And you didn't treat yourself for those

23    issues.  Dr. Levin treated you.

24        **A.**    Correct.

25        **Q.**    Now, notwithstanding that you worked a reduced

67

1    patient load for almost all of fiscal year 2020, you didn't

2    experience any loss in compensation, did you?

3        **A.**    For 2020, no.

4        **Q.**    And that was according to your own exhibit that

5    you and Mr. Siegel drafted, Plaintiff's Exhibit 194; isn't

6    that right?

7        **A.**    Correct.

8        **Q.**    In fact, Dr. Scott-McKinney, your salary went up

9    in fiscal year 2020, after your scribe resigned, didn't it?

10       **A.**    I don't recall that, no.

11       **Q.**    You recall being deposed in this case.  Correct?

12       **A.**    Sure.  Yes.

13       **Q.**    You recall being deposed in your Workers'

14   Compensation case by an attorney Zach Irwin.  Correct?

15       **A.**    Yes.

16       **Q.**    During that deposition you were placed under oath.

17       **A.**    Of course.

18       **Q.**    Swore to tell the truth.

19       **A.**    Absolutely.

20       **Q.**    Just like you have today.  Right?

21       **A.**    Correct.

22       **Q.**    Okay.  And, Doctor, I'm reading from your May 5,

23   2020 deposition transcript, at Page 56, Line 2, Mr. Irwin

24   asked you:  Since Ms. Cauley has left, has your compensation

25   changed at all?  Your answer was, Yes.  And his question

1    was, How?

2            And your answer was, Well, because our financial

3    agreement stipulates that our salaries, an average of the

4    previous three years, every year our salary changes for the

5    upcoming fiscal year.  Then that is guaranteed for that

6    entire year.  So my salary went up a little.  I don't recall

7    the exact amount, but I know it went up a little.  And that

8    is because of the average of the previous three fiscal

9    years, the previous three years of productivity.  Is that

10   your testimony?

11       **A.**   Yes.

12       **Q.**   Now, Doctor, let's focus on CP&A's 2021 fiscal

13   year, please.  CP&A's 2021 fiscal year ran from July 1, 2020

14   to June 30, 2021.  Correct?

15       **A.**   Yes.

16       **Q.**   And you worked without a scribe for about five

17   months of that fiscal year.  Correct?

18       **A.**   Yes.

19       **Q.**   And --

20       **A.**   I'm sorry.  Tell me the fiscal year again.

21       **Q.**   Sure.  For fiscal year 2021, that started July 1,

22   2020.  Correct?

23       **A.**   Oh, yes.  Okay.

24       **Q.**   And you worked without a scribe during that fiscal

25   year until November 19, 2020.  Correct?

1      **A.**    Correct.

2      **Q.**    Okay.  Now, during this period of time, Doctor,

3   you also worked a reduced patient load, didn't you?

4      **A.**    Yes.

5      **Q.**    And, Dr. Scott-McKinney, you are not responsible

6   for calculating your own compensation, are you?

7      **A.**    No.

8      **Q.**    And you don't calculate the compensation for other

9   physicians in your medical practice either.

10     **A.**    No.

11     **Q.**    And there's someone at CP&A who is responsible for

12   that.  Correct?

13     **A.**    Yes.

14     **Q.**    And who is that person?

15     **A.**    The business manager.

16     **Q.**    Is that Mark Janowiak?

17     **A.**    Most recently I believe Mark Janowiak and another

18   person worked together on it.

19     **Q.**    So Mark Janowiak is responsible for calculating

20   the compensation for physicians at CP&A.

21     **A.**    Currently I believe so, but I don't believe so at

22   -- during those other fiscal years, I think it was him along

23   with someone else that conferred together.

24     **Q.**    In fiscal year 2021 Mr. Janowiak was responsible

25   for calculating your compensation, yes or no?

70

1      **A.**   I don't -- I can't say that with certainty.  I

2   don't know.

3      **Q.**   Well, Dr. Scott-McKinney, do you recall being

4   deposed in June of 2020.  Correct?

5      **A.**   In June of -- yes.

6      **Q.**   And you were deposed by Mr. Long on that occasion.

7   Right?

8      **A.**   Yes.

9      **Q.**   And you were placed under oath then too.  Right?

10     **A.**   Yes.

11     **Q.**   And during that deposition you were asked -- this

12  is at Page 40, Line 8 -- "Do you know who has that

13  responsibility for determining compensation for you?

14          "ANSWER:  There is practice administrator that is

15  currently performing that role.

16          "QUESTION:  Who is that?

17          "ANSWER:  Contract administrator for Children's

18  Hospital.  His name is -- his name is Mark Janowiak."

19          Does that refresh your recollection as to who was

20  calculating compensation?

21     **A.**   Yes.  However, as I stated, I believe he had other

22  administrators at Children's that helped him with that

23  calculation.

24     **Q.**   I'm not asking you if there were other people

25  involved.  I am asking if Mark Janowiak calculated

1    compensation during fiscal year 2020 and 2021?

2        **A.**   Yes.

3        **Q.**   Thank you.

4            Now, I want to direct your attention to

5    Plaintiff's Exhibit 195, which you testified about in

6    response to Mr. Siegel's questioning.

7            Now, Dr. Scott-McKinney, I think you testified in

8    response to Mr. Siegel's questioning that you drafted this

9    report, didn't you?

10       **A.**   Correct.

11       **Q.**   But it wasn't just you, it was Mr. Siegel too,

12   wasn't it?

13       **A.**   No, Mr. Siegel helped me with the formatting, I'm

14   not good at Excel spreadsheets.  But I drafted this.

15       **Q.**   So it was just you that drafted this?

16       **A.**   Yes, these are my numbers from Children's exhibit.

17       **Q.**   Dr. Scott-McKinney, I'm going to show you what's

18   been marked as Defendant's Exhibit 175.  Let me know when

19   you see that up on your screen, please.

20           (No response)

21           Dr. Scott-McKinney, do you recognize the name and

22   email address at the top of this document?

23       **A.**   Yes, Mr. Siegel.

24       **Q.**   So that's your attorney's email at the top of this

25   email, isn't it?

72

1        **A.**   Yes.

2        **Q.**   And why don't we go ahead and take a look at that

3   first paragraph there.  Can you read the sentence starting

4   with, "Note?"

5        **A.**   "Note that exhibits 194, 195 and 196 are

6   compilations prepared by Dr. Scott-McKinney and me based on

7   evidence in this case."

8        **Q.**   So at least according to this email, Exhibits 194,

9   195 and 196 were drafted by both you and Mr. Siegel?

10            **MR. SIEGEL:**  Objection.  Mischaracterizes her

11   testimony.

12            **THE COURT:**  Overruled.

13            **MR. JOHNSON:**  You can answer.

14            **THE WITNESS:**  I'm sorry.  Repeat the question,

15   please?

16   **BY MR. JOHNSON:**

17        **Q.**   According to Mr. Siegel's email here, Exhibits 194

18   and 195 and 196 were prepared by you and your lawyer, Eric

19   Siegel.  Correct?

20        **A.**   According to what is written here, that is what

21   that reads, yes.

22        **Q.**   But Mr. Siegel has got it wrong?

23        **A.**   No.  What I said was, and I will be clear, those

24   are my numbers, my calculations, but my counsel -- I'm not

25   good with Excel spreadsheets and he helped me to format it.

**-173-**

1    **Q.**  Just format it?

2    **A.**  Correct.  Just format.

3    **Q.**  Okay.  And, Doctor, let's refer back to

4    Defendant's Exhibit 175, please.  I'm sorry -- Plaintiff's

5    Exhibit 195.

6        Now, Dr. Scott-McKinney, you had previously

7    designated Jody Malcolm to opine on lost wages in this case,

8    hadn't you?

9    **A.**  Yes.

10   **Q.**  But you withdrew Ms. Malcolm's expert designation

11   on Thursday, April 21, just over a week prior to today's

12   hearing.  Right?

13   **A.**  Correct.

14   **Q.**  And then on Monday, April 25, 2022, you and

15   Mr. Siegel disclosed your joint reports, which were marked

16   as Plaintiff's Exhibit 194, 195 and 196.  Right?

17   **A.**  Correct.

18   **Q.**  And that was a joint effort by you and your

19   lawyer.

20       **MR. SIEGEL:**  Objection.  Asked and answered.

21       **THE COURT:**  Overruled.

22       **THE WITNESS:**  Repeat the question.  I'm sorry.

23   BY MR. JOHNSON:

24   **Q.**  Plaintiff's Exhibit 194, 195 and 196 were a joint

25   effort by you and your lawyer.  Yes or no?

74

1    **A.**   Yes.

2    **Q.**   And if the calculations in Plaintiff's Exhibit 195

3  are right, you will receive about $30,000, won't you?

4    **A.**   Yes.

5    **Q.**   So rather than Jody Malcolm, a vocational expert,

6  providing an opinion about the lost wages that you'll

7  receive, you and Mr. Siegel have taken up that role in this

8  case.

9    **A.**   Well, it's -- it seems better to use Children's

10  actual exhibits and Children's actual data, with the

11  exception of the one line item.  Otherwise, there is no

12  speculation.  It's hard data.  It's historical.  I'm not

13  theorizing anything other than plugging in the one line that

14  takes into account the patient-per-revenue loss.  All these

15  other numbers come from the actual reports, the financial

16  reports that we receive.

17    **Q.**   Well, Dr. Scott-McKinney, Jody Malcolm is a

18  vocational expert.  She calculates lost wages for a living.

19  Right?

20    **A.**   That is part of her expertise, yes.

21    **Q.**   And there's no reason why Jody Malcolm couldn't

22  review Children's documents and formulas and figure out what

23  your lost wages were.  Right?  In fact, you hired her to do

24  that.

25       **MR. SIEGEL:**  Objection.  Compound.

75

1          **THE COURT:**  Can you rephrase?

2          **MR. JOHNSON:**  Sure.

3     BY MR. JOHNSON:

4     **Q.**    There is no reason why Jody Malcolm, a vocational

5     expert, couldn't review Children's documents and formulas,

6     and figure out the back pay you were entitled to in this

7     case.  There is no reason she couldn't do that.  Right?

8     **A.**    She could do that.  But would you like me to

9     expand on --

10    **Q.**    No, that's fine.  She not doing that anymore, you

11    and Mr. Siegel are doing it now.

12    **A.**    Well, I'm doing the math, yes.

13    **Q.**    And Mr. Siegel is involved in the creation of

14    these reports as well?

15         **THE COURT:**  All right.  I think we got that point.

16    BY MR. JOHNSON:

17    **Q.**    Now, Dr. Scott-McKinney, this document assumes

18    that with a scribe you would have generated $876,150 in

19    patient revenue during fiscal year '21.  Right?

20    **A.**    Yes.

21    **Q.**    And, Dr. Scott-McKinney, that's more revenue you

22    had generated in any fiscal year with your employment with

23    CP&A, isn't it?

24    **A.**    I wouldn't know.

25    **Q.**    As you sit here on the stand today, are you able

1    to recall generating more than $876,150 for any fiscal year

2    with CP&A?

3        **A.**   I don't know.  I would have to look at the data.

4        **Q.**   Now, Dr. Scott-McKinney, the 2021 fiscal year

5    started in July of 2020, which was certainly during the

6    COVID-19 pandemic.  Right?

7        **A.**   Yes.

8        **Q.**   And during the first couple weeks of COVID, you

9    were instructed to stop seeing patients in the office, and

10   saw only three to six patients per day.  Right?

11       **A.**   Yes.

12       **Q.**   And after that, you started taking telemedicine

13   visits, but you were still seeing less patients than you

14   were pre-COVID.  Right?

15       **A.**   Yes.

16       **Q.**   So COVID-19 adversely impacted your patient visits

17   at CP&A?

18       **A.**   Yes.

19       **Q.**   And as a result, it affected the revenue generated

20   by patient visits.  Correct?

21       **A.**   Yes.

22       **Q.**   And, Dr. Scott-McKinney, the $876,150 that you

23   have on this exhibit, is $161,700 more than the revenue you

24   had actually generated during fiscal year '21.  Right?

25       **A.**   Yes.

1    **Q.**   And, Doctor, you arrive at that figure by assuming

2    that you would have seen 15 more patients per week.  Right?

3    **A.**   Yes.

4    **Q.**   And that each of those patients would generate

5    $220 in revenue?

6    **A.**   Yes.

7    **Q.**   And you would have generated that revenue for a

8    period of 49 weeks.  Correct, Doctor?

9    **A.**   Correct.

10   **Q.**   But, Dr. Scott-McKinney, you only worked without a

11   scribe during fiscal year '21 from July 1, 2020 to November

12   19, 2020.  Right?

13   **A.**   Correct.

14   **Q.**   That's certainly less than 49 weeks, isn't it?

15   **A.**   Correct.

16   **Q.**   In fact, it's about 20 weeks.  Right?

17   **A.**   Correct.

18           **MR. JOHNSON:**  Your Honor, may Mr. Long approach

19   the ELMO?

20           **THE COURT:**  Of course.

21           **MR. JOHNSON:**  Thank you.

22   BY MR. JOHNSON:

23   **Q.**   Now, Dr. Scott-McKinney, Mr. Long and I have some

24   calculations on what you would have made under your chart,

25   if we limit ourselves to the period of time that you did not

1    have a scribe.  So please follow along.  I am going to ask

2    you some questions about your math.

3              So, Doctor, to determine your weekly revenue loss,

4    we need to multiply $220 by 15 patients per week; is that

5    correct?

6         **A.**   Yes.

7         **Q.**   And 220 times 15 equals $3,300.  Right?

8         **A.**   I believe so.

9         **Q.**   And Mr. Long is doing the math on the ELMO here.

10   Can you see that up on your screen?

11        **A.**   No.

12             **THE COURT:**  No.

13             **MR. JOHNSON:**  I'm sorry.

14   **BY MR. JOHNSON:**

15        **Q.**   Let me ask you that question again,

16   Dr. Scott-McKinney, $220 times 15 patients equals $3,300.

17   Correct?

18        **A.**   Yes.

19        **Q.**   And that would need to be multiplied by 20 weeks

20   in this scenario to get to the net medical revenue that you

21   missed out on during the period of time that you did not

22   have a scribe.  Right?

23        **A.**   Yes.  Although I'm using the work-hour restriction

24   that I'm under.

25        **Q.**   Not my question, Dr. Scott-McKinney.  If we are

1    limiting ourselves to the period of time that you worked

2    without a scribe, we would need to multiply 3300 by 20.

3    Correct?

4        **A.**    I understand that, yes.

5        **Q.**    Thank you.  And, Doctor, that equals $66,000.

6    Correct?

7        **A.**    Yes.

8        **Q.**    So in that scenario, Mr. Long would need to write

9    in $66,000 in cells B-19 and D-19 on your chart.  Right?

10        **A.**    B-19, yes.

11        **Q.**    And D-19 as well.  Correct, Doctor?

12        **A.**    Yes.

13        **Q.**    And that's the additional patient revenue that you

14    would have generated during this period of time, had you

15    worked with a scribe.  Right, Doctor?

16        **A.**    Based on your calculations, yes.

17        **Q.**    Okay.  And that needs to be added to your actual

18    net medical revenue to determine how much net medical

19    revenue you would have had in this scenario.  Right?

20        **A.**    Correct.

21        **Q.**    And $66,000 plus $714,450 equals $780,450.  Right,

22    Doctor?

23        **A.**    Yes.

24        **Q.**    So Mr. Long would need to write that figure into

25    cells B-20 and B-22.  Correct?

1      **A.**   Yes.

2      **Q.**   Now, Doctor, the $66,000 figure needs to be added

3  to the practice's actual net medical revenue, which here is

4  $2,945,790.  Correct?

5      **A.**   Correct.

6      **Q.**   And $66,000 plus $2,945,790 equals $3,011,790.

7  Correct?

8      **A.**   Yes.

9      **MR. JOHNSON:**  So Mr. Long would need to write that

10  in cells E-20 and E-22.

11  **BY MR. JOHNSON:**

12      **Q.**   And, Doctor, to calculate your actual earned

13  compensation before budget margin deficit, we need to take

14  34.14 percent of your net medical revenue, which is $780,450

15  here.  Right?

16      **A.**   Yes.

17      **Q.**   So .3414 times $780,450 equals $266,446.  Correct?

18      **A.**   Yes.

19      **Q.**   And that's the actual earned compensation before

20  budget margin deficit.  Right?

21      **A.**   Right.

22      **MR. JOHNSON:**  So Mr. Long would write that figure

23  into cell B-24.

24  **BY MR. JOHNSON:**

25      **Q.**   Now, Dr. Scott-McKinney, you get a percentage of

81

1    the junior doctor credit as well.  Correct?

2         **A.**   Correct.

3         **Q.**   And that is proportionate to your percentage of

4    the revenue generated by all of the senior physicians.

5    Right?

6         **A.**   Yes.

7         **Q.**   So if $780,450 is 42 percent of the revenue

8    generated by all of the senior physicians, then you would

9    get 42 percent of the junior physician credit.  Right?

10        **A.**   If it was 42 percent, yes.

11        **Q.**   Right.  And here the total junior doctor credit is

12   $28,451.  Right?

13        **A.**   Yes.

14        **Q.**   And .42 times 28,451 equals 11,950.  Right,

15   Doctor?

16        **A.**   Yes.

17        **Q.**   So Mr. Long would need to write that figure into

18   cell B-25; is that right, Doctor?

19        **A.**   Yes.

20        **Q.**   And that's your junior doctor credit.  Right?

21        **A.**   Yes.

22        **Q.**   So we didn't have to add that to your actual

23   earned compensation before budget margin deficit to

24   calculate actual earned compensation before budget margin

25   deficit, but after the junior doctor credit.  Right?

82

1      **A.**   Yes.

2      **Q.**   So $266,446 plus $11,950 equals $278,396.  Right,

3   Doctor?

4      **A.**   Yes.

5         **MR. JOHNSON:**  And Mr. Long needs to write that

6   figure into cell B-26.

7   **BY MR. JOHNSON:**

8      **Q.**   And, Doctor, that's the actual earned compensation

9   before budget margin deficit but after the junior doctor

10  credit.  Right?

11     **A.**   Yes.

12     **Q.**   Now, to figure out the total compensation by

13  physician, we need to figure out the percentage of your net

14  medical revenue to the practice's net medical revenue.

15  Right?

16     **A.**   Correct.

17     **Q.**   And 780,450 divided by 3,011,790 equals .2591.

18  Right, Doctor?

19     **A.**   Yes.

20     **Q.**   So we would need to put for your percentage of

21  total compensation by physician 25.91 percent.  Right,

22  Doctor?

23     **A.**   Yes.

24     **Q.**   And here the total budget margin deficit is

25  $154,028.  Right?

1      **A.**   Yes.

2      **Q.**   And to figure out your allocation of the budget

3   margin deficit, we need to take 25.19 percent of that

4   number.  Right?

5      **A.**   Yes.  Correct.

6      **Q.**   So .2591 times 154,028 equals $39,909.  Right,

7   Doctor?

8      **A.**   Yes.

9      **Q.**   And Mr. Long needs to write that into cell B-30.

10  Right?

11     **A.**   Yes.

12     **Q.**   And that's your allocation of the budget margin

13  deficit, the portion that you are responsible for.

14     **A.**   Yes.

15     **Q.**   And, Doctor, we need to subtract that from your

16  actual earned compensation to determine the actual earned

17  compensation after the budget margin deficit.

18     **A.**   Correct.

19     **Q.**   And $278,396 minus $39,909, equals $238,487; is

20  that right?

21     **A.**   Yes.

22     **Q.**   So Mr. Long would need to write that figure into

23  cell B-31.  Right?

24     **A.**   Yes.

25     **Q.**   And that's your actual earned compensation after

84

1    budget margin deficit.

2         **A.**    Correct.

3         **Q.**    Now, Dr. Scott-McKinney, to determine how much

4    additional money you would have made, that figure needs to

5    be reduced by the base compensation that was paid to you.

6         **A.**    Correct.

7         **Q.**    And here that's $236,820.  Right?

8         **A.**    Yes.

9         **Q.**    So, Doctor, $238,487 minus $236,820 equals $1,667.

10    Right, Doctor?

11         **A.**    Yes.

12         **Q.**    So in the scenario -- and Mr. Long needs to write

13    that into cells B-35 through B-37.  Correct?

14         **A.**    Yes.

15         **Q.**    So, Doctor, where we limit your earnings to the

16    period of time when you worked without a scribe, you would

17    have only made $1,667 more during fiscal year 2020.

18    Correct?

19         **A.**    Yes.

20         **Q.**    And under any scenario, even your own, you didn't

21    have any lost wages during fiscal year '20.

22         **A.**    No.

23         **Q.**    So during the entirety of the period of time that

24    you worked without a scribe, for roughly 16 months, your

25    total lost wages, according to your own compensation or your

85

1   own computations, were merely $1,667.  Correct?

2       **A.**   Yes, based on the math that you've put here.

3           **MR. JOHNSON:**  Your Honor, we would like to

4   introduce the marked-up version of Plaintiff's Exhibit 195

5   as 195-A.

6           **THE COURT:**  Mr. Siegel?

7           **MR. SIEGEL:**  I have no objection, Your Honor.

8           **THE COURT:**  Without objection, 195-A is admitted.

9       (Plaintiff's Exhibit 195A was admitted.)

10          **MR. JOHNSON:**  Thank you, Your Honor.

11          **MR. SIEGEL:**  Your Honor, would it be possible to

12  get a copy at a break so I have it?  I don't need it now but

13  --

14          **THE COURT:**  Yeah.  It sounds like it will.

15          **MR. SIEGEL:**  Thank you.

16  BY MR. JOHNSON:

17      **Q.**   Dr. Scott-McKinney, I'd like to now refer you to

18  Plaintiff's Exhibit 196.

19          (Brief pause.)

20          Dr. Scott-McKinney, what's up on your screen is

21  Plaintiff's Exhibit 196; that's yours and Mr. Siegel's

22  calculation of lost wages.  Correct?

23      **A.**   Yes.

24      **Q.**   Okay.  But this wasn't just you and Mr. Siegel's

25  work, was it?

1      **A.**   Yes, it was just Mr. Siegel and I.

2      **Q.**   You didn't incorporate the opinions of your former

3   expert, Jody Malcolm, into this report?

4      **A.**   Just the methodology portion.

5      **Q.**   Did you use any of the same statements, formulas,

6   et cetera, that Ms. Malcolm had?

7      **A.**   Well, yes, the methodology.

8      **Q.**   Ms. Malcolm [sic], let's take a look at Page 1.

9   You have a chart that is referred to as the closed period of

10  dates of plaintiff's back pay wage loss.  Do you see that?

11     **A.**   Yes.

12     **Q.**   And that has a column for the dates of plaintiff's

13  revenue loss.

14     **A.**   Yes.

15     **Q.**   It has a column for plaintiff's loss of revenue.

16     **A.**   Yes.

17     **Q.**   And that's a product of less patients per week,

18  multiplied by the revenue that those patients would have

19  generated.  Right?

20     **A.**   Yes.

21     **Q.**   And there's a column for compensation percentage.

22     **A.**   Yes.

23     **Q.**   And there's a column for plaintiff's calculated

24  wage loss.  Right?

25     **A.**   Yes.

87

1       **Q.**   And the wage loss column is simply a percentage of

2  lost revenue.

3       **A.**   Yes.

4       **Q.**   Dr. Scott-McKinney, I'd like to now show you

5  what's been marked as Defendant's Exhibit 174.  Do you see

6  that document up on your screen now?

7       **A.**   Yes.

8       **Q.**   Do you recognize this document?

9       **A.**   Yes.

10       **Q.**   Have you seen it before?

11       **A.**   Yes.

12       **Q.**   What is it?

13       **A.**   That's Ms. Malcolm's report for wage loss.

14       **Q.**   And Ms. Malcolm used to be your expert but she's

15  not anymore.  Right?

16       **MR. SIEGEL:**  Objection.

17       **THE WITNESS:**  I'm sorry?

18       **MR. SIEGEL:**  I withdraw.

19       **THE WITNESS:**  It's not that she is not my expert.

20  I mean, I worked with her and understand her methodology.

21  **BY MR. JOHNSON:**

22       **Q.**   But she's not testifying at trial here today, you

23  are?

24       **A.**   Correct.

25       **Q.**   Now, let's refer to Page 9 of Ms. Malcolm's

88

1    report, please.  So at Page 9, Ms. Malcolm has a chart

2    referred to as the closed period of dates of plaintiff's

3    wage loss.  Right?

4    **A.**   Yes.

5    **Q.**   That column also -- or that chart also has a

6    column for the dates of plaintiff's revenue loss.  Correct?

7    **A.**   Yes.

8    **Q.**   It has a column for plaintiff's loss of revenue

9    just like yours.

10    **A.**   Yes.

11    **Q.**   It has a column for compensation percentage, just

12    like yours.

13    **A.**   Yes.

14    **Q.**   It has a column for plaintiff's calculated wage

15    loss, just like yours?

16    **A.**   Yes.

17    **Q.**   And that wage loss column is a percentage of lost

18    revenue.  Right?

19    **A.**   Correct.

20    **Q.**   And it's even got the same shading at the bottom

21    of the chart, doesn't it?

22    **A.**   Yes.

23    **Q.**   So did you copy and paste Ms. Malcolm's chart into

24    your report?

25    **A.**   No.  But the format, as I said, formatting -- I'm

1    not sure how to format things for court.  The numbers are

2    the numbers that I got from the plaintiff exhibits.  But the

3    formating, no, I didn't do the formating.

4        **Q.**    But it just so happened that formating ended up to

5    be the same exact formatting as Ms. Malcolm?

6        **A.**    I think the formating in her report is very clear.

7    And I think it's a great format, actually.

8        **Q.**    She was a good expert.  Take her opinions and use

9    them as your own.

10        **A.**    Methodology, yes.

11        **Q.**    You and Mr. Siegel, you are not vocational

12    experts, are you?

13        **A.**    No.

14        **Q.**    But Ms. Malcolm was.

15        **A.**    Yes.

16        **Q.**    And I deposed Ms. Malcolm about her charts, didn't

17    I?

18        **A.**    Yes.

19        **Q.**    And you withdrew her as a witness after that

20    deposition.

21        **A.**    Yes.

22        **Q.**    After defendant filed a second Motion in Limine to

23    exclude Ms. Malcolm's testimony.

24        **A.**    Yes.

25        **Q.**    And I've never deposed you about your charts

1    before, have I?

2        **A.**    No.

3        **Q.**    And Mr. Long hasn't deposed you about your charts

4    either.

5        **A.**    No.

6        **Q.**    And that's because you and Mr. Siegel drafted your

7    charts well after both of your depositions in this case.

8    Right?

9        **A.**    Yes.

10       **Q.**    And, in fact, you drafted both of your charts

11   after the trial on liability in this case.  Right?

12       **A.**    Yes.

13       **Q.**    But you certainly knew you were claiming lost

14   wages well in advance of the trial in this case.  Weren't

15   you?

16       **A.**    Yes.

17       **Q.**    And you only disclosed these charts to the

18   defendant one week before today's hearing.

19       **A.**    Yes.

20       **Q.**    Let's refer back to Plaintiff's Exhibit 196,

21   please, Dr. Scott-McKinney.  On Page 2 of your report, you

22   purport to validate the claim you've seen 15 less patients

23   per week as a result of not having a scribe.  Right?

24       **A.**    Yes.

25       **Q.**    And you do that by comparing your yearly patient

1  visit numbers in 2018 and 2019 to 2020 and 2021.  Right?

2      **A.**   Yes.

3      **Q.**   And you saw 4,058 patients in 2018 and 4,253

4  patients in 2019.  Right?

5      **A.**   Yes.

6      **Q.**   And fiscal year '19 was the most patients you had

7  seen in any fiscal year for CP&A, isn't it?

8      **A.**   I don't recall but it certainly was the most I've

9  seen recently, yes.

10     **Q.**   And as you sit here on the stand today, can you

11 recall any fiscal year in which you saw more patients than

12 4,253?

13     **A.**   I would have to see all of the data.  There's no

14 need for me to memorize it but I believe that was probably

15 one of the better years, yes.

16     **Q.**   So your baseline for the amount of patients that

17 you could have seen with a scribe is based on at least one

18 of the most productive years you've had in recent memory.

19 Right?

20     **A.**   Yes.

21     **Q.**   And fiscal year '18 and '19 those were not

22 affected by the pandemic, were they?

23     **A.**   No.

24     **Q.**   But fiscal year '20 and '21 were.  Right?

25     **A.**   The last quarter of fiscal year '20 but not the

92

1   first three quarters was, yes.

2        Q.   Go ahead.

3        A.   And fiscal year '21 I would say recovery.

4        Q.   But there was still some effects from COVID in

5   fiscal year '21.  Correct?

6        A.   Not that I saw in terms of my patients but perhaps

7   for the practice, yes.

8        Q.   And that affects your compensation, doesn't it?

9   The performance of your practice.

10       A.   Yes.  Yes.

11       Q.   Now, Doctor, on Page 2 of your report, you assume

12   a discount rate of 3 percent.  Do you see that?

13       A.   Yes.

14       Q.   Now, you use the term, "Net present value

15   calculation."  Right?

16       A.   Yes.

17       Q.   Doctor, you are not an economist.  Right?

18       A.   No.

19       Q.   You don't have any training that qualifies you to

20   do a net present value calculation of front pay.

21       A.   Training?  No.  I don't think I need training.

22       Q.   Do you have any experience on doing a net present

23   value calculation outside of what is done in this report?

24       A.   I may have used it for -- in the past but not that

25   I can recall with 100 percent certainty so no.

-193-

1      **Q.**   So you can't recall any specific instances in

2   which you've done a net present value calculation prior to

3   this report.

4      **A.**   No.

5      **Q.**   And this report just so happens to concern money

6   that you want the Court to award you in this case.  Right?

7      **A.**   Yes.

8      **Q.**   And you selected a 3 percent rate as more

9   conservative than the 10-year Treasury rate.  Right?

10     **A.**   Yes.

11     **Q.**   And that was your decision, that 3 percent was

12  conservative?

13     **A.**   Well, if you look at the T-Bill, every day the

14  T-Bill rate comes out.  So, yes, I thought it was a more

15  conservative interest rate, yes.

16     **Q.**   Did Mr. Siegel have any input on using 3 percent?

17         **MR. SIEGEL:**  Objection.  Attorney/client

18  privilege.

19         **THE COURT:**  Sustained.

20  **BY MR. JOHNSON:**

21     **Q.**   Dr. Scott-McKinney, on Page 3 you have a Chart II,

22  Plaintiff's projected front pay wage loss.  Do you see that?

23     **A.**   Yes.

24     **Q.**   And that has a column for dates of plaintiff's

25  revenue loss.  Right?

94

1      **A.**   Yes.

2      **Q.**   And that's a product of patients per week

3  multiplied by the revenue those patients would have

4  generated.

5      **A.**   Yes.

6      **Q.**   And it's got a compensation percentage.

7      **A.**   Yes.

8      **Q.**   And it's got a column for plaintiff's calculated

9  wage loss.  Right?

10     **A.**   Yes.

11     **Q.**   Now, there's no reduction in these charts for a

12  budget margin deficit, is there?

13     **A.**   No.

14     **Q.**   Yet there was a budget margin deficit in fiscal

15  years '20 and '21.  Right?

16     **A.**   Yes.

17     **Q.**   And those were the two most recent completed

18  fiscal years for CP&A?

19     **A.**   Correct.

20     **Q.**   And, Dr. Scott-McKinney, this is, again, the same

21  methodology used for the calculation of lost wages by your

22  former expert, Ms. Malcolm.

23     **A.**   Same methodology, yes.

24     **Q.**   And the methodology is taking, simply, a

25  percentage of the revenue you would have generated in those

1    fiscal years or you would have expected to have generated in

2    these fiscal years and calculating that as your wage loss.

3    Right?

4        **A.**    Yes.

5        **Q.**    So in its simplest form, wage loss equals a

6    percentage of revenue.

7        **A.**    Yes.

8        **Q.**    While this was once Ms. Malcolm's methodology,

9    it's now yours and Mr. Siegel's.

10        **A.**    Is that a question or a statement?

11        **Q.**    It's a question.

12        **A.**    Yes, these are the numbers that I input, yes.

13        **Q.**    Now, at the bottom of the page on Plaintiff's

14    Exhibit 196, there's a statement with three asterisks next

15    to it.  Do you see that?

16        **A.**    Yes.

17        **Q.**    Can you go ahead and read that into the record,

18    please?

19        **A.**    "The noted work life expectancy is based on the

20    plaintiff's current age in relation to the anticipated

21    retirement age, according to the Social Security

22    Administration.  The work --"

23        **Q.**    Go ahead, Doctor.  Sorry.

24        **A.**    "The work life expectancy has not been adjusted in

25    consideration of the plaintiff's medical/physical

1    conditions."

2            **MR. JOHNSON:**  And can we refer to Plaintiff's

3    Exhibit 194 on Page 11 on the bottom of the page?

4    **BY MR. JOHNSON:**

5        **Q.**  Doctor, there's a statement with three asterisks

6    there too.  Can you go ahead and read that statement?

7        **A.**  "The noted work life expectancy is based upon the

8    plaintiff's current age in relation to the anticipated

9    retirement age, according to the Social Security

10   Administration."

11       **Q.**  Now, I thought you testified earlier that you just

12   used the formating and methodology from Ms. Malcolm's expert

13   report.

14       **A.**  Yes, but this is a good qualifier for -- to

15   explain why certain things were done.

16       **Q.**  So the exact same statement about work life

17   expectancy appears in both Ms. Malcolm's report and your

18   report.

19       **A.**  Yes.

20       **Q.**  And did you copy and paste that statement from

21   Ms. Malcolm's report?

22       **A.**  It's not copy and pasted, but it's the same

23   language, yes.

24       **Q.**  So you both just reached the same conclusion and

25   the same language?

1    **A.**   Well, she advised on what's customary and what's

2    not.  So you have to allow for certain things.  So it should

3    be a footnote.

4    **Q.**   Now, who did the work life expectancy analysis in

5    your report?  Was it you, Ms. Malcolm or Mr. Siegel?

6    **A.**   The report that was submitted today, that's my

7    calculation.

8    **Q.**   And there was no input from Ms. Malcolm or

9    Mr. Siegel on that calculation?

10    **A.**   No.

11    **Q.**   Now, Dr. Scott-McKinney, you don't have any

12    training in examining work life expectancy, do you?

13    **A.**   No.

14    **Q.**   Do you have any prior experience in examining work

15    life expectancy?

16    **A.**   Nope.

17    **Q.**   And is this the first time you've analyzed

18    anyone's work life expectancy?

19    **A.**   Yes.

20    **Q.**   And it just so happens to be your own.

21    **A.**   Yes.

22    **Q.**   Now, on Page 4 of your report, you attach a

23    printout from GIGACalculator.com; that's Plaintiff's Exhibit

24    196 we are referring back to now.

25         And, Doctor, you use this calculator to reduce

98

1    your lost wage calculation to present value.  Correct?

2        **A.**    Correct.

3        **Q.**    Who decided to use GIGACalculator.com?  Was that

4    you, Ms. Malcolm or Mr. Siegel?

5        **A.**    Who decided to use GIGA?

6        **Q.**    Uh-huh.

7        **A.**    I don't recall.

8        **Q.**    So it was one of those three though.  Right?

9        **A.**    You said me, Mr. Siegel or Jody Malcolm?

10       **Q.**    Right.

11       **A.**    I don't recall, actually.

12       **Q.**    Do you know how, whoever decided to use

13   GIGACalculator.com landed on GIGACalculator.com?

14       **A.**    No.

15       **Q.**    Do you know if GIGACalculator.com is an accepted

16   method among economists for calculating net present value?

17       **A.**    I do not know, no.

18       **Q.**    Did you ever use GIGACalculator.com before you and

19   Mr. Siegel generated your report?

20       **A.**    No, I don't think so.

21       **Q.**    Now, Dr. Scott-McKinney, I'd like to refer you to

22   Page 6 of your report, where you calculate an employer

23   contribution of 5 percent for all of your claimed lost wages

24   through 2030.  Right?

25       **A.**    Yes.

1    **Q.**   And your methodology, here, if I understand your

2    testimony earlier, is that you simply take 5 percent of all

3    the additional wages that you estimate you would have earned

4    and you tack that on as an additional employer contribution.

5    Right?

6    **A.**   Yes.

7    **Q.**   But isn't Children's National's retirement

8    contribution up to 5 percent of your wages?

9    **A.**   Yes.

10   **Q.**   Okay.  So even right now, Children's National is

11   contributing up to 5 percent of your wages.  Right?

12   **A.**   Oh, yes.

13   **Q.**   So, Dr. Scott-McKinney, isn't it true then that

14   Children's National wouldn't simply contribute another 5

15   percent for any additional money that you would have made?

16   **A.**   Well, it's based on what you elect.  And for the

17   entire 15 years I have -- I believe I have always tried to

18   make my 401k contribution, such that I would match or if

19   it's -- I would match so that I would get the most from

20   Children's in terms of their matching funds.  So typically I

21   put 10 percent, which is the benchmark for getting 5

22   percent.

23   **Q.**   So you've still contributed the maximum amount

24   that you are able to during the period of time that you

25   worked without a scribe.  Right?

1      **A.**   Yes.  There was one recent error that was made on

2   the 401k part, but they have since corrected it but, yes.

3            **MR. JOHNSON:**  Your Honor, at this point in time we

4   move to strike Plaintiff's Exhibit 194, 195 and 196 along

5   with plaintiff's testimony on those documents.  She's

6   clearly copied and pasted that information from her former

7   expert.  She is not qualified to render the opinions in

8   there.  And defendant, again, has been ambushed with those

9   documents, directly before today's hearing, without any

10  opportunity for discovery on them.  The plaintiff has known

11  she is claiming lost wages in this case, and there is no

12  reason why those documents were disclosed to defendant when

13  they were.

14           **THE COURT:**  All right.  Are you done with your

15  cross-examination?

16           **MR. JOHNSON:**  I'm not, Your Honor.  I'm just

17  moving on to a different subject.

18           **THE COURT:**  All right.  I'm going to deny your

19  motion.

20           **MR. JOHNSON:**  Thank you, Your Honor.

21  **BY MR. JOHNSON:**

22       **Q.**   Now, Dr. Scott-McKinney, you introduced several

23  records from Dr. Leo Rozmaryn dated between October 6th,

24  2020 and April 13th, 2021 in response to Mr. Siegel's

25  questioning.  Correct?

1    **A.**    Yes.

2    **Q.**    But Dr. Scott-McKinney, you saw Dr. Rozmaryn

3    before October 6th, 2020.  Right?

4    **A.**    Yes.

5    **Q.**    And you saw him for the first time on August 11,

6    2020.  Right?

7    **A.**    I believe so, yes.

8    **Q.**    Is there any reason why you omitted that note from

9    your earlier testimony?

10    **A.**    No.

11    **Q.**    No reason?

12    **A.**    No.

13    **Q.**    Doctor, I'd like to refer you to Defendant's

14    Exhibit 173, please.  Doctor, go ahead and read that first

15    sentence under "Initial office visit" into the record,

16    please?

17    **A.**    "Doctor McKinney is a 57-year-old woman who has

18    for the past three years has had steady increasing pain,

19    mostly numbness and tingling and color changes in her

20    fingers."

21    **Q.**    Now, Dr. Scott-McKinney, as of August 11, 2020,

22    you had been working without a scribe for only a year.

23    Right?

24    **A.**    Only a year?

25    **Q.**    About one year.  As of August of 2020?

1      **A.**   Yes.

2      **Q.**   So that would mean that according to

3  Dr. Rozmaryn's here, your hand symptoms started well before

4  your live scribe resigned, didn't they?

5      **A.**   Yes, but there's two different types of hand

6  symptoms that I have but, yes.

7      **Q.**   Okay.  And, Dr. Scott-McKinney, that was well

8  before the defendant refused to provide a scribe in this

9  matter, that your hand symptoms started.  Right?

10     **A.**   Yes.

11     **Q.**   And, Doctor --

12        **MR. JOHNSON:**  Actually, Your Honor, before I

13  continue, I would like to admit Defendant's Exhibit 173 into

14  evidence, please.

15        **MR. SIEGEL:**  No objection.

16        **THE COURT:**  Without objection, Exhibit 173 is

17  admitted.

18     (Defendant's Exhibit 173 was admitted.)

19        **MR. JOHNSON:**  Your Honor, for the record we would

20  like to admit 174 and 175 as well.

21        **MR. SIEGEL:**  No objection.

22        **THE COURT:**  174 and 175 are also admitted.

23     (Defendant's Exhibits 174 and 175 were admitted.)

24        **MR. JOHNSON:**  Thank you, Your Honor.

25

1    **BY MR. JOHNSON:**

2        **Q.**    Now, Dr. Scott-McKinney, I'd like to refer you to

3    the second page of Defendant's Exhibit 173, please.  The

4    first paragraph on this page, five lines up from the bottom,

5    there's a sentence that starts with, "She has no history."

6    Can you read that sentence into the record, please?

7        **A.**    "She has no history of any night pain, which rules

8    out carpal tunnel syndrome."

9        **Q.**    So, Dr. Scott-McKinney, he ruled out carpal tunnel

10    syndrome, didn't he?

11        **A.**    He thought on this note, if you read further down,

12    that I had repetitive strain syndrome, which is what he

13    diagnosed me with there.

14        **Q.**    That's not my question, Dr. Scott-McKinney.  On

15    this note, Dr. Rozmaryn ruled out carpal tunnel syndrome,

16    didn't he?

17        **A.**    Yes.

18        **Q.**    And it just so happens that this is the note you

19    omitted from your earlier testimony.

20        **A.**    Yes.

21        **Q.**    Now, Dr. Scott-McKinney, Plaintiff's Exhibit 197,

22    the first two pages, which I'd like to refer you to.

23        (Brief pause.)

24        **THE COURT:**  Find a place to stop in the next

25    couple minutes.

1          **MR. JOHNSON:**  Will do, Your Honor.

2     **BY MR. JOHNSON:**

3          **Q.**   Dr. Scott-McKinney, Plaintiff's Exhibit 197, the

4     first two pages is Dr. Rozmaryn's October 6th, 2020 note.

5     Correct?

6          **A.**   Yes.

7          **Q.**   And you were still working without a scribe at

8     this time, weren't you?

9          **A.**   Correct.

10         **Q.**   Where in this note does Dr. Rozmaryn, if at all,

11    reference carpal tunnel syndrome?

12         **A.**   Scroll down.  I believe it was his third -- my

13    third visit with Dr. Rozmaryn.

14         **Q.**   So the diagnosis of carpal tunnel syndrome is

15    nowhere in the October 6, 2020 note, is it?

16         **A.**   Scroll down.  No.

17              **MR. JOHNSON:**  Your Honor, we can break there.

18              **THE COURT:**  Okay.  Why don't we come back at 2:15.

19    All right.  Thanks, folks.  You may step down.

20              **THE WITNESS:**  Thank you.

21              **DEPUTY CLERK:**  All rise.

22              **DEPUTY CLERK:**  This honorable court stands in

23    recess.

24              (Lunch was taken from 12:45 p.m. to 2:15 p.m.)

25              **THE COURT:**  Give me one moment, Mr. Johnson.

1      **MR. JOHNSON:**  Yes, sir.

2      **THE COURT:**  All right.  Mr. Johnson, you may

3  continue and Dr. Scott-McKinney, I remind you, you are still

4  under oath.

5      **MR. JOHNSON:**  Thank you, Your Honor.

6  **BY MR. JOHNSON:**

7      **Q.**  Dr. Scott-McKinney, when we left off, I believe we

8  were talking about Plaintiff's Exhibit 196.  Correct?  Which

9  was Dr. Rozmaryn's records.

10      **A.**  Yes.

11      **Q.**  I'm sorry, Doctor, 197.

12      **A.**  Okay.  Yes.

13      **Q.**  And, Dr. Scott-McKinney, right before we had left

14  off, I had asked you, the first two pages of Exhibit 197,

15  which are Dr. Rozmaryn's October 6th, 2020 note, did not

16  make any reference to carpal tunnel syndrome.  Right?

17      **A.**  Correct.

18      **Q.**  And, Dr. Scott-McKinney, I now refer you to

19  Plaintiff's Exhibit 197, Pages 3 and 4.  And we will start

20  with 3.  That is Dr. Rozmaryn's note from February 2, 2021.

21  Right?

22      **A.**  Yes.

23      **Q.**  And you had a virtual scribe for a couple months

24  as of this visit.  Right?

25      **A.**  Yes.

1    **Q.**   And, Dr. Scott-McKinney, this is the very first

2    note from Dr. Rozmaryn that references carpal tunnel

3    syndrome, isn't it?

4    **A.**   If you could scroll down, please.  I believe there

5    is a second part of that note.  Can you go to the very

6    bottom, please?  Yes.

7    **Q.**   So, Dr. Scott-McKinney, Dr. Rozmaryn's notes make

8    no reference to carpal tunnel syndrome until after you had

9    received a virtual scribe.  Correct?

10   **A.**   Well, I believe this visit from February, if you

11   scroll further down -- no, down -- they made, yes, he

12   clarified that "Her diagnosis is repetitive strain syndrome,

13   secondary to carpal tunnel."

14   **Q.**   Right.  I don't know that that answers my

15   question, Dr. Scott-McKinney.  My question was, The very

16   first time Dr. Rozmaryn references carpal tunnel syndrome in

17   his notes, was after you received a virtual scribe.

18   Correct?

19   **A.**   Yes.

20   **Q.**   And, Dr. Scott-McKinney, this was almost three

21   months after you had begun working with a virtual scribe.

22   Right?

23   **A.**   Correct.

24   **Q.**   Now, Dr. Scott-McKinney, Plaintiff's Exhibit 197

25   and Defendant's Exhibit 173 are all of your notes from

1    Dr. Rozmaryn.  Right?

2         **A.**   No, they are not all of the notes.

3         **Q.**   So there are other notes from Dr. Rozmaryn that

4    you also haven't entered into evidence today.

5         **A.**   Yes, it was an oversight.  There were two other

6    dates of service that are not a part of this packet, yes.

7         **Q.**   Well, Dr. Scott-McKinney, if we are limiting

8    ourselves to the notes that we have in the record here

9    today, which is Plaintiff's Exhibit 197 and Defendant's

10   Exhibit 173, nowhere in either of these notes does

11   Dr. Rozmaryn attribute your carpal tunnel syndrome to

12   working without a scribe for 16 months, does it?

13        **A.**   No, he doesn't reference the period of time

14   without the scribe.  Correct.

15        **Q.**   And Dr. Rozmaryn also does not attribute your

16   repetitive strain syndrome in these notes to the 16 months

17   you worked without a scribe, does he?

18        **A.**   No, he didn't reference that.

19        **Q.**   So in all of the medical records from Dr. Rozmaryn

20   before the Court today, neither of them attribute either

21   carpal tunnel or repetitive strain syndrome to the 16 months

22   you worked without a scribe; is that correct?

23        **A.**   Yes.  However, he was aware of the scribe issue,

24   because he makes reference to it, that she's working towards

25   a scribe.  So he was aware that I didn't have a scribe and

1  then I did have a scribe, yes.

2      **Q.**   But he did not attribute those six -- your medical

3  conditions, the repetitive strain or the carpal tunnel, to

4  the 16 months when you did not have a scribe.  Correct?

5      **A.**   No, not specifically.

6      **Q.**   Doctor, I'd like to refer you back to Plaintiff's

7  Exhibit 196, please.  On Page 4 of this exhibit --

8          **MR. JOHNSON:**   I'm sorry.  Can you go to Page 3,

9  please?

10          Your Honor, a moment of the Court's indulgence,

11  please.

12          (Discussion with Mr. Long off the record.)

13  **BY MR. JOHNSON:**

14      **Q.**   Dr. Scott-McKinney, on Page 6 of your report,

15  Plaintiff's Exhibit 196, you claim an additional 5 percent

16  of all of your lost wages as a lost 401k contribution as

17  well.  Correct?

18      **A.**   Yes.

19      **Q.**   Okay.  But, Dr. Scott-McKinney, the wages you lost

20  are incentive compensation, not base salary.  Right?

21      **A.**   Um, not necessarily.

22      **Q.**   Are you calculating for lost wages, anything other

23  than incentive compensation, in Plaintiff's Exhibit 196?

24      **A.**   This lost wages doesn't include incentive -- does

25  not include incentive.

1    **Q.**   What was that, Doctor?

2    **A.**   The lost wages does not include incentive.  Is

3    that your question?

4    **Q.**   Dr. Scott-McKinney, the wages that you're claiming

5    you lost as the result of a reduction in patient revenue

6    are -- what would have been paid to you as incentive

7    compensation.  Right?

8    **A.**   Not necessarily, no.

9    **Q.**   So when do you get paid the compensation that you

10   would have received as a result of patient revenue?  Is that

11   not incentive compensation?

12   **A.**   The way that our pay system works is when they

13   look back over your past three years, they take an average

14   of all the money that you would have received, and that is

15   then averaged over three years, and you are paid 85 percent

16   of that up front, and 15 percent is held back, and they

17   determine whether you get the 15 percent based on if you met

18   budget.

19   **Q.**   And is there anywhere in Plaintiff's Exhibit 196

20   that you're claiming lost wages for a reduction in your

21   salary?

22   **A.**   I'm sorry.  Rephrase that question, please.

23   **Q.**   Is there anywhere in Plaintiff's Exhibit 196 where

24   you're claiming a lost wage because of a reduction in your

25   salary?

1      **A.**    No, it's the total of what I would have earned or

2    what I would have brought in in terms of revenue.

3      **Q.**    Right.

4      **A.**    It's revenue based.

5      **Q.**    Right.  And the portion of that revenue that you

6    would have received is incentive compensation.  Right?

7      **A.**    No, because of the -- the total revenue, the net

8    medical revenue, when it's all added up, you then take a

9    percentage, which typically has been 35 percent, then that's

10   your actual earned compensation.

11          And then they compare that number with what you've

12   been paid as a distribution.  And the difference between

13   what they paid you and what you actually earned is paid out

14   as an incentive.

15     **Q.**    Right.  And that's what you're claiming you missed

16   out on as the result of a reduction in patient revenue.

17   Right?

18     **A.**    No.  The 43,000 would be the total revenue minus

19   the percentage, the 32 percent; that is the number.

20     **Q.**    And that would have been paid to you at the end of

21   the fiscal year.  Right?

22     **A.**    Yes and no.  Because, again, your salary then gets

23   recalculated every fiscal year.  And if you were earning

24   more money each year, they would pay you 85 percent of that.

25   So not quite.

1      **Q.**   Dr. Scott-McKinney, you don't claim that your

2   salary was adversely affected as a result of not having a

3   scribe, do you?

4      **A.**   Yes.  My salary would be adversely affected as a

5   part of not having a scribe.  Because the total revenue

6   makes up how they calculate your salary, what they are going

7   to pay you.

8      **Q.**   So where is the effect on your salary accounted

9   for in Plaintiff's Exhibit 196?

10      **A.**   Can you scroll back?

11      **Q.**   Doctor, where do you want to scroll?

12      **A.**   Actually, I believe that came from one of the

13   other plaintiff exhibits, in terms of the number of where I

14   got the 43,000 from.

15      **Q.**   Doctor, before we move on from this exhibit, there

16   is nothing in Plaintiff's Exhibit 196 that is claiming a

17   reduction in your salary as the result of not having a

18   scribe.  If there is, please direct us towards it.

19      **A.**   Well, it's based on the number of patients that I

20   would not be seeing.  This is based on 15 less patients per

21   week.

22      **Q.**   Doctor, I don't think that answered my question.

23   Can you point us to anything in Plaintiff's Exhibit 196 that

24   is claiming losses for a reduction in your salary?  Where in

25   this exhibit does that appear?

1    **A.**    No.  I don't think it does.  I think it's the

2    total loss.  I don't think it breaks it down from salary

3    versus incentive, no.

4    **Q.**    Thank you.

5    But Children's National only matches your

6    contributions in 401k up to 5 percent of your base salary,

7    not your incentive compensation.  Right?

8    **A.**    Yes, that is correct.

9    **Q.**    Okay.  So it's just base salary.

10    **A.**    Yes, that is correct.

11    **Q.**    And base salary, at least a loss in base salary,

12    is not calculated in Plaintiff's Exhibit 196.

13    **A.**    Correct.

14    **Q.**    Thank you.

15    Now, Dr. Scott-McKinney, you testified earlier

16    that there is nothing in your employment agreement providing

17    that you would get paid a percentage of revenue as wages.

18    Right?  Your employment agreement doesn't say that.

19    **A.**    Um -- the employment agreement, the Appendix C,

20    does talk about the different formulas.

21    **Q.**    That wasn't my question, Doctor.  Does your

22    employment agreement provide that you will be paid a

23    percentage of your patient revenue as wages?  You testified

24    earlier that it didn't.

25    **A.**    I don't think so but I would have to read it

1   again.

2       **Q.**   So you are not aware that it does.

3       **A.**   I don't think so.

4       **Q.**   Now, Doctor, if we refer to Page 1 of Plaintiff's

5   Exhibit 196, please.  Here you calculate lost wages in Chart

6   1 as a percentage of your loss revenue.  Right?

7       **A.**   Yes.

8       **Q.**   It's 32 percent of all the revenue you lost.

9   Right?

10      **A.**   Yes.

11      **Q.**   And your employment agreement doesn't provide you

12  will be paid a percentage of all revenue, does it?

13      **A.**   I don't think so.

14      **Q.**   Okay.  Let's go to Page 3 of Exhibit 196, please.

15  Dr. Scott-McKinney, this chart as well, Chart 2, calculates

16  your wage loss as a percentage of all of the revenue you

17  missed out on.  Right?

18      **A.**   Yes.

19      **Q.**   And that's not the way your employment agreement

20  calculates your wages.

21      **A.**   Correct.

22      **Q.**   Thank you, Doctor.

23          **MR. JOHNSON:**  I have nothing further

24          **THE COURT:**  Thank you, Mr. Johnson.  Mr. Siegel,

25  redirect?

1          **REDIRECT EXAMINATION OF STACY SCOTT-McKINNEY, M.D.**

2     **BY MR. SIEGEL:**

3          **Q.**    Dr. Scott-McKinney, you were asked questions about

4     the fact that the calculations on Plaintiff Exhibit 196

5     don't take into account factors such as budget margin

6     deficit and other things that are referenced in this

7     exhibit.  Right?

8          **A.**    Yes.

9          **Q.**    Prior to the pandemic, approximately how many

10    times was there a budget margin deficit that you experienced

11    in the 13 years of your tenure?

12         **A.**    I don't recall any other than the last two years.

13         **Q.**    Other than the budget margin deficit and the

14    junior doctor credit, what other factors, if any, did

15    Children's Hospital use to your knowledge to assess what

16    your compensation would be as it pertains to the

17    Reconciliation Compensation Report?

18         **A.**    Those are the main two significant factors.

19    Sometimes there are refunds that you might see listed on

20    that report.  So if patients were returned money, that would

21    affect the total revenue for that year.  But I remember one

22    of the last years it was 10,000.  So that's not a huge

23    difference, but the most significant would be if there's a

24    budget margin deficit or a junior doctor credit.

25         **Q.**    And a credit, I believe you testified, would add

1    to your income.  Correct?

2         **A.**    Yes.

3         **Q.**    You testified during your direct examination that

4    you intend to retire at age 67; is that right?

5         **A.**    Yes.

6         **Q.**    And I believe Mr. Johnson asked you questions

7    about that.  To what extent, if any, did you rely upon

8    Plaintiff Exhibit 98, which is the Social Security

9    Administration document, to reach your decision about your

10   retirement?

11        **A.**    I didn't rely on that.  It just helped validate my

12   opinion.

13        **Q.**    There was testimony about Defendant's Exhibit 173,

14   which is Dr. Rozmaryn's August of 2020 patient report.  Do

15   you recall that?

16        **A.**    Yes.

17        **Q.**    Can you explain to the Court why that document was

18   not included in the package of patient notes associated with

19   Dr. Rozmaryn?

20        **A.**    That was an oversight that I noted this weekend,

21   along with the other two dates of service that were also not

22   included.

23        **Q.**    I want to direct you back to Plaintiff Exhibit

24   197.  First of all, Mr. Johnson asked you questions about

25   these particular first two pages.  Correct?

1        **A.**   Um, this one?

2        **Q.**   Yes.  He asked you questions about the October

3    6th, 2020 patient note.  Do you recall that?

4        **A.**   Oh, yes.

5        **Q.**   And I believe you testified or affirmed that

6    carpal tunnel is not mentioned on this document.  Right?

7        **A.**   Correct.

8        **Q.**   On Page 2 of this document, what was the diagnosis

9    that Dr. Rozmaryn provided after assessing you and your

10   symptoms associated with your hand?

11       **A.**   Repetitive strain syndrome of my right hand.

12       **Q.**   Under the "Plan" section, could you read into the

13   record the highlighted portion?

14       **A.**   "I do believe that the hand injury is related to

15   the work, to a reasonable degree of medical certainty, and I

16   think the treatment is reasonable, necessary and related to

17   her work injury."

18       **Q.**   Dr. Rozmaryn saw you on October 6th, 2020 when he

19   wrote this note; is that right?

20       **A.**   Yes.

21       **Q.**   And this was approximately 15 months of you

22   working without a scribe this time; is that right?

23       **A.**   Yes.

24       **Q.**   Now, Mr. Johnson asked you about Defense Exhibit

25   173, about the notation in Dr. Rozmaryn's note that you had

1    been discussing symptoms, of hand symptoms, for the

2    preceding three years.  Do you recall that testimony?

3        **A.**   Yes.

4        **Q.**   Can you explain to the Court that progression of

5    your disease and the differences associated with your hand

6    injuries?

7        **A.**   Well, initially my hand symptoms were limited to a

8    portion of my hand; and that was determined to be related to

9    my neck.  That was radiculopathic.  Then my hand symptoms

10   progressed, and it was no longer felt to be radiculopathic.

11       **MR. JOHNSON:**  Objection, Your Honor.  The witness

12   was starting to explain what other doctors had said or felt

13   about her condition.  We don't have any of that testimony

14   before the Court.

15       **THE COURT:**  Why don't we work on rephrasing this.

16       **MR. SIEGEL:**   Okay.

17   **BY MR. SIEGEL:**

18       **Q.**   Dr. Scott-McKinney, you heard testimony from

19   Dr. Levin in this case via videotaped deposition.  Right?

20       **A.**   Yes.

21       **Q.**   During that testimony, what did he attribute the

22   hand symptoms that he treated you for, during the

23   progression of your illness, from 2017 when he started

24   seeing you until the time that he completed his work with

25   you in 2021?

1          **MR. JOHNSON:**  Objection.  Dr. Levin's testimony

2    speaks for itself.  We don't need Dr. Scott-McKinney to

3    retestify.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  Carpal tunnel syndrome.

6    **BY MR. SIEGEL:**

7      **Q.**  That's Dr. Levin?

8      **A.**  No, Dr. Levin's -- my initial hand issues were

9    radiculopathic.  Dr. Levin referred to his partner,

10   Dr. Rozmaryn, in his deposition testimony for my hand

11   issues.

12     **Q.**  So when Dr. Rozmaryn started seeing you in October

13   of 2020, and looking at his note of repetitive strain

14   syndrome, which later became repetitive pain syndrome

15   secondary to carpal tunnel, what symptoms were you

16   describing to Dr. Rozmaryn that were different, if at all,

17   than you were describing to Dr. Levin?

18     **A.**  Oh, I see.

19          My whole hand was becoming blue, cold, achy, numb,

20   as opposed to the first couple of fingers.  The distribution

21   of my symptoms were different.

22     **Q.**  In 2019, did you seek any other medical attention

23   associated with your hand symptoms to further explore

24   possible causes?

25     **A.**  Yes.

1      **Q.**   Who did you see?

2      **A.**   I saw Dr. Berdia in Dr. Levin's practice.

3      **Q.**   What did you describe to Dr. Berdia?

4      **A.**   I described my hand symptoms, coldness and

5   discoloration.

6      **Q.**   I want to show you what's been marked as Plaintiff

7   Exhibit 200.

8          **MR. SIEGEL:**  Your Honor, may I hand this up?

9          **THE COURT:**  Thank you.

10   **BY MR. SIEGEL:**

11      **Q.**   Dr. Scott-McKinney, what is this?

12      **A.**   That's the office note from Dr. Berdia.

13      **Q.**   And what relationship, if any, does he have to

14   Dr. Levin?

15      **A.**   They are business partners.

16      **Q.**   When you saw Dr. Berdia, did he make any

17   assessments to rule out any causes associated with your

18   hand?

19          **MR. JOHNSON:**  Objection, Your Honor.  The witness

20   cannot testify to what other doctors didn't say to her.

21          **THE COURT:**  Sustained.

22   **BY MR. SIEGEL:**

23      **Q.**   Dr. Scott-McKinney, how did you come to receive

24   this note?

25      **A.**   He gave it to me, the doctor.

120

1           **MR. SIEGEL:**  Your Honor, I'd like to move into

2     evidence Plaintiff Exhibit 200, which is similar to

3     Dr. Levin's notes and Dr. Rozmaryn's notes that came from

4     the same medical practice as a business record.

5           **MR. JOHNSON:**  Your Honor, we object.  And this is

6     exactly the problem of what plaintiff did with

7     Dr. Rozmaryn's record, because Dr. Levin authenticated his

8     own records.  Now every single medical record coming from

9     Orthopedic Center P.A. is now authenticated and admissible.

10    Dr. Rozmaryn testified about his records.  This is yet

11    another doctor from the same medical practice.

12          **THE COURT:**  I'm overruling the objection.  I will

13    admit it.  As I said before, I think Dr. Levin's testimony

14    laid the foundation for the business records more broadly.

15          (Plaintiff's Exhibit 200 was admitted.)

16    **BY MR. SIEGEL:**

17        **Q.**   Turning to Page 2 of Plaintiff Exhibit 200, what

18    was Dr. Berdia's conclusion in regards to your hand, based

19    on his analysis?

20        **A.**   "Right hand Raynaud's Phenomena."

21        **Q.**   Did he rule out any other conditions that could be

22    a cause for your hand symptoms?

23        **A.**   "Since it's not coming from her cervical or carpal

24    tunnel."

25        **Q.**   And where are you referring on this page for that

1    conclusion?

2        **A.**    It's under the plan, second sentence.

3        **Q.**    Could you please read it into the record, so we

4    are clear on what you are talking about?

5            **THE COURT:**  I see it.  I see it.

6            **MR. SIEGEL:**  Okay.  Thank you, Your Honor.

7    **BY MR. SIEGEL:**

8        **Q.**    Do you recall testimony during cross-examination

9    where Mr. Johnson, with the assistance of Mr. Long, were

10   running through calculations on the fly here in court

11   pertaining to your Plaintiff Exhibit 195?

12       **A.**    Yes.

13       **Q.**    What, if any, expertise was required by you to

14   confirm those arithmetic calculations?

15       **A.**    None.

16           **MR. SIEGEL:**  Thank you, Your Honor.  I have no

17   other questions.

18           **THE COURT:**  Thank you.

19           Dr. Scott-McKinney, you --

20           **MR. JOHNSON:**  Can we have some brief recross,

21   since plaintiff introduced a new exhibit on his recross?

22           **THE COURT:**  You may not.  Dr. Scott-McKinney, you

23   may step down.

24           Mr. Siegel, do you have anything further?

25           **MR. SIEGEL:**  Your Honor, with the Court's approval

1    of allowing us to attach to the closing briefs Dr. Levin's

2    excerpted testimony and Dr. Scott-McKinney's testimony, we

3    rest.

4                    **THE COURT:**  Okay.  Thank you.

5                    Does defense wish to make an opening statement

6    briefly?

7                    **MR. JOHNSON:**  Thank you, Your Honor.

8                    The flaw for request for damages is the request

9    for both back and front pay after the date she received a

10   virtual scribe.

11                   Your Honor, as you know, this is a failure to

12   accommodate case.  Right?  That's the only claim at issue in

13   this case.  Plaintiff brought suit because the defendant had

14   failed to provide her a medical scribe.  She's had one at

15   all times since November of 2020, yet she's asking for both

16   her preferred accommodation and damages during that period

17   of time.

18                   Now, the evidence has shown that she has the

19   accommodation she's asked for all along.  So giving

20   Dr. Scott-McKinney both back- and front-pay damages after

21   November 2020 and a scribe, is akin to giving a plaintiff

22   who is terminated both reinstatement and front pay.  It's

23   got to be one or the other, and she has her preferred

24   accommodation.  So there's nothing left for the Court to

25   decide as far as any monetary award.

1          Now, her whole -- the whole premise for her claim

2     that she's entitled to front-pay damages after November of

3     2020 was that there was some sort of permanent worsening of

4     her condition.

5          **MR. SIEGEL:**  Objection, Your Honor.  This is not

6     closing argument, it's not an opening statement and not what

7     the evidence is going to show.

8          **THE COURT:**  Overruled.

9          **MR. SIEGEL:**  Thank you.

10         **MR. JOHNSON:**  Your Honor, to Mr. Siegel's point,

11    the evidence has not shown there was any worsening of her

12    medical condition.  The only evidence that you heard during

13    the plaintiff's case in chief that was speculation, was that

14    she could work eight hours prior to when she lost her scribe

15    and she could only work six hours now.  There's been

16    absolutely no testimony that that reduction was caused by

17    her not having a scribe for the 16-month period that she

18    didn't have one.

19         And to the contrary, her own doctor has said the

20    opposite.  Dr. Levin has already testified at the trial of

21    this case that she is no worse off now than had she had the

22    scribe all along.

23         Now, her testimony about being entitled -- or

24    looking for front-pay damages after November 19, 2020 is

25    also directly contrary to this Court's ruling on Motions in

124

1    Limine, which was that the plaintiff is not entitled to any

2    damages in this case for worsening of conditions.

3         And when we filed that motion, plaintiff made no

4    reference of carpal tunnel syndrome or hands issues.  It's

5    was all about her neck and shoulder.  And now the plaintiff

6    has interjected those issues into the case as a workaround

7    to this Court's previous order, that she's not entitled to

8    any damages for physical injuries or the worsening of her

9    medical condition.

10        Now, on the issue of declaratory injunctive

11   relief, because I know Your Honor wanted to address that

12   with the plaintiff at the outset, there's no fear of

13   imminent harm or future discrimination in this case.  As I

14   mentioned before, the evidence has shown that the plaintiff

15   has her preferred accommodation and has had it at all times

16   since November of 2020.

17        And you will hear from Mr. Janowiak shortly that

18   there is no plan at Children's National to take away her

19   scribe or remove her accommodation.  So there is no risk of

20   injury to her that would necessitate any further injunctive

21   relief.  And in doing so would grant Dr. Scott-McKinney more

22   rights than what she is entitled to under the law.

23        Mr. Siegel talked about how there would have to be

24   an interactive process with Dr. Scott-McKinney to talk about

25   what accommodations she wants and whether or not there would

125

1    be any appropriate replacement for that accommodation;

2    that's already what the law requires.  It requires an

3    interactive process.

4        And defendant took a legal position in this

5    litigation that it wasn't required to provide

6    Dr. Scott-McKinney a scribe.  The jury has rendered a

7    verdict on that issue and defendant fully intends to conduct

8    itself accordingly.  Dr. Scott-McKinney again has what she

9    asked for, which is a scribe, so there is no fear of future

10   harm.

11       Briefly, Your Honor, on the issue of company-wide

12   relief, the case law cited in defendant's post-trial brief

13   is clear, this is an individualized claim.  This is one

14   employee who alleged a failure to accommodate, who now has a

15   scribe accommodation.

16       **THE COURT:**  Are any of your cases D.C. HRA cases?

17       **MR. JOHNSON:**  Your Honor, I don't recall as I am

18   up here now.  They were D.C. cases.  I think they dealt with

19   Title VII, but I am not aware of any distinction between the

20   way Title VII treats injunctive relief in the way the D.C.

21   HRA treats it.  There needs to be a fear of imminent injury.

22   And there needs to be some sort of company-wide allegation

23   to trigger some obligations on the part of a large employer,

24   like Children's National, to engage in company-wide training

25   of its managers.

1          Which is training by the way, Your Honor, that

2     Children's National already does.  It already conducts

3     training for its managers.  It already posts notices about,

4     you know, discrimination laws, et cetera.  So all of that is

5     already being done by the defendant.

6          And you will hear from Mr. Janowiak shortly, that

7     even as it relates to the issue of back pay,

8     Dr. Scott-McKinney has not seen any drop in compensation in

9     this case.  She told you as much with her own exhibits that

10    she saw no drop in compensation in fiscal year '20.  And

11    Mr. Janowiak will provide further testimony that she's seen

12    no drop in compensation in fiscal year 2021.

13          Thank you, Your Honor.

14          **THE COURT:**  Thank you.  You may call your first

15    witness.

16          **MR. JOHNSON:**  The defense will call Mr. Janowiak,

17    Mr. Mark Janowiak.

18          **THE COURT:**  Thank you.  You may approach the

19    witness stand to be sworn.

20          **DEPUTY CLERK:**  If you would please raise your

21    right hand.  Do you solemnly swear or affirm that any

22    information or testimony you shall present to the Court will

23    be the truth, whole truth and nothing but the truth?

24          **THE WITNESS:**  I do.

25          **THE COURT:**  Good afternoon, sir.

1        **THE WITNESS:**  Good afternoon.

2        **DIRECT EXAMINATION OF MARK JANOWIAK**

3   BY MR. JOHNSON:

4        **Q.**   Good afternoon, Mr. Janowiak.

5        **A.**   Good afternoon.

6        **Q.**   Can you tell the without who your employer is,

7   please?

8        **THE COURT:**  We've already been through this.  I

9   know unless -- has it changed since?

10        **MR. JOHNSON:**  No, Your Honor, it has not.

11   BY MR. JOHNSON:

12        **Q.**   Mr. Janowiak, what are your job duties?

13        **A.**   I am the director of business operations.  So I

14   oversee revenue, as well as the physician compensation.

15        **Q.**   And what role did you hold prior to director of

16   business operations?

17        **A.**   Practice administrator.

18        **Q.**   And in those roles, both practice administrator

19   and director of business operations, were you responsible

20   for determining the compensation of physicians associated

21   with CP&A?

22        **A.**   Yes.

23        **Q.**   And how long have you performed that function in

24   both of your two roles?

25        **A.**   I took it over independently in I think fiscal

**-228-**

1    year '20, when we lost our business manager.

2        **Q.**    Now, Mr. Janowiak, as a result of performing that

3    function, are you familiar with the formulas used by CP&A to

4    compensate its physicians?

5        **A.**    Very.

6        **Q.**    And, Mr. Janowiak, you were here for

7    Dr. Scott-McKinney's testimony on Plaintiff's Exhibit 196

8    and her calculation of lost wages, weren't you?

9        **A.**    I was.

10       **Q.**    What issues did you take with Dr. Scott-McKinney's

11   calculations?

12       **A.**    She's assuming there is no pandemic effect.  And

13   records show that there was a significant increase in loss

14   of visits across the practice.  Dr. Scott-McKinney and other

15   physicians through -- with NCNPA or CP&A, which it is also

16   known.

17           Additionally, she did not take into account a

18   budget margin deficit.

19           **THE COURT:**  Say that again?

20           **THE WITNESS:**  A budget margin deficit.  Meaning

21   they either didn't earn enough money to pay for their

22   operating costs, which includes a physician compensation.

23           Additionally, she is using a compensation

24   percentage, which you can't -- is actually a calculation.

25   You can't just arbitrarily assign a percentage.  It can't

1    just be 32, because that number can actually be zero.  There

2    are practices who have had zero because they've had more

3    expenses than they have had revenue.  Because that number is

4    essentially taking total expenses, dividing it by total

5    revenue; that gives you a percentage.  You subtract that

6    from 100 percent, and that gives you that number.  So you

7    can't just arbitrarily put numbers out there.

8           And historically, their numbers have varied from

9    20s, in the mid-20s, up to 35 percent.  So it's hard to

10   really dictate.  And it's actually gotten worse with the

11   pandemic.  So that number is generally getting smaller.

12   **BY MR. JOHNSON:**

13       **Q.**   Now, Mr. Janowiak, you heard Dr. Scott-McKinney in

14   estimating the number of patients that she could have seen

15   with a scribe.  She was using fiscal years '18 and '19 as

16   her baseline.  Do you recall that?

17       **A.**   Yes.

18       **Q.**   Is there any problems with that?

19       **A.**   Yeah, that's impossible to replicate being that

20   it's a pandemic year.  Again, starting with fiscal year,

21   quarter 4 of fiscal year '20, they went from a positive

22   margin down to negative margin in one quarter.  So one bad

23   quarter can really affect everything.  And this has been

24   going on for over two years now.  So it's not apples to

25   apples by any means.  You have to build in a reduction

1    factor that every practice has seen across C&PA.

2         **Q.**   Mr. Janowiak, I would like to now show you what's

3    been marked as Plaintiff's Exhibit 1, which was previously

4    introduced into evidence at the trial in this case.

5              **THE COURT:**  Actually, I have a question for you.

6                    **EXAMINATION OF MARK JANOWIAK**

7    **BY THE COURT:**

8         **Q.**   Mr. Janowiak, I totally get what you are saying

9    about the last couple of years being unusual.

10        **A.**   Uh-huh.

11        **Q.**   Are you suggesting that -- well, let me put it

12   this way, I think what the plaintiffs are suggesting is 2018

13   and 2019 are more of an appropriate baseline.  We have had

14   aberrations the last couple years.  I think they assume that

15   the practice would go back to something that more approaches

16   2018 and 2019, and the last couple years have been a blip.

17   Do you have some reason to disagree?

18        **A.**   I do.  Because they actually closed -- they used

19   to have two locations, which was a total of -- I think it

20   was a total of, I think, 16 exam rooms with five providers.

21   They are now in one location, with six exam rooms, and the

22   same number of providers.  So it's physically impossible to

23   see that same volume of patients that they were seeing in

24   '18 and/or '19 with only one location.

25        **Q.**   Understood.  So that's your primary concern?

1    **A.**   Yeah.  You can't generate that many.  They would

2    fight over space, essentially.  We have had to monitor -- or

3    alter their schedules just to get enough so they can work

4    enough to see enough patients.

5    **BY MR. JOHNSON:**

6    **Q.**   And, Mr. Janowiak, was fiscal year '19 an outlier

7    at all to the extent that it was an extremely good year for

8    C&PA?

9    **A.**   Yeah, it was.  Across C&PA it was an abnormally

10   good year.  We have not had one since -- I have been with

11   C&PA for eight years now and I've never seen anything like

12   2019.  And I don't foresee that we will see something like

13   that any time soon, either.

14   **Q.**   Mr. Janowiak, I'd like to draw your attention to

15   Page 21 of Plaintiff's Exhibit 1, please.

16        (Brief pause.)

17        Mr. Janowiak, do you recognize what's on your

18   screen here?

19   **A.**   Yes, that is Exhibit C of the physician

20   compensation that explains how we calculate their base and

21   incentives.

22   **Q.**   And as director of business operations, you are

23   familiar with the terms of this compensation program.

24   Right?

25   **A.**   Very much so.

1    **Q.** Do all physicians have the same terms in their

2    compensation program?

3    **A.** They do.

4    **Q.** Mr. Janowiak, at Page 22, Paragraph F, can you

5    read the sentence starting with, "to the extent that"?

6    **A.** "To the extent that the physician's actual earned

7    compensation exceeds the total payments made to a physician

8    during that fiscal year, the company shall make a fiscal

9    year end payment to physician as necessary to ensure that

10   the sum of the total payments made to the physician during

11   that fiscal year, and the fiscal year end payment, equals

12   the physician's actual earned compensation for that fiscal

13   year."

14   **Q.** And what does that mean in practice for a CP&A

15   physician, Mr. Janowiak?

16   **A.** It means that you have to earn more than your base

17   salary in order to get an incentive payout.  And at the time

18   we were doing quarterly payments, so you could earn that --

19   remember 85 percent of your total actual earned compensation

20   is what's considered your base.  They can earn that 15

21   percent each quarter.  And then at the end of the year they

22   can earn -- oh, excuse me -- up to another 35 percent, if

23   they have the margin to do so.

24   **Q.** And Mr. Janowiak, just to give you an example, if

25   Dr. Scott-McKinney's actual earned compensation during a

133

1    fiscal year was $140,000 less than the payments made to her

2    during that fiscal year, would she get any incentive

3    compensation?

4        **A.**    No.

5        **Q.**    And, Mr. Janowiak, on the following page there is

6    a reference to calculation terms defined.  And the first one

7    is actual earned compensation.  Do you see that?

8        **A.**    I do.

9        **Q.**    And does that paragraph define actual earned

10    compensation?

11        **A.**    It does.

12        **Q.**    And, Mr. Janowiak, I know this is a very

13    math-heavy formula, can you describe for the Court in more

14    practical terms what actual earned compensation is?

15        **A.**    Yep.  So we take your net medical revenue, which

16    is your net patient revenue, essentially, and you multiply

17    it by that number that I talked about, what we call inverse

18    expense ratio, but I think it is referred to as the

19    compensation percentage, which again is total expenses

20    divided by total charges, and then you subtract that from

21    100.  That percentage is what you multiply their net medical

22    revenue by, and that determines what their actual earned

23    compensation is.

24        **Q.**    And the actual earned compensation, is it possible

25    that that could be as high as 35 percent of revenue?

1          **A.**    It can be.

2          **Q.**    And is it also possible that it could be a lot

3     lower?

4          **A.**    It can be.

5          **Q.**    And do physicians simply get paid their actual

6     earned compensation as wages?

7          **A.**    No, they do not.

8          **Q.**    What portion of the actual earned compensation do

9     they receive as incentive compensation?

10         **A.**    Well, each year you have an actual earned

11    compensation, but your base is an average of three years.

12    So it's not just net medical revenue.  So it's not

13    straightforward.

14              So if you have a bad year, that bad year can bring

15    down your average.  So you essentially carry that bad year

16    for three years until -- it's always a three-year lookback.

17              Can you repeat the question just to make sure I

18    answered it correctly.

19         **Q.**    No.  No.  I think you answered it generally.

20         **A.**    Okay.

21         **Q.**    Has CP&A ever calculated the compensation of its

22    physicians as merely a percentage of the revenue they

23    generate via patient visits?

24         **A.**    Never.

25         **Q.**    On this same page here, there is a reference to

1    budget margin deficit, under actual earned compensation.  We

2    may need to scroll up a little bit for you to see it.

3         **A.**   Yep.

4         **Q.**   Do you see that, Mr. Janowiak?

5         **A.**   I do.

6         **Q.**   Can you describe to the Court how the budget

7    margin deficit affects compensation?

8         **A.**   Yep.  If there is a shortfall, all the physicians

9    have to take that deficit on, and it reduces their actual

10   earned compensation.  So it could bring down their incentive

11   payout, reduce their incentive payout.  It can also affect,

12   when we recalculate their base.  Remember we do a three-year

13   average after budget margin deficit.  So it can affect your

14   base and your incentive payoff.

15        **Q.**   Mr. Janowiak, I would like to show you what has

16   been marked as Plaintiff's Exhibit 107, also previously

17   introduced at the trial in this matter.

18        (Brief pause.)

19             Mr. Janowiak, do you recognize this document?

20        **A.**   I do.

21        **Q.**   And were you personally involved in the creation

22   of this exhibit?

23        **A.**   I was.

24        **Q.**   For what purpose do you use this exhibit?

25        **A.**   This is used to calculate their year-end incentive

1    and then to recalculate their base for the next following

2    fiscal year.

3        **Q.**    And during which period of time does this show the

4    compensation of Dr. Scott-McKinney and her colleagues?

5        **A.**    This would be fiscal year '19.  So it would run

6    July 1st of 2018 to June 30th of 2019.

7        **Q.**    And did Dr. Scott-McKinney have a live scribe

8    during this time?

9        **A.**    I believe she did.

10        **Q.**    At the top of this page, Mr. Janowiak, there is

11    Dr. Scott-McKinney's name, there's three names redacted in

12    black, and three names redacted in white.  Do you see that?

13        **A.**    I do.

14        **Q.**    Whose names were redacted in black?

15        **A.**    Those are senior physicians.  Meaning they get

16    credit for the junior physician.

17        **Q.**    And on this page there is a reference to annual

18    actual NMR total.  What is that?

19        **A.**    That is, basically, their net medical revenue,

20    before budget margin deficit.  So total revenue brought into

21    the practice.

22        **Q.**    So did Dr. Scott-McKinney generate $850,872 in

23    patient revenue in fiscal year 2019?

24        **A.**    She did.

25        **Q.**    Was that highest in her practice?

1      **A.**    Yes.

2      **Q.**    To your knowledge, was that the most medical

3    revenue Dr. Scott-McKinney ever generated?

4      **A.**    That I can recall, yes, that's correct.  This is

5    the highest -- the most she's ever generated.

6      **Q.**    And how much did the closest provider generate in

7    that medical revenue?

8      **A.**    $717,185.

9      **Q.**    Under the heading annual reconciliation, three

10   lines down, there is a reference to total compensation paid.

11   And maybe we can scroll down a little bit so you can see

12   that.

13     **A.**    Yes.

14     **Q.**    What is that?

15     **A.**    That is the base compensation, plus any incentives

16   paid for quarters 1, 2 or 3.

17     **Q.**    And does the line for annual incentive

18   compensation due in green, at the bottom of this chart, show

19   the incentive compensation paid to Dr. Scott-McKinney at the

20   conclusion of this fiscal year?

21     **A.**    It does.

22     **Q.**    And is that the difference between the actual

23   earned compensation and total compensation paid?

24     **A.**    That's correct.

25     **Q.**    And does the combination of the annual incentive

1   compensation due and total compensation paid show the total

2   money made by a provider during a fiscal year?

3       **A.**   Repeat that again.

4       **Q.**   Does the annual incentive compensation due and the

5   line for total compensation paid show the total money made

6   by a physician during this fiscal year?

7       **A.**   Yes.

8       **Q.**   And was Dr. Scott-McKinney the highest paid

9   provider at Laurel CP&A during this fiscal year?

10      **A.**   Yes.

11      **Q.**   Mr. Janowiak, I would now like to show you

12  plaintiff's trial exhibit 119, which has also been

13  previously introduced in this case.

14          Mr. Janowiak, this chart shows the compensation of

15  Dr. Scott-McKinney and other physicians at Laurel CP&A

16  during what period of time?

17      **A.**   This would be fiscal year '20.  So it would run

18  July 1st of 2019 to June 30th of 2020.

19      **Q.**   Does this exhibit have the same formulas that were

20  used to calculate the compensation in the previous exhibit?

21      **A.**   Yes.

22      **Q.**   Now, did Dr. Scott-McKinney have a live scribe

23  during this period of time?

24      **A.**   I think for one month, and then I think the scribe

25  resigned in, I believe, January -- or excuse me -- July.

139

1    **Q.**   So this was the first fiscal year after the

2    resignation of Dr. Scott-McKinney's scribe?

3    **A.**   Correct.

4    **Q.**   The first line of this document references actual

5    base compensation paid.  Do you see that?

6    **A.**   Yes.

7    **Q.**   And how much compensation was Dr. Scott-McKinney

8    paid during fiscal year 2020?

9    **A.**   $235,677.

10   **Q.**   Was that, again, more than any of the other

11   providers at her practice?

12   **A.**   Yes.

13   **Q.**   And under that there is a line for annual

14   incentive compensation paid in yellow.  Do you see that?

15   **A.**   Yes.

16   **Q.**   Is that also more than any of the other providers

17   at her practice?

18   **A.**   Yes.

19   **Q.**   During what quarters did Dr. Scott-McKinney

20   receive incentive compensation?

21   **A.**   Quarter 1 and quarter 2.

22   **Q.**   And what period of time would be covered by

23   quarter 1 and 2 in fiscal year '20?

24   **A.**   July 1st of 2019 to December 31st of 2019.

25   **Q.**   And did Dr. Scott-McKinney have a scribe during

1    the quarters that she generated that incentive compensation?

2         **A.**    Just that one month in quarter 1.

3         **Q.**    And how come no one got incentive compensation in

4    quarter 3 of 2020?

5         **A.**    The pandemic had hit when we were doing the

6    calculations.  And all physician leaders agreed to withhold,

7    just due to the impact that they knew would be generated, so

8    they wouldn't have to pay it and then take it back.  So they

9    wanted to be conservative and make sure that the practices

10   were financially stable.

11        **Q.**    And, Mr. Janowiak, how long did the affects of

12   COVID-19 last, as far as its impact on the finances of CP&A?

13        **A.**    It's still ongoing.

14        **Q.**    Can you describe that in a little more detail,

15   Mr. Janowiak?

16        **A.**    Yeah.  When it first hit, they essentially stopped

17   visits.  All visits were stopped.  We did transition to

18   mainly telemed.  Eventually we did bring some of the younger

19   kids in to make sure they got vaccinated.  We didn't want

20   them to go unvaccinated.  Even today the volumes are

21   significantly less due to lack of staffing.  The staffing

22   shortages that everyone is feeling.  We are unable to keep

23   up with that.  Physicians go out due to illness.  Some

24   providers have gotten COVID so that has impacted their

25   ability to be productive.

141

1          And we just -- we are starting to see another

2     spike in COVID right now at some of our practices.  So we

3     are anticipating another spike like Omicron.  When Omicron

4     hit, all practices -- this was just this year -- were

5     reduced by, I think, 30 percent in total visits.

6          **Q.**   And this year, Mr. Janowiak, is fiscal year 2022.

7     Right?

8          **A.**   That's correct.

9          **Q.**   Now, referring back to Plaintiff's Exhibit 119,

10    how much net medical revenue did Dr. Scott-McKinney have

11    during fiscal year 2020?

12         **A.**   $705,504.

13         **Q.**   And did that remain more than any of the other

14    providers at her practice?

15         **A.**   Yes.

16         **Q.**   Now, there's a reference in this document to

17    actual reconciliation calculation comp. percentage.  Do you

18    see that?

19         **A.**   Yes.

20         **Q.**   And what is that?

21         **A.**   Oh, sorry.  Okay there.

22              That is the inverse expense ratio, but it's the --

23    basically, again, the total expenses divided by total

24    revenue.  And you subtract that from 100 percent.  And that

25    gives you that percentage.  That's how much we multiply by

1    their net medical revenue to determine how much they

2    actually earned in compensation.

3         **Q.**    And how does this document calculate that

4    $211,792 figure under the calculation comp. percentage?

5         **A.**    It takes NMR and multiplies it by that percentage

6    of the calculation comp. percentage.

7         **Q.**    And does that figure need to be further reduced to

8    account for the budget margin deficit?

9         **A.**    It does.

10        **Q.**    Okay.  And where on this document is that shown?

11        **A.**    The allocation of budget margin deficit, right

12   under annual reconciliation FY '20, the last box.

13        **Q.**    So is that the $199,238 number?

14        **A.**    That is correct.

15        **Q.**    And that figure, is that the actual earned

16   compensation that we were discussing earlier in regards to

17   Dr. Scott-McKinney's employment agreement?

18        **A.**    Yes.

19        **Q.**    And of what significance is it that that figure is

20   about $54,000 less than the total compensation paid to

21   Dr. Scott-McKinney during this fiscal year?

22        **A.**    In a normal year, she would have had to pay back

23   the $18,000 in incentive she already paid out -- excuse me

24   -- in quarters 1 and 2.  And it also -- that 199 we would

25   use to calculate the three-year average, so it would

1    actually drop her base as well.  So her next year's salary

2    would be significantly less.

3            And, also, that -- I have to make sure -- yeah,

4    her base had gone down.  She had to owe back her incentive.

5    But she signed the Children's offer to all of the

6    physicians, an amendment to sign, which allowed them to

7    retain any incentive already paid in quarters 1 and 2.  They

8    didn't have to pay it back, even if they owed it back.

9    Children's took the hit.  And then they kept their base.

10   Instead of using that 199 to calculate her new base, she was

11   able to keep the same rate that she had that current year.

12      **Q.**   So, Mr. Janowiak, in scenarios where the actual

13   earned compensation is less than the total compensation

14   paid, there is no incentive compensation paid.

15      **A.**   That's correct.

16      **Q.**   Now, did Dr. Scott-McKinney earn less in

17   compensation in fiscal year 2020 than in fiscal year 2019?

18      **A.**   No.  Well, hold on.  Can you -- total cash

19   compensation or are you talking about base compensation?

20      **Q.**   Total compensation, as compared between

21   Plaintiff's Exhibit 107 and Plaintiff's Exhibit 119.

22      **A.**   Yes.  So she earned less in 2020 than she did in

23   2019.

24      **Q.**   And did the other senior physicians at her

25   practice also generally earn less?

1     **A.**   Yes.

2     **Q.**   Was Dr. Scott-McKinney, in fiscal year 2020, still

3  the highest-paid provider at her practice?

4     **A.**   Yes.

5     **Q.**   Mr. Janowiak, do Plaintiff's Exhibits 107 and 119

6  show a drop in compensation for Dr. Scott-McKinney because

7  she didn't have a scribe?

8        **MR. SIEGEL:**  Objection.  Speculation.

9        **THE COURT:**  Overruled.

10       **THE WITNESS:**  No.

11  **BY MR. JOHNSON:**

12     **Q.**   Do Plaintiff's Exhibit 107 and 119 show a drop in

13  compensation because Dr. Scott-McKinney worked a reduced

14  work schedule?

15     **A.**   No.

16     **Q.**   To what do you attribute the drop in compensation

17  shown in Plaintiff's Exhibits 107 and 119?

18     **A.**   Can you repeat the question to make sure I

19  understood it correctly?

20     **Q.**   Sure.  Mr. Janowiak, I think you recognized

21  earlier that Dr. Scott-McKinney made less in fiscal year

22  2020 --

23     **A.**   Right.

24     **Q.**   -- than she did in fiscal year 2019?

25     **A.**   Right.

1      **Q.**   And that is reflected in Plaintiff's Exhibit 107

2   and Plaintiff's Exhibit 119.  Right?

3      **A.**   Right.

4      **Q.**   To what, if anything, do you attribute that drop?

5      **A.**   Mainly the pandemic.  As I said before, you could

6   see it in quarters 1 and 2, they were actually making

7   incentive, which means they were earning more money.  So

8   that last quarter really had a huge impact on the practice

9   and decreased her earnings as a result, because we had a

10  large budget deficit.

11     **Q.**   And, Mr. Janowiak, just looking at the first two

12  quarters of fiscal year 2020, was Dr. Scott-McKinney and her

13  practice on track to have a good year financially?

14     **A.**   Yes --

15     **Q.**   Mr. Janowiak, I would now like to show you what's

16  been marked as Plaintiff's Exhibit 192, please.

17     (Brief pause.)

18         Now, Mr. Janowiak, does Plaintiff's Exhibit 192

19  employ the same formulas to calculate compensation as

20  Plaintiff's Exhibit 107 and 119?

21     **A.**   It does.

22     **Q.**   And were you the one that created those formulas

23  to calculate the compensation of providers?

24     **A.**   Yes.

25     **Q.**   And this chart shows Dr. Scott-McKinney's

1    compensation during what period of time?

2        **A.**    This would be fiscal year '21.  So it runs July

3    1st of 2020 to June 30th of 2021.

4        **Q.**    And did Dr. Scott-McKinney have a virtual scribe

5    during this time?

6        **A.**    She did starting in November of 2020.

7        **Q.**    And did Dr. Scott-McKinney have that scribe during

8    the entirety of quarters 3 and 4 of fiscal year 2021?

9        **A.**    Yes.

10        **Q.**    And what was her best quarter, revenue wise, in

11    fiscal year 2021?

12        **A.**    It was actually quarter 3.

13        **Q.**    And how much revenue did she generate during that

14    quarter?

15        **A.**    $192,370.

16        **Q.**    Mr. Janowiak, I'd now like to show you what's been

17    marked as Defendant's Exhibit 192A, please.

18        (Brief pause.)

19        Mr. Janowiak, what is Defendant's Exhibit 192A?

20        **A.**    It is the reconciliation report for fiscal year

21    '21.

22        **Q.**    Okay.  And did you create the formulas in this

23    spreadsheet just like the earlier ones?

24        **A.**    Yes.

25        **Q.**    And do you do that to perform your job duties of

1    calculation of Dr. Scott-McKinney and other providers at

2    CP&A?

3         **A.**   Yes.

4         **Q.**   Is it a regular part of your job?

5         **A.**   It is.

6         **Q.**   And is this record created and maintained as part

7    of your job?

8         **A.**   Yes.

9         **Q.**   And, Mr. Janowiak, does Defendant's Exhibit 192A

10   show what Dr. Scott-McKinney's compensation would have been

11   if she had generated $192,370 during each quarter of fiscal

12   year '21?

13        **A.**   Yes.

14        **Q.**   And does this exhibit show what Dr. Scott-McKinney

15   could have made, if she had a scribe for the whole fiscal

16   year?

17        **A.**   Correct.

18            **MR. JOHNSON:**  Your Honor, I move to admit

19   Defendant's Exhibit 192A.

20            **THE COURT:**  Mr. Siegel?

21            **MR. SIEGEL:**  Your Honor, I am just thinking.  I'm

22   going to object.  This is not a business record.

23            It seems to me this witness needs to lay more

24   foundation as to what these calculations are.  It's not a

25   business record in the sense of a record kept in the regular

1    course of business.  This is like the calculations that

2    Dr. Scott-McKinney did.  So I would respectfully ask that a

3    foundation be laid.

4         **THE COURT:**  All right.  I don't think it is a

5    business record, but I am going to admit it.  I think it's a

6    -- kind of a hypothetical, based on a witness who certainly

7    is well-positioned to make the assumption.  So I'm going to

8    overrule the objection.  I will allow in 192A.

9         **MR. JOHNSON:**  Thank you, Your Honor.

10   **BY MR. JOHNSON:**

11        **Q.**   Mr. Janowiak, how does this exhibit calculate the

12   $767,416 in that medical revenue?

13        **A.**   We took her best quarter and replaced each

14   quarter, as if she had a scribe the whole time.  So we

15   calculated it as if the full fiscal year she had the support

16   of a virtual scribe.

17        **Q.**   So did this exhibit replace the revenue that

18   Dr. Scott-McKinney actually generated in quarters 1 and 2 of

19   fiscal year '21?

20        **A.**   Correct.

21        **Q.**   And did it replace that revenue with the revenue

22   that Dr. Scott-McKinney actually generated while working

23   with a scribe during this fiscal year?

24        **A.**   Yes.

25        **Q.**   And how does this exhibit calculate the actual

1    earned compensation of $261,991?

2        **A.**    We take that hypothetical NMR, multiply it by the

3    comp. percentage, the 34.14 percent, and that gave us the

4    $261,991.

5        **Q.**    And how does this exhibit calculate the actual

6    earned compensation, plus the junior doctor credit of

7    $273,814?

8        **A.**    Repeat the question, please.

9        **Q.**    How did this exhibit calculate the figure for

10    actual earned compensation, plus junior doctor credit, which

11    is $273,814?

12        **A.**    So the total junior credit available was 28,451.

13    We calculated her percentage of productivity to be 42

14    percent.  So we took 42 percent times the $28,451 of junior

15    credit.

16        **Q.**    And, Mr. Janowiak, how does this exhibit calculate

17    the earned compensation earned after margin deficit of

18    $233,270?

19        **A.**    It takes her AEC or actual earned compensation

20    after budget margin deficit, subtract it from her

21    compensation already paid; and that calculates her -- that

22    delta.

23        **Q.**    And, Mr. Janowiak, in this scenario that we've run

24    here, does Dr. Scott-McKinney's actual earned compensation

25    after budget margin deficit exceed the base compensation

1    paid to her?

2         **A.**    It does not.

3         **Q.**    And what is the significance of that?

4         **A.**    It means she would not have generated any

5    incentive and her calculation for next year would

6    potentially lower her base, if it was significantly lower.

7                    **EXAMINATION OF MARK JANOWIAK**

8    **BY THE COURT:**

9         **Q.**    Sorry.  Can you --

10        **A.**    Yeah.

11        **Q.**    So what was -- what did you do -- how did you

12   figure out what it would have looked like if she had a

13   virtual scribe the entire year?

14        **A.**    There was only one -- essentially one and a half

15   quarters that she didn't have a scribe.  So we took her best

16   month or her best quarter when she did have a scribe --

17        **Q.**    The third quarter.

18        **A.**    -- and just took it and replaced it with what was

19   in quarters 1 and 2.  That gave her that credit of revenue

20   because that was her best that she had.  That allowed us to

21   kind of come up with that net medical revenue total.  And

22   then we just multiplied it by the practices, what their

23   comp. percentage was.  It just kind of gave us a

24   hypothetical, best case scenario, if she truly did replicate

25   her best quarter for the full year.

1      **Q.**   Okay.  And so her best actual quarter you said was

2   the third quarter you said --

3      **A.**   Correct.

4      **Q.**   -- was the third quarter.  Right?

5      **A.**   Yep.

6      **Q.**   That's where she got 192,000?

7      **A.**   Yes.

8      **Q.**   And why was that better than the second quarter

9   where I see 331 --

10      **A.**   Because quarters 1 and 2 are combined.  We did

11   them as a combined.  We didn't split them up.  We didn't do

12   a quarter 1, 2, 3.  We did a quarter 1 and 2 combined and

13   then we did quarter 3 and quarter 4.

14          The reason we did that is, actually, was to

15   benefit Dr. Scott-McKinney to help -- because she had a lot

16   of encounters she hadn't signed, which she ended up signing

17   in quarter 2.  So it actually went to help her.  But, also,

18   we had gotten some CARES funding from the government, and we

19   had to wait to figure out how to apply that; so that's why

20   we ended up doing quarter 1 and quarter 2 combined.

21      **Q.**   Okay.  So 192 is a bit of an aberration there, in

22   that you don't have any zeros across for first quarter.

23      **A.**   Right.  She has -- no, that's incentive.  I think

24   you are referring to incentive.  Are you talking about the

25   box above it?

1    **Q.**   No, annual average NMR.  Isn't that what I should

2    be looking at?

3    **A.**   I don't see zeros.

4    **Q.**   Quarter 1 for Plaintiff's trial Exhibit 192.

5         **MR. JOHNSON:**  Your Honor, I think you are looking

6    at the incentive compensation paid, not the actual NMR.

7         **THE WITNESS:**  Yeah.  You need to look --

8         **THE COURT:**  No, I'm looking down at the second --

9    I'm looking at 192.

10        **MR. JOHNSON:**  Can I try to clear this up with the

11   witness, please, Your Honor?

12        **THE COURT:**  Yeah.

13        **DIRECT EXAMINATION OF MARK JANOWIAK (CONT'D.)**

14   **BY MR. JOHNSON:**

15   **Q.**   Mr. Janowiak, in Exhibit 192, that is

16   Dr. Scott-McKinney's compensation based on the net medical

17   revenue that she actually generated in fiscal year '21.

18   Correct?

19   **A.**   Correct.  The 714,450.  Correct.

20   **Q.**   So in Plaintiff's Exhibit 192, Dr. Scott-McKinney

21   generated $714,415 in that net medical revenue?

22   **A.**   Correct.

23   **Q.**   If we refer back to Defendant's Exhibit 192A, this

24   document calculates Dr. Scott-McKinney's compensation and

25   what it would have been if she had $767,416 in net medical

153

1    revenue.  Correct?

2         **A.**    Correct.

3         **Q.**    And, Mr. Janowiak, does that give

4    Dr. Scott-McKinney additional revenue that she didn't

5    actually generate during that fiscal year?

6         **A.**    Correct.

7         **Q.**    And what is that additional revenue based on?

8         **A.**    We based it on, again, her best quarter when she

9    had a scribe, which was quarter 3.  So we replaced quarters

10   1 and 2 with quarter 3.  So essentially 192,370, we just

11   multiplied it by 2.  And that gave her -- that gives the

12   total of 384,740 for quarters 1 and 2 combined.

13        **Q.**    And, Mr. Janowiak, just so the record is clear, in

14   Defendant's Exhibit 192A, the $767,416 needs to be reduced

15   by the actual reconciliation comp. percentage.  Correct?

16        **A.**    Correct.

17        **Q.**    And where is that reflected?

18        **A.**    In the 261,991.

19        **Q.**    So that's the fiscal year '21, actual earned

20   compensation.  Correct?

21        **A.**    In this scenario, yes.

22        **Q.**    And, Mr. Janowiak, that figure needs to be further

23   reduced by the junior doc NMR credit.  Correct?

24        **A.**    It's not reduced --

25        **Q.**    I'm sorry.  It needs to be increased by the junior

1    doc NMR credit.  Right?

2         **A.**   Yes.

3         **Q.**   And where is that reflected in that exhibit?

4         **A.**   It's the $273,814.  So we added the $11,823 to

5    that from the junior credit.

6         **THE COURT:**  But it's basically the budget margin

7    deficit.  That means that even if she brought in more, she

8    wouldn't have been paid more.

9         **THE WITNESS:**  Correct.  That's what happened.  The

10   budget margin deficit was so large, that it actually -- her

11   actual earned compensation after budget margin ended up

12   being $233,000 and her base is 236.

13        **THE COURT:**  I understand.

14        **THE WITNESS:**  So she underearned, essentially.  So

15   the budget margin deficit can really affect the practice.

16   **BY MR. JOHNSON:**

17        **Q.**   So, Mr. Janowiak, does Exhibit 192A show that

18   Dr. Scott-McKinney lost any money as the result of not

19   having a scribe during the first two quarters of this fiscal

20   year?

21        **A.**   No.

22        **Q.**   What does it show?

23        **A.**   It shows that she actually earned less than her

24   base.  So she got no incentive payout.

25        **Q.**   Mr. Janowiak, I'd now like to show you what's been

1    marked as Plaintiff's Exhibit 195, please.

2        (Brief pause.)

3            Mr. Janowiak, on this exhibit there's a reference

4    to annual actual NMR total with additional SSN compensation.

5    Do you see that?

6        **A.**    Yes.

7        **Q.**    And this document assumes Dr. Scott-McKinney could

8    have generated $876,150 in patient revenue.  Right?

9        **A.**    Correct.

10       **Q.**    Based on what you know about the business

11   conditions of CP&A, do you think that was possible?

12       **A.**    No, she couldn't even -- she didn't even perform

13   that pre-COVID.  So it's very unlikely she would do it in

14   COVID.

15       **Q.**    So to your knowledge is $876,150 more net medical

16   revenue that Dr. Scott-McKinney had generated in any fiscal

17   year of her employment?

18       **A.**    That's correct --

19       **Q.**    Mr. Janowiak, I'd now like to show you what's been

20   marked as Defendant's Exhibit 196, please.

21       (Brief pause.)

22           Mr. Janowiak, on Page 1 of this document there's a

23   Chart 1, closed period of dates for plaintiff's wage loss.

24   Do you see that?

25       **A.**    Yes.

1    **Q.**   What fiscal year of CP&A does this cover?

2    **A.**   That would cover fiscal year '22, which is our

3    current fiscal year.

4    **Q.**   So is that fiscal year over yet?

5    **A.**   No.

6    **Q.**   Is there any accounting for a budget margin

7    deficit in this chart?

8    **A.**   None.

9    **Q.**   Is it possible there could be a budget margin

10   deficit in this chart?

11        **MR. SIEGEL:**  Objection.  Oh, this chart.

12   Withdraw.

13        **THE WITNESS:**  Very likely.

14   **BY MR. JOHNSON:**

15   **Q.**   And was there a budget margin deficit in the two

16   most recent fiscal years at CP&A?

17   **A.**   That's correct.

18   **Q.**   Are there any other issues with the calculations

19   you see in this chart?

20   **A.**   Yes, she is multiplying her lost revenue by the

21   compensation percentage, and assuming that's actually money

22   she will take home; that's not how you calculate their

23   incentives and/or wages.

24   **Q.**   Mr. Janowiak, I think we discussed a little bit

25   earlier that there was a drop in patient visits, if we

1    compared fiscal year '18 and '19 to '20 and '21?

2        **A.**    Correct.

3        **Q.**    The factors that explain that are what?

4        **A.**    Two main things, the pandemic and then the closing

5    of the College Park location.

6        **Q.**    And you've already discussed how that impacted

7    patients --

8        **A.**    Yeah.  They went from 10 -- excuse me, 16 exam

9    rooms to 6.

10       **Q.**    Now, Mr. Janowiak, on Page 3, Dr. Scott-McKinney

11   estimates her front pay wage loss from fiscal year 2023 to

12   fiscal year 2030.  Do you see that?

13       **A.**    I do.

14       **Q.**    Do any of those years account for a budget margin

15   deficit?

16       **A.**    They do not.

17       **Q.**    And do you know whether any of those years will

18   have a budget margin deficit?

19       **A.**    I wish I had a crystal ball but no, I don't.

20       **Q.**    And does CP&A have any plans to change its

21   compensation model?

22       **A.**    We do.

23       **Q.**    And do you expect that in the fiscal years

24   reflected in this chart Dr. Scott-McKinney will be

25   compensated in a different manner than the way she is

1    currently today?

2        **A.**    Yes.

3        **Q.**    Mr. Janowiak, does CP&A or Children's National, to

4    your knowledge, have any plans to remove

5    Dr. Scott-McKinney's scribe?

6        **A.**    No, I actually just budgeted it for the next

7    fiscal year to pay for it.

8        **Q.**    So it's your intent, based on current conditions,

9    that Dr. Scott-McKinney will continue to have a scribe?

10        **A.**    That's correct.

11        **MR. JOHNSON:**  I have no further questions.

12        **THE COURT:**  All right.  Why don't we take a

13    five-minute break now.  Thanks.

14        (Recess.)

15        **THE COURT:**  All right.  Mr. Janowiak, I will

16    remind you you are still under oath.

17        **THE WITNESS:**  Yes.

18        **THE COURT:**  Mr. Siegel.

19        **CROSS-EXAMINATION OF MARK JANOWIAK**

20    BY MR. SIEGEL:

21        **Q.**    Good afternoon, Mr. Janowiak.

22        **A.**    Good afternoon.

23        **Q.**    I believe you testified during direct examination

24    that you were testifying about the historic variance in the

25    -- what you call the inverse expense percentage --

1      **A.**   Yeah.

2      **Q.**   -- and that it runs anywhere from mid-20 percent

3  to up to 35 percent.  Correct?

4      **A.**   It can run from zero up to 35 so --

5      **Q.**   During your tenure you haven't seen it zero at the

6  Laurel practice --

7      **A.**   No, I have not.

8      **Q.**   In fact, in fiscal year 2021, the percentage was

9  34.14 percent.  Correct?

10     **A.**   Correct.

11     **Q.**   And so that means, absent -- if there wasn't a

12  budget margin deficit, Dr. Scott-McKinney's annual

13  compensation amount would be whatever annual comp. earning

14  was, times 34.14 percent, less what she was paid out; that

15  would be the difference that would be owed.  Correct?

16     **A.**   You are saying without the budget margin deficit?

17     **Q.**   Correct.

18     **A.**   Yes, but you have to include the budget margin

19  deficit.

20     **Q.**   Understood.  But if you assume that there is no

21  budget margin deficit, that it is a very simple arithmetic

22  equation of annual compensation that's earned, minus the

23  amount that is paid; that equates to how much money is owed

24  to her at the end of the year.  Right?

25     **A.**   As incentive, yes.

1      **Q.**    When did you start working with Children's
2   Hospital?
3      **A.**    It's been eight years, so 2014.
4      **Q.**    So prior to 2014, you don't know about whether or
5   not the Laurel practice had a budget marginal deficit, do
6   you?
7      **A.**    I can look historically.  I have all of the
8   records.
9      **Q.**    Sure.  But as of today you don't.
10      **A.**    Yeah.
11      **Q.**    I believe you also testified that the College Park
12   practice closed and that's going to affect the number of
13   patients that the Laurel practice will see over time.
14   Correct?
15      **A.**    Yes.
16      **Q.**    You are aware that the Laurel practice signed a
17   lease extension for additional space going forward.
18   Correct?
19      **A.**    Yes.
20      **Q.**    And that buildout is currently taking place.
21   Correct?
22      **A.**    Actually, no, it has not started yet.
23      **Q.**    You expect that buildout to be completed sometime
24   between now and the next six months.  True?
25      **A.**    Sometime in our fiscal year 2023.  So they are

1  projecting September.  But, again, with delays of supplies

2  it could be December, January.  It's really anyone's guess

3  at this point.

4  **Q.**   You don't know.  It would be speculation.

5  **A.**   It won't be this year.

6  **Q.**   And it's expected that they are going to expand

7  the number of examination rooms by at least five, if not

8  more.  Correct?

9  **A.**   Correct.

10  **Q.**   There's also been -- during the pandemic there was

11  a hiring freeze for the Laurel office.  Correct?

12  **A.**   At one point all practices -- the whole

13  institution had a freeze.

14  **Q.**   And that freeze has been lifted now.  Correct?

15  **A.**   Yes.

16  **Q.**   In fact, the Laurel practice is hiring two new

17  physicians.  True?

18  **A.**   There are two positions open.  Correct.

19  **Q.**   They are advertising to fill those slots.

20  Correct?

21  **A.**   Yes.

22  **Q.**   In part, that's because Mr. Glaser retired at the

23  end of 2021.  True?

24  **A.**   That's correct.

25  **Q.**   When Dr. Glaser retired in 2021, Children's

1    National Medical Center paid him $154,000.  True?

2        **A.**   I don't know off the top of my head how much they

3    paid him.

4        **Q.**   Well, his compensation earned, based on his

5    part-time status, was approximately $75,000.  True?

6        **A.**   Again, I don't know off the top of my head.  If

7    you had something to present me, I could tell you for sure,

8    but I don't have anything to qualify that statement.

9        **Q.**   Well, if Dr. Glaser was paid an additional $75,000

10    than he earned, and it was taken out of an expense from the

11    Laurel practice, you would consider that an aberration.

12    Correct?

13        **A.**   Correct.

14        **Q.**   It would not be a recurring expense going forward.

15        **A.**   Correct.

16        **Q.**   Now, I believe you also testified that you're

17    anticipating another spike in COVID.  Correct?

18        **A.**   Yes.

19        **Q.**   I believe you also testified during your

20    examination you have no crystal ball.

21        **A.**   No.  No.

22        **Q.**   So you have no way of knowing whether that will

23    happen?

24        **A.**   That's correct.  But all indications and our

25    healthcare leaders, who works with the federal government,

1    has indicated as such in meetings, that we are looking

2    forward to another spike in COVID.

3        **Q.**    But as you sit here today, that's entirely

4    speculation, even from the healthcare professionals.

5    Correct?

6        **A.**    Correct.

7        **Q.**    Now, you testified that Plaintiff's Exhibit 107,

8    119 and 192 that pertain to the annual physician

9    compensation reconciliation reports.  Right?

10        **A.**    Correct.

11        **Q.**    And the same formulas are used in each of those

12    years.  Correct?

13        **A.**    Yes.

14        **Q.**    You would agree that Plaintiff's Exhibit 194 and

15    195 have applied the same formula calculations.  True?

16        **A.**    It appeared that way but totally different

17    numbers, yeah.  The theory looked correct.

18        **Q.**    So she applied the calculations the same way you

19    would apply them on 192A.  True?

20        **A.**    In briefly looking at it, yes.

21        **Q.**    For Plaintiff Exhibit -- I'm sorry.  For

22    Defendant's Exhibit 192A, I believe that was a hypothetical,

23    as if Dr. Scott-McKinney was using a scribe for the entire

24    year.  Correct?

25        **A.**    Correct.

1      **Q.**   That hypothetical was based on

2   Dr. Scott-McKinney's 6-hour work restriction.  True?

3      **A.**   I would guess so.  If that's her schedule, then,

4   yes.  I don't have anything to do with her schedule.

5      **Q.**   Sure.  And Dr. Scott-McKinney, if she was seeing

6   six hours of direct-patient care versus eight hours

7   direct-patient care, you agree she would be generating more

8   revenue based on the more hours of patient care.

9      **A.**   Not necessarily.  If you don't have the patients.

10   And we've seen a decrease in volume because of the pandemic,

11   and we don't have as many patients coming in.  Not

12   necessarily true; that is a speculation.

13      **Q.**   Well, I appreciate that.  I appreciate that.  When

14   you are speculating about the number of patients coming in,

15   you don't know how many patients Dr. Scott-McKinney is

16   seeing during the course of 2022.  Do you?

17      **A.**   I do.

18      **Q.**   You're scheduling -- you can state here with

19   definitiveness that Dr. Scott-McKinney is seeing less

20   patients in the six hours of direct-patient care than she

21   has seen previously because of the pandemic.  Correct?

22      **A.**   Yes.

23      **Q.**   But you don't know if she had eight hours of

24   patient care whether she would be seeing more patients, do

25   you?

1        **A.**    No, but neither does she.

2        **Q.**    Granted.  We don't know the future.  Right?

3        **A.**    (No response)

4        **Q.**    We do know, though, that in fiscal year 2019

5    Dr. Scott-McKinney did work eight hours of direct-patient

6    care.  True?

7        **A.**    I believe so.  I'm not 100 percent sure.

8        **Q.**    She saw eight hours of direct-patient care in

9    2018.  Correct?

10        **A.**    I would assume so.

11        **Q.**    In fact, every year since she started at

12    Children's National Medical Center, up to when the pandemic

13    started, she was having eight hours of direct-patient care;

14    is that right?

15        **A.**    I guess.  I only look at FTE.  Her schedule is at

16    the clinic level.

17        **Q.**    And you sat here today when she testified.  Right?

18        **A.**    Yes.

19        **Q.**    So you heard her testify that since the losing of

20    the scribe, she has had to have a 6-hour work restriction.

21    Correct?

22        **A.**    Yes.

23        **Q.**    And that 6-hour work restriction is six hours of

24    direct-patient care.  True?

25        **A.**    True.

1      **MR. JOHNSON:**  One minute of your time.  Court's

2    indulgence.

3          **THE COURT:**  Uh-huh.

4          **MR. JOHNSON:**  Thank you.

5       (Brief pause.)

6          **THE COURT:**  While you're looking, can you remind

7    me, how many -- you said that this Laurel buildout may add

8    five-plus examination rooms.

9          **THE WITNESS:**  Yes.

10         **THE COURT:**  Remind me how many you had and how

11   many you have now?

12         **THE WITNESS:**  So there are six in the Laurel

13   location now.  They are going to add -- I believe it's going

14   to be six more, because I believe it is a total of 12.

15         **THE COURT:**  Okay.  And how many did you have

16   between the two locations?

17         **THE WITNESS:**  Sixteen.  Ten at College Park and

18   six at Laurel.

19   **BY MR. SIEGEL:**

20      **Q.**  Mr. Janowiak, do you know what the patient volume

21   was in the Laurel practice versus the College Park practice?

22   If you could give a percentage difference.

23      **A.**  I believe it was higher.  I don't know

24   percentagewise.  Because when we do our numbers, we combine

25   them.  We don't generally break them out and compare the

1    two.  But generally College Park had more, because they had

2    more exam rooms.

3        **Q.**    How many physicians worked in College Park?

4        **A.**    They rotate.  But generally there is always, I

5    think two -- I think when College Park was open, I think it

6    was one and a half providers at Laurel and then, like, three

7    or four at College Park, if I recall correctly.

8        **Q.**    In regards to the number of physicians that are

9    working in the Laurel office, you would agree that each year

10   the physician's budget, how much they believe they are going

11   to be seeing in terms of patients --

12       **A.**    Uh-huh.

13       **Q.**    -- is that correct?

14       **A.**    Yes.

15       **Q.**    And that's how you set your expense budgets; is

16   that right?

17       **A.**    Correct.

18       **Q.**    So if they meet their budget, then there is no

19   budget deficit.  True?

20       **A.**    No, not necessarily.  If you don't collect the

21   money, then it's net revenue.  Visits are -- they are

22   important to generating the revenue, but you have to make

23   sure you collect the revenue.

24       **Q.**    Sure.

25       **A.**    So if you are not closing your encounters or

1  billing anything out, then are you not collecting anything.

2      **Q.**   If we assume, based on historical information for

3  the Laurel practice, that the same level of revenue is going

4  to be collected, with some write-offs you've maintained,

5  that hasn't really changed much over time, has it?

6      **A.**   It has, actually.  You can see it in the budget

7  margin deficit that they incurred the last two fiscal years.

8  So, yes, it's been quite significantly impacted.

9      **Q.**   But the budget margin deficit, I believe, for 2020

10  was around 54,000.  Correct?

11      **A.**   That's correct.

12      **Q.**   And that was during the start of the pandemic.

13  Correct?

14      **A.**   Yes.

15      **Q.**   In fact, practices closed down for about two

16  months.  Didn't see patients.

17      **A.**   They didn't close down.  They pivoted to telemed.

18  I don't think any practice closed.  We just went straight to

19  telemed.

20      **Q.**   Prior to FY 2020, the percentage of collections

21  for the preceding years that you've been with Children's

22  National Medical Center has approximately been the same.

23  Correct?

24      **A.**   Yes, approximately the same.

25      **MR. SIEGEL:**   Thank you, Your Honor.  I have no

1    further redirect.

2              **THE COURT:**  Thank you.  Mr. Johnson?

3              **MR. JOHNSON:**  Your Honor, one moment.

4              (Discussion with Mr. Long off the record.)

5              **MR. JOHNSON:**  Your Honor, no redirect at this

6    time.

7              **THE COURT:**  All right.  Thank you.

8              Mr. Janowiak, you may step down.

9              Anything further from the defense?

10             **MR. JOHNSON:**  No, Your Honor.  We would like to

11   make a motion, however, on lack of causation on that issue,

12   if Your Honor will hear us.

13             **THE COURT:**  Is that something we can do as part of

14   closings?

15             **MR. JOHNSON:**  Your Honor, we can certainly brief

16   it in our closing brief as well.

17             **THE COURT:**  No, I mean the arguments I'm going to

18   hear right now.

19             **MR. JOHNSON:**  Your Honor, I was under the

20   impression we were doing closing briefs rather than closing

21   arguments.

22             **THE COURT:**  All right.  You don't have any?  You

23   are good with that, Mr. Siegel?

24             **MR. SIEGEL:**  Your Honor, you ordered us to put

25   closing briefs in by May 16th.

1          **THE COURT:**  So you are not planning to do closing

2     arguments?

3          **MR. SIEGEL:**  I assumed you weren't going to have

4     us do closing arguments because we are doing closing briefs.

5          **THE COURT:**  Okay.

6          **MR. SIEGEL:**  I will say this, Your Honor, I think

7     it would be premature to make any motions about causation,

8     because I have to put together my closing argument in a

9     brief with respect to the evidence that's been brought into

10    not only this case today but also at the trial.

11         So I don't know how -- I'm not sure that would

12    be --

13         **THE COURT:**  All right.  So do you want to be heard

14    now or do you want to just deal with it on the papers?

15         **MR. JOHNSON:**  Your Honor, if only on the issue of

16    causation, I would like to be heard now, if Your Honor --

17         **MR. SIEGEL:**  Wait.  Your Honor --

18         **THE COURT:**  Yes.

19         **MR. SIEGEL:**  Am I going to have an opportunity to

20    present a rebuttal case?

21         **THE COURT:**  Did you want to?

22         **MR. SIEGEL:**  A few questions, yes.

23         **THE COURT:**  Okay.  Go ahead.

24         **MR. SIEGEL:**  Has defense rested?

25         **THE COURT:**  I believe we have.  I thought we were

1    done.

2             **MR. JOHNSON:**  We have rested on evidence.

3             **MR. SIEGEL:**  Okay.  Thank you.  I'm sorry.  I

4    would like to call Dr. Scott-McKinney back to the stand.

5             **THE COURT:**  Okay.  Can you proffer?  What is this

6    going to be?

7             **MR. SIEGEL:**  What's that?

8             **THE COURT:**  What is your rebuttal?

9             **MR. SIEGEL:**  The rebuttal is that there was, in

10   fact, an aberration in FY 2021 in that her retiring partner

11   was paid a significant amount of money that reflects the

12   budget margin deficit being at $154,000.

13            **THE COURT:**  Okay.

14            **MR. SIEGEL:**  So it just has an impact on, kind of,

15   what we can expect going forward or even backward.

16            **THE COURT:**  Okay.

17            **MR. SIEGEL:**  It will be very brief, Your Honor.

18            **THE COURT:**  All right.

19            Dr. Scott-McKinney.  Ma'am, you are still under

20   oath.

21            Rebuttal.

22       **DIRECT EXAMINATION OF STACY SCOTT-McKINNEY, M.D.**

23            **MR. SIEGEL:**  May I proceed?

24            **THE COURT:**  You may.

25

**BY MR. SIEGEL:**

    **Q.**   Dr. Scott-McKinney, do you have any personal knowledge of Mr. Glaser's retirement in December of 2021?

    **A.**   Yes.

    **Q.**   Do you know how much money he was paid as a physician in fiscal year 2021?

    **A.**   Um, he was paid $154,000.

    **Q.**   And do you know how much money he generated in revenue that year?

    **A.**   Approximately half of that.

    **Q.**   So if he generated --

    **A.**   He --

    **Q.**   Sorry.  Let me ask the question.  So, if I understand your testimony, he was paid $154,000 and generated approximately $75,000 in revenue.  Correct?

    **MR. JOHNSON:**  Objection, Your Honor.  Leading.

    **THE COURT:**  Sustained.

**BY MR. JOHNSON:**

    **Q.**   Dr. Scott-McKinney, just to be clear, what is your knowledge, your personal knowledge, about how much revenue Dr. Glaser generated before he retired in December of 2021?

    **A.**   He generated approximately 74,000 or $75,000.

    **MR. SIEGEL:**  Nothing further.

    **THE COURT:**  I'm sorry.  Any cross, Mr. Johnson?

    **MR. JOHNSON:**  Yes, Your Honor.  Briefly.

1        **CROSS-EXAMINATION OF STACY SCOTT-McKINNEY, M.D.**

2    BY MR. JOHNSON:

3        **Q.**    Dr. Scott-McKinney, the testimony you just

4    provided about what Dr. Glaser was paid in his final year of

5    employment, what is the basis for that testimony?

6        **A.**    I was referring to one of the exhibits.

7        **Q.**    Do you know which exhibit you were referring to?

8        **A.**    If you show me the exhibits.  He's the first

9    doctor that is always listed so, yes.

10       **Q.**    Well, Doctor, I'm asking you.  You provided the

11   testimony.  Was that based on a document or was that based

12   on what someone told you?

13       **A.**    No.  It's based on a document.

14       **Q.**    And this was during fiscal year '21?

15       **A.**    I believe it is fiscal year '21, but let's look at

16   fiscal year '21 and '20, please.

17       **Q.**    Well, Dr. Scott-McKinney, the testimony you just

18   provided about what Dr. Glaser was paid, that was during his

19   final year of employment.  Correct?

20       **A.**    Yes.

21       **Q.**    And I think your testimony was that during his

22   final year of employment, Dr. Glaser only generated -- was

23   it $100,000 in that medical revenue?

24       **A.**    Um, no.  So for FY '21, actual earned compensation

25   was $76,248.

1      **Q.**    Okay.  So, Dr. Scott-McKinney, I'm showing you

2   what is fiscal year 2021.  Correct?

3      **A.**    Yes.

4      **Q.**    And it was your testimony that Dr. Glaser

5   generated $100,000 in net medical revenue, but was paid some

6   amount more than that; is that what you testified?

7          **THE COURT:**  No, she just said 75 -- I mean, she

8   just read it.  She is looking at 76,000.  And she said he

9   got paid about 154,000.  He generated about 75,000.

10  **BY MR. JOHNSON:**

11     **Q.**    Okay.  Where in this document does it show that

12  Dr. Glaser generated $150,000 in medical --

13         **THE COURT:**  That's not what she said.  She said

14  $76,000.

15         **MR. JOHNSON:**  Okay.

16  **BY MR. JOHNSON:**

17     **Q.**    Where in this document does it show that

18  Dr. Glaser generated $76,000?

19     **A.**    Where it says, "FY '21 actual earned compensation

20  $76,248."  And then at the very top it tells you what each

21  physician is paid as a salary.  So he received $156,000 and

22  he earned $76,000.

23     **Q.**    And is it your testimony in response to

24  Mr. Siegel's questioning that Dr. Glaser should not have

25  been paid that $154,000?

1    A.   Well, he was overpaid and this wasn't the first

2  year he was overpaid.  I believe that that does affect

3  expenses.  And it's not to be expected going forward.  So

4  it's -- and he has retired.

5    Q.   And is this the only year, to your knowledge, that

6  Dr. Glaser was overpaid?  Are there other years you can

7  point us to?

8    A.   Well, I believe the prior fiscal year he was also

9  overpaid.  But this year, I think, was the most.  But you

10  can pull up the last one.  I can look at it.

11    Q.   Well, Dr. Scott-McKinney, in this fiscal year

12  Dr. Glaser was paid a base salary.  And that base salary is

13  guaranteed.  Right?  Providers don't have to pay that back.

14  Right?

15    A.   That is correct.

16    Q.   So in your own scenario, if you had a base salary

17  and earned less incentive compensation than that base

18  salary, you would also simply receive your base salary.

19  Right?  You wouldn't be at risk of losing that, would you?

20    A.   That is correct.  However, I have pointed out to

21  the Children's administration that it's inappropriate to

22  overpay someone that substantially.  You should have some

23  sort of reconciliation put in place so that you are fiscally

24  responsible.  Why would you overpay by that large a

25  percentage?

1      **Q.**  Right.  But if you were in Dr. Glaser's shoes, you

2  would have gotten that compensation too.  Right?

3      **A.**  Yes, because that's how the contract is written.

4  You are guaranteed that.  Even if he -- even if Dr. Glaser

5  earned a dollar, he would have still been paid $156,000,

6  because as per our contract, that is a guaranteed.  The only

7  thing subject that you would lose would be incentive.  So he

8  -- obviously if he earned a dollar, he would receive zero in

9  incentive, but would be guaranteed, no matter how little he

10  worked, 156,000.

11          **MR. JOHNSON:**  Thank you, Dr. Scott-McKinney.

12          **THE COURT:**  All right.  Thank you, ma'am.  You may

13  step down.

14          I'll hear -- I'm sorry.  Did you have rebuttal or

15  redirect for Dr. Scott-McKinney?

16          **MR. SIEGEL:**  No, Your Honor.  I rest.

17          **THE COURT:**  Thank you.  I will hear briefly on

18  your motion.

19          **MR. JOHNSON:**  Thank you, Your Honor.

20          As I mentioned at the outset, plaintiff's claim

21  for both back pay and front pay after November 19, 2020 is

22  premised on the idea that Dr. Scott-McKinney's medical

23  condition and injuries were made worse off as a result of

24  not having a scribe for the 16-month period when she didn't

25  have one.

1          Now, there's been no evidence presented today or

2     at the trial of this matter that that's the case.  There's

3     no evidence to it.  Even the newly-injected testimony from

4     Dr. Rozmaryn about carpal tunnel syndrome, nowhere

5     references that Dr. Scott-McKinney was diagnosed with carpal

6     tunnel syndrome or repetitive strain disorder, as a result

7     of not having a scribe during this 16-month period.

8          And the doctor that's treated Dr. Scott-McKinney

9     throughout the duration of this litigation has said the

10     exact opposite.  Dr. Levin's testified that she is no worse

11     off now than had she had the scribe all along.

12          And Dr. Scott-McKinney just doesn't like that

13     testimony.  So she's now pivoted to the carpal tunnel

14     syndrome.  But that doesn't fare any better because there is

15     no evidence, no medical testimony, outside of plaintiff's

16     speculation who is not an expert, she is a lay witness in

17     this case, that her condition has been made any worse off.

18          She has a degenerative condition.  Dr. Levin has

19     testified that degenerative conditions develop over time.

20     So the only thing that she can do is speculate that because

21     she is still under a work restriction that that's the result

22     of not having a scribe during the 16-month period.

23          In addition, her claim for lost wages after

24     November 19, 2020 is barred by her binding election of

25     remedies in this case.  She went to the Workers'

1    Compensation Commission and she sought permanent partial

2    benefits for her neck injuries.

3            And in our post-trial brief, we cited the Maryland

4    case law that the workers' compensation statute provides

5    compensation to employees for reduction in their earning

6    capacity as the result of a work-related injury.

7            Now, we showed up to court during the pretrial

8    hearing and we briefed this issue.  We argued it before the

9    Court.  Not once did the plaintiff raise the fact, But Judge

10   I have carpal tunnel syndrome or repetitive strain syndrome

11   that was not covered by the workers' compensation order.

12           And as a result of that briefing, Your Honor

13   issued an order providing that plaintiff was not entitled to

14   any damages as a result of physical injuries or worsening of

15   her condition.  And now plaintiff has decided that it is the

16   carpal tunnel syndrome and the repetitive strain disorder

17   that gets her around Your Honor's ruling.

18           But the ruling was clear.  It was no damages for

19   physical injuries or worsening of her medical condition.  It

20   wasn't limited to physical injuries or worsening of her neck

21   condition or her wrist condition or some other body part.

22   It was limited to all medical conditions.  And plaintiff

23   should not be able to work around that order by injecting

24   the carpal tunnel syndrome and hand issues into this

25   litigation.

1      **THE COURT:**  How, if at all, does the defense -- or

2   the jury's verdict affect your argument?  I mean, haven't

3   they found there was some injury from her lack of a scribe

4   that I've got to consider in terms of how it's affected her

5   going forward?

6      **MR. JOHNSON:**  Yeah.  Your Honor, the jury found

7   that there was a failure to accommodate during that 16-month

8   period, and they awarded her damages for emotional distress

9   and other related injuries as a result.

10      But the jury, even in that case, in advance of

11   trial, was instructed that they could not award the

12   plaintiff any damages for physical injury or worsening of

13   her medical condition.  So the jury's verdict is completely

14   in line with the argument we are making now, and so is the

15   testimony of plaintiff's own expert.  He even said that

16   plaintiff's symptoms, even if you assume the truth of

17   everything he said at the trial in this case, that

18   plaintiff's symptoms were aggravated during the 16-month

19   period that she was without a scribe.  But there's been no

20   competent testimony from anyone that plaintiff's conditions

21   were permanently worsened as a result of that.

22      So I think limiting the plaintiff to lost wages

23   during the period of time she worked without a scribe and a

24   failure to accommodate case is perfectly consistent with the

25   jury's ruling or the verdict that there was a failure to

1    accommodate during this 16-month period; that's what we are

2    trying to limit the Court's consideration to, is the

3    16-month period when the plaintiff did not have a scribe, in

4    the absence of any evidence on causation that would allow

5    her to go beyond that period.

6        **THE COURT:**  I understand.

7        **MR. JOHNSON:**  Thank you, Your Honor.

8        **THE COURT:**  All right.

9        Mr. Siegel, do you wish to be heard?

10        **MR. SIEGEL:**  Yes, Your Honor.

11        Shall I proceed, Your Honor?

12        **THE COURT:**  Yes.

13        **MR. SIEGEL:**  We believe there is sufficient

14    evidence in this case to show that the newly-diagnosed

15    repetitive strain syndrome and carpal tunnel is the cause --

16    was caused by her 16 months without a scribe.  She saw

17    Dr. Rozmaryn in August of 2020, 15 months without having a

18    scribe.

19        Plaintiff Exhibit 97, on Page 2, which I had her

20    read that information into the record, it's highlighted on

21    Page 2.  Underneath the diagnosis of repetitive strain

22    syndrome it says, "I do believe the hand injury is related

23    to the work, to a reasonable degree of medical certainty,

24    and I think the treatment is reasonable and necessary and

25    related to her work injury."

1        Now, he didn't specifically say, It's not related

2   -- it's my opinion to a reasonable degree of medical

3   certainty that her 16 months without a scribe caused her to

4   have this condition.  But if you read this particular, clear

5   medical opinion to a reasonable degree of medical certainty,

6   and you add to that his examination of the upper extremity,

7   on Page 3, which is also highlighted, he's indicating that

8   there's no material changes going to occur, even with the

9   presence of a scribe, because she's been without a scribe

10  and she's not improving.

11       And so these new conditions would establish the

12  requisite causation needed to -- for her to seek back pay

13  and front pay.

14       **THE COURT:**  So is there -- do you agree there is

15  tension then between what he is saying and what Dr. Levin

16  said?

17       **MR. SIEGEL:**  No, because what Dr. Levin was

18  opining about was her neck and shoulder conditions, not

19  about her hand, which is totally independent.

20       As Dr. Scott-McKinney testified, you can have

21  consequences to the hand based on radiculopathy, which comes

22  from the neck, a pinched nerve.  You can also have

23  consequences to the hand, which are endemic to the hand;

24  that is carpal tunnel, which is located in the hand, where

25  the ligaments and bones go through.  So there are two

1    separate conditions; that's why she went to a hand

2    specialist in Dr. Levin's office.  He came up with an

3    independent -- an independent diagnosis.

4            Moreover, Plaintiff Exhibit 200 was from

5    Dr. Berdia in March of 2019 when she had a scribe.

6    Dr. Berdia diagnosed her with Raynaud's and ruled out carpal

7    tunnel.  So she didn't have it prior to the time that she

8    had the scribe.  She got it after she was without a scribe

9    for 16 months.  In my mind, the evidence that has been

10   presented would be sufficient enough for causation to

11   establish an ineligibility for back pay and front pay.

12           Now, what I'd like to then address is Your Honor's

13   ruling on the Motion in Limine.  Your Honor's ruling on the

14   Motion in Limine was based on and the motion itself was

15   based upon the January 4th, 2020 ruling from the Workers'

16   Compensation Committee, which is Defendant's Exhibit 166.

17   That partial permanent disability finding was only as to the

18   neck and shoulder.  The carpal tunnel was not before the

19   Commission.  So there is no election of remedies here.

20           And, in fact, as Your Honor pointed out when you

21   granted the motion, in order for that to happen, in order

22   for an election of remedies to occur, the defendant would

23   have to establish that the Workers' Compensation Commission

24   issued a final judgment.  There was no final judgment on

25   carpal tunnel, because it was never before the Workers'

1      Compensation Commission, only neck and shoulder.  Therefore

2      there is no election of remedies.

3              So what we have here, factually, is

4      Dr. Scott-McKinney's testimony that prior to 2019 she had

5      hand symptoms that were radicular, radicular in origin,

6      meaning they came from the neck and pinched nerve.  We have

7      a doctor in 2019, from the medical records, saying he's

8      ruled out carpal tunnel.

9              Then in 2020, August, which is -- August and into

10     October -- has examined her as a hand specialist in

11     Dr. Levin's office, and has not only given her a diagnosis

12     of repetitive strain syndrome, secondary to carpal tunnel,

13     but he's stated to a reasonable degree of medical certainty

14     that it's because of her work.  Which at the time she was

15     working without a scribe.

16             So clear inferences can be drawn for purposes of

17     causation to establish an eligibility for back and front

18     pay.  And there is no final judgment of the Workers'

19     Compensation Commission that would preclude her from seeking

20     that relief in this Court.

21             Thank you, Your Honor.

22             **THE COURT:**  All right.  Thank you, Mr. Siegel.

23             **MR. JOHNSON:**  Your Honor, can I touch briefly on

24     some of the exhibits referenced by Mr. Siegel?

25             **THE COURT:**  Yes.

1            **MR. JOHNSON:** Your Honor, I first want to touch

2      on, you know, plaintiff's reference to Dr. Rozmaryn noting

3      the hand symptoms were the result of the work.  As plaintiff

4      concedes, as he must, you know, that doesn't mean work

5      without a scribe.  And Dr. Rozmaryn's notes observed that

6      the hand symptoms had started three years prior to when

7      Dr. Scott-McKinney was forced to work without a scribe.  So

8      the only thing we are left with is willful speculation that

9      work means work without a scribe.

10            Dr. Scott-McKinney had worked as a pediatrician

11     documenting her patient notes since 2007 for Children's

12     National and for many years before that.  Certainly there

13     needs to be some expert testimony or someone from a treating

14     physician of Dr. Scott-McKinney, not her own

15     characterizations of what a cervical -- what a strain injury

16     is or what carpal tunnel syndrome is; that those conditions

17     were the result of working without a scribe during a

18     16-month period.

19            I mean, the only thing plaintiff can do is

20     speculate I did this for 30-something years, but it wasn't

21     those 29 other years I worked as a pediatrician that caused

22     this condition.  It was the 16 months when I did it, and

23     that was what caused my carpal tunnel or my other wrist

24     issues.

25            I mean, Dr. Rozmaryn's notes don't support that,

1    and they rather support the contrary, because they note that

2    the conditions and symptoms had started long before she was

3    forced to work without a scribe.

4            Now, turning to the Plaintiff's Exhibit 200, the

5    notes from Dr. Berdia, those notes observed that plaintiff

6    was diagnosed with a hand condition during the period of

7    time that she worked with a scribe.  I can't fathom how that

8    exhibit supports plaintiff's contention that any of her hand

9    issues are related to the period of time that she worked

10   without a scribe.  If anything, they support the opposite.

11   Before she ever lost her scribe, she was having these issues

12   with her hand.

13           The Court can't allow the plaintiff to testify

14   that, Well, my symptoms were a little different then as

15   opposed to now, and that must be because I worked without a

16   scribe.  She needs expert testimony on that point.  She is a

17   lay witness.  She shouldn't be allowed to self-diagnose

18   herself, but then also say that not only am I

19   self-diagnosing myself, but these diagnoses that I'm

20   observing are attributable to this cause rather than that.

21   She needs an expert to do that.  The only expert she has

22   come forward with in this case has said the exact opposite.

23           Now, briefly on the point about election of

24   remedies, plaintiff could have very well made this argument

25   about the hand and the wrist when we briefed this issue

1    before.  It was never raised because this case was always

2    about Dr. Levin's treatment of the plaintiff and the neck

3    and shoulder issues.

4           It wasn't until after Your Honor ruled that

5    plaintiff could not recover for physical injuries or

6    worsening of her condition, that the plaintiff decided to

7    pivot and say, Well, now, it was actually carpal tunnel

8    syndrome and my hand issues that were cause of not having a

9    scribe.  She only did that because she didn't like the

10   testimony of her own expert, who had completely debunked the

11   theory that she was made any worse off as a result of not

12   having this accommodation.  And that's the only person who

13   has treated her throughout the entire relevant period of

14   this case.

15          He started treating her when she had a live

16   scribe.  He started treating her before she ever had a live

17   scribe.  He treated her while she had and live scribe.  He

18   treated her when she didn't have a live scribe and he

19   continued to treat her when she had a virtual scribe.

20          There is absolutely no reason why the Court should

21   just disregard what that expert has said and interpret this

22   vague statement to work to mean that, Well, work must mean

23   the 16-month period when the plaintiff didn't have a scribe.

24   Again, it's just wishful speculation, Your Honor.

25          **THE COURT:**  So, you know, I think a theme

1    throughout this has been kind of your frustration with the

2    plaintiff maybe bobbing and weaving or developing their case

3    or what have you, including now saying that they've come up

4    with this carpal tunnel syndrome concern after my motion --

5    my ruling on your Motion in Limine having to do with the

6    Maryland case.

7          I guess, you know, so what? Let's say that their

8    theory has evolved. Are you saying this is too late for

9    them to advance this theory? I guess I don't understand. I

10    mean, if Mr. Siegel is right that the Maryland compensation

11    decision was about the neck and shoulder, I don't know that

12    the timing matters much.

13          **MR. JOHNSON:** Well, Your Honor, that's certainly

14    one prong of what we are arguing that it is late in the game

15    to sort of change the plaintiff's theory. But

16    Dr. Scott-McKinney did go to the Workers' Compensation

17    Commission and she sought compensation for work-related

18    injuries. Right? She sought compensation for work-related

19    injuries caused by working without a scribe. So, you know,

20    it's sort of a neverending story if the plaintiff can say,

21    Well, that was actually only related to my neck and

22    shoulder, you know, actually my wrist hurt. And then she

23    can go to the Workers' Compensation Commission on that

24    issue, but then tell the Court, Well, actually my leg hurt

25    from working without a scribe and it never ends.

1        Plaintiff went to Workers' Compensation Commission

2   to obtain compensation for a work-related injury, and is now

3   seeking compensation in this case for a work-related injury

4   caused by working without a scribe.

5        Now, that doesn't even address the causation

6   issues that the plaintiff has, that even if this Court is

7   inclined to consider the Dr. Rozmaryn's notes, at the very

8   best, we have speculations that the injury is related to the

9   work.

10        Well, what is the work?  Dr. Scott-McKinney's been

11   a pediatrician for thirty-some years.  How can we interpret

12   Dr. Rozmaryn's note to say, Well, work must mean the period

13   of time working without a scribe.  It's only reasonable to

14   assume that if Dr. Scott-McKinney does have carpal tunnel

15   syndrome, that the 29 years of typing before she had a

16   scribe contributed to that.

17        I mean, she certainly needs an expert witness to

18   say, No, it actually had nothing to do with that 28-year or

19   29-year period when she didn't have a scribe.  It was only

20   caused by that 16-month period.  I mean, that's not

21   something Dr. Scott-McKinney can argue by inference or just

22   say, you know, I was able to work a 6-hour workload -- or I

23   was able to work an eight-hour patient load when I had a

24   scribe, and I'm not able to now, so that must mean I was

25   made worse off.  She has a degenerative condition.  It gets

1    worse over time.  Again, Dr. Levin has explained this and he

2    said it there.  And there is no reason to look away from the

3    one expert that has treated her throughout this case because

4    another doctor said it was related to the work.

5            **THE COURT:**  All right.  Thank you, Mr. Johnson.

6            **MR. SIEGEL:**  Your Honor --

7            **THE COURT:**  I'm going to take this under

8    advisement.  You all obviously are welcome to include these

9    points in your briefs.

10           I will say, and maybe it's late in the day for

11   this, but this feels like a case to me where some settlement

12   could be had.

13           Dr. Scott-McKinney continues to work for the

14   defense.  Much of what she is seeking, at least the

15   declaratory relief, defendants say they are already

16   providing, have to provide under the law.

17           I think -- you know, I'm not making any decisions

18   at this point.  I thought Mr. Janowiak testified very

19   credibly and as someone who certainly understands the ins

20   and outs of the comps. spreadsheet.  I know you all put a

21   lot of time and money into the litigation thus far.  I

22   wonder if you might be able to reach some settlement before

23   doing more briefing and whatnot but that's to the parties.

24           All right.  Anything further, Mr. Siegel?

25           **MR. SIEGEL:**  No.  Thank you for your time today.

1          **THE COURT:**  All right.  And Mr. Long?

2          **MR. LONG:**  No, that's it, Your Honor.  Thank you.

3          **THE COURT:**  Thank you, folks.  I will take it

4    under advisement.  I look forward to seeing your briefing.

5          **MR. SIEGEL:**  Thank you.

6          **MR. JOHNSON:**  Thank you.

7          **DEPUTY CLERK:**  This Honorable Court is adjourned.

8          (Proceedings concluded at 4:22 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 **C E R T I F I C A T E**

2

3        I, **Lorraine T. Herman, Official Court**

4 **Reporter,** certify that the foregoing is a true and

5 correct transcript of the record of proceedings in the

6 above-entitled matter.

7

8

9

10    May 9, 2022           /s/_____

       **DATE**              **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Plaintiff's Trial Exhibit**

**1**

# AMENDED & RESTATED
# PHYSICIAN EMPLOYMENT AGREEMENT

**THIS AMENDED AND RESTATED PHYSICIAN EMPLOYMENT AGREEMENT** ("Agreement") is entered into and made effective this January 1, 2010 (the "Effective Date") by and between Children's Pediatricians & Associates, LLC, a limited liability company organized under the laws of the District of Columbia (the "Company"), and Stacy Scott-McKinney. M.D.., a physician duly licensed to practice medicine in the State of Maryland (the "Physician").

## WITNESSETH:

**WHEREAS,** the Company has a primary care pediatric medical practice in order to improve the availability of quality pediatric care services delivered in a cost-effective and clinically efficient manner to the residents of the Greater Washington D.C. Metropolitan Area including certain areas in the State of Maryland and the Commonwealth of Virginia; and

**WHEREAS,** the Company employs Physician as a pediatrician licensed to practice in the State of Maryland pursuant to Physician Employment Agreement dated January 20, 1999 (the "Employment Agreement") to provide quality pediatric care services; and

**WHEREAS,** the Physician and Company agree to amend and restate the terms of the Employment Agreement; and

**WHEREAS,** the Physician and Company agree the terms and conditions of this Agreement shall supersede the terms and conditions set forth in the Employment Agreement.

**NOW THEREFORE,** in consideration of the promises and covenants contained herein and intending to be legally bound hereby, the parties agree as follows:

1. **Employment.** The Company hereby employs the Physician to perform the duties associated with the medical care operations of Company, and the Physician hereby accepts such employment upon all of the terms and conditions as are hereinafter set forth or incorporated.

DC:34436.1
**FINAL**



DEPOSITION
EXHIBIT
Deposition 1
6/15/20    KV

2.    Duties.

a.    The Physician shall hereunder provide the full range of services for which she is authorized to perform as a physician on a "Part Time" and "Full Time" basis. Rendering the full range of services on a "Part Time" or "Full Time" basis, as defined below, shall constitute working at Company's facilities; rendering services to the Company Patients; using office space, facilities, equipment and personnel furnished by the Company; and supervising the performance of services by such non-physician practitioners of the Company as required by federal and state law and the Company's policies and procedures. "Part time" is defined as at least fifty percent (50%) of full time and less than full time. Full time is defined as performing in-office services, evening and weekend call, and hospital rounds four and one half (4½) days each week; provided that four and one half (4½) days shall be equal to nine (9) sessions, and one (1) session shall be equal to either four (4) hours of in-office services or hospital rounds the Physician shall render services in connection with the practice location set forth in Exhibit A and in cooperation with the physicians associated with such practice (the "Practice Group"). For purposes of this Agreement, "Company Patients" shall refer to all patients for whom a physician employed by the Company has performed medical services during the course of her employment with Company, notwithstanding that some or all of such the Company Patients may have received medical services from such a physician prior to her employment with Company. A patient shall continue to be deemed a Company Patient until the patient requests in writing to the Company that her records be transferred to a physician outside the Company or the records are otherwise transferred by the Company to the Physician under this Agreement.

b.    The Physician shall devote her time and best efforts to perform diligently the practice of medicine as directed by Company; notwithstanding the foregoing, in all instances, the Physician shall retain the responsibility for exercising her independent medical judgment. The Company shall not interfere with the independent medical judgment of the Physician. The Company agrees that it will at no time knowingly issue to the Physician any direction or impose upon him/her any requirements in complying with which the Physician could foreseeably violate the professional ethics and mandates of her profession. The Physician agrees at all times to act, practice her profession, and perform her duties under this Agreement in accordance with such standards of professional ethics and practice and all statutes, rules and regulations as may from time to time be applicable to the Physician or to any professional services that he may render.

c.    The Physician's duties shall include the essential functions of employment set forth in Exhibit A, as amended from time to time. In connection with her duties, the Physician shall at all times promote the professional practice of the Company and perform all things reasonably desirable to maintain and improve her professional skills. The Physician shall practice medicine exclusively for the benefit of the Company Patients, and shall practice medicine for no other patients, with the exception of the Sandy Springs After Hours Pediatrics location in Olney, Maryland, unless approved by the Company. Company approval shall not be unreasonably withheld.

3.    Licenses and Insurance.

2

**PLAINTIFF001376**

a.    Throughout the term of this Agreement, the Physician shall hold a currently valid and unlimited license to practice medicine in the State of Maryland. Furthermore, the Physician shall hold a currently valid and unlimited Drug Enforcement Administration Registration number. The Physician agrees to provide promptly a copy of said license and Drug Enforcement Administration Registration to the Company upon request.    The Physician shall maintain participation in any insurance plan (payor) and the Medicare and Medicaid Programs in which Company has a contract and as determined by the Company. The Physician agrees to immediately deliver to Company, upon receipt, a copy of any decision or action adverse to the Physician's Drug Enforcement Administration Registration number, her license to practice medicine in the State of Maryland or her Insurance Plan and Medicare or Medicaid participation status or billing numbers.

b.    The Physician must be eligible at all times to be insured for and to maintain professional liability insurance carrying the limits and subject to the deductibles and retention desired by the Company, which minimally will be $1 million/$3 million coverage, for all procedures to be performed on the Company Patients at rates reasonably equivalent to those available with respect to other physician employees of Company, allowing for normal rate differentials among specialties. ("Reasonable Cost"). Company shall pay for the Reasonable Cost of Physician's professional liability insurance, which shall include tail coverage in accordance with and subject to the provisions of Section 3.c. below, provided that if the cost of Physician's insurance is not reasonably equivalent to those available with respect to other physician employees of Company, allowing for normal rate differentials among specialties and insurers, Physician shall pay Company the difference between the rate of Physician's insurance and the Reasonable Cost. "Reasonably equivalent" shall be interpreted to mean standard issue rates of insurers who write professional liability insurance for physicians in the State of Maryland. Physician agrees to deliver promptly to Company, upon receipt, a copy of any notice of claim against the Physician involving physician's liability insurance or any adverse action, change or modification to the terms and conditions of physician's insurance coverage.

c.    Upon termination with the Company, Physician shall be insured for and maintain professional liability tail insurance for the period of 11/1/1999 to the "Effective Date" carrying the limits and subject to the deductibles and retention desired by the Company. This represents the "Prior Period Tail Coverage".    The parties agree that Physician shall continue in effect, throughout the term of this Agreement, the professional liability insurance policy in effect during the period from November 1, 1999 through the Effective Date (the "Prior Policy") so as to eliminate the need for the purchase of a separate "tail policy" to provide the Prior Period Tail Coverage. The Company shall pay the premium for the Prior Policy throughout the term of this Agreement in accordance with Section 3.b. above. The Company also shall be responsible for 100% of the cost of professional liability tail coverage for Physician's professional activities occurring during the period from November 1, 1999 (the effective date of the Prior Policy) through the effective date of termination of this Agreement subject to the following conditions. If Physician terminates this Agreement (other than for breach by the Company) before the fifth anniversary of the Effective Date of the first employment agreement, Physician shall assume partial responsibility for this tail coverage (the "Current Period Tail Coverage".) Otherwise, the Company shall pay 100% of the cost of the Current Period Tail Coverage ("Current Period Tail Cost"): If the Physician terminates this Agreement before the first anniversary of the Effective

3

PLAINTIFF001377

Date, Physician shall assume full responsibility for the costs of the Current Period Tail Cost); if Physician terminates this Agreement on or after the first anniversary but before the second anniversary of the Effective Date, physician shall reimburse the Company four-fifths of the Current Period Tail cost; if Physician terminates this Agreement on or after the second anniversary but before the third anniversary, Physician shall reimburse the Company three-fifths of the Current Period Tail Cost; if Physician terminates this Agreement on or after the third anniversary but before the fourth anniversary, Physician shall reimburse the Company two-fifths of the Current Period Tail Cost; and if Physician terminates this Agreement on or after the fourth anniversary but before the fifth anniversary, Physician shall reimburse the Company one-fifth of the Current Period Tail Cost. The Company may off-set any monies due under this Section 3(c) from compensation the Company owes Physician under this Agreement.

4.    **Medical Staff Privileges**

The Physician shall maintain staff privileges on the medical staff of Children's Hospital (the "Hospital") and/or at one or more other hospitals in the service area of the Practice Group and as directed by the Company ("Designated Institutions").

5.    **Rules, Regulations, Membership.**

a.    The Physician shall be subject to all policies, rules and regulations of Company. The Physician agrees that neither the Operating Agreement of the Company nor any rules, regulations and employee handbook issued by the Company shall create an employment for any length of time or create any rights in favor of the Physician.

b.    The Physician shall procure and maintain contracting provider status in such health maintenance organization, preferred provider organization, or with any other third party payor as deemed necessary by Company; provided, however, that the Physician cannot enter into or renew such contracting status unless the Company authorizes such participation.

6.    **Facilities and Support.** The Company shall furnish the Physician with pager, cell phone, answering service, office space, materials, equipment, secretarial assistance, and such other examination facilities, auxiliary services, as the Company provides and determines shall be suitable to the Physician's position and adequate for the performance of his/her duties. During the term of this Agreement and any renewal hereof, the Company shall provide to the Physician all resources which are in accordance with the budget approved from time to time by Company. the Company shall provide, at its sole cost and expense, appropriate liability insurance regarding the premises, including but not limited to property insurance and casualty insurance.

7.    **Compensation and Benefits.** In consideration for the performance by the Physician of services for the Company as provided hereunder, the Company agrees to pay the Physician total benefits and compensation as set forth in Exhibits B and C, respectively, attached hereto and incorporated by reference herein, subject to all applicable city, state, federal and other withholding taxes. Annual benefits and compensation as set forth in Exhibits B and C shall be determined in accordance with the Physician's Employment Year, as defined in Exhibit C.

4

**PLAINTIFF001378**

**8.**    **Physician's Representations.**  The Physician hereby represents and warrants to the Company that as of the date of execution of this Agreement he/she has the legal right to enter into this Agreement and perform the duties hereunder, and that he/she is not subject to or bound by any non-compete or other restrictive covenant that would impede or interfere in the performance of his/her duties hereunder.

**9.**    **Patients and Records.**   All patient files, financial records and other records pertaining to patients of the Company and all personnel records pertaining to compensation and expenses of the Physician within the scope of his/her employment shall at all times be the property of Company.

**10.**    **Assignment of Contracts; Billings and Fees.**

a.    The Physician agrees to assign to the Company and to cause the Physician to assign to the Company all proceeds of all fees collected and all rights to the proceeds of billings, including, but not limited to, all fees owed or received pursuant to managed care contracts, or for the professional services of the Physician rendered during the term of this Agreement.   The Physician also agrees that whenever possible, the Company shall be entitled to obtain and maintain, or transfer, any provider numbers necessary to bill and collect for services rendered by the Physician hereunder. The Physician agrees that all fees for his/her professional services and for ancillary services furnished by the Company during the term of this Agreement shall be the property of the Company.

b.    Except as set forth in Schedule 10(b), the Physician agrees to cooperate with the Company and take all required actions and to cause the Physician's former practice to cooperate with the Company and take all required actions for the purpose of assigning or transferring to the Company all outstanding contracts with third party payors, including, but not limited to, managed care organizations, governmental payors, employers, insurance companies and third party administrators to which the Physician and/or the Physician's former practice is party.   During his/her employment by the Company, the Physician agrees not to enter into or renew any contracts to provide services to the Company Patients without the prior written consent of Company.

Except as provided in Schedule 10(c), the Physician agrees not to enter into any contract to provide professional services of any type relating to the practice of medicine without the prior written consent of the Company with the exception of the Olney, Maryland office of Sandy Springs After Hours Pediatrics.  If any such contract is approved by the Company, the Company shall determine whether (i) the Physician shall assign the right to all fees received under such contracts to the Company, and the Company shall determine the amount, if any, the Physician shall be compensated in addition to the compensation set forth in Exhibit C for such additional services; or (ii) the Physician may receive such compensation outside this Agreement. Notwithstanding the foregoing, the Physician may engage in activities (i) as an author, (ii) as a lecturer, or (iii) in activities unrelated to the practice of medicine, including expert witness testimony; and the Physician may retain all fees and other compensation derived by the Physician during the term of this Agreement as a lecturer or author or in activities unrelated to the practice of medicine, including as an expert witness, provided such activities do not interfere with the Physician's duties

5

PLAINTIFF001379

under this Agreement and provided the Physician has given advance written notice to the Company of her involvement in such activity and, in the case of expert witness testimony, has received advance written consent that such activity does not interfere with any business of the Company. If, however, in the reasonable judgment of the Company, the Physician's work with an entity other than the Company to provide professional services of any type relating to the practice of medicine or the Physician's work as a lecturer, author or other activity, with the exception of Sandy Spring After Hours Pediatrics, interferes with the delivery of professional services by physicians of the Company, then the Company, upon written notice to the Physician, may require (i) the Physician to discontinue such activities, and/or (ii) any revenue derived from such work, subsequent to such notice, to be collected by, paid to, and belong to the Company and the Company shall determine the amount, if any, that is paid to the Physician in addition to compensation set forth in Exhibit C.

      d.    The Physician acknowledges that his/her employment in no way confers upon him/her any interest or claim in any fees which are charged by the Company for the Physician's services, whether the same are collected during the Physician's employment or after termination of the Agreement and the Physician disclaims and renounces any such interest.

      e.    Notwithstanding anything herein contained to the contrary, this Agreement shall not be construed as prohibiting the Physician from being a passive investor. In addition, notwithstanding anything herein contained to the contrary, the Physician shall not have the right to make any contracts or commitments for or on behalf of the Company without prior consent of Company.

6

**PLAINTIFF001380**

**-298-**

11.    Term and Termination.

    *a.*    The Initial Term of this Agreement shall be five (5) years from the Effective Date set forth above.

    b.    After the Initial Term or Renewal Term of this Agreement, this Agreement shall be automatically renewed for additional five (5) year terms ("Renewal Terms"), unless either party delivers written notice to the other not later than ninety (90) days prior to the expiration of the Initial Term or the Renewal that it or he/she does not intend to renew this Agreement.

    c.    This Agreement may be terminated without cause at any time by the mutual agreement of the parties to this Agreement.

    d.    This Agreement may be terminated by either party for the breach of the other party of a material term of the Agreement, including but not limited to substantial failure to pay sums due under this Agreement upon the expiration of forty-five (45) days after receipt of written notice of the breach and an opportunity to cure within that period.

    e.    The Company shall have the right to terminate this Agreement immediately upon the occurrence of any of the following:

        i.    suspension, curtailment, or revocation of the Physician's Drug Enforcement Administration Registration number or his/her license to practice medicine in the State of Maryland regardless of the pendency of any appeal of such suspension, curtailment, or revocation;

        ii.    termination, suspension for patient care reasons, suspension for non-patient care reasons (e.g., medical record incompletion) for greater than thirty (30) days which interferes with any of the Company physician's ability to provide services to patients, or involuntary non-renewal of the Physician's medical staff privileges or membership at any of the Designated Institutions or any non-renewal as a result of any adverse action that would be reportable to the National Practitioner Data Bank;

        iii.    expulsion of, suspension of, or other final disciplinary action against the Physician by any professional medical organization as a result of professional misconduct, or resignation by the Physician from any professional medical organization under threat of disciplinary action for professional misconduct;

        iv.    The Physician's failure or inability to qualify or continue eligibility for professional liability insurance coverage at rates reasonably equivalent to those available with respect to other physician

7

PLAINTIFF001381

employees of the Company;

v.     imposition of any sanctions, including exclusion, suspension, or other limitation, relating to the Physician's Medicare or Medicaid participation;

vi.    death of the Physician;

vii.   conviction, plea of guilty or no contest to a felony by the Physician or any felony charge against the Physician that relates to the practice of medicine or which causes embarrassment to the Company or may have a negative impact on the Company's ability to perform its services; provided that, the Company may suspend the Physician without compensation or any right to compensation during the pendency of the charge;

viii.  gross inattention to or willful neglect of the duties to be performed by the Physician;

ix.   abuse of any legal or illegal substance, including drugs or alcohol, which impairs the Physician's ability to perform hereunder; breach by the Physician of medical ethics; other unprofessional or disruptive conduct; or action by the Physician which, in Company's judgment, may damage Company's reputation or interfere with Company's and/or its physicians' ability to provide quality care services to the Company Patients.  Except where, in Company's opinion, the conduct or activity involved presents a risk of causing harm to patient safety or is of such a serious, repetitive, continuing or willful nature so as to present a significant risk of injury to Company's reputation or business interests, the Company shall provide written notice of such activity and an opportunity to cure it within forty-five (45) days of such notice, for all or any portion of which the Company may suspend the Physician, without compensation or right to compensation, as it deems appropriate in light of the conduct of the activity involved.

     f.    If the Physician does not satisfactorily perform the essential functions of employment set forth in Exhibit A for ninety (90) consecutive days or one hundred eighty (180) days within a one (1) year period due to physical or mental impairment, the Company may terminate this Agreement immediately; provided, however, that the Company shall comply with the requirements of the Americans with Disabilities Act, including making reasonable accommodations, to the extent applicable.

     g.    Notwithstanding the foregoing grounds for termination, if extenuating circumstances require the Physician to leave the Company's service area, then the Physician may terminate this Agreement upon one hundred and twenty (120) days written notice to the Company;

8

**PLAINTIFF001382**

provided, however, that the Physician shall be subject to the restrictive covenants in Section 12 of this Agreement.

h.    In the event of the termination of this Agreement, the Physician shall be entitled to the compensation earned by him/her prior to the date of termination as provided for in this Agreement.

i.    If this Agreement is terminated, the Physician shall cooperate with the Company in the orderly transfer of patients treated by the Physician during the course of his/her employment to another physician associated with Company.

j.    The Physician agrees that upon termination of his employment with the Company for any reason, whether voluntary or involuntary, the Physician shall promptly deliver to the Company all materials, whether written, descriptive or maintained in some other form, relating to Company, its business, affairs, patients and potential patients. The Physician shall also deliver such other property in his possession, including any automobile, telephone, pager or other electronic or medical equipment, that was supplied to the Physician by Company; provided, however, that the parties may mutually agree in writing to the purchase of any such property by the Physician.

12.    Covenant Not to Compete and Confidentiality of Information.

a.    Except for those circumstances listed in Section 12(b) below, during the term of the Agreement and for a period of twelve (12) months following the termination or expiration of the Agreement (the "Restricted Period"), and within five (5) miles of any of the Company's office location(s) at which the Physician performs professional services during the term of the Agreement other than on a substitute or coverage basis (the "Restricted Territory"), the Physician shall not:

i.    compete, either as an employee, independent contractor, consultant, owner, officer or director or otherwise in any manner with the Company in any business serving the public in which the Company is engaged as of the date of such termination or expiration, including any business which competes with Company;

ii.    disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Company and any patient, supplier, payor or employee of Company. In fulfillment of this obligation the Physician agrees to take all steps necessary for the Company to effect an orderly transfer of patient records and information in the event of a termination of the Physician's employment hereunder for any reason. Such steps include, but are not limited to assisting with the transfer of the Company Patients to other physicians employed by the Company or an Affiliate of the Company (For purposes of this Agreement, an "Affiliate" shall be any entity which controls, is controlled by, or is under common control with Company);

9

PLAINTIFF001383

iii.    solicit employees of the Company or the Company Patients;

iv.    send announcements or publications regarding new offices or employment affiliations to the Company Patients; provided however, the Physician may conduct one general mailing to the Company Patients, the content of which will be agreed upon by the Company and the Physician;

v.    except as otherwise provided in Section 9, remove patient records from Company, unless a patient requests the transfer of his/her records in writing and then the Physician may only obtain such records during business hours; or

vi.    except as otherwise provided in Section 9, take, copy, or distribute in any way lists of the Company Patients.

b.    Section 12(a)(i) shall apply in the event of termination of the Agreement by the Company or non-renewal of the Agreement by the Company pursuant to Section 11(b), or by the Physician pursuant to Section 11(d) or by the parties pursuant to 11(c).

c.    In the event the provisions of this Section 12 are deemed to exceed the time, geographic, or occupational limitations permitted by applicable law, then such provisions shall be automatically reformed to the maximum time, geographic or occupational limitation permitted by applicable law.

d.    If the Physician violates the covenants in this Section 12, then the parties acknowledge that it would be impracticable or extremely difficult to fix the actual damages resulting therefrom, and therefore, if the Physician is found to be in breach of such covenants the Physician shall pay to the Company one year's Base Compensation as of the date of termination, as defined in Exhibit C, which payment is not in the nature of a penalty. If the Company notifies the Physician of a breach of the covenants in Section 12, the Physician shall have thirty (30) days to attempt to cure such breach. Upon the agreement of both parties that a cure has been effected, no payment shall be due to the Company. In the event the Physician does not or cannot cure such breach, the Company may make a demand for payment within an additional thirty (30) days. If the Physician fails to pay such Base Compensation within said time period, the Physician understands and agrees that the Company shall have the right to file an action to enjoin the Physician from further breach without a bond, in addition to any other rights the Company may have, and to seek liquidated damages in the amount of the Base Compensation. Each party shall be responsible for its own costs, in any such action to enforce this or any other provision of this Agreement. Upon payment in accordance with this Section 12d, the Company shall release the Physician from any further liability under this Section 12.

13.    **Confidentiality of Information.**  The Physician recognizes and acknowledges that all of Company's "Proprietary Information," as defined below, shall remain confidential and shall

10

PLAINTIFF001384

remain the sole property of Company. "Proprietary Information" shall include, but not be limited to, Company's concepts, trademarks, service marks, patient lists, patients, including those generated by the Physician for Company, computer programs, business strategies for developing new patient and new physician relationships, including physician recruitment, cost data, utilization review techniques, medical management, quality assurance protocols, patents, trade secrets, know-how and other proprietary processes and such proprietary information included in manuals or memoranda, as they may now exist or which may be developed during the Physician's employment. Such Proprietary Information that is generated by or for the Company or an Affiliate are valuable, special, and unique assets of Company' business, access to and knowledge of which are essential to the performance of the Physician's duties hereunder. The Physician will not, during or after the term of his/her employment by Company, in whole or in part, disclose such Proprietary Information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall the Physician make use of any such property for his/her own purposes or for the benefit of any person, firm, corporation or other entity (except Company) under any circumstances during or after the term of his/her employment; provided, however, that during and after the term of the Physician's employment restrictions in Section 13 of this Agreement shall not apply to secrets, know-how and processes which are then in the public domain (provided that the Physician was not responsible, directly or indirectly, for such secrets, know-how or processes entering the public domain without Company's consent) or (ii) in existence prior to the execution of this Agreement and the Physician proves such existence to the reasonable satisfaction of Company. The foregoing notwithstanding, nothing herein shall prohibit the Physician from making disclosures regarding Proprietary Information which are required under applicable law, provided that the Physician consults with the Company and the Company consents to such disclosure, which consent shall not be unreasonably withheld. Upon termination of this Agreement for any reason, the Physician shall cease all use of any of the Proprietary Information and, at the request of the Company, shall execute such documents as may be necessary to evidence the Physician's abandonment of any claim thereto. The parties recognize that a breach of this Section 13 cannot be adequately compensated in money damages and therefore agree that injunctive relief shall be available to the Company.

14.    **Patient and Financial Records.**

a.    All patient files, financial records and other records pertaining to patients of the Company and all personnel records pertaining to compensation and expenses of the Physician within the scope of his/her employment shall at all times be the property of Company; provided, however that the Physician shall have such right of access to such reports, records, and supporting documentation as required by Company's policies and for rendering bills for patients for services performed by the Physician or reimbursement purposes, defense of malpractice claims and other legal compliance reasons. The Physician shall prepare, in accordance with generally accepted medical practice and such direction as the Company shall from time to time provide, records of all examinations, procedures, and other professional services rendered by the Physician. Upon termination or expiration of this Agreement, all records of patients treated by the Physician shall remain in the possession of Company, except that upon written request of any patient, copies of such patient's records shall be delivered to physician designated by patient.

b.    The Physician agrees to execute documents reasonably requested by the

11

**PLAINTIFF001385**

Company as needed for contracts with third party payers or as may be needed to comply with governmental regulations. The Physician also agrees to maintain time records in a form and containing such information as may be required by third party payors, governmental regulations or as reasonably needed to obtain or justify reimbursement.

        c.     The Physician shall maintain all records in compliance with federal and state laws. The Physician agrees that until the expiration of seven (7) years after the furnishing of services pursuant to this Agreement, the Physician shall make available, upon written request, to the Secretary of the Department of Health and Human Services, the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement and such of the Physician's books, documents, and records as are necessary to certify the nature and extent of the costs.

        d.     The Company agrees to retain all records pertaining to patients treated by the Physician until later of: (i) seven (7) years from the last date of service or discharge, as applicable; (ii) seven (7) years from the termination of this Agreement; (iii) seven (7) years after the patient's age of majority; or (iv) the applicable statute of limitations period. The Company agrees to allow the Physician access for all reasonable purposes consistent with Section 14(a) above.

     **15.**    **Severability.** In the event any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions shall nevertheless be binding upon the respective parties hereto with the same effect as though the invalid or unenforceable provision was deleted. In the event that any state or federal laws or regulations now existing or enacted or promulgated after the Effective Date of this Agreement are interpreted by judicial decision, regulatory agency or legal counsel for the Company in such a way as to indicate that the structure of this Agreement may be in violation of such laws or regulations or may jeopardize the tax exempt status of Children's National Medical Center or its Affiliates, the Agreement shall be amended by the parties to preserve, to the maximum extent possible, the underlying arrangement.

     **16.**    **Other Documents.** The parties hereto shall execute and deliver such other documents and perform such further acts as shall be reasonably necessary to carry out and effectuate all of the terms and conditions of this Agreement.

     **17.**    **Applicable Law.** This Agreement is being delivered and is intended to be performed in the District of Columbia and shall be construed and enforceable in accordance with the laws of the District of Columbia.

     **18.**    **Assignment Prohibited.** This Agreement is personal to each of the parties hereto, and neither party may assign or delegate any of its rights or obligations hereunder without first obtaining the written consent of the other; provided, however, that the Company may assign its rights and delegate its obligations hereunder to any Affiliate of the Company or a successor in interest of Company.

     **19.**    **Successors.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors and permitted assigns.

12

**PLAINTIFF001386**

20.    **Captions.**  The captions contained herein are not a part of this Agreement.  They are only for the convenience of the parties and do not in any way modify, amplify, or give notice of any of the terms, covenants, or conditions of this Agreement.

21.    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original.

22.    **Expenses.**  Unless otherwise expressly provided herein, each party hereto will pay the expenses incurred by him, her, or it under or in connection with this Agreement, including counsel fees and expenses of his, her, or its representatives, whether or not the transactions contemplated by this Agreement are consummated.

23.    **Notices.**  All notices required or permitted hereunder shall be in writing and shall be deemed to have been duly given if sent by registered or certified mail, postage prepaid, and return receipt requested to the parties, addressed as follows (or at such other addresses as designated by the parties in writing from time to time):

   If to Physician:

   Stacy Scott McKinney, M.D., FAAP
   17518 Ashton Forest Terrace,
   Sandy Spring, M.D. 20860

   If to Company:

   F. Robert Yates, Jr.,FACHE, FACMPE
   Vice President
   Children's National Medical Center
   Children's Pediatricians and Associates
   111 Michigan Avenue, N.W.
   Washington, D.C. 20010-2970
   Ryates@cnmc.org

13

**PLAINTIFF001387**

**-305-**

24. **Disputes.** The Company and the Physician shall meet and confer in good faith to attempt to resolve any dispute arising under this Agreement. Except as provided otherwise in Section 12, any dispute between the parties which cannot be resolved pertaining to the relationship between the Physician and Company, or under this Agreement shall be determined by arbitration in the District of Columbia in accordance with the American Health Lawyers Alternative Dispute Resolution Rules of Procedure on Arbitration. Each party shall bear its own costs of arbitration, or, when applicable, litigation.

25. **Non-Disparagement.** The Physician agrees to represent the Company or affiliates of the Company or its officers, directors, managers, physicians or agents (collectively "**Company or Agents**") in a positive manner and to refrain from making derogatory or otherwise unfavorable statements regarding the Company or Agents to either the Company Patients or persons not affiliated with the Company, regarding any business, clinical or other matters relating to the Company he/she becomes aware of during his/her tenure with the Company. Notwithstanding the foregoing, this Section shall not limit any person's right to give truthful and non-malicious testimony should they be so compelled by law.

26. **Referrals.** As an employed physician, there is an requirement under this Agreement that the Physician shall always give primary consideration to the patient's best medical treatment; and there is an expectation that the Physician makes every attempt where possible to refer all and any patients of Children's Pediatricians and Associates to Children's Hospital for services required by the patients or to any Affiliate; and provides Children's Hospital and its Affiliates with every opportunity to provide services to all and any patients of Children's Pediatricians and Associates. This expectation shall not override a patient's ability to choose a physician or medical service by a non-Children's Hospital provider or affiliate. No compensation made under this Agreement is in return for the referral of patients or in return for the purchasing, leasing or ordering of any products or services from Children's Hospital or an Affiliate. Notwithstanding the foregoing, such expectation shall not apply to any part-time physician's private patients (non-Company patients). Such part time physicians shall not provide medical services to their private patients at any CP&A practice or location.

27. **Waiver.** Failure to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement at any one time shall not be deemed a waiver of such term, covenant, or condition at any other time nor shall any waiver or relinquishment of any right or power herein at any time be deemed a waiver or relinquishment of the same or any other right or power at any other time.

28. **Survival.** The provisions of Sections 9, 11(g), 12, 13, 14(c) and 14(d) shall survive any termination of this Agreement.

14

**PLAINTIFF001388**

29.    **Entire Agreement.**  This Agreement (including any exhibits and schedules attached hereto) contains the entire agreement between the parties concerning the subject matter contained herein and there are no other terms, covenants, obligations, or representations, oral or written, of any kind whatsoever.  Any modification, addition or alteration of this Agreement must be in writing and signed by both parties.  This Agreement shall supersede the terms and conditions set forth in the Employment Agreement referenced above and such Employment Agreement shall terminate at 12 a.m. on the Effective Date of this Agreement.

**PLAINTIFF001389**

**INTENDING TO BE LEGALLY BOUND,** the parties hereto have executed this Agreement on the Effective Date.

**CHILDREN'S PEDIATRICIANS**
**& ASSOCIATES, LLC**                    **PHYSICIAN**

Signature: _____        Signature: _____

Print Name: Edwin K. Zechman, Jr.     Print Name: Stacy Scott-McKinney, MD, FAAP

Title:      President

16

**PLAINTIFF001390**

**-308-**

EXHIBIT A
OF
AMENDED & RESTATED PHYSICIAN EMPLOYMENT AGREEMENT

## JOB DESCRIPTION FOR PHYSICIAN

As used in the Physician Employment Agreement to which this document is an exhibit, the phrase "essential functions of employment" refers to the following responsibilities and duties of the Physician:

### Functions

1.      Performing or causing to be performed patient care, including examinations, tests, reports, procedures and other functions accepted as part of the practice of medicine consistent with normally accepted standards of care;

2.      Appropriately documenting findings, procedures, etc. in the designated electronic medical record;

3.      Being responsible for causing twenty-four (24) hours a day, three hundred sixty-five (365) days per year coverage of patient care needs for the location or locations where the Physician performs clinical services during the term of this Agreement;

4.      Being available to perform his/her professional services during Company's office hours;

5.      Obtaining and legibly recording in the designated electronic medical record a detailed medical history of each patient, including, but not limited to, the patient's chief complaint, his/her present condition, the patient's individual history, and his/her family history;

6.      Performing complete physical examinations of each patient consistent with the normally accepted standard of care in the community including but not limited to, examinations of the patient's head, eyes, ears, nose, throat, abdomen, liver, and spleen, and all systems of the body including but not limited to the circulatory, reproductive and nervous systems;

7.      Analyzing reports and/or findings of tests and personal examinations in order to assess the medical condition of the patient, including diagnosing his/her injury or illness and formulating a prognosis;

8.      Referring patients to other physicians, including specialists and other health care providers, when and if needed. See Provision #26 of the Employment Agreement;

9.      Prescribing medication and treatment for the patient and recommending appropriate physical and dietary routines and methods for prevention of disease and personal hygiene;

17

**PLAINTIFF001391**

10.    Performing such clinical procedures as are consistent with the Physician's prior practice patterns and training;

11.    Performing or supervising various invasive medical procedures that include, but are not limited to, the injection of medications, inoculations, and vaccinations;

12.    Keeping and maintaining appropriate records relating to all professional services rendered;

13.    Preparing and attending to all reports, claims, and correspondence necessary or appropriate to the performance of the professional services;

14.    Promoting the professional practice of Company;

15.    Timely reporting births, deaths, outbreak of contagious diseases and other information required to appropriate governmental authorities and as required for the Company reporting;

16.    Directly supervising nurses and other personnel in accordance with Company's policies, procedures and applicable laws. Supervisory responsibilities may include, but are not limited to, interviewing, hiring, and training new assigned staff; assigning and directing work; appraising performance; rewarding and disciplining employees; addressing complaints and resolving problems;

17.    Participating in the Company governance and management, credentialing and peer review activities; and attending all meetings but not less than 50% of meetings in connection with governance, management, credentialing and peer review, if members of such entities;

18.    Performing other duties assigned by the Company from time to time that are commensurate with professional services normally and customarily performed by a physician; and

19.    Following all policies and procedures of the Company and of any managed care organization with which the Company may contract.

18

PLAINTIFF001392

**EXHIBIT B**
**DESCRIPTION OF BENEFITS**

The Company shall provide the Physician with the benefits listed in this Exhibit B and as more fully described in Company's policies.

1.   Life insurance in the amount of two (2) times Base Compensation.

2.   Supplemental life insurance in an amount up to two hundred and fifty thousand dollars ($250,000) payable by the Physician.

3.   The Company shall pay premiums for long term disability coverage in the amount of sixty percent (60%) of current base compensation up to an aggregate of ten thousand dollars ($10,000) per month.

4.   Health insurance as provided to all the Company employees.

5.   Qualified retirement plan as provided to all the Company employees. The employer contribution shall begin upon the commencement of employment with the Company.

6.   Non-qualified retirement plan as provided to physicians employed by Company.

7.   Medical Spending and Dependent Spending accounts offered to all the Company employees.

8.   The Physician shall be entitled to four (4) weeks vacation during the initial term of this contract, and four (4) weeks vacation thereafter, prorated for part time physicians. Vacation leave may be accrued.

9.   Six (6) holidays and one (1) personal day per year all of which may be accrued.

10.  Twelve (12) sick days per year which can be accrued up to a maximum of five hundred twenty (520) hours.

11.  Five (5) days per year for continuing medical education, and approved expenses reimbursable to a maximum of $2,500 per year during the initial term of this contract, and $2,500 per year shall be reimbursed thereafter. Reimbursement levels are for full time employment, and shall be adjusted on a pro rata basis for part time employment.

12.  Auto reimbursement including mileage reimbursement and parking consistent with the Company policy.

13.  Business expenses approved by the Company, including but not limited to license, dues, and medical fees relating to the Physician's medical license.

19

**PLAINTIFF001393**

# EXHIBIT C
## PHYSICIAN COMPENSATION PROGRAM

This Exhibit sets forth the terms and conditions of the Physician's compensation arrangement with the Company.

## I. Annual Compensation

### A.    Up to Completion of First Full Fiscal Year with Company:

Physician shall receive his/her Base Compensation ($1/26^{th}$ per pay period) on a biweekly basis. Physician shall also receive fifteen (15%) of Negotiated Total Compensation as payments on a biweekly basis for the first full fiscal year of employment only. Physician shall be entitled to earn Incentive Compensation to the extent that his/her Actual Earned Compensation for the year exceeds Base Compensation.

At the end of the fiscal year, if the Physician's Actual Earned Compensation (which includes an adjustment for the allocation of any Budget Margin Deficit) exceeds the Total Payments Made to Physician, the Physician shall receive the difference between the two.

### B.    All Future Full Fiscal Years with Company:

The Physician shall receive his/her Base Compensation on a biweekly basis. On a quarterly basis, Physician shall be entitled to receive additional quarterly estimated incentive payments to the extent that his/her estimated Actual Earned Compensation for the quarter exceeds Base Compensation for that quarter.

Notwithstanding the foregoing:

### C.    First Full Fiscal Year:

For the first full fiscal year with the Company, Physician shall receive his/her Negotiated Total Compensation, as defined below, on a biweekly basis ($1/26^{th}$ of Negotiated Total Compensation per pay period).

### D.    End of Fourth Quarter for the First Full Fiscal Year:

At the end of the fourth quarter of the first full fiscal year with the Company, to the extent that the Physician's Actual Earned Compensation is below Total Payments made to Physician, the Physician may choose to either pay the Company, by check, within sixty (60) days after notice to the Physician, or by reducing the following year's compensation, the difference between the Actual Earned Compensation and the Total Payments made to Physician, up to the 15% of the Negotiated Total Compensation.

21

**PLAINTIFF001395**

**-312-**

E.    *End of Quarters One through Three for All Future Fiscal Years:*

After each quarter, Company shall calculate the difference between Physician's estimated Actual Earned Compensation for the quarter, and the Base Compensation paid to Physician during the quarter. Physician shall be entitled to receive quarterly estimated incentive payments equal to the lower of (i) 15% of quarterly Projected Compensation (to be determined in the beginning of each full fiscal year) or (ii) Quarterly estimated Actual Earned Compensation minus Base Compensation paid. The Company shall make its best effort to pay this addition aforementioned amount within 30 days.

F.    *End of Fourth Quarter for All Future Full Fiscal Years:*

At the end of the fourth quarter for all future full fiscal years with the Company, to the extent that the Physician's Actual Earned Compensation is below Total Payments Made to Physician, the Physician may choose to either pay the Company, by check within sixty (60) days after notice to Physician, or by reducing the following year's compensation, the difference between the Actual Earned Compensation and the Total Payments Made to Physician, up to Total Payments Made to Physician minus Base Compensation paid. To the extent that the Physician's Actual Earned Compensation exceeds the Total Payments Made to Physician during that fiscal year, the Company shall make a Fiscal Year End Payment to Physician as necessary to ensure that the sum of the Total Payments Made to Physician during that fiscal year and the Fiscal Year End Payment equals the Physician's Actual Earned Compensation for the fiscal year. The Physician shall not be required to pay back the base compensation portion of Total Payments Made to Physician during the fiscal year. The Company shall make its best effort to pay the Fiscal Year End Payment within 60 days after the end of the fiscal year.

G.    *Estimated Quarterly Incentive Compensation Reporting*

After each quarter, Company shall provide each physician with a report of projected estimated compensation that may be paid to physician at the end of the fourth quarter of the full fiscal year pursuant to section F above.

H. .    All terms and conditions of compensation shall be set forth in writing in advance for one fiscal year. Company and Physician and/or Practice may not amend in writing or orally the terms of compensation for any fiscal year once the fiscal year has begun.

I. .    In good faith Company will calculate Physician compensation in accordance with the terms and conditions of this Exhibit C. In the event of any issue regarding the interpretation of any term and condition herein, Physician has the right to object in writing within thirty (30) days after any issue arises. Company shall provide a written response to Physician within thirty (30) days after receipt of such written objection. Such response by Company shall be considered final.

22

**PLAINTIFF001396**

**-313-**

## II. Calculation Terms Defined

**1. Actual Earned Compensation** – Calculation of Actual Earned Compensation is the product of the Physician's Net Medical Revenue and the lower of:

- o  The percentage appropriate for the Physician's Fiscal Year: Year 1 – 35%, Year 2 – 35%, Year 3 and beyond – 35%; or
- o  The Practice Group's Net Medical Revenue and the Practice Group's operating costs included in the Practice Group's Financial Performance Report, expressed as a percentage ( i.e., 1 – Practice Group's Operating Costs / Practice Group's NMR).

Notwithstanding the foregoing:

The Physician's allocated amount of the Budget Margin Deficit will reduce the above calculation to reach Actual Earned Compensation. The Physician's allocation is calculated as a percentage of the Physician's Actual Earned Compensation over the Practice Group's total Actual Earned Compensation before the reduction (i.e., Budget Margin Deficit X the percentage of (Physician's Actual Earned Compensation before allocation / Practice Group's total Actual Earned Compensation before allocation)).

**2. Actual Earned Compensation (estimated)** – Calculation of estimated Actual Earned Compensation is the product of the Physician's Net Medical Revenue for the quarter and the lower                                                                                                  of:

- o  The percentage appropriate for the Physician's Fiscal Year: Year 1 – 35%, Year 2 – 35%, Year 3 and beyond – 35%.
- o  The Practice Group's Net Medical Revenue and the Practice Group's operating costs for the quarter included in the Practice Group's Financial Performance Report, expressed as a percentage ( i.e., 1 – Practice Group's Operating Costs / Practice Group's NMR).

**3. Base Compensation** – Base Compensation means the Physician's fiscal year compensation, excluding the Physician's quarterly estimated incentive payments. Base Compensation shall be 85% of the Projected Compensation for the period.

**4. Budget Margin Deficit** – Budget Margin Deficit is any shortfall between the Practice's Budgeted Net Margin (the difference between the practice's budgeted revenues and expenses) and Actual Net Margin (the difference between the practice's actual revenues and expenses) before year end adjustments. The Practice's fiscal year Budgeted Net Margin will be established and approved prior to the fiscal year by CP&A's Board of Directors in accordance with CP&A and CNMC policy and shared with and communicated to all Physicians.

**5. Capitation Credit** – Capitation Credit means the number resulting from the following formula, or from the formula adopted by the Company:

(Physician's charges for all patients) / (Practice Group charges for all patients) X (All Capitation Payments received by the Company for Practice Group services)

23

**PLAINTIFF001397**

**-314-**

**6. Company** – Company means the Children's Pediatricians & Associates, LLC.

**7. Fiscal Year** – The fiscal year shall begin on July 1st and end on June 30th. In the event the Physician begins employment between July 1 and December 31, then the first full fiscal year ends on June 30th of that same fiscal year. In the event that the Physician begins employment between January 1 and June 30th, then the first full fiscal year with the Company ends on June 30th of the following fiscal year.

**8. Junior Level Physician Pool** – The Junior Level Physician Pool shall include the net medical revenue of all junior level physicians (those not designated as Senior Level Physicians herein) in a particular Practice or Practice Group.

**9. Incentive Compensation** – Incentive Compensation is equal to the Physician's Actual Earned Compensation (which includes an adjustment for the allocation of any Budget Margin Deficit) minus Base Compensation for the fiscal year.

**10. Negotiated Total Compensation** – In the event the Physician begins employment between July 1 and December 31, then the Negotiated Total Compensation means the amount of compensation (Base and possible Incentive Compensation) agreed upon in writing by the Company and the Physician to be paid to the Physician until the completion of the first fiscal year ending June 30th. In the event that the Physician begins employment between January 1 and June 30th, then the Negotiated Total Compensation means the amount of compensation (Base and possible Incentive Compensation) agreed upon in writing by the Company and the Physician to be paid to the Physician until the completion of the Physician's first full fiscal year with the Company.

**11. Net Medical Revenue** –Net Medical Revenue (also called Total Patient Revenue) is the payment received by the Company for services rendered by or attributed to the Physician during a fiscal year. For Junior Level Physicians, Net Medical Revenue shall include payments for (a) fee-for-service payments, less refunds, received by Company for services rendered by the Physician during a fiscal year; and (b) the Capitation Credit, less Physician's pro rata share of refunds, calculated in the same manner as Physician's Capitation Credit.

In addition to 11a and 11b above, Senior Level Physicians shall also be credited with  allocable portions of: (a) nurse practitioners revenue, (b) nursing visits, (c) lab receipts, (d) revenue from physicians formerly associated with the practice, and  (e) the difference between [Thirty Five (35%)] [physician specific percentage in each agreement] percent of Junior Level Physician Pool less all Junior Level Physicians' actual earned compensation for such Practice Group. Notwithstanding the foregoing, the Company's calculation of Net Medical Revenue for Senior Level Physicians shall exclude revenue generated from the rendering of Designated Health Services to the extent required under applicable law.

24

**PLAINTIFF001398**

**-315-**

**12. Practice Group's Operating Costs** – Practice group's operating costs are all costs included in the practice group's financial Performance Report per CP&A's information system. Practice group's operating costs are the full costs that are necessary to earn operating revenue. Allocations are made for the costs of identifiable supporting services provided by other responsibility segments (CP&A Corporate and other CNMC support departments.)

**13. Part-Time** – Part-Time means at least fifty percent (50%) of Full-Time but less than Full-Time.

**14. Practice or Practice Group** – The practice or practice group means the individual practice of a group of physicians practicing at the same CP&A location(s), not the practice of all of the Company physicians.

**15. Projected Compensation** – Projected Compensation means the amount resulting from the following calculation, which calculation is based upon the number of years that the Company has employed the Physician:

Until Completion of the First Full Fiscal Year with Company: Negotiated Total Compensation

Second Fiscal Year with Company: The Physician's Actual Earned Compensation in the First Full Fiscal Year with the Company

Third Fiscal Year with Company: The average of the Physician's Actual Earned Compensation in the First and Second Fiscal Years with the Company

All Future Years: The average of the Physician's Actual Earned Compensation in the three previous Fiscal Years with the Company

**16. Senior Level Physician** - Senior Level Physician means a physician employed by the Company and designated a senior level physician as defined herein. Junior Level Physicians shall be eligible for senior level physician status with the approval of the majority of senior level physicians with their respective practice group as of the eighth year of employment with Company if employment is between 0.50 FTE and 1 FTE unless otherwise determined by other senior level physicians of his/her respective Practice Group. Only board certified physicians are eligible for senior level status. Physicians who have demonstrated that they have generated a significant patient base prior to the eighth year of employment are also eligible for senior level status. In addition in order to be eligible for senior level physician, Physicians must also actively participate in as least one of Company's committees.

**17. Total Compensation** – Total Compensation means the sum of the Physician's Base Compensation, all quarterly estimated incentive payments made to Physician, and fiscal year end payment or amount due from Physician, if applicable.

**18. Total Payments Made to Physician** – Total Payments made to Physician means the sum of Base Compensation payments during the fiscal year and quarterly estimated incentive payments

25

**PLAINTIFF001399**

made to Physician for the first three quarters of the fiscal year.

## III. Calculation Example #1

Assumptions used in our Example include:

- ○ Physician's Projected Fiscal Year Compensation = $150,000
  - ○ Base Compensation - $127,500
  - ○ Estimated Incentive Payment - $14,375

- ○ Practice Group Fiscal Year Budget Margin Deficit = $60,000

- ○ Agreement Percentage Appropriate for the Fiscal Year = 33%

- ○ Practice Group Actual Earned Compensation before the Budget Margin Deficit allocation = $875,000

The following table contains information for calculating the Physician's Compensation:

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Fiscal Year |
|---|---|---|---|---|---|
| Physician Net Medical Revenue [1] | $150,000 | $125,000 | $175,000 | $125,000 | $575,000 |
| Practice Group Operating Costs [2] | $400,000 | $360,000 | $520,000 | $320,000 | $1,600,000 |
| Practice Group Net Medical Revenue [3] | $600,000 | $500,000 | $700,000 | $500,000 | $2,300,000 |
| % Operating Costs [4] | 67% | 72% | 74% | 64% | 70% |
| 1 - % Operating Costs [5] | 33% | 28% | 26% | 36% | 30% |
| Actual Earned Compensation before Budget Margin Deficit Allocation [6] | $49,500 | $35,000 | $45,000 | **Factored into Physician fiscal year end payment** | $172,500 |
| Physician Budget Margin Deficit Allocation [7] | **No allocation made until year end** | | | | $12,034 |

26

PLAINTIFF001400

-317-

| Actual Earned Compensation [8] | **No allocation made until year end** | | | | $160,466 |
|---|---|---|---|---|---|
| Base Compensation Paid (Guaranteed) [9] | $31,875 | $31,875 | $31,875 | $31,875 | $127,500 |
| Quarterly Estimated Incentive Payments Made to Physician [10] | $5,625 | $3,125 | $5,625 | **Factored into Year End Payment** | $14,375 |
| Total Payments Made to Physician [11] | $37,500 | $35,000 | $37,500 | $31,875 | $141,875 |
| Physician Year end Payment [12] See Note below | | | | | $18,591 |

Note: The Physician received Base Compensation and quarterly estimated incentive payments are below Actual Earned Compensation for the fiscal year. Therefore, the Physician shall receive the difference of $18,591 by check.

27

**PLAINTIFF001401**

**-318-**

## III. Calculation Example #2

Assumptions used in our Example include:

- o  Physician's Projected Fiscal Year Compensation = $150,000
  - o  Base Compensation - $127,500
  - o  Estimated Incentive Payment - $14,375

- o  Practice Group Fiscal Year Budget Margin Deficit = $175,000

- o  Agreement Percentage Appropriate for the Fiscal Year = 33%

- o  Practice Group Actual Earned Compensation before the Budget Margin Deficit allocation = $875,000

The following table contains information for calculating the Physician's Compensation:

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Fiscal Year |
|---|---|---|---|---|---|
| Physician Net Medical Revenue [1] | $150,000 | $125,000 | $175,000 | $125,000 | $575,000 |
| Practice Group Operating Costs [2] | $400,000 | $360,000 | $520,000 | $320,000 | $1,600,000 |
| Practice Group Net Medical Revenue [3] | $600,000 | $500,000 | $700,000 | $500,000 | $2,300,000 |
| % Operating Costs [4] | 67% | 72% | 74% | 64% | 70% |
| 1 - % Operating Costs [5] | 33% | 28% | 26% | 36% | 30% |
| Actual Earned Compensation before Budget Margin Deficit | $49,500 | $35,000 | $45,000 | **Factored into Physician fiscal year end payment** | $172,500 |
| Physician Budget Margin Deficit Allocation [7] | **No allocation made until year end** | | | | $34,500 |
| Actual Earned Compensation [8] | **No allocation made until year end** | | | | $138,000 |
| Base Compensation Paid (Guaranteed) [9] | $31,875 | $31,875 | $31,875 | $31,875 | $127,500 |
| Quarterly Estimated Incentive Payments Made to Physician | $5,625 | $3,125 | $5,625 | **Factored into Year End Payment** | $14,375 |

28

PLAINTIFF001402

| [10] | | | | | |
|---|---|---|---|---|---|
| Total Payments Made to Physician [11] | $37,500 | $35,000 | $37,500 | $31,875 | $141,875 |
| Physician Year end Payment [12] See Note below | | | | | ($3,875) |

Note: The Physician received Base Compensation and quarterly estimated incentive payments above Actual Earned Compensation for the fiscal year. Therefore, the Physician must pay CP&A the difference of $3,875 by check or carry a negative compensation balance into the next fiscal year.

**Calculation References**

[1] Physician Net Medical Revenue – Net Medical Revenue for each quarter attributed to the Physician.

[2] Practice Group Operating Costs – Operating Costs for each quarter and the fiscal year from the Practice Group's Financial Performance Reports.

[3] Practice Group Net Medical Revenue – The entire Practice Group's Net Medical Revenue for each quarter and the fiscal year from the Practice Group Financial Performance Reports.

[4] % Operating Costs – % Operating Costs is equal to the Practice Group's Operating Costs over Net Medical Revenue (i.e., the percentage of $1,600,000 / $2,300,000 = 70%).

[5] 1 - % Operating Costs – See above (i.e., the percentage of 1 - .7 = 30%)

[6] Actual Earned Compensation before Budget Margin Deficit Allocation – Actual Earned Compensation is the product of the Physician Net Medical Revenue and the lower of the Agreement % or 1 - % Operating Cost (i.e., 30% x $575,000 = $172,500 for the fiscal year)

[7] Physician Budget Deficit Allocation – Physician Budget Deficit Allocation the product of the Practice Group Budget Margin Deficit and the percentage of the Physician's Actual Earned Compensation over the Practice Group Total Actual Earned Compensation before the Budget Margin Deficit allocation (i.e., $175,000 x Percentage of ($172,500 / $875,000) = $34,500).

[8] Actual Earned Compensation – Actual Earned Compensation is the Actual Earned Compensation before Budget Deficit Allocation minus the Physician's Budget Margin Deficit Allocation (i.e., $172,500 - $34,500 = $138,000).

[9] Base Compensation Paid – Base Compensation Paid is 85% of the Physician's projected fiscal year Compensation. This amount will be paid to the Physician biweekly (i.e., 85% x $150,000 = $127,500 for the fiscal year).

[10] Quarterly estimated incentive payments made to Physician – Quarterly estimated incentive

29

**PLAINTIFF001403**

payments made to Physician are equal to the lower of:

1. 15% of the Physician's quarterly Projected Compensation (i.e., .25 x Projected Compensation)
2. Quarterly Actual Earned Compensation minus quarterly Base Compensation Paid.

This amount will be paid to the Physician quarterly (i.e., for the second quarter, the lower of 15% x ($150,000 x .25) = $5,625 or $35,000 - $31,875 = $3,125, of which the lower = $3,125).

[11] Total Payments Made to Physician – Total Payments Made to Physician is the sum of all Base Compensation payments made and all Quarterly estimated incentive payments made to Physician during the fiscal year. The total will not exceed the total projected compensation for the fiscal year (i.e., $127,500 + $14,375 = $141,875 for the fiscal year).

[12] Physician Year end Payment – The higher of Physician Actual Earned Compensation minus Total Payments made to Physician or Base Compensation Paid minus Total Payments made to Physician (i.e., the higher of $138,000 - $141,875 = ($3,875) or $127,500 - $141,875 = ($14,375), of which the higher = ($3,875)).

30

**PLAINTIFF001404**

**-321-**

EXHIBIT 1

Plaintiff's Trial
Exhibit

**13**

cw

**Journal of Hours at Laurel Office 2017**

1/18 arrived 9am, left  11:17pm

1/19 arrived 8:35; left 9:15

1/20 arrived 8:40; left 9: 10

1/23/17 arrived 8:30; left 8:25

1/25 arrived 8:35; left 8:55

1/26 arrived 1:15; left 9:05

1/27 arrived 8:35; left 10:10

1/30 arrived 8:35; left 9:40

2/1 arrived 8:30; left 6:30; started again at home 9:30p-12:45am

2/2 arrived 1:15; left 9:10

2/3 arrived 8:35; left 8:30

2/6 arrived 8:35; left 8:35

2/8 arrived 8:30; left 8:35

2/9 arrived 8:35; left 9pm

2/13/17 arrived 8:35; left 9:15

2/15 arrived 8:20; left 6:45

2/16 arrived 1p-left 8:15

2/17 arrived 8:25; left 10:20

2/20 arrived 8:35; left  8:35 (K.F left at 5:40)

2/22 arrived 8:30p-left 9:00

2/23 arrived 8:40-left 7:40

2/24 arrived 8:40; left 9

2/27/17 arrived 8:45; left 10:40

PLAINTIFF004716

3/1 arrived 9am; left 11:15pm

3/2 arrived 1:15; left 8:30

3/3 arrived 8:35; left 7  (K.F left 6:15)

3/6 arrived 8:45; left 7:45p (Delaney still here/K.F. off)

3/8 arrived 8:35; left 8:10

3/9 arrived 1:20; left 7:10 (left early) restarted documenting 8:15p to 12:30am

3/10 arrived 8:30; left early 6:340 for a meeting

3/12 Sunday arrived 12:30-left 5:10p

3/13 arrived 8:35; left 8:10 due to snow storm; started 9:20- off 12:20AM

3/15 arrived 8:35; left 11:50p

3/16 arrived 1:20; left 8:20

3/17 arrived 8:35; left 7p (KF left 6p)

3/24 arrived 8:45; left 11:30p

3/27 arrived 8:40; left 9;42

3/29 arrived 8:35; left 10;20; (Delaney left 8:10; KF left 5:45)

3/30 arrived at 1:18; left 6:15

3/30  arrived 8:35; left 7:05

3/31 arrived 8:35; left 7:30(?)

4/3 arrived 8:30; left 8:45

4/5 arrived 8:35; left 8:45

4/6 arrived 1:20; left 4:15; returned 5:30-left 7:30

4/7 arrived 8:35; left 9:35

4/10 arrived at 8:20; left at 9:57p

4/12 arrived 8:35; left 9:05

4/13 arrived 8:35; left 10;04

PLAINTIFF004717

4/14 arrived 8:35; left 6p to go to doctor

4/17 arrived 8:40; left 6p for mRI

5/11 arrived 8:35; left 8:20 pain

5/12 arrived 8:45; left 8:30 pain

5/15 arrived 8:40; left 7:30

5/17 arrived 8:35; left  8p pain

5/18 arrived 9:15; left 9:20 pain; changed desks at 7:30p -less pain

5/19 arrived 8:35; left 8:30 (Phil in IT assembled the mobile laptop cart)

5/22 arrived 8:30; left 8:30; pain (not as bad as last week)

5/24 arrived 8:35; left 7:45 –left early –will do EHR at home; pain less during day until 5pm then significant

5/25/17 arrived 1:15; left 5:30

5/26 arrived 8:40; left 6:30

5/29

5/31

6/1 arrived 8:30; left 1:30

6/2; arrived 10:15; left 8p (pain by 3p)

6/6 arrived 8:45; left 9:10

6/7 arrived 8:30; left 7:15

6/8

6/16 arrived 11am left 8:45 pain restarted this afternoon

6/19 8:45; left 8:30 pain since 9am

6/26 arrived 10am; left 7p in pain with 14 unfinished notes plus labs and reports not reviewed

6/30 arrived 8:40 left 7:45

7/3 arrived 8:35; left 8:45

7/5 arrived 8:45; left 8:05

PLAINTIFF004718

7/6/17 arrived 1:15; left 6:15

7/7/17 arrived 8:35; left 8

7/10 arrived 8:35; left 7:40

7/12 arrived 8:35;left 7:15

7/17/17 arrived 8:30; left 9:15

7/19 arrived 8:30; left 8:45 with lots of work to still do

7/24 arrived 8:35; left 6:30

7/26 arrived 8:35; left 8:15;  Dr D left at 7:50p

7/28 arrived 8:30; left 7:45

7/31 arrived 8:20; left 9p

8/2 arrived 8:35; left 6:50

8/3 arrived 12:30 left 7:40

8/4 arrived 8:35; left 7:30

8/14 arrived 8:35; left 10p

8/16 arrived 8:35; left 10p

8/17 arrived at 1:15; left 8:45

8/18 arrived 8:15; left at 8:30

8/23 arrived 9:30; left 8:30

8/24 arrived 12:45; left 6:40

8/28/17 arrived 8:35; left 7:45

9/1/17 arrived 8:35; left 8:55

9/7/17 arrived 12:50; left 7:40

9/8/17 arrived 8:25;left 8:30

9/15/17 arrived 8:45; left 8:55

9/20 arrived 8:35; left 8:40

PLAINTIFF004719

9/21 arrived 12:45left 7:25

9/22 arrived 8:35; left 8:50

9/25 arrived 8:30; left 9:45 (w/ Dr D)

9/27/17 arrivved 8:35; left 7:55 (school function)

9/28/17 arrived 8:35; left 8:20

9/29 arrived 8:35; left 9:05

10/5 arrived 8:25; left 9:45

10/6 arrived 8:35; left 10:35

10/9 off

10/11 arrived 8:30; left 9:45 (Delaney left 6:50p)

10/12 arrived 1:15; left 8:05

10/13 arrived 8:45; left 9:25

10/16 arrived 8:45;

10/18 arrived 8:35; left 6pm for meeting

10/19 arrived 1p-left 7:20

10/20 arrived 8:35; left 7:45

11/23 arrived 8:30; left 9:45

10/25 arrived 8:45; left 7:45

10/26 arrived 1p; left 8:30

10/27 arrived 8:40; left 9p

11/1 arrived 8:40; left 6:15

11/2 arrived 1:20; left 6:20

11/3 arrived 8:20; left 8:20

11/6 arrived 8;30; left 9p

11/8/17 arrived 8:45; left 5:10 sick

PLAINTIFF004720

11/9/17 arrived 12:50; let 8:35

11/10 arrived 8:30; left 6:50

11/13 arrived 8:25; left 8:15

11/20 arrived 8:40;left 7:15

11/22 arrived 8:30; left 6:35

11/24/17 arrived 8:35; left 7:20

11/27 arrived 8:25; left 7:45

11/29 arrived 8:30; left 8:45

12/1 arrived 8:35; left 7:15 when computers went down

12/4 arrived 8:30; left 7:50

12/6 arrived 8:40; left 7:55 (Margy still here)

12/8 arrived 8:35; left 8:40

12/11/17 arrived 8:30; left 8:35

12/18 arrived 8:40; left 8:30

12/20/17 arrived 8:40; left 7p

12/21 arrived 12:15; left 7p

12/22 arrived 8:40; left 9:15

### 2018

1/3/18 arrived 8:35; left 8:40

1/4/18 arrived 8:35; left 7:35

1/5/18 arrived 8:40; left 8:40

1/8/18 8:35; left 6:30 inclement weather

1/10/18 arrived 8:35; left 6:45

1/11/8 arrived 1:15; left 7:10

1/12/18 arrived 8:35;left 9:15

PLAINTIFF004721

3/26/18 left early due to migraine

3/28/18 arrived 8:40; left 7:45; mild headache; dr Delaney left 5min earlier

3/30/18 arrived 8:35; left 7:45

4/2/18 arrived 8:35; left 7:55

4/9/19 arrived 8:35;I left 8:50

4/11/18 arrived 8:40; left 7:40

4/20/18 arrived 8:35; left 7:50

4/23/18 arrived 8:35; left 8:50

4/25/18 arrived 8:40; left 7:40

5/2/18 arrived 8:35; left 6p

5/4/18 arrived 8:35;left 7:30

5/7/18 arrived 8:35; left 8:15

5/9/18 arrived 8:35; left 7:40

5/10/18 arrive 1:15; left 7:50

5/21/18 arrived 8:35; left 7:25

5//23/18 arrived 8:40; left 9:25

5/25/18 arrive 8:40; left 6:40

5/30/18 arrived 8:30; left 8:25

6/6/18 arrived 8:35; left 9pm

6/11/18 arrived 8:35; left 8:15p

6/15/18 arrived 8:35; left 7:15

6/18/18 arrived 8:35; left 9:30

7/2/18 arrived 8:35; left 9:30pm  ** Asiah started today (Scribe) she left at noon for a med appt; I left at 9pm-had excessive paper work including 30 Correspondence and 32 tasks and school forms; Dr D left 9p

7/5/18 arrived 1pm left 7pm; Asiah here until 6:15

7/6/18 arrived 8:35; left 1:15; asiah left 12:20

PLAINTIFF004722

-328-

7/9/18 arrived 8:35; left 10pm; Asiah left 6:30

7/11/18 arrived 8:35; left 7:15; asiah left 5:16

7/13/18 arrived 8:35; left 8pm; asiah left 5:50

7/16/18 arrived 8:35; left 6:45; Asiah off today

7/18/18 arrived 8:35; left 8:30; asiah left 6:30

7/19/18 arrived 12;45; left 6:55; asiah left 6:30

7/20/18 arrived 8:35; left 8:15; asiah off today

7/23/18 arrived 8:35; left 8:35p; asiah left 6:30p

7/25/18 arrived 8:35; left 8:05; asiah left 6:35

7/26/18 arrived at 12:45; left 5:15; Asiah left 5:15

7/27/18 arrived 1:30; left 7:20; Asiah left 6p

7/30/18 arrived 8:35; left 8:35; Asiah left 6:15p

8/1/18 arrived 8:35 and left 6:50; Asiah left 6:30

8/2/18 arrived 1pm; left 7:30; asiah left 6:34

8/3/18 arrived 8:35; left 6:25; asiah left 6:15

8/6/18 arrived 8:35; left 8:00; asiah left 6:30

8/8/18 arrived 8:35; left 8:45; asiah left 6:30

8/10/18 arrived 8:35; left 8:45; asiah left 6:38

8/17/18 arrived 8:15; left 2:15; Asiah not here on vacay this week; Surface computer still not repaired

8/20/18 arrived 8;35; left 8p; Asiah left 6:34; Surface computer still not here; laptop still slow

8/22/18 arrived 8:35; left 7:25; asiah left 6:30; no surface computer

8/23/18 arrived 1pm; left 7:30; asiah left 6:40

8/24/18 arrived 8:20; left 7:20; asiah left 6:38

8/27/18 arrived 8:30; left 8:40-in a lot of pain today; Asiah left 6:34

8/29/18 arrived 8:25; left 8:40p; in pain; Asiah left urgently between 9:30 and 10am

PLAINTIFF004723

8/30/18 arrived 12:30p; left 6:50; Asiah Not here

8/31/18 arrived 8:30; left 9:55pm ; Asiah not here

9/5/18 arrived 8:30; left 7p; Asiah left 6:30

9/6/18 arrived 12:15; left 6:47; Asiah left 6:31

9/7/18 arrived 8:35; left 8:25; Asiah left 6:30

9/10/18 arrived 8:35; left 10:30; interviewed a  PNP; asiah left 6:30

9/12/18 arrived 8:35; left 8:10; asiah called out sick

9/13/18 arrived 1pm left 6:33; asiah here 1:15 to 6:30

9/14/18 arrived 8:35; left 9: 15; asiah left 6:34

9/17/18 off

9/19/18 arrived 8:35; left 9:35pm; asaih left 6:30

9/20/18 arrived 1pm; left 6:55; asiah left 6:33

9/21/18 arrived 8:35; left 7:35; asiah left 6:35

9/24/18 arrived 8:35; left 9:40pm; asaih left 7pm

9/26/18 arrived 8:35; left 8:30; asaih left 6:30

9/27/18 arrived 12:15; left 8:55;  asiah left 6:33

9/28/18 arrived 8:35; left 8:55; asiah left 6:34

10/1/18 arrived 8:30; left 9:18; Dr D left 9:06; Asiah left 6:33

10/3/18 arrived 8:33; left 7:50; Asiah left 6:32; Dr D still here

10/4/18 arrtived 1p; left 7:30; asiah left 6:40

10/5/18 arrived 8:35; left 8:30; asiah 6:40

10/8/18 arrived 8:15am; left 8:40pm; asiah left 6;31

10/10/18 arrived 8:35; left 9:10; Dr D still here; asiah left 6:40

10/11/18 arrived 9:15; left 9p; asiah left 7p

10/12/18 arrived 8:35; left 9p; asiah left 6:08

10/15/18 arrived 8:35; asiah left 4:05; I left 8:10

10/17/18 arrived 8:35; asiah left 12:40; I left 7:50

10/18/18 arrived 1pm; asiah left 6:35; I left 8:25

10/19/18 arrived 8:30; asiah came 8:35 and left 7:05; I left 9:35

10/22/18 arrived 8:35; left 9:35; Asaih came 8:30 reportedly; left 6:33

10/24/18 arrived 8:35; left 9:15; asiah left 6:38; dr D left 8p

10/25/18 arrived 12:15; left 8:50; asiah left 6:38

10/26/18 arrived 8:35; left 9:15; Asiah left 6:10

10/29/18 arrived 8:35; Left 10:15p; Asiah left 6:32

10/31/18 arrived 8:35; left 6:15 (family); Asiah left 6:10

11/1/18 arrived 1p-left 8:43; asiah left 6:38

11/2/18 arrived 8:35; left 9:30p; asiah left 6:35

11/3/18 arrived 8:35; left 9:35; asiah off today-family emergency; dr D left 8p

11/5/18 arrived 8:35; left 9:30; asiah off

11/7/18 arrived 8:35; left 7:45 due to pain;  asiah still off; Dr D still here; 11/8 6:30am-8:15am home

11/8/18 arrived 9:45; left 10:15pm; asiah on leave

11/9/18 arrived 8:35; left 9:55; asiah on leave

11/12/18 arrived 8:35; left 8:55; asiah left 6:33; Dr D still here

11/14/18 arrived 8:15; left 9:40; Dr D still here; Asiah left 6:30

11/15/18 arrived 12:45;left 8:45; Asiah left 6:36; we are both off 11/16

11/19/18 arrived 8:30; left 9:55; asiah left 6:49; too many triage calls today;  Dr D off all week

11/21/18 arrived 8:35; left 9:10; asiah left 6:38

1123/18 arrived 8:30; left 9:05; Asiah left 6:38

11/26/18 arrived 8:35; left 9:45; Asiah left 6:50

11/28/18 arrived 8:30; left 8p need break; Asiah left 6:55

PLAINTIFF004725

11/29/18 arrived 12:30-left 9:40; asiah left 6:37

11/30/18 arrived 8:25; left 9:15; asiah arrived 8:35 and left 6:55

12/3/18 arrived 8:35; left 9:30; asiah left 6:55

12/5/18 arrived 8:30; left 3:30 early leave; asiah left 3:30

12/6/18 arrived 1:15; left 7pm;left early-restarted 11:55p-1:55am; asiah left 6:30p

12/7/18 arrived 8:35; left 8:48; asiah left 6:35

12/10/18 arrived 8:30; left 8:45; 21 notes left;resume at home; asiah left 7p; Dr D left 7:40

12/12/18 arrived 8:30; left 4:30 for Xmas party for staff; asaih left 4:30; restarted  9p-12:20am; 8:45am to 10am

12/13/18 arrived 12:55; left 8:30; asiah left approx. 7 -7:10p

12/14/18 arrived 8:30; left 8:55; asiah left 6:45

12/17/18 arrived 8:35; left 8:40; asiah left 6:42

12/19/18 arrived 8:35; left 9:55; Dr D left 9:45; Asiah left 7:40approx

12/20/18 arrived 1p; left 7:32; Asiah out sick; worked at home for 2hrs

12/21/18 arrived 8:35; left 9:40; Asiah off

12/24/18 8:35; left 2:55; office closed today at noon; Asiah still off on leave

12/30/18 arrived 6:20pm left 8:15pm

## 2019

1/2/19 8:35a; left 8:30p; Asiah left 6:30; Dr D still here

1/3/19 1:15; left 8:40; Asiah left 6:38; Dr D still here

1/4/19 8:35; left 10:20p; Asiah left 6;37

1/5 Saturday worked

1/7/19 arrived 8:30; left 9:30p; DR D on vacation; Asiah left 6:40?

1/9/19 arrived 8:30; left 10p; Dr D on vacation; Asiah left 7:04

1/10/19 arrived 1:15; left 8:50; Asiah left 6:55

1/11/19 arrived 8:20; left 8:52; Asiah left

PLAINTIFF004726

1/14/19 office closed due to snow

1/6/19 8:30; left 8:52; Dr D still here; Asiah left 6:40ish

1/17/19 1p-8:25; Asiah left 7:20;

1/18/19 8:35; left 7:50; Asiah left 6:32

1/23/19 8:30; left 8:55; Asiah left 6:33

1/24/19 1:15p; left 7:28; Asiah signed off 6:35

1/25/19 arrived 8:30; left 9p; Asiah left 6:33

1/28/19 arrived 8:35; left 8p; Asiah left 6:33; Dr D still here

1/30/19 delayed opening due to weather; arrived 10:10; left 8:33; Asiah left 6:33

1/31/19 arrived 8:35; left 7:50; Asiah left 6:55

2/1/19 arrived 8:35; left 6:30 (snow storm) Asiah left before 5p

2/4/19 arrived 8:30; left 8p;Asiah left 6:33; DR D still here

2/6/19 arrived 8:35; left 8:35; Dr D still here; Asiah left early today due to illness (left 12:15)

2/7/19 arrived 12:45; left 6p due to computer problem; Asiah left 6p

2/8/19 arrived 8:30; Asiah arrived late; Asiah left 6:33; I left 7:45

2/11/19 arrived 8:35; Left 9:45; Asiah out sick; increased pain and right hand very cold

2/13/19 arrived 8:35; left 9p; Asiah still out; hand very cold; neck pain

2/14/19 arrived 1pm; left 7p; Asiah still out sick

2/15/19 arrived 8:35; Asiah left 6:35; I left 8:40p

2/20/19 snow storm-office closed

2/21/19 arrived 1p-left 6:30p; Asiah left 6:33; I worked at home 10:30p-1:30am

2/22/19 arrived 8:30; Asiah left 6:37; I left 8:20

2/25/19 arrived 8:35; Asiah left 6:35; I left 8:50

2/26/19 arrived 8:35; left 12:30; Asiah did not work today

2/27/19 arrived 8:37; left 7:16; Asiah left 6:35

PLAINTIFF004727

2/28/19 arrived 1pm; left 8:35; Asiah left 6:35

3/1/19 arrived 8:35;left 7:55; Asiah left 6:50

3/4/19 arrived 8:30; Asiah left 6:36; I left 9:15p

3/6/18 arrived 8:25; Left 7:30p; Dr D stil l here; Asiah left 6:35

3/7/19 arrived 12:25; left 6:40; Asiah left 6:30

3/8/19 arrived 8:16; Asiah left 6:35; I left 7:55

3/11/19 arrived 8:35; Asiah left 6:40; I left 8:05; Dr D still here

3/12/19 arrived 12:50; Asiah arrived 1:10 and left 5:55; I left 7:25; Dr D still here

3/13/19 arrived 8:35; left 7:50; Asiah left 6:37; Dr D still here

3/14/19 arrived 12:15; left 7p; Asiah left 6:36

3/18/19 arrived 8:30; left 9p; Dr D left 8p; Asiah left 6:45

3/20/19 arrived 8:35; left 6:20; resumed 9:30pm to 1230am

3/21/19 arrived 12:50; ;eft 6:40

3/22/19 arrived 8:45; left 1:45p; Asiah left 12:30 or later

3/25/19 arrived 8:35; left 8:40p; Asiah left 6:35; Dr D left 8:30

3/27/19 arrived 9:35; left 9:10

3/28/19 arrived 1:05; left 7:50; Asiah left 6:36

3/29/19 arrived 8: 30; left 7:15p

4/1/19 arrived 8:30; left 8:55

4/3/19 arrived 8:30; left 8:20

4/4/19 arrived 1:10; left 6:45

4/5/19 arrived 8:30; left 8:55

4/8/19 arrived 8:30; Asiah left 6:15; I left 7p

4/10/19 arrived 8:40; Asiah left 7p; I left 9:55

4/11/19 arrived 1p; left 8:20; Asiah left at

PLAINTIFF004728

4/12/19 arrived 8:35; left 8:10

4/15/19 OFF for trial; Asiah was their witness

4/17/19 8:35; left 7:55; Asiah left 6:35

4/18/19 arrived 12:45; left 6:50

4/19/19 arrived 8:35; left 8:55; Asiah left 6:50

4/22/19 arrived 8:30; left 9:50; Asiah left 7p

4/24/19 arrived 8:35; left 8:35; Asiah left 6:35

4/25/19 arrived 12:30; left 7:25; Asiah left 7:02

4/26/19 arrived 8:35; left 8:15

4/29/19 arrived 8:35; left 7:15; Asiah left 6:40

5/1/19 arrived 8:30; left 7:05

5/2/19 arrived 8:30; left 1:05; Asiah left 12:50

5/3/19 arrived 8:30; left 8:15; Asiah

5/6/19 arrived 8:35; left 8:10; Asiah

5/8/19 arrived 8:40; left 7:45; Asiah called out; no replacement sent

5/9/19 arrived 1p; left 7:10; Asiah left 7

5/10/19 arrived 8:35; left 7:15; Asiah left 6:45

5/13/19 arrived 8:35; left 8p; Asiah left 6:45 or after

5/15/19 arrived 8:35; left 7p; Asiah left 6:36; Dr D still here

5/16/19 arrived 12:45p; left 7:10

5/17/19 arrived 8:25; left 8:20; Asiah left 6:36

5/18 worked Saturday

5/20/19 arrived 8:35; left 9:30; I interviewed another triage nurse applicant Asiah left after 7p;

5/22/19 arrived 8:35; Asiah car trouble arrived at 11am and left before 5p; I left 8:45

5/23/19 arrived 1:20; left 8:20

5/24/19 arrived 8:35; left 8:55; Asiah left 6:45

5/29/19 arrived 8:35; left 7:50

5/30/19 arrived 1p; training PNP

5/31/19 left 6:30p

6/3/19 arrived 8:35; left 10:05p

6/5/19 arrived 8:40; left 8:40; Asiah left after 7p

6/6/ arrived 1pm;eft 7:10

6/7/19 arrived 8:35; left 7:10 w/ Asiah

6/10/19 arrived 8:35; left 11:10pm; Asiah left 6:36

6/12/19

6/13/19 arrived 1p; left 9:10p; Asiah left 7p

6/14/19 arrived 8:35; left 7p; Asiah left 6:38

6/15/19 Will start entering my Saturdays; arrived 8:35; left 2:35; Asiah left 2:30

6/17/19 arrived 8:35; left 10:07; Asiah left 6;37

6/19/19 arrived 8:35; left 9:15; Asiah left 7:18

6/20/19 mandatory webinar 12p-12:20; arrived at work 1:15p-left 9:25; Asiah left 7:55

6/21/19 we are both off

6//24/19 arrived 8:35; left 10:15p; Asiah left 6:30

6/26/19

6/27/19

6/28/19 arrived 8:35; left 9p; Asiah left 7:20

7/1/19 arrived 8:35; left 9a; ashiah left 7:40

7/3/19 arrived 8:35; left 8:50

7/10/19 arrived 8:35; left 8:10; Asiah resigned today-notice given

7/11/19 arrived 1p-left

PLAINTIFF004730

7/12/19 arrived 8:35; left 9:15; Asiah left 6:55

7/15/19 arrived 8:35; left 9:10; Asiah left 6:45

7/17/19 arrived 8:35; left 8:10

7/18/19 arrived 1:20; left 8:15

7/19/19 arrived 8:35; left 7:30

7/20/19 Saturday; arrived 8:35; left 2:25; Asiah left 1p

7/22/19 arriving 8:35; leave  7:25

7/24/19 arrived 8:35; left 8:40

7/25/19 arrived 9:10; left 11pm; Asiah left 8:30=LAST DAY; CNMC will not pay for another scribe

**No scribe services starting 7/29/19**

*No voice dictation system starting 7/29/19*

7/29/19 arrived 8:25; left 9:45pm Left most of correspondence to be completed another day

7/31/19 arrived 8:35; left 10pm; Unprecedented amount of work unable to complete; Was trained preliminarily on voice dictation system at 6p

8/1/19 arrived 1:10; left 8:55-used voice dictation when appropriate between 5:20 and 8:45; unable to complete more tasks than usual

8/2/19 arrived 8:35; left 8:30; Used dictation when appropriate at lunch and after patients; inundated w/ tasks; pain in shoulder and hand cold and index finger tingly

8/5/19 arrived 8:37; left 9:30; Worsening pain all day especially late afternoon;  right hand very cold; shoulder hurting; pain 8-9/10

8/7/19 arrived 8:35; left 7:30; pain at a 6/10;  hand cold

8/8/19 arrived 1p; left 7:30p; Neck pain 8 out of 10; hand cold

8/9/19 arrived 8:35; left 1:45; neck pain and hand cold and tingly; left for Ortho

8//14/19 Arrived 8am; left 3:10pm Worked "1/2 day"

8/15/19 arrived 1pm;

8/16/19 arrived 8:30 ;left 3p

8/17/19 arrived 8:30; left 12:50 Saturday

PLAINTIFF004731

7/12/19 arrived 8:35; left 9:15; Asiah left 6:55

7/15/19 arrived 8:35; left 9:10; Asiah left 6:45

7/17/19 arrived 8:35; left 8:10

7/18/19 arrived 1:20; left 8:15

7/19/19 arrived 8:35; left 7:30

7/20/19 Saturday; arrived 8:35; left 2:25; Asiah left 1p

7/22/19 arriving 8:35; leave  7:25

7/24/19 arrived 8:35; left 8:40

7/25/19 arrived 9:10; left 11pm; Asiah left 8:30=LAST DAY; CNMC will not pay for another scribe

**No scribe services starting 7/29/19**

*No voice dictation system starting 7/29/19*

7/29/19 arrived 8:25; left 9:45pm Left most of correspondence to be completed another day

7/31/19 arrived 8:35; left 10pm; Unprecedented amount of work unable to complete; Was trained preliminarily on voice dictation system at 6p

8/1/19 arrived 1:10; left 8:55-used voice dictation when appropriate between 5:20 and 8:45; unable to complete more tasks than usual

8/2/19 arrived 8:35; left 8:30; Used dictation when appropriate at lunch and after patients; inundated w/ tasks; pain in shoulder and hand cold and index finger tingly

8/5/19 arrived 8:37; left 9:30; Worsening pain all day especially late afternoon;  right hand very cold; shoulder hurting; pain 8-9/10

8/7/19 arrived 8:35; left 7:30; pain at a 6/10;  hand cold

8/8/19 arrived 1p; left 7:30p; Neck pain 8 out of 10; hand cold

8/9/19 arrived 8:35; left 1:45; neck pain and hand cold and tingly; left for Ortho

8//14/19 Arrived 8am; left 3:10pm Worked "1/2 day"

8/15/19 arrived 1pm;

8/16/19 arrived 8:30 ;left 3p

8/17/19 arrived 8:30; left 12:50 Saturday

PLAINTIFF004732

8/19/19 arrived 8:35; left 7:30; too much work unable to do; hand discolored and tingly; neck pain. I can not work long days

8/21/19 On work restriction of 6hrs; arrived 8:30; pain by 9:30-increased to a 8 out of 10 by 12pm; left at 3p; unable to do any billing or charts or any forms; only complted Rx refills and call back

8/22/19 arived 1p-left 8:50; computer work ended at approx. 7:45; paperwork done until left; pain 6=7 at 7:30

8/23/19 arrived 8:15; left 3:50; pain by 9:45am

8/26/19 arrived 8:15 left 4:15; pain

8/28/19 arrived 8:15; left 4:45; 6hrs on computer 2+hrs doing paperwork; pain and hand cold and tingling by 9:30

8/29/19 arrived 11:15; Left 7:25; by 5pm pain at a 9 neck and left shoulder  and hand cold and index finger tingly

8/30/19 arrived 8:15;left 4p; pain7 at 12pm

8/31/19 arrived 8:25; left 1:15;pain 3

9/4/19 arrived 8:30; left 5p; Patient care went over time that I had cut off; pain 7-8; overwhelmed; notified  OM

9/5/19 arrived 11:15 ; left 8:40; pain 6

9/6/19 arrived 8:15; left 4:30 pain 6

9/7/19 Saturday worked at home for 2.5hrs

9/8/19 came to office and worked 4:30 to 6p

9/9/19 arrived 8:30; pain at a 5-6 by 9:30 and 7- by 10:30; left 6:35

9/11/19 arrived 8:30; pain at 10 neck and especially shoulder; hand numb; left 6

9/12/19 arrived 11:20; left 7:45; hand numb/shoulder pain ; too much work still being given; unable to complete notes (4 of 21 done ), correspondence labs etc; did do Rx refills and school forms

9/13/19 arrived 8:30; left 7:15; hand numb and cold all day; at 4pm I had 34 unfinished patient encounters from the last two days; scores of correspondence, school forms; letter for a patient; Rx refills

9/14/19 Saturday 8:30 to 1p Saturday

9/15/19 Sunday 2:25 to 3:35 and 5:30 to 10:45 shoulder and neck pain

9/16/19 8:30 to 5:38; hand cold shoulder aching; neck pain with extension

PLAINTIFF004733

9/18/19

9/23/19

9/25/19 8:20a; left 5:45p; pain 7-8 out of 0 by 11:30; right hand cold and tingling entire day after 10am; tons of papers and correspondence, schoolforms and labs in my box

9/26/19 8:30-left 12noon for doctors appt; 3p-7p; hand cold; neck and shoulder pain 7-8 out of 10. Today I stopped over using the computer and will continue to limit computer use to daily total

9/27/19 8:30 to 12;  break 1hr fromcomputer; 1-3:30; pain neck and shoulder; hand cold and tingly since the morning. I have 33 unfinished notes from patient visits as of 5:45pm; LEFT 5:55

9/28/19 8:30; left 1:10p; hand cold and tingling; neck and shoulder pain 6-7 out of 10 this AM; I now have 42 unfinished encounters

9/30/19 arrived 8:30am; pain by 9am; hand cold and tingling by 9:30; left 5:30; 59 unfinished charts

10/2/19 arrived 8:30; neck pain; hand cold and numb; I have 77 unfinished charts; left 6pm

10/3/19 arrived 1:15; left 8:55; hand dusky cold and numb; neck and shoulder pain

10/4/19 arrived 8:30; left 5:35; hand cold and discolored all day since 9:20; neck and shoulder pain

10/5/19 worked college park office

10/6/19 worked at home on unfinished charts

10/7/19 arrived 8:30; left 6pm; hand cold and numb and dusky all day; neck pain 4 this AM and by 3p was a 6-7

10/9/19 arrived 8:30; pain by 9a; hand cold and worsening numbness all day; shoulder and neck pain 8 out of 10; miserable all day;  left 5:10p; went to PT 2nd session

10/10/19 went to PT 9:30a: 3rd session; arrived work 12:30p; started on computer 1p; neck and shoulder pain 2, NO hand numbness, discoloration  or coldness today!!!!!!!! left 7: 40

10/11/19 arrived 8:35; left 5:45; hand not cold and numb until about mid-day and even then not as severe as had been ; neck pain and shoulder pain 3-4 overall symptoms not severe today.  Able to do more of my notes today (complete)

10/14/19 arrived 8:15; left 7:04; right hand cold numb/tingly and discolored since 10am; neck pain 4-5 shoulder pain 3-4. Hand very uncomfortable; stayed late to do some of Dr P's work (she is on vacation)

10/16/19 arrived 8:30; left 5p; hand cold numb ; neck pain 4-5; shoulder 3-4; went to PT

PLAINTIFF004734

10/17/19 Hearing this AM; headache afterwards and felt a little light headed 1st two hours of work; 1-7:05; right hand cold dusky and numb; neck pain 4; shoulder not hurting; able to complete more notes than usual ; today touchscreen fixed

10/18/19 8:30 to 5:25; hand minimal numbness and tingling; neck pain 4-5,no shoulder pain; able to complete 2/3 of my notes!

10/19/19 Saturday 8:35 to 1:15p-hand cold and numb all morning; neck pain 6-7; No shoulder pain; able to complete all notes

10/21/19 arrived 8:35; left 8:25; worked 11hrs; office is giving me unprecedented amounts of work. No one is assisting me. Stayed late to write a letter for a complex patient and to do FMLA forms and various abnl labs that needed to be addressed and patients notified.  Only completed 2 notes out of 21 today; hand numb all day since 10;   neck pain 4-5 shoulder pain 2-3.

10/23 overwhelmed with the amount of work and pain. Left 5:15; went to PT

10/24 arrived 12:15; left 9:10; no hand numbness or discoloration nor coldness today!!; neck pain 3-4 no shoulder pain today

10/25/19 arrived 8:35; left 6:10; hand cold and numb most of the day until 4p better for 1hr and then numb and cold again between 5-6p; neck pain 4-5, No shoulder pain Was able to complete all notes today

10/28/19 arrived 8:35; left 5:53; hand only intermittently numb and cold-much better than usual; no shoulder pain; neck pain 3-4; completed almost all of the notes

10/30

10/31 left early for PT

11/1/19 arrived 8:35; left 7; no shoulder pain and neck pain 2; completed all my notes!!; hand got mild cold and numb around 2p; new-right middle finger with moderate to severe pain all day at the MCP joint on palmar side-difficult to do hip exam on babies and type

11/4 left 3:35 for Ortho apt regarding right middle finger; 6:30p to 10:30EHR

11/6 arrived 8:25; left 6:30; hand mildly cold; not blue

11/7/19 12:30; left 6:30

11/8/19

11/11/19 arrived 8:25; left 8:25

11/13/19 arrived

11/14/19 arrived 1p-left 7:45p

PLAINTIFF004735

11/15/19 arrived 8:30; left 8p; hand cold and tingling, neck pain

11/16/19 8:30; left 2:30; hand coldand numb since 9:30; shulder pain by12

11/18/19 arrived 8:35; left 6:30; hand coldand tingly but not as severe as usually; neck still

11/20

11/21

11/22 horrible day; arrived 8:30 computers down; 9:55 computers back up by 10:15 hand cold and numb and blue and this was problematic all day; finished seeing morning patients at 12:35; missed parts of provider meeting; 1p next patient in a room ; NO down time and 3p showed up 3:30; left 5:30

12/5/19 had a lot of right anterior shoulder pain and hand numbness and coldness this afternoon. Stylus for touchscreen not working well; Notified IT this evening that I had tried changing the battery but this is not helping…need new stylus so I can use touchscreen.

12/6 IT working on stylus; not working well; hand numb and shoulder pain

12/9/19 IT fixed stylus at 1p. AM using mouse too much; right shoulder aching and hand blue but did finish all notes

12/12 1pmto 7:20p neck and shoulder pain mild today; hand not blue but a little cold

12/13/19 hand cold and numb and neck pain 6-7 out of 10 since 11am; left 5:48

12/16/19 8:30 to 4:15; hand cold and numb all day; neck pain 6-7

12/18/19 8:30 to 6:35-neck pain 6-7; hand cold

————

12/19/19 1p-10:25p; at 5pm had 101 uncompleted lab tasks-finished them all at 10:03; neck pain8 out of 10 most of the day and hand minimally cold/numb

12/20 8:15 to 8:25; between 10 and 11 neck 8 out of 10, stopped seeing patients and called Ortho for PT order; lots of patients late today and added on other sibs who were sick

Off for break until 1/2/20-spent the break doing unfinished charts  6hrs at a time on a few days

### 2020

1/2/2020 1:20p- left 8:5020pm; neck pain and stiffness most of the day, hand cold  but not blue; some numbness earlier in day; signed up for DUO authenificatio

1/3/20 8:30- left5:15;   neck pain all day; a lot of patients; very stressed; auras noted and migraine started 2:30; rested; left 5:15

PLAINTIFF004736

Saturday1/4/2020 8:15 left 2:30; by 1pm neck pain was a 7 and hand cold and numb and dusky

1/6

1/8 8:30 left 3:15; hand dusky and cold; neck stiff and sore; IT said coming today to observe MModal; my atty said this must be arranged thru counsel; very stressful the back n forth with IT trying to deal with seeing patients

1/9 arrived 1p; computers not working (none of my laptops would connect to the EHR); IT did troubleshooting for 1hr-got one laptop working by 2p-very stressful as I was 1hr behind schedule all day; none of my notes done by 7p except 1 chart; Neck pain 7-8 and and right hand cold all day and dusky; left 7:40

1/10 arrived 8:30; pain at an 8 as of 9:30am and hand extremely cold; 1st patient would not let me examine her well-says my hand is too cold; neck very sore and stiff and painful. PT set up for 1/14 not under WC; front staff made error and cancelled a patients appt for f/u asthma; seen at 3:30; left 5:30

1/13/19 arrived 8:30; left 6:13; hand numb and cold most of the day; neck pain 5-6; Asked Dr P if she could sit in on meeting with IT and her scheduling preference; met with nurses after work to hear their concerns with laurel office

1/15 arrived 8:30; left 4:38; hand cold all day and pale; neck pain 4-5; less stiff though; left for PT

1/16/20 arrived 12:15; left 7:55; hand cold and numb most of the day but neck stiffness better and pain 3-4 today –better

1/17/20 arrived 8:30; left 6:10; neck pain 3-4; hand cold and dusky andnumb; able to do all my notes today!!

1/22/20 arrived 8:30; left 5:15; neck pain 3; hand not numb until id day but was cold late morning; (had been off work since 5 days ago and had PT yesterday) was able to finish almost all notes!

1/23/20 arrived 1:10; left 6:25; neck pain 3; hand cold and numb but not as much as usual and was able to finish all notes; feet hurting today

1/24/20 arrived 8:25; left 6:20; neck pain and shoulder pain 5-7 at times; hand cold and numb all day; feet hurting; called PT office at 4:20 to get same day appt-they were closed or no answer

1/25/20 arrived 8:30; left 1:10; neck pain 2; hand cod and numb but not severe; finished all charts

1/27/20 arrived 8:30; left 7:03; hand coldness mild; neck pain 3; finished all notes

1/29

1/30/20 1p-8"30; hand numb and cold

PLAINTIFF004737

1/31/20 8:30a; left 6; neck pain 2-3; hand mildly cold not blue; finished all notes

2/5/20 8:30; left 5:20; no notes completed today; administrative fiasco that dramatically affected my efficiency

2/6/20 1p-left 8:04; (phone conference 12:30p-1:05); hand numb and cold by 7p-precisely 6 hrs on computer; neck pain 4-5 no shoulder pain; finished all notes today; Dr Glaser emailed me aaking if I am interested in the virtual scribe

2/7/20 8:35p- 5:20 pm; Dr Glaser emailed me again asking about if I want a Virtul scribe; hand numb and cold by noon nek pain 3-4; no shoulder pain; most notes not done

2/8/20 8:15 –left 2:30; hand numb and cold; neck 4; finished all notes

2/10 8:30 6:30

2/12/20 8:35; left ; neck pain all day 8/10; only able to complete one note

2/13/20 1p-6:15; neck pain 4-5; hand little dusky and numb; unable to complete any  notes

2/14 8:30; left 1:55; neck pain/ hand cold and little numbness; finished all notes

2/17 8:30p a lot of pain today-neck; hand numb

2/19

2/20 1p-left 7:40; Had PT this morning-neck pain 3-4 better than earlier in week; hand not dusky and only mildly cold; unable to do most of notes today; New strategy implemented for handling backlog of notes/billing/correspondence-sent to colleagues

2/21 8:30a-left 5:33; neck pain 4-5; hand numb and cold by 9;30

2/22/20 Saturday 8:15 to 2:15; hand numb and cold all day; neck pain 4

02/24/20 arrived 8:35; left 6p; hand numb and old and dusky all day; migraine this afternoon

2/26/20 arrived 8:35; left 4:40; hand mildly cold and neck pain 2-3; less stiff

2/27/20 arrived 12:30; left 6:22; hand cold numb; typing some with left hand; physical therapy tonight

2/28/20 arrived 8:35; left 5:33; hand cold numb; neck pain 4-5 migraine

3/2/20 arrived 8:30; left 5:45; hand ccold neck pain 4-5; no shoulder pain today

3/3/20 askedto fill in for Dr G whose out sick; arrived 2p-left6p; hand minimally cold; neck 4-5

3/4/20 arrived 8:30; left 5:53; hand minimally cold; neck 3-4; many unfinished notes

3/5/20 arrived 12:30-left 5:48;hand minimally cold; neck 3-4; many unfished notes

PLAINTIFF004738

3/6/20 arrived 8:30; left 5:20; neck pain and stiffness ; hand minimal numbness

3/7/20 8;15; left 1:50; hand cold and numb this morning, patient complained ; neck stiff  pain 3

3/9/20 8:35; left 6:20; hand cold and numb; covering Dr Pampati's electronic health records too

3/11/20 8:35 to 5:45; neck pain 5 neck stiff; hand numb and cold

3/12/20 arrived 12:50; left 7:18; hand cold and less numb than yesterday; neck pain but less stiff than yesteday

3/13/20 arrived 8:35; left 5:05; neck pain and stiffness; shoulder pain bilat; hand only mildly cold and numb today

3/16/20

3/18 8:30 to 7:30; CNH Voc Reh specialist came today 4-6pm; neck pain 4; hand numb and cold and dusky all day up until mid way during meeting with rehab spec

3/19/20 1p-left 7:15; neck stiff pain 4-5; hand numb and cold; slightly dusky

3/20/20 cancelled my vacation to work on unresolved encounters; in office from 9a-6;45p; took breaks; 3/23/20 cancelled  my vacation to work on correspondence back log; in office 9:15 to 6:30p-took breaks; neck pain 6-7 from looking down at papers

3/25/20 8:30; left 6:15; jand cold and numb neck 5; stiff neck; migraine

3/26/20 12:30-left 6:20; hand cold and numb; neck very stiff, pain; migraine

3/27/20 8:30; left 3:50 migraine; neck stiff;  hand cold numb

3/28 and 3/29 worked from home 6hrs each day

3/30/20 8:30; left 5:35; neck stiff; pain 4-5; hand cold but not dusky; migraine

4/1/20 8:25; left 5:40; hand cold and numb but not blu; neck pain 3; migraine

4/2/20 12:20 –left 6:10; hand cold and numb but not blue and not as cold; neck pain 3-4; no migraine today

4/3/20 8:25-left 5:02; hand numb and cold but less than usual and not very discolored today. No migraine; Neck pain 3-4

4/6/20 8:30 left 5:46; right shoulder pain around 3pm; right hand cold but not as dusky and numb; no migraine

4/8/20 8:30; left at 12:45 to work fro home on telehealth; hand not numb today as of 12:40 but neck stiff and pain 3-4

PLAINTIFF004739

4/9/20 12:30 – Received eye shield today to use with patient care; left 7:20; hand mildly cold; neck stiff pain2-3

4/10/20 arrived 8:30; left 5:55; neck pain4-5; hand cold and numb most of the day and dusky

4/13/20 arrived 8:30; left 5:33; hand not blue and only mildly numb today but neck and shoulder pain by midday

4/15/20 arrived 8:30; left 4:22; hand cold and numb most of day; neck pain by midday

4/16/20 arrived 12:25; left 6:50; neck and shoulder pain; hand cold and numb; neck stiff

4/17/20 arrived 8:25; left 4:45; increased neck pain 6-7 and left sided neck pain now too; hand cold but not as numb; neck very stiff; hurts to look down at screen

4/20/20 arrived 8:25; left 5:15; neck pain 6; hand cold and numb since 9:45

4/22/20 arrived 8:30; left 5:20; neck pain and hand cold and numb; nurse sick;

4/24/20 arrived 8:30; left 12:45; working from home at 1:15; neck pain and stiffness; hand cold and numb; other nurse sick

4/27/20 out sick AM (two nurse + covid) I was tested for Covid today; telehealth pm

4/29/20 telehealth PM; off AM sick; hand cold and numb at home this afternoon

4/30/20 9:30 Fit Testing; 12:35- 6:30 left; hand cold

5/1/20 arrived 8:20; left 5:45; The Nurse (JM) reported to work sick w/ sore throat and low grade temp; had symptoms for 2d-needs to be tested for Covid; No nurse today; no other providers; worked alone; saw 3 patients and 12 telehealth; neck stiff; neck pain 6

5/4 arrived 8:25; left 4:40; headache; neck pain and stiffness 5; hand not blue; unable to complete all encounters

5/6 arrived 8:30; left 6:35; neck pain 4-5; stiff; hand not blue

5/8 arrived 8:25; left 5:40; neck 4; very stiff; hand mildly discolored not numb; completed all unresolved encounter from 5/4

5/11 arrived 8:25; left 12:40 to go home; 1:15 telehealth

5/13 8:30 left 6:30; neck pain 4, hand cold but not dusky

5/14/20 12p-left 7:30; neck pain 3; no shoulder pain; hand ok

0ff 5/15 thru 5/21

5/23 8:30 to 3:15 patients; neck pain 2-3; hand not discolored

PLAINTIFF004740

5/27/20 arrived 8:40; left 5:45; hand mildly discolored and cold but not numb; neck pain 4-5

5/28/20 arrived 12:45; left 6:15; neck pain 4-5 no shoulder pain

5/29/20 arrived 8:20; left 5:18; neck pain4-5 hand mildly numb but not discolored; migraine this afternoon –all afternoon

6/1/30 arrived 8:35; left 5:53; neck pain 7-8; shoulder pain; hand numb and cold and dusky after 12; headache; more office visits today; could not finish notes

6/3 arrived 8:25; left 5:05; neck pain 4-5 hand cold

6/4/20 ARRIVED 1:10; LEFT 6:33; NECK PAIN 4-5; no shoulder pain; hand not blue

6/5/20 arrived 8:25; left 5:30; neck pain 4-5; very stiff; hand numb and cold and mildly dusky

6/8/20 arrived 8:30; left5:54; hand numb most of day after 12; neck pain 3-4

6/10/20 arrived 8:25 right hand numb by 9; neck pain 5; left 12:40 for working at home for TMVs

6/11/20 arrived 1p- left 6:25; neck pain 5; stiff; a lot of unfinished encounters-only able to complete 1 of 12

6/12/20 arrived 9:08; left 6:20; neck pain 5-6; migraine 4p; a lot of unresolved encounters

6/19/20 arrived 8:15; left 6:10; neck pain 5-6; hand cold numb; No other docs here; working alone

6/22/20 arrived 8:30 ;eft 5:55; neck pain 6; hand OK; no other docs working; working alone

6/24 arrived 8:35; left 6:12; neck pin 5-6 working alone

6/25 arrived 1:10; left 7:10; neck pain 5 hand numb today by mid afternoon

6/26/20 arrived 8:20; left 5:25; migraine and dizzy started mid AM;neck pain 6-7; shoulder pain (anterior) hand numb and cold all day

6/29/20 arrived 8:30; left 6:05; migraine started mid day  Neck pain 5; hnad numb and cold most of afternoon; last patient came 35min late

7/1/20 arrived 8;30 neck pain 6-7; shoulder pain today-aching anteriorly; hand numb; stylus stopped working today; no battery available to replace; office will order

7/2/20 arrived 1p-left 7:15pm; neck pain 7; shoulder pain; no stylus at all; I went to w 2stores no battery; office says their order will not comein until Monday 76; IT Shin says theydo not have a battery either

76/20 arrived 8:30; left 6:10; stylus arrived late morning; neck pain 5-6; anterior shoulder pain today; hand not dusky but is numb at times

PLAINTIFF004741

7/7 arrived 12:30; left 6p; neck pain 5-6; stiffness

7/8 arrive 8:25; left 5:20; neck pain 5-6; hand numb and discolored as of 11am; no shoulde rpain

On leave 7/9 untl 7/13

7/13 arrived 8:30; left 5:40hand numb by 9:15; neck pain 5-6 mid-day; 7-8 by end of day with stiffness

7/15 arrived 8:30; left 6:43; bad day; neck pain 6-7 neck very stiff; hand numb and cold all day; only 3 of 18 notes done

7/16 arrived 12:30; left 7:02; headache; neck pain 5-6; neck stiff; hand numb

7/17 arrived 8:25; left 5:49; neck pain 6-7; very stiff; hand numb most of day not blue this afternoon

7/20 arrived 8:25; left 6p; hand numb since 11a and dusky; neck pain and stiffness; no shoulder pain

7/22 arrived 8:30; left 6:52; neck pain6-7 stiff; hand numb all day; too much work; forms labs calls

7/23 arrived 1:15; by 2:12  hand numb anterior shoulder pain; hand dusky; neck pain 6; stiffness; left 5:56

7/24 arrived 8:30; neck pain 7-8; hand numb and dusky from 9:20; neck stiffness severe

7/27 arrived 8:30; left 5:42  hand numb by 9:20; neck pain worsened 10:30 7-8; neck stiff; hand numb cold dusky all day

7/29/20 arrived 8:30; left 5:40; neck pain 7-8; hand numb and dusky cold; right shoulder pain; migraine this afternoon

7/30/20 arrived 11:30; left 8:20; right neck pain 5; hand OK; shoulder ok; left neck hurting

8/7//20 arrived 8:30; left 5:25;  neck pain 7-8 by 1p; hand blue numb cold; right ant shoulder pain; miserable day

8/10/20 arrived 8:30; left 6p; neck pain 6-7; hand numb blue cold since 9:15

8/12/20 arrived 8:25; left 6:15; neck pain 7 hand numb shoulder pain

8/13/20 arrived 11:45; left 7:05p; neck pain 7-8; hand numb since 3; hand cold; using heater to warm had; Sent email to Med director regrading status of scribe-no reply; initial email sent to Janowiak 8/11 – no reply

8/14/20 arrived 8:20; left 705p; neck pain 8, hand cold numb; very stressful day due to error in financials as well; migraine;

8/17/20 arrived 8:25; left 6:26; neck pain 5-6; hand cold numb  blue; slightly less cold than usual in early afternoon but by late afternoon very cold(started Silden this AM)

PLAINTIFF004742

8/19 /20 arrived 8:25; left 5:55; miserable day; neck pain 7-8; hand numb cold all day (did not take sild today)

8/20/20 arrived 12:45; left 6:46; neck pain 5-6 hand cold numb

8/21/20 arrived 8:20 ;left 5:38; neck pain 7-8 hand cold numb; miserable day! Emailed Perez for update

8/24/20 arrived 8:25; left 6:15; neckpain 7-8; hand cold numb but not until early afternoon (took full dose sild this AM) 12:30 lunch meeting; email from billing regarding my unfinished encounters.

8/26 8:30-left at 12:15 for two doctors appt regarding health; neck pain 7

8/27 1p- left 8p; hand numb but not as cold as usual; neck pain 7; 11 phone messages after seeing patients; very stressful

8/28/20 ARRIVED 8:15; LEFT 6:30; Only doc here today; very stressful; neck pain 8 by 2p; hand cold numb most of day; neck stiff

8/30/20 arrived 8:32; left 6:30; horrible day; neck pain 7-8; hand numb cold neck very stiff; increased pain and numbness by 10:30awork restriction notification given

8/31

9/2 arrived 8:38; left 3:40; neck pain 5; hand minimally numb; on TID Sild

9/3/20 arrived 12:30; left 7:30; neck pain 5; hand mild numbness; on Sild

9/4/20 arrived 820; left 4:10; neck pain severe today especially by 11a; went to lie down in car at lunch; hand mild coldness and numbness; only doctor here today

9/9/20arrived 8:20; left 4:43; neck pain 5-6; hand mildly numb not blue; headache most of day

9/10/20 arrived 12: 35; left 7:35; neck pain 5-6; hand minimal numb; headache all day; vague meeting request from Ms Perez-stress level high; 5:30p ergo eval w/ Roz (chair height off; monitor height off; arms not at proper level nor legs; need pillow and need elevated monitor; need electric mobile desk and a different key board and a different mouse

9/11/20 arrived 8:20; left 5:08; neck pain 5-6; hand mildly numb; stress!! Emails about my schedule not being approved for reduction unless I apply thru Hartford

9/14/20 arrived 8:18; left 4p; neck pain 7; very stressed; only doctor here; headache most of day; hand mildly numb and cold

9/15/20 arrived 12:25; left 7p; neck pain 4-5 no headache; hand only mildly numb and cold; heard scribe contract near end of negotiations-very good news!

9/16/20 arrived 8:20a; left 3:35; last patient left 2:45; neck pain 5; hand numb today and cold

9/17-9/20 away however did all unresolved encounters during leave

9/21/20 arrived 8:20; left 4:05  hand numb; neck pain 5-6

9/23/20 arrived 8:25; left 3:17 neck pain 5-6 hand numb and cold

9/24/2020 arrived 12:50; left 7:53; neck pain 5-6; hand numb and cold since early afternoon

9/25/20 arrived 8:25; left 3 :30; neck pain 6-7 hand cold and numb all day

9/28/20 arrived 8:15; neck pain 5-6; hand cold numb left 1p for WC Hearing

9/30/20 arrived 825; left 4:15; neck pain 6; hand cold numb all day; will send over sched for scribe co

10/1/20 arrived 12:30; eft 7:53; neck pain 5; hand cold numb

10/2/20 arrived 8:25; left 5:05; neck pain 6=7 hand cold numb; headache

10/3/20 arrived 8:25; left 1 :10; neck pain 4-5 hand numb and cold –mild

10/5/20 arrived 8:25; left 4:20; neck pain 6 hand numb and cod; right shoulder pain

10/7/20 to 10/9/20 monitor not working on this computer

10/12/20 arrived 8:30; left 6:03; neck pain 6-7; hand numb all day and cold

10/14/20 arrived 8:20; left 6:20; neck pain 7-8; hand numb and cold all day; MISERABLE DAY!!!

10/15/20 arrived 1p; left 8p; neck pain 7; hand cold but not numb

10/16/20 arrived 8:30; left 5:40; neck pain 7-8; hand cold numb since later morning; headache

10/19/20 arrived 8:30; left 9; neck pain 8-9 since 1p; hand cold mid day applied nitro paste-helped hand coldness; right shoulder pain;  headache most of afternoon; upper back pain; ergo equipment approved and ordered; ortho tomorrow; stayed after work to clean off desks for new equip and new desk

10/220

10/21/20 left 7p

10/23/20 arrived 8:30; left 3:15 hand numb an cold; neck pain 6-7

10/26/20 arrived 8:30; left 4:15; hand numb and cold all day; neck pain 6-7; right shoulder pain

10/29/20 arrived 1p-left 8p; neck pain 5; hand numb cold

10/30/20 arrived 8:30; left 4; neck pain 5-6; hand numb and cold all day; received very insensitive and stressful letter from Dr Glaser; Only doctor here

PLAINTIFF004744

11/2/20 arrived 8:30; left 4:45; neck pain 6-7; hand numb and cold all day; tried finishing all notes before responding to triage calls and had 12 tasks –left too late; did send practice admin a letter with ideas for unresolved encounter

11/3/20 arrived 1:20p to work on unresolved encounters, see patients and have Pre-Discovery meeting regarding virtual scribe; neck pain 5-6; hand numb but not cold

11/5/20 arrived 1p (on Huddle at 12:30p); left 7:55p; neck pain 6; hand mildly numb and cold; left hip pain

11/6

11/9/20 arrived 8:20; left 4:20; neck pain 6-7 by 1p; hand cld numb since 10:30; shoulder pain; typing wth left hand at times

11/19/20 12p-left 8:25; neck pain 6-7; hand cold and numb all day; virtual scribe started today

11/20/20 8:25an left 4:05; neck pain 6-7 hand numb and cold; scribe in training; she can not see my lab tasks

11/23/20 8:30 ; left 8p; hand numb and cold starting at 3p; neck pain 6; asked CN to fix some issues w/ the items the scribe can help me with

11/27/20 8:30; left 6:45; hand numb and cold; neck pain 6

11/28/20 8:30a; left 12:15; scribe virtual; Saturday; neck pain 4-5; hand slightly numb and cold

11/30/20 8:30; left 6:38; scribe left 5:40; hand numb and cold most of day and especially after 11am; neck pain 6

12/2/20 arrived 8:30; left 6:38; scribe left 5:31; hand very cold and numb; shoulder® aching most of the afternoon; neck pain 6

12/4/20 arrived 8:23; left 6:23; scribe left 5:05; neck pain 6; headache most of day; hand cold and numb most of day; right shoulder aches; stayed late to clean out desk; got notice that someone coming with electric desk on Monday

12/7/20 arrived 8:20; left 6:43; scribe left 5:33; neck pain 6; hand numb and cold; electric desk assembled today but can not be used because no outlet yet; old broken desk has to be removed first.

12/9/20 arrived 8:20; left 6:52; neck pain 6-7; hand numb and cold all day; electric desk was not working; tech came later this afternoon and fixed; file cabinet has to be assembled; no screwdriver here; headache most of evening

PLAINTIFF004745

12/10/20 arrived 12:23; left 7:40; hand numb and cold; neck pain 6; stiff

12/11/20 arrived 8:23; left 7:07; neck pain 7; hand cold numb;  headache; no time to put together equipment; touch screen still shutting off

12/14/20 arrived 8:24; left 7:45; hand cold and numb all afternoon and evening; headache this evening; office equipment not set up; stayed late again to try and fix; sent email to Jm and DG requesting assistance

12/16/20 arrived 8:30; snow storm; No decision made by hosp regarding closing by 2:15 still; neck pain; hand cold nad numb

12/17/20 arrived 12:45; left 6:59; migraine ; hand cold/numb; neck pain 6

12/18/20 arrived 8:20; left 7:06; migraine in afternoon; hand cold but not as numb; neck pain 5-6; scribe left at 5:30; finished all unresolved encounters

12/19/20 arrived 8:35; left 2:15; neck [pain 5; hand numb by 11; scribe left at 1:23; no migraine; sent team an update

12/21/2o arrived 8:35; left 9:08; neck pain 7-8; hand numb cold; poor staffing; only one front desk person; scribe left 5:38; too much admin work; had 4min break for lunch today

12/23

On vacation 12/23 thru 1/6/2021-NO hand numbness or coldness or discoloration; neck pain 1-2

1/7/21 arrived 12:35; left 8p; scribe 1-7; hand cold and numb since 3p; neck pain 4

1/8/21 arrived 8:25; left 6:45; scribe 8:30 to 5; hand cold and numb since 9:30; neck pain 6-7

1/11/21 arrived 8:25; left 6:50; scribe left 5:15; neck pain 6; hand numb and very cold since 9:15; stayed late to put files in file cabinet

1/13/21 arrived 8:25; left 6:18; scribe left 5:23; neck pain5-6; hand less numb than yesterday but still cold;

1/14/21 arrived 12:30; left 7:02; scribe left 6:32; neck pain 5-6; hand cold and numb

1/15/21 arrived 8:25; left 6:15; very stressful day; WC issues; ergonomic issues; touchscreen  computer dying often; neck pain 7-8; hand numb cold

1/20/21 arrived *:20; left 6:15; scribe lest 5:18; neck pain 6=7; hand numb cold

1/21/21 arrived 11:45; left 7:07; scribe left 6:27; neck pain 6-7; hand numb and cold

1/23/21 arrived8:20; left 6:20; scribe left 6:12; hand numb and cold; neck pain 7; stressful day

PLAINTIFF004746

1/25

1/27

1/28 arrived 11:35; left 6:38; scribe 1-5:30; neck pain; hand cold numb

1/29/ arrived 8:25; left 6; scribe left 5p; neck pain 5-6; hand numb cold; very stressful day; no response from childrens regarding ergon assessment

1/30/21 arrived 8:25; left 12:20; scribe left 11:45; neck pain 3-4; hand numb cold; TMV from laurel office

2/1/21 arrived 9:15; left 3p; scribe left 2:44; neck pain 4-5; hand numb cold

2/3/21 arrived 8:20; left 8:30; scribe left 5:50; IT came at 4:30 to finish assembling ergo equipment; neck pain 6; hand cold and numb

2/5/21 arrived 8:20; left 5: 30; neck 6 hand cold

2/8/21 arrived 8:25; left 7:17; neck pain 6-7; hand cold all day; was informed that 3rd provider will share office space and told that if my furniture reorganized all 3 could fit; stayed late to move around books and files

2/10/21 arrive 8:15; left 6:38; scribe left 5p; stayed to clean up and finish arranging office and reply to work email; hand numb/cold/dusky; neck pain 6

2/11/21 arrive 12:45; left 6:46; scribe left 5:27; neck pain 6; hand numb and cold; stayed late to resched thurs pm patients and respond to emails

2/12/21 arrive 8:17; left 6:20; scribe left 6:05; neck pain 5-6; hand cold and numb most of day

2/15/21 arrived 8:30; left 5:53; Alicia left 5:17; neck pain 6-7; shoulder pain; hand numb and cold most of day; headache all afternoon; stressful day with 3 providers here now

2/17/21 arrived 8:20; left 5:56; Alicia left 5:03; neck pain 6-7; hand cold and numb; headache afternoon; home accommodations approved

2/18 office closed inclement weather; no staff

2/19/21 arrived 8:23; left 7:45; Alicia left 6:22; neck pain 5-6; hand very cold and numb all day; stayed late to respond to emails and mail and answer calls

2/20/21 arrived 8:20; lwft 12:50; Alicia left 12:22; neck pain4; hand cold and numb

2/22/21 arrived 8:10; left 5:22; Alicia left 5p; neck pain 6-7; hand numb and cold; right shoulder hurting this afternoon; ??when home equipment coming

2/24/21 arrived 8:22; left 6:55; Neck pain 7-8; hand very numb and miserably cold and numb all day! shoulder aching; Alicia left 5:38; I stayed to do lots of call backs and Rxs

PLAINTIFF004747

2/25/21 arrived 12:45; left 7;08; Alicia left 6:38; neck pain 5-6; hand cold numb; not as bad as yesterday

2/26/21 arrived 8:16; left 6:20; neck pain 6-7; hand numb cold; Alicia left 5:45

3/3/21 left late due to insulting email

3/4/21 arrived 12:50; left 6:11; neck pain 6-7; hand numb cold; migraine-tension

3/5

3/8/21 arrived 8:15; left 5:15; neck pain 5; hand cold numb

3/10/21 arrived 8:15; left 6:30; neck pain 5; hand cold but not numb

3/15/21 arrived 8:15; left 5p; hand cold and numb; neck pain 5-6

3/17/21 arrived 815; left 6;45; Alicia left 6p; hand cold numb, neck pain 5-6

3/18 home TMV

3/19/21 arrived 8:15; left 7:08; Alicia left 5:46; hand cold and numb, neck pain 6-7

3/24/21 arrived 8:10; left 6:16; Alicia left 5:38; hand cold within 20min of working on computer; numb all day; neck pain was a 1-2 on arrival and a 5-6 by end of day; Right shoulder pain

3/26/21 alicia power outage-no back up plan; arrived 8:20; left 7p; Alicia left 6:10; hand numb cold neck pain 5-6

3/27/21 alicia 8:30 to 12; I left 12:49; neck pain 4; hand cold and numb

3.29.21 arrive 8:15; Alicia left 5:15; I left 5:30; neck pain 4-5; hand cold and numb

3/31/21 arrive 8:15; leave 5:26; Alicia left 5:10; neck pain 6; hand cold as ice and numb

4/2

4/5 arrived 8:19; left 5:30; Alicia left 5:16; neck pain 5; hand numb and cold

4/7/21 arrived 8:15; left 6p; Alicia left 5:33; neck pain 5-6; hand numb cold

4/9

4/12/21 arrived 8:15; left 6:50; Alicia left 6:20ish; neck pain 5-6; hand numb and cold; last patient today 4:15

4/14/21 arrived 8:15; lft 8p; Alicia left after 6:30; a lot of admin work; neck pain 5-6; hand numb cold

4/15

4/16/21 arrived 8:15; left 6p; Alicia left 5:44; Neck pain 5-6 hand numb cold

PLAINTIFF004748

4/17/21 arrived 8:23; left 1:15; Alicia left 12:30; neck pain 3—5; hand mildly cold

4/19/21 arrived 8:15; left 5:50; Alicia left 5:40; neck pain 5-6 hand numb cold

4/21/21 arrived 8:15; left 6:30; Alicia left before 6; neck pain 5-6; hand cold numb

4/22

4/23/21 arrived 8:18; left 6p; same neck and hand

4/26/21 arrived 8:18; left 6p; Alicia left 5:42; neck pain 6-7; hand numb and cold

4/28/21 arrived 8:15; left 6:45; Alicia left 6:38; neck pain 6-7; hand cold

4/30/21 arrived 8:16; left 6:45; Alicia left 5:43; neck pain 5-6 hand cold numb

5/3/21 arrived 8:22; left 5:50; Alicia left 5:45; neck pain 5; hand cold

5/5/21 arrived 8:23; left 6:30; Alicia left 5:30; neck pain 5-6; wore wrist/arm splint-hard to work but hand less cold and numb than usual

5/7/21 arrived 8:15; left 5:25; Alicia left 5;05; neck pain5-6 hand cold numb

5/10/21 arrived 8:20; left 5:40; Alicia left 5:05; neck pain 5=6 hand cold numb with brace; no time do all all the exercises

5/12/21 arrived 8:23; left 6:33; Alicia left 6:15; neck pain 5-6; hand cold and less numb with brace

5/13/21

5/14/21 arrived 8:15p; left 8:03; replacement scribe informed me at 8:33 that she does not have access to our EMR; she also can not do TMV calls and has done no billing; stress level 10l; shoulder and neck pain 8; hand very cold and numb; Brianna left at 4:45

5/15/21 arrived 8:20; left 12:52; Brianna did not know about the attestation/forms/billing; neck pain 6-7; hand cold not numb

5/17/21 arrived 8:15; left 7; Alicia left 5:52; neck pain 6-7; hand not numb; wearing carpal tunnel brace; headache most of day especially by 11a-lasted all day; working on some of the notes from 5/14; password reset prob

5/19/21 arrived 8:15; left 6:45; Alicia left 6; neck pain 6-7; hand mildly numb and cold with brace; completed notes from 5/14

5/20

5/21/2021 arrived 8:15; left 6:15; Alicia left 5:30; neck pain 6-7; hand doing better with brace-intermittently cold...numb -at times totally fine

PLAINTIFF004749

5/24/21

5/26/21 arrived 8:15; left 7:22; Alicia left 6:18; neck pain 6-7; hand doing pretty good with the wrist brace and exercises-having intermittent coldness and numbness not continuous

6/4/21 arrived 8:22; left 5:50; Alicia left 5:30; neck pain was at a 2 over vacay; by end of today it is a 3-4; hand w/ brace minimal coldness intermittent but had no issues w. hand over vacay; right middle finger stiffness at joint over the past couple weeks

6/7

6/9/21 arrived 8:20a; left 6:22; Alicia left 5:33; neck pain 5; hand intermittently cold and numb; middle finger sore at joint

6/10

6/11/21 arrived 8:20; left 6:20; Alicia left 5:05; neck pain 6-7; hand cold and numb despite hand brace

6/14/21 arrived 8:22; left 6:48; Alicia left 5:33; neck pain 6-7 hand cold and numb

6/16/21 arrived 8:20; left 6:26; Alicia left 5:36; neck pain 6-7; hand intermittent cold and numb; wore brace all day

6/17

6/18 arrived 8:16; left 6:30; Alicia left 5:18; neck pain 6-7; hand cold and numb (forgot brace at home) will order one for each location I workl

6/23/21 arrived 8:20; left 6:12; jand cold and numb as day progressed starting at 8:50; neck pain 4

6/28/21 arrived 8:20; left 7:58; Alicia left 6:03; lots of labs/school forms; neck pain 6; hand cold and numb most of day; brace worn

6/30/21 arrived 8;22; left 6:33; Alicia left 5:25; neck pain 6-7; hand numb and cold intermittently

7/1

7/2 arrived 8:28; left 7p; Alicia left 5:16; neck pain 6-7, 8 at times today; wore brace hand intermittently numb and cold (most of day); right should pain at times today; right 3rd finger pain with typing and hip exams

Holiday leave

'7/7/21 8:20; left 6:20; Alicia left 5:47; neck pain 6-7 ;hand cold and numb;

7/9/21 arrived 8:20a; left 5:52; Alicia left 5:18; neck pain 5; hand numb and cold but intermittently with wrist brace

PLAINTIFF004750

7/12/21 arrived 8:20; left 6:45; Alicia lwft 6p; neck pain6-7; hand cold and numb intermit; shoulder pain

7/14/21 arrived 8:23; left 7:05; Alicia left 6:21; neck pain 5; hand cold and numb intermittently

7/16/21 arrived 8:20; left 7:10; Alicia left 6:10; hand cold and numb intermittently; neck pain 5; improved mobility since PT this week; right shoulder hurts

7/19/21 arrived 8:18; left 7:02; Alicia left 5:33; neck pain 5; hand cold and numb intermittently

7/22/21 arrived 8:15; left 6:30; Alicia left 5:48; neck pain 5; hand cold and numb most of day

7/23/21 arrived 8:03; left 5:18; Alicia ;eft 5p; neck pain 5-6; hand cold and numb; right 3rd finger pain

7/26/21 arrived 8:22; left 5:45; Alicia left 5; neck pain 5; hand cold and numb intermittent

7/28/21 arrived 8:15; left 6:45; Alicia left 6:16; neck pain 5; hand cold numb

7/29

7/30/21 arrived 8:23; left; neck pain 5; hand very cold numb; temp in office 60; messaged office manager regarding locked thermostat box-no reply

7/31/21 arrived 8:20; left 12:45; Alicia left 12:30; neck pain 5; hand very cold and numb; temp in office 62, still no reply from office manager

8/2/21 ARRIVED 8:22; LEFT 6:28; Alicia left 5:30; horrible day; scribe and I unable to hear each other until late AM; using my cell phone audio; neck pain 5-6; hand very numb and very cold all day; office temp still 64; ,most patients complaining of temp office espec inafternoon

8/3/21 arrrived 8:23; left 7p; Alicia left 6:16; neck pain 5-6; hand very cold and nu,b

8/4

8/6/21 arrived 8:23; left 6:17; Alicia left 5:48; neck pain 5-6; hand cold numb

8/9/21 arrived 8:20; left 8:10; Alicia left 5:45; I had 20 school forms; lots of Rx and labs to review; neck pain 5-6; hand very cold and numb all day

8/11/21 arrived 8:21; left 6:08; Alicia left 5:32; neck pain 5-6; hand numb cold; midd finger pain

8/12

8/13 arrived 8:20; left 7:15; Alicia left 5:53; neck pain 5-6; hand cold like ice and numb

8/16/21 arrived 8:20; left 6:36; Alicia left 6:04; neck pain 6; handcold numb; stressed regarding case

8/18/21 arrived 8:20; left 8:20; Alicia left 6:35; neck pain 6; hand cold numb; feeling increased stress

8/19

PLAINTIFF004751

8/20/21arrived 8:23; left 8; Alicia left 5:48; neck pain 6-7; hand cold numb

8/23/21 arrived 8:23; left 7:08; neck pain 7 -8 by end of day; hand very cold and numb (no scribe for first 45min)

On leave 8.24 till 9/1

9/2 1:15to 6

9/3/21 arrived 8:22; left 8:04; Alicia left 7p; hand very numb and cold; neck pain 5-6

9/7/21 arrived 8:20; left 12:05

9/8/21 arrived 8:15; left 8:50; Alicia left 6:15; hand cold numb; neck pain 5-6

PLAINTIFF004752

PLAINTIFF004579

Plaintiff's Trial
Exhibit
97

Summary By Provider
CHILDRENS PEDIATRICIANS and ASSOCIATES, LLC
CP Laurel (1042)
FY 2020 Actuals

2019 · 2020

**Charges by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmeke | $52,495 | $73,397 | $65,124 | $191,016 | $65,123 | $74,124 | $95,690 | $234,937 | $81,978 | $54,711 | $71,672 | $208,360 | $37,682 | $42,748 | $92,253 | $172,663 | $836,376 |
| Dr. Glaser | $112,699 | $93,586 | $112,237 | $318,921 | $79,336 | $101,281 | $98,760 | $279,377 | $103,253 | $79,737 | $97,542 | $290,531 | $15,257 | $17,517 | $32,692 | $55,736 | $914,565 |
| Dr. Lowe | $68,434 | $89,496 | $67,329 | $225,258 | $85,882 | $78,705 | $81,580 | $246,357 | $93,849 | $73,207 | $68,731 | $235,788 | $15,726 | $39,346 | $62,827 | $153,899 | $861,501 |
| Dr. Pumpai | $69,624 | $83,370 | $71,645 | $224,439 | $67,897 | $92,985 | $89,382 | $250,165 | $92,596 | $99,704 | $63,870 | $256,170 | $22,777 | $41,603 | $64,000 | $138,388 | $969,561 |
| Dr. Pyle | $54,750 | $66,161 | $82,752 | $203,663 | $83,859 | $68,503 | $61,405 | $213,797 | $75,655 | $35,747 | $50,621 | $162,022 | $29,800 | $27,231 | $58,993 | $126,033 | $705,515 |
| Dr. Scott-McKinney | $108,503 | $106,868 | $97,554 | $312,926 | $87,748 | $112,350 | $149,454 | $348,553 | $148,067 | $81,953 | $129,388 | $360,008 | $67,873 | $31,767 | $103,421 | $203,081 | $1,224,547 |
| Former Physicians | $62 | $583 | $2 | $645 | $2 | $0 | $0 | $2 | $0 | $0 | $15 | $90 | $0 | $0 | ($50) | ($50) | $712 |
| Non Physicians | $240 | $110 | $170 | $520 | $345 | $290 | $220 | $855 | $120 | $135 | $35 | $290 | $0 | $0 | $35 | $35 | $1,700 |
| **Total Charges** | $467,206 | $513,070 | $498,611 | $1,477,307 | $470,222 | $525,228 | $575,761 | $1,574,242 | $595,092 | $495,104 | $452,473 | $1,633,235 | $214,529 | $200,211 | $444,449 | $859,189 | $5,414,478 |

**Receipts by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmeke | $20,917 | $24,967 | $46,355 | $91,379 | $43,053 | $37,278 | $52,029 | $132,361 | $42,832 | $42,356 | $45,890 | $131,091 | $26,203 | $21,560 | $38,408 | $86,132 | $440,972 |
| Dr. Glaser | $57,587 | $50,672 | $73,795 | $182,355 | $97,570 | $49,050 | $93,360 | $169,000 | $51,605 | $53,295 | $46,020 | $150,920 | $17,989 | $9,226 | $15,488 | $42,713 | $544,072 |
| Dr. Lowe | $42,530 | $32,072 | $58,068 | $132,660 | $55,498 | $33,583 | $56,272 | $145,443 | $38,973 | $46,424 | $42,954 | $128,351 | $24,982 | $21,939 | $37,552 | $81,373 | $491,328 |
| Dr. Pumpai | $32,990 | $27,897 | $56,086 | $116,872 | $46,429 | $35,668 | $51,075 | $133,172 | $40,481 | $44,942 | $49,723 | $135,146 | $28,363 | $20,597 | $31,045 | $80,395 | $465,585 |
| Dr. Pyle | $38,107 | $34,267 | $42,749 | $115,143 | $58,773 | $33,602 | $33,216 | $130,591 | $44,481 | $24,829 | $24,087 | $93,397 | $30,590 | $14,555 | $25,534 | $71,468 | $411,599 |
| Dr. Scott-McKinney | $54,978 | $53,154 | $77,785 | $195,927 | $52,429 | $52,842 | $69,869 | $175,341 | $63,144 | $59,526 | $56,500 | $189,220 | $55,560 | $33,579 | $29,965 | $119,114 | $685,502 |
| Former Physicians | $20,058 | $3,290 | $925 | $34,243 | $1,232 | $1,782 | $760 | $3,772 | $363 | $59,526 | $1,549 | $2,323 | $488 | $810 | $384 | $1,653 | $42,021 |
| Non Physicians | $100 | $205 | $65 | $370 | $530 | $195 | $190 | $715 | $202 | $65 | $35 | $302 | $0 | $20 | ($25) | ($45) | $1,381 |
| **Total Receipts** | $0 | $63 | $2,256 | $2,319 | $330 | $143 | $10 | $486 | $5,730 | $5,195 | $0 | $5,515 | $0 | $0 | $1,232 | $1,232 | $10,125 |
| Quantity Refunds | $285,598 | $225,615 | $355,870 | $865,950 | $325,325 | $240,091 | $316,606 | $850,315 | $302,348 | $271,452 | $266,808 | $840,723 | $184,578 | $123,029 | $178,770 | $486,359 | $3,086,378 |
| Receipts Less Refunds | | | | ($2,144) | | | | ($1,935) | | | | ($2,395) | | | | ($1,115) | ($67,489) |
| **Receipts Percentage** | 61.4% | 44.1% | 71.6% | 58.8% | 69.2% | 47.0% | 55.0% | 56.0% | 50.8% | 69.7% | 59.0% | 55.9% | 86.0% | 61.4% | 40.2% | 56.6% | 57.0% |

*Incentive payment information has not been added for reporting purposes. These totals have always been included in the P&L so they are for information only.

**Visits by Provider (by Date Post)**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmeke | 195 | 257 | 227 | 679 | 251 | 298 | 412 | 961 | 309 | 340 | 289 | 938 | 165 | 183 | 296 | 644 | 3,222 |
| Dr. Glaser | 362 | 308 | 389 | 1,039 | 325 | 357 | 376 | 1,038 | 329 | 280 | 224 | 833 | 84 | 98 | 176 | 358 | 3,308 |
| Dr. Lowe | 245 | 307 | 222 | 774 | 363 | 310 | 310 | 983 | 325 | 248 | 259 | 832 | 165 | 98 | 235 | 358 | 3,147 |
| Dr. Pumpai | 272 | 307 | 274 | 853 | 252 | 351 | 315 | 948 | 339 | 345 | 259 | 943 | 169 | 172 | 228 | 569 | 3,313 |
| Dr. Pyle | 170 | 198 | 268 | 636 | 343 | 249 | 214 | 806 | 250 | 136 | 161 | 547 | 121 | 98 | 179 | 398 | 2,387 |
| Dr. Scott-McKinney | 294 | 299 | 259 | 852 | 261 | 349 | 423 | 1,033 | 367 | 207 | 408 | 982 | 284 | 126 | 305 | 715 | 3,562 |
| Former Physicians | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| **Total** | 1,539 | 1,675 | 1,639 | 4,857 | 1,925 | 1,914 | 2,050 | 5,769 | 1,920 | 1,556 | 1,600 | 5,076 | 988 | 832 | 1,422 | 3,242 | 18,594 |

**Adjustments by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmeke | $15,185 | $19,681 | $28,554 | $63,431 | $34,908 | $29,798 | $40,214 | $104,919 | $34,024 | $38,126 | $34,051 | $106,241 | $21,052 | $21,072 | $32,497 | $74,631 | $349,221 |
| Dr. Glaser | $35,224 | $36,160 | $44,667 | $116,051 | $42,928 | $38,398 | $41,927 | $123,253 | $39,523 | $39,415 | $33,374 | $112,312 | $12,990 | $23,604 | $15,336 | $51,620 | $402,946 |
| Dr. Lowe | $23,814 | $26,870 | $36,702 | $94,386 | $41,874 | $27,215 | $41,799 | $110,888 | $32,602 | $34,004 | $30,958 | $98,403 | $17,705 | $25,304 | $30,284 | $73,293 | $376,970 |
| Dr. Pumpai | $23,166 | $23,137 | $36,294 | $82,596 | $38,116 | $31,177 | $40,676 | $107,970 | $37,531 | $40,102 | $34,873 | $112,506 | $19,565 | $34,351 | $31,117 | $85,353 | $388,426 |
| Dr. Pyle | $22,494 | $24,847 | $26,203 | $73,544 | $45,411 | $35,843 | $30,560 | $158,177 | $31,018 | $21,561 | $14,801 | $67,380 | $22,081 | $13,084 | $18,652 | $53,816 | $290,998 |
| Dr. Scott-McKinney | $43,783 | $41,126 | $49,014 | $133,922 | $41,726 | $45,741 | $55,027 | $133,589 | $18,385 | $45,703 | $87,015 | $151,103 | $33,039 | $44,868 | $28,208 | $106,116 | $529,831 |
| Former Physicians | $21,453 | $3,245 | $25,552 | $26,552 | $2,578 | $2,303 | $125 | $5,006 | $569 | $924 | $8,700 | $9,432 | ($561) | ($162) | $315 | ($429) | $54,362 |
| Non Physicians | $0 | $35 | $0 | $35 | $35 | $0 | $903 | $938 | $23 | $0 | $70 | $93 | $0 | $0 | $50 | $50 | $1,101 |
| **Total Adjustments** | $190,119 | $177,110 | $223,367 | $590,597 | $242,450 | $195,960 | $249,430 | $687,840 | $233,676 | $220,535 | $165,825 | $650,036 | $126,294 | $161,846 | $196,232 | $444,372 | $2,372,844 |

7/9/2020

PLAINTIFF004580

Summary By Provider
CHILDREN'S PEDIATRICIANS and ASSOCIATES, LLC
CP Laurel (1042)
FY 2019 Actuals

2019

**Charges by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Brown | | | | | | | | | | | | | | | | | |
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Dimmeke | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Parrish | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinley | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| Former Physicians | | | | | | | | | | | | | | | | | |
| Non Physicians | | | | | | | | | | | | | | | | | |
| **Total Charges** | | | | | | | | | | | | | | | | | |

**Receipts by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Brown | | | | | | | | | | | | | | | | | |
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Dimmeke | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Parrish | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinley | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| Former Physicians | | | | | | | | | | | | | | | | | |
| Non Physicians | | | | | | | | | | | | | | | | | |
| P4P Pay-for-performance | | | | | | | | | | | | | | | | | |
| Quarterly Rebates | | | | | | | | | | | | | | | | | |
| Receipts Less Refunds | | | | | | | | | | | | | | | | | |
| **Receipts Percentage** | | | | | | | | | | | | | | | | | |

*Incentive payment information has been added for reporting purposes. These dollars have always been included in the P&L so they are for information only.*

**Visits by Provider (by Date Post)**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Brown | | | | | | | | | | | | | | | | | |
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Dimmeke | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Parrish | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinley | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | | | | |

**Adjustments by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Brown | | | | | | | | | | | | | | | | | |
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Dimmeke | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Parrish | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinley | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| Former Physicians | | | | | | | | | | | | | | | | | |
| Non Physicians | | | | | | | | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | | | | | | | | |

7/5/2019

PLAINTIFF004581

CHILDREN'S PEDIATRICIANS and ASSOCIATES, LLC
FY 2018 Actuals

**Charges by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Domneka | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Glass | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinney | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| Former Physicians | | | | | | | | | | | | | | | | | |
| Non Physicians | | | | | | | | | | | | | | | | | |
| **Total Charges** | | | | | | | | | | | | | | | | | |

**Receipts by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Domneka | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Glass | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinney | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| Former Physicians | | | | | | | | | | | | | | | | | |
| Non Physicians | | | | | | | | | | | | | | | | | |
| Capitation | | | | | | | | | | | | | | | | | |
| **Total Receipts** | | | | | | | | | | | | | | | | | |
| Ordinary Refunds | | | | | | | | | | | | | | | | | |
| Receipts Less Refunds | | | | | | | | | | | | | | | | | |
| Receipts Percentage | | | | | | | | | | | | | | | | | |

**Visits by Provider (by Date Post)**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Domneka | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Glass | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinney | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | | | | |

**Adjustments by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delaney | | | | | | | | | | | | | | | | | |
| Dr. Domneka | | | | | | | | | | | | | | | | | |
| Dr. Glaser | | | | | | | | | | | | | | | | | |
| Dr. Glass | | | | | | | | | | | | | | | | | |
| Dr. Lowe | | | | | | | | | | | | | | | | | |
| Dr. Pyle | | | | | | | | | | | | | | | | | |
| Dr. Scott-McKinney | | | | | | | | | | | | | | | | | |
| Degrasse, NP | | | | | | | | | | | | | | | | | |
| Former Physicians | | | | | | | | | | | | | | | | | |
| Non Physicians | | | | | | | | | | | | | | | | | |
| **Total Adjustments** | | | | | | | | | | | | | | | | | |

PLAINTIFF004582

Summary By Provider
CHILDRENS PEDIATRICIANS and ASSOCIATES, LLC
CP Laurel (1042)
FY 2017 Actuals

**Charges by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delorey | $64,381 | $70,090 | $56,597 | $191,068 | $68,673 | $70,489 | $47,535 | $186,697 | $52,309 | $51,879 | $50,026 | $147,223 | $53,082 | $41,558 | $33,491 | $113,111 | $628,100 |
| Dr. Demmeke | $37,909 | $73,138 | $67,077 | $177,724 | $62,702 | $67,272 | $32,110 | $162,084 | $67,067 | $43,479 | $75,463 | $196,028 | $53,424 | $59,075 | $50,223 | $162,722 | $698,558 |
| Dr. Glaser | $66,044 | $128,593 | $108,135 | $325,152 | $116,317 | $84,457 | $97,305 | $298,079 | $87,360 | $135,990 | $135,902 | $354,553 | $81,718 | $98,396 | $84,813 | $256,897 | $1,155,097 |
| Dr. Glass | $66,972 | $129,287 | $100,568 | $298,856 | $53,319 | $91,075 | $173,509 | $258,003 | $74,543 | $37,150 | $73,662 | $231,415 | $70,716 | $79,513 | $72,912 | $223,141 | $1,011,395 |
| Dr. Pyle | $12,150 | $90,590 | $78,569 | $181,818 | $99,974 | $110,442 | $102,946 | $313,362 | $74,996 | $63,171 | $113,819 | $271,886 | $42,952 | $96,192 | $106,017 | $245,161 | $1,012,128 |
| Dr. Scott-McKinney | $106,000 | $92,394 | $117,297 | $315,681 | $115,111 | $125,424 | $100,631 | $341,188 | $109,965 | $123,705 | $102,033 | $335,703 | $80,916 | $115,547 | $77,297 | $273,760 | $1,290,330 |
| Degrosse, NP | $15,100 | $69,753 | $43,215 | $128,063 | $43,962 | $36,225 | $44,445 | $124,632 | $51,635 | $36,852 | $45,359 | $133,846 | $35,352 | $43,768 | $44,081 | $125,181 | $511,727 |
| Dr. Feldman | $2,039 | $36 | | $1,616 | $5,556 | $33,048 | $20,704 | $59,706 | $12,629 | | $26,252 | $39,761 | $17,203 | $22 | $25 | $7,251 | $89,337 |
| Former Physicians | $370 | $52 | $65 | $497 | $50 | | | $50 | | | | $51 | | | $745 | $300 | $1,391 |
| Non-Physicians | $45 | $180 | $175 | $380 | $565 | $560 | $1,538 | $2,863 | $335 | $490 | $470 | $591 | $185 | | | $20 | $4,050 |
| Capitation** | $6,701 | $16,790 | $16,496 | $19,977 | $17,637 | $9,541 | $12,397 | $29,375 | $9 | $10 | $1,295 | $3,205 | $1,964 | | $11,311 | $12,273 | $552,382 |
| **Total Charges** | $374,630 | $654,582 | $571,539 | $1,600,763 | $606,639 | $918,997 | $819,209 | $1,745,564 | $515,639 | $493,278 | $614,134 | $1,623,029 | $410,571 | $525,279 | $409,464 | $1,408,412 | $6,377,473 |

**Collections by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delorey | $32,156 | $35,975 | $18,756 | $86,789 | $40,234 | $38,684 | $26,130 | $104,988 | $23,559 | $23,186 | $32,541 | $79,287 | $20,952 | $25,793 | $18,517 | $64,012 | $335,845 |
| Dr. Demmeke | $10,156 | $40,628 | $23,500 | $74,284 | $33,744 | $39,634 | $19,025 | $92,303 | $27,660 | $27,131 | $13,263 | $68,173 | $33,429 | $33,151 | $51,171 | $32,950 | $630,553 |
| Dr. Glaser | $48,332 | $53,985 | $44,343 | $144,331 | $37,074 | $56,519 | $57,392 | $151,085 | $41,744 | $40,035 | $56,175 | $134,535 | $45,263 | $52,361 | $43,289 | $140,376 | $630,883 |
| Dr. Glass | $39,892 | $51,552 | $40,772 | $132,075 | $53,004 | $44,583 | $39,940 | $146,905 | $41,174 | $40,181 | $51,855 | $134,535 | $34,506 | $46,615 | $45,349 | $126,470 | $539,087 |
| Dr. Pyle | $818 | $16,514 | $17,458 | $24,791 | $74,644 | $56,542 | $50,790 | $111,976 | $42,689 | $40,181 | $70,712 | $159,592 | $24,926 | $52,295 | $48,333 | $125,453 | $491,812 |
| Dr. Scott-McKinney | $45,348 | $56,157 | $38,609 | $140,374 | $72,990 | $64,531 | $56,968 | $194,828 | $53,099 | $55,453 | $66,401 | $182,094 | $48,945 | $55,718 | $51,718 | $154,057 | $482,252 |
| Degrosse, NP | $4,291 | $36,569 | $16,633 | $47,693 | $39,091 | $18,738 | $20,529 | $67,358 | $26,227 | $20,336 | $24,479 | $71,043 | $19,751 | $15,530 | $25,367 | $76,749 | $256,943 |
| Dr. Feldman | $33,758 | $2,351 | $1,942 | $27,752 | $1,832 | $58,326 | $11,422 | $21,580 | $4,366 | $8,747 | $56,499 | $19,612 | $4,501 | $3,126 | $104 | $8,131 | $57,274 |
| Former Physicians | $2,025 | $1,697 | $900 | $4,613 | $654 | $1,430 | $105 | $105 | $290 | $470 | $490 | $1,100 | $195 | $5,230 | $300 | $500 | $5,573 |
| Non-Physicians | $545 | $1,169 | | $9,914 | $496 | $2,333 | $2,232 | $1,072 | | | | | | | | | $16,451 |
| Capitation | | | | | | | | | | | | | | | | | |
| Quarterly Refunds | | | | ($509) | | | | ($1,175) | | | | ($1,242) | | | | ($1,555) | ($7,505) |
| **Total Collections** | $216,114 | $272,743 | $210,169 | $701,035 | $392,888 | $331,481 | $272,825 | | $293,618 | $283,336 | $352,006 | $903,425 | $231,849 | $293,325 | $235,036 | $791,951 | $3,339,004 |
| Collections Less Refunds | | | | $700,130 | | | | | | | | $909,438 | | | | $791,956 | $3,365,803 |
| **Collection Percentage** | 58.3% | 41.7% | 36.8% | 43.9% | 64.9% | 53.9% | 53.3% | | 57.4% | 57.4% | 57.4% | 55.9% | 56.6% | 57.2% | 53.3% | 53.2% | 53.3% |

**Visits by Provider (by Date Post)**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delorey | 210 | 232 | 174 | 616 | 214 | 231 | 147 | 592 | 132 | 168 | 202 | 502 | 138 | 134 | 114 | 386 | 2,096 |
| Dr. Demmeke | 124 | 245 | 252 | 621 | 244 | 256 | 128 | 628 | 272 | 198 | 315 | 775 | 206 | 243 | 232 | 681 | 2,717 |
| Dr. Glaser | 282 | 367 | 351 | 990 | 387 | 340 | 340 | 985 | 308 | 306 | 297 | 1,187 | 307 | 307 | 285 | 899 | 3,991 |
| Dr. Glass | 256 | 430 | 371 | 1,059 | 387 | 347 | 349 | 1,006 | 304 | 309 | 324 | 937 | 287 | 305 | 294 | 886 | 3,680 |
| Dr. Pyle | 57 | 335 | 327 | 719 | 398 | 399 | 447 | 1,241 | 271 | 312 | 464 | 1,047 | 151 | 357 | 391 | 899 | 3,906 |
| Dr. Scott-McKinney | 323 | 281 | 359 | 963 | 371 | 376 | 304 | 1,051 | 320 | 368 | 317 | 1,055 | 283 | 347 | 223 | 833 | 3,852 |
| Degrosse, NP | 7 | 0 | 4 | 11 | 20 | 106 | 77 | 203 | 48 | 0 | 40 | 88 | 28 | 0 | 0 | 38 | 340 |
| Dr. Feldman | 54 | 282 | 179 | 515 | 186 | 167 | 202 | 555 | 207 | 144 | 190 | 541 | 144 | 173 | 174 | 491 | 2,102 |
| Non-Physicians | | | | | | | | | | | | | | | | | |
| **Total** | 1,299 | 2,182 | 2,017 | 5,394 | 2,167 | 2,149 | 1,889 | 4,375 | 1,863 | 1,788 | 2,338 | 6,002 | 1,634 | 1,971 | 1,889 | 5,103 | 22,284 |

**Adjustments by Provider**

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Delorey | $32,714 | $36,846 | $27,324 | $96,985 | $37,759 | $34,055 | $21,923 | $94,487 | $22,111 | $22,724 | $27,226 | $72,162 | $21,432 | $20,631 | $14,380 | $56,643 | $320,177 |
| Dr. Demmeke | $14,044 | $40,030 | $27,670 | $81,745 | $32,288 | $34,433 | $17,657 | $85,135 | $20,169 | $21,612 | $20,671 | $82,633 | $26,054 | $23,781 | $25,533 | $73,449 | $325,024 |
| Dr. Glaser | $40,952 | $51,003 | $48,107 | $141,902 | $54,716 | $44,858 | $39,227 | $138,801 | $43,023 | $39,999 | $50,080 | $133,663 | $37,933 | $32,566 | $35,957 | $106,456 | $520,121 |
| Dr. Glass | $39,489 | $54,572 | $43,387 | $137,498 | $53,537 | $44,610 | $35,740 | $134,107 | $34,552 | $37,049 | $55,056 | $126,597 | $28,728 | $33,581 | $33,228 | $105,835 | $473,539 |
| Dr. Pyle | $3,882 | $22,472 | $30,003 | $57,157 | $56,092 | $55,787 | $50,302 | $156,012 | $50,702 | $33,702 | $57,323 | $130,827 | $23,240 | $58,363 | $42,395 | $123,243 | $431,551 |
| Dr. Scott-McKinney | $51,880 | $48,472 | $49,123 | $149,129 | $144,460 | $58,532 | $50,230 | $108,034 | $51,993 | $49,058 | $48,017 | $150,068 | $38,953 | $45,535 | $40,993 | $115,695 | $508,100 |
| Degrosse, NP | $5,183 | $28,406 | $19,243 | $52,632 | $22,846 | $16,131 | $19,560 | $58,341 | $25,655 | $16,034 | $17,304 | $55,993 | $17,219 | $21,550 | $19,566 | $58,335 | $225,501 |
| Dr. Feldman | $1,784 | $3,508 | $1,335 | $6,607 | $47 | ($59) | $297 | $25,581 | $4,901 | $4,539 | $3,079 | $13,720 | $3,363 | $1,194 | $190 | $4,767 | $47,387 |
| Former Physicians | | | | | | | | | | $290 | | $335 | $13 | | $58 | $101 | $5,040 |
| Non-Physicians | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $70 | $35 | $105 | $140 | ($431) | $0 | ($229) | ($430) |
| **Total Adjustments** | $204,293 | $298,343 | $244,507 | $743,033 | $325,791 | $248,681 | $257,697 | $355,307 | $225,537 | $271,397 | $271,749 | $747,140 | $197,033 | $317,611 | $312,277 | $435,022 | $2,555,073 |

**Additional capitation information has been added for Finance. Those totals have always been included in the total charges and adjustments so they are for information only.

-362-

7/7/2017

exhibitstickers.com

**Plaintiff's Trial Exhibit 107**

**Fiscal Year 2019 Annual Physician Compensation Reconciliation Report**

**College Park - Laurel Practice**

**FINAL 8/12/19**

| This version includes FY19 vaccine expense | 0.90 | 0.50 | Dr. Scott - McKinney* 0.80 | 0.80 | 0.50 | 0.90 | 0.90 | TOTAL 5.30 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 50,760 | | |
| **Actual Base Comp Paid (Total)** | **$196,747** | **$87,236** | **$206,598** | **$121,748** | **$83,630** | **$59,717** | **$164,998** | **$920,674** |
| | | | | | | | | |
| Actual Incentive Comp Paid (Qtr 1) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Actual Incentive Comp Paid (Qtr 2) | $8,630 | $4,127 | $9,135 | $5,371 | - | - | - | 27,263 |
| Actual Incentive Comp Paid (Qtr 3) | $8,630 | $3,752 | $9,135 | $5,371 | - | - | - | 26,888 |
| Actual Incentive Comp Paid (Qtr 4) | | | | | | | | |
| **Actual Incentive Comp Paid Total** | **$17,260** | **$7,879** | **$18,271** | **$10,741** | **$0** | **$0** | **$0** | **$54,150** |
| | | | | | | | | |
| Annual Actual NMR Q1 | 173,106 | 80,484 | 185,558 | 116,722 | 72,027 | - | 112,203 | 740,101 |
| Annual Actual NMR Q2 | 194,954 | 102,459 | 227,656 | 152,887 | 116 | 2,022 | 160,346 | 840,439 |
| Annual Actual NMR Q3 | 190,982 | 80,405 | 198,654 | 115,459 | 84,673 | 85,267 | 110,954 | 866,394 |
| Annual Actual NMR Q4 | 158,143 | 85,450 | 239,004 | 93,126 | 100,508 | 86,851 | 115,891 | 878,974 |
| **Annual Actual NMR total** | **$717,185** | **$348,798** | **$850,872** | **$478,194** | **$257,325** | **$174,139** | **$499,395** | **$3,325,908** |
| | | | | | | | | |
| Annual Actual NMR (Total) | $717,185 | $348,798 | $850,872 | $478,194 | $257,325 | $174,139 | $499,395 | $3,325,908 |
| Annual Reconciliation Calculated Comp Percentage | 33.27% | 33.27% | 33.27% | 33.27% | 32.0% | 28.0% | 28.0% | 33.3% |
| FY 19 Actual Calculated Comp (Based on year-end percentage) | $238,578 | $116,031 | $283,051 | $159,076 | $82,344 | $48,759 | $139,831 | $1,067,669 |
| Jr Doc NMR Credit | $11,596 | $5,640 | $13,758 | $7,732 | | | | $38,726 |
| Jr. Doc NMR Credit % | 30% | 15% | 36% | 20% | | | | 100% |
| FY19 Actual Calculated Comp (Based on year-end percentage) + Jr Credit | $250,175 | $121,671 | $296,808 | $166,808 | $82,344 | $48,759 | $139,831 | $1,106,395 |
| Percent Of Total Compensation by Physician | 22.61% | 11.00% | 26.83% | 15.08% | 7.44% | 4.41% | 12.64% | 100.00% |

| ANNUAL RECONCILIATION: FY 2019 | | | Dr. Scott - McKinney | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Base Compensation Paid | $196,747 | $87,236 | $206,598 | $121,748 | $83,630 | $50,760 | $140,248 | $886,967 |
| Incentive Compensation Paid | $17,260 | $7,879 | $18,271 | $10,741 | $0 | $8,958 | $24,750 | $87,858 |
| Total Compensation Paid | $214,007 | $95,115 | $224,868 | $132,489 | $83,630 | $59,717 | $164,998 | $974,824 |
| FY 2019 Actual Calculated Comp, Before Deficit Allocation | $250,175 | $121,671 | $296,808 | $166,808 | $82,344 | $48,759 | $139,831 | $1,106,395 |
| Percentage Total Compensation | 22.61% | 11.00% | 26.83% | 15.08% | 7.44% | 4.41% | 12.64% | 100.0% |
| **Actual Earned Income** | **$36,168** | **$26,556** | **$71,940** | **$34,319** | **($1,286)** | **($10,958)** | **($25,167)** | **$131,571** |
| Actual Net Margin From Operations (from Performance Reports) | | | | | | | | $151,797 |
| Nurse Practitioner | | | | | | | | $0 |
| Physician Base Compensation Deficit | | | | | ($1,286) | ($2,001) | ($418) | **($3,704)** |
| Variance Between Margin and Actual Earned Income | | | | | | | | **$16,522** |
| Budget Margin Deficit | | | | | | | | **$0** |
| Balance After Annual Reconciliation | $36,168 | $26,556 | $71,940 | $34,319 | $0 | $0 | $0 | **$168,982** |
| Incentive Amount to be Repaid for FY19 (Incentive Payback) | $0 | $0 | $0 | $0 | $0 | ($8,958) | ($24,750) | **($33,707)** |
| Incentive Amount to be Repaid for FY18 (last year) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Physician Base Compensation Deficit | $0 | $0 | $0 | $0 | ($1,286) | ($2,001) | ($418) | **($3,704)** |
| Percentage Calculation for Reallocation Base Deficit (FTE) | 30.00% | 16.67% | 26.67% | 26.67% | | | | 100% |
| Provider Deficit Reallocation (Incentive Payback) | ($1,111) | ($617) | ($988) | ($988) | | | | **($3,704)** |
| Annual Incentive Compensation Due/Paid (Before Margin Deficit) | $35,056 | $25,938 | $70,952 | $33,331 | $0 | $0 | $0 | **$165,278** |
| Deficit Between Allowable Margin and Calculated Earned Income | ($10,112) | ($5,618) | ($8,989) | ($8,989) | $0.00 | $0.00 | $0.00 | **($33,707)** |
| Annual Incentive Compensation Due | $24,944.05 | $20,320.57 | $61,963.53 | $24,342.47 | $0.00 | $0.00 | $0.00 | **$131,570.63** |
| FY 2019 Actual Earned Compensation Paid (AEC) | $249,063.28 | $121,053.23 | $295,820.62 | $165,820.04 | $83,629.91 | $50,759.62 | $140,248.37 | $1,106,395.08 |
| Compensation figure used for FY20 Calculation | $250,174.60 | $121,670.63 | $296,808.46 | $166,807.88 | $82,343.97 | $48,758.95 | $139,830.58 | $1,106,395.08 |



Plaintiff's Trial
Exhibit
110

FY 2018 Annual Physician Compensation Reconciliation Report

CP/Laurel

Draft- 8/16/2018

| | | Dr. Scott - McKinney | | | | TOTAL | | DeGrasse, NP |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 1.00 | | |
| | $201,171 | $90,299 | $193,943 | $120,881 | $138,400 | $143,644 | $888,337 | $51,045 |

**Actual Base Comp Paid (Total)**

| Actual Incentive comp Paid (Qtr1) | $0 | $0 | $7,525 | $0 | $3,591 | $5,936 | 17,052 | |
| Actual Incentive Comp Paid (Qtr 2) | $8,557 | $5,225 | $8,908 | $5,473 | $7,872 | $6,327 | 33,804 | |
| Actual Incentive Comp Paid (Qtr 3) | $ | $ | $8,908 | $5,473 | $7,872 | $6,327 | 37,137 | |
| Actual Incentive Comp Paid (Qtr 4) | | | | | | | | |
| **Actual Incentive Comp Paid Total** | $8,557 | $5,225 | $25,340 | $10,946 | $19,334 | $18,591 | $87,993 | |

| Annual Actual NMR Q1 | 142,255 | 65,635 | 198,941 | 92,150 | 145,464 | 183,409 | 827,853 | $60,871 |
| Annual Actual NMR Q2 | 157,010 | 89,244 | 210,250 | 107,692 | 139,226 | 181,196 | 865,197 | $57,202 |
| Annual Actual NMR Q3 | 177,989 | 76,286 | 182,628 | 108,097 | 147,264 | 162,724 | 854,989 | $62,913 |
| Annual Actual NMR Q4 | 176,187 | 92,933 | 196,129 | 124,112 | 32,452 | 158,112 | 779,926 | 59,968 |
| **Annual Actual NMR (total)** | $653,441 | $324,098 | $787,950 | $432,051 | $464,403 | $685,992 | $3,347,924 | $240,954 |

| Annual Actual NMR (Total) | $653,441 | $324,098 | $787,950 | $432,051 | $464,403 | $685,992 | $3,347,924 | 1% |
| Annual Reconciliation Calculated Comp Percentage | 33.3% | 33.3% | 33.3% | 33.3% | 33.3% | 30.0% | 33.3% | |
| FY 18 Actual Calculated Comp (Based on year-end percentage) | $217,419 | $107,837 | $262,174 | $143,756 | $154,520 | $205,795 | $1,091,501 | |
| Percent Of Total Compensation by Physician | 19.92% | 9.88% | 24.02% | 13.17% | 14.16% | 18.85% | 100.00% | |

| **ANNUAL RECONCILIATION: FY 2018** | Dr. Glaser | Dr. Delaney | Dr. Scott - McKinney | Dr. Demmeke | Dr. Glass | Dr. Pyle | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| Base Compensation Paid | $201,171 | $90,299 | $193,943 | $120,881 | $138,400 | $143,644 | $888,337 | |
| Incentive Compensation Paid | $8,557 | $5,225 | $25,340 | $10,946 | $19,334 | $18,591 | $87,993 | |
| Total Compensation Paid | $209,728 | $95,523 | $219,283 | $131,827 | $157,734 | $162,234 | $976,330 | |
| FY 2018 Actual Calculated Comp. Before Deficit Allocation | $217,837 | $107,837 | $262,174 | $143,756 | $154,520 | $205,795 | $1,091,501 | |
| Percentage Total Compensation | 19.92% | 9.88% | 24.02% | 13.17% | 14.16% | 18.85% | 100.0% | |
| **Actual Earned Income** | $7,691 | $12,314 | $42,891 | $11,929 | ($3,214) | $43,560 | $115,171 | |
| **Actual Net Margin From Operations (from Performance Reports)** | | | | | | | $87,031 | |
| Nurse Practitioner | | | | | | | 1,899 | |
| **Variance Between Margin and Annual Earned Income** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Physician Base Compensation Deficit** | | | | | | | ($30,039) | |
| **Budget Margin Deficit** | ($5,984) | ($52,968) | ($7,215) | ($3,956) | ($4,252) | ($5,664) | ($30,039) | |
| **Balance After Annual Reconciliation (Available Margin)** | $1,708 | $9,346 | $35,675 | $7,973 | ($7,466) | $37,897 | $85,132 | |
| Incentive Amount to be Repaid for FY16 (Incentive Payback) | $0 | $0 | $0 | $0 | ($7,466) | $0 | ($7,466) | |
| Incentive Amount to be Repaid for FY19 (last year) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Physician Base Compensation Deficit | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Percentage Calculation for Retroaction Base Deficit (FTE) | | | | | | | | |
| Provider Deficit Realocation (Incentive Payback) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Junior Physician Credit - Allocated based of of Senior Partner % of NMR | | | | | | | | |
| Allowable by Remaining Margin | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0 | |
| **Annual Incentive Compensation (Dual/Paid with Jr Partner** | $1,708 | $9,346 | $35,675 | $7,973 | $0 | $37,897 | $85,132 | |
| FY 2018 Actual Earned Compensation (AEC) | $211,436 | $104,869 | $254,959 | $139,800 | $150,268 | $200,131 | $1,061,462 | |
| Compensation figure used for FY19 Calculation | $217,419 | $107,837 | $262,174 | $143,756 | $154,520 | $205,795 | $1,091,501 | |

Q4 Payments   $3,345,977 | Capitation | 1947.45
$3,347,924
$2,661,942   $ | 1,899

Pyle Difference to 33.3%
NMR | $685,982
33.6%
Actual- 30% | $228,246.26
To be Reallocated to SPs | $205,794.55
| $22,451.70

Total SP NMR
Dr. Glaser | $ 5,511.34
Dr. Delaney | $ 2,733.55
Dr. Scott - McKinney | $ 6,845.83
Dr. Demmeke | $ 3,644.06
Dr. Glass | $ 3,916.93
| $ 22,451.70

Allowable per margin
Dr. Glaser | $0
Dr. Delaney | $0.00
Dr. Scott - McKinney | $0.00
Dr. Demmeke | $0.00
Dr. Glass | $0.00

$87,031.09  <== Includes NP

Plaintiff's Trial Exhibit 119

exhibitsticker.com

**Fiscal Year 2020 Annual Physician Compensation Reconciliation Report**

**College Park - Laurel Practice**

FINAL:     10.21.2020

| | | Dr. Scott - McKinney* | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| FTE | 0.90 | 0.80 | 0.80 | 0.60 | 0.90 | | 0.90 | 4.90 |
| Actual Base Comp Paid (Total) | $203,544 | $235,677 | $130,444 | $95,455 | $121,512 | 103,285 | $131,785 | $918,416 |
| | | | | | | | | |
| Actual Incentive Comp Paid (Qtr 1) | $8,995 | $10,450 | $5,770 | $4,146 | $0 | | $0 | $29,361 |
| Actual Incentive Comp Paid (Qtr 2) | $6,464 | $7,616 | $5,770 | $4,146 | $0 | | $0 | $23,996 |
| Actual Incentive Comp Paid (Qtr 3) | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| Actual Incentive Comp Paid (Qtr 4) | | | | | | | | |
| Actual Incentive Comp Paid Total | $15,459 | $18,066 | $11,540 | $8,293 | $0 | | $0 | $53,358 |
| | | | | | | | | |
| Annual Actual NMR Q1 | $193,615 | $189,975 | $115,965 | $115,317 | $127,307 | | $127,545 | $869,724 |
| Annual Actual NMR Q2 | $158,313 | $197,512 | $133,130 | $120,188 | $140,633 | | $138,605 | $888,380 |
| Annual Actual NMR Q3 | $141,037 | $202,666 | $134,185 | $90,783 | $143,534 | | $132,114 | $844,319 |
| Annual Actual NMR Q4 | $37,342 | $115,351 | $97,742 | $71,150 | $78,125 | | $86,881 | $486,591 |
| Annual Actual NMR total | $530,306 | $705,504 | $481,021 | $397,438 | $489,600 | | $485,145 | $3,089,014 |
| | | | | | | | | |
| Annual Actual NMR (Total) | $530,306 | $705,504 | $481,021 | $397,438 | $489,600 | | $485,145 | $3,089,014 |
| Actual Reconciliation Calculation Comp Percentage | 30.02% | 30.02% | 30.02% | 30.02% | 28.00% | | 30.02% | |
| FY20 Actual Earned Comp before Budget Margin Deficit Allocation | $159,198 | $211,792 | $144,403 | $119,311 | $137,088 | | $145,641 | $917,432 |
| Jr Doc NMR Credit (SP split based on SP % of NMR Totals) | $0 | $0 | $0 | $0 | | | | $0 |
| FY20 Actual Earned Comp before Budget Margin Deficit Allocation + Jr Doc Credit | $159,198 | $211,792 | $144,403 | | | | | |
| Percent Of Total Compensation by Physician | 17.35% | 23.09% | 15.74% | 13.00% | 14.94% | | 15.87% | 100.00% |

| | | Dr. Scott - McKinney | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **ANNUAL RECONCILIATION: FY20** | | | | | | | | |
| Allocation of Budget Margin Deficit | ($9,436) | ($12,554) | ($8,560) | ($7,072) | ($8,126) | | ($8,633) | ($54,381) |
| AE Comp after Budget Margin Deficit | $149,761 | $199,238 | $135,843 | $112,239 | $128,962 | | $137,008 | $863,051 |
| Base Compensation Paid | $203,544 | $235,677 | $130,444 | $95,455 | $121,512 | | $131,785 | $918,416 |
| Incentive Compensation Paid | $15,459 | $18,066 | $11,540 | $8,293 | $0 | | $0 | $53,358 |
| Total Compensation Paid | $219,003 | $253,743 | $141,983 | $103,748 | $121,512 | | $131,785 | $971,773 |
| Year-End Incentive Payout (if positive margin) | ($15,459) | ($18,066) | ($6,140) | $8,491 | $7,450 | | $5,223 | ($18,501) |
| Amendment Forgiveness of incentive payback (Forfeiture of payout) | $15,459 | $18,066 | $6,140 | $0 | $0 | | $0 | $39,665 |
| Year-End Incentive Payout (regarding actual margin) | $0 | $0 | $0 | $8,490.65 | $7,450.42 | | $5,222.85 | $21,163.91 |
| | | | | | | | | |
| Actual Earned Compensation Paid (AEC) | $219,003 | $253,743 | $141,983 | $112,239 | $128,962 | | $137,008 | $992,937 |
| | | | | | | | | |
| Compensation Figure Used for FY21 Calculation | $149,761 | $199,238 | $135,843 | $112,239 | $128,962 | | $137,008 | $863,051 |

Plaintiff's Trial
Exhibit

162



# The Orthopaedic Center, P.A.
A Division of The Centers for Advanced Orthopaedics, LLC

9420 Key West Avenue
Suite 300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

20500 Seneca Meadows Pkwy
Suite 2100
Germantown, MD 20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F. St, N.W.
Suite 305
Washington, D.C. 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary Feldman, DPM
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph Hanna, M.D.
Richard Reff, M.D.
Scott C. Faucett M.D.
Joseph O'Brien M.D.

6/13/17
STACY SCOTT-MCKINNEY

Dr. Scott – McKinney is followed with chronic neck and arm pain that is considerably exacerbated by her documentation requirements. She would strongly benefit from a scribe.

Sincerely yours,
David Levin M.D.

Signature: _____

David Levin, M.D.

EXHIBIT

Levin Ex. 2



**The Orthopaedic Center, P.A.**

9420 Key West Avenue, #300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary E. Feldman, DPM
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, M.D., M.S.

20500 Seneca Meadows
Pkwy. Suite 2100
Germantown, MD 20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F Street NW, Suite #305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Patient Name:   STACY D SCOTT MCKINNEY
Date of Service:   9/4/2018

DOB:   ~~REDACTED~~
Chart #:   204763

**Plaintiff's Trial Exhibit**

**163**

**Chief Complaint:** Follow up of chronic neck pain

**HPI:** Dr. Scott McKinney is a 55-year-old female pediatrician who is followed with chronic neck pain associated with C5-6 spondylosis as the result of a work related injury. I last saw her 10 months ago. She has had transient relief only following a cervical epidural steroid injection by Dr. Hough. I had referred her for physical therapy in 12/2017 though this was not approved for her until 07/2018, at which time I provided another prescription for the same. She has responded well to physical therapy and dry needling and returns to discuss a repeat trial of the same. She has made some changes to her workstation, including using a touch screen instead of a mouse, which has been somewhat helpful. She has also started using a scribe who has reduced the amount of typing the patient has to do. Unfortunately, she has had increasing pain over the last month since having to back to using a mouse due to her touch screen computer not being compatible with the software she has to use for work. She notes pain in the right trapezius and shoulder region.

**ROS:**
A complete 10-point system review was performed and negative but for that recorded in the history of present illness.

**Medical History:**

**Family History:**

**Past Surgical History:**

**Social History:**
Does the patient smoke or chew tobacco?   ☐ No ☐ Yes Number: _____ packs per day for _____ years

**Allergies:**

**Medications:** Medrol (4 MG, Take tapering dose as directed)
Valium (5 MG, Take 1 tablet(s) by mouth 1/2 hour prior to MRI, may repeat times 1)

**Height:** 5 ft 5 in **Weight:** 138 lbs

**Physical Examination:** On examination, this is a pleasant female in no acute distress. She is alert and oriented x three. Affect is appropriate. She gets to 2 fingerbreadths short of full cervical flexion, 70 degrees extension, 50 degrees left rotation, and 45 degrees right rotation. Negative right Spurling's test. Negative empty can sign. Negative Speed's test. Mildly positive right Hawkins test. Negative Neer's test.

**Imaging:**

**EXHIBIT**

**Levin Ex. 3**

**Assessment:** Chronic neck and right shoulder pain in the setting of C5-6 spondylosis and right rotator cuff impingement, symptomatic due to overexertion while charting in her role as a pediatrician.

**Plan:** She has made significant improvements with the help of a scribe and a touch screen that does not require use of a mouse. Unfortunately, she has lost these services, and her symptoms are regressing. I continue to recommend use of a scribe and a touch screen. I have also authorized additional physical therapy for the next 4 to 6 weeks with transition to a home exercise program. She is not interested in pursuing surgical intervention and I do not think repeat cervical epidural injections would be more durably beneficial than her initial trial. She will transition from physical therapy to a home exercise program and follow up with me on an as needed basis.

/iScribes: LMK

Provider Signature:

David Levin, M.D.                                    9/4/2018
                                                     Date

**PLAINTIFF000106**



**The Orthopaedic Center, P.A.**

9420 Key West Avenue, #300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary E. Feldman, DPM
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, M.D., M.S.

20500 Seneca Meadows
Pkwy. Suite 2100
Germantown, MD 20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F Street NW, Suite #305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Patient Name:    STACY D SCOTT MCKINNEY
Date of Service:  3/5/2019

DOB:    ~~REDACTED~~
Chart #:  204763

**Plaintiff's Trial Exhibit**

**164**

**Chief Complaint:** Right arm and hand pain and coldness

**HPI:** Ms. Scott McKinney is a 55-year-old female pediatrician who is followed with chronic neck pain associated with C5-6 spondylosis and foraminal stenosis, symptomatic as the result of overuse at work. She has had excellent but transient relief following an epidural steroid injection by Dr. Hough. She has had some temporary response to physical therapy. When I last saw her in 09/2018 I had recommended continued modifications to her workspace with use of a scribe and/or touchscreen. A scribe was hired in 07/2018 and has been helpful for her as it relates to her neck pain. She presents now to discussed her ongoing neck pain. She does note some occasional right arm and hand pain that progresses as the day goes on. She denies any weakness in the right arm, although she does note some tingling and a cold sensation. She does report she is less symptomatic on her days off from work, but not resolved.

**ROS:**
A complete 10-point system review was performed and negative but for that recorded in the history of present illness.

**Medical History:**

**Family History:**

**Past Surgical History:**

**Social History:**
Does the patient smoke or chew tobacco?    ☐ No  ☐ Yes Number: _____ packs per day for _____ years

**Allergies:**

**Medications:** Medrol (4 MG, Take tapering dose as directed)
Valium (5 MG, Take 1 tablet(s) by mouth 1/2 hour prior to MRI, may repeat times 1)

**Height:** 5 ft 5 in  **Weight:** 138 lbs

**Physical Examination:** CONSTITUTIONAL: Height 5'5" Weight 138 lbs. This is a pleasant, well-developed individual, in no apparent distress.
CARDIAC: Regular rate and rhythm by palpation.
PULMONARY: No audible wheezing or signs of respiratory distress.
PSYCHIATRIC: Alert and Oriented x 3, Pleasant mood and appropriate affect.
ABDOMEN: No tenderness appreciated. No noted hernia present.
SKIN: No evidence of lacerations, abrasions, or rashes over bilateral lower extremities.
LYMPHATIC: No lymphadenopathy or edema in bilateral lower extremities.

**EXHIBIT**

**Levin Ex. 4**

MUSCULOSKELETAL/NEUROLOGICAL: Negative right carpal tunnel compression test. On examination of her cervical spine, she gets to 2 fingerbreadths short of full flexion, 55 degrees left rotation, 50 degrees right rotation, and 50 degrees extension. She notes tingling in the radial forearm and hand, as well as the thumb and index finger, with right Spurling's test. Negative empty can signs. Normal 5/5 supraspinatus strength. Negative Hawkins test. Negative Neer's test. Negative Speed's test.

**Imaging:**

**Assessment:** 1. Chronic neck pain and right cervical radiculopathy with posterior shoulder pain associated with C5-6 spondylosis.
2. Right hand coldness and intermittent color change that I suspect is non-radiculopathic.

**Plan:** As it relates to the neck, she continues to wish to hold off on surgical intervention. She is clearly deriving symptomatic benefit from the scribe and use of a touchscreen, and I have encouraged continued use of these indefinitely. She clearly noted worsening of her pain when the scribe had to take medical leave following a death in the family. She also notes clear worse pain after a workday, or particularly after several workdays in a row. We have discussed the possibility of going to ann every other workday schedule, but we will hold off on that for the time being. We have discussed that she is a candidate for surgical treatment consisting of C5-6 ACDF, although she does not wish to pursue this. Her symptoms are reasonably well controlled with the reasonable accommodations at work. I have recommended she see my hand partner for a second opinion regarding her right hand coldness and discoloration. She will follow up with me on an as needed basis.

/iScribes: LMK

Provider Signature:

_____
David Levin, M.D.

3/5/2019
_____
Date



**The Centers**
for Advanced Orthopaedics

The Orthopaedic Center Division

9420 Key West Avenue  Suite 300  Rockville, Maryland 20850  (301) 251-1433
20500 Seneca Meadows Pkwy  Suite 2100  Germantown, Maryland 20876  (301) 251-1433
2112 F Street, Suite 305  Washington, DC 20037  (202) 912-8480

Date: 8/20/2019

To Whom It May Concern:

RE: SCOTT MCKINNEY, STACY D

> **Plaintiff's Trial Exhibit**
> **166**

Patient I.D. Number: 204763

STACY SCOTT MCKINNEY will be unable to return to:
☐ work
☐ school
☐ gym class
☐ athletic activities

until: _____

Comments: _____

STACY SCOTT MCKINNEY will be able to return to work/school beginning: <u>8/20/2019</u>, with the following restrictions:
☐ no restrictions
☐ light work duties
☐ reduced working hours (specify) _____
☒ restrictions or comments <u>PLEASE LIMIT COMPUTER WORK TO 6 HOURS PER DAY.</u>

I plan to see STACY SCOTT MCKINNEY again <u>9/17/2019</u>

_____
David Levin, M.D.

> **EXHIBIT**
> Levin Ex. 6



**The Centers** for Advanced Orthopaedics

The Orthopaedic Center Division

9420 Key West Avenue  Suite 300  Rockville, Maryland 20850  (301) 251-1433
20500 Seneca Meadows Pkwy  Suite 2100  Germantown, Maryland 20876  (301) 251-1433
2112 F Street, Suite 305  Washington, DC 20037  (202) 912-8480

Date: 11/19/2019

To Whom It May Concern:

RE: SCOTT MCKINNEY, STACY D

Plaintiff's Trial Exhibit

**168**

Patient I.D. Number: 204763

STACY SCOTT MCKINNEY will be unable to return to:
☐ work
☐ school
☐ gym class
☐ athletic activities

until: _____

Comments: _____

STACY SCOTT MCKINNEY will be able to return to work/school beginning: 11/19/2019, with the following restrictions:
☐ no restrictions
☐ light work duties
☐ reduced working hours (specify) _____
☒ restrictions or comments PLEASE LIMIT COMPUTER WORK TO NO MORE THAN 6 HOURS PER DAY AND A SCRIBE ON A PERMANENT BASIS .

I plan to see STACY SCOTT MCKINNEY again _____

David Levin, M.D.

**EXHIBIT**

Levin Ex. 8

PLAINTIFF000045



**The Orthopaedic Center, P.A.**

9420 Key West Avenue, #300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 251-2768
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary E. Feldman, DPM
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, M.D., M.S.

20500 Seneca Meadows
Pkwy. Suite 2100
Germantown, MD 20876
Phone: (301) 972-4752
Fax: (301) 251-2768

2112 F Street NW, Suite #305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Patient Name:  STACY D SCOTT MCKINNEY
Date of Service:  3/31/2020

DOB: ~~REDACTED REDACTED~~
Chart #:  204763

**Plaintiff's Trial Exhibit**

**169**

**Chief Complaint:** Follow up of chronic right-sided neck and arm pain

**HPI:** Dr. Scott McKinney is a 56-year-old female who I have followed with chronic right-sided neck and arm pain associated with C5-6 spondylosis and right C6 foraminal stenosis. Her symptoms began as a result of an overuse injury at work. She has responded favorably in the past to use of a scribe and to limiting her prolonged computer work to no more than 6 hours a day. ~~REDACTEDREDACTEDREDACTEDREDACTED~~ I had recommended physical therapy at her last visit to help manage her pain until she was able to get a scribe. This was not approved, but she did do physical therapy through her private insurance and has continued to work on a home exercise program.

Since her last visit due to the coronavirus emergency outbreak, Dr. Scott McKinney, has been doing more telehealth visits and is seeing fewer patients. She has seen approximately 40% fewer patients over the last 2 to 3 weeks and does note some improvement in her neck pain as well as the numbness and cold sensation in her right hand. Her pain has certainly not resolved, but she has had some improvement as her activity requirements at work have diminished. She is still using the touchscreen typing and doing some mousing with her patients, but is just seeing fewer patients right now, which has been helpful for her pain.

Her past medical history is unchanged.

**ROS:**
A complete 10-point system review was performed and negative but for that recorded in the history of present illness.

**Medical History:**

**Family History:**

**Past Surgical History:**

**Social History:**
Does the patient smoke or chew tobacco?  ☐ No  ☐ Yes  Number: _____ packs per day for _____ years

**Allergies:**

**Medications:** Medrol (4 MG, Take tapering dose as directed)
Valium (5 MG, Take 1 tablet(s) by mouth 1/2 hour prior to MRI, may repeat times 1)

**Height:** 5 ft 5 in  **Weight:** 138 lbs

**Physical Examination:** CONSTITUTIONAL: Height _____" Weight _____ lbs. This is a pleasant, well-developed individual, in no apparent distress.

PLAINTIFF004466

**EXHIBIT**

Levin Ex. 9

CARDIAC: Regular rate and rhythm by palpation.
PULMONARY: No audible wheezing or signs of respiratory distress.
PSYCHIATRIC: Alert and Oriented x 3, Pleasant mood and appropriate affect.
ABDOMEN: No tenderness appreciated. No noted hernia present.
SKIN: No evidence of lacerations, abrasions, or rashes over bilateral lower extremities.
LYMPHATIC: No lymphadenopathy or edema in bilateral lower extremities.
MUSCULOSKELETAL/NEUROLOGICAL: The physical exam is performed with the help of the video aspect of the
Doxy.me platform. On examination of the cervical spine, she has very limited lateral bending to 50 degrees on either side,
45 degrees rotation to either side, 50 degrees extension, and 3 fingerbreadths short of full flexion.

**Imaging:**

**Assessment:** Chronic cervicalgia associated with C5-6 disc degeneration and right C6 nerve root impingement,
aggravated as a result of overuse at work.

**Plan:** I continue to recommend an indefinite limitation of 6 hours of computer work a day and full-time use of a scribe.
She has had some improvement since her work demands have diminished in conjunction with the coronavirus outbreak. If
her pain escalates as she returns to a more normal work schedule, particularly until her scribe is approved, I would
recommend continued physical therapy for symptom management. I would like to reassess her in 6 weeks time.

This telephone visit was conducted in concordance with CDC's recommendation that during the COVID-19 outbreak
healthcare facilities should "provide non-urgent patient care by telephone" especially in patients at increased risk for an
adverse outcome when exposed to coronavirus infections.

Patient consented to the telephone/video visit.

/iScribes: LMK

Provider Signature:

_____          3/31/2020
David Levin, M.D.                Date



**The Orthopaedic Center, P.A.**

9420 Key West Avenue, #300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 251-2768
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary E. Feldman, DPM
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, M.D., M.S.

20500 Seneca Meadows
Pkwy. Suite 2100
Germantown, MD 20876
Phone: (301) 972-4752
Fax: (301) 251-2768

2112 F Street NW, Suite #305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Patient Name:    STACY D SCOTT MCKINNEY
Date of Service:    5/12/2020

DOB:    REDACTED REDACTED
Chart #:    204763

> **Plaintiff's Trial Exhibit**
> **170**

**Chief Complaint:** Follow up of chronic neck pain and right arm numbness and tingling

**HPI:** Ms. Scott McKinney is a 56-year-old female pediatrician who is followed with chronic neck pain and right arm numbness and tingling associated with C5-6 spondylosis and right C6 foraminal stenosis. Her symptoms resulted from an overuse injury at work and have remained aggravated by consistent computer work. She has had some relief in the past from use of a scribe, REDACTEDREDACTEDREDACTEDREDACTEDREDACTEDREDACTED REDACTED I placed her on a 6 hour work day and continued scribe use restrictions. She had some modest improvement at her last office visit, largely due to decreased workload associated with the COVID-19 crisis. However, her pain has increased somewhat since resuming her regular workload recently.

**ROS:**
A complete 10-point system review was performed and negative but for that recorded in the history of present illness.

**Medical History:**

**Family History:**

**Past Surgical History:**

**Social History:**
Does the patient smoke or chew tobacco?        ☐ No  ☐ Yes  Number: _____ packs per day for _____ years

**Allergies:**

**Medications:** Medrol (4 MG, Take tapering dose as directed)
Valium (5 MG, Take 1 tablet(s) by mouth 1/2 hour prior to MRI, may repeat times 1)

**Height:** 5 ft 5 in  **Weight:** 138 lbs

**Physical Examination:** CONSTITUTIONAL: Height 5' 5" Weight 138 lbs. This is a pleasant, well-developed individual, in no apparent distress.
CARDIAC: Regular rate and rhythm by palpation.
PULMONARY: No audible wheezing or signs of respiratory distress.
PSYCHIATRIC: Alert and Oriented x 3, Pleasant mood and appropriate affect.
ABDOMEN: No tenderness appreciated. No noted hernia present.
SKIN: No evidence of lacerations, abrasions, or rashes over bilateral lower extremities.
LYMPHATIC: No lymphadenopathy or edema in bilateral lower extremities.

> **EXHIBIT**
> **Levin Ex. 10**

**PLAINTIFF004577**

MUSCULOSKELETAL/NEUROLOGICAL: On examination of the cervical spine, she gets to 3 fingerbreadths short of full flexion, 60 degrees left rotation, 55 degrees right rotation, and 45 degrees extension. She has neck pain only with right Spurling's test.

**Imaging:**

**Assessment:** Persistent and actually worsening right-sided neck pain, with increasing symptoms as her workload has ramped up.

**Plan:** It remains my opinion within a reasonable degree of medical certainty that her ongoing neck pain is substantially influence by her work load. I continue to recommend full-time use of a scribe. Until her litigation is complete and the scribe is provided, I will continue to limit her workload to reduce her symptoms flares. We will keep her at a 6-hour workday as a surrogate for decreased work demands, although we may need to discuss limiting the number of patients that she sees in the future. She will continue her home exercise program for neck and upper back strengthening. We may revisit formal physical therapy as the COVID-19 crisis diminishes for symptom management until she has her scribe approved. I will continue to follow her with a repeat evaluation in 6 weeks.

/iScribes:LMK

Provider Signature:

David Levin, M.D.                     5/12/2020
                                       Date

**PLAINTIFF004578**



**The Orthopaedic Center, P.A.**

9420 Key West Avenue, #300
Rockville, MD  20850
Phone: (301) 251-1433
Fax: (301) 251-2768
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, M.D., M.S.
Andrew Pham, M.D.
Kathleen McHale M.D.



EXHIBIT

4

12850 Middlebrook Road
Suite 307
Germantown, MD 20874
Phone: (301) 972-4752
Fax: (301) 251-2768

2112 F Street NW,  Suite #305
Washington, DC 20037
Phone: (202) 912-8480
Fax:  (202) 912-8484

Patient Name:   STACY D SCOTT MCKINNEY
Date of Service:   11/24/2020

DOB:   REDACTED
Chart #:   204763

**Plaintiff's Trial Exhibit**

**175**

**Chief Complaint:**  Follow up of chronic neck pain and right cervical radiculopathy

**HPI:** Dr. Scott McKinney is a 57-year-old female who is followed with chronic neck pain and right cervical radiculopathy associated with C5-6 spondylosis and foraminal stenosis, symptomatic as a result of an overuse injury at work. She is vacillating between tolerating 4 and 6 hours of work while waiting her scribe to be reinstated. I placed her back on a 4-hour work day as of her last visit. She notes slight improvement in her pain between the decreased work hours and physical therapy. She continues to have a cold numbing sensation in the right hand and residual mild right shoulder pain. She has been taking Skelaxin at nighttime for pain control. She reports that she has been provided with a virtual scribe as of last week.

**ROS:**
A complete 10-point system review was performed and negative but for that recorded in the history of present illness.

**Medical History:**

**Family History:**

**Past Surgical History:**

**Social History:**
Does the patient smoke or chew tobacco?     ☐ No  ☐ Yes  Number: _____ packs per day for _____ years

**Allergies:**

**Medications:**  Medrol (4 MG, Take tapering dose as directed)
Skelaxin (800 MG, Take 1 TAB PO BID PRN muscle spasm)
Valium (5 MG, Take 1 tablet(s) by mouth 1/2 hour prior to MRI, may repeat times 1)

**Height:** 5 ft 5 in  **Weight:** 138 lbs

**Physical Examination:**  CONSTITUTIONAL: Height 5' 5" Weight 138 lbs. This is a pleasant, well-developed individual, in no apparent distress.
CARDIAC: Regular rate and rhythm by palpation.
PULMONARY: No audible wheezing or signs of respiratory distress.
PSYCHIATRIC: Alert and Oriented x 3, Pleasant mood and appropriate affect.
ABDOMEN: No tenderness appreciated. No noted hernia present.
SKIN: No evidence of lacerations, abrasions, or rashes over bilateral lower extremities.
LYMPHATIC: No lymphadenopathy or edema in bilateral lower extremities.

PLAINTIFF004767                                           CONFIDENTIAL

MUSCULOSKELETAL/NEUROLOGICAL: On examination of the cervical spine, she gets to 2 fingerbreadths short of full flexion, 35 degrees extension, and 20 degrees rotation to either side.

**Imaging:**

**Assessment:** Chronic cervicalgia and right C6 radiculopathy.

**Plan:** She has had some symptomatic improvement, in large part due to her 4-hour workday. We will keep her at a 6-hour workday and full-time use of the scribe, and we will revisit this in 2 months at her next follow-up. If she has tolerated her 6-hour direct patient care workday and use of her scribe, I suspect she will be at maximum medical improvement at that visit.

/Nuance DAX: LMK

Provider Signature:

David Levin, M.D.                                    11/24/2020
                                                    Date

PLAINTIFF004768                                    CONFIDENTIAL

Fiscal Year 2021 Annual Physician Compensation Reconciliation Report

College Park - Laurel Practice

FINAL:9/14/2021

exhibitsticker.com

Plaintiff Trial Exhibit

192

5/2/22

EXHIBIT

3

| | | Dr. Scott - McKinney* | | | | TOTAL |
|---|---|---|---|---|---|---|
| FTE | 0.69 | 0.80 | 0.80 | 0.40 | 0.90 | 1.00 | 4.59 |
| **Actual Base Comp Paid (Total)** | $156,816 | $236,820 | $130,790 | $64,178 | $111,403 | $137,861 | $837,869 |
| | | | | | | | |
| Actual Incentive Comp Paid (Qtr 1) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Actual Incentive Comp Paid (Qtr 2) | $0 | $0 | $11,540 | $0 | $8,939 | $11,513 | $31,991 |
| Actual Incentive Comp Paid (Qtr 3) | $0 | $0 | $5,770 | $0 | $4,469 | $5,756 | $15,996 |
| Actual Incentive Comp Paid (Qtr 4) | | | | | | | |
| **Actual Incentive Comp Paid Total** | $0 | $0 | $17,310 | $0 | $13,408 | $17,269 | $47,987 |

| | | Dr. Scott - McKinney* | | | | TOTAL |
|---|---|---|---|---|---|---|
| Annual Actual NMR Q1 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Annual Actual NMR Q2 | $105,127 | $331,774 | $341,256 | $72,325 | $265,161 | $324,548 | $1,440,191 |
| Annual Actual NMR Q3 | $43,337 | $192,370 | $144,102 | $53,139 | $127,219 | $162,507 | $722,673 |
| Annual Actual NMR Q4 | $74,880 | $190,306 | $140,660 | $104,438 | $118,316 | $154,327 | $782,926 |
| **Annual Actual NMR total** | $223,344 | $714,450 | $626,017 | $229,902 | $510,696 | $641,382 | $2,945,790 |
| | | | | | | | |
| **Annual Actual NMR (Total)** | $223,344 | $714,450 | $626,017 | $229,902 | $510,696 | $641,382 | $2,945,790 |
| Actual Reconciliation Calculation Comp Percentage | 34.14% | 34.14% | 34.14% | 34.14% | 30.00% | 33.00% | |
| **FY21 Actual Earned Comp (Based on year-end percentage)** | $76,248 | $243,909 | $213,718 | $78,487 | $153,209 | $211,656 | $977,227 |
| Jr. Doc NMR Credit (Split Based on Senior Doc NMR Totals) | $3,543 | $11,332 | $9,930 | $3,647 | | | $28,451 |
| **Jr. Doc NMR Credit % (Based on Senior Doc NMR Totals)** | 12% | 40% | 35% | 13% | | | 100% |
| FY21 Actual Earned Comp (Based on year-end percentage) + Jr Credit | $79,791 | $255,241 | $223,648 | $82,134 | $153,209 | $211,656 | $1,005,678 |
| Percent Of Total Compensation by Physician | 7.80% | 24.96% | 21.87% | 8.03% | 15.68% | 21.66% | 100.00% |
| **Total Compensation Paid** | $156,816 | $236,820 | $148,100 | $64,178 | $124,811 | $155,131 | $885,856 |
| **Balance Before Annual Reconciliation** | $0 | $18,420 | $75,548 | $17,955 | $28,398 | $56,525 | $196,847 |
| Actual Net Margin From Operations (from Performance Reports)¹ | | | | | | | $ 74,861 |
| NP Annual Incentive (Productivity by SNR Physicians) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Budget Margin Deficit** | | | | | | | $ (154,028) |

| ANNUAL RECONCILIATION: FY21 | | Dr. Scott - McKinney | | | | TOTAL |
|---|---|---|---|---|---|---|
| Allocation of Budget Margin Deficit | ($12,018) | ($38,444) | ($33,686) | ($12,371) | ($24,148) | ($33,361) | ($154,028) |
| **Actual Earned Comp after Budget Margin Deficit** | $67,773 | $216,797 | $189,962 | $69,763 | $129,060 | $178,295 | $851,650 |
| Base Compensation Paid | $156,816 | $236,820 | $130,790 | $64,178 | $111,403 | $137,861 | $837,869 |
| Incentive Compensation Paid | $0 | $0 | $17,310 | $0 | $13,408 | $17,269 | $47,987 |
| Total Compensation Paid | $156,816 | $236,820 | $148,100 | $64,178 | $124,811 | $155,131 | $885,856 |
| Year-End Incentive Payout (if positive margin) | $0 | $0 | $41,862 | $5,585 | $4,249 | $23,165 | $74,861 |
| **Year-End Incentive Payout (regarding actual margin)** | | | | | | | |
| | | | | | | | |
| **Actual Earned Compensation Paid (AEC)** | $67,773 | $216,797 | $189,962 | $69,763 | $129,060 | $178,295 | $960,717 |
| | | | | | | | |
| **Compensation Figure Used for FY22 Calculation** | | | $189,962 | $69,763 | $129,060 | $178,295 | $851,650 |

-379-

Plaintiff Trial Exhibit

193

5/2/22

exhibitstickers.com

Summary By Provider
CHILDRENS NATIONAL PEDIATRICIANS and ASSOCIATES, LLC
CP Laurel (1042)
FY 2021 Actuals

## Charges by Provider

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmoke | 75,172 | 84,416 | 89,600 | 249,188 | 116,752 | 120,812 | 111,723 | 349,287 | 86,929 | 71,882 | 79,641 | 238,451 | 71,296 | 59,014 | 78,578 | 208,948 | 1,045,874 |
| Dr. Glaser | 26,772 | 30,496 | 28,651 | 85,919 | 33,845 | 32,539 | 30,100 | 96,484 | 21,808 | 21,008 | 36,183 | 71,076 | 37,920 | 33,033 | 39,018 | 110,588 | 364,068 |
| Dr. Lowe | 73,857 | 63,464 | 76,957 | 214,278 | 139,704 | 99,281 | 119,752 | 358,738 | 97,059 | 82,560 | 91,118 | 270,737 | 87,389 | 52,058 | 95,919 | 235,366 | 1,079,118 |
| Dr. Pampati | 75,581 | 58,377 | 67,378 | 201,336 | 109,442 | 77,731 | 90,967 | 278,340 | 67,118 | 70,607 | 79,176 | 216,901 | 70,934 | 60,266 | 54,892 | 186,092 | 882,669 |
| Dr. Pyle | 55,419 | 41,691 | 28,035 | 125,145 | $0 | $0 | $16 | $16 | $30 | 36,151 | 51,212 | 87,393 | 65,886 | 28,607 | 60,625 | 155,119 | 367,673 |
| Dr. Scott-McKinney | 75,354 | 67,278 | 117,361 | 259,994 | 64,948 | 75,869 | 177,949 | 321,766 | 83,901 | 117,138 | 117,758 | 318,797 | 105,152 | 107,024 | 71,566 | 283,742 | 1,184,299 |
| Former Physicians | $0 | $10 | $0 | $10 | $0 | $0 | $0 | $0 | $0 | $0 | $25 | $25 | $0 | $0 | $0 | $0 | $35 |
| Non Physicians | $0 | $0 | $60 | $60 | $60 | $25 | ($10) | $85 | $0 | $0 | $34 | $34 | $20 | $15 | $105 | $140 | $319 |
| Total Charges | 382,155 | 345,733 | 408,043 | 1,135,930 | 467,951 | 406,257 | 530,507 | 1,404,716 | 356,845 | 391,423 | 455,146 | 1,203,414 | 438,597 | 346,062 | 395,336 | 1,179,995 | 4,924,055 |

## Receipts by Provider

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmoke | 51,186 | 51,793 | 48,917 | 151,896 | 54,856 | 64,130 | 63,333 | 182,318 | 54,985 | 54,251 | 47,943 | 157,229 | 36,890 | 34,601 | 47,954 | 119,445 | 610,888 |
| Dr. Glaser | 18,933 | 17,322 | 14,964 | 51,219 | 21,824 | 15,404 | 17,830 | 55,058 | 13,454 | 13,454 | 14,533 | 41,392 | 24,864 | 17,285 | 24,492 | 66,641 | 214,310 |
| Dr. Lowe | 42,423 | 44,601 | 28,610 | 115,634 | 65,989 | 55,668 | 63,928 | 185,585 | 55,892 | 55,978 | 52,918 | 164,788 | 54,792 | 29,122 | 55,175 | 139,089 | 605,096 |
| Dr. Pampati | 38,427 | 40,434 | 38,030 | 116,890 | 44,768 | 53,030 | 40,684 | 138,481 | 34,548 | 42,402 | 43,788 | 132,538 | 44,839 | 35,388 | 38,934 | 119,161 | 507,070 |
| Dr. Pyle | 39,621 | 32,619 | 24,633 | 96,873 | 6,764 | 649 | 190 | 7,604 | 551 | 8,622 | 23,640 | 32,312 | 36,415 | 24,738 | 23,328 | 84,481 | 221,270 |
| Dr. Scott-McKinney | 56,674 | 46,310 | 54,403 | 157,387 | 39,328 | 78,650 | 177,949 | 177,623 | 47,532 | 72,717 | 72,478 | 192,727 | 60,025 | 60,654 | 56,830 | 177,509 | 705,046 |
| Former Physicians | $897 | $86 | $283 | $1,265 | $272 | $1 | $22 | $294 | ($376) | $140 | $370 | $434 | $83 | $305 | ($19) | $369 | $2,362 |
| Non Physicians | $0 | $0 | $25 | $25 | $40 | $25 | ($10) | $55 | $0 | $0 | $34 | $34 | $10 | $15 | $0 | $25 | $139 |
| FtP Payer Incentive | $65 | $4,291 | $0 | $4,356 | $0 | $0 | $0 | $0 | $0 | $0 | $6,276 | $6,276 | $0 | $0 | $3,406 | $3,406 | $16,077 |
| Total Receipts | 248,160 | 233,164 | 209,865 | 691,189 | 254,158 | 228,234 | 264,627 | 747,019 | 218,136 | 247,564 | 255,753 | 721,453 | 258,717 | 201,109 | 246,694 | 706,520 | 2,866,181 |
| Quarterly Refunds | | | | ($1,182) | | | | ($1,320) | | | | ($5,056) | | | | ($3,020) | ($10,887) |
| Receipts Less Refunds | | | | 690,007 | | | | 745,699 | | | | 716,398 | | | | 703,220 | 2,855,324 |
| Receipts Percentage* | 64.9% | 67.4% | 51.4% | 60.8% | 54.3% | 56.2% | 49.9% | 53.2% | 61.1% | 63.2% | 56.2% | 60.0% | 59.0% | 58.1% | 62.4% | 59.9% | 58.2% |

**Incentive payment information has been added for reporting purposes. These totals have always been included in the P&L so they are for information only.
*Receipts % is based on the receipts posted over the charges posted in the reporting month. This figure differs from the collection rate provided by Finance.

## Visits by Provider (by Date Post)

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmoke | 254 | 248 | 282 | 784 | 428 | 365 | 340 | 1,133 | 244 | 202 | 230 | 676 | 217 | 207 | 248 | 672 | 3,265 |
| Dr. Glaser | 141 | 155 | 144 | 440 | 161 | 162 | 159 | 482 | 137 | 75 | 148 | 360 | 131 | 148 | 112 | 391 | 1,673 |
| Dr. Lowe | 222 | 176 | 229 | 627 | 458 | 293 | 309 | 1,060 | 234 | 214 | 231 | 679 | 243 | 148 | 260 | 651 | 3,017 |
| Dr. Pampati | 251 | 205 | 232 | 688 | 399 | 294 | 314 | 1,007 | 228 | 217 | 247 | 692 | 263 | 238 | 202 | 703 | 3,090 |
| Dr. Pyle | 164 | 129 | 80 | 373 | 0 | 0 | 0 | 0 | 0 | 116 | 157 | 273 | 206 | 96 | 167 | 469 | 1,115 |
| Dr. Scott-McKinney | 205 | 158 | 288 | 651 | 241 | 219 | 515 | 975 | 201 | 287 | 305 | 793 | 293 | 291 | 200 | 784 | 3,203 |
| Former Physicians | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1,237 | 1,071 | 1,255 | 3,563 | 1,687 | 1,333 | 1,637 | 4,657 | 1,044 | 1,111 | 1,318 | 3,473 | 1,353 | 1,128 | 1,189 | 3,670 | 15,363 |

## Adjustments by Provider

| Provider | Jul | Aug | Sep | Qtr1 Subtotal | Oct | Nov | Dec | Qtr2 Subtotal | Jan | Feb | Mar | Qtr3 Subtotal | Apr | May | Jun | Qtr4 Subtotal | FY Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Demmoke | 35,694 | 32,066 | 33,868 | 101,628 | 46,239 | 51,829 | 43,726 | 141,794 | 42,376 | 34,619 | 33,127 | 110,122 | 27,231 | 30,115 | 33,529 | 90,874 | 444,418 |
| Dr. Glaser | 13,324 | 11,061 | 12,086 | 36,471 | 15,644 | 12,884 | 11,735 | 40,263 | 13,620 | 11,121 | 11,607 | 31,607 | 14,665 | 13,686 | 15,091 | 43,442 | 151,783 |
| Dr. Lowe | 31,596 | 30,756 | 25,904 | 88,256 | 16,956 | 43,051 | 48,137 | 148,145 | 41,002 | 42,585 | 34,847 | 118,434 | 41,257 | 21,243 | 37,276 | 99,777 | 454,611 |
| Dr. Pampati | 28,764 | 28,506 | 25,672 | 82,942 | 35,231 | 40,476 | 32,169 | 107,877 | 34,161 | 35,376 | 29,833 | 99,370 | 33,764 | 24,597 | 25,303 | 83,664 | 371,853 |
| Dr. Pyle | 25,079 | 15,889 | 15,808 | 56,775 | 33,465 | $626 | ($213) | 33,877 | $119 | 9,051 | 16,984 | 26,154 | 26,431 | 17,873 | 19,343 | 63,648 | 150,055 |
| Dr. Scott-McKinney | 43,358 | 24,290 | 41,429 | 108,885 | 41,944 | 31,730 | 59,017 | 132,691 | 34,074 | 53,488 | 49,457 | 137,020 | 44,971 | 40,966 | 35,969 | 121,906 | 500,501 |
| Former Physicians | ($864) | ($131) | ($454) | ($1,448) | ($584) | $499 | $0 | ($85) | ($36) | $1,125 | ($767) | $351 | ($70) | ($345) | $203 | ($212) | ($1,394) |
| Non Physicians | $35 | $0 | $0 | $35 | $0 | $0 | $0 | $0 | $35 | $35 | $35 | $35 | $10 | $0 | $0 | $10 | $115 |
| Total Adjustments | 176,786 | 142,245 | 154,312 | 473,543 | 198,896 | 181,094 | 194,571 | 574,562 | 162,381 | 186,145 | 174,602 | 523,129 | 186,259 | 148,136 | 166,714 | 501,109 | 2,072,343 |

7/7/2021
CP Laurel 1042

Plaintiff Trial Exhibit 194
exhibitsticker.com
5/2022

| # | A | B (Dr. Scott-McKinney) | C (Formula/Source) | D (Total) | E (Formula/Source) |
|---|---|---|---|---|---|
| 1 | Fiscal Year 2020 Annual Physician Compensation Reconciliation Report | | | | |
| 2 | College Park - Laurel Practice | | | | |
| 3 | | | | | |
| 4 | | Dr. Scott-McKinney | Formula/Source | Total | Formula/Source |
| 5 | FTE | 0.8 | Plaintiff Trial Exh. 119 | 4.9 | Plaintiff Trial Exh. 119 |
| 6 | Actual Base Comp Paid (Total) | $235,667 | Plaintiff Trial Exh. 119 | $918,416 | Plaintiff Trial Exh. 119 |
| 7 | | | | | |
| 8 | Actual Incentive Comp Paid (Qtr 1) | $10,450 | Plaintiff Trial Exh. 119 | $29,361 | Plaintiff Trial Exh. 119 |
| 9 | Actual Incentive Comp Paid (Qtr 2) | $7,616 | Plaintiff Trial Exh. 119 | $23,996 | Plaintiff Trial Exh. 119 |
| 10 | Actual Incentive Comp Paid (Qtr 3) | $0 | Plaintiff Trial Exh. 119 | $0 | Plaintiff Trial Exh. 119 |
| 11 | Actual Incentive Comp Paid (Qtr 4) | | | | |
| 12 | Actual Incentive Comp Paid TOTAL | $18,066 | Plaintiff Trial Exh. 119 | $53,358 | Plaintiff Trial Exh. 119 |
| 13 | | | | | |
| 14 | Annual Actual NMR Q1 | $189,975 | Plaintiff Trial Exh. 119 | $869,724 | Plaintiff Trial Exh. 119 |
| 15 | Annual Actual NMR Q2 | $197,512 | Plaintiff Trial Exh. 119 | $888,380 | Plaintiff Trial Exh. 119 |
| 16 | Annual Actual NMR Q3 | $202,666 | Plaintiff Trial Exh. 119 | $844,319 | Plaintiff Trial Exh. 119 |
| 17 | Annual Actual NMR Q4 | $115,351 | Plaintiff Trial Exh. 119 | $486,591 | Plaintiff Trial Exh. 119 |
| 18 | Annual Actual NMR TOTAL | $705,504 | Plaintiff Trial Exh. 119 | $3,089,014 | Plaintiff Trial Exh. 119 |
| 19 | Additional income if 8 hours patient care 41 weeks | | Plaintiff Trial Exh. 97 at 1 = $689,502/3,582 patient visits, or $192.50 revenue/patient visit x 15 patient visits per week x 41 weeks | $118,388 | |
| 20 | Annual Atual NMR TOTAL with additional SSM income | $823,892 | | $3,207,402 | |
| 21 | | | | | |
| 22 | Annual Actual NMR (Total) | $823,892 | | $3,207,402 | |
| 23 | Actual Reconciliations Calculation Comp Percentage | 30.02% | Plaintiff Trial Exh. 119 | 30.02% | Plaintiff Trial Exh. 119 |
| 24 | FY20 Actual Earned Comp before Budget Margin Deficit Allocation | $247,332 | Plaintiff Trial Exh. 1, App. C; B22 x B23 | $962,862 | |
| 25 | Jr Doc NMR Credit (SP split based on SP % of NMR Totals) | $0 | | $0 | |
| 26 | FY20 Actual Earned Comp before Budget Margin Deficit Allocation + Jr Doc Credit | $247,332 | | $962,862 | |
| 27 | Percent of Total Compensation by Physician | 25.69% | Plaintiff Trial Exh. 1, App. C; B26 / D26 | 100% | Plaintiff Trial Exh. 119 |
| 28 | | | | | |
| 29 | ANNUAL RECONCILIATION-FY20 | | | | |
| 30 | Allocation of Budget Margin Deficit | ($13,969) | Plaintiff Trial Exh. 1, App. C; D30 x B27 | ($54,381) | Plaintiff Trial Exh. 119 |
| 31 | AE Comp After Budget Margin Deficit | $233,363 | Plaintiff Trial Exh. 1, App. C; B26 + B30 | $908,481 | |
| 32 | Base Compensation Paid | $235,667 | Plaintiff Trial Exh. 119 | $918,416 | |
| 33 | Incentive Compensation Paid | $18,066 | | $53,358 | |
| 34 | Total Compensation Paid | $253,743 | | $971,773 | |
| 35 | Year-End Incentive Payout (if positive margin) | ($18,066) | | ($18,501) | |
| 36 | Amendment Forgiveness of Incentive payback | $18,066 | | $39,665 | |
| 37 | Year-End Incentive Payout (regarding actual margin) | $0 | | $21,164 | |
| 38 | Actual Earned Compensation PAID (AEC) | $253,743 | | $992,937 | |
| 39 | NO BACK PAY LOSS FOR FY 2020 | | | | |
| 40 | | | | | |

exhibitsticker.com

Plaintiff Trial Exhibit

195

5/2/22

| # | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Fiscal Year 2021 Annual Physician Compensation Reconciliation Report | | | | |
| 2 | College Park - Laurel Practice | | | | |
| 3 | | | | | |
| 4 | | Dr. Scott-McKinney | Formula/Source | Total | Formula/Source |
| 5 | FTE | 0.8 | Plaintiff Trial Exh. 192 | 4.59 | Plaintiff Trial Exh. 192 |
| 6 | Actual Base Comp Paid (Total) | $236,820 | Plaintiff Trial Exh. 192 | $837,869 | Plaintiff Trial Exh. 192 |
| 7 | | | Plaintiff Trial Exh. 192 | | Plaintiff Trial Exh. 192 |
| 8 | Actual Incentive Comp Paid (Qtr 1) | $0 | Plaintiff Trial Exh. 192 | $31,991 | Plaintiff Trial Exh. 192 |
| 9 | Actual Incentive Comp Paid (Qtr 2) | $0 | Plaintiff Trial Exh. 192 | $15,996 | Plaintiff Trial Exh. 192 |
| 10 | Actual Incentive Comp Paid (Qtr 3) | $0 | Plaintiff Trial Exh. 192 | $0 | Plaintiff Trial Exh. 192 |
| 11 | Actual Incentive Comp Paid (Qtr 4) | | Plaintiff Trial Exh. 192 | | Plaintiff Trial Exh. 192 |
| 12 | Actual Incentive Comp Paid TOTAL | $0 | Plaintiff Trial Exh. 192 | $47,987 | Plaintiff Trial Exh. 192 |
| 13 | | | | | |
| 14 | Annual Actual NMR Q1 | $0 | Plaintiff Trial Exh. 192 | $0 | Plaintiff Trial Exh. 192 |
| 15 | Annual Actual NMR Q2 | $331,774 | Plaintiff Trial Exh. 192 | $1,440,191 | Plaintiff Trial Exh. 192 |
| 16 | Annual Actual NMR Q3 | $192,370 | Plaintiff Trial Exh. 192 | $722,673 | Plaintiff Trial Exh. 192 |
| 17 | Annual Actual NMR Q4 | $190,306 | Plaintiff Trial Exh. 192 | $782,926 | Plaintiff Trial Exh. 192 |
| 18 | Annual Atual NMR TOTAL | $714,450 | Plaintiff Trial Exh. 192 | $2,945,790 | Plaintiff Trial Exh. 192 |
| 19 | Additional income if 8 hours patient care 49 weeks | $161,700 | Plaintiff Trial Exh. 193 = $705,046 revenue/3,203 patient visits, or $220 revenue/patient visit x 15 patient visits per week x 49 weeks | $161,700 | |
| 20 | Annual Actual NMR TOTAL with additional SSM income | $876,150 | | $3,107,490 | |
| 21 | | | | | |
| 22 | Annual Actual NMR (Total) | $876,150 | | $3,107,490 | |
| 23 | Actual Reconciliations Calculation Comp Percentage | 34.14% | Plaintiff Trial Exh. 192 | 34.14% | Plaintiff Trial Exh. 192 |
| 24 | FY20 Actual Earned Comp before Budget Margin Deficit Allocation | $299,118 | Plaintiff Trial Exh. 1, App. C; B22 x B23 | $1,060,897 | Plaintiff Trial Exh. 1, App. C; D22 x D23 |
| 25 | Jr Doc NMR Credit (SP split based on SP % of NMR Totals) | $12,748 | Plaintiff Trial Exh. 192; B24 / B24 + senior doctor (Glazer, Pyle, Demmeke) from PEX192 x $28,451 | $28,451 | Plaintiff Trial Exh. 192 |
| 26 | FY21 Actual Earned Comp before Budget Margin Deficit Allocation + Jr Doc Credit | $311,866 | Plaintiff Trial Exh. 1, App. C; B24 + B25 | $1,089,348 | Plaintiff Trial Exh. 1, App. C; D24 + D25 |
| 27 | Percent of Total Compensation by Physician | 28.19% | Plaintiff Trial Exh. 1, App. C; B24 / D24 | | |
| 28 | | | | | |
| 29 | ANNUAL RECONCILIATION: FY21 | | | | |
| 30 | Allocation of Budget Margin Deficit | ($43,428) | Plaintiff Trial Exh. 1, App. C; D30 x B27 | ($154,028) | Plaintiff Trial Exh. 192 |
| 31 | AE Comp After Budget Margin Deficit | $268,438 | Plaintiff Trial Exh. 1, App. C; B26 + B30 | $935,320 | |
| 32 | Base Compensation Paid | $236,820 | B6 | | |
| 33 | Incentive Compensation Paid | $0 | | | |
| 34 | Total Compensation Paid | $236,820 | | | |
| 35 | Year-End Incentive Payout (if positive margin) | $31,618 | Plaintiff Trial Exh. 1, App. C; B31 - B34 | | |
| 36 | Year-End Incentive Payout (regarding actual margin) | $31,618 | | | |
| 37 | BACK PAY LOSS FOR FY 2021 | $31,618 | | | |
| 38 | | | | | |

**Plaintiff Trial Exhibit**

**196**

5/2/22

exhibitsticker.com

**BACK PAY ASSUMPTIONS AND DATA BY PLAINTIFF**

**Dr. Scott-McKinney's AVERAGE** revenue per patient visit was of **$192.50 for FY 2020** ($689,502.00 total revenue divided by 3,582 total patient visits). Dr. Scott-McKinney's reduced earnings when she limits direct patient care to six (6) hours equate to reduced earnings of $2,887.50 per week at a 15 patient/week.

**For FY 2021**, the **AVERAGE** revenue per patient visit **for Dr. Scott-McKinney** is **$220.00** ($705,046.00 in total revenue divided by 3,203 total patient visits).  That equates to $3,300.00 per week at six (6) hours of direct patient care.

**CHART I - CLOSED PERIOD OF DATES OF PLAINTIFF'S BACK PAY WAGE LOSS**

**7-1-21 TO 6-30-22**

**For FY 2022 and going forward**, Dr. Scott-McKinney uses the **AVERAGE FY 2021 revenue per patient visit FOR THE PRACTICE** of **$186.56** ($2,866,818 total revenue divided by 15,363 total patient visits) from Plaintiff Exhibit 193 (FY 2021 Summaries by Provider, just like Plaintiff Exhibit 119 for FY 2020). This revenue number is more conservative that the average revenue number for Dr. Scott-McKinney because she receives higher average revenue per patient visit due to the complexity of the cases that she handles.  Dr. Scott-McKinney's reduced earnings when she limits direct patient care to six (6) hours equates to reduced earnings of $2,798.40 per week (or $186.56 x 15 patient visits per week).

| Dates of Plaintiff's Revenue Loss | Plaintiff's Loss of Revenue * | Compensation Percentage** | Plaintiff's Calculated Wage Loss |
|---|---|---|---|
| 7-1-21 TO 6-30-22 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| **PLAINTIFF'S BACK PAY LOSS FOR FY 2022 THROUGH TRIAL** | | **$43,878.91** | |

** The 32% is a conservative compensation percentage utilized to calculate Dr. Scott-McKinney's wage loss, given that historically her compensation percentage is at or near 35%, just like for FY 2021, which was 34.14%.

**TOTAL BACK PAY LOSS = $31,618 (FROM PLAINTIFF TRIAL EXHIBIT 195) + $43,878.91 ABOVE = $75,496.91**

**Add 5% employer contribution on retirement contributions from Dr. Scott-McKinney**
**$75,496.91 x 5% = $3,774.85 employer contribution**

**TOTAL BACK PAY LOSS = $79,271.76**

-383-

<mark>FOR FRONT PAY CALCULATION</mark>

**VALIDATION OF 15 PATIENT VISITS PER WEEK FOR 6 HOURS OF DIRECT PATIENT CARE**

**Compare Dr. Scott-McKinney Average Patient Visits for two years pre-FY 2019 with post-FY 2020**

**SOURCES: PEX 97 and PEX 193**

| 2018 | 4,058 | 2020 | 3,582 |
|------|-------|------|-------|
| 2019 | <u>4,253</u> | 2021 | <u>3,203</u> |
| Average | 4,156 | | 3,393 |

**Difference = 4,4156 – 3,393 =<mark>763 lost patient visits</mark> at 6 hours of direct patient care compared to 8 hours of direct patient care**

**For front pay calculations assume loss of 15 patient visits/week x 49 weeks = <mark>735 patient visits</mark>**

**For Net Present Value Calculation, assume <mark>discount rate of 3%</mark> based on interest rate more conservative than 10-year treasury rate (a selected rate of return on conservative investment).**

**CHART II – <mark>PLAINTIFF'S PROJECTED FRONT PAY WAGE LOSS</mark>**

**REMAINDER OF WORK LIFE EXPECTANCY**

| Dates of Plaintiff's Revenue Loss | Plaintiff's Loss of Revenue * | Compensation Percentage ** | Plaintiff's Calculated Wage Loss |
|---|---|---|---|
| | | | |
| 7-1-22 TO 6-30-23 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-23 TO 6-30-24 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-24 TO 6-30-25 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-25 TO 6-30-26 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-26 TO 6-30-27 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-27 TO 6-30-28 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-28 TO 6-30-29 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| 7-1-29 TO 6-30-30 | $2,798.40/wk x 49  weeks = $137,121.60 | 32% | **$43,878.91** |
| **PLAINTIFF'S TOTAL PROJECTED FRONT PAY WAGE LOSS REMAINDER OF WORK LIFE EXPECTANCY *** ** | | **<mark>$351,031.28</mark>** | |

** The 32% is a conservative compensation percentage utilized to calculate Dr. Scott-McKinney's wage loss, given that historically her compensation percentage is at or near 35%, just like for FY 2021, which was 34.14%.

***The noted Work Life Expectancy is based upon the Plaintiff's current age in relation to the anticipated retirement age according to the Social Security Administration. The Work Life Expectancy has not been adjusted in consideration of the Plaintiff's medical/physical condition(s).

**THE NET PRESENT VALUE OF $351,031.28 - APPLYING A 3% DISCOUNT FACTOR BASED ON THE 10-YEAR TREASURY RATE = <mark>$308,009.05</mark>**

- 3 -

4/25/2022                                    NPV Calculator - Calculate Net Present Value

 **calculator**

GIGA / Calculators / Finance / NPV Calculator

# NPV Calculator

Use this online calculator to easily calculate the NPV (Net Present Value) of an investment based on the initial investment, discount rate and investment term. Also calculates Internal Rate of Return (IRR), gross return and net cash flow.



**-386-**

4/25/2022                                      NPV Calculator - Calculate Net Present Value



**Share result:**  direct link 🔗

## Options Guide For Beginners

Discover the secret to selecting stocks with options offering the greatest potential.

TWTrader.com                                                              Open

**Related calculators**

| Internal Rate of Return | WACC Calculator | TVM Calculator |

≡ Quick navigation:

1. Using the NPV calculator
2. What is Net Present Value?
   ○ How to choose the discount rate in NPV analysis?
3. NPV formula
4. A practical example
5. Applications, caveats, and alternatives to net present value
6. Financial caution

## 🧮 Using the NPV calculator

Our online **Net Present Value calculator** is a versatile tool that helps you:

- calculate the Net Present Value (NPV) of an investment
- calculate gross return, Internal Rate of Return IRR and net cash flow

Start by entering the initial investment and the period of the investment, then enter the **discount rate**, which is usually the [weighted average cost of capital (WACC)](#), after tax, but some people prefer to use higher discount rates to adjust for risk, opportunity cost and other factors. This is entirely up to you. Finally, enter the net cash flow for each year or other period (a maximum of 25 periods are allowed). Make sure you enter the free cash flow and not a cash flow after interest, which will result in double-counting the time value of money.

-387-

**CHART III – PLAINTIFF'S PROJECTED FRONT PAY EMPLOYER CONTRIBUTION TO RETIREMENT LOSS**

**REMAINDER OF WORK LIFE EXPECTANCY**

| Dates of Plaintiff's Revenue Loss | Plaintiff's Calculated Wage Loss | Employer Contribution of 5% to retirement |
|---|---|---|
| | | |
| 7-1-22 TO 6-30-23 | $43,878.91 | 2,193.95 |
| 7-1-23 TO 6-30-24 | $43,878.91 | 2,193.95 |
| 7-1-24 TO 6-30-25 | $43,878.91 | 2,193.95 |
| 7-1-25 TO 6-30-26 | $43,878.91 | 2,193.95 |
| 7-1-26 TO 6-30-27 | $43,878.91 | 2,193.95 |
| 7-1-27 TO 6-30-28 | $43,878.91 | 2,193.95 |
| 7-1-28 TO 6-30-29 | $43,878.91 | 2,193.95 |
| 7-1-29 TO 6-30-30 | $43,878.91 | 2,193.95 |
| **FRONT PAY FOR LOST EMPLOYER CONTRIBUTION** | | $17,551.60 |

**THE NET PRESENT VALUE OF EMPLOYER 5% CONTRIBUTION - APPLYING A 3% DISCOUNT FACTOR BASED ON THE 10-YEAR TREASURY RATE = $15,393.18**

**TOTAL FRONT PAY DAMAGES = $323,402.23**

- 4 -

4/26/2022                                      NPV Calculator - Calculate Net Present Value

 **calculator**

GIGA / Calculators / Finance / NPV Calculator

# NPV Calculator

Use this online calculator to easily calculate the NPV (Net Present Value) of an
investment based on the initial investment, discount rate and investment
term. Also calculates Internal Rate of Return (IRR), gross return and net cash
flow.



| | |
|---|---|
| Initial investment | $ 1 |
| Discount rate | 3 % |
| How many years? | 8 |

**Cash flow**

| | |
|---|---|
| Year 1 | $ 2193.95 |
| Year 2 | $ 2193.95 |
| Year 3 | $ 2193.95 |
| Year 4 | $ 2193.95 |
| Year 5 | $ 2193.95 |
| Year 6 | $ 2193.95 |
| Year 7 | $ 2193.95 |
| Year 8 | $ 2193.95 |

Calculate

✓ **Calculation results**

| | |
|---|---|
| Net Present Value | **$15,393.18** |
| Internal Rate of Return | **219,300%** |
| Gross Return | **1,754,300%** |
| Net Cash Flow | **$17.543** |

**-389-**

4/26/2022                                    NPV Calculator - Calculate Net Present Value



**Share result:** direct link



### Related calculators

Internal Rate of Return    WACC Calculator    TVM Calculator

Quick navigation:

1. Using the NPV calculator
2. What is Net Present Value?
   ◦ How to choose the discount rate in NPV analysis?
3. NPV formula
4. A practical example
5. Applications, caveats, and alternatives to net present value
6. Financial caution

## Using the NPV calculator

Our online **Net Present Value calculator** is a versatile tool that helps you:

- calculate the Net Present Value (NPV) of an investment
- calculate gross return, Internal Rate of Return IRR and net cash flow

Start by entering the initial investment and the period of the investment, then enter the **discount rate**, which is usually the weighted average cost of capital (WACC), after tax, but some people prefer to use higher discount rates to adjust for risk, opportunity cost and other factors. This is entirely up to you. Finally, enter the net cash flow for each year or other period (a maximum of 25 periods are allowed). Make sure you enter the free cash flow and not a cash flow after interest, which will result in double-counting the time value of

**-390-**

Plaintiff Trial Exhibit

197

5/2/22



**The Orthopaedic Center, P.A.**
A Division of The Centers for Advanced Orthopaedics, LLC

9420 Key West Av
Suite 300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

20500 Seneca Meadows
Pkwy.
Suite 2100
Germantown, MD 20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F Street
Suite 305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, MD
Andrew B. Pham, MD

# SCOTT MCKINNEY, STACY

**AN:** 204763
**DOB:** REDACTED
**DOS:** 10-6-2020

## Return Office Visit
Ms. McKinney is here at follow up.

**PAST MEDICAL, SURGICAL, FAMILY and SOCIAL HISTORY:** Unchanged since their last visit to THE ORTHOPAEDIC CENTER; reviewed and available on patient medical history form in The Orthopaedic Center Medical Record; signed and dated on 8-11-2020.

**MEDICATIONS, ALLERGIES and REVIEW of SYSTEMS:** Unchanged since their last visit to THE ORTHOPAEDIC CENTER; reviewed and available on patient medical history form in The Orthopaedic Center Medical Record; signed and dated on 8-11-2020.

**PHYSICAL EXAMINATION:** She is actually feeling a little bit better; she's been trying very hard to implement some of the measures that we talked about. Although she does feel that some of the improvement in her symptoms has to do with the fact that my partner Dr Levin has limited her work hours and that already tells me that the physical stressors of her job are a significant contributing factor. She has had an ergonomic evaluation dated 9-10-2020. I have reviewed this in great detail; it does address the height, her arm spans, the position of her chairs, her feet. There is a discussion about an ergonomic keyboard, ergonomic mouse and variable height desks. I think the ergonomic assessment is thoughtful and complete. I think it should be implemented at the earliest possible time. Additionally, if she can get a scribe to assist with the sheer volume of typing needed, I think that would be great. But I still think she should limit the amount of time on computer for no more than an hour and take some breaks.

Her exam today shows good range of motion cervical spine; negative Lhermitte; negative Spurling test; full shoulder, forward elevation lateral abduction internal external rotation; full elbow flexion extension, wrist flexion extension, full pronation supination of the forearm; full finger movement; sensation motor function vascularity; no atrophy noted; no trophic changes noted in the hand. In general, her exam is looking a lot better. I also do not see any focal tenderness. I think she is making progress.

Diagnosis – repetitive strain syndrome, right hand and arm, and neck.

**PLAN**: I have given her some sitting and standing, stretching exercises that I think she should do; do them at least a few times a day and it will help her a good deal. I do believe that the hand injury is related to the work to a reasonable degree of medical certainty and I think the treatment is reasonable, necessary and related to her work injury. I'd like to see her back only as necessary. As long as she has gotten everything she needs and she is on the mend, there is certainly nothing further that needs to be done.

*Electronically Signed*
Leo M. Rozmaryn, M.D.

cc: Jenny Moy, M.D.
  /sms



**The Centers**
for Advanced Orthopaedics

**SCOTT MCKINNEY, STACY**

Visit Note - February 2, 2021

HMS ID
28D204763

Sex
**Female**

UCB


Phone
(301) 802-0813

Unit
MM0000914960

### Alerts
Allergy to adhesive.
No allergy to shelfish/iodine, no fever,
no palpitations, no wheezing, no
pacemaker, no shortness of breath,
and no dizziness.

### Allergies
Reviewed February 2, 2021.
No known drug allergies

### Medications
Reviewed and no changes noted
February 2, 2021.
Over Red/Haler 40 mcg/actuation
Inhalation - HFA aerosol breath
activated
Ventolin HFA inhalation
amlodipine oral
Crestor oral
nortriptyline oral
Skelaxin oral

### Medical History
Reviewed and no changes noted
February 2, 2021.
H/O: hypertension
Other: Migraines Asthma

### Musculoskeletal History
Reviewed and no changes noted
February 2, 2021.
Other: Repetitive strain right
hand,shoulder tendinitis,cervical
radiculopathy

### Musculoskeletal Family History
Hypertension

### Musculoskeletal Surgery
History of surgical procedure on
cervical spine

### Family History
Reviewed and no changes noted
February 2, 2021.
No family history of clinical finding
(situation)

### Social History
Reviewed February 2, 2021.

Single Question Alcohol Screening: 0
days
Smoking status - Never smoker

### ROS
Provider reviewed on Feb 02, 2021.

A focused review of systems was
performed including Cardiovascular,
Constitutional / Symptom, ENT and
Mouth, Gastrointestinal (G.I.),
Genitourinary (G.U.), Hematologic /

**Chief Complaint: Follow Up Hand Pain, Right**

**HPI:** This is a 57 year old female who is right hand dominant and is being seen for a chief complaint of Follow Up Hand Pain, involving the right hand. This occurs in the context of a gradual and insidious onset. She has had no surgical procedures. The pain has been present for 4 years. The right hand pain occurs with computer work. The right hand pain is described as associated with pins and needles and cold and associated with finger numbness and discolored . The right hand pain 1 out of 10 currently. She reports the following pertinent negatives: no tendon injury and no wrist pain. She reports no limitations from this complaint. Since the last visit, her condition is unchanged.

**Historical Summary:**
Dr. Scott McKinney is followed with chronic neck pain and right cervical radiculopathy associated with C5-6 spondylosis and foraminal stenosis, symptomatic as a result of an overuse injury at work. I have placed her on a restriction of a 6-hour workday and full-time use of the scribe.

**Vitals:**

| VITALS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Taken By | B.P. | Pulse | Resp. | O2 Sat. | Temp. | Ht. | Wt. | BMI | BSA |
| 02/02/21 13:12 | Huber, Amy | | | | | 98.6 F | 65.0 in | 138.0 lbs | 23 | 1.7 |

\* Patient Reported

**Exam:**

**Upper Extremity**

Stacy McKinney Scott comes in after an absence of approximately 4 months. Unfortunately the symptoms in her right hand really have not improved much she has done all the ergonomic modifications that I asked she's also modified her work schedule she also has and gotten a scribe to help with much of the computer work however that is have a limited but positive effect on this but not enough to materially change her overall situation however her symptoms seem to of localized themselves now to the index middle and ring fingers which is slightly different than before. on exam she has she has in the past talked about color changes in the end but I'm not seeing that today.

**Data Reviewed:**
Independent interpretation of a test performed by another physician/other qualified health care professional (not separately reported) (EMGs north conduction studies dated April 30, 2019 reveals no evidence of a carpal tunnel syndrome however there is some evidence of C6 to T1 cervical alarm radiculopathy and pain rapidly)

**Impression/Plan:**
1. Carpal Tunnel Syndrome, Right
   Carpal tunnel syndrome, right upper limb (G56.01)
   distributed on the right transverse palmar carpal ligament.
   Status: Inadequately Controlled

   **Plan: Counseling - Carpal Tunnel Syndrome.**
   Nonsurgical treatment is indicated for mild cases whereas surgery is indicated for more severe cases that have not responded to conservative management. If carpal tunnel syndrome is treated in its early stages with proper

**Leo M Rozmaryn, MD (Primary Provider) (Bill Under)**
(301) 251-1433 Work
(301) 424-5266 Fax

26 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page 1

 **The Centers**
for Advanced Orthopedics

# SCOTT MCKINNEY, STACY

Visit Note - February 2, 2021

| PMS ID 28D204763 | Sex **Female** | DOB REDACTED | Phone (301) 802-0813 | Visit MM0000914960 |

Lymphatic, Integumentary, Musculoskeletal, Neurological, and Respiratory and was notable for Numbness or tingling in upper extremity (s), Joint stiffness, Heart murmur, Headaches, Joint pains, and Tingling.

No Joint Swelling.

physical therapy and modification of factors causing the problem, it might be possible to alleviate or reduce the symptoms and stop the progression of the disease. Modifying activity by creating rest periods, adjusting computer workstation positions, and providing better wrist support may help.

The natural history is marked by episodes of discomfort on the thumb side of the hand that come and go. In more advanced cases there is loss of grip strength. In most people, symptoms worsen with time. The carpal tunnel is a tunnel like structure in the wrist surrounded by bones and soft tissue. Carpal tunnel syndrome occurs when there is excess pressure on a nerve in the wrist in the carpal tunnel. There are many factors that contribute to the development of carpal tunnel syndrome such as heredity, beign overweight, overuse of the hand (i.e., extensive typing), hormone changes during pregnancy, and age. Some medical conditions like diabetes and thyroid disease predispose and individual to carpal tunnel syndrome. It is more common in women than men. Most people experience numbness, pain, or an electric shock like sensation in the hand. Symptoms are often worse at night. Keeping your hand in one position often makes the symptoms worse.

Contact office if pain worsens in your hand, if you have difficulty sleeping, or if there is increasing disability.

Medication Counseling
Medication Counseling Other : Steroid injection into the right carpal tunnel

After counseling the patient, we decided on the following plan for the RIGHT WRIST: Steroid injection

**Plan: Carpal Tunnel Injection.**
The risks, benefits and alternatives of carpal tunnel injection were discussed with the patient. Risks include infection, bleeding, hematoma, nerve injury, and soreness at the injection site.  No certain guarantees have been made, patients understand that responses can vary and multiple procedures may be necessary. The patient was identified and timeout confirmed the correct foot for the procedure.  The patient was positioned appropriately. The overlying skin was prepped with Alcohol and cold spray was applied for topical anesthesia.

The volar aspect of the wrist was identified and the needle was placed one centimeter proximal to the distal wrist flexion crease and ulnar to the palmaris longis tendon. The needle was then directed at a 30 degree angle distally into the carpal tunnel while the patient maintained a gentle fist. The needle was then aspirated to ensure no intravascular involvement and the injection performed.  A total of 1 injections on the  right transverse palmar carpal ligament were treated with  1 ml of Dexamethasone Sodium Phosphate, 4mg with 9 ml of 1% lidocaine without epinephrine.

A band aid was applied and ice instructions were provided. Patient was advised to avoid strenuous activities for at least 2 days., lot number: 921200.
Complications: The patient tolerated the procedure well without complications or pain.

**Plan: Separate and Identifiable Documentation.**

2. **Carpal Tunnel Syndrome, Right**
Carpal tunnel syndrome, right upper limb (G56.01)

**Follow up in 3 weeks for: F/U evaluation**

**Staff:**

Leo M Rozmaryn, MD (Primary Provider)  (Bill Under)

Electronically Signed By: Leo M Rozmaryn, MD, 02/03/2021 09:37 AM EST

---

**Leo M Rozmaryn, MD (Primary Provider) (Bill Under)**
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page 2

PLAINTIFF004694
CONFIDENTIAL



# The Centers
for Advanced Orthopaedics

**SCOTT MCKINNEY, STACY**

**Communication:**
February 4, 2021

PMS ID
28D204763

Sex
Female

DOB
REDACTED

Phone
(301) 802-0813

SSN
MM0000914960

Patient was seen by me on 2/2/2020 for her right hand. She reported numbness, tingling, coldness, and decolorization. She did not have hand pain. Her diagnoses is repetitive strain syndrome secondary to carpal tunnel syndrome.

Electronically Signed By: Amy Huber, 02/04/2021 05:36 PM EST

Electronically Signed By: Leo M Rozmaryn, MD, 02/04/2021 05:36 PM EST

**Amy Huber**
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page 1

CONFIDENTIAL



**The Centers**
for Advanced Orthopaedics

Visit Note - March 16, 2021

**SCOTT MCKINNEY, STACY**

PMS ID
28D204763

Sex: Female
DOB: REDACTED
Phone: (301) 802-0813
MRN: MM0000914960

## Chief Complaint: F/U Carpal Tunnel Syndrome, Right evaluated on February 2, 2021

**Allergies**
Reviewed March 16, 2021.
No known drug allergies

**Medications**
Reviewed and no changes noted March 16, 2021.
Qvar RediHaler 40 mcg/actuation inhalation - HFA aerosol breath activated
Ventolin HFA inhalation
amlodipine oral
Crestor oral
nortriptyline oral
Skelaxin oral

**Medical History**
Reviewed and no changes noted March 16, 2021.
H/O: hypertension
Other: Migraines Asthma

**Musculoskeletal History**
Reviewed and no changes noted March 16, 2021.
Other: Repetitive strain right hand,shoulder tendinitis,cervical radiculopathy

**Musculoskeletal Family History**
Hypertension

**Musculoskeletal Surgery**
History of surgical procedure on cervical spine

**Family History**
Reviewed and no changes noted March 16, 2021.
No family history of clinical finding (situation)

**Social History**
Reviewed March 16, 2021.

Single Question Alcohol Screening: 0 days
Smoking status - Never smoker

**ROS**
Provider reviewed on Mar 16, 2021.

A focused review of systems was performed including Allergic / Immunologic, Cardiovascular, Constitutional / Symptom, Hematologic / Lymphatic, and Neurological and was notable for Numbness or tingling in upper or lower extremity (s), Allergy to adhesive, and Heart murmur.

No Allergy To Shellfish/Iodine, No Chest Pain, No Pregnancy Or Planning A Pregnancy, No Allergic Reaction To Foods/environment, No

**HPI:** This is a 57 year old female who is following up for Carpal Tunnel Syndrome on the right transverse palmar carpal ligament. She was seen on February 2, 2021, at which time counseling carpal tunnel syndrome was performed and we decided on the following plan: Steroid injection and she was treated with Carpal Tunnel injection.

The patient presents for further evaluation and management and injection last visit helped 1 day.

Today the patient reports:
Pain Intensity 0.0 - No Pain.
Modifying factors: worsens with activity. Signs and symptoms: tingling and numbness. Quality: radiating. Timing: constant.

The patient followed the treatment plan as directed.

**Historical Summary:**
Dr. Scott McKinney is followed with chronic neck pain and right cervical radiculopathy associated with C5-6 spondylosis and foraminal stenosis, symptomatic as a result of an overuse injury at work. I have placed her on a restriction of a 6-hour workday and full-time use of the scribe.

**Vitals:**

| VITALS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Taken By | B.P. | Pulse | Resp. | O2 Sat. | Temp. | Ht. | Wt. | BMI | BSA |
| 03/16/21 13:31 | Huber, Amy | | | | | 98.6 F | 65.0 in | 135.0 lbs | 22.5 | 1.7 |

* Patient Reported

**Exam:**

**Upper Extremity**

At 4 weeks follow-up after a right carpal tunnel injection patient had a day or 2 of good relief after the injection but after that any kind of repetitive use causes a sense of coldness numbness and tingling even after short time on a computer unfortunately her job does require use of the computer fair amount she is done all of her modifications and is try to take breaks but within the parameters of what her work requires. She does not currently wear her wrist brace at night and she has only been doing the nerve and tendon gliding exercises sporadically on exam today she has full range of motion of the wrist and fingers slightly positive Durkin sign but a negative Tinel's Phalen's test is plus minus. She has no trophic changes noted no atrophy noted no weakness of thumb abduction and no pain.

Right Wrist Special Tests: positive Durkan's compression test and positive Phalen's test.

**Impression/Plan:**
1. **Carpal Tunnel Syndrome, Right**
   Carpal tunnel syndrome, right upper limb (G56.01) distributed on the right transverse palmar carpal ligament, right flexor pollicis longus tendon (Zone IV), and right wrist joint.
   Status: Improved

   Plan: Counseling - Carpal Tunnel Syndrome.
   Nonsurgical treatment is indicated for mild cases whereas surgery is indicated for more severe cases that have

**Leo M Rozmaryn, MD (Primary Provider) (Bill Under)**
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page

CONFIDENTIAL



## The Centers
### for Advanced Orthopaedics
**Visit Note - March 16, 2021**

# SCOTT MCKINNEY, STACY

| | PMSID | Sex | DOB | Phone | MRN |
|---|---|---|---|---|---|
| | 28D204763 | Female | REDACTED | (301) 802-0813 | MM0000914960 |

Leg Cramps, And No Personal Or Family History Of Blood Clot.

not responded to conservative management. If carpal tunnel syndrome is treated in its early stages with proper physical therapy and modification of factors causing the problem, it might be possible to alleviate or reduce the symptoms and stop the progression of the disease. Modifying activity by creating rest periods, adjusting computer workstation positions, and providing better wrist support may help.
The natural history is marked by episodes of discomfort on the thumb side of the hand that come and go. In more advanced cases there is loss of grip strength. In most people, symptoms worsen with time. The carpal tunnel is a tunnel like structure in the wrist surrounded by bones and soft tissue. Carpal tunnel syndrome occurs when there is excess pressure on a nerve in the wrist in the carpal tunnel. There are many factors that contribute to the development of carpal tunnel syndrome such as heredity, beign overweight, overuse of the hand (i.e., extensive typing), hormone changes during pregnancy, and age. Some medical conditions like diabetes and thyroid disease predispose and individual to carpal tunnel syndrome. It is more common in women than men. Most people experience numbness, pain, or an electric shock like sensation in the hand. Symptoms are often worse at night.
Keeping your hand in one position often makes the symptoms worse.
Contact office if pain worsens in your hand, if you have difficulty sleeping, or if there is increasing disability.

After counseling the patient, we decided on the following plan for the RIGHT WRIST: Conservative Management

**Plan: Home Exercise Program - Wrist.**
Indication: Carpal Tunnel Syndrome, Right
- Right Hand Therapeutic Exercises: ball squeeze, continue all previous exercises, DIP flexion-extension, finger extension with rubber band, finger stretches, fist stretches, knuckle bend, finger bend, finger walking, MCP flexion-extension, PIP flexion-extension, thumb IP flexion, thumb MCP flexion, thumb opposition, wrist flexion-extension, and wrist pronation-supination.
- Recommend frequency of 2-3 times  per week for 6-8 weeks.
- Weight Bearing, Right Hand: Advance as tolerated.

- Other Recommendations: You should attempt to do wrist exercises on a daily basis. If you are pain free with the exercises you have been prescribed, you can advance to a more difficult program. Adopting these exercises into a weekly routine even after your recovery will help your wrist and hand stay in optimal condition. Should you feel significant pain or discomfort, please reduce the number of repetitions or frequency as tolerated. If pain still persists, discontinue exercises and contact the office.

**Plan: Hand Therapy.**
Indication: Carpal Tunnel Syndrome, Right - right flexor pollicis longus tendon (Zone IV) - G56.01
Instructions: Evaluate and Treat per diagnosis/objective exam, Desensitization, Joint Mobilization, and Tendon Gliding Exercise
Restrictions: Advance as tolerated.
Recommend frequency of 2-3 times  per week for 6-8 weeks.
- Therapeutic Exercises: All exercises prn per therapist.
- Manual Therapy: All manual therapy prn per therapist.
- Modalities: All modalities prn per therapist.

Provider: Leo M Rozmaryn, MD
Priority: normal

Time frame: 4-6 week(s)

**Plan: Surgical Decision Making.**
The risks benefits alternatives and possible complications of surgery have been explained to the patient in detail the pre-preoperative and postoperative course has been explained as well.

The following risk factors, which impact and increase risk of the planned surgery, have been identified:
Surgery has been discussed and recommended.  I still believe that her carpal tunnel symptoms are emanate from the patient's work because that is the only thing that really kicks it off I have explained to her that while it is not an emergency to get the carpal tunnel release done this is a lifestyle issue and when she is tired of having a numb hand she will come back and I have explained to her the nature of the surgery the preperioperative and postoperative course.

**Follow up in 4 weeks for: F/U evaluation - 10 minutes**

**Staff:**

Leo M Rozmaryn, MD (Primary Provider)  (Bill Under)

---

**Leo M Rozmaryn, MD (Primary Provider) (Bill Under)**
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page



**The Centers**
for Advanced Orthopaedics

Visit Note - March 16, 2021

PMS ID
28D204763

# SCOTT MCKINNEY, STACY

| Sex | DOB | Phone | MRN |
|-----|-----|-------|-----|
| Female | REDACTED | (301) 802-0813 | MM0000914960 |

Electronically Signed By: Leo M Rozmaryn, MD, 03/17/2021 09:00 AM EDT

Leo M Rozmaryn, MD (Primary Provider) (Bill Under)
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page

PLAINTIFF004698
CONFIDENTIAL



**The Centers**
for Advanced Orthopaedics

Visit Note - April 13, 2021



PMS ID
28D204763

Sex
Female

UCR
REDACTED

Phone
(301) 802-0813

SSN
MM0000914960

# Scott-Mckinney, Stacy

### Allergies
Reviewed April 13, 2021.
No known drug allergies

### Medications
Reviewed and no changes noted April 13, 2021.
Qvar RodiHaler 40 mcg/actuation Inhalation - HFA aerosol breath activated
Ventolin HFA inhalation
amlodipine oral
Crestor oral
nortriptyline oral
Skelaxin oral

### Medical History
Reviewed and no changes noted April 13, 2021.
H/O: hypertension
Other: Migraines Asthma

### Musculoskeletal History
Reviewed and no changes noted April 13, 2021.
Other: Repetitive strain right hand,shoulder tendinitis,cervical radiculopathy

### Musculoskeletal Family History
Hypertension

### Musculoskeletal Surgery
History of surgical procedure on cervical spine

### Family History
Reviewed and no changes noted April 13, 2021.
No family history of clinical finding (situation)

### Social History
Reviewed April 13, 2021

Single Question Alcohol Screening: 0 days
Smoking status - Never smoker

### ROS
Provider reviewed on Apr 13, 2021.

A focused review of systems was performed including Allergic / Immunologic, Cardiovascular, Constitutional / Symptom, Hematologic / Lymphatic, and Neurological and was notable for Numbness or tingling in upper or lower extremity (s), Allergy to adhesive, and Heart murmur.

No Allergy To Shellfish/Iodine, No Chest Pain, No Pregnancy Or Planning A Pregnancy, No Allergic Reaction To Foods/environment, No

## Chief Complaint: F/U Carpal Tunnel Syndrome, Right evaluated on March 16, 2021

**HPI:** This is a 57 year old female who is following up for Carpal Tunnel Syndrome on the right transverse palmar carpal ligament, right flexor pollicus longus tendon (Zone IV), and right wrist joint. She was seen on March 16, 2021, at which time counseling carpal tunnel syndrome was performed and we decided on the following plan: Conservative Management, she was treated with Home Exercise Program - Wrist, and she was treated with Hand Therapy.

The patient presents for further evaluation and management and still no improvement.

Today the patient reports:
Pain Intensity 0.0 - No Pain.
Modifying factors: unchanged by treatment. Timing: with activity. Signs and symptoms: numbness. Quality: soreness.

The patient followed the treatment plan as directed.

### Historical Summary:
Dr. Scott McKinney is followed with chronic neck pain and right cervical radiculopathy associated with C5-6 spondylosis and foraminal stenosis, symptomatic as a result of an overuse injury at work. I have placed her on a restriction of a 6-hour workday and full-time use of the scribe.

### Vitals:

| VITALS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Taken By | B.P. | Pulse | Resp. | O2 Sat. | Temp. | Ht. | Wt. | BMI | BSA |
| 04/13/21 13:17 | Huber, Amy | | | | | 98.6 F | 65.0 in | 135.0 lbs | 22.5 | 1.7 |

* Patient Reported

**Exam:**

### Upper Extremity

At 1 month follow-up her right hand is really pretty much in the same. When she is on the computer for a long period of time the hand gets very dusky and numb and that does not take very long for her to do that resting it helps she does not get numb at night and she has been able to function with just about everything but driving or reading a book is not a problem we talked about desk deskersize and standersize exercises her exam today is benign with negative Tinel's Phalen's Durkin sign no weakness of thumb abduction no atrophy noted no trophic changes noted and she has normal tactile sensation compared to the other side today I still think that this is right carpal tunnel syndrome secondary to repetitive strain I want her to spend some time working with the hand therapist with a wrist brace is when she needs to take frequent breaks and I have given her a break exercises to do at work I will see her in 8 weeks I am not in a hurry to do a carpal tunnel release but it may come to it

Right Wrist Special Tests: positive Durkan's compression test.

### Impression/Plan:
1. **Carpal Tunnel Syndrome, Right**
   Carpal tunnel syndrome, right upper limb (G56.01) distributed on the right wrist and right wrist joint.

**Leo M Rozmaryn, MD (Primary Provider) (Bill Under)**
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page 1

CONFIDENTIAL



**The Centers**
for Advanced Orthopaedics

## Scott-Mckinney, Stacy

Visit Note - April 13, 2021

PMS ID
28D204763

Sex
Female

DOB
REDACTED

Phone
(301) 802-0813

Enc.
MM0000914960

Leg Cramps, And No Personal Or
Family History Of Blood Clot.

Status: Improved

**Plan: Counseling - Carpal Tunnel Syndrome.**
Nonsurgical treatment is indicated for mild cases whereas surgery is indicated for more severe cases that have not responded to conservative management. If carpal tunnel syndrome is treated in its early stages with proper physical therapy and modification of factors causing the problem, it might be possible to alleviate or reduce the symptoms and stop the progression of the disease. Modifying activity by creating rest periods, adjusting computer workstation positions, and providing better wrist support may help.
The natural history is marked by episodes of discomfort on the thumb side of the hand that come and go. In more advanced cases there is loss of grip strength. In most people, symptoms worsen with time. The carpal tunnel is a tunnel like structure in the wrist surrounded by bones and soft tissue. Carpal tunnel syndrome occurs when there is excess pressure on a nerve in the wrist in the carpal tunnel. There are many factors that contribute to the development of carpal tunnel syndrome such as heredity, beign overweight, overuse of the hand (i.e., extensive typing), hormone changes during pregnancy, and age. Some medical conditions like diabetes and thyroid disease predispose and individual to carpal tunnel syndrome. It is more common in women than men. Most people experience numbness, pain, or an electric shock like sensation in the hand. Symptoms are often worse at night. Keeping your hand in one position often makes the symptoms worse.
Contact office if pain worsens in your hand, if you have difficulty sleeping, or if there is increasing disability.

After counseling the patient, we decided on the following plan for the RIGHT WRIST: Occupational and Hand Therapy

**Plan: Hand Therapy.**
Indication: Carpal Tunnel Syndrome, Right - right wrist joint - G56.01
Instructions: Evaluate and Treat per diagnosis/objective exam
Recommend frequency of 2-3 times per week for 6-8 weeks.
- Therapeutic Exercises: All exercises prn per therapist.
- Manual Therapy: All manual therapy prn per therapist.
- Modalities: All modalities prn per therapist.

Provider: Leo M Rozmaryn, MD
Priority: normal

Time frame: 4-6 week(s)

**Plan: Brace Instructions.**
The patient brings in a clean orthosis. The patient is instructed to use the orthosis for as many hours per day as needed. I recommend continued use of the orthosis until next follow up. The patient may remove the orthotic daily for bathing and cleaning cautiously. Removal should be done as instructed by the physical therapist or physician. After bathing or cleansing the area, the orthotic should be replaced. The patient should keep the immobilized extremity elevated to reduce swelling.Should there be an increase in pain, moderate swelling of digits, decreased sensation, tingling or numbness, or other concerns please contact the office for further evaluation.

**Plan: Brace - Wrist.**
Diagnosis: Carpal Tunnel Syndrome, Right The right wrist was braced with a Thumb keeper. I sized the patient for the orthosis and provided education (wear time, skin care, and safety precautions) about proper use of the orthosis
 The patient is instructed to use the orthosis as many hours per day as needed. I recommend continued use of the orthosis until next follow up.

**Follow up in 6 weeks for: F/U evaluation - 10 minutes**

**Staff:**

Leo M Rozmaryn, MD (Primary Provider)  (Bill Under)

Electronically Signed By: Leo M Rozmaryn, MD, 04/16/2021 09:52 AM EDT

**Leo M Rozmaryn, MD (Primary Provider) (Bill Under)**
(301) 251-1433 Work
(301) 424-5266 Fax

28 Rockville Office
14995 Shady Grove Road
Suite 350
Rockville, MD 20850-8700

Page 2

PLAINTIFF004700
CONFIDENTIAL

-400-

Coronavirus (COVID-19) Updates

Telephone Problems Affecting Customer Service



**Plaintiff Trial Exhibit**

**198**

5/2/22



Social Security

## Starting Your Retirement Benefits Early

You can start receiving your Social Security retirement benefits as early as age 62. However, you are entitled to full benefits when you reach your full retirement age. If you delay taking your benefits from your full retirement age up to age 70, your benefit amount will increase.

If you start receiving benefits early, your benefits are reduced a small percent for each month before your full retirement age.

To find out how much your benefit will be reduced if you begin receiving benefits from age 62 up to your full retirement age, use the chart below and select your year of birth. This example is based on an estimated monthly benefit of $1000 at full retirement age.

## Full Retirement and Age 62 Benefit By Year Of Birth

| Year of Birth [1] | Full (normal) Retirement Age | Months between age 62 and full retirement age [2] | At Age 62 [3] | | | |
|---|---|---|---|---|---|---|
| | | | A $1000 retirement benefit would be reduced to | The retirement benefit is reduced by [4] | A $500 spouse's benefit would be reduced to | The spouse's benefit is reduced by [5] |
| 1943-1954 | 66 | 48 | $750 | 25.00% | $350 | 30.00% |
| 1955 | 66 and 2 months | 50 | $741 | 25.83% | $345 | 30.83% |
| 1956 | 66 and 4 months | 52 | $733 | 26.67% | $341 | 31.67% |
| 1957 | 66 and 6 months | 54 | $725 | 27.50% | $337 | 32.50% |
| 1958 | 66 and 8 months | 56 | $716 | 28.33% | $333 | 33.33% |
| 1959 | 66 and 10 months | 58 | $708 | 29.17% | $329 | 34.17% |
| 1960 and later | 67 | 60 | $700 | 30.00% | $325 | 35.00% |

1. If you were born on January 1st, you should refer to the previous year.

2. If you were born on the 1st of the month, we figure your benefit (and your full retirement age) as if your birthday was in the previous month. If you were born on January 1st, we figure your benefit (and your full retirement age) as if your birthday was in December of the previous year.

3. You must be at least 62 for the entire month to receive benefits.

4. Percentages are approximate due to rounding.

5. The maximum benefit for the spouse is 50 percent of the benefit the worker would receive at full retirement age. The percent reduction for the spouse should be applied after the automatic 50 percent reduction. Percentages are approximate due to rounding.

**Before You Make Your Decision**

There are advantages and disadvantages to taking your benefit before your full retirement age. The advantage is that you collect benefits for a longer period of time. The disadvantage is your benefit will be reduced. Each person's situation is different. It is important to remember:

- If you delay your benefits until after full retirement age, you will be eligible for <u>delayed retirement credits</u> that would increase your monthly benefit.

- That there are <u>other things to consider</u> when making the decision about when to begin receiving your retirement benefits.

    If you decide to delay your benefits until after age 65, you should still **apply** for Medicare benefits within three months of your 65th birthday. If you wait longer, your Medicare medical insurance (Part B) and prescription drug coverage (Part D) may cost you more money.



# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STACY SCOTT-MCKINNEY, M.D.,

    *Plaintiff,*

v.             Case No. 1:19-cv-02980

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

    *Defendant.*

   I, Stacy Scott-McKinney, M.D., declare under penalty of perjury that the foregoing are true statements based on my personal knowledge:

1. I am the Plaintiff in the above-captioned lawsuit.

2. I submit this Declaration in support of my request for permanent injunctive relief as a result of Defendant's discrimination against me for failing to provide a scribe for 16 months and the resulting lasting negative impact of that unlawful decision.

3. I was informed by Defendant representatives that, later this fall 2022, Defendant CNMC's subsidiary, Children's Pediatricians and Associates ("CP&A"), will be transitioning to new electronic medical records ("EMR") software from Cerner Corporation.  This is the first time CNMC/CP&A has changed its EMR software in 15 years.

4. The main hospital at CNMC has had Cerner EMR software for some time, so now CP&A will as well.

5. I could envision Defendant trying to have me attempt voice dictation software ("VDS") again like it did in August 2019 with the "MModal" software.

1

6. However, I was one of a handful of physicians who has already piloted the new Cerner EMR software prior to all employees being trained on it before its implementation.

7. From my firsthand experience, I already know that there are many boxes and dropdown menus in this EMR software, just like my current EMR software.

8. As a result, the new EMR software being implemented at CP&A later this year could not possibly have VDS that would be effective for my medical condition as there is no VDS that can check boxes and navigate dropdown menus.

9. Defendant uses "Dragon" VDS at its hospital with the Cerner EMR software. Cerner, through a representative, has confirmed that fact. I previously piloted Dragon software in 2018 prior to my scribe, Asiah Cauley, starting. That VDS, like MModal, was and is only useful for narrative style documenting and not dropdown menus or box clicks. Cerner representatives have also confirmed my prior experience with Dragon software that the software will dictate where the cursor is placed. It is up to me to place the cursor, which means I have to move the mouse to do so. Dragon software is not a Cerner product.

10. A medical scribe is the only effective accommodation to allow me to continue patient record documentation duties.

11. Additionally, based on my longstanding tenure with Defendant, I find it highly unlikely that Defendant CNMC/CP&A will change EMR systems again prior to 2030 given the exorbitant price tag involved with such a transition.

12. In the unlikely event that CNMC/CP&A does replace the EMR software prior to 2030 (when I retire), I would still need a scribe unless the replacement EMR alternative is proven to be comparable *and* effective with VDS or other means to navigate that software so that my medical condition is not exacerbated further.

2

13. My medical condition/disorders include cervical radiculopathy, shoulder tendinitis, carpel tunnel syndrome and finger tendinitis.

14. The reasonableness of any accommodation to replace my scribe has to prioritize *effectiveness* not just whether it is "reasonable" in concept or compatible with the EMR software.

15. I do not mind trying new products or services that could help me, but Defendant should not be the arbiter of whether such products or services are a suitable alternative to the scribe without proper testing and validation.

16. My experience in 2019 with being ordered to use MModal VDS software when the MModal representative told me on July 31, 2019 that it does not work with box clicking validates that Defendant forced me to use VDS that was never tested in practice and did not work, which placed me in danger of further injury.

### Further Evidence of Retaliation for Protected Activity

17. During the pendency of this lawsuit and in the fall of 2021, my Team Lead physician, Dr. Dan Glaser, announced that he was going to retire at the end of the year.

18. The Team Lead is a supervisory position and will carry with it financial benefits.

19. Upon Dr. Glaser's announcement of his retirement and given that I am the most senior physician in my Laurel, Maryland practice, I volunteered to assume the Team Lead position for my practice after consulting with and receiving agreement from my physician colleagues.

20. I sent an email to CP&A's Vice President of Ambulatory Services, Marc DiFazio, M.D., Director of CP&A Business Operations, Mark Janowiak, and Kathy Prestidge, Director of CP&A Clinical Operations, stating my willingness and interest to volunteer for the Team

3

Lead position. He responded that there would be a formal interview and application process for the Team Lead position. See the email exchange attached to this Declaration.

21. During my over 15-year tenure with Defendant, such an application and interview process for the Team Lead position is unprecedented. It is typical that the most senior physician in a CP&A practice group assumes the Team Lead position when the incumbent retires.

22. Contrary to Dr. DiFazio's statement about a formal process, neither I nor my practice physician colleagues ever received any notification of an application, interviews or how to apply.

23. Instead, Defendant CNMC/CP&A unilaterally selected a physician who is junior to me and is outside of my Laurel practice group to assume the Team Lead position for my practice. That physician is not only junior to me but works in CP&A's Bowie, Maryland office.

24. To my knowledge during my tenure with Defendant, no physician from one practice group has ever assumed the Team Lead position for another practice group. This too is unprecedented.

I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 that the foregoing facts are true and made on my personal knowledge.

___April 19, 2022___
Date

Stacy Scott-McKinney, M.D.

4

Case 1:19-cv-02980-TNM    Document 96-1    Filed 04/13/22    Page 6 of 7

### RE: Team Lead-Laurel

**DiFazio, Marc <MDiFazio@childrensnational.org>**
Mon 11/29/2021 5:56 PM

To: Scott-Mckinney, Stacy <STscott@childrensnational.org>;Janowiak, Mark <MJanowia@childrensnational.org>;Prestidge, Kathy <kprestidge@childrensnational.org>;Kim, Holly <HoKim@childrensnational.org>

Hi Stacy – thanks for your interest. The new CNPA leadership team is addressing the transition, and we have a recruitment and interview process that will be followed – This may require an interim leader, and I have alerted Dan.    We encourage you to send us a CV, a letter confirming your interest in the formal job description once reviewed (Holly will send out) and we will proceed with interviews for all who express interest!

md

**From:** Scott-Mckinney, Stacy <STscott@childrensnational.org>
**Sent:** Monday, November 29, 2021 12:43 PM
**To:** DiFazio, Marc <MDiFazio@childrensnational.org>; Janowiak, Mark <MJanowia@childrensnational.org>; Prestidge, Kathy <kprestidge@childrensnational.org>
**Subject:** RE: Team Lead-Laurel

Hi All
Checking back...see message from 11/19 below...
Thx
Stacy

**From:** Scott-Mckinney, Stacy
**Sent:** Friday, November 19, 2021 5:08 PM
**To:** Glaser, Dan <DGlaser@childrensnational.org>; DiFazio, Marc <MDiFazio@childrensnational.org>; Janowiak, Mark <MJanowia@childrensnational.org>; Prestidge, Kathy <kprestidge@childrensnational.org>
**Subject:** RE: Team Lead-Laurel

Howdy All and Happy Friday
I am following back up to see where things stand with the Team Lead position for Laurel. As you know, I am willing and able, over 30yrs experience, seniority and have the support of all providers.
If there are concerns perhaps we can meet to discuss them.
Let me know.
Thx and have a nice weekend.
Stacy

**From:** Glaser, Dan <DGlaser@childrensnational.org>
**Sent:** Thursday, November 4, 2021 11:00 AM
**To:** Scott-Mckinney, Stacy <STscott@childrensnational.org>
**Cc:** Janowiak, Mark <MJanowia@childrensnational.org>; Prestidge, Kathy <kprestidge@childrensnational.org>; DiFazio, Marc <MDiFazio@childrensnational.org>
**Subject:** RE: Team Lead

Just letting you know that the decision of who will be the Physician Lead is not a done deal, and that Management, including Kathy, Mark, and the Director Marc DiFazio are involved in the decision. Thank you for your patience. Dan

**From:** Scott-Mckinney, Stacy <STscott@childrensnational.org>
**Sent:** Wednesday, November 3, 2021 1:15 PM
**To:** Glaser, Dan <DGlaser@childrensnational.org>
**Cc:** Demmeke, Tsega <TDemmeke@childrensnational.org>; Lowe, Vanessa <vlowe@childrensnational.org>; Pyle, Jessica <Jessica.Pyles@childrensnational.org>; Pampati, Sneha <spampati@childrensnational.org>
**Subject:** Team Lead

Hey Dan
I wanted to let you know everyone is supportive of me assuming Team Lead after you retire in December.
Thanks
Stacy



**The Orthopaedic Center, P.A.**
A Division of The Centers for Advanced Orthopaedics, LLC



Plaintiff Trial Exhibit
**200**
5/2/22

9420 Key West Avenue
Suite 300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary Feldman, DPM
Kenneth Fine, M.D.
David A Levin, M.D.
Joseph R Hanna, M.D.
Richard B Reff, M.D.
Scott Faucett, M.D.
Andrew B Pham, M.D.

20500 Seneca Meadows Pkwy
Suite 2100
Germantown, MD20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F Street,
Suite 305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (240) 912-8484

**SCOTT MCKINNEY, Stacy D**
**AN:**    204763
**DOB:**    REDACTED REDACTED

**Date of Service:**    03/27/19

**Return office visit**

Dear Dr Moy:

I had the pleasure of seeing Dr McKinney who as you know is a 55 year old pediatrician. She is right hand dominant. She has had an issue with her right hand with discoloration and color changes and numbness that has been going on for about one year. It seems to involve her index finger but also goes over to the middle and half of the ring finger. It seems to be the volar side and somewhat the dorsal side also at the tips. There was no injury or trauma but it seems to be associated with work and using her hands especially using the EMR system when she makes notes. It has been getting worse. She did start a high blood pressure medication about one month ago but she feels that these symptoms predated that. She has had no specific treatment. She has had some neck issues that were treated by Dr Levin.

**Medications:** Unchanged since last visit to The Orthopaedic Center.

**Allergies:** Unchanged since last visit to The Orthopaedic Center.

**ROS:**
Complete ROS which was performed during a previous encounter was re-examined and reviewed with the patient. There is nothing new to add today. For details, please refer to my previous note in this chart.

**PHYSICAL EXAMINATION:**
**Vital Signs:** Height 65"; Weight 138 lbs; Respiratory Rate 20
**Constitutional:** Well nourished; No physical deformities; Normally developed; Good grooming.
**Respiratory:** Normal effort; No dyspnea, labored breathing or use of accessory muscles.
**Skin:** No rash, No jaundice. No lesions. No cyanosis.
**Neurologic/Psychiatric:** Alert. Oriented to person, place and time. No distress. Normal affect.
**Eyes:** Normal pupils, conjunctivae, eyelids and EOM.

Examination shows that she has evidence of an incomplete arch and poor filling of the radial and ulnar arteries on the right side. Negative Tinel's and negative Phalen's and Durkan's results in some tingling to the index finger. Otherwise Her skin is intact and she is neurovascularly intact distally.

**PLAINTIFF004434**



**The Orthopaedic Center, P.A.**
A Division of The Centers for Advanced Orthopaedics, LLC

9420 Key West Avenue
Suite 300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary Feldman, DPM
Kenneth Fine, M.D.
David A Levin, M.D.
Joseph R Hanna, M.D.
Richard B Reff, M.D.
Scott Faucett, M.D.
Andrew B Pham, M.D.

20500 Seneca Meadows Pkwy
Suite 2100
Germantown, MD20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F Street,
Suite 305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (240) 912-8484

**SCOTT MCKINNEY, Stacy D**
**AN:**    204763
**DOB:**    REDACTED REDACTED

**Date of Service:**    **03/27/19**

X-Rays - see my dictated report

**IMPRESSION:**
1.    Right hand Raynaud's phenomenon.

**PLAN:**
I think it is more a Raynaud's issue. She showed me pictures. It seems to be more vascular in nature. I don't think it is neurologic in nature and it is not coming from her cervical or carpal tunnel, I believe. I think it is a vasospastic disorder. She should get worked up by a rheumatologist and this is what I recommended to her. Consideration could also be made to change her to Nifedipine instead of Amlodipine that she is currently on. I will see her back as needed.

Thanks again for allowing me to see Stacy for her right hand. If I can be of any further assistance or answer any questions please do not hesitate to call.

*Electronically Signed*

Sunjay Berdia, M.D.
SB/cb
cc: Jenny Moy, M.D.

**PLAINTIFF004435**



**The Orthopaedic Center, P.A.**
A Division of The Centers for Advanced Orthopaedics, LLC

9420 Key West Avenue
Suite 300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Gary Feldman, DPM
Kenneth Fine, M.D.
David A Levin, M.D.
Joseph R Hanna, M.D.
Richard B Reff, M.D.
Scott Faucett, M.D.
Andrew B Pham, M.D.

20500 Seneca Meadows Pkwy
Suite 2100
Germantown, MD20876
Phone: (301) 972-4752
Fax: (301) 972-4836

2112 F Street,
Suite 305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (240) 912-8484

**SCOTT MCKINNEY, Stacy D**
**AN:** 204763
**DOB:** REDACTEDREDACTED REDACTEDREDACTED

**Date of Service:** 03/27/19

XRAY REPORT:

3 views of the hand do not show any osseous abnormality.

*Electronically Signed*

Sunjay Berdia, M.D.
SB/cb
cc: Jenny Moy, M.D.

**PLAINTIFF004436**

**-412-**

Def. Exhibit 173



**The Orthopaedic Center, P.A.**
**A Division of The Centers for Advanced Orthopaedics, LLC**

9420 Key West Avenue
Suite 300
Rockville, MD 20850
Phone: (301) 251-1433
Fax: (301) 424-5266
www.theorthocentermd.com

20500 Seneca Meadows
Pkwy,
Suite 2100
Germantown, MD 20876
Phone: (301) 972-4782
Fax: (301) 972-4836

2112 F Street
Suite 305
Washington, DC 20037
Phone: (202) 912-8480
Fax: (202) 912-8484

Leo M. Rozmaryn, M.D.
Barry P. Boden, M.D.
Sunjay Berdia, M.D.
Kenneth Fine, M.D.
David A. Levin, M.D.
Joseph R. Hanna, M.D.
Richard B. Reff, M.D.
Scott C. Faucett, MD
Andrew B. Pham, MD

## SCOTT MCKINNEY, STACY

AN: __204763__
DOB: REDACTED
DOS: 8-11-2020

### Initial Office Visit

Dr. McKinney is a 57 year old woman who for the past 3 years has had steady increasing pain mostly numbness and tingling and color changes in her fingers. It seems to occur mostly when she is on the computer which as a pediatrician, she finds herself doing a lot of. She's had mostly the numbness and discoloration which she describes as very distressing. She has gone to the Mayo clinic; has had vascular studies which really were not that conclusive except she was told that she has some Reynaud's disease with color changes when she put her fingers in ice cold water. With the vascular flow study she has had arteriograms with Doppler. And essentially was told that this was mostly normal. She had EMG and nerve conduction studies looking for carpal tunnel syndrome. She was also told she had baseline vasospasms with no fixed arterial obstruction; thoracic outlet maneuvers were negative as well. A diagnosis of carpal tunnel syndrome was thrown about as well as thoracic outlet syndrome, Reynaud's. The main thing is that her symptoms realty have not gotten any better but it all seems to be made worse right now with work. She has tried some remedial ergonomic modifications but not enough. She otherwise is an entirely healthy active woman.

**REVIEW OF SYSTEMS:** Review of systems available on patient medical history form in The Orthopaedic Center Medical Record signed and dated on 8-11-2020.

**MEDICAL HISTORY:** Otherwise, patient is healthy. No heart disease, lung disease, kidney disease, diabetes. History of high blood pressure, high cholesterol, migraines, C5-6, C6-7 disc herniation (and being followed by my partner, Dr Levin).

**FAMILY HISTORY:** Reviewed with patient and unremarkable.

**PAST SURGICAL HISTORY:** Reviewed with patient and unremarkable.

**MEDICATIONS:** for hypertension, hyperlipidemia, migraines; take calcium channel blockers and hormone replacement therapy.

PLAINTIFF004688                    CONFIDENTIAL

**ALLERGIES:**

**PHYSICAL EXAMINATION:** Height: 65" Weight: 138 lbs.  On exam, she has full range of motion cervical spine; negative Lhermitte; negative Spurling test; full shoulder shrug; full elbow flexion extension, both range of motion and power; normal reflexes C5,6 and 7 bilaterally; full wrist flexion extension; finger flexion extension; Allen test shows excellent filling through both ulnar arterial distribution although it is slightly sluggish on the ulnar side on the right; she has a totally left normal Allen test. I did a cold stress test which showed only minimal erythema in the cold. This doesn't seem to be so much related to temperature change but a lot of repetitive use causes her to have some discoloration in the fingers. Her symptoms start within 30 minutes of being on the computer. She doesn't take too many breaks because  the nature of her job is very high pressured, high energy and high stress. She has a negative Tinels, Phalens and Durkan's sign; negative Roos test; no tenderness at the pectoralis minor or the scalenes; no trophic changes noted; no atrophy noted; negative Wartenburg; negative Fromment sign; no weakness to thumb abduction; full active flexion extension of the fingers with normal power and the wrist as well, with normal power. My feeling is that she has none of the above. If she has any Reynaud's, it is of any significance to cause her the kind of distress that it does. The cold stress test didn't show very much. She has no history of any night pain, which  rules out carpal tunnel syndrome. She might have some cervical radiculopathy but this would not explain the symptoms in her hand, as pronounced as they are. I don't see any evidence of arterial obstruction or venous obstruction. There is no evidence of any dystonic movements either by history or on physical exam. She has normal coordination. I think we are dealing with repetitive strain pain.

**PLAN:**  I have given her detailed ergonomic instructions for her work station: lowering the desk to umbilicus height; vertical mouse; Microsoft natural keyboard; limit the amount of time typing for less than 20 minutes. I have also given her DeskErcise and Standercise; nerve and tendon gliding exercises to be done 5x a day; hot soaks to be done twice a day. I will not give her non-steroidal anti-inflammatory at this time. I don't think she needs night brace because she has no symptoms at night. I'd like to see her back in 4 weeks' time. I think doing these exercises will help her a good deal. I also gave her some formal neck and shoulder exercises that she can do in addition to the DeskErcise and that will be on my web site as well.

*Electronically Signed*
Leo M. Rozmaryn, M.D.

cc: Jenny Moy, M.D.
/sms

PLAINTIFF004689                              CONFIDENTIAL

Page 422 of 552    Filed: 11/29/2022    Document #1975465    USCA Case #22-7113



**MalcolmDubato, LLC**

11025 Stratfield Court • Marriottsville, MD 21104

Phone: 410-442-0280

Fax: 410-442-0416

E-mail: info@malcolmdubato.com

www.malcolmdubato.com

# EFFECTIVE ACCOMMODATION OPINION
# SUPPLEMENTAL REPORT
# FOR
# STACY SCOTT-MCKINNEY

# 1-25-22

Prepared by:

Jody Malcolm MAS, MSW, LCSW-C
CDMS, CRC, CVE, CCM, CLCP
jody@malcolmdubato.com

Dana Blair, B.A., Sociology
CDMS, CCM, CLCP
dana@malcolmdubato.com

USCA Case #22-7113        Document #1975465        Filed: 11/29/2022        Page 423 of 552

## *Table of Contents*

| *Section* | *Page Number* |
|---|---|
| Case Information | 3 |
| Purpose of Effective Accommodation Report | 4 – 5 |
| Updated Vocational Damages Charts | 6 – 12 |

Page 424 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

*Case Information*

| Date of Addendum | 1-25-22 |
|---|---|
| Date of Original Reports and Addendums: | 2-26-20; 4-22-20; & 11-11-20 |
| Date of Referral: | 2-17-20 |
| Referral Source: | Eric Siegel, Esquire<br>Kalbian Hagerty, LLP |
| Party Name: | Stacy Scott-McKinney |
| Party Date of Birth: | 6-21-1963 |
| Date of Incident: | 2-2017 |
| Case Reference and Jurisdiction: | Stacy Scott-McKinney v. Children's National Medical Center<br>1:10-CV-2980<br>Federal Court |
| Report Prepared by: | Jody Malcolm<br>MalcolmDubato, LLC.<br>Master of Social Work degree [MSW]<br>Master of Administrative Science degree [MAS]<br>Licensed Certified Social Worker-Clinical [LSCW-C]<br>Certified Case Management [CCM]<br>Certified Vocational Evaluator [CVE]<br>Certified Rehabilitation Counselor [CRC]<br>Certified Disability Management Specialist [CDMS]<br>Certified Life Care Planner [CLCP]<br><br>Dana Blair<br>MalcolmDubato, LLC.<br>Certified Case Management [CCM]<br>Certified Disability Management Specialist [CDMS]<br>Certified Life Care Planner [CLCP] |

- 3 -

Page 425 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

### *Purpose of the Effective Accommodation Report*

Recall, our previous reports included calculations based upon Dr. Scott-McKinney's Compensation Structure which, according to Dr. Scott-McKinney, is based upon a Production Model. We were provided with documentation regarding the average charge per visit which is $288.26 and her average revenue per visit, provided by the Practice Administrator, Mark Janowiak, MHA, which is $165.84 per patient[1].

In our previous reports, we utilized this "per patient" dollar figure to calculate Dr. Scott-McKinney's loss of visit revenue due to the loss of the medical scribe and being placed on computer work restrictions by her treating physician on 8-20-19, which resulted in an additional reduction in hours Dr. Scott-McKinney was evaluating patients at the practice.

Prior to the 8-20-19 work restrictions limiting Dr. Scott-McKinney to performing no more than six (6) hours per day of direct patient care, Dr. Scott-McKinney was providing patient care to approximately 88 - 101 patients per week, this equates to $14,593.92 to $16,749.84 per week [$165.84 x 88; $165.84 x 101].

With the reduction of Dr. Scott-McKinney's patient care hours to six (6) hours of direct patient care, she was only performing patient care for approximately 73 – 83 patients per week, which equates to $12,106.32 to $13,764.72 per week [$165.84 x 73; $165.84 x 83].

Therefore, subsequent to the loss of the medical scribe and being placed on computer work restrictions by her treating physician on 8-20-19, Dr. Scott-McKinney experienced a loss of visit revenue of approximately $2,487.60 to $2,985.12 per week, which equates to $134,330.40 to $161,196.48 since 8-20-19 and up to 9-1-20 [$2,487.60 x 54 weeks; $2,985.12 x 54 weeks].

Please refer to the additional formulas below which represent the reduced earnings when Dr. Scott-McKinney is limited to six (6) hours of direct patient care:

- $14,593.92 - $12,106.32 = $2,487.60
- $16,749.84 - $13,764.72 = $2,985.12

The additional reduction in hours, during which time Dr. Scott-McKinney evaluates her last patient at 1:30/1:45 p.m. or four (4) hours of direct patient care, equates

---

[1]This figure does not take into account the deduction of fees for the fiscal year overhead expenses of the practice.

Page 426 of 552          Filed: 11/29/2022          Document #1975465          USCA Case #22-7113

to an additional loss of 6-7 patients, 3 days per week. This equates to an additional loss of 18-21 more patients per week and a total loss of 33-39 patients per week for this reduced work schedule.

Therefore, when Dr. Scott-McKinney is limited to four (4) hours of direct patient care she is only able to perform patient care for approximately 55 – 62 patients per week, which equates to $9,121.20 to $10,282.08 per week [$165.84 x 55; $165.84 x 62].

Recall the full patient schedule was 88-101 patients per week which equates to $14,593.92 to $16,749.84 per week [$165.84 x 88; $165.84 x 101].

Please refer to the additional formulas below which represent the reduced earnings when Dr. McKinney is limited to four (4) hours of direct patient care:

- $14,593.92 - $9,121.20 = $5,472.72
- $16,749.84 - $10,282.08 = $6,467.76

To the best of our knowledge, Dr. Scott-McKinney has since been provided with an effective accommodation of a scribe, allowing her to work up to her maximum potential of six (6) hours per day of evaluating patients, which is a permanent work day restriction per her treating physician, David Levin, M.D., Orthopedic Surgeon as of 1-2021.

On 1-19-22 we received information from Plaintiff Attorney, Eric Siegel, Esquire at which time we were provided with updated compensation reconciliation documents for Dr. Scott-McKinney and were requested to prepare an Addendum to the 11-11-20 Opinion Report. Recall, the medical practices' Fiscal Year is from July 1 to June 30.

We were provided with the following documentation:

- Fiscal Year of 2017 Annual Physician Compensation Reconciliation Report **[Attachment #1]**

- Fiscal Year of 2019 Annual Physician Compensation Reconciliation Report **[Attachment #2]**

- Fiscal Year of 2020 Annual Physician Compensation Reconciliation Report **[Attachment #3]**

Based upon this new information, additional calculations are provided below.

Page 427 of 552          Filed: 11/29/2022          Document #1975465          USCA Case #22-7113

## *Vocational Damages Charts*

The following Vocational Damages charts provide a summary of the anticipated costs associated with loss of wages.

Any loss of wages and/or revenue reflected herein are considered in present day value; therefore, unless deemed unnecessary by the referring party, it is recommended the economic damages associated with wage loss be reviewed by a qualified economist for consideration of other economic factors.

If liability is established and damages are awarded, the following vocational damages should be awarded to Dr. Scott-McKinney:

The Vocational Damages charts are identified as follows:

| Chart I | TOTAL VOCATIONAL DAMAGES |
|---|---|
| Chart II | CLOSED PERIOD OF DATES OF PLAINTIFF'S WAGE LOSS 7-1-19 TO 6-30-21 |
| Chart III | CLOSED PERIOD OF DATES OF PLAINTIFF'S WAGE LOSS 7-1-21 TO 3-30-22 |
| Chart IV | PLAINTIFF'S PROJECTED LOSS OF WAGE LOSS REMAINDER OF WORK LIFE EXPECTANCY |

Page 428 of 552          Filed: 11/29/2022          Document #1975465          USCA Case #22-7113

**CHART I – TOTAL VOCATIONAL DAMAGES**

| | |
|---|---|
| **CLOSED PERIOD OF DATES OF PLAINTIFF'S WAGE LOSS 7-1-19 TO 6-30-21** | $79,702.70 to $95,374.57 |
| **CLOSED PERIOD OF DATES OF PLAINTIFF'S WAGE LOSS 7-1-21 TO 3-30-22** | $31,045.25 to $37,254.30 |
| **PLAINTIFF'S PROJECTED LOSS OF WAGE LOSS REMAINDER OF WORK LIFE EXPECTANCY** | $341,497.70 TO $409,797.30 |
| **TOTAL VOCATIONAL DAMAGES** | **$452,245.65 to $542,426.17** |

Costs presented in year 2022 dollars.  It is recommended the economic damages associated with wage loss be reviewed by a qualified economist for consideration of other economic factors.

- 7 -

Page 429 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

**CHART II – CLOSED PERIOD OF DATES OF PLAINTIFF'S WAGE LOSS**

**7-1-19 TO 6-30-21**

| Dates of Plaintiff's Revenue Loss | Plaintiff's Loss of Revenue * | Compensation Percentage** | Plaintiff's Calculated Wage Loss |
|---|---|---|---|
| 7-1-19 to 6-30-20*** [Reduced Schedule 6 hours of direct patient care] | **$109,454.40 to $131,345.28** <br> $2,487.60/wk x 44 weeks = $109,454.40 <br> $2,985.12/wk x 44 weeks = $131,345.28 | 30% | **$32,836.32 to $39,403.58** |
| 7-1-20 to 9-1-20 [Reduced Schedule 6 hours of direct patient care] | **$22,388.40 to $26,866.08** <br><br> $2,487.60/wk x 9 weeks = $22,388.40 <br> $2,985.12/wk x 9 weeks = $26,866.08 | 30% | **$6,716.52 to $8,059.82** |
| 9-2-20 to 10-5-20 [Reduced Schedule 4 hours of direct patient care] | **$27,363.60 to $32,338.80** <br><br> $5,472.72 /wk x 5 weeks = $27,363.60 <br> $6,467.76 /wk x 5 weeks = $32,338.80 | 30% | **$8,209.08 to $9,701.64** |
| 10-6-20 to 10-22-20 [Reduced Schedule 6 hours of direct patient care] | **$4,975.20 to $5,970.24** <br><br> $2,487.60/wk x 2 weeks = $4,975.20 <br> $2,985.12/wk x 2 weeks = $5,970.24 | 30% | **$1,492.56 to $1,791.07** |
| 10-23-20 to 11-20-20 [Reduced Schedule 4 hours of direct patient care] | **$21,890.88 to $25,871.04** <br><br> $5,472.72 /wk x 4 weeks = $21,890.88 <br> $6,467.76 /wk x 4 weeks = $25,871.04 | 30% | **$6,567.26 to $7,761.31** |
| 11-23-20 to 6-30-21 [Reduced Schedule 6 hours of direct patient care] | **$79,603.20 to $95,523.84** <br><br> $2,487.60/ wk x  32 weeks = $79,603.20 <br> $2,985.12 / wk x  32 weeks = $95,523.84 | 30% | **$23,880.96 to $28,657.15** |
| **TOTAL PLAINTIFF'S WAGE LOSS** | | | **$79,702.70 to $95,374.57** |

*This figure is based on the reported average revenue per visit of $165.84 as provided by Mark Janowiak, MHA Practice Administrator. Dr. Scott-McKinney's reduced earnings when she limits direct patient care to four (4) hours equate to reduced earnings of $5,472.72 to $6,467.76 per week. Dr. Scott-McKinney's reduced earnings when she limits direct patient care to six (6) hours equate to reduced earnings of $2,487.60 to $2,985.12 per week.

** The Compensation 30% is based upon the Actual Reconciliation Calculation Comp Percentage included on the Fiscal Year 2020 Annual Physician Compensation Reconciliation Report

*** This figure represents the timeframe for which the physician's office transitioned to virtual visits and seeing less patients due to COVID-19. It should be noted, 8 weeks [2 months] during this timeframe were not included in the calculations as no patients were seen.

- 8 -

Page 430 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

**CHART III - CLOSED PERIOD OF DATES OF PLAINTIFF'S WAGE LOSS**

**7-1-21 TO 3-30-22**

| Dates of Plaintiff's Revenue Loss | Plaintiff's Loss of Revenue * | Compensation Percentage** | Plaintiff's Calculated Wage Loss |
|---|---|---|---|
| 7-1-21 TO 3-30-22 | **$97,016.40 TO $116,419.68**<br><br>$2,487.60/ wk x 39  weeks = $97,016.40<br>$2,985.12 / wk x  39 weeks = $116,419.68 | 32% | **$31,045.25 to $37,254.30** |
| **TOTAL PLAINTIFF'S WAGE LOSS** | | | **$31,045.25 to $37,254.30** |

*This figure is based on the reported average revenue per visit of $165.84 as provided by Mark Janowiak, MHA Practice Administrator. Dr. Scott-McKinney's reduced earnings when she limits direct patient care to four (4) hours equate to reduced earnings of $5,472.72 to $6,467.76 per week. Dr. Scott-McKinney's reduced earnings when she limits direct patient care to six (6) hours equate to reduced earnings of $2,487.60 to $2,985.12 per week.

** The 32% is a conservative compensation percentage utilized to calculate Dr. Scott-McKinney's wage loss.

- 9 -

**-423-**

Page 431 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

**CHART IV – PLAINTIFF'S PROJECTED WAGE LOSS**

**REMAINDER OF WORK LIFE EXPECTANCY**

| Dates of Plaintiff's Revenue Loss | Plaintiff's Loss of Revenue * | Compensation Percentage ** | Plaintiff's Calculated Wage Loss |
|---|---|---|---|
| 4-1-22 TO 6-30-22 | **$32,338.80 TO $38,806.56**<br><br>$2,487.60/ wk x 13 weeks = $32,338.80<br>$2,985.12 / wk x 13 weeks = $38,806.56 | 32% | **$10,348.42 TO $12,418.10** |
| 7-1-22 TO 6-30-23 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52  weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| 7-1-23 TO 6-30-24 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52  weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| 7-1-24 TO 6-30-25 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52  weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| 7-1-25 TO 6-30-26 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52  weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| 7-1-26 TO 6-30-27 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52  weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |

- 10 -

Page 432 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

| Dates of Plaintiff's Revenue Loss | Plaintiff's Loss of Revenue* | Compensation Percentage | Plaintiff's Calculated Wage Loss |
|---|---|---|---|
| 7-1-27 TO 6-30-28 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52   weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| 7-1-28 TO 6-30-29 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52   weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| 7-1-29 TO 6-30-30 | **$129,355.20 TO $155,226.24**<br><br>$2,487.60/ wk x 52   weeks = $129,335.20<br>$2,985.12 / wk x 52 weeks = $155,226.24 | 32% | **$41,393.66 TO $49,672.40** |
| **PLAINTIFF'S TOTAL PROJECTED WAGE LOSS REMAINDER OF WORK LIFE EXPECTANCY \*\*\*** | | **$341,497.70 TO $409,797.30** | |

*This figure is based on the reported average revenue per visit of $165.84 as provided by Mark Janowiak, MHA Practice Administrator. Dr. Scott-McKinney's reduced earnings when she limits direct patient care to four (4). equate to reduced earnings of $5,472.72 to $6,467.76 per week. Dr. Scott-McKinney's reduced earnings when she limits direct patient care to six (6). equate to reduced earnings of $2,487.60 to $2,985.12 per week.

** The 32% is a conservative compensation percentage utilized to calculate Dr. Scott-McKinney's wage loss.

***The noted Work Life Expectancy is based upon the Plaintiff's current age in relation to the anticipated retirement age according to the Social Security Administration. The Work Life Expectancy has not been adjusted in consideration of the Plaintiff's medical/physical condition(s).

Page 433 of 552

Filed: 11/29/2022

Document #1975465

USCA Case #22-7113

This report and the opinions represented herein are all offered within a reasonable degree of vocational certainty.

This expert's opinion and report are not to be considered as an offer to provide any current type of vocational rehabilitation services to Dr. Scott-McKinney.

We reserve the right to consider supplemental information and, if necessary, alter our opinions accordingly.


DANA BLAIR
B.A., Sociology
CDMS, CCM, CLCP

JODY MALCOLM
MAS, MSW, LCSW-C
CDMS, CRC, CVE, CCM, CLCP


NO OUTSIDE COPIES
Scott-McKinney.SupplementalReport

Def. Exhibit 175

**Jeffrey Johnson**

| | |
|---|---|
| **From:** | Eric Siegel <esiegel@kalbianhagerty.com> |
| **Sent:** | Monday, April 25, 2022 5:21 PM |
| **To:** | Kraig Long; Jeffrey Johnson |
| **Subject:** | Scott-McKinney v CNMC |
| **Attachments:** | Eric L. Siegel.vcf; PEX119 Finance REVISED_CP Laurel FY20-Q4 Recon -FINAL V3 10.21.2020 with Addendum Forgiveness.pdf; PEX192 Malcolm Dep Exhibit 3 2021 Annual Comp Reconciliation Report.pdf; PEX193 Summary by provider 1042 CP Laurel Jun 2021 Packet.pdf; PEX194 FY 2020 Annual Physician Comp Reconciliation Report SSM Compile.pdf; PEX195 FY 2021 Annual Physician Comp Reconciliation Report SSM Compile.pdf; PEX196 Malcolm Scott-McKinney charts prepared by SSM FNL.pdf; PEX197 Dr notes re carpel tunnel.pdf; PEX97 Revenue sheets 2017-2020 Plt04579-4582.pdf |

◄External Email► - From: esiegel@kalbianhagerty.com

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Kraig and Jeff:

Good afternoon.  To provide transparency in advance of the evidentiary hearing on damages, I attach exhibits, including some that have already been admitted into evidence at trial, which we intend to use at the hearing.  We also reserve the right to cite to other exhibits, whether Plaintiff or Defendant Trial Exhibits, that have already been admitted into evidence or otherwise.  Note that Exhibits 194, 195 and 196 are compilations prepared by Dr. Scott-McKinney and me based on evidence in this case.  We intend to use these exhibits during Dr. Scott-McKinney's testimony and to move into evidence to substantiate her claims for back and front pay.

Respectfully,

Respectfully,

**Eric L. Siegel**
*Counsel*

 KALBIAN HAGERTY LLP

888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625
Email: esiegel@kalbianhagerty.com

1

# Fiscal Year 2021 Annual Physician Compensation Reconciliation Report
## College Park - Laurel Practice

FINAL:9/14/2021   FINAL:9/14/2021

| | | Dr. Scott-McKinney* | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| FTE | 0.69 | 0.80 | 0.80 | 0.40 | 0.90 | 1.00 | 4.59 |
| Actual Base Comp Paid (Total) | $156,816 | $236,820 | $130,790 | $64,178 | $111,403 | $137,861 | $837,889 |
| | | | | | | | |
| Actual Incentive Comp Paid (Qtr 1) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Actual Incentive Comp Paid (Qtr 2) | $0 | $0 | $11,540 | $0 | $8,939 | $11,513 | $31,991 |
| Actual Incentive Comp Paid (Qtr 3) | $0 | $0 | $5,770 | $0 | $4,469 | $5,756 | $15,996 |
| Actual Incentive Comp Paid (Qtr 4) | | | | | | | |
| Actual Incentive Comp Paid Total | $0 | $0 | $17,310 | $0 | $13,408 | $17,269 | $47,987 |
| | | | | | | | |
| Annual Actual NMR Q1 & Q2 Combined | $105,127 | $384,740 | $341,256 | $72,325 | $265,161 | $324,548 | $1,493,157 |
| Annual Actual NMR Q3 | $43,337 | $192,370 | $144,102 | $53,139 | $127,219 | $162,507 | $722,673 |
| Annual Actual NMR Q4 | $74,880 | $190,306 | $140,660 | $104,438 | $118,316 | $154,327 | $782,926 |
| Annual Actual NMR total | $223,344 | $767,416 | $626,017 | $229,902 | $510,696 | $641,382 | $2,998,756 |
| | | | | | | | |
| Annual Actual NMR (Total) | $223,344 | $767,416 | $626,017 | $229,902 | $510,696 | $641,382 | $2,998,756 |
| Actual Reconciliation Calculation Comp Percentage | 34.14% | 34.14% | 34.14% | 34.14% | 30.00% | 33.00% | |
| FY21 Actual Earned Comp (Based on year-end percentage) | $76,248 | $261,991 | $213,718 | $78,487 | $153,209 | $211,656 | $995,309 |
| Jr Doc NMR Credit (Split Based on Senior Doc NMR Totals) | $3,441 | $11,823 | $9,645 | $3,542 | | | $28,451 |
| Jr. Doc NMR Credit % (Based on Senior Doc NMR Totals) | 12% | 42% | 34% | 12% | | | 100% |
| FY21 Actual Earned Comp (Based on year-end percentage) + Jr Credit | $79,689 | $273,814 | $223,363 | $82,029 | $153,209 | $211,656 | $1,023,760 |
| Percent Of Total Compensation by Physician | 7.65% | 26.32% | 21.47% | 7.89% | 15.39% | 21.27% | 100.00% |
| Total Compensation Paid | $156,816 | $236,820 | $148,100 | $64,178 | $124,811 | $155,131 | $885,856 |
| Balance Before Annual Reconciliation | $0 | $36,994 | $75,263 | $17,851 | $28,398 | $56,525 | $215,031 |
| Actual Net Margin From Operations (from Performance Reports)* | $0 | $0 | $0 | $0 | $0 | $0 | $ 74,861 |
| NP Annual Incentive (Productivity by SNR Physicians) | | | | | | | |
| Budget Margin Deficit | $0 | $0 | $0 | $0 | $0 | $0 | $ (154,028) |

| ANNUAL RECONCILIATION: FY21 | | Dr. Scott-McKinney | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| Allocation of Budget Margin Deficit | ($11,800) | ($40,544) | ($33,074) | ($12,146) | ($23,710) | ($32,754) | ($154,028) |
| Actual Earned Comp after Budget Margin Deficit | $67,890 | $233,270 | $190,290 | $69,883 | $129,499 | $178,901 | $869,733 |
| Base Compensation Paid | $156,816 | $236,820 | $130,790 | $64,178 | $111,403 | $137,861 | $837,889 |
| Incentive Compensation Paid | $0 | $0 | $17,310 | $0 | $13,408 | $17,269 | $47,987 |
| Total Compensation Paid | $156,816 | $236,820 | $148,100 | $64,178 | $124,811 | $155,131 | $885,856 |
| Year-End Incentive Payout (if positive margin) | $0 | $0 | $42,189 | $5,705 | $4,688 | $23,771 | $76,353 |
| Year-End Incentive Payout (regarding actual margin) | $0 | $0 | $42,189 | $5,705 | $4,688 | $23,771 | $76,353 |
| | | | | | | | |
| Actual Earned Compensation Paid (AEC) | $67,890 | $233,270 | $190,290 | $69,883 | $129,499 | $178,901 | $862,209 |
| Compensation Figure Used for FY22 Calculation | $67,890 | $233,270 | $190,290 | $69,883 | $129,499 | $178,901 | $869,733 |

Plaintiff Trial Exhibit
1954
5022
exhibitsticker.com

| # | A | B | C | D | E |
|---|---|---|---|---|---|
| | | Dr. Scott-McKinney | Formula/Source | Total | Formula/Source |
| 1 | Fiscal Year 2021 Annual Physician Compensation Reconciliation Report | | | | |
| 2 | College Park - Laurel Practice | | | | |
| 3 | | | | | |
| 4 | | Dr. Scott-McKinney | Formula/Source | Total | Formula/Source |
| 5 | FTE | 0.8 | Plaintiff Trial Exh. 192 | 4.59 | Plaintiff Trial Exh. 192 |
| 6 | Actual Base Comp Paid (Total) | $236,820 | Plaintiff Trial Exh. 192 | $837,869 | Plaintiff Trial Exh. 192 |
| 7 | Actual Incentive Comp Paid (Qtr 1) | $0 | Plaintiff Trial Exh. 192 | $31,991 | Plaintiff Trial Exh. 192 |
| 8 | Actual Incentive Comp Paid (Qtr 2) | $0 | Plaintiff Trial Exh. 192 | $15,596 | Plaintiff Trial Exh. 192 |
| 9 | Actual Incentive Comp Paid (Qtr 3) | $0 | Plaintiff Trial Exh. 192 | $0 | Plaintiff Trial Exh. 192 |
| 10 | Actual Incentive Comp Paid (Qtr 4) | $0 | Plaintiff Trial Exh. 192 | $0 | Plaintiff Trial Exh. 192 |
| 11 | Actual Incentive Comp Paid TOTAL | $0 | Plaintiff Trial Exh. 192 | $47,587 | Plaintiff Trial Exh. 192 |
| 12 | Actual Incentive Comp Paid TOTAL | | | | |
| 13 | | | | | |
| 14 | Annual Actual NMR Q1 | $0 | Plaintiff Trial Exh. 192 | $0 | Plaintiff Trial Exh. 192 |
| 15 | Annual Actual NMR Q2 | $331,774 | Plaintiff Trial Exh. 192 | $1,440,191 | Plaintiff Trial Exh. 192 |
| 16 | Annual Actual NMR Q3 | $192,370 | Plaintiff Trial Exh. 192 | $722,673 | Plaintiff Trial Exh. 192 |
| 17 | Annual Actual NMR Q4 | $190,306 | Plaintiff Trial Exh. 192 | $782,926 | Plaintiff Trial Exh. 192 |
| 18 | Annual Actual NMR TOTAL | $714,450 | Plaintiff Trial Exh. 192 | $2,945,790 | Plaintiff Trial Exh. 192 |
| 19 | Additional Income if 8 hours patient care 49 weeks | $60,000 *(hw)* / $151,700 | Plaintiff Trial Exh. 193 = $705,046 Actual NMR totals for each senior doctor (Glazer, Pyle, Demmeke) from PBX192 x revenue/patient visit x 15 patient visits per week x 49 weeks | $60,000 *(hw)* | |
| 20 | Annual Actual NMR TOTAL with additional SSM income | $780,450 / $876,650 *(hw $557,700)* | $151,700 | $3,697,790 / $3,757,700 *(hw)* | $60,000 *(hw)* |
| 21 | | | | | |
| 22 | Annual Actual NMR (Total) | $780,450 / $876,650 | | $3,697,790 / $3,757,700 *(hw)* | $3,011,790 *(hw)* |
| 23 | Actual Reconciliations Calculation Comp Percentage | 34.14% | Plaintiff Trial Exh. 192 | 34.14% | Plaintiff Trial Exh. 192 |
| 24 | FY20 Actual Earned Comp before Budget Margin Deficit Allocation | $1,060,897 *(hw $1,011,790)* | Plaintiff Trial Exh. 192 | $1,060,897 | Plaintiff Trial Exh. 1, App. C; D22 x D23 |
| 25 | Jr Doc NMR Credit (SP-split based on SP % of NMR Totals) + Jr Doc Credit | $11,950 *(hw $11,950 / $12,740)* | Plaintiff Trial Exh. 192 | $28,451 | Plaintiff Trial Exh. 192 |
| 26 | FY21 Actual Earned Comp before Budget Margin Deficit Allocation + Jr Doc Credit | $748,295 *(hw $751,706 / $26,899)* | Plaintiff Trial Exh. 1, App. C; B24 + B25 | $1,089,348 | Plaintiff Trial Exh. 1, App. C; D24 + D25 |
| 27 | Percent of Total Compensation by Physician | 25.19% | Plaintiff Trial Exh. 1, App. C; B24 / D24 | | |
| 28 | | | | | |
| 29 | ANNUAL RECONCILIATION: FY21 | | | | |
| 30 | Allocation of Budget Margin Deficit | $79,947 *(hw)* / $254,028 | Plaintiff Trial Exh. 1, App. C; C30 x B27 | ($254,028) | Plaintiff Trial Exh. 192 |
| 31 | AE Comp After Budget Margin Deficit | $268,438 *(hw)* / $764,412 | Plaintiff Trial Exh. 1, App. C; B26 + B30 | $955,320 | Plaintiff Trial Exh. 1, App. C; D26 + D30 |
| 32 | Base Compensation Paid | $236,820 | B6 | | |
| 33 | Incentive Compensation Paid | $0 | | | |
| 34 | Total Compensation Paid | $236,820 | | | |
| 35 | Year-End Incentive Payout (if positive margin) | $31,618 | Plaintiff Trial Exh. 192 | | |
| 36 | Year-End Incentive Payout (regarding actual margin) | $31,618 | | | |
| 37 | PLUS: PTO Payout (when it was paid)? | $167 *(hw)* / $39,559 | | | |
| 38 | | | | | |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STACY SCOTT-MCKINNEY, M.D.,

       *Plaintiff*,

v.

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

       *Defendant*.

Case No. 1:19-cv-02980-TNM

## **PLAINTIFF'S CLOSING BRIEF FOR MAY 2, 2022 EVIDENTIARY HEARING**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iii

I.    PLAINTIFF HAS PRESENTED UNREBUTTED EVIDENCE OF CAUSATION
      TO SUPPORT AN AWARD OF ECONOMIC DAMAGES ................................................. 2

II.   PLAINTIFF HAS PRESENTED UNREBUTTED EVIDENCE TO SUPPORT AN
      AWARD OF BACK PAY ............................................................................................. 11

III.  PLAINTIFF HAS MET ALL EVIDENTIARY REQUIREMENTS TO JUSTIFY A
      FRONT PAY AWARD ................................................................................................. 17

IV.   INJUNCTIVE RELIEF IS JUSTIFIED IN THIS CASE ...................................................... 26

CONCLUSION ............................................................................................................... 27

CERTIFICATE OF SERVICE ........................................................................................... 27

## TABLE OF AUTHORITIES

### CASES

*Abdul-Azim v. Howard Univ. Hosp.*,
213 A.3d 99 (D.C. 2019) ........................................................................................ 3

*Barbour v. Medlantic Mgmt. Corp.*,
952 F.Supp. 857 (D.D.C. 1997) ............................................................................ 16

*Barbour v. Merrill*,
48 F.3d 1270 (D.C. Cir. 1995) ........................................................................ 16, 17

*Barocco v. Ennis Inc.*,
100 F. App'x 965 (5th Cir. 2004) ......................................................................... 18

*Berger v. Iron Workers Reinforced Rodmen*,
170 F.3d 1111 (D.C. Cir. 1999) ........................................................................... 15

*Cape Bille Shipping Co. v. Tug Judy Moran*,
2007 U.S. Dist. LEXIS 74671 (S.D.N.Y. Aug. 22, 2007) ................................... 18

*Chesapeake & Ohio Ry. Co. v. Kelly*,
241 U.S. 485 (1916) .............................................................................................. 19

*Curri v. Sec'y of HHS*, No. 17-0432V,
2018 U.S. Claims LEXIS 1594, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) ......... 20

*D.C. Office of Human Rights v. D.C. Dep't of Corr.*,
40 A.3d 917 (D.C. 2012) ...................................................................................... 15

*Danielson v. Sec'y of HHS*, No. 18-1878V,
2020 U.S. Claims LEXIS 2743 (Fed. Cl. Dec. 29, 2020) ..................................... 20

*Dillenbeck v. Sec'y of HHS*, No. 17-428V,
2019 U.S. Claims LEXIS 1069 (Fed. Cl. July 29, 2019) ...................................... 20

*Forman v. Korean Air Lines Co.*,
84 F.3d 446 (D.C. Cir. 1996) ............................................................................... 15

*Furline v. Morrison*,
953 A.2d 344 (D.C. 2008) ...................................................................................... 3

*Goldman v. Sec'y of HHS*, No. 16-1523V,
2020 U.S. Claims LEXIS 2397 (Fed. Cl. Nov. 2, 2020) ....................................... 21

*Hargus v. Ferocious & Impetuous, LLC*, No. 2013-111,
2015 U.S. Dist. LEXIS 48794 (D.V.I. Apr. 14, 2015) ................................................. 19

*Hayes v. SkyWest Airlines, Inc.*, Civil Action No. 15-cv-02015-REB-NYW,
2018 U.S. Dist. LEXIS 163023 (D. Colo. Sep. 24, 2018) ...................................... 20, 21

*In re Body Transit, Inc.*,
619 B.R. 816 (Bankr. E.D. Pa. 2020) ......................................................................... 21

*In re Engle Cases*,
283 F. Supp. 3d 1174 (M.D. Fla. 2017) ...................................................................... 21

*In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*,
460 B.R. 567 (Bankr. D.D.C. 2011) .......................................................................... 18

*Ingersoll Milling Mach. Co. v. M/V Bodena*,
829 F.2d 293 (2d Cir. 1987) ...................................................................................... 18

*Jones & Laughlin Steel Corp. v. Pfeifer*,
462 U.S. 523 (1983) .................................................................................................. 19

*Kimmel v Gallaudet Univ.*,
639 F.Supp.2d 34 (D.D.C. 2009) ................................................................................. 3

*Lively v. Flexible Packing Ass'n*,
830 A.2d 874 (D.C. 2003) ............................................................................................ 3

*Luna v. Coombs (In re Coombs)*, Nos. 7-10-11712 SA, 10-1099 S,
2012 Bankr. LEXIS 1994 (Bankr. D.N.M. May 4, 2012) .......................................... 21

*McKnight v. General Motors Corp.*,
973 F.2d 1366 (7th Cir. 1992) ................................................................................... 17

*Morgan v. Psychiatric Institute of Washington*,
692 A.2d 417 (D.C. 1997) ......................................................................................... 16

*Morris v. BNSF Ry. Co.*, No. 15 C 2923,
2019 U.S. Dist. LEXIS 36566 (N.D. Ill. Mar. 7, 2019) ............................................ 20

*Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights*,
917 A.2d 1094 (D.C. 2007) ....................................................................................... 16

*Pollard v. E. I. du Pont de Nemours & Co.*,
532 U.S. 843 (2001) .................................................................................................. 16

*Porter v. Natsios*,
   414 F.3d 13 (D.C. Cir. 2005) ............................................................................ 1

*Regal v. Wells Fargo Bank, N.A.*,
   205 F. Supp. 3d 195 (D. Mass. 2016) ............................................................ 21

*Resolution Tr. Corp. v. First Am. Bank*,
   155 F.3d 1126 (9th Cir. 1998) ...................................................................... 18

*Robinson v. District of Columbia*,
   341 F. Supp. 3d 97 (D.D.C. 2018) ................................................................ 12

*Thompson v. Sawyer*,
   678 F.2d 257 (D.C. Cir. 1982) ...................................................................... 16

*Timus v. District of Columbia Dep't of Human Rights*,
   633 A.2d 751 (D.C. App. 1993) .................................................................... 24

*UMW v. Moore*,
   717 A.2d 332 (D.C. 1998) ............................................................................ 16

*United States v. Certain Land Situated in the City of Detroit*,
   286 F. Supp. 2d 865 (E.D. Mich. 2003) ...................................................... 19

*United States v. Peavey Barge Line*,
   748 F.2d 395 (7th Cir. 1984) ........................................................................ 18

*Wash. Convention Ctr. Auth. v. Johnson*,
   953 A.2d 1064 (D.C. 2008) .......................................................................... 16


## **STATUTES**

D.C. Code § 2-1401.01 .............................................................................................. 3

D.C. Code § 2-1401.02(4) .......................................................................................... 3

D.C. Code § 2-1402.11(a)(1) ...................................................................................... 3

D.C. Code § 2-1403.01 .............................................................................................. 3

D.C. Code § 2-1403.13(a)(1)(D) ................................................................................ 2

D.C. Code § 2-1403.13(a)(2) ...................................................................................... 3

D.C. Code § 2-1403.16(a) .......................................................................................... 2

D.C. Code § 2-1403.16(b) ................................................................. 2

D.C. Code § 2-1404.02 ..................................................................... 3

D.C. Code § 2-141.02(19) ................................................................ 3

D.C. Code § 2-1411.02 ..................................................................... 3

D.C. Code § 2-1411.03 ..................................................................... 3

**RULES**

29 C.F.R. § 1630.2(h)(1) .................................................................. 4

Fed. R. Evid. 803(17) ...................................................................... 19

**REGULATIONS**

D.C. Mun. Regs. 4-200.1 .................................................................. 3

D.C. Mun. Regs. 4-200.2 .................................................................. 3

D.C. Mun. Regs. 4-200.3 .................................................................. 3

D.C. Mun. Regs. 4-205.1 .............................................................. 4, 6

D.C. Mun. Regs. 4-299 .................................................................... 4

Plaintiff Stacy Scott-McKinney, by and through counsel, submits this closing brief in support of her claim for economic damages and injunctive relief in this lawsuit. She seeks injunctive relief, as explained in response to the Court's questions during the May 2 evidentiary hearing.[1] With regard to economic damages, Dr. Scott-McKinney seeks back pay and front pay as a result of Defendant's failure to accommodate her physical disabilities for 16 months by refusing to provide a medical scribe to assist her with her documentation responsibilities. As a result of that unlawful action – as determined by a jury – Dr. Scott-McKinney suffered emotional distress damages[2] and has developed repetitive strain syndrome in her right hand and limb secondary to carpel tunnel syndrome. This disabling hand condition, in and of itself but along with her pain associated with her existing neck and shoulder conditions, prevents Dr. Scott-McKinney from resuming a direct patient care schedule of eight (8) hours.

Her primary orthopedic doctor, Dr. David Levin – who also testified at trial by videotape – has ordered that she remain *permanently* on a work restriction of 6 hours of direct patient care. Dr. Leo Rozmaryn, her primary treating physician for her hand condition, agrees with Dr. Scott-McKinney's work restriction, the need for a scribe and the ergonomic modifications. Nonetheless, he documents that her right hand has not improved in spite of these accommodations, and her condition is not adequately controlled, further supporting the continued work restriction. That 2-

---

[1]      Plaintiff incorporates into this brief by reference her previously filed briefs on that issue to support her request for injunctive relief and will not repeat those arguments or set forth that law again. *See* ECF ## 91 at 14-18, 96 (ECF #96-1 was also admitted into evidence at the evidentiary hearing as Plaintiff Exhibit 199). She also incorporates by reference the legal standards set forth in her post-trial brief for awarding equitable relief including back pay and front pay. ECF #91.

[2]      The jury has already awarded Dr. Scott-McKinney $200,000.00 in compensatory damages to compensate her for the emotional distress, pain, suffering, and indignities she has suffered. "During the remedial stage of the proceedings, the district court [likewise] may make factual findings to determine appropriate 'make whole' relief under § 2000e-5(g)(1), as long as the findings are consistent with the jury verdict." *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005) (internal citation omitted).

hour reduction in direct patient care has had, and will continue to have, adverse economic consequences, justifying an award of back pay and front pay to make Dr. Scott-McKinney whole for Defendant's civil rights violation.

Dr. Scott-McKinney has presented sufficient evidence at trial and the evidentiary hearing[3] to establish that Defendant's discrimination caused her to permanently reduce her direct patient care to six hours. As a result, she has presented evidence of her back pay losses for fiscal years 2021 and 2022 and her front pay losses through 2030, when she testified that she plans to retire from practicing medicine. Defendant's only witness, Mark Janowiak, did not undermine the evidence presented by Dr. Scott-McKinney. Accordingly, Plaintiff seeks an award of back and front pay in the total amount of $402,673.99 (*See* Plaintiff Exhibit 196 at 1, 6).

## I.    PLAINTIFF HAS PRESENTED UNREBUTTED EVIDENCE OF CAUSATION TO SUPPORT AN AWARD OF ECONOMIC DAMAGES

Dr. Scott-McKinney has presented sufficient evidence of causation to support an award of economic damages. The D.C. Human Rights Act ("DCHRA") provides that "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate…." D.C. Code § 2-1403.16(a). In such a lawsuit, "[t]he court may grant any relief it deems appropriate, including, relief provided in … [§] 2-1403.13(a)." D.C. Code § 2-1403.16(b). Clearly, the express language of the DCHRA does not limit the damages or the types of injuries for relief under the circumstances. Simply put, an aggrieved plaintiff may seek all applicable "damages" for alleged discrimination under the DCHRA.

D.C. Code § 2-1403.13(a) sets forth many available remedies for discrimination under the

---

[3]      The Court physically received Plaintiff Exhibits 192-200 and admitted them into evidence. To the extent that he Court is missing any copies, Plaintiff is happy to re-submit any such copies.

DCHRA, including but not limited to "(D) [t]he payment of compensatory damages to the person aggrieved by such practice…"  D.C. Code § 2-1403.13(a)(1)(D).  "With regard to compensatory damages … the Commission[4]  shall develop guidelines …."  D.C. Code § 2-1403.13(a)(2).

The Commission's "guidelines" are codified in the D.C. Municipal Regulations.  The regulations provide "… substantive and procedural requirements for awards of compensatory damages … pursuant to …. D.C. Official Code § 2-1403.13(a)."  D.C. Mun. Regs. 4-200.1.  The intent of the regulations is to "… insure payment to persons aggrieved by unlawful discrimination of all … damages fairly and reasonably attributable to unlawful discriminatory acts or practices."  D.C. Mun. Regs. 4-200.2.  "The damages for which an award may be made shall include all of the damages enumerated herein, if proved, but shall not be limited thereto; it being the Commission's intent to award damages of any nature whatever which can be fairly proved to have resulted from acts of discrimination."  D.C. Mun. Regs. 4-200.3 (emphasis added).  Clearly, given the broad reach of the DCHRA to eliminate discrimination in the District[5], the Commission fashioned guidelines for the award of compensatory damages that is equally broad and not exhaustive.  Thus, economic damages that stem from discrimination are recoverable.

It is clear that the DCHRA provides for payment of "damages" with no restriction on the

---

[4]    The "Commission" refers to the D.C. Commission on Human Rights, the agency charged with enforcement of the DCHRA; that agency has issued regulations to implement the DCHRA. D.C. Code §§ 2-1401.02(4) (definition of "Commission"), 2-141.02(19) (definition of "Office of Human Rights" ("Office")), 2-1403.01 (powers of Commission and Office), 2-1404.02 (powers and functions of Commission), 2-1411.02 and 2-1411.03 (powers and functions of Office).

[5]    The DCHRA's stated goal is to eliminate "discrimination for any reason other than that of individual merit," D.C. Code § 2-1401.01, and evinces an intent to "'strike at the entire spectrum of disparate treatment' of individuals with disabilities." Kimmel v Gallaudet Univ., 639 F.Supp.2d 34, 41 (D.D.C. 2009). The DCHRA prohibits an employer from discriminating against an employee wholly or partially on the basis of a disability. *Abdul-Azim v. Howard Univ. Hosp.*, 213 A.3d 99, 102 (D.C. 2019) (citing D.C. Code § 2-1402.11(a)(1)) (emphasis added); *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008)). "The DCHRA 'is a remedial civil rights statute that must be generously construed.'" *Lively v. Flexible Packing Ass'n*, 830 A.2d 874, 887 (D.C. 2003) (internal citations omitted).

types of injuries for which damages could be awarded. The Commission has defined "Damages" under the DCHRA as follows: "'Damages - A monetary award made to a prevailing complainant and assessed against a respondent to compensate for injuries sustained as a result of discriminatory acts or practices found by the Commission to be unlawful under the Human Rights Act of 1977.'" D.C. Mun. Regs. 4-299. Expanding the guidelines further, the Commission has articulated a category of damages that specifically applies to economic damages stemming from the adverse impact of physical injuries resulting from Defendant's discriminatory treatment of Dr. Scott-McKinney. Specifically, the Commission regulations provide: "If the prevailing complainant suffered any physiological[6] … problems as a result of the violation of the Human Rights Act of 1977 and *incurred expenses or damages therefrom*, he or she shall be entitled to reimbursement of such expenses or compensation for such damages based on competent medical evidence thereof, including, but not limited to, the damages specified in this section." D.C. Mun. Regs. 4-205.1 (emphasis added).

Dr. Scott-McKinney has met the requirements of the DCHRA to justify an award of economic damages stemming from the unlawful failure to accommodate her physical disabilities. Specifically, she testified that there are two different types of hand symptoms that she has experienced. Transcript of Evidentiary Hearing, May 2, 2022 ("Hrg Transcript"), attached hereto as Exhibit A, at 102:2-6. One type is radicular in origin stemming from her previously diagnosed neck and shoulder nerve impingement. Dr. David Levin Trial Testimony, Exhibit B attached

---

[6]    Merriam Webster defines "Physiology" as "the organic processes and phenomena of an organism or any of its parts or of a particular bodily process." In defining the term "disability," which covers "physical impairments," the EEOC has defined a "physical impairment" to mean any physiological disorder or condition affecting one or more bodily systems, such as neurological, musculoskeletal or circulatory. 29 C.F.R. § 1630.2(h)(1). The Commission's regulations equate physical impairments with physiological conditions affecting systems of the body. Dr. Scott-McKinney's physical impairments affect her musculoskeletal, neurological and circulatory systems of her hand.

hereto, at 15:6-10.  The second type of hand symptoms is from repetitive motion injuries to her right hand as a result of her excessive typing during the 16-month period without a scribe.  Dr. Scott-McKinney testified that, during that time, she "had a very difficult time managing really long hours. [She] brought work home routinely, worked into the middle of the night routinely." Hrg Transcript (Exhibit A) at 28:11-19.  Not only did she suffer from worsening neck and shoulder pain, she "also had quite significant hand symptoms, cold, achy, numb, blue hand."  *Id*. at 28:20-24.  These hand symptoms were every day.  *Id*. at 28:25-29:1.

Dr. Scott-McKinney explained how she documented her daily hand symptoms after losing her scribe, pointing to Plaintiff Exhibit 13 and specific highlighted text.  *Id.* at 29:2:9, 29:25-30:19; Plaintiff Exhibit 13 at 22-24, 27, 29-30, 32.  Her hand symptoms have persisted even after she obtained a virtual scribe in November 2020.  Hrg Transcript (Exhibit A) at 30:21-23.

As a result of her ongoing hand symptoms, she sought medical attention from Dr. Leo Rozmaryn, a partner of her orthopedic treating physician, Dr. Levin.  Dr. Rozmaryn's patient notes were admitted into evidence as Plaintiff Exhibit 197.  Those notes make clear to a reasonable degree of medical certainty that Dr. Scott-McKinney's diagnosis of repetitive strain syndrome and carpel tunnel syndrome were caused by her ongoing typing work without a scribe.  Before examining that evidence, it must be highlighted that in March of 2019 – just prior to Dr. Scott-McKinney losing her scribe in July – another partner of Dr. Levin, Dr. Sunjay Berdia, ruled out carpel tunnel syndrome as a diagnosis for the hand symptoms that Dr. Scott-McKinney was experiencing at that time.  *See* Plaintiff Exhibit 200 at 2.

Dr. Scott-McKinney first saw Dr. Rozmaryn on August 11, 2020, approximately one year after working without a scribe.  Dr. Rozmaryn noted that her hand symptoms were "made worse

right now with work." *See* Defendant's Exhibit 173[7] at 1 (Rozmaryn, 8/11/20 note). He notes during his physical examination that her hand discoloration seems to be related to "a lot of repetitive use.… Her symptoms start within 30 minutes of being on the computer." *Id*. at 2. Dr. Rozmaryn initially ruled out carpel tunnel syndrome as the primary diagnosis because Dr. Scott-McKinney did not experience any night pain, and he concluded that she suffers from "repetitive strain pain." *Id*.

Dr. Rozmaryn saw Dr. Scott-McKinney again on October 6, 2020. Plaintiff Exhibit 197 at 1. He notes that Dr. Levin limited Dr. Scott-McKinney's direct patient care to 6 hours, which alleviated some of her symptoms, and this led Dr. Rozmaryn to conclude that "the physical stressors of her job are a significant contributing factor." *Id*. at 1. The "physical stressors" are her repeated typing throughout her workday. Dr. Rozmaryn also stated that if Dr. Scott-McKinney could get a scribe to assist her with the "sheer volume of typing needed," he believed that it would be good. Dr. Rozmaryn opined a diagnosis of "repetitive strain syndrome." It was on this visit that Dr. Rozmaryn wrote: "I do believe that the hand injury is related to the work to a *reasonable degree of medical certainty*…." *Id*. at 2 (emphasis added). The *only* inference to be drawn from this expert medical opinion is that the incessant typing caused the repetitive strain syndrome in her right hand. This competent medical evidence establishes causation between Dr. Scott-McKinney working without a scribe, forcing her to type long hours, and her hand injury. *See* D.C. Mun. Regs. 4-205.1 (medical evidence supports causation for award of damages). The hand injury, in turn, over and above the worsening pain symptoms associated with her neck and shoulder injuries, is the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care

---

[7]     Dr. Scott-McKinney testified that this patient record and two other visit records were inadvertently omitted from the package of Rozmaryn patient records included in Plaintiff Exhibit 197. Exhibit A at 115:13-22.

because, to do so, would require her to type many more hours per workday.

Dr. Rozmaryn saw Dr. Scott-McKinney next on February 2, 2021.  Plaintiff Exhibit 197 at 3.  This was approximately two months after she started working with a virtual scribe. He noted that Dr. Levin had placed her on a 6-hour direct patient care work restriction.  Importantly, he noted: "Unfortunately, the symptoms in her right hand really have not improved much[.] she has done all the ergonomic modifications that I asked[.] she's also modified her work schedule[.] she also has and gotten a scribe to help with much of the computer work[.] however that is [(sic)] have a limited but positive effect on this *but not enough to materially change her overall situation*…." *Id*. (emphasis added).

Dr. Rozmaryn also reviewed data from April 30, ***2019***, prior to Dr. Scott-McKinney losing her scribe.  He noted that there was no evidence of carpel tunnel syndrome "however there is some evidence of C6 to T1 cervical alarm radiculopathy and pain rapidly."  *Id*.  This statement reflects that any hand symptoms in 2019 were radicular in origin and not the result of excessive repetition motion of the right hand.  Dr. Rozmaryn's impression and diagnosis in February 2021 was that Dr. Scott-McKinney suffers post-failure-to-accommodate from repetitive strain syndrome secondary to carpel tunnel syndrome[8] in her right hand and limb, which is "inadequately controlled." *Id*. at 3-5.

At Dr. Scott-McKinney's March 16, 2021 follow-up appointment with Dr. Rozmaryn, he noted that he still believes that "her carpel tunnel symptoms are [sic] emanate from the patient's work because that is the only thing that really kicks it in."  Plaintiff Exhibit 197 at 7.  At the April visit after seeing no changes, Dr. Rozmaryn fitted Dr. Scott-McKinney with a wrist brace, which she wears daily to this day.

---

[8]    Dr Rozmaryn explained in his patient note what carpel tunnel syndrome is and how it occurs.  *See* Plaintiff Exhibit 197 at 3-4.

Dr. Levin's trial testimony corroborates Dr. Rozmaryn's conclusion that Dr Scott-McKinney suffers from a hand disorder that is different and independent from the radiculopathy associated with her neck and shoulder disorders. *See* Dr. Levin Trial Testimony (Exhibit B), at 15:6-16:17 (focusing on 16:9-12 discussing carpel tunnel syndrome). Dr. Scott-McKinney also explained the difference between her prior hand symptoms and her new hand condition after losing her scribe when she was being treated by Dr. Rozmaryn. Exhibit A at 116:24-118:21. Dr. Levin has permanently limited Dr. Scott-McKinney to 6 hours of direct patient care "to limit the additional charting that she has to do even with a scribe, which was another exacerbating factor for her."[9] *Id*. at 31:10-18; Plaintiff Exhibit 168 (Dr. Levin patient note, 11/19/19).

Dr. Levin and Dr. Scott-McKinney both testified that they did not revisit taking her back to 8 hours of direct patient care after she received a virtual scribe. Dr. Levin testified that, after losing her scribe, they "were having enough trouble getting her through a workday of six hours even with the scribe when she had the scribe back that we did not broach the subject of going back to eight hours…." Dr. Levin Trial Testimony (Exhibit B) at 33:1-15. After Dr. Scott-McKinney began using a virtual scribe, Dr. Levin saw her in November 2020 and kept her at 6 hours of direct patient care because, while the scribe substantially diminished her charting requirements, there were still some charting requirements even with a scribe. *Id*. at 40:18-41:12. He opined that six hours seems to be the right number of direct patient care hours for Dr. Scott-McKinney because she is in the office for two to four hours after seeing patients; those hours amount to additional charting over and above what the scribe is doing in order to allow her to tolerate her disability. *Id*. at 41:13-42:2.

---

[9]     Dr. Levin had to lower her direct patient care hours to 4 and alternate until Dr. Scott-McKinney received the virtual scribe in November 2020, as Dr. Scott-McKinney and Dr. Levin testified at trial. *See* Dr. Levin Trial Testimony (Exhibit B) at 31:19-32:22; 39:11-40:17.

Dr. Scott-McKinney corroborated Dr. Levin's testimony when she stated that the permanent work restriction of 6 hours of direct patient care was required to prevent progression of her disorders.  She testified: "… I'm trying to strike a balance between managing pain, managing hand symptoms, trying to be productive and having some type of quality of life, because a 6-hour – up-to-6-hour workday is still 9 to 11 hours in the office and an 8-hour workday is 10 to 14 hours. And that was three years ago.  Now I'm less efficient because of my hand than I was three years ago." Exhibit A at 37:16-38:9.  Defendant's unlawful actions caused her to be less efficient and should be required to compensate her because of those actions.

Defendant has argued at the hearing and in its pre-hearing brief on legal standards (ECF #93) two points to deny Plaintiff economic damages: (1) there is no evidence of causation, and (2) the Court granted Defendant's prior motion *in limine* regarding evidence of physical injury damages (ECF #40) based on an election of remedies.  Both arguments are without merit.

As for the first argument that there is no evidence of causation, the evidence presented at the hearing and highlighted above is to the contrary.  Plaintiff anticipates that Defendant will assert based on Dr. Levin's trial testimony that her "conditions" are no worse off with a scribe than without now that she has a virtual scribe.  However, that assertion misses the mark.  Dr. Levin's testimony expressly pertains to Dr. Scott-McKinney's neck and shoulder impairments. That is clearly the subject matter of his testimony.  His knowledge is only limited to those issues that Dr. Scott-McKinney brought to his attention for treatment.  Exhibit A at 66:18-21 (Plaintiff testimony). He provided *no* testimony about Dr. Scott-McKinney's independent diagnoses by Dr. Rozmaryn or the cause of her right-hand symptoms.  Accordingly, Dr. Levin's testimony does not undercut in any way Dr. Rozmaryn's diagnoses of repetitive strain syndrome and carpel tunnel syndrome pertaining to her right hand and limb during the 16-month period that she was without a scribe.

There is no basis to expand Dr. Levin's testimony to cover topics that were not raised before him.

Defendant also claims prejudice by admitting into evidence Dr. Rozmaryn's and Dr. Berdia's medical records (Plaintiff Exhibits 197 and 200) as somehow a trial ambush tactic by Plaintiff. The Court appeared to reject that claim at the hearing but, in any event, should reject that claim based on the facts. As the Court may recall, a Minute Order was issued on September 2, 2021, reopening discovery to allow Defendant to re-depose Dr. Scott-McKinney and her psychologist. In anticipation of that order, counsel for Defendant and Plaintiff conferred to ensure that all medical records were up to date and produced completely prior to her deposition. *See* Declaration of Eric L. Siegel and attached September 7, 2021 email chain, attached hereto as Exhibit C. All responsive documents were in fact produced by no later than September 9, 2021 per the Court's Order and agreement of counsel. *See* Exhibits C and D.

Moreover, Defendant asked to re-open discovery based in part on Dr. Scott-McKinney's claim of ongoing damages after receiving a virtual scribe. *See* Exhibit C attached to Siegel Declaration at 19-20. Dr. Scott-McKinney was re-deposed on October 19, 2021, well after Defendant received all pertinent medical records. There are more than 15 references to the word "hand" in the deposition, yet Defendant never asked her about her diagnoses of repetitive strain syndrome or carpel tunnel syndrome. Should Plaintiff be penalized for Defendant's failing to inquire?

The lack of prejudice is further underscored by the fact that Plaintiff consented to Defendant's motion to re-open discovery again for two additional depositions in late 2021, including another deposition of Dr. David Levin. ECF #33. The Court granted that motion to include the "deposition of Dr. David Levin to explore records produced since his prior deposition on July 7, 2020." See Minute Order dated November 5, 2021. Defendant could have asked to take

Dr. Rozmaryn's deposition, or even asked Dr. Levin about those medical records. Again, no such requests were made. Defendant has suffered no prejudice based on anything that Dr. Scott-McKinney did.

Defendant's second argument to preclude an award of economic damages is that the Court should not grant such damages because Plaintiff elected her remedies by filing a workers compensation claim in 2017. That argument too is without merit, as explained during the hearing. Specifically, Defendant Exhibit 166 is the Maryland Workers Compensation Commission ("MWCC") award of permanent partial disability dated January 4, 2022. That award expressly pertains only to Dr. Scott-McKinney's neck and shoulder injuries. It does not address *in any way* the work injuries to her right hand, let alone Dr. Rozmaryn's diagnoses of repetitive strain syndrome and carpel tunnel syndrome after losing her scribe in 2020. Thus, there is no final judgment by the MWCC pertaining to these hand diagnoses that would even trigger an election of remedies defense. Such a claim should be rejected.

In sum, the causation evidence presented remains unrebutted. Dr. Scott-McKinney has a permanent work restriction primarily due to her hand injuries caused by the incessant typing during the 16 months without a scribe. The Court is justified to grant make whole relief including back and front pay to Plaintiff.

## II.   PLAINTIFF HAS PRESENTED UNREBUTTED EVIDENCE TO SUPPORT AN AWARD OF BACK PAY

Having established causation to justify an award of economic damages, Dr. Scott-McKinney undertook the task of calculating lost back pay through June 30, 2022[10] and presented that testimony at the May 2 hearing. She testified that she performed the following analyses:

---

[10]     Defendant attacked Dr. Scott-McKinney at the hearing because her counsel assisted her with formatting her Excel spreadsheets. However, she made clear that she supplied all the numbers and formulas for the creation of Plaintiff Exhibits 194-196. Exhibit A at 71:7-16, 72:17-73:2.

1. She reviewed the "Summary by Provider" documents (Plaintiff Exhibits 97 and 193) to determine her annual patient visits and annual revenues that she generated for fiscal years 2018 through 2021.

2. She then took all of her patient visits by fiscal year for FY 2018 and 2019 and compared those numbers to those of FY 2020 and 2021 to determine the average lost patient visits of 763. *See* Plaintiff Exhibit 196 at 2. This corroborated her assumption of losing approximately 15 patient visits per week, or 735 patient visits per year (15 patient visits x 49 weeks, which takes into account vacations) based on a reduced direct patient care schedule of six hours versus eight.

3. She then determined that her average revenue per patient visit for FY 2020 was $192.50 by dividing her total revenue for that fiscal year by her total patient visits for the year.

4. She performed the same calculation for FY 2021 to arrive at an average revenue per patient visit of $220.00.

5. She then used Defendant's Annual Physician Compensation Reconciliation Reports for fiscal years 2020 and 2021 (Plaintiff Exhibits 119 and 192), applied the formulas contained therein, which were taken directly from her Employment Agreement's Physician Compensation Plan (Plaintiff Exhibit 1, Appendix C), and performed the calculations to determine her back pay loss.

Ultimately, Dr. Scott-McKinney calculated that she suffered no back pay loss in FY 2020. *See* Plaintiff Exhibit 194. In contrast, she suffered a back pay loss for FY 2021 of $31,618.00 using Defendant's own revenue numbers and formulas. *See* Plaintiff Exhibit 195. The only addition to the Reconciliation Report model on Plaintiff Exhibit 195 was line 19, which reflects the revenue lost because of the 6-hour work restriction.

Given that Defendant's Annual Physician Compensation Reconciliation Report is not ready for FY 2022 because the fiscal year is not over, Dr. Scott-McKinney calculated her back pay loss through June 30, 2022[11], using a more conservative average revenue per patient visit number of $186.56. That number is the average revenue per patient visit for her entire Laurel practice, which includes junior doctors who perform less complicated patients. In calculating back pay loss, Plaintiff is not required to prove her losses with exactitude but only with reasonable certainty. *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 109 (D.D.C. 2018).

Dr. Scott-McKinney also used a 32% compensation percentage, which Defendant's witness Mark Janowiak referred to as the "inverse expense ratio." Hrg Transcript (Exhibit A) at 133:12-23. She chose that percentage because it too is more conservative than the historical percentage that applied to her of 35%. *Id*. at 51:4-9.

Defendant's only witness Mark Janowiak, Defendant's business manager, corroborated that the formulas in the Annual Physician Compensation Reconciliation Reports (Plaintiff Exhibits 107, 119 and 192) are the same. Exhibit A at 138:11-21; 145:15-24; 163:7-13. **He validated that Dr. Scott-McKinney's compensation calculations in Plaintiff Exhibits 194 and 195 were correct**.[12] Exhibit A at 163:14-20. He also corroborated that the main negative factor affecting physician compensation is the budget margin deficit and that a physician can earn up to 35% of

---

[11]    Dr. Scott-McKinney calculated back pay through June 30, 2022 because the fiscal year ends in approximately 6 weeks, and she assumed that these proceedings would not be resolved until that time. Hrg Transcript (Exhibit A) at 52:8-17.

[12]    In contrast, Mr. Janowiak testified about a hypothetical scenario reflected in Defendant Exhibit 192A if Dr. Scott-McKinney had a virtual scribe for the entirety of fiscal year 2021. However, that scenario is not helpful because it is based on her current work restriction of *6 hours* of direct patient care and not her lost hours. Exhibit A at 163:21-164:4. Mr. Janowiak did not perform *any* analysis based on the assumption that Dr. Scott-McKinney returned to 8 hours of direct patient care, like she did for 13 years prior to losing her live scribe. That calculation based on the 2-hour loss of direct patient care is precisely what Dr. Scott-McKinney did.

his or her production revenue. Exhibit A at 132:4-23; Plaintiff Exhibit 1 at 22, Para. F.  Mr. Janowiak conceded that, if there is no budget margin deficit, the annual physician reconciliation reports reflect that compensation is simply the inverse expense ratio (35% plus or minus) applied to the physician's generated revenue.  *See generally* Exhibit A at 159:8-25; Exhibit A at 114:13-24 (Plaintiff's corroborates Janowiak testimony). Dr. Scott-McKinney testified that prior to the pandemic for the last 13 years, she can recall no other year other than the last two (FY 2020 and FY 2021) that a budget margin deficit occurred.  Exhibit A at 114:3-115:2.

Notwithstanding that he supported Dr. Scott-McKinney's damage calculation methodology under the circumstances, he testified that there is no way Dr. Scott-McKinney would receive 32% percent of her lost revenues.  However, her compensation percentage in FY 2021 was 34.14%!  We are returning to normalcy in business operations, so 35% is a likely percentage going forward.  This validates the use of a more conservative 32% compensation percentage.

In addition, FY 2021 was plagued by COVID-related expenses and paying Dr. Glaser $156,816.00, whereas his actual earned compensation after a budget margin deficit was $67,773.00[13] based on his patient production of only $223,000.00, an approximately $90,000.00 "aberration" expense for the Laurel practice.  *See* Plaintiff Exhibit 192; Exhibit A at 162:9-15 (Janowiak testimony).  Dr. Scott-McKinney testified that historically over the past 15 years she has worked for Defendant  – putting aside the last two COVID years – she routinely received 35% of her generated patient revenue, and there was no budget margin deficit.  Exhibit A at 51:10-22.

Mr. Janowiak claimed at the hearing that it is impossible that Dr. Scott-McKinney would ever generate as much patient revenue working 8 hours of direct patient care as she did in 2019 to

---

[13]    Dr. Scott-McKinney testified based on Plaintiff Exhibit 192 that Dr. Glaser's actual earned compensation before budget margin deficit was $76,248.00.    Exhibit A at 173:21-25. Consequently, Dr. Glaser received $156,000.00 in compensation but only earned approximately $76,000.00 by his production, an $80,000 differential; he was overpaid.  *Id.* at 174:17-175:4.

justify her lost revenue claim. He testified that 2019 reflects the highest number of patients that Dr. Scott-McKinney had ever seen in a given year and correspondingly the highest amount of patient revenue she had ever generated. He concluded that it was an aberration. This claim, however, does not undermine Dr. Scott-McKinney's economic damage calculations. She took that issue into account by taking the average patient visits for 2018 and 2019 and comparing it to the average patient visits for 2020 and 2021. That comparison of averages resulted in a more conservative total number of patient visits between 8 hours and 6 hours of direct patient care: 763 patient visits. Again, that number validated Dr. Scott-McKinney's assumption of 15 patient visits lost per week, or 735 patient visits per year. She concluded that 15 patient visits is the right number to calculate her lost revenue and corresponding lost compensation.

It must be highlighted that **at no time has Defendant ever challenged that Dr. Scott-McKinney has lost 15 patients per week as a result of her permanent work restriction.** That absence of evidence is a concession that her permanently reduced direct patient care schedule has a value, justifying an award of economic damages. She testified what that value is, and Mark Janowiak validated her methodology, which is reasonable given that she used ***his*** formulas and Annual Physician Compensation Reconciliation Report analysis.

Since Dr. Scott-McKinney claims a loss of 15 patient visits per week, or 735 patient visits per fiscal year, associated with her work restriction of 6 hours of direct patient care, she calculated her back pay for FY 2022 to be $43,878.91. Hrg Testimony (Exhibit A) at 50:9-22. That number assumes that she will receive no junior doctor net medical revenue ("NMR") credit (which would only *increase* her compensation further). *Id*. at 51:23-52:7.

Defendant protested during the hearing that Dr. Scott-McKinney does not have the "expertise" to perform such calculations and that she needed an economist to do so. However,

Defendant's counsel's own actions during the hearing undermines that protestation.  Defendant's counsel questioned Dr. Scott-McKinney and performed the same calculations "on the fly" during cross examination, demonstrating that no special expertise is required to perform the simple math required.  Dr. Scott-McKinney testified to that fact.  Exhibit A at 121:8-15.

Nonetheless, Defendant relied on the testimony of Mark Janowiak to attack Plaintiff's calculations.  He testified that she did not take into account the "pandemic effect" on patient visits or the budget margin deficit.  However, that testimony was simply an assertion and not true.  Plaintiff Exhibit 194 certainly took into account the pandemic effect because there were *two months* where Dr. Scott-McKinney did not see patients, and that is why she only saw patients for 41 weeks instead of her usual 49 weeks, whether in person or through telehealth visits.

As for the budget margin deficit, she testified and provided the exhibits that clearly show that the actual budget margin deficits for FY 2020 and 2021 were taken into account in her calculations.  *Compare* Plaintiff Exhibits 119 and 192 *with* Plaintiff Exhibits 194 and 195.  She also testified, as reflected above, that prior to the pandemic, her practice did not suffer a budget margin deficit.  Accordingly, she has reason to believe that business life is returning to normal now that the practice is up to full operation, two more doctors are being hired and her Laurel, Maryland medical office space is expanding the number of patient examination rooms to twelve.  Exhibit A at 161:6-9, 16-21; 166:6-18.

Mr. Janowiak's testimony that closing the College Park office and reducing the number of examination rooms and doctors will adversely affect Dr. Scott-McKinney's claimed economic losses is unavailing and makes no sense.  While the gross revenues for both practice locations will be reduced now that there is only one location, there is also less overhead expense.  Defendant did not produce any documentary evidence setting forth the impact, if any, of the College Park closure

on physician revenue generation and compensation going forward.  As mentioned above, the Laurel practice is expanding to 12 examination rooms (compared to the total of 16 between College Park and Laurel) and adding two additional doctors to Laurel.  *Id*.  Mr. Janowiak failed to mention that fact during his direct examination testimony but conceded it during cross examination.

Even if overall revenue is reduced by the elimination of one office location, so long as the Laurel practice generates revenue for the remaining doctors and each doctor meets his or her budgeted revenue and expenses for a given fiscal year, as was the case in the 13 years prior to the pandemic, Dr. Scott-McKinney's compensation is derived only based on *her* production.  There is no reason to believe that this will change, and Defendant has presented no evidence or testimony to suggest otherwise, other than Mr. Janowiak's conjecture.  Mr. Janowiak's claim of an adverse impact of the "pandemic effect" on the number of patients to be seen going forward is belied by the trend for FY 2021, which shows that the inverse expense ratio increased from 30% in FY 2020 to 34.14% in FY 2021, which is 0.86% off of the 35% benchmark percentage.

In sum, Plaintiff seeks back pay loss, which includes the amount of the lost employer contribution to her retirement plan, in the total amount of $79,271.76.  She testified that Defendant has routinely made a 5% contribution to her retirement plan based on her contributions over the last 15 years.  Exhibit A at 99:7-100:2.  In addition, she seeks interest on her back pay award as is required by the DCHRA.  *D.C. Office of Human Rights v. D.C. Dep't of Corr.*, 40 A.3d 917, 929 (D.C. 2012).  The decision of how to compute prejudgment interest is within this Court's discretion.  *Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111, 1139 (D.C. Cir. 1999) (citing *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996)).

### III.    PLAINTIFF HAS MET ALL EVIDENTIARY REQUIREMENTS TO JUSTIFY A FRONT PAY AWARD

Like back pay, Dr. Scott-McKinney explained her calculations for a front pay award, which

were similar to her back pay calculation for fiscal year 2022. Dr. Scott-McKinney testified that her 6-hour work restriction is permanent, resulting in a 2-hour reduction in direct patient care going forward, compared to the 8 hours of care for the 13 years prior to losing her scribe in 2019.

The goal of front pay is to put the victim of discrimination in the financial position she should have enjoyed (i.e., to make the plaintiff whole) as a result of the losses caused by a defendant's discriminatory actions. *Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights*, 917 A.2d 1094, 1105 n.22 (D.C. 2007) (DCHRA case); *see Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1080-81 (D.C. 2008) (DCHRA case); *Thompson v. Sawyer*, 678 F.2d 257, 292 (D.C. Cir. 1982) (Title VII case); *Barbour v. Merrill*, 48 F.3d 1270, 1279-80 (D.C. Cir. 1995) (same). Dr. Scott-McKinney seeks that make-whole relief as a result of Defendant's failure to accommodate her physical disabilities for 16 months and the resulting adverse impact on her ability to see patients.

The U.S. Supreme Court in *Pollard* held that "[i]n cases in which reinstatement is not viable… because of *psychological injuries* suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement." *Pollard v. E. I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (emphasis added). Instead of psychological injuries, Dr. Scott-McKinney's newly diagnosed right hand injuries prevent her from working *at full capacity* (8 hours of direct patient care) – which is analogous to full reinstatement – causing her ongoing future economic damages and justifying an award of front pay.

"Determining the amount and duration of front pay requires some speculation because assumptions about the future are necessary." *Barbour v. Medlantic Mgmt. Corp.*, 952 F.Supp. 857, 863 (D.D.C. 1997) (internal citations omitted). However, "a party is not required to prove damages to a degree of mathematical certainty, . . . but must instead offer some evidence which

18

allows the trier of fact to make a reasoned judgment." *UMW v. Moore*, 717 A.2d 332, 339-40 (D.C. 1998), quoting *Morgan v. Psychiatric Institute of Washington*, 692 A.2d 417, 426 (D.C. 1997) (citations omitted); *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995) (citations omitted) ("court should not refuse to award front pay merely because some speculation about future earnings is necessary, or because parties have introduced conflicting evidence"). "Indeed, in other contexts, such as when valuing lost earning capacity in a personal injury case, courts (or juries) routinely engage in some speculation, based on the factual record the parties have established…. Courts are equally capable of resolving similar uncertainties when awarding front pay to victims of employment discrimination." *Barbour*, 48 F.3d at 1280 (internal citations omitted).

Dr. Scott-McKinney has met her evidentiary burden at the hearing to allow the Court to make a reasoned judgment regarding front pay by presenting all elements of proof to substantiate a front pay award. That evidence is viewed with the understanding that the law tolerates some speculation given that lost wages in the future are involved. "The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award,' including 'the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate.'" *Barbour*, 48 F.3d at 1279, quoting *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992), cert. denied, 122 L. Ed. 2d 665, 113 S. Ct. 1270 (1993).

Specifically, Dr. Scott-McKinney testified that she plans to retire from the practice of medicine at age 67. Exhibit A at 115:3-5. The Social Security Administration Benefit Table (Plaintiff Exhibit 198), which the Court admitted into evidence by taking judicial notice under Federal Rule of Evidence 201, validates her retirement decision. *Id.* at 115:6-12. She presented evidence of the amount of the proposed award. *See* Plaintiff Exhibit 196 at 3. She presented

19

testimony that she selected a discount rate of three percent (3%) based on the 10-year Treasury Rate, because it is a conservative interest rate.  Exhibit A at 56:13-25, 93:8-15.

In addition to Plaintiff's testimony, because U.S. Treasury interest rates are readily accessible to the public via a website and are published daily by the Federal Reserve, courts take judicial notice of a Treasury interest rate on a given day.  *See, e.g., In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 574 (Bankr. D.D.C. 2011) (Teel, J.) (taking judicial notice of 30-year treasury yield); *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir. 1987) (holding that district court did not abuse discretion in "determining prejudgment interest based upon an average of prevailing Treasury Bill rates, which are short-term, risk-free obligations"); *Cape Bille Shipping Co. v. Tug Judy Moran*, 2007 U.S. Dist. LEXIS 74671, at *39 (S.D.N.Y. Aug. 22, 2007) (taking judicial notice of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding" trial); *United States v. Peavey Barge Line*, 748 F.2d 395, 402 n.15 (7th Cir. 1984) (affirming prejudgment interest award based on district court taking judicial notice of the range of interest rates for the Treasury (11% to 18.35%) during the particular time period cited by the United States and applying the conservative rate of 11% as the prejudgment interest rate even though a higher rate could be fully justified); *Resolution Tr. Corp. v. First Am. Bank*, 155 F.3d 1126, 1129 (9th Cir. 1998) (observing that district court is capable of taking judicial notice of posted Treasury Bill rates and performing necessary calculations to resolve prejudgment interest in summary proceedings); *Barocco v. Ennis Inc*., 100 F. App'x 965, 968 (5th Cir. 2004) (finding no abuse of discretion by district court to admit actuarial tables and to take judicial notice of treasury bill rates, instead of requiring an economic expert, to determine lost earning capacity of plaintiff).

Moreover, Federal Rule of Evidence 803(17) provides: "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: … (17) *Market Reports and Similar Commercial Publications.* **Market quotations**, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." Fed. R. Evid. 803(17) (emphasis added). Dr. Scott-McKinney presented testimony that she used the 10-year U.S. Treasury rate as a conservative investment rate upon which to base her more conservative 3% discount rate for her front pay calculations. Exhibit A at 56:13-25. Such testimony is not hearsay because 10-year Treasury rates are published daily (and throughout the day) by the Federal Reserve, are "market quotations," are generally relied on by the public in making conservative investment decisions, and are relied upon by economists and other professionals in making discount rate calculations.

The U.S. Supreme Court has stated long ago: "The discount rate should be based on the rate of interest that would be earned on '*the best and safest investments*.'" *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533, 538 (1983), (quoting *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 490 (1916)). (emphasis added). The Supreme Court explained: "Once it is assumed that the injured worker would definitely have worked for a specific term of years, he is entitled to a risk-free stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default." *Pfeifer*, 462 U.S. at 537. "United States Treasury securities, which come in different maturities up to 30 years, may well satisfy the 'best and safest investments' requirement." *Hargus v. Ferocious & Impetuous, LLC*, No. 2013-111, 2015 U.S. Dist. LEXIS 48794, at *8 (D.V.I. Apr. 14, 2015). (citing *United States v. Certain Land Situated in the City of Detroit*, 286 F. Supp. 2d 865, 871 (E.D. Mich. 2003) ("[A]n investment in U.S. Treasury securities is safe because an investor will

not lose the principal underlying the investment.")).  "In other words, the trier of fact must determine what net discount rate to apply such that a plaintiff entitled to a damages award is awarded a lump sum that, if safely invested, will provide him with an amount equivalent to his future damages."  *Hargus*, 2015 U.S. Dist. LEXIS 48794 at *8.

Dr. Scott-McKinney used this data and inputted it into a net present value calculator to arrive at her actual front pay wage damages.  Exhibit A at 57:1-58:10; Plaintiff Exhibit 196 at 4-5.  She performed the same calculations to determine the net present value of the lost employer contributions to her retirement account.  Exhibit A at 58:14-59:17; Plaintiff Exhibit 196 at 6-8.  Based on these calculations, Plaintiff claims front pay losses through 2030 in the amount of $323,402.23.  Plaintiff Exhibit 196 at 6.

Defendant has challenged Dr. Scott-McKinney's use of a website net present value calculator.  However, like home and care loan calculators, net present value calculators have become ubiquitous.  Lay people routinely use such calculators to perform calculations that only economists or labor statisticians could do years ago.

In fact, courts also have routinely used net present value calculators in reducing lost future income to present value given their ubiquity.  Many courts simply apply an applicable discount interest rate to the principal sums awarded per year for the duration of the front pay award to discount to present value.  *See*, *e.g. Hayes v. SkyWest Airlines, Inc*., Civil Action No. 15-cv-02015-REB-NYW, 2018 U.S. Dist. LEXIS 163023, at *18-21 (D. Colo. Sep. 24, 2018) (court uses present value calculator to arrive at front pay award); *Morris v. BNSF Ry. Co*., No. 15 C 2923, 2019 U.S. Dist. LEXIS 36566, at *4 n.1 (N.D. Ill. Mar. 7, 2019) (court applies NPV calculator to determine front pay amount); *Curri v. Sec'y of HHS*, No. 17-0432V, 2018 U.S. Claims LEXIS 1594, 2018 WL 6273562, at *7 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (court applies 1% discount rate for 15

years and 2% thereafter to account for low treasury interest rates of the present day) (citing cases); *Danielson v. Sec'y of HHS*, No. 18-1878V, 2020 U.S. Claims LEXIS 2743, at *12 n.10 (Fed. Cl. Dec. 29, 2020); *Dillenbeck v. Sec'y of HHS*, No. 17-428V, 2019 U.S. Claims LEXIS 1069, at *44-45 (Fed. Cl. July 29, 2019) (calculating figure using the online NPV calculator available at https://financial-calculators.com/present-value-calculator (compounding annually)); *Regal v. Wells Fargo Bank, N.A.*, 205 F. Supp. 3d 195, 204 (D. Mass. 2016) (using NPV calculator to determine sum under Home Affordable Modification Program at HHS); *In re Body Transit, Inc.*, 619 B.R. 816, 830 n.21 (Bankr. E.D. Pa. 2020) (bankruptcy court uses NPV calculator to determine business valuation); *Goldman v. Sec'y of HHS*, No. 16-1523V, 2020 U.S. Claims LEXIS 2397, at *38 (Fed. Cl. Nov. 2, 2020) (using online NPV calculator); *In re Engle Cases*, 283 F. Supp. 3d 1174, 1254 n.71 (M.D. Fla. 2017) (taking judicial notice of the Bureau of Labor Statistics' inflation-adjustment calculator, a widely-accepted instrument for measuring the present-value of a dollar figure); *Luna v. Coombs (In re Coombs)*, Nos. 7-10-11712 SA, 10-1099 S, 2012 Bankr. LEXIS 1994, at *10-11 n.4 (Bankr. D.N.M. May 4, 2012) (using NPV calculator).

Given the ubiquity of these calculators and court use of such calculators to determine the net present value of future damages over time, it should be acceptable for Plaintiff to likewise use a calculator to accurately calculate her front pay losses. As one court put it, "… determination of an award of future damages 'should not be converted into a graduate seminar on economic forecasting.'" *Hayes*, Civil Action No. 15-cv-02015-REB-NYW, 2018 U.S. Dist. LEXIS 163023, at *20. Plaintiff has met her obligations to calculate her front pay damages to the best of her abilities, not with exactitude, but with reasonable certainty, as the law requires.

She did not take into account any budget margin deficit because, as she testified, for the 13 years prior to the pandemic, her Laurel practice did not suffer any such deficits. Thus, the math

becomes even more simple to calculate her lost front page wages.

Defendant attempts to attack the eight years of front pay loss by suggesting that Dr. Scott-McKinney may no longer be employed by Defendant in the near future.  That suggestion should be rejected as contrary to the facts and Dr. Scott-McKinney's wishes.  Despite the fact that Dr. Scott-McKinney has been employed by Defendant *for 15 years* (Exhibit A at 25:7-9) and has no desire to leave, Defendant has pointed out during the cross examination of Dr. Scott-McKinney that her employment contract expires on December 31, 2024, such that there is "a chance" that she will not be employed after that date.[14]  Exhibit A at 65:2-6.  However, that contract is subject to an auto-renewal for another 5 years if neither party gives notice to terminate the relationship. Plaintiff testified that she is not intending to leave her employment.

Defendant appears to suggest that somehow her contract will not be renewed, calling into question her claim for front pay past December 31, 2024.  Such a suggestion is fantasy and grabbing at straws.  Contrary to Defendant's suggestion, during trial and the evidentiary hearing, Defendant repeatedly highlighted the fact that Dr. Scott-McKinney is the highest producer in her Laurel practice.  *See*, *e.g.*, Exhibit A at 136:22-137:3.  She testified at trial that she enjoys the practice and her location in Laurel where she has practiced for over thirty years.  She testified at the hearing that she is 58 years old and intends to retire at age 67 when her full retirement benefits kick in.  Exhibit A at 25:16-24.  Her former partner, Dr. Dan Glaser, worked for Defendant for over 25 years (Exhibit A at 25:10-13), demonstrating the longevity of doctors working for Defendant – another factor supporting her desire to remain employed by Defendant for front pay purposes.  In addition, it would be antithetical to a prudent business owner to terminate the

---

[14]      In its post-trial brief, Defendant euphemistically referred to this as "the fluidity of an ongoing employment relationship."  ECF #93 at 20.  There is no "fluidity" unless Defendant unilaterally decides to terminate Dr. Scott-McKinney's employment at the end of 2024, not based on her performance, which is nothing short of stellar, but for other nefarious reasons.

employment relationship of its highest producer (unless it wished to do so in retaliation for asserting her civil rights and winning at trial!).

The D.C. Circuit in *Barbour* listed a number of non-exhaustive factors that district courts should consider in determining a front pay award, including the plaintiff's age, the length of time employees in similar positions stay at the defendant employer and other factors. 48 F.3d at 1280. Other courts offer more factors to consider, which may be useful in this present case, including "the length of prior employment, the permanency of the position held, the nature of work, [and] the age and physical condition of the employee ...." *Reneau*, 945 F.2d at 871. "If a plaintiff is close to retirement, front pay may be the only practical approach." *See Newhouse v. McCormick & Co., Inc*., 110 F.3d 635, 641-42 (8th Cir. 1997) citing *Duke v. Uniroyal, Inc*., 928 F.2d 1413, 1424 (4th Cir.), cert. denied, 502 U.S. 963 (1991). The evidence presented at the hearing, as highlighted above, meets each of those factors to justify a front pay award through 2030, the year of Dr. Scott-McKinney's retirement.

Lastly, in its post-trial brief (ECF # 93 at 11-12), Defendant argued that front pay is not justified in this case because Dr. Scott-McKinney was given a virtual scribe in November 2020 and did not lose her job. Consequently, front pay and provision of a scribe would amount to a "windfall." Defendant has equated its provision of a scribe with reinstatement of a plaintiff to her job. ECF #93 at 11. Defendant argues: "Here, awarding Plaintiff front or back pay during any period of time when she was appropriately accommodated (after November 19, 2020) would be akin to awarding a plaintiff who was terminated both front pay and reinstatement." *Id*. Such an analogy, however, is inapposite.

Dr. Scott-McKinney seeks front pay not because she lost her job but because, notwithstanding the provision of a scribe, her capacity to see patients has been *permanently*

*diminished* as a result of the 16 months without a scribe due to Defendant's unlawful discrimination. That diminished capacity has adverse economic consequences, justifying an award of front pay. Contrary to Defendant's assertion, she suffers no windfall. Rather, she is seeking lost compensation to make her whole, as the law dictates.

## IV.    INJUNCTIVE RELIEF IS JUSTIFIED IN THIS CASE

Briefly, as expressed at the hearing and in post-trial briefs, Plaintiff requests injunctive relief as a result of Defendant's prior callous behavior in having her serve as a Guinea pig to try out voice dictation software, knowing that it was not tested or validated to work with Children's Pediatrician's & Associates' electronic medical record ("EMR") system. As Dr. Scott-McKinney declared under penalty of perjury and adopted by her testimony at the hearing, Defendant is implementing a new EMR system in the fall of 2022 from Cerner Corporation; that system also has dropdown menus and box clicks, the source of her typing problems. *See* Plaintiff Exhibit 199. Plaintiff requests that Defendant be ordered to provide a scribe until such time, if at all, as a tested and validated substitute method of documenting can replace her scribe without forcing Dr. Scott-McKinney to either further reduce her hours of direct patient care or increase her pain and physical symptoms.

Defendant suggests that an injunction is not required and offers testimony from Mark Janowiak that he has budgeted for the next fiscal year (2023) to pay for a scribe. Exhibit A at 158:3-10. That Defendant has budgeted for next fiscal year does not speak to the following years. In contrast, based on Defendant's past behavior, Plaintiff requires an injunction to keep the status quo until such time as a reasonable, tested and validated alternative is offered. Giving up her scribe prior to such validation would only serve to damage her further.

Finally, as a private attorney general enforcing the D.C. Human Rights Act (*Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 775 n.13 (D.C. App. 1993)), Plaintiff

seeks an injunction to require Defendant to train its managers annually on disability discrimination law requirements, reasonable accommodation and the interactive process and to post statutorily-required notices of such laws.  To date, Defendant has not done so.

**CONCLUSION**

Based on the foregoing points, authorities and evidence, Plaintiff requests that the Court award economic damages in the amount of $402,673.99 and the injunctive relief requested.

Date:  May 16, 2022                          Respectfully submitted,

                                            **KALBIAN HAGERTY, LLP**

                                            By   /s/ Eric L. Siegel
                                            Eric L. Siegel (D.C. Bar No. 427350)
                                            888 17th Street, N.W., Suite 1200
                                            Washington, D.C. 20006
                                            Tel: (202) 419-3296
                                            Fax: (202) 223-6625
                                            esiegel@kalbianhagerty.com
                                            *Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was provided to counsel for Defendant and the Court at the hearing held on May 16, 2022.

                                            /s/ Eric L. Siegel
                                            Eric L. Siegel

# EXHIBIT B



# Transcript of David Levin, M.D.

**Date:** January 20, 2022
**Case:** Scott-McKinney -v- Children's National Medical Center, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    9

| | | |
|---|---|---|
| 1 | Q    In your current practice, how long have | 17:34:37 |
| 2 | you been there? | 17:34:39 |
| 3 | A    Since 2011. | 17:34:39 |
| 4 | Q    In your medical practice, do you document | 17:34:42 |
| 5 | patient visits and care? | 17:34:46 |
| 6 | A    I do. | 17:34:48 |
| 7 | Q    And what do you do in order to do that? | 17:34:49 |
| 8 | MR. JOHNSON:  You can answer. | 17:34:58 |
| 9 | A    We have an electronic medical record that | 17:34:58 |
| 10 | involves a -- that involves a combination of | 17:35:01 |
| 11 | clicking boxes and dictation software. | 17:35:04 |
| 12 | Q    As part of that process did you create an | 17:35:07 |
| 13 | office note each time you've seen a patient? | 17:35:13 |
| 14 | A    Yes, I do. | 17:35:16 |
| 15 | Q    Was the office note made at or near the | 17:35:18 |
| 16 | time that you saw the patient? | 17:35:18 |
| 17 | A    Yes, it is. | 17:35:19 |
| 18 | Q    And was the office note made or generated | 17:35:21 |
| 19 | in your electronic medical record system? | 17:35:26 |
| 20 | A    Yes, it is. | 17:35:28 |
| 21 | Q    Are these office notes kept in the | 17:35:29 |
| 22 | regular course of your regularly conducted medical | 17:35:32 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022          10

| | | |
|---|---|---|
| 1 | practice activities? | 17:35:36 |
| 2 | A      Yes, they are. | 17:35:36 |
| 3 | Q      Is making an office note a regular | 17:35:37 |
| 4 | practice of your medical practice? | 17:35:40 |
| 5 | A      It is. | 17:35:42 |
| 6 | Q      Does your medical practice keep those | 17:35:43 |
| 7 | office patient visit notes at your office for | 17:35:46 |
| 8 | retrieval when you see a patient? | 17:35:49 |
| 9 | A      Yes, it does. | 17:35:50 |
| 10 | Q      Are either you or a medical employee in | 17:35:52 |
| 11 | your office responsible to be the custodian of those | 17:35:55 |
| 12 | office patient records? | 17:35:59 |
| 13 | A      Yes. | 17:36:00 |
| 14 | Q      So when we review today your office notes | 17:36:00 |
| 15 | as part of your testimony, are these the same office | 17:36:04 |
| 16 | notes of your medical practice that you've been | 17:36:07 |
| 17 | discussing that you keep per patient? | 17:36:10 |
| 18 | A      Yes. | 17:36:12 |
| 19 | Q      Do you know of the plaintiff | 17:36:12 |
| 20 | Dr. Stacy Scott-McKinney? | 17:36:17 |
| 21 | A      I do. | 17:36:18 |
| 22 | Q      And how do you know her? | 17:36:19 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    15

| | | |
|---|---|---|
| 1 | A    So that's another description for the | 17:41:05 |
| 2 | terminology -- for the description I just gave. | 17:41:10 |
| 3 | Cervical radiculopathy is a syndrome of pain, | 17:41:13 |
| 4 | numbness or tingling in the shoulder blade or arm | 17:41:15 |
| 5 | from a compressed nerve in the neck. | 17:41:17 |
| 6 | Q    What, if any, conclusions did you reach | 17:41:19 |
| 7 | regarding Dr. Scott-McKinney's diagnosis as a result | 17:41:22 |
| 8 | of your medical workup of her condition in 2017? | 17:41:24 |
| 9 | A    My conclusion was that she has cervical | 17:41:27 |
| 10 | radiculopathy from a compressed right C6 nerve. | 17:41:31 |
| 11 | Q    And what does it mean the term "overuse | 17:41:36 |
| 12 | injury," if you know? | 17:41:38 |
| 13 | A    So doing a repetitive task can either | 17:41:39 |
| 14 | create a problem or take a problem that was less | 17:41:46 |
| 15 | symptomatic and make it more -- and make it more | 17:41:50 |
| 16 | symptomatic or aggravated. | 17:41:53 |
| 17 | So in her case I did believe that she had | 17:41:54 |
| 18 | a repetitive overuse injury associated with her | 17:41:58 |
| 19 | preexisting C5-6 disc degeneration and preexisting | 17:42:02 |
| 20 | nerve compression.  The repetitive computer work | 17:42:06 |
| 21 | associated with the voluminous demands of | 17:42:12 |
| 22 | documenting her patient encounters over the course | 17:42:17 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022                16

```
 1   of the day was exacerbating her neck condition which    17:42:20

 2   was otherwise fairly well controlled.                   17:42:25

 3        Q      What extent, if at all, do overuse           17:42:25

 4   injuries make worse degenerative conditions?            17:42:29

 5        A      They can contribute to the degeneration     17:42:31

 6   of the disc.  More often, though, they can take a       17:42:37

 7   problem that is relatively quiescent and make it        17:42:42

 8   symptomatic at least in this context.                   17:42:46

 9             In other contexts, for example, carpal        17:42:53

10   tunnel syndrome, repetitive use of our tendons can      17:42:56

11   cause them to swell and they can physically compress    17:42:59

12   the nerve in the carpal tunnel.                         17:43:02

13             In this case we don't tend to see             17:43:05

14   exacerbation of her bone spurs or degeneration --       17:43:08

15   upper disc degeneration, or rather aggravating the      17:43:13

16   condition is what Dr. Scott-McKinney is suffering       17:43:14

17   from.                                                   17:43:17

18        Q    I'm going to show you what's been             17:43:17

19   previously marked as Plaintiff's Exhibit Trial          17:43:21

20   Exhibit 171.                                            17:43:25

21             (Exhibit 171 was marked for                   17:43:25

22   identification and attached to transcript.)             17:43:25
```

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    31

```
1    November 2019.                                           18:00:10

2          Q      And what is Plaintiff's Exhibit 168?        18:00:11

3          A      This is a work note.                        18:00:22

4                 (Exhibit 168 was marked for                 18:00:22

5    identification and attached to transcript.)              18:00:22

6          A      Again, reiterating that she should limit    18:00:26

7    her computer work or her direct patient care to no       18:00:30

8    more than six hours per day, and I reiterated that       18:00:36

9    she should have a scribe on a permanent basis.           18:00:38

10         Q      Why did you make that recommendation?       18:00:40

11         A      I'd been recommending it for some time      18:00:43

12   that she have a scribe in order to assist her with       18:00:47

13   her -- with her charting requirements which was the      18:00:54

14   primary exacerbating factor of her pain.  Limiting       18:00:57

15   her to six hours per day was also -- was another way     18:01:03

16   of trying to limit the additional charting that she      18:01:07

17   has to do even with a scribe, which was another          18:01:10

18   exacerbating factor for her.                             18:01:15

19         Q      Did there come a point in time that you     18:01:15

20   further reduced the number of hours that she would       18:01:19

21   have direct patient as a result of her condition?        18:01:22

22         A      There did.  There did come such a time.     18:01:23
```

Transcript of David Levin, M.D.
Conducted on January 20, 2022                  32

```
1   I can't recall whether it was before or after that      18:01:28

2   last office note that you showed me, but there was a     18:01:31

3   time, as I recall, when her -- when she had lost her     18:01:35

4   scribe again and her pain was once again exacerbated    18:01:41

5   and dropped her down to four hours of direct patient    18:01:46

6   care.                                                    18:01:50

7           At that point -- there was also a time           18:01:51

8   when her patient volume was dramatically diminished     18:01:52

9   because of COVID and her pain seemed to do better       18:01:57

10  during that time as well.  This was a little bit        18:02:01

11  after that 2019 visit probably.  And we made efforts    18:02:02

12  to get her back to a six-hour workday so she could      18:02:07

13  be as productive as she wanted to be.  And at times     18:02:11

14  she would tolerate that; at times her sym- -- her       18:02:16

15  pain was exacerbated and we dropped her back down to    18:02:18

16  four hours.                                              18:02:21

17          So we were trying to find a happy medium         18:02:24

18  for quite some time both allowing Dr. Scott-McKinney    18:02:24

19  to do her job the way she's trained and to her best     18:02:28

20  of her ability to see the number of patients that       18:02:32

21  she wants to see without exacerbating her symptoms      18:02:34

22  unduly.                                                  18:02:34
```

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    33

| | |
|---|---|
| 1    **Q**    Did you ever consider taking her back to | 18:02:38 |
| 2    an eight-hour per day of direct patient care? | 18:02:40 |
| 3    **A**    We did talk about that.  She did direct | 18:02:44 |
| 4    patient care for eight hours prior to -- prior to a | 18:02:48 |
| 5    long stretch of time where she lost her scribe and | 18:02:54 |
| 6    she was tolerating that well. | 18:02:57 |
| 7    And either due to a combination of her | 18:02:58 |
| 8    disease progressing or due to, you know, | 18:03:03 |
| 9    deconditioning from protecting her neck over that | 18:03:08 |
| 10   long period of time, we were having enough trouble | 18:03:11 |
| 11   getting her through a workday of six hours even with | 18:03:15 |
| 12   the scribe when she had the scribe back that we did | 18:03:18 |
| 13   not broach the subject of going back to eight hours | 18:03:22 |
| 14   at least -- not in the last few visits that we saw | 18:03:29 |
| 15   each other. | 18:03:30 |
| 16   **Q**    I'm showing you what's been marked as | 18:03:30 |
| 17   Plaintiff Exhibit 170 and ask if you recognize this | 18:03:34 |
| 18   document. | 18:03:36 |
| 19   (Exhibit 170 was marked for | 18:03:36 |
| 20   identification and attached to transcript.) | 18:03:37 |
| 21   **A**    This is another office note from May 12th | 18:03:37 |
| 22   of 2020. | 18:03:40 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022                          39

| | | |
|---|---|---|
| 1 | identification and attached to transcript.) | 18:09:24 |
| 2 | Q     What is this document? | 18:09:28 |
| 3 | A     This is a work note from October 2020 | 18:09:29 |
| 4 | stating that beginning October 23, 2020, for four | 18:09:36 |
| 5 | weeks she is restricted to no more than four hours | 18:09:40 |
| 6 | of direct patient care while at work.  And again, I | 18:09:43 |
| 7 | reiterated that she should have a scribe on a | 18:09:47 |
| 8 | permanent basis, and I recommended that those | 18:09:49 |
| 9 | restrictions remain in place until she was seen | 18:09:54 |
| 10 | again I believe on November 20th. | 18:09:57 |
| 11 | Q     Did there come a point in time that you | 18:10:00 |
| 12 | learned that Dr. Scott-McKinney received a scribe | 18:10:02 |
| 13 | again? | 18:10:06 |
| 14 | A     Yes.  I cannot recall exactly when | 18:10:07 |
| 15 | offhand but yes.  I believe she was without a scribe | 18:10:10 |
| 16 | for about 16 months total. | 18:10:13 |
| 17 | Q     I'm going to show you what's been | 18:10:15 |
| 18 | previously marked as Plaintiff Trial Exhibit 175 -- | 18:10:22 |
| 19 | (Exhibit 175 was marked for | 18:10:22 |
| 20 | identification and attached to transcript.) | 18:10:22 |
| 21 | Q     -- and ask if you recognize this | 18:10:25 |
| 22 | document. | 18:10:26 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    40

| | | |
|---|---|---|
| 1 | A      This is another office note from | 18:10:26 |
| 2 | November 24, 2020.  And I reiterated what I said | 18:10:29 |
| 3 | earlier that her number of patient hours were -- had | 18:10:37 |
| 4 | been dropped to four hours and then up to six hours | 18:10:43 |
| 5 | while we were trying to find a happy medium for her | 18:10:46 |
| 6 | while awaiting for her scribe to be reinstated. | 18:10:49 |
| 7 | I know that her pain was slightly | 18:10:53 |
| 8 | improved with her decreased work hours and with | 18:10:55 |
| 9 | physical therapy.  She was still having a cold | 18:10:58 |
| 10 | numbing sensation in the right hand and residual | 18:11:02 |
| 11 | right shoulder pain.  She was taking a muscle | 18:11:05 |
| 12 | relaxer called Skelaxin at nighttime to help her | 18:11:08 |
| 13 | with pain control. | 18:11:13 |
| 14 | Q      So -- | 18:11:14 |
| 15 | A      I'm sorry.  And I did report that she had | 18:11:15 |
| 16 | been prescribed -- provided a virtual scribe as of | 18:11:19 |
| 17 | the prior week as of this visit. | 18:11:20 |
| 18 | Q      So in your plan section can you explain | 18:11:22 |
| 19 | to the jury why you kept her to six hours of direct | 18:11:27 |
| 20 | patient care if she was using a scribe at this point | 18:11:31 |
| 21 | in time? | 18:11:33 |
| 22 | A      So we were still trying to find that | 18:11:34 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    41

| | | |
|---|---|---|
| 1 | happy medium.  The scribe substantially diminished | 18:11:39 |
| 2 | her charting requirements, but there was still some | 18:11:42 |
| 3 | charting requirements even with a scribe.  We still | 18:11:44 |
| 4 | have to review the note produced by the scribe.  We | 18:11:47 |
| 5 | still have to edit it.  We still have to do your | 18:11:52 |
| 6 | prescriptions and your forms for, you know, for | 18:11:55 |
| 7 | children, for school, and for gym class, etc. | 18:12:02 |
| 8 | And so at this point we were again trying | 18:12:04 |
| 9 | to find that right balance for her which we arrived | 18:12:10 |
| 10 | at still staying with the six-hour direct patient | 18:12:13 |
| 11 | care plus a scribe and see if that would control her | 18:12:17 |
| 12 | pain adequately. | 18:12:20 |
| 13 | Q     Is it your view that six hours is | 18:12:21 |
| 14 | something that she's going to be keeping or not | 18:12:26 |
| 15 | keeping? | 18:12:28 |
| 16 | A     Well, at this point at least as of our | 18:12:29 |
| 17 | last several visits, that seemed to be the right | 18:12:35 |
| 18 | number for her.  That six hours of direct patient | 18:12:38 |
| 19 | care which, again, you know, she's in the office for | 18:12:41 |
| 20 | I'm sure two to four hours after that on a given | 18:12:46 |
| 21 | day, that that would be the amount of additional | 18:12:47 |
| 22 | charting over and above what the scribe is able to | 18:12:51 |

Transcript of David Levin, M.D.
Conducted on January 20, 2022                    42

| | | |
|---|---|---|
| 1 | help her with that she would be able to allow her to | 18:12:55 |
| 2 | tolerate her disability. | 18:12:58 |
| 3 | Q    Based on your treatment of | 18:12:58 |
| 4 | Dr. Scott-McKinney over the roughly three and a half | 18:13:00 |
| 5 | to four years that you've been seeing her, how would | 18:13:04 |
| 6 | you characterize or describe the effectiveness of | 18:13:05 |
| 7 | using a scribe in terms of maintaining manageable | 18:13:07 |
| 8 | pain from her physical condition while maintaining | 18:13:10 |
| 9 | productivity as a physician? | 18:13:14 |
| 10 | MR. JOHNSON:  Objection. | 18:13:14 |
| 11 | A    I would say it was very helpful for her | 18:13:15 |
| 12 | both in terms of objectively improving range of | 18:13:20 |
| 13 | motion in the neck, subjectively reporting decreased | 18:13:25 |
| 14 | pain and the ability to continue her work and remain | 18:13:29 |
| 15 | productive and not have to retire early. | 18:13:32 |
| 16 | The decrease in the amount of charting | 18:13:35 |
| 17 | that Dr. Scott-McKinney does was going to be | 18:13:37 |
| 18 | paramount for her to be able to continue to work as | 18:13:41 |
| 19 | a pediatrician, and the only really two options | 18:13:43 |
| 20 | available, you know, save a dramatic change to her | 18:13:47 |
| 21 | electronic medical record, which I guess would be a | 18:13:50 |
| 22 | third, would be to dramatically diminish the number | 18:13:53 |

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STACY SCOTT-MCKINNEY, M.D.,

        *Plaintiff*,

v.                                   Case No. 1:19-cv-02980

CHILDREN'S NATIONAL MEDICAL
CENTER/CHILDREN'S NATIONAL
HEALTH SYSTEM,

        *Defendant*.

I, Eric L. Siegel, declare under penalty of perjury that the foregoing are true statements based on my personal knowledge:

1.     I am the Plaintiff's counsel in the above-captioned lawsuit.

2.     Attached to this Declaration as Exhibit C and separately as Exhibit D are true and correct email exchanges between myself of Defendant's counsel regarding Plaintiff's supplemental production of medical records both during discovery and subsequently but before Plaintiff's October 19, 2021 deposition.

3.     All responsive and outstanding medical records were produced to Defendant as of September 9, 2021.

I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 that the foregoing facts are true and made on my personal knowledge.

      May 15, 2022                    /s/ Eric L. Siegel

         Date                         Eric L. Siegel

| From: | Eric Siegel |
|---|---|
| To: | Jeffrey Johnson; Kraig Long |
| Cc: | Kim Edwards |
| Subject: | RE: McKinney v. CNMC |
| Date: | Tuesday, September 7, 2021 2:04:27 PM |
| Attachments: | Eric L Siegel7.vcf |
| | PLAINTIFF004688-004703.pdf |
| | image001.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image007.png |
| | image008.png |

**CONFIDENTIAL LAW FIRM COMMUNICATION**

**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

Good day  Out of an abundance of caution, I reached out to Dr. Levin's office to determine if any other records exist.  I may have produced some or all of these records but wanted to ensure that you have them.  See the attached as supplemental production. Have a good day.

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.

Suite 1200

Washington, DC 20006

Phone Main: 202-223-5600

Phone Direct: 202-419-3296

Fax:  202-223-6625

Email: esiegel@kalbianhagerty.com

www.kalbianhagerty.com








CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Thursday, September 2, 2021 2:53 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Cc:** Kim Edwards <kim.edwards@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to**

**the end for further instructions.**

Jeff:

I received the following 19 additional pages of medical records from Dr. Levin's office, which cover the period from June 2020 through January 2021.  I am advised that there are a small group of documents pertaining to physical therapy, which , out of an abundance of caution, I provide as well.  Dr. Levin's medical records and his opinion about Dr. Scott-McKinney's permanent impairments as a result of not having a scribe for a year has not changed.  I simply provide for completeness to show course of treatment.

Sincerely,

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625
Email: esiegel@kalbianhagerty.com
www.kalbianhagerty.com







**-480-**



CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Thursday, September 2, 2021 11:38 AM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Cc:** Kim Edwards <kim.edwards@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

**-481-**

I have searched for your missing supplemental production of documents that were sent to you on May 19, 2020.  The medical records should have been marked "Confidential" and subject to our joint protective order.  I do not see that they were.  In any event, please ensure that these remain confidential or let me know so that I may resent a corrected version with the "Confidential" marking. In light of the judge's order and our ongoing duty to supplement, I have reached back to Dr. Scott-McKinney's treating doctors and her workers' compensation lawyers to see if there are any other responsive documents for supplemental production post May 2020.  I will produce as soon as I hear back shortly regarding the response.  Then, you should be up to date.

Sincerely,

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625
Email: esiegel@kalbianhagerty.com
www.kalbianhagerty.com









CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Sent:** Thursday, August 26, 2021 11:54 AM
**To:** Eric Siegel <esiegel@kalbianhagerty.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Cc:** Kim Edwards <kim.edwards@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

Eric,

I spoke with the judge's law clerk this morning, and he advised that we should call in to chambers jointly to brief him (the law clerk) on the issue.  The law clerk will then relay the information to Judge McFadden to set up a more formal teleconference with Court.  Given your availability, I told him we could call in Monday morning.  Does 9:30 a.m. work for you?  If so, we will call you first, then patch in chambers.

On another note, my assistant, cc'd, recently went through Plaintiff's document production to make sure that our file was in order after transition to the new firm.  I believe that Plaintiff's production ranges in bates numbers from Plaintiff 1 to Plaintiff 4611.  However, we are unable to locate the documents bates numbered 4438-4578.  Can you or someone from your office confirm that Plaintiff's production ends at 4611, and re-send Plaintiff 4438-4578.

Thanks,

Jeff

---

**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Wednesday, August 25, 2021 4:34 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

I am available Monday through Wednesday next week and can be flexible on times.

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.

Suite 1200

Washington, DC 20006

Phone Main: 202-223-5600

Phone Direct: 202-419-3296

Fax:  202-223-6625

Email: esiegel@kalbianhagerty.com

www.kalbianhagerty.com








CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Sent:** Wednesday, August 25, 2021 4:32 PM
**To:** Eric Siegel <esiegel@kalbianhagerty.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

Eric,

We think its is prudent to request a status conference with the court to discuss the reopening of discovery.  Kraig is traveling tomorrow.  Please let us know your availability Friday or early next week.  Once we have your availability, I will reach out to chambers to request a conference.

Thanks,

Jeff

---

**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Wednesday, August 25, 2021 3:57 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

The documents exchanged after discovery are the medical documents I provided to you. As for questions about the virtual scribe, I will determine whether the question is outside the scope of the limited discovery to determine my response.  This is a failure to accommodate case.  We alleged your client failed to accommodate my client.  You have stated in your previously filed motion for summary judgment that provision of the virtual scribe was voluntary and not required on your client's part so I can only conclude that if a jury finds in your favor, CNMC will remove the virtual scribe.  CNMC does not get to make much of the fact that it provided a virtual scribe after failing to provide a scribe, live or virtual, for a year, only to cause my client further damages.  Again, I am not going to stop you from asking my client about the virtual scribe as it relates to her claim for compensatory damages.  But, I will not allow any questions that may address liability, which should have been and could have been addressed prior to the end of the discovery.  Conduct yourselves accordingly.

Sincerely,

**Eric L. Siegel**
*Counsel*

 KALBIAN HAGERTY LLP

888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625

Email: esiegel@kalbianhagerty.com

www.kalbianhagerty.com








CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Sent:** Wednesday, August 25, 2021 2:41 PM

**To:** Eric Siegel <esiegel@kalbianhagerty.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

Eric,

We are simply seeking discovery on events that have transpired since the discovery deadline (including use of the virtual scribe, damages claimed by your client, and treatment she has received), as well as the content of any documents exchanged since the discovery deadline.  If it is your position that defendant should not be entitled to discovery on these subjects, then please explain the basis for that position.

Thanks,

---

**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Wednesday, August 25, 2021 1:31 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

I am in receipt of your email.  I do not agree with your characterization of the scope of discovery.  You may coordinate the depositions of Dr. Mills and Dr. Scott-McKinney.  I will determine whether your questioning exceeds the limitations of the discovery required.  If so, I will instruct my client not to answer a particular question asked.  You will have to seek the judge's involvement on these issues if you deem it necessary.  This discovery is to address Dr. Scott-McKinney's claim for compensatory damages and the medical records received and the contents therein as it pertains to her claim for damages, and that is all.  Discussion about other topics is off limits, in our view.  I already shared with Kraig that my client has been successful in performing her job with the virtual scribe and does not seek other accommodations at this time.  Whether she uses a virtual scribe or not, you may ask her about her symptoms regarding compensatory damages and whether those symptoms have been positively or adversely affected by the use of the scribe at work.  However, those questions are only addressed towards her claim for compensatory damages and nothing more.  Your client made the choice to accommodate Dr. Scott-McKinney even after declining to provide a live scribe for a year, and the results in terms of patient visits and revenue have been quite positive.  Nonetheless, the limited discovery solely remains focused on her claim for compensatory damages and the medical records you received.  I leave it to you to coordinate for September by

**-488-**

offering dates.

Sincerely,

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625
Email: esiegel@kalbianhagerty.com
www.kalbianhagerty.com

An international
member of
AllyLaw






CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**Eric L Siegel**
Kalbian Hagerty, LLP
Of Counsel
(202) 223-5600 Work
(202) 419-3296 Work
esiegel@kalbianhagerty.com
888 17th Street, N.W.
Suite 1000
Washington, D.C. 20006
www.kalbianhagerty.com

**From:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Sent:** Wednesday, August 25, 2021 1:11 PM
**To:** Eric Siegel <esiegel@kalbianhagerty.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

Eric,

I am writing to follow up on the conversation between you and Kraig about a limited reopening of discovery to address the information and documents provided after the discovery deadline.  At this time, we intend to take the deposition of Dr. Mills and Dr. Scott-McKinney.  With regards to the subjects of examination for Dr. Scott-McKinney, we do not agree to limit our examination to the treatments received from Dr. Mills, but would certainly not seek to rehash any facts or issues that occurred prior to Dr. Scott-McKinney's deposition in 2020.  We have not had an opportunity for discovery on Dr. Scott-McKinney's use of a virtual scribe, the documents/information provided after the discovery deadline, as well as any treatments, damages, and limitations/suffering claimed by Dr. Scott-McKinney since the discovery deadline.  We presume that Dr. Scott-McKinney is going to seek damages for events occurring after the discovery deadline at trial (notwithstanding receipt of the virtual scribe).  If that is correct, then Defendant is entitled to discovery of the basis for, and nature of, that claim. Also, a reopening of discovery may include additional miscellaneous discovery limited to the aforementioned subjects.  Our plan would be to take the depositions of Dr. Mills and Dr. Scott-McKinney, and then evaluate whether any follow-up discovery is required.  If this is agreeable, I would propose scheduling the depositions of Dr. Scott-McKinney and Dr. Mills for September, and concluding any necessary follow-up discovery by the end of October.

Thanks,

Jeff

**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Tuesday, August 17, 2021 11:08 AM
**To:** Kraig Long <kraig.long@nelsonmullins.com>; Jeffrey Johnson
<jeffrey.johnson@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to
the end for further instructions.**

Kraig and Jeff:

Good morning.  I have conferred with my client.  We are amenable to you deposing Dr.
Mills and a limited reopening of Dr. Scott-McKinney's deposition to discuss only her
visits with Dr. Mills (which occurred after her deposition in this matter) and the contents
of those conversations.  Plaintiff's deposition will not be a rehash or new ground
pertaining to the facts underlying her assertions of liability for disability discrimination,
including any facts or issues prior to her initial deposition date, given that you had that
opportunity already.  If this is amenable, please let me know what you are proposing for
deposition dates so that I may check my and my client's schedules.  I would like to get
this limited discovery completed expeditiously so that it does not interfere with my trial
preparation and other impending trials in late 2021 and early 2022.  Thank you.

Sincerely,

**Eric L. Siegel**
*Counsel*

 KALBIAN HAGERTY LLP

888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625
Email: esiegel@kalbianhagerty.com
www.kalbianhagerty.com









CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Kraig Long <kraig.long@nelsonmullins.com>
**Sent:** Wednesday, August 11, 2021 1:34 PM
**To:** Eric Siegel <esiegel@kalbianhagerty.com>; Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

Hi Eric,

Let's do Monday at 2:30 pm.  I will send a calendar invite with a dial in number.

---

**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Wednesday, August 11, 2021 1:18 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Cc:** Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

We can schedule a time on Monday or Tuesday next week to discuss.  I am available after 2pm either day.

**Eric L. Siegel**
*Counsel*

 KALBIAN HAGERTY LLP

888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600
Phone Direct: 202-419-3296
Fax:  202-223-6625
Email: esiegel@kalbianhagerty.com
www.kalbianhagerty.com

An international
member of
 AllyLaw

 

**-493-**



CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Sent:** Wednesday, August 11, 2021 11:54 AM
**To:** Eric Siegel <esiegel@kalbianhagerty.com>
**Cc:** Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

Eric,

We have had a chance to review Dr. Scott-McKinney's supplemental production.  Based on the records produced, and the fact that Dr. Scott-McKinney appears to be claiming ongoing damages after receipt of the virtual scribe, we would like to discuss with you a limited reopening of discovery for the purpose of exploring the following issues:

**-494-**

1.       Whether Dr. Scott-McKinney contends that the virtual scribe currently being provided is an appropriate accommodation.
2.       The extent of any pain, suffering, limitations or damages experienced by Dr. Scott-McKinney since working with the virtual scribe.
3.       The psychological treatment referenced in the records provided, as well as any other treatment Dr. Scott-McKinney has received since the initial discovery period.

Given that discovery closed in August of 2020, we have not had a chance to obtain discovery on these subjects and believe that some additional discovery is necessary to prepare for trial in March of 2021.  We anticipate that any reopening of discovery would be limited to a couple months early this fall, and would involve a deposition of Dr. Scott-McKinney, and potentially some miscellaneous follow-up discovery based on the deposition testimony.  This would not have any impact on the trial date in March.  Do you have time for a call in the next few days to discuss?

Thanks,

Jeff

---

**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Tuesday, August 3, 2021 5:36 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Cc:** Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff:

Thanks.  Welcome to the new firm.

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.
Suite 1200
Washington, DC 20006
Phone Main: 202-223-5600

Phone Direct: 202-419-3296

Fax:  202-223-6625

Email: esiegel@kalbianhagerty.com

www.kalbianhagerty.com

An international
member of

AllyLaw

*Rated "AV Preeminent" by Martindale-Hubbell ®*

CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>
**Sent:** Tuesday, August 3, 2021 4:54 PM
**To:** Eric Siegel <esiegel@kalbianhagerty.com>
**Cc:** Kraig Long <kraig.long@nelsonmullins.com>
**Subject:** McKinney v. CNMC

Eric,

Kraig forwarded me your two recent supplemental medical record productions.  Please continue to cc me on any communications regarding this matter.  We will review the records and get back to you

soon.

Thanks,

Jeff

JEFFREY JOHNSON  ASSOCIATE
jeffrey.johnson@nelsonmullins.com
100 S. CHARLES STREET | SUITE 1600
BALTIMORE, MD 21201
T 443.392.9430  F 443.392.9499
NELSONMULLINS.COM    VCARD    VIEW BIO

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

# EXHIBIT D

| From: | Eric Siegel |
|---|---|
| To: | Jeffrey Johnson; Kraig Long |
| Cc: | Kim Edwards |
| Subject: | RE: McKinney v. CNMC |
| Date: | Thursday, September 9, 2021 11:12:27 AM |
| Attachments: | Eric L Siegel7.vcf |
| | PLAINTIFF004712-004715.pdf |
| | image001.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image007.png |
| | image008.png |
| | PLAINTIFF004704-004711.pdf |

**CONFIDENTIAL LAW FIRM COMMUNICATION**

**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to the end for further instructions.**

Jeff and Kraig:

Good morning.  This shall be the last supplemental production for this matter.  I obtained three recent medical records and a Joint Motion to Vacate in the Workers Compensation case and associated Order.  See the attached for production and service.

Sincerely,

**Eric L. Siegel**
*Counsel*



888 17th Street, N.W.

Suite 1200

Washington, DC 20006

Phone Main: 202-223-5600

Phone Direct: 202-419-3296

Fax:  202-223-6625

Email: esiegel@kalbianhagerty.com

www.kalbianhagerty.com

An international
member of



**-499-**






CONFIDENTIALITY NOTE: A law firm (Kalbian Hagerty, LLP) is sending this message; it is intended for the exclusive use of the individual or entity that is the named addressee and may contain information that is privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee or an employee or agent responsible for delivering this message to the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify me immediately by e-mail, discard any paper copies and delete all electronic files of the message.  The unauthorized disclosure or interception of email is a federal crime; 18 U.S.C. Sec. 2517(4).

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).



**From:** Eric Siegel <esiegel@kalbianhagerty.com>
**Sent:** Thursday, September 2, 2021 2:53 PM
**To:** Jeffrey Johnson <jeffrey.johnson@nelsonmullins.com>; Kraig Long <kraig.long@nelsonmullins.com>
**Cc:** Kim Edwards <kim.edwards@nelsonmullins.com>
**Subject:** RE: McKinney v. CNMC

**CONFIDENTIAL LAW FIRM COMMUNICATION**
**If you are not the addressee, DO NOT READ THE TEXT OF THIS MESSAGE, but skip to**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **STACY SCOTT-MCKINNEY,** | |
| **Plaintiff,** | |
| **v.** | **Case No: 1:19-CV-2980-TNM** |
| **CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM,** | |
| **Defendant.** | |

## DEFENDANT'S CLOSING BRIEF ON FRONT AND BACK PAY DAMAGES

Based on the evidence heard at trial and at the May 2, 2022 evidentiary hearing, Children's National Medical Center ("Children's National" or "Defendant"), by and through its undersigned counsel, submits this Closing Brief on Front and Back Pay Damages ("Closing Brief").

Respectfully submitted,

*/s/ Kraig B. Long*
Kraig B. Long, Bar#467858
Jeffrey T. Johnson, Bar#1724768
Nelson Mullins Riley & Scarborough, LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
Tel: 443-392-9460
Fax: 443-392-949
Kraig.Long@nelsonmullins.com
Jeffrey.Johnson@nelsonmullins.com
***Counsel for Defendant***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARDS AND ARGUMENT ...................................................................... 2

I.     Plaintiff Cannot Recover Lost Wages After November 19, 2020 ................................ 2

       A.     Granting Plaintiff lost wages after November 19, 2020 would amount to a
              windfall. ........................................................................................................ 2

       B.     An award of lost wages after November 19, 2020 would be inconsistent with the
              jury instructions and contravene this Court's ruling that Plaintiff is barred from
              recovering for personal injuries or worsening of her medical condition. .............. 3

       C.     Plaintiff has provided no evidence that her ongoing limitations were caused by
              working without a scribe prior to November 19, 2020. ........................................ 5

II.    Plaintiff's Damages Calculations Exaggerate Her Weekly Patient Visits and Contradict
       Plaintiff's Employment Agreement ................................................................ 12

       A.     Plaintiff improperly assumes that she would have seen 15 more patients per week
              if provided a scribe from July 29, 2019 to November 19, 2020. .......................... 12

       B.     Plaintiff's calculation of lost wages for fiscal years 2022-2033 are inconsistent
              with the compensation structure in Plaintiff's employment agreement ................ 13

       C.     Plaintiff's claim for lost "employer match" contributions to her 401K account is
              entirely without merit .......................................................................... 15

       D.     Plaintiff's calculations overlook that her employment contract only extends
              through 2025 and that Defendant is in the process of changing the compensation
              structure ........................................................................................................ 16

III.   Plaintiff Did Not Lose Any Wages from July 29, 2019 to November 19, 2020 ............. 16

CONCLUSION ................................................................................................................ 19

CERTIFICATE OF SERVICE ......................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armenian Assembly of America, Inc. v. Cafesjian,*
746 F.Supp.2d 55 (D.D.C. 2010) ................................................................8

*Baltimore v. B.F. Goodrich Co.,*
545 A.2d 1228 (D.C. 1988) .......................................................................8

*Barbour v. Merrill,*
48 F.3d 1270 (D.C. Cir. 1995) ..............................................................3, 5

*Barnes v. Anderson,*
202 F.3d 150 (2d Cir. 1999) ......................................................................8

*Daniels v. District of Columbia,*
15 F.Supp.3d 62 (D.D.C. 2014) .................................................................8

*Doherty v. Corizon Health,*
No. 3:19CV420-HEH, 2022 WL 782777 (E.D. Va. Mar. 14, 2022) ........7

*Dollar v. Smithway Motor Xpress, Inc.,*
710 F.3d 798 (8th Cir. 2013) ...................................................................16

*Halcomb v.* Woods, 610 F.Supp.2d 77 (D.D.C. 2009) ..................................8

*International Sec. Corp. of Virginia v. McQueen,*
497 A.2d 1076 (D.C. 1985) .......................................................................9

*Jefferson v. Milvets Sys. Tech., Inc.,*
986 F.Supp. 6 (D. D.C. 1997) ................................................................5, 6

*Jones v. Miller,*
290 A.2d 587 (D.C. 1972) .........................................................................9

*Lasley v. Georgetown Univ.,*
688 A.2d 1381 (D.C. Cir. 1997) ................................................................8

*Lightfoot v. Rosskopf,*
377 F.Supp.2d 31 (D.D.C. 2005) ...............................................................9

*Mazor v. State Dep't of Correction,*
279 Md. 355 (1977) ...................................................................................5

*Peyton v. DiMario,*
287 F.3d 1121 (D.C. Cir. 2002) ...............................................................16

*Queen v. Queen*,
   308 Md. 574 (1987) ................................................................................................5

*Sourgoutsis v. United States Capitol Police*,
   No. 16-CV-1096 (KBJ), 2020 WL 6887782 (D.D.C. Nov. 24, 2020) ....................................2

*Timus v. District of Columbia Dep't of Human Rights*,
   633 A.2d 751 (D.C. App. 1993)................................................................................................2

*White v. District of Columbia Water and Sewer Authority*,
   962 A.2d 258 (D.C. 2008) ........................................................................................................3

*Williams v. Lucy Webb Hayes Nat. Training School for Deaconesses and
   Missionaries*,
   924 A.2d 1000 (D.C. 2007) ......................................................................................................8

## <u>INTRODUCTION</u>

Plaintiff's sole claim in this litigation is that Defendant failed to accommodate her disability under the District of Columbia Human Rights Act ("DCHRA") by failing to provide a medical scribe from July 29, 2019 to November 19, 2020. Following a jury verdict in Plaintiff's favor (including an award of $200,000 in compensatory damages), this Court held an evidentiary hearing on May 2, 2022 to adjudicate economic damages. At the evidentiary hearing, Plaintiff only called herself as a witness and presented her own self-serving calculation of lost wages. According to Plaintiff's calculations – most of which were copied and pasted from the report of her former vocational expert, Jody Malcolm – Plaintiff has incurred or will incur $430,303.04 in back and front pay through her anticipated retirement in 2030.

As set forth below, Plaintiff's claim for lost wages after November 19, 2020 must be rejected because such damages 1) would constitute a windfall for Plaintiff, 2) would contravene this Court's prior Order that Plaintiff cannot recover damages for personal injuries, and 3) are unsupported by any evidence that Children's National caused any of Plaintiff's ongoing limitations. Moreover, Plaintiff's methodology for calculating lost wages was shown to be fatally flawed by the testimony of Defendant's Director of Business Operations, Mark Janowiak, who is responsible for determining the compensation for all CP&A pediatricians including Plaintiff. Based on the testimony of Mr. Janowiak and Plaintiff, Plaintiff incurred no lost wages during the period of time that she worked without a scribe. Finally, Plaintiff has failed to show any entitlement to injunctive relief, either concerning herself or the broad company-wide relief requested in her post-trial submission (ECF No. 91). Defendant therefore respectfully requests that the Court reject Plaintiff's claim for lost wages in its entirety.

## LEGAL STANDARDS AND ARGUMENT

**I.  Plaintiff Cannot Recover Lost Wages After November 19, 2020**

**A.  Granting Plaintiff lost wages after November 19, 2020 would amount to a windfall.**

During the evidentiary hearing and at trial, Plaintiff agreed that she has been appropriately accommodated with a scribe at all times since November 19, 2020, and that she only worked without a scribe for 16 months leading up to this date. *See* Excerpts of Transcript of Evidentiary Hearing, attached hereto as Exhibit A, at p. 65:10-15. Thus, the supposed wrong that Plaintiff sought to remedy in filing this suit – *i.e.*, failure to provide a scribe – has been remedied for 1.5 years. Mr. Janowiak further testified that Defendant has no plans to remove Plaintiff's current scribe and has budgeted to continue providing the accommodation into the future. Exhibit A at p. 158:3-10.

Nonetheless, almost all of the lost wages calculated by Plaintiff relate to the period of time after November 19, 2020 when Plaintiff received a scribe accommodation. Exhibit A at p. 84:15-19. Yet, awarding Plaintiff front pay during any period of time when she was appropriately accommodated (after November 19, 2020) would amount to double recovery, and would be akin to awarding a plaintiff who was terminated both front pay and reinstatement to their former position. *But see Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (noting that only "[w]hen that preferred remedy [of reinstatement] is unavailable, front pay is appropriate."). Such relief would contravene the very purpose of make whole relief under the DCHRA by putting Plaintiff in a better position than she would have been in but for the failure to accommodate. *See White v. District of Columbia Water and Sewer Authority*, 962 A.2d 258, 260 (D.C. 2008) (noting that the purpose of make whole relief is "to recreate the employment conditions and relationships that would have existed in the absence of intentional discrimination."). If there was no failure to

accommodate from July 29, 2019 to November 19, 2020, then Plaintiff would have had a scribe—nothing more. Thus, she should not be placed in a better position by receiving both a scribe <u>and</u> front pay through the reminder of her anticipated tenure with Defendant.

**B. An award of lost wages after November 19, 2020 would be inconsistent with the jury instructions and contravene this Court's ruling that Plaintiff is barred from recovering for personal injuries or worsening of her medical condition.**

Plaintiff's calculation of lost wages after November 19, 2020 relies on the assertion that Plaintiff has suffered physical injuries and the exacerbation of her medical condition as the result of Defendant's failure to provide a scribe during the 16 months preceding November 19, 2020. *See* Plaintiff's Post Trial Brief on Equitable Relief (ECF No. 91) at p. 8. Plaintiff testified that such ongoing limitations and medical conditions have prevented her from returning to the eight hours of daily patient care that she had performed prior to working without a scribe from July 29, 2019 to November 19, 2020. Exhibit A at pp. 37:16-38:9. However, this Court has already ruled that Plaintiff is not entitled to any damages for personal injuries or worsening of her medical condition and instructed the jury accordingly at trial.

On January 5, 2022, Defendant filed a Motion *in Limine* to Preclude Plaintiff from Introducing Evidence of, or Seeking Damages for, Physical Injury or Worsening of her Medical Condition (ECF No. 40) ("Defendant's Motion *in Limine*"). During the pretrial conference on February 18, 2022, the Court granted Defendant's Motion *in Limine*, finding that Plaintiff's pursuit of permanent partial disability benefits from the Maryland Workers' Compensation Commission amounted to a binding election of remedies. *See* February 22, 2022 Paperless Order. In light of this Order, Defendant requested a jury instruction that compensatory damages "shall not include damages related to physical injury or worsening of Dr. Scott-McKinney's medical condition." ECF No. 76 at p. 10. Plaintiff notably objected to this instruction at the conclusion of evidence during trial, arguing <u>for the very first time</u> that injuries to Plaintiff's hand and wrist were not subject

to a binding election of remedies before the Maryland Workers' Compensation Commission. However, the Court overruled Plaintiff's objection, noting that the time to raise such arguments was in opposition to Defendant's Motion *in Limine*. Indeed, Plaintiff's Opposition to Defendant's Motion *in Limine* did not mention any injuries to Plaintiff's hand or wrist, notwithstanding that Plaintiff claims she was diagnosed with such injuries more than one year prior to the filing of Plaintiff's Opposition. *See* ECF No. 51. Therefore, the jury was instructed at the close of evidence during trial that any award of compensatory damages should compensate Plaintiff for "pain and suffering, emotional distress, including feelings of depression, anxiety and/or humiliation, and/or harm to reputation that she may have suffered[,]" but <u>shall not include damages related to physical injury or worsening of Dr. Scott-McKinney's medical condition</u>." ECF No. 77 at pp. 30-31.

Notwithstanding that this Court has already ruled that Plaintiff cannot recover any damages for physical injuries or worsening of her medical condition – and instructed the jury accordingly – Plaintiff is now asking this Court to award lost wage damages stemming from alleged injuries to her hand and wrist. Plaintiff must not be allowed to do so, given that her award of permanent partial disability benefits from the Maryland Worker's Compensation Commission has already compensated Plaintiff for wage loss stemming from any work-related injury. *See Queen v. Queen*, 308 Md. 574, 586 (1987) (a "<u>lump sum permanent partial disability award … represents an amount based on the loss of future earning capacity</u>[.]") (emphasis added); *Mazor v. State Dep't of Correction*, 279 Md. 355, 363 (1977) ("workmen's compensation is one facet of an overall system of wage-loss protection[.]"). Plaintiff should also not be allowed to interject the issue of injuries to her hand and wrist into this case to avoid this Court's prior ruling, as she was capable of making those arguments in opposing Defendant's Motion *in Limine* and entirely failed to do so. Otherwise, Plaintiff would be permitted to ask the Court for damages that the jury was explicitly instructed

not to consider. This would surely violate the established principle that the district court may make factual findings to determine appropriate "make whole" relief… as long as the findings are consistent with the jury verdict." *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005) (emphasis added).

### C. Plaintiff has provided <u>no evidence</u> that her ongoing limitations were caused by working without a scribe prior to November 19, 2020.

Even assuming, *arguendo*, that the Court is inclined to consider Plaintiff's claim for lost wages after November 19, 2020 – which it should not – Plaintiff also failed to provide <u>any</u> evidence that the 16-month period that she worked without a scribe caused any of her ongoing limitations. While back and front pay are recognized remedies under the DCHRA and related federal employment laws, Plaintiff is required to provide evidence that such damages were caused by Defendant's failure to accommodate to obtain such damages. *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C. Cir. 1995).

This Court's decision in *Jefferson v. Milvets Sys. Tech., Inc.* is instructive. 986 F.Supp. 6 (D. D.C. 1997). In that case, the plaintiff succeeded at trial in proving that he was terminated from his employment in retaliation for protected activity under Title VII. *Id.* at 8. The evidence revealed that the plaintiff, after termination by the defendant, began working in a comparable role at a different company, but worked about half as many hours as he had worked for the defendant. *Id.* According to the plaintiff, he could not return to full-time work due to emotional distress caused by his retaliatory termination and would be unable to do so for another five years. *Id.* Plaintiff therefore sought a year-and-a-half in back pay and five years of front pay. *Id.* The Court in *Jefferson* opined that plaintiff's claims for back and front pay were "utterly speculative," and observed that:

> [w]hile there was sufficient evidence for a reasonable jury to find that the plaintiff had suffered some compensable, emotional distress at the hands of the defendant, <u>the plaintiff has pointed to no probative evidence (such as expert testimony from a psychologist or a physician) that this emotional distress has precluded him from working full-time and will continue to do so for another five years.</u>

*Id* (emphasis added). In rendering its opinion, the Court was clear that speculative evidence would not support an award of back or front pay. *Id.* at 7.

Here, Plaintiff has likewise failed to provide evidence that working without a scribe from July 29, 2019 to November 19, 2020 has caused her to work a reduced patient load through 2030. Moreover, Plaintiff's assertion that she has been permanently limited as the result of working without a scribe for this limited period of time is directly contrary to the <u>only</u> medical testimony that Plaintiff has offered in this case. Dr. David Levin – an orthopedic surgeon –  treated Plaintiff for conditions affecting the discs in her neck both before, during, and after the period of time that Plaintiff worked without a scribe in this matter. Exhibit A at p. 66:9-17. Dr. Levin was also the one that recommended that Plaintiff receive a scribe accommodation in the first place, and further recommended that Plaintiff work a permanent reduced work schedule of six hours of patient care per day. Exhibit A at p. 66:3-8. According to Dr. Levin's testimony at trial, Plaintiff's condition is "degenerative," meaning that it necessarily progresses or gets worse over time. *See* Excerpts of Dr. David Levin Trial Testimony, attached hereto as Exhibit B, at p. 44:2-9. Dr. Levin further testified that computer work did not cause the discs in Plaintiff's neck to degenerate, and that – while Plaintiff's symptoms were aggravated during the 16 months she worked without a scribe – the structural changes to Plaintiff's discs were not made worse as a result. Exhibit B at pp. 44:10-18, 72:8-14. When asked whether there were any "lasting effects on [Plaintiff] from the period of time from July of 2019 to November of 2020, when she did not have a scribe[,]" Dr. Levin plainly testified that "I cannot say [with] medical certainty that her conditions worsened as a result of not

6

having that scribe." Exhibit B at pp. 72:15-73:9. Dr. Levin has further opined that he does "not think [Plaintiff] is necessarily worse off now than had she had the scribe all along." Exhibit B at pp. 74:18-75:18.

Given that Plaintiff does not like what Dr. Levin has to say about her permanent limitations, she now relies on an entirely separate doctor to support her claim of lost wages after November 19, 2020. In particular, Plaintiff would have the Court disregard Dr. Levin's testimony that she is no "worse off" as the result of not having a scribe in light of: 1) Plaintiff's own testimony that she suffered "quite significant hand symptoms, cold, achy, numb, blue hand" since working without a scribe, Exhibit A at pp. 28:20-24; and 2) medical records from Dr. Leo Rozmaryn diagnosing Plaintiff's hand symptoms as carpal tunnel syndrome and repetitive strain syndrome. *See* Plaintiff's Exhibit 197. However, neither piece of evidence can support Plaintiff's claim that she is permanently limited as the result of working without a scribe for 16 months.

Concerning the former, Plaintiff's testimony that she experienced quite significant hand symptoms that have persisted since her receipt of a virtual scribe does not remotely prove that her ongoing hand symptoms were caused by working without a scribe during the 16-month period at issue. In any event, Plaintiff, as a lay witness, is not qualified to render any opinion about the cause of her current medical conditions or limitations, which requires expert testimony. *Doherty v. Corizon Health*, No. 3:19CV420-HEH, 2022 WL 782777, at *10 (E.D. Va. Mar. 14, 2022) ("Doherty, a lay person, is incompetent to testify as to the cause of any medical condition.") (citations omitted); *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) ("[T]he medial effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person"); *Armenian Assembly of America, Inc. v. Cafesjian*, 746 F.Supp.2d 55, 65 (D.D.C. 2010) ("Therefore, a lay witness who is not qualified as an expert may not give

opinions that are based on his or her specialized knowledge, even if those opinions were also based on his or her personal knowledge. If the witness' testimony results from a process of reasoning which can be mastered only be specialists in the field, it is expert testimony that must be disclosed before trial.").

This Court has rather repeatedly found that expert testimony is required to establish the cause of a medical condition. *See Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1384 (D.C. Cir. 1997)) ("Our rule for medically complicated cases is that proof of causation normally requires medical opinion testimony"); *Daniels v. District of Columbia*, 15 F.Supp.3d 62, 73 (D.D.C. 2014) (finding that fact witnesses "may not offer an opinion as to whether the defendants' actions cause the plaintiff's [injuries], since only an expert may testify to establish such a causal relationship"); *Halcomb v. Woods*, 610 F.Supp.2d 77, 85 (D.D.C. 2009) (adopting the view set forth by the D.C. Court of Appeals that "expert testimony is necessary to demonstrate a causal link between a defendant's act and a plaintiff's harm 'in cases presenting medically complicated questions due to multiple and/or preexisting causes") (quoting *Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231 (D.C. 1988)); *Williams v. Lucy Webb Hayes Nat. Training School for Deaconesses and Missionaries*, 924 A.2d 1000, 1003 (D.C. 2007) ("Although there is no inflexible requirement in a personal injury case that the plaintiff produce medical testimony on causation, expert testimony is required unless the issue of causation can be resolved within the realm of ordinary human knowledge and experience" (internal citations omitted)).  The only exceptions to this rule are "(1) when the injury develops within a reasonable time after the accident; (2) when causation is clearly apparent; or (3) when the cause of the injury relates to matters of common experience, knowledge or observation of laypersons." *Lightfoot v. Rosskopf*, 377 F.Supp.2d 31, 33 (D.D.C. 2005).

In the case at bar, the cause of Plaintiff's ongoing wrist and hand injuries after November 19, 2020 is certainly a medically complicated issue requiring expert testimony. Concerning the first exception, Plaintiff's injury and symptoms started well before she ever worked without a scribe, rather than a "reasonable time after" the failure to accommodate in this case. Regarding the second and third exceptions, causation is neither "clearly apparent" nor within "the common experience" of lay persons. To the contrary, Plaintiff testified at trial that she worked a full patient schedule as an employee of Defendant for more than ten years prior to July, 2019, and that she performed 10-14 hours of computer work per day during this time. Exhibit A at p. 37:4-8. Plaintiff also worked as a pediatrician for roughly 30 years prior to July 29, 2019. Yet, Plaintiff contends that her current hand and wrist limitations are the result of the 16-month period that she worked without a scribe, performing nine to eleven hours of computer work per day. Exhibit A at p. 37:9-15. Of course, "common experience, knowledge or observation" does not dictate that 16 months of computer work – rather than the other 28-plus years of documentation – are the cause of a repetitive strain or carpal tunnel injury. This is a far cry from the simple or common cases where the Court has permitted lay testimony on causation . *See, e.g., International Sec. Corp. of Virginia v. McQueen*, 497 A.2d 1076, 1080 (D.C. 1985) (in action for assault and battery, plaintiff was permitted to testify that the assault caused her injuries of "radiating pain in the left shoulder and a swelling under the left knee[.]"); *Jones v. Miller*, 290 A.2d 587, 591 (D.C. 1972) ("Because of the close proximity in time between the collision and appellant's subjective symptoms of physical injury and the fact that some pain is a natural consequence of a physical injury, we hold that it was within the province of the jury to infer, without the aid of expert medical testimony, that appellant's pain and suffering were caused by the appellee's negligence").

Plaintiff's reliance on Dr. Rozmaryn's medical notes – without the benefit of Dr. Rozmaryn's testimony – do not fill the void of required expert evidence. These notes are vague at best, and merely mention that Plaintiff's carpel tunnel and repetitive strain syndrome are "related to the work[,]" which Plaintiff alleges without any basis to mean the 16-month period at issue in this case. Plaintiff's Exhibit 197 at p. 2. However, the first record from Plaintiff's treatment with Dr. Rozmaryn on August 11, 2020 – which Plaintiff disingenuously omitted from her exhibits at trial – reveals why Plaintiff's interpretation of Dr. Rozmaryn's records must be rejected.

While Plaintiff asserted that she did not enter the August 11, 2020 note into evidence because of an "oversight[,]" Exhibit A at p. 107:3-6, this record significantly undermines Plaintiff's claim that the injuries to her hand were caused by working without a scribe. Notably, Dr. Rozmaryn's August 11, 2020 note reveals that Plaintiff "is a 57 year old woman who <u>for the past 3 years</u> has had steady increasing pain mostly numbness and tingling and color changes in her fingers." *See* August 11, 2020 medical record from Dr. Rozmaryn, admitted in evidence as Defendant's Exhibit 173 (emphasis added). Notably, as of August 2020, Plaintiff had only been working without a scribe for one year. Thus, Dr. Rozmaryn's August 11, 2020 record confirms that Plaintiff's hand symptoms were increasing long before she was ever required to work without a scribe. This is consistent with Dr. Levin's treatment notes – admitted at trial – revealing that Plaintiff's hand symptoms began well before July 29, 2019. *See* Dr. Levin's March 5, 2018 treatment note, admitted in evidence as Plaintiff's Exhibit 164 (noting that Plaintiff had presented to discuss "right arm and hand pain[,]" as well as "some tingling and cold sensation"). Even the March 27, 2019 treatment notes from Dr. Levin's partner and hand specialist, Dr. Sunjay Berdia, reveal that Plaintiff's hand symptoms of discoloration and numbness had been ongoing for one

year and were "getting worse" long before Plaintiff ever worked without a scribe. *See* Dr. Berdia's

March 27, 2019 treatment note, admitted in evidence as Plaintiff's Exhibit 200.

More importantly, Dr. Rozmaryn observed, in his August 11, 2020 note, that Plaintiff "has

no history of any night pain, <u>which rules out carpal tunnel syndrome</u>." Defendant's Exhibit 173

at p. 2 (emphasis added). This of course contradicts Plaintiff's assertion that carpal tunnel

syndrome was somehow brought about by Plaintiff's work without a scribe. Dr. Rozmaryn's only

other treatment note from the period of time that Plaintiff worked without a scribe – on October 6,

2020 – makes no mention of carpal tunnel syndrome at all. *See* Plaintiff's Exhibit 197 at pp. 1-2.

Indeed, the first reference to carpal tunnel syndrome does not appear until Dr. Rozmaryn's note

from February 2, 2021—almost three months after Plaintiff received a virtual scribe on November

19, 2020. *See* Plaintiff's Exhibit 197 at pp. 4-5. Given that Plaintiff was not diagnosed with carpal

tunnel syndrome until months after she received a scribe, there is no basis to assume that this

diagnosis was caused by working without a scribe.

Given that Dr. Rozmaryn's records – like those from Dr. Levin and Dr. Berdia – reveal

that Plaintiff's hand symptoms were worsening long before July, 2019, his references to "the

work," cannot be interpreted as "<u>work without a scribe</u>" during the time period in question. Indeed,

Plaintiff conceded that Dr. Rozmaryn's records do not contain any such conclusions about the 16-

month period at issue:

> Q. Well, Dr. Scott-McKinney, if we are limiting ourselves to the notes that we have
> in the record here today, which is Plaintiff's Exhibit 197 and Defendant's
> Exhibit 173, nowhere in either of these notes does Dr. Rozmaryn attribute your
> carpal tunnel syndrome to working without a scribe for 16 months, does it?
> A. No, he doesn't reference the period of time without the scribe. Correct.
> Q. And Dr. Rozmaryn also does not attribute your repetitive strain syndrome in
> these notes to the 16 months you worked without a scribe, does he?
> A. No, he didn't reference that.

11

Exhibit A at p. 107:7-18.  Quite simply, if Dr. Rozmaryn held any opinion about the 16-month period where Plaintiff worked without a scribe then Plaintiff could have easily called him as a witness to explain what he meant by "the work."  Dr. Rozmaryn has never testified at any proceeding in this case, and Plaintiff should not be permitted to rely on his ambiguous records to obfuscate the testimony of the only medical expert that she is "no worse off" as the result of working without a scribe.

## II. Plaintiff's Damage Calculations Exaggerate Her Weekly Patient Visits and Contradict Plaintiff's Employment Agreement

### A. Plaintiff improperly assumes that she would have seen 15 more patients per week if provided a scribe from July 29, 2019 to November 19, 2020.

Plaintiff claims that the failure to accommodate in this case caused her to work a reduced schedule of 6-hours per day since July 29, 2019, resulting in a reduction of 15 patient visits per week.  Exhibit A at p. 41:17-21, 45:19-21.  Plaintiff bases her estimated loss of 15 patient per week on a comparison of her yearly patient visits during Defendant's 2018 and 2019 fiscal years (July 1, 2017 to June 30, 2019) to Defendant's 2020 and 2021 fiscal years (July 1, 2019 to June 30, 2021).  Exhibit A at pp. 38:11-14, 39:20-40:1.  Yet, the drop in patient visits shown by comparing these fiscal years is easily explained on grounds other than Plaintiff's lack of a scribe.

Mr. Janowiak – who is intimately familiar with the productivity of all CP&A pediatricians – testified that the COVID-19 pandemic had a drastic impact on patient visits and patient revenue that Plaintiff and her colleagues experienced during fiscal years 2020, 2021 and beyond.  Exhibit at A pp. 128:10-16, 140:11-13.  Plaintiff confirmed as much, noting that she took telemedicine visits after the start of the pandemic, but still saw less patients than she had in fiscal years 2018 and 2019.  Exhibit A at pp. 76:4-21.  Plaintiff further confirmed that she "took off" 8 weeks of work in light of the COVID-19 pandemic in fiscal year 2020 but did not account for this 2-month

layoff in comparing fiscal years to show how much patient visits she lost because of working without a scribe. Exhibit A at p. 46:13-19. Mr. Janowiak also testified that, since fiscal years 2018 and 2019, Plaintiff's medical practice has gone from two locations with 16 exam rooms to one location with six exam rooms, "[s]o it's physically impossible to see that same volume of patients that [the physicians] were seeing in '18 and/or '19 with only one location." Exhibit A at p. 130:18-24. Thus, neither Plaintiff nor any other provider could reasonably be expected to match the patient visits or revenue achieved during fiscal years 2018 and 2019 during fiscal years 2020 and 2021. Exhibit A at p. 128:10-16. As such, Plaintiff cannot compare these fiscal years to show the patient visits lost because of working without a scribe.

The flaws in Plaintiff's claim that she could see 15 more patients per week if provided a scribe from July 19, 2019 to November 19, 2020 are revealed by Plaintiff's calculation of lost wages during fiscal year 2021 (June 1, 2020 to June 30, 2021) in Plaintiff's Exhibit 195. In this exhibit, Plaintiff calculates $31,618 in lost wages based on the assumption that, while working with a scribe, she could have seen 735 more patients and generated a total of $876,150 in revenue. Plaintiff's Exhibit 195. However, Plaintiff's estimate of $876,150 in patient revenue while working with a scribe exceeds Plaintiff's productivity during fiscal year 2019, which was both Plaintiff's and Defendant's most productive fiscal year to-date. Exhibit A at pp. 75:21-76:3, 131:6-13, 136:22-137:3. Surely, Plaintiff's best year in her 15-year career for Defendant should not serve as the baseline of patient visits that she could see with a scribe. This is especially so for fiscal years 2020 and 2021, when the patient visits and revenue of all physicians were adversely affected by the COVID-19 pandemic.

**B. Plaintiff's calculation of lost wages for fiscal years 2022-2033 are inconsistent with the compensation structure in Plaintiff's employment agreement.**

Plaintiff calculates her lost wages in fiscal years 2022 through 2030 (July 1, 2021 through June 30, 2030) by simply taking 32% of all additional revenue she claims she would have generated by seeing 15 more patients per week. Plaintiff's Exhibit 196 at pp. 1, 3; Exhibit A at pp. 112:15-113:22. However, Plaintiff recognized that she has an employment agreement with Defendant, which includes a detailed "Physician Compensation Program" describing how she is paid. Exhibit A at pp. 63:17-64:11; Plaintiff's Exhibit 1. Notably, Plaintiff conceded that she calculates lost wages as 32% of all revenue that she could have generated if seeing 15 more patient per week, notwithstanding that <u>her employment agreement does not provide that she will simply receive a percentage of patient revenue as wages</u>. Exhibit A at pp. 63:17-64:11.

Mr. Janowiak – who has been responsible for calculating the compensation of Plaintiff and her colleagues for several years – further testified that Plaintiff does not simply receive a percentage of her patient revenue as wages. Exhibit A at p. 134:21-24. Rather, Mr. Janowiak testified that Plaintiff's patient revenue is reduced by a percentage – determined by the inverse ratio of the medical practice's revenue to expenses – to determine the Plaintiff's "actual earned compensation." Exhibit A at p. 133:12-23. However, Plaintiff is not simply paid her actual earned compensation as wages. Exhibit A at p. 134:5-7. Rather, Plaintiff's actual earned compensation is reduced by Plaintiff's allocation of a "budget margin deficit," which is the shortfall between the medical practice's budgeted ratio of revenue to expenses versus the actual ratio of revenue to expenses. Plaintiff's Exhibit 1 at p. 23. Only after this allocation, will Plaintiff receive an incentive compensation payout for the amount by which her actual earned compensation exceeds the salary paid to Plaintiff during the fiscal year. Exhibit A at p. 132:4-23.

Accordingly, in calculating her front pay through June 30, 2030 as merely a percentage of all patient revenue, Plaintiff fails to account for the budget margin deficit, which reduced

Plaintiff's compensation by $12,554 in fiscal year 2020 and $38,444 in fiscal year 2021.  *See* Plaintiff's Exhibits 119 and 192.  Indeed, Plaintiff testified that she had no lost wages in fiscal year 2020 due in part to the budget margin deficit.  *See* Plaintiff's Exhibit 194; Exhibit A at pp. 46:23-47:5.  Yet, she entirely fails to account for this factor in all future fiscal years through June 30, 2030.  Thus, her calculations again put Plaintiff in an even better position than she would have been but for the failure to accommodate in this matter.

Moreover, Plaintiff's calculations of lost wages as a percentage of patient revenue were clearly copied and pasted from the report of Plaintiff's former vocational expert, Jody Malcolm.  *Compare* Plaintiff's Exhibit 196 at pp. 1 and 3 *with* Defendant's Exhibit 174 at pp. 10-11.  Plaintiff notably withdrew Ms. Malcolm as an expert shortly after Defendant filed a second motion *in limine* to exclude Ms. Malcolm's testimony, pointing out that Ms. Malcolm had testified under oath that her calculation of lost wages as a percentage of patient revenue did not reflect Plaintiff's employment agreement at all.  ECF No. 94-1 at pp. 7-8; ECF No. 97.  Given that Plaintiff utilizes the same charts as Ms. Malcolm – and concedes that her methodology is the same – Plaintiff's Exhibit 196 should likewise be disregarded by the Court as unreliable.  *See* Exhibit A at p. 94:20-23.

**C.  Plaintiff's claim for lost "employer match" contributions to her 401K account is entirely without merit.**

Plaintiff claims an additional $19,168.03 for lost employer contributions to her 401K savings account, which is 5% of all lost wages claimed in this matter.  Plaintiff's Exhibit 196 at pp. 1-3, 4.  However, Plaintiff testified that Defendant only matches up to 5% of all salary payments made to her and could not identify anywhere in Plaintiff's Exhibit 196 where she claims lost wages for a reduction in her salary.  *See* Exhibit A at pp. 111:15-112:14.  Indeed, Plaintiff's Exhibit 194, 195 and 196 strictly calculate Plaintiff's lost wages as lost "year-end incentive

payouts" based on a reduction in Plaintiff's patient revenue.  *See* Plaintiff's Exhibit 195.  Thus, the lost wages claimed by Plaintiff are not subject to Defendant's 401K employer matching contributions, and Plaintiff's claim for lost contributions to her 401K account must be rejected.

### D. Plaintiff's calculations overlook that her employment contract only extends through 2025 and that Defendant is in the process of changing the compensation structure.

While some speculation is necessary to determine front pay," such damages cannot be overly speculative, and must be supported by competent evidence allowing the court to project the plaintiff's losses into the future.  *Peyton v. DiMario*, 287 F.3d 1121, 1129 (D.C. Cir. 2002); *see also Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798 (8th Cir. 2013) (vacating award of front pay where the damages were overly speculative).  Here, Plaintiff's calculation of front pay through June 30, 2030 is overly speculative for two additional reasons.  First, Plaintiff employment contract with Defendant is only effective through January 1, 2025, with either party able to terminate the agreement with 90 days' notice in advance of that date.  Plaintiff's Exhibit 1 at pp. 1 and 7.  Second, Mr. Janowiak testified that Defendant is in the process of changing its compensation model for pediatricians and noted that he expects that Plaintiff will be compensated under a different model for fiscal years 2023 through 2030 (July 1, 2022 through June 30, 2030).  Exhibit A at pp. 157:20-158:2.  Thus, Plaintiff cannot reasonably calculate lost wages under her <u>current</u> compensation model through June 30, 2030—five years past the expiration of her current employment agreement.

### III.    Plaintiff Did Not Lose Any Wages from July 29, 2019 to November 19, 2020

Once Plaintiff's claim for lost wages is appropriately limited to the 16-month period at issue in this litigation, the evidence demonstrates that Plaintiff has not lost any compensation as the result of Defendant's failure to accommodate.  Plaintiff only worked without a scribe from July 29, 2019 to November 19, 2020—spanning parts of Defendants 2020 and 2021 fiscal years (July

1, 2019 to June, 30, 2021). As referenced above, Plaintiff has conceded that she did not experience any lost wages during fiscal year 2020 – covering the first 11 months when Plaintiff worked without a scribe. *See* Plaintiff's Exhibit 194. Thus, the only period of time at issue for purposes of this Court's adjudication of lost wages is the first five months of fiscal year 2021 (July 1, 2020 to November 19, 2020).

During the evidentiary hearing, Mr. Janowiak credibly testified that Plaintiff did not lose any compensation during the 2021 fiscal year. Mr. Janowiak demonstrated this with Defendant's Exhibit 192A. As explained by Mr. Janowiak, Exhibit 192A was created by modifying the fiscal year 2021 Annual Physician Compensation Report (Plaintiff's Exhibit 192), which Mr. Janowiak used to calculate incentive compensation based on the revenue generated by Plaintiff and her colleagues. Exhibit A at pp. 145:18-146:3. In Defendants Exhibit 192A, Mr. Janowiak replaced the revenue that Plaintiff had actually generated while working without a scribe ($714,450 on Exhibit 192) with $764,416. *See* "Annual Actual NMR Total" on Defendant's Exhibit 192A. Mr. Janowiak calculated this additional revenue by assuming that, if Plaintiff had a scribe during the first two quarters of fiscal year 2021 (July 1, 2020 to December 31, 2020), Plaintiff would have been able to generate $192,370 during each of these two quarters ($384,740 combined). *See* Defendant's Exhibit 192A; Exhibit A at pp. 148:11-20, 153:3-12. Mr. Janowiak selected $192,370 per quarter because that was the amount of revenue that Plaintiff was able to generate during her quarter three of fiscal year 2021, which was her most productive quarter while working with a scribe. Exhibit A at p. 148:11-20; *see also* "Annual Actual NMR Q3" in Plaintiff's Exhibit 192.

Thus, Defendant's Exhibit 192A – using the same formulas created by Mr. Janowiak in Plaintiff's Exhibit 192 – demonstrates what Plaintiff's compensation would have been if she had generated an additional $52,966 in patient revenue by working with a scribe during the entirety of

the 2021 fiscal year.  *Compare* "Annual Actual NMR" in Plaintiff's Exhibit 192 *with* the same figure in Defendant's exhibit 192A.  Notably, Defendant's Exhibit 192A shows that, even with an additional $52,966 in patient revenue, Plaintiff's "actual earned compensation after budget margin deficit" is still less than her "base compensation paid."  *See* Exhibit 192A.  Thus, Plaintiff would not have made any more money in fiscal year 2021 if she had a scribe for the entirety of the fiscal year.  *See* Exhibit A at pp. 149:23-150:6.  In both Plaintiff's Exhibit 192 and Defendant's Exhibit 192A, the "year-end incentive payout" to Plaintiff remains $0.  *Compare* Plaintiff's Exhibit 192 *with* Defendant's exhibit 192A.

Even assuming, *arguendo*, that the Court prefers Plaintiff's own calculation of lost wages to Mr. Janowiak's – which it should not given the exaggerated patient visit numbers pointed out in Part II.a, *supra*. – Plaintiff's lost wages during the 16-month period at issue are a mere $1,667.  *See* Plaintiff's Exhibit 195A.  Plaintiff's Exhibit 195A was created via Plaintiff's own testimony on cross examination during the evidentiary hearing and reflects Plaintiff own calculation of lost wages when reduced from 49 weeks to 20 weeks to account for the time from July 1, 2020 to November 19, 2020.  Exhibit A at pp. 78:15-85:9.  When asked about the numbers reflected in Plaintiff Exhibit 195A, Plaintiff agreed that her lost wages from July 29, 2019 to November 19, 2020 are only $1,667.  Exhibit A at p. 84:15-85:2.  Therefore, in the alternative event that the Court credits Plaintiff's exaggerated calculation of lost wages, the most that can be awarded to Plaintiff is $1,667.

**IV.    Plaintiff is Not Entitled to Injunctive Relief**

Defendant previously addressed Plaintiff's clam for injunctive relief in its' Post-Trial Brief on Plaintiff's Economic Damages and Opposition to Plaintiff's Motion for Injunctive Relief (ECF No. 93), at pp. 10-16.  Defendant refers the Court back to the authority and arguments cited in its

brief for why Plaintiff is not entitled to any injunctive relief in this matter. Defendant further emphasizes the testimony of its Director of Business Operations, Mark Janowiak, at the evidentiary hearing, noting that Defendant has no plans to remove Plaintiff's current scribe and has budgeted to continue providing the accommodation into the future. Exhibit A at p. 158:3-10. Based on this undisputed testimony, Plaintiff cannot reasonably contend that there is any danger of recurrent failure to accommodate, such that an injunction requiring permanent provision of a scribe is permissible. *See Sourgoutsis v. United States Capitol Police*, No. 16-CV-1096 (KBJ), 2020 WL 6887782, at *3 (D.D.C. Nov. 24, 2020).

Plaintiff has also failed to cite to any authority which would allow her to obtain the requested injunctive relief of company-wide manager training and positing of notices, as she does not dispute the authority that injunctive relief "should generally apply only to the plaintiff where a class has not been certified." *See* ECF No. 93 at p. 16. Plaintiff only emphasizes the *dicta* from a concurring opinion in *Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 775 n.13 (D.C. App. 1993) that an aggrieved person under the DCHRA acts as a "private attorney general." ECF No. 96 at p. 10. However, *Timus* did not concern injunctive relief for a claim of employment discrimination at all and did not remotely hold that a single plaintiff who proves only one instance of failure to accommodate under the DCHRA can seek company-wide injunctive relief. Thus, Plaintiff's reliance on *Timus* in misplaced.

## **CONCLUSION**

For the foregoing reasons, Defendant Children's National respectfully requests that this Court deny Plaintiff's request for injunctive relief and lost wages.

Date:  May 16, 2022                    Respectfully submitted,

                                       */s/ Kraig B. Long*
                                       Kraig B. Long, Bar#467858
                                       Jeffrey T. Johnson, Bar#1724768
                                       Nelson Mullins Riley & Scarborough, LLP
                                       100 S. Charles Street, Suite 1600
                                       Baltimore, MD 21201
                                       Tel: 443-392-9460
                                       Fax: 443-392-949
                                       Kraig.Long@nelsonmullins.com
                                       Jeffrey.Johnson@nelsonmullins.com
                                       **Counsel for Defendant**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of May 2022 the foregoing Post-Trial Brief on

Front and Back Pay Damages was served via the Court's ECF system on:

                    Eric L. Siegel
                    KALBIAN HAGERTY, LLP
                    888 17th Street, N.W., Suite 1000
                    Washington, D.C. 20006
                    (202) 419-3296
                    esiegel@kalbianhagerty.com

                    **Counsel for Plaintiff**


                    Kraig B. Long



# Transcript of David Levin, M.D.

**Date:** January 20, 2022

**Case:** Scott-McKinney -v- Children's National Medical Center, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of David Levin, M.D.
Conducted on January 20, 2022

---

41

1  happy medium.  The scribe substantially diminished
2  her charting requirements, but there was still some
3  charting requirements even with a scribe.  We still
4  have to review the note produced by the scribe.  We
5  still have to edit it.  We still have to do your
6  prescriptions and your forms for, you know, for
7  children, for school, and for gym class, etc.
8          And so at this point we were again trying
9  to find that right balance for her which we arrived
10 at still staying with the six-hour direct patient
11 care plus a scribe and see if that would control her
12 pain adequately.
13     Q    Is it your view that six hours is
14 something that she's going to be keeping or not
15 keeping?
16     A    Well, at this point at least as of our
17 last several visits, that seemed to be the right
18 number for her.  That six hours of direct patient
19 care which, again, you know, she's in the office for
20 I'm sure two to four hours after that on a given
21 day, that that would be the amount of additional
22 charting over and above what the scribe is able to

---

42

1  help her with that she would be able to allow her to
2  tolerate her disability.
3      Q    Based on your treatment of
4  Dr. Scott-McKinney over the roughly three and a half
5  to four years that you've been seeing her, how would
6  you characterize or describe the effectiveness of
7  using a scribe in terms of maintaining manageable
8  pain from her physical condition while maintaining
9  productivity as a physician?
10         MR. JOHNSON: Objection.
11     A    I would say it was very helpful for her
12 both in terms of objectively improving range of
13 motion in the neck, subjectively reporting decreased
14 pain and the ability to continue her work and remain
15 productive and not have to retire early.
16         The decrease in the amount of charting
17 that Dr. Scott-McKinney does was going to be
18 paramount for her to be able to continue to work as
19 a pediatrician, and the only really two options
20 available, you know, save a dramatic change to her
21 electronic medical record, which I guess would be a
22 third, would be to dramatically diminish the number

---

43

1  of patients she sees and, therefore, the amount of
2  charting she has to do or to get help with the
3  charting from a scribe.
4          MR. SIEGEL:  Thank you very much, Doctor.
5  I have no further questions.  Opposing counsel may.
6          EXAMINATION BY COUNSEL FOR THE DEFENDANT
7  BY MR. JOHNSON:
8      Q    Yeah, Doctor, I will have some cross for
9  you, but I'd like to go off the record for maybe
10 just two minutes and then we'll come back on and
11 we'll resume.
12         THE VIDEOGRAPHER:  Okay.  Going off the
13 record.  The is 6:14 p.m., Eastern Time.
14         (A brief recess was held.)
15         THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 6:16 p.m., Eastern Time.
17 BY MR. JOHNSON:
18     Q    Good afternoon, Dr. Levin.  As you know,
19 my name is Jeff Johnson.  I'm one of the attorneys
20 representing the defendant Children's National
21 Medical Center in this case.
22         I have a couple of question for you in

---

44

1  follow-up to Mr. Siegel's questioning.
2          The first is, Doctor, your diagnosis of
3  Dr. Scott-McKinney is a degenerative condition; is
4  that correct?
5      A    The C5-6 disc is -- problem is a
6  degenerative one, yes.
7      Q    Okay.  And, Doctor, degenerative means
8  that the condition develops over time, right?
9      A    Correct.
10     Q    Okay.  And, Doctor, if I understand your
11 earlier testimony, it is not your opinion that
12 computer work caused the discs in
13 Dr. Scott-McKinney's neck to degenerate, right?
14     A    Correct.
15     Q    Okay.  Rather, it's that working on the
16 computer exacerbated the symptoms associated with
17 her degenerative condition; is that right?
18     A    That's my contention, exactly.
19     Q    Right.
20         Now, Doctor, the computer work that
21 aggravates Dr. Scott-McKinney's symptoms are typing,
22 mousing, and clicking; is that right?

---

USCA Case #22-7113    Document #1975465    Filed: 11/29/2022    Page 534 of 552
Case 1:19-cv-02980-TNM    Document 104-2    Filed 05/16/22    Page 3 of 5

Exhibit B
18 (69 to 72)

Transcript of David Levin, M.D.
Conducted on January 20, 2022

---

69

1    A    Yes.
2    Q    Okay.  And, Doctor, this is something
3 that Dr. Scott-McKinney was pretty upbeat about,
4 right?
5    A    **Specifically, I said she notes**
6 **improvement down to a 3 out of 10.  So I think that**
7 **would -- what you said would characterize it**
8 **properly.**
9    Q    So, Doctor, Dr. Scott-McKinney's symptoms
10 improved while working under the limitation of four
11 hours of direct patient care, right?
12    A    **Relative to where she was working under**
13 **the six hours of direct patient care, yes.**
14    Q    Okay.  And, Doctor, when you recommend
15 either a four-hour limitation on patient care or a
16 six-hour limitation on patient care, to your
17 knowledge, Dr. Scott-McKinney's employer allowed her
18 to work under that limitation?
19    A    **That's correct.**
20    Q    Now, Dr. Levin, you've previously opined
21 in this litigation that a limitation on
22 Dr. Scott-McKinney's computer work would not be

---

70

1 medically necessary if she had a scribe, right?
2    A    **Well, there was a time when I thought**
3 **that that would be adequate for her to get back to**
4 **her previous eight-hour patient care.  And certainly**
5 **it allows her to do her six hours of patient care,**
6 **which she would've been unable to do at least**
7 **consistently outside the pandemic lull without the**
8 **use of a scribe.  But we never tried to get her back**
9 **to eight hours of full patient care with the use of**
10 **a scribe.**
11    Q    Right.
12        And, Doctor, when you were deposed on
13 July 7th of 2020, I asked you if Dr. Scott-McKinney
14 had a scribe, would there be any need for a
15 limitation on her computer work and you said there
16 would not.  Does that sound correct?
17    A    **Correct.  That was my hope for her.**
18    Q    Okay.  And, Doctor, you're aware that
19 Dr. Scott-McKinney's been utilizing a virtual scribe
20 since November of 2020, right?
21    A    **I wasn't aware either way since the last**
22 **time I saw her in January of last year.**

---

71

1    Q    Well, Doctor, as of your visit note with
2 her in November of 2020 -- 2021, she was using the
3 virtual scribe, right?
4    A    **I believe that's right.**
5    Q    Okay.  And, Doctor, notwithstanding that
6 Dr. Scott-McKinney's been using a virtual scribe for
7 more than one year, you've kept her on the
8 limitation of six hours of computer work, right?
9    A    **Correct.**
10    Q    And she's working under that limitation
11 to this date?
12    A    **I believe so.**
13    Q    Now, Dr. Levin, the pain associated with
14 Dr. Scott-McKinney's condition, it can have good
15 months and bad months, good days and bad days
16 irrespective of the use of a scribe, right?  Is that
17 fair?
18    A    **That is fair, yes.**
19    Q    Okay.  And Dr. Scott-McKinney has not
20 been pain free since receiving a virtual scribe in
21 November of 2020, has she?
22    A    **She has not been pain free since 2017.**

---

72

1    Q    Okay.  So she hasn't been pain free at
2 any time since 2017 to the present, right?
3    A    **Not that I'm aware of, no.**
4    Q    Okay.  And, Doctor, you're not aware of
5 any accommodations that would allow
6 Dr. Scott-McKinney to be pain free, are you?
7    A    **No.**
8    Q    And, Doctor, you don't believe that
9 Dr. Scott-McKinney's pain has permanently worsened
10 as a result of working without a scribe, do you?
11    A    **I believe that her condition was**
12 **aggravated during those 16 hours [sic].  But more**
13 **likely than not, the structural changes to her discs**
14 **were -- would not be made worse by that aggravation.**
15    Q    So there were no lasting effects on
16 Dr. Scott-McKinney from the period of time from July
17 of 2019 to November of 2020, when she did not have a
18 scribe?
19    A    **Well, her symptoms are -- she's not able**
20 **to tolerate the same amount of time that she was**
21 **working prior to those 16 hours [sic].  So either**
22 **her condition has worsened, which happens sometimes**

Transcript of David Levin, M.D.
Conducted on January 20, 2022

73

1 over time, or there was an impact of that.
2         The -- we -- even with the -- she's only
3 tolerating six hours of direct patient care after
4 the return of the scribe where prior to the
5 16 months of absence she was tolerating eight hours.
6 So something is responsible for that progression,
7 but I cannot with say medical certainty that her
8 conditions worsened as a result of not having that
9 scribe.
10    Q    So as we sit here today, Doctor, you
11 don't have any opinion as to whether or not working
12 without a scribe from July of 2019 to November of
13 2020, is the cause of any limitations or pain
14 currently experienced by Dr. Scott-McKinney, do you?
15    A    Well, I can say that her condition has
16 worsened.  But I cannot say that that's the direct
17 cause.
18    Q    Okay.  And, Dr. -- Dr. Levin, you recall
19 when I deposed you in November -- on November 16 of
20 2021, I asked you -- and this is on Page 71 of your
21 transcript, Line 10: I'd asked you: "To the extent
22 Dr. Scott-McKinney is experiencing any pain or

74

1 limitations in the present day, do you attribute
2 that to the period of time when she did not have a
3 scribe between July of 2019 and November of 2020?"
4         And your answer was: "I do not.  I do
5 not think she is necessarily worse off now than had
6 she had the scribe all along."
7         Wasn't that your testimony?
8    A    Yes.  Although, she does have less
9 tolerance of her workday even -- even with the
10 scribe now than she did have prior to 16 months ago.
11 But I stand by the fact that I cannot say with
12 certainty that the absence of a scribe that's made
13 her worse.
14         MR. JOHNSON:  Thank you, Dr. Levin.  I
15 have nothing further.
16    REDIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF
17 BY MR. SIEGEL:
18    Q    Dr. Levin, I want to refer you back to
19 the last question that counsel asked you where he
20 read the transcript from your November 2021
21 deposition.  He appeared to have only read part of
22 your testimony.  If, in fact, you go to Page 71

75

1 starting with Line 10 where he asked you the
2 question:  "So to the extent Dr. Scott-McKinney's
3 experiencing any pain or limitations in the present
4 day, do you attribute that to a period of time when
5 she did not have a scribe between July of 2019 and
6 November 2020?"
7         And your answer completely was, answer
8 (as read):  "I do not.  I do not think she is
9 necessarily worse off now than had she had the
10 scribe all along.  I think she dealt with a lot of
11 increased pain for that year based on her current or
12 as of her last visit a year ago.  Nearly her range
13 of motion's back to that, which she had
14 previously -- when she had had the scribe or close
15 to it, the pain was back to where she had been with
16 her pain.  Yes."
17         Is that your answer?
18    A    Yes.
19    Q    And so notwithstanding the issue of pain,
20 when counsel asked you about it being subjective,
21 during the course of your treatment over the roughly
22 three and a half years to four years of treatment of

76

1 her, you did range-of-motion assessments on each
2 visit, correct?
3    A    Yes.
4    Q    And were you able to objectively verify
5 that notwithstanding whatever pain she had, she
6 certainly had changes in her range of motion that
7 were debilitating?
8    A    Yes.
9         MR. JOHNSON:  Objection.  Leading.
10    Q    Was it your goal in having a combination
11 of a six-hour direct patient care limitation and
12 having a scribe to ensure that Dr. Scott-McKinney
13 could manage her pain and still be productive as a
14 pediatrician?
15         MR. JOHNSON:  Objection.
16    A    Yes.  Yes.  The purpose was to try to
17 allow her to continue to work, which was becoming
18 increasingly difficult.  Certainly with a full work
19 schedule and without a scribe, it was not going to
20 be possible to continue to work for, certainly, much
21 longer.
22         So, yes, we're trying to find some way of

Transcript of David Levin, M.D.
Conducted on January 20, 2022

77

1  getting her to do the work that she loves and that
2  she's good at doing without, you know, without
3  causing substantially increased pain.
4      MR. SIEGEL:  Thank you very much for your
5  time.  I have no further questions.
6      MR. JOHNSON:  Thank you, Dr. Levin.
7      MR. SIEGEL:  Thank you.
8      THE WITNESS:  You're welcome.
9      THE VIDEOGRAPHER:  And this concludes
10 today's deposition of Dr. David Levin.  Going off
11 the record.  The time is 6:53 p.m., Eastern Time.
12      (The following discussion was held off
13 the videotaped record.)
14      THE COURT REPORTER:  Transcript orders?
15      MR. JOHNSON:  We would like to order the
16 transcript.
17      MR. SIEGEL:  I would like to order a full
18 transcript and a condensed or mini in addition to
19 the video, obviously.
20      (Off the Record at 6:55 p.m.)
21          *   *   *
22

78

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Avinoam Miller, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the foregoing transcript is a true and
5   accurate record of the testimony given; that said
6   testimony was taken by me stenographically and
7   thereafter reduced to typewriting under my
8   direction; that reading and signing was not
9   requested; and that I am neither counsel for,
10  related to, nor employed by any of the parties to
11  this case and have no interest, financial or
12  otherwise, in its outcome.
13
14       In WITNESS WHEREOF, I have hereunto set
15  my hand and fixed my notarial seal this 31st day of
16  January 2022.
17
18  My commission expires:  November 9, 2023.
19
20
21  NOTARY PUBLIC IN AND FOR
22  THE STATE OF MARYLAND

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **STACY SCOTT-MCKINNEY, M.D.**, <br><br> Plaintiff, <br><br> v. <br><br> **CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM**, <br><br> Defendant. | Case No. 1:19-cv-02980 (TNM) |

## MEMORANDUM OPINION

Dr. Stacy Scott-McKinney sued Children's National Medical Center (Children's National, or the Hospital) under the D.C. Human Rights Act. She alleged the Hospital discriminated against her because of her disability when it denied her a scribe to assist in her work as a physician. A jury agreed and awarded $200,000 in non-economic damages. Scott-McKinney now seeks more remedies—injunctive relief, back pay, and front pay—and the Hospital objects. The Court held an evidentiary hearing and received post-hearing briefing on remedies. Considering the evidence adduced at trial and the post-trial damages hearing, as well as the parties' briefing, the Court finds Scott-McKinney is entitled to some prospective injunctive relief but has not proven economic damages.

## I. FACTUAL BACKGROUND AND LEGAL PRINCIPLES

As early as 2017, Scott-McKinney had pain and other symptoms in her neck, shoulder, and hand. Both parties agree Scott-McKinney's physical ailments make her "disabled" under federal and D.C. law. Her work as a physician in the Hospital's Laurel, Maryland, practice—in

particular, typing and clicking during medical notetaking—exacerbated that disability. The Hospital provided Scott-McKinney a scribe to assist in those notetaking responsibilities to ameliorate her pain. Then, from July 2019 to November 2020, the Hospital removed the scribe.

Scott-McKinney sued. She argued the Hospital's failure to provide a scribe violated the District's anti-discrimination law (the D.C. Human Rights Act or DCHRA). A jury agreed, awarding $200,000 in non-economic damages. The only remaining question is whether the Court should also award back pay, front pay, and/or injunctive relief.

The DCHRA allows a plaintiff to recover "damages and such other remedies as may be appropriate." D.C. Code § 2-1403.16(a). Those remedies may include an "order . . . requiring such respondent to cease and desist from such unlawful discriminatory practice" as well as "compensatory damages to the person aggrieved by such practice." *Id.* § 2-1403.13(a)(1), (a)(1)(D); *see also id.* § 2-1403.16(b). A court may make factual findings to determine what relief is appropriate, but those findings and the relief it awards must be "consistent with the jury verdict." *Porter v. Natsios*, 414 F.3d 13, 21 (D.C. Cir. 2005). Ultimately, the plaintiff bears the burden of "proving damages with reasonable certainty." *Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 109 (D.D.C. 2018) (cleaned up); *see also* D.C. Mun. Regs. tit. 4 § 200.3 (noting an intent to "award damages of any nature whatever which can be fairly proved to have resulted from acts of discrimination").

Ultimately, Scott-McKinney does not show she suffered—or will suffer—economic damages because of Children's National failing to provide a scribe. She *has* shown a reasonable likelihood Children's National may discriminate against her again by removing her scribe, entitling her to an injunction prohibiting the Hospital from doing so. There is no evidence, however, showing a need for broader, company-wide relief.

The Court explains its conclusion for each form of relief below, but certain credibility findings are relevant to all forms of relief and thus warrant preliminary discussion.  At the evidentiary hearing, Scott-McKinney testified about her symptoms, their effect on her work, and her alleged lost wages due to losing her scribe.  She also proffered several demonstrative exhibits, videotaped deposition testimony from Dr. David Levin (one of her treating physicians) introduced at trial, and doctor's notes documenting her disability diagnosis and prognosis.  Children's National relied mostly on Levin's videotaped deposition testimony, live testimony at the evidentiary hearing from its Director of Business Operations, Mark Janowiak, and cross-examination of Plaintiff's witnesses.  Reviewing this evidence, the Court makes the following initial findings of fact:

- Scott-McKinney is a generally credible witness.  Her demeanor throughout the evidentiary hearing was calm and precise, suggesting honesty.  Substantively, Scott-McKinney gave compelling testimony showing that her disability has limited her ability to manage a typical patient load.

- Janowiak is a highly credible witness with background knowledge that makes him uniquely qualified to testify about physician compensation at Children's National.  Because Janowiak calculates physician pay at the Laurel Practice, he is well-positioned to opine on whether (and how much) Scott-McKinney lost out on compensation during the time she worked without a scribe.  He came across as very intelligent and competent in his field.

- When Scott-McKinney and Janowiak's back/front pay calculations conflict, the Court finds Janowiak's testimony more credible.  Although the Court found Scott-McKinney to be generally credible, her testimony on this point is self-serving—she has every incentive to inflate her past and potential lost wages to increase her pay—and well outside her area of expertise.  More, her lost-pay calculations appear to be adopted from a now-abandoned expert report, and cross-examination during the evidentiary hearing showed those calculations do not reflect how the Hospital compensates physicians.  By contrast, Janowiak's testimony was well-supported by actuarial explanation.

- Doctor's notes recording Plaintiff's diagnosis and treatment are probative but ultimately entitled to little weight.  The Court found adequate foundation authenticating those notes, but they do not (on their face) establish causation between Scott-McKinney's disability and the Hospital removing her scribe.  Without supporting testimony to provide that causal link, they are of little probative value.

With these general findings of fact in mind, the Court turns to its more particularized findings for each form of relief.

## II. BACK PAY

Scott-McKinney is not entitled to back pay because the evidence shows the Hospital's discrimination did not impact her pay in Fiscal Year 2020 or Fiscal Year 2021.

To understand why requires some understanding of how Children's National compensates physicians. The Hospital's physician pay consists of base compensation and incentive compensation. *See, e.g.*, Pl.'s Ex. 119 (FY 2020 Annual Physician Compensation Reconciliation Report). Janowiak, explained how those two forms of pay break down. Children's National calculates what it calls "actual earned compensation" by multiplying a physician's net medical revenue by an inverse expense ratio (total expenses/total charges). *See* May 2, 2022, Remedies Hearing Tr. (RH Tr.) 133:15–134:11 (Testimony of M. Janowiak). A physician's base compensation is 85% of the rolling three-year average of that actual earned compensation figure. *See id.* at 134:10–11. If a physician's annual actual earned compensation exceeds her base compensation, she can receive that excess as incentive pay. *See id.* at 132:16–17. But, if a practice runs a budget deficit, actual earned compensation is reduced on a *pro rata* basis so that all physicians bear their share of the shortfall. *See id.* at 135:8–14.[1]

---

[1] "Senior" physicians may also earn a "junior doctor credit"—essentially a percentage of revenue generated by less-experienced doctors in the practice. *See, e.g.*, Pl.'s Ex. 192 (FY 2021 Annual Physician Comp. Reconciliation Rep't).

Applying this compensation formula, Scott-McKinney did not lose any pay in FY 2020 due to the Hospital's discrimination.[2]  The Laurel Practice ran a significant budget margin deficit—$54,381—because of business shutdowns occasioned by COVID-19, which in turn meant none of the practice's physicians were eligible for incentive pay in Q3 or Q4.  *See* Pl.'s Ex. 194; Pl.'s Ex. 119; RH Tr. 140:16–17 ("When it first hit, they essentially stopped visits. All visits stopped."); *id.* at 143:4–11.  Scott-McKinney concedes the Hospital's failure to provide a scribe did not cause her any back-pay losses in FY2020.  *See* RH Tr. 47:4–5.

The real dispute concerns whether Plaintiff lost incentive pay in FY 2021.  She testified that working without a scribe made her documentation responsibilities significantly more onerous.  *See, e.g.*, RH Tr. 28:17–19 ("I had a very difficult time managing really long hours. I brought work home routinely, worked into the middle of the night routinely.").  And her symptoms apparently worsened and took on new dimensions during that time.  *See, e.g.*, *id.* at 28:22–24 ("I had worsening neck and shoulder pain, and I also had quite significant hand symptoms, cold, achy, numb, blue hand.").

But Scott-McKinney has not shown her loss of efficiency caused her to lose out on incentive pay.  To the contrary, the evidence shows that even with a scribe Plaintiff likely would have been paid the same.  This was evident in Janowiak's testimony.  He presented a hypothetical compensation calculation for FY 2021, replacing the two FY 2021 quarters Scott-McKinney operated *without* a scribe with figures representing her best financial quarter *with* a

---

[2]  There was some confusion at the evidentiary hearing about whether Scott-McKinney claims losses in base salary, losses in incentive payout, or some combination of both.  *See* RH Tr. 108:19–112:3.  But Plaintiff ultimately acknowledged "loss in base salary[ ] is not calculated" in her back-pay loss calculations.  *Id.* at 112:11–13.  And, if there were any doubt, her own exhibits calculate back-pay losses as a "Year-End Incentive Payout."  *See, e.g.*, Pl.'s Ex. 195 (line 36).

virtual scribe.[3] *See* Def.'s Ex. 192A (Hypothetical FY 2021 Annual Physician Comp.

Reconciliation Rep't); RH Tr. 148:13–16.  Even with that Plaintiff-friendly calculation, Scott-

McKinney's actual earned compensation (after budget margin) would not exceed her base

compensation.  *See id.* at 150:2; *see also* Def.'s Ex. 192A (actual earned compensation:

$233,270; base compensation: $236,820; incentive payout: $0).  This is because of FY 2021's

particularly high budget margin deficit.  *Compare* Pl.'s Ex. 110 (FY 2018 Annual Physician

Comp. Reconciliation Rep't) (showing a budget margin deficit of $30,039), *with* Pl.'s Ex. 195

(FY 2021 Reconciliation Rep't) (showing a budget margin deficit of $154,028).[4]  So there is a

straightforward, nondiscriminatory explanation for Plaintiff not receiving incentive pay.

Seeking to avoid this conclusion, Scott-McKinney offers an alternative calculation.  In

her post-evidentiary hearing briefing, she summarizes her methodology as follows:

- She reviewed the "Summary by Provider" documents (Pl.'s Exs. 97 & 193) to determine her annual patient visits and annual revenues that she generated for fiscal years 2018 through 2021.

- She then took all her patient visits by fiscal year for FY 2018 and 2019 and compared those numbers to those of FY 2020 and 2021 to determine the average lost patient visits of 763. See Pl. Ex. 196 at 2. This corroborated her assumption of losing about 15 patient visits per week, or 735 patient visits per year (15 patient visits x 49 weeks, which reflects vacations) based on a reduced direct patient care schedule of six hours versus eight.

---

[3]  Although these figures are hypothetical, the Court has already explained that Janowiak is "a witness who is well-positioned to make the assumption[s]" underlying them.  RH Tr. 148:6–7.  Scott-McKinney says the hypotheticals are faulty because they rely on her performance under a 6-hour work-restriction with a virtual scribe post-November 2020, rather than her performance in the 13 years before losing her scribe.  *See* Pl.'s Br. on Remedies 13 n.12.  Plaintiff did not meaningfully impeach Janowiak on this point at the evidentiary hearing.  And in any case, it makes little sense to rely on Scott-McKinney's performance in the years before her disability deteriorated.  The question is how much revenue she could have generated in FY 2021 while coping with limiting symptoms, not how much revenue she could generate before her symptoms became apparent.

[4]  Plaintiff acknowledged the uniquely high budget margin deficit in FY 2021.  *See* Pl.'s Br. on Remedies 14 ("FY 2021 was plagued by COVID-related expenses . . . .").

- She then determined that her average revenue per patient visit for FY 2020 was $192.50 by dividing her total revenue for that fiscal year by her total patient visits for the year.

- She performed the same calculation for FY 2021 to arrive at an average revenue per patient visit of $220.00.

- She then used Defendant's Annual Physician Compensation Reconciliation Reports for fiscal years 2020 and 2021 (Pl. Exs. 119 and 192), applied the formulas contained there, which came directly from her Employment Agreement's Physician Compensation Plan (Pl. Ex. 1, App'x C), and performed the calculations to determine her back pay loss.

Pl.'s Br. on Remedies 12, ECF No. 103.

The Court finds this methodology is unreliable. Scott-McKinney's calculations largely rely on multiplying purported lost revenue (due to working less without a scribe) by a "conservative" baseline of how much of the practice's revenue Plaintiff generates (32%). *See* Pl.'s Ex. 196. But there's at least two problems with that approach.

*First*, as Scott-McKinney admits, Children's National does not determine her compensation that way. *See* RH Tr. 112:21 –113:3 ("Q: Does your employment agreement provide that you will be paid a percentage of your patient revenue as wages? . . . A: I don't think so but I would have to read it again."); *see also* Pl.'s Ex. 1 (Employment Agreement). *Second*, and more fundamentally, her "lost revenue" calculation appears to attribute 100% of the reduction in patient visits to the Hospital's discrimination—it does not reflect other reasons she may have seen a reduced patient load in FY 2021 compared with FY 2019. For example, nowhere does the "reduced patient visits" calculation account for Plaintiff's 3-week vacation or her 8-week sabbatical for COVID-19.[5] *See* RH Tr. 46:14–19. Nor does it consider that the practice shut down its second location. *See id.* at 130:18–24 ("They are now in one location,

---

[5] This omission is particularly strange because Scott-McKinney *does* account for her vacation and sabbatical in calculating the total number of weeks she worked.

with six exam rooms [as opposed to 16], and the same number of providers. So it's physically

impossible to see that same volume of patients that they were seeing in '18 and/or '19 with only

one location."). And it does not acknowledge that one of Scott-McKinney's baseline years—FY

2019—was "an abnormally good year." *Id.* at 131:9–10.

Given all this, the Court has serious doubts about the reliability of Plaintiff's back-pay

calculations. She selected a methodology that differs significantly from how Children's National

calculates her compensation. In doing so, she ignored contributing factors that might reduce her

overall back pay recovery while relying on baselines that are uniquely favorable to her. By

contrast, Janowiak gave detailed, well-supported testimony explaining (1) how physicians at

Children's National are compensated, (2) why physicians in the Laurel practice saw reduced

patient loads in FY 2021, and (3) why even Plaintiff's best quarter with a virtual scribe would

not have earned her any more compensation in FY 2021 due to an unusually high budget margin

deficit. And Scott-McKinney never successfully impeached Janowiak on the accuracy of these

points.

Given all this, the Court finds Plaintiff has not proved back-pay damages to a "reasonable

certainty." *Robinson*, 341 F. Supp. 3d at 109 (cleaned up).[6]

### III. PAY AFTER NOVEMBER 2020/FRONT PAY

The next question is whether Plaintiff is entitled to compensation for *ongoing* harm

caused by the Hospital's failure to provide a scribe for 16 months. The Court finds Scott-

---

[6] By extension, Scott-McKinney has no right to lost employer contributions on her purported
back-pay losses. The Court therefore denies that requested relief as well.

McKinney has not shown the Hospital's discrimination caused lasting harm that will undermine her ability to earn compensation when working with a scribe.

Plaintiff's argument in favor of front pay is straightforward, relying on two premises. First, she says "excessive typing" without a scribe from July 2019 to November 2020 caused her repetitive strain injuries. Pl.'s Br. on Remedies 5. Second, those repetitive strain injuries form "the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care." *Id.* 6–7. As a result, she argues, she is entitled to front pay to compensate her for the added revenue she would have generated but-for the Hospital's discrimination. *Id.* 18; *see also* Pl.'s Ex. 196 at 2 (Front Pay Calculation).

Scott-McKinney offers a variety of evidence to establish premise one—that working without a scribe caused her repetitive strain injuries.

At the evidentiary hearing on damages, Plaintiff testified that during the 16 months without a scribe she "had a very difficult time managing really long hours" and that she "had quite significant hand symptoms, cold, achy, numb, blue hand." RH Tr. 28:11–19; *id.* 28:20–24. Scott-McKinney eventually sought care from Dr. Leo Rozmaryn, *see* Pl.'s Ex. 197 (Treatment Notes from Dr. Rozmaryn), who diagnosed her with repetitive strain syndrome secondary to carpal tunnel syndrome, *id.* (February 4, 2021 note). She says Rozmaryn concluded "the hand injury is related to the work" and that "the physical stressors of her job are a significant contributing factor." *See id.* She also relies on videotaped deposition testimony—introduced at trial—from Levin, the physician who treated her cervical-spine disability. He explained that Plaintiff "suffers from a hand disorder that is different and independent from the radiculopathy associated with her neck and shoulder disorders." Pl.'s Br. on Remedies 8 (citing Levin Dep. 15:6–16:17, ECF No. 103-2).

But these diagnoses do not facially support a causal link between the Hospital removing Scott-McKinney's scribe and her developing carpal tunnel syndrome. Rozmaryn's references to "the work" and "the physical stressors of her job" suggest Plaintiff's work *in general* causes her symptoms, not that the specific 16-month period at issue is responsible. The evidence confirms as much.

The record shows Scott-McKinney's non-radiculopathic symptoms predate the Hospital's discrimination by more than a year. Rozmaryn's initial patient visit notes reveal Plaintiff "*for the past 3 years* has had steady increasing pain mostly numbness and tingling and color changes in her fingers." Def.'s Ex. 173 (Dr. Rozmaryn 8/11/2020 Patient Notes) (emphasis added); *see also* Pl.'s 197 (Dr. Rozmaryn 2/2/2021 Patient Notes) (showing Plaintiff's pain "has been present for 4 years"). And Dr. Sunjay Berdia—another treating physician—noted that Plaintiff's "discoloration and color changes and numbness" had "been going on for about one year" in *March 2019*. *See* Pl.'s Ex. 200. That these symptoms arose well before the Hospital removed her scribe undermines any causal connection between the two.

To overcome this problematic timeline, Scott-McKinney says Berdia "ruled out carpel [sic] tunnel syndrome as a diagnosis for the hand symptoms that [she] was experiencing" during her March 2019 exam. Pl.'s Br. on Remedies 5. True, Berdia offered a preliminary opinion that her non-radiculopathic symptoms were "more vascular in nature, . . . not coming from her cervical or carpal tunnel." Pl.'s Ex. 200; *see id.* (noting an impression of "[r]ight hand Reynaud's phenomenon"). But Rozmaryn later noted that diagnosis was incomplete after more testing. *See* Def.'s Ex. 173 (Dr. Rozmaryn 8/11/2020 Patient Notes) ("She has . . . had vascular studies which were really not that conclusive except she was told that she has some Reynaud's disease with color changes when she put her finders in cold water. With the vascular flow study

she has had arteriograms with Doppler. And essentially was told that this was mostly normal.").
In any case, this argument proves too much—Rozmaryn himself ruled out carpal tunnel syndrome in August 2020, more than a year after the Hospital removed Plaintiff's scribe. *See id.* ("She has no history of any night pain, which rules out carpal tunnel syndrome.").

To be sure, Scott-McKinney's symptoms worsened over time. But that deterioration, again, does not establish a causal link between the Hospital removing her scribe and her non-radiculopathic symptoms. Rozmaryn's own notes explain that "[i]n most people, [carpal tunnel] symptoms worsen over time." *See* Pl.'s Ex. 197 (Dr. Rozmaryn 2/2/2021 Patient Notes). And "many factors [ ] contribute to [that] development"—"heredity, being overweight, overuse of the hand (i.e., extensive typing), hormone changes during pregnancy, and age." *Id.* So, without more, Plaintiff has shown only a temporal *correlation* between losing her scribe and a deterioration in her condition; she has not shown *causation*.

Part of the issue here is that Scott-McKinney relies almost entirely upon enigmatic doctor's notes to prove causation. Although the Court admitted these notes over the Hospital's objections, they ultimately do not provide the proof that she needs. Indeed, as explained above, the timeline they imply defeats her case. The only actual testimony from an expert, Dr. Levin, was at best irrelevant and at worst undermined her argument.[7] This leaves her with her own

---

[7] Levin acknowledged Plaintiff is "not able to tolerate the amount of time that she was working prior" to losing her scribe, but he could not say with "medical certainty that her conditions worsened as a result of not having that scribe." Levin Dep. 72:19–73:9. Scott-McKinney says that testimony was limited to her cervical-spine issues. Perhaps. But reading Levin's testimony as limited in scope still leaves Plaintiff with a dearth of causation evidence related to her non-radiculopathic symptoms.

testimony.  It was sincere, but she is neither an expert in this area nor did her explanations alone fill the holes in the other evidence.

In sum, the evidence shows Scott-McKinney's repetitive strain injury predates the Hospital's decision to remove her scribe and arises out of her work.  While her condition appears to have worsened during the 16 months at issue, there is no medical evidence establishing a causal link between that deterioration and her working without a scribe.  So there is little basis to link the Hospital's decision to remove the scribe with her diminished earning capacity.  That means there is no basis to award front pay.[8]

### IV. INJUNCTIVE RELIEF

The last question is whether Plaintiff is entitled to injunctive relief.  She asks for two types of injunctions: (1) an order requiring the Hospital "to provide a scribe" until a valid substitute can be found, and (2) an order requiring the Hospital "to train its managers annually" on the DCHRA's requirements and "to post statutorily required notices of such laws."  Pl.'s Br. on Remedies 26–27.

"Given the substantial similarity" between Title VII and the DCHRA, courts in this circuit rely on interpretations of Title VII when reviewing claims under the DCHRA.  *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999); *cf. Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008).  In the mine run of Title VII cases, "enjoining a defendant from further acts of discrimination is a typical remedy."  *Johnson*

---

[8]  Given this, the Court need not reach Plaintiff's second premise—that her repetitive strain injury is "the catalytic factor that prevents Dr. Scott-McKinney from resuming 8 hours of direct patient care."  Pl.'s Br. on Remedies 6–7.  And the Court likewise need not address any claim for lost employer contributions to front pay.

*v. Brock*, 810 F.2d 219, 225 (D.C. Cir. 1987). This is true even where the defendant ceases the

illegal conduct. And a "request for injunctive relief will be moot only where there is no

reasonable expectation that the conduct will recur." *Bundy v. Jackson*, 641 F.2d 934, 946 n.13

(D.C. Cir. 1981).[9] But any such injunctive relief "should be narrowly tailored and should

generally apply only to the plaintiff where a class has not been certified." *Jean-Baptiste v.*

*District of Columbia*, 958 F. Supp. 2d 37, 50 (D.D.C. 2013).

The Hospital has not shown that "there is no reasonable expectation that the conduct will

recur." *Bundy*, 641 F.2d at 946 n.13. To dispel the prospect of future discrimination, it offers

Janowiak's testimony that it has "budgeted [Scott-McKinney's scribe] for the next fiscal year."

RH Tr. 158:6–7. But that is not enough—although it appears the Hospital intends to employ a

scribe for FY 2023, the Court can only speculate about its plans afterward. And as Plaintiff

notes, it appears the Hospital intends to implement a new electronic medical records (EMR)

technology in late-2022, potentially paired with a pre-existing voice dictation software (VDS).

*See* Decl. of Dr. Scott-McKinney ¶¶ 3, 9 ECF No. 96-1. Children's National had implemented

VDS as an "alternative" during the 16 months it removed her scribe, *see id.* ¶ 5, so Plaintiff's

concern that this technological changeover may lead to further discrimination is not

unreasonable.[10]

---

[9] As other courts have recognized, a different four-factor test applies to most requests for
permanent injunction. *See Jean Baptiste v. District of Columbia*, 958 F. Supp. 2d 37, 49 n.15
(D.D.C. 2013) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). But it
appears "the general practice in our Circuit [is] granting Title VII injunctions without an explicit
invocation of this test." *Id.* Neither party has suggested otherwise. The Court thus follows suit.

[10] In a late filing, Plaintiff offered invoices showing the Hospital was late in paying for her
scribe at least once. *See* Pl.'s Ex. to Praecipe, ECF No. 106-1; Def.'s Response to Praecipe, ECF
No. 107. The Court acknowledges this additional evidence but finds it does little to establish a
prospect of future discrimination.

The Hospital says issuing an injunction requiring it to provide a scribe would be a windfall because "under the DCHRA, no employee enjoys the unfettered right to a single accommodation through their anticipated retirement." Def.'s Post-Trial Br. 14, ECF No. 93. It says there are an "endless number of ways in which Plaintiff's computing responsibilities, physical limitations, and potential accommodations could change." *Id.* 15. Sure, those things might change. But Defendant has offered nothing to show they *will* change, much less any concrete details about how those changes would affect the reasonableness of using a scribe as an accommodation.

The jury reviewed ample evidence of Scott-McKinney's limitations, her work responsibilities, and the Hospital's "alternatives" to a scribe. It concluded a scribe was a reasonable accommodation and that the Hospital's failure to provide one was unlawful. The Court will not contradict that finding. *See Porter*, 414 F.3d at 21 (noting that a court's remedy must be "consistent with the jury verdict"). A scribe is a reasonable accommodation, and the Court will order that Defendant provides one for Scott-McKinney as long as she works at Children's National.

The Court will not, however, order broad company-wide injunctive relief. Scott-McKinney requests an order requiring the Hospital to "train its managers annually on disability discrimination law requirements, reasonable accommodation, and the interactive process," as well as "to post statutorily required notices of such laws." Pl.'s Br. on Remedies 26–27. But Plaintiff did not seek to certify a class and there was no evidence establishing systemic unlawful behavior toward individuals with disabilities. She offers only bare *ipsi dixit*. *See id.* at 27 ("To date, Defendant has not done so."). Without more, the Court will not order such sweeping relief.

### V. CONCLUSION

In sum, Scott-McKinney has not established the Hospital's discrimination caused her to lose out on incentive pay in fiscal years 2020 and 2021.  She has also not shown the Hospital's discrimination reduced her earning capacity going forward.  That means she is not entitled to back or front pay.  But Plaintiff has established a reasonable probability of discrimination going forward, and the Hospital has offered almost no evidence to dispel the specter of future discrimination.  For that reason Scott-McKinney is entitled to an injunction requiring the Hospital to provide her a scribe.

A separate order will issue.

2022.07.05
11:04:59 -04'00'

Dated: July 5, 2022                                    TREVOR N. McFADDEN, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**STACY SCOTT-MCKINNEY, M.D.**,

      Plaintiff,

      v.

**CHILDREN'S NATIONAL MEDICAL CENTER/CHILDREN'S NATIONAL HEALTH SYSTEM**,

      Defendant.

Case No. 1:19-cv-02980 (TNM)

---

**<u>ORDER</u>**

Upon consideration of the evidence, the relevant law, and the parties' briefing—and for the reasons stated in the accompanying Memorandum Opinion—the Court will grant in part and deny in part the Plaintiff's [106] Motion for Injunctive Relief.

Plaintiff Stacy Scott-McKinney's requests for economic damages in the form of front- and back-pay are hereby DENIED.

The request for injunctive relief is hereby GRANTED in part. Defendant Children's National Medical Center shall provide Plaintiff a scribe so long as she works at the Hospital performing substantially the same duties. The Court denies any broader, company-wide relief.

SO ORDERED.

The Clerk of Court is requested to close this case.

2022.07.05
11:07:18 -04'00'

Dated: July 5, 2022                    TREVOR N. McFADDEN, U.S.D.J.

**-545-**